K27VRAJA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              19 CR 870 (JMF)

MUSTAPHA RAJI,

        Defendant.                     ARRAIGNMENT

------------------------------x

                               New York, N.Y.
                               February 7, 2020
                               2:37 p.m.

Before:

              HON. JESSE M. FURMAN,

                        District Judge

                APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
DINA Y. McLEOD
    Assistant United States Attorney

JEREMY SCHNEIDER
    Attorney for Defendant

1           (Case called)
2           MS. McLEOD:  Good afternoon, your Honor.
3           Dina McLeod, for the government.
4           THE COURT:  Good afternoon.
5           MR. SCHNEIDER:  Good afternoon, your Honor.
6           Jeremy Schneider, for Mustapha Raji.
7           THE COURT:  Good afternoon to both of you as well.
8           Mr. Raji, my name is Jesse Furman.  I'm a United
9   States District Judge here in the Southern District of New
10  York.  I have been assigned to your case, which means that I
11  would be the judge who would preside over any trial, and will
12  be the judge -- would be the judge, in the event that you were
13  convicted of any offense, to sentence you.
14          The purpose of today's proceeding is to arraign you on
15  the indictment, that's 19 CR 870, and then we're going to talk
16  about a schedule going forward.
17          Counsel, anything to discuss before I proceed to the
18  arraignments?
19          MS. McLEOD:  No, your Honor.
20          MR. SCHNEIDER:  No, your Honor.
21          THE COURT:  All right.
22          So in that case, Mr. Raji, if you would please rise.
23          Have you seen a copy of the indictment 19 CR 870,
24  charging you with four counts, one count of money laundering,
25  one count of wire fraud --

1           THE DEFENDANT:  Yes, yes.
2           THE COURT:  All right.
3           MR. SCHNEIDER:  I'm sorry.
4           THE COURT:  All right.
5           You've seen a copy of the indictment in this case?
6           THE DEFENDANT:  Yes, I have.
7           THE COURT:  And have you read it?
8           THE DEFENDANT:  Yes.
9           THE COURT:  Have you discussed it with Mr. Schneider?
10          THE DEFENDANT:  Briefly, yes.
11          THE COURT:  All right.
12          And would you like me to read or summarize it out
13   loud, or do you waive the public reading?
14          THE DEFENDANT:  No, it's fine.
15          THE COURT:  And how do you plead at this time, guilty
16   or not guilty?
17          THE DEFENDANT:  Not guilty.
18          THE COURT:  Okay.  Thank you.  You may be seated.
19          All right.  Ms. McLeod, first I'd like you to just
20   follow up on the matter raised by letter regarding the
21   defendant's transfer here.  I'm a little troubled by how long
22   it took for him to get here.  I'm not sure it matters one way
23   or another, except that I didn't end up excluding time, there
24   was no request for me to exclude time after I denied the
25   application without prejudice.

1    It does seem problematic that the marshals would take
2 over a month to transfer somebody.  I understand that they need
3 to go through Oklahoma, other -- that there are complications
4 in logistics, but the Speedy Trial Act certainly contemplates a
5 quicker transfer than occurred in this case.  So is there a
6 problem that happened in this case?  Is this an institutional
7 thing?
8    MS. McLEOD:  There was no specific problem identified,
9 except that I think they sort of thought that he had gone a
10 little bit unlucky with the timing, in that he may have just
11 missed -- sort of, each time just missed the last flight.  So,
12 unfortunately, the information I provided to you was
13 essentially what was provided to me in that they, sort of,
14 basically run their own airline, and the flights are scheduled
15 when they're scheduled.  But I don't disagree.
16    I will say, I think I injected a bit of confusion into
17 things with the letter, because I read the statute as somewhat
18 ambiguous in these circumstances as to when the Speedy Trial
19 Act began.
20    I have since done some case law research on it, and it
21 does seem like the Speedy Trial Act begins at arraignment.  But
22 the statute wasn't, sort of, a model of clarity, and so that's
23 why I wrote the letter.  In any case, I don't think we're
24 anywhere near the time running off the clock.
25    THE COURT:  No, definitely not, and I don't want to be

1   heard to suggest that we are.  And I haven't done any research
2   myself, but 3161(h)(1)(F) says except that any time consumed in
3   excess of ten days from the date of an order of removal, I
4   certainly would have thought that that is the applicable
5   provision here.  And it suggests that in Congress's
6   contemplation, the expectation that the marshals would transfer
7   people here in far shorter time than occurred here.
8            MS. McLEOD:  I did too which is why I wrote the
9   letter.  And certainly in the communications with the marshals
10  they understood the Court's concern and the order was shared
11  with them.  Unfortunately, I don't have any other, sort of,
12  specific information other than what was shared in the letter.
13            THE COURT:  All right.  That's fine.
14            MR. SCHNEIDER:  Your Honor?
15            THE COURT:  Yes.
16            MR. SCHNEIDER:  Just for whatever it's worth, I don't
17  have a copy of that letter.  I don't know if I'm supposed to
18  get one or not.
19            THE COURT:  It was docketed, so --
20            MR. SCHNEIDER:  Okay.
21            THE COURT:  You certainly have it available to you if
22  you look on the docket.
23            MR. SCHNEIDER:  Okay.  That's fine.
24            THE COURT:  Or at least I think it was.  I'll confirm
25  that.

Case 1:19-cr-00870-JMF   Document 15   Filed 03/04/20   Page 6 of 17     6
K27VRAJA

1             MS. McLEOD:  It is on the docket.
2             THE COURT:  Yes.
3             MR. SCHNEIDER:  Okay.
4             THE COURT:  Thanks.
5         So, Ms. McLeod, can you tell me a little bit by way of
6    background about the charges in the case?
7             MS. McLEOD:  Yes, your Honor.
8         And just to give even more, sort of, background, the
9    defendant actually has a co-conspirator in this case named
10   Nancy Martino-Jean, who was previously charged and convicted in
11   the Southern District of New York.  Her name -- if I hadn't
12   already said it, her name is Nancy Martino-Jean.  That case was
13   before Judge Buchwald and has already completely run its
14   course; that defendant was sentenced.
15        I sent the Court the complaint in that case, and I
16   will send it to Mr. Schneider as well.  But that does lay out
17   in some detail at least part of the scheme, although it's
18   focused on the co-conspirator and not on Mr. Raji.
19            But so to give a little bit of --
20            THE COURT:  Can I interrupt for one second?
21            MS. McLEOD:  Yes.
22            THE COURT:  Can you give me the docket number -- the
23   district court docket number of that case?
24            MS. McLEOD:  I don't have the district court docket
25   number, your Honor, but I can email it right after.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

1    THE COURT: All right. I'm sure my deputy is going to
2 give it to me in about ten seconds. Go ahead.
3    MS. McLEOD: In essence, in July 2018, a
4 Manhattan-based hedge fund was the victim of an email
5 compromise scheme. Essentially, what happened -- and this is
6 laid out in detail in the Martino-Jean complaint -- was that
7 somehow an employee of the hedge fund had their email account
8 compromised. And likely through what we call spear phishing,
9 which is when someone sends an email which purports to be a
10 legitimate email asking someone to click on a link. They click
11 on a link.
12    In this case, I think they were taken to a fake
13 Microsoft login page. And that person entered their login
14 credentials, thus allowing the compromise. That compromise led
15 to the hedge fund sending a $1.7 million wire to a bank account
16 in Florida that was held in the name Unique Bamboo Investments.
17 That was controlled by Nancy Martino-Jean.
18    Raji is the vice president of Unique Bamboo
19 Investments, although he was not a signatory on that bank
20 account. In addition, Raji received some of those fraudulent
21 proceeds directly, and some of the proceeds somewhat
22 indirectly.
23    In addition, after Ms. Martino-Jean -- in the
24 investigation of that case, the government executed a number of
25 search warrants on various email accounts related to

1  Ms. Martino-Jean.  And we uncovered evidence from that email
2  account that indicates that Mr. Raji was involved in the
3  cover-up, essentially, of this fraudulent wire.  So it's a
4  little complicated, but it essentially -- essentially, Raji
5  forwarded the defendant various scanned documents which were
6  purported to be a loan agreement between Unique Bamboo
7  Investments, i.e., Raji and Martino-Jean's company, and the
8  victim hedge fund.  And among the scanned documents he sent
9  were a signature page for the purported loan contract loan
10 agreement which had a notarization on it, but no signatures.
11         Those emails were sent about two weeks after the
12 fraudulent wire transfer, and after, we believe, Martino-Jean
13 was aware that there was an investigation into the wire
14 transfer, based on her Google search history.  Among other
15 things, she was searching, you know, "How to delete things from
16 my hard drive," things like that.
17         That cover-up that I described, that purported loan
18 agreement, is consistent with the story that Martino-Jean told
19 to FBI agents when she was arrested in September 2019.  At that
20 post-arrest interview she told FBI agents that the $1.7 million
21 transfer was due to a loan; that it was a loan agreement
22 between Unique Bamboo Investments and the victim hedge fund.
23         So there's sort of a lot more details around it, but
24 that's sort of the basic, sort of, contours of the scheme.
25 There was a lot of money transfers that happened subsequent to

1  the initial wire transfer which resulted in the money
2  laundering conspiracy charge.  But that's essentially what the
3  scheme is.
4            If the Court has any questions, I'm happy to answer.
5            THE COURT:  First of all, for Mr. Schneider's benefit,
6  the district court docket number from the *Martino-Jean* case is
7  18 CR 853.
8            MR. SCHNEIDER:  853?
9            THE COURT:  853, yes.
10           MR. SCHNEIDER:  Thank you.
11           THE COURT:  One question, Ms. McLeod:  Is the identity
12 of the hedge fund public?  Is it not public?
13           MS. McLEOD:  I would have to look at the docket in the
14 *Martino-Jean* case and see whether it was actually -- whether
15 the name of the hedge fund was described in the sentencing
16 paperwork.  The hedge fund -- I'm describing the hedge fund as
17 the victim.  And it was, in a sense -- the true owner of the
18 funds was an individual, and that person's name is not public.
19           THE COURT:  All right.  Well, I ask because, first of
20 all, I want to ensure that anyone who would be entitled to
21 notice under the Crime Victims Rights Act has received that
22 notice.  Can you make that representation?
23           MS. McLEOD:  Yes.  Certainly they were -- I have been
24 in touch with that victim's counsel, and they should be in the
25 U.S. Attorney's Office.

1          THE COURT:  All right.

2          And second, can you file a letter, if need be under

3     seal, within, let's say, three days just identifying who the

4     victims are in this case?  I have no reason to think that I

5     would have a conflict, but I just want to make sure that

6     there's no issues on that front as well.

7          MS. McLEOD:  Yes.

8          THE COURT:  If the identities are public, then there's

9     no reason for that to be sealed; but if they are not public,

10    then obviously I think it should be filed under seal to

11    preserve their privacy.  All right?

12         MS. McLEOD:  Yes, your Honor.

13         THE COURT:  All right.

14         Turning to discovery, can you tell me what the nature

15    and status of the discovery is.

16         MS. McLEOD:  Yes.  So the discovery right now is

17    approximately 12 gigabytes.  That discovery is ready to go.

18    I'll explain a little bit what additional discovery might be

19    remaining.

20         That 12 gigabytes consists of the email search warrant

21    returns for approximately five email accounts.  It also

22    consists of a number of bank records, quite a few bank records.

23    It also consists of returns that were provided pursuant to

24    2703(d) orders, which are court orders for noncontent

25    information.  The applications for all of that legal process

would also be part of the production. I think there was a small amount of, sort of, voluntary productions as well in there.

So that is ready to go. And Mr. Schneider has given me a drive today. So we can load that up and get it to him as soon as we can load it up and mail it out.

In terms of the, sort of, additional productions that may be coming, Nancy Martino-Jean's phone was seized upon her arrest, and we obtained a search warrant for it. But we're unable to get into the phone for technical reasons until a few weeks ago. I was informed by FBI that they now have the technical ability to get into that phone, and we now have an image of it. So we are going to review that phone for responsiveness and turn over the responsive documents.

In addition, two of Mr. Raji's phones were seized upon his arrest. And so it will take a little bit of time for us to just review those responsiveness as well. Although given that those are his phones, as soon as we have the warrant, we'd be able to turn over the entirety of the images to him and send him the responsive set.

THE COURT: You don't have a warrant at present?

MS. McLEOD: We don't, your Honor.

THE COURT: Okay.

MS. McLEOD: We plan on getting it ASAP.

THE COURT: Okay. I would certainly urge you to move

1  quickly on that front.  Just to answer a question that you may
2  have now or when you do that, my general practice is to have
3  those handled by the magistrate judge on criminal duty, so you
4  should go there.
5          All right.  Any other discovery?
6          MS. McLEOD:  No, I think that's it, your Honor.
7          THE COURT:  And did Mr. Raji make any post-arrest
8  statements?
9          MS. McLEOD:  No, your Honor.
10         THE COURT:  All right.
11         So, Mr. Schneider, I guess my question, I think you
12 know, is how much time you would need to review whatever
13 discovery is coming your way and how much time would you need
14 to prepare any motions.
15         Let me say it sounds like giving the government two
16 weeks to produce whatever is currently in its possession is
17 ample time; so I'll set a deadline for discovery of two weeks
18 from today, recognizing, of course, that if the searches of the
19 defendant's phone have not yet happened, then that wouldn't
20 obviously be produced in the next two weeks, but as soon
21 thereafter as possible.
22         So with that, Mr. Schneider, how much time would you
23 like to prepare any motions?
24         MR. SCHNEIDER:  Your Honor, the concern I had is
25 not -- I'm sorry, may I remain seated?  I have back issues.

Case 1:19-cr-00870-JMF   Document 15   Filed 03/04/20   Page 13 of 17    13
K27VRAJA

1            THE COURT:  Sure.

2            MR. SCHNEIDER:  Thank you.

3            The concern I had is not when they produce it, but the
4    concern I had is how much is going to be produced, not what
5    they have now -- well, actually, that is not true.

6            You talk about -- from what I can tell from what the
7    government said, my client's alleged to have been involved in,
8    quote -- I guess the cover-up as part of that I think is what I
9    heard her say, in addition to other aspects of it.

10           So whatever is in his phone, as well as in the email
11   accounts, are critical for me to review.  I don't know how much
12   they are talking about, that's the problem I have.  I don't
13   know if they're talking about hundreds and thousands -- I just
14   don't know.  So that's why it's hard for me to say how much
15   time I need to review it and then decide what motions I have.

16           Because I know your normal practice is to set this
17   down for a motion schedule now.  I'd like you to kind of be
18   flexible and let us come back in about 60 days to see, A, if
19   the government has been able to even give me the rest of the
20   phones, which are probably very, very critical; and then B, how
21   much -- once I get a chance to see what it is, how much we're
22   talking about.

23           So I'm suggesting to come back in about 60 days so I
24   can tell you then how much I've gone through and how much more
25   I -- much more time I may need or I may not, depends on if I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K27VRAJA

1  get everything soon and I see that it's not that big a deal, I
2  can tell you then.  So I'm suggesting April 17th for a status
3  conference and then pick a date then.  I think it's -- I know
4  it's not what you like to do.
5            THE COURT:  So, Mr. Schneider, I'm not known for my
6  flexibility, but --
7            MR. SCHNEIDER:  I have faith in you though, Judge.
8            THE COURT:  All right.  But you failed to persuade me.
9            Here's what I would propose, my counteroffer:  Why
10 don't we stick with what I normally do, which is set a motion
11 deadline, but recognize that that may be flexible.  If it turns
12 out that, upon reviewing the discovery, you need additional
13 time to go over -- to go through it, then you can make an
14 application to extend it, and I will be reasonable with respect
15 to that.  But I think I would be inclined to stick with my
16 usual approach, which is to set a deadline and have you back
17 shortly after any motions would be filed.
18           So what do you think?
19           MR. SCHNEIDER:  Do I have a choice?
20           THE COURT:  No.
21           MR. SCHNEIDER:  Okay.  So I think it's a great idea.
22           THE COURT:  Awesome.  That's what I thought.
23           So given that, assuming that you have most, if not
24 everything, within two weeks -- I would also note that it is my
25 intuition that you're not going to need to review the content

1  of the emails or the content of the phones to know whether you
2  have a motion to file.  It may be necessary to review them to
3  know whether it's worth bothering, but I think if you have a
4  motion, you'll probably know it based on the actual
5  applications rather than the contents.
6          But be that as it may, you want to set a motion
7  deadline for some time in early April and later in April?
8          MR. SCHNEIDER:  I was going to suggest early May, your
9  Honor, because that will give me time -- I was actually going
10 to suggest mid May.
11         THE COURT:  All right.  I'll tell you what.  I'll give
12 you until May 8th, which is almost mid May.
13         Any opposition to a motion would be due May 22nd; and
14 any reply would be due May 29th.  If there is a motion, I
15 recognize that that's over Memorial Day.  And if we need to
16 tweak or adjust things, you can make an application as well.
17 But, again, that's the deadline for the filing of any defense
18 motions.
19         Mr. Schneider, if you go through the discovery and you
20 can't file them by that time, just let me know and we can
21 adjust it.  But certainly my hope is that that is enough time
22 for you to do whatever you need to do to file motions.
23         I will have you back shortly after any motions would
24 be filed, namely, on, let's say, Monday, May 11th, at 3:30 in
25 the afternoon.

1    MR. SCHNEIDER:  May 11th?  I'm just checking -- yes,
2    May 11th is fine, Judge, yes.
3            THE COURT:  All right.  So May 11th, 3:30.
4            If any motion has been filed, you should certainly be
5    prepared to discuss it, particularly if it's something that
6    everybody agrees would need a hearing.  We'll schedule a
7    hearing and, in any event, certainly do what we can with
8    respect to any motions.  In all likelihood I would allow them
9    to proceed with full briefing on the schedule that I set
10   before.
11           In either case, counsel, I think know my general
12   practice is to set a trial date at the second pretrial
13   conference; so at that May 11th conference you should be
14   prepared to set a trial date.  I'm happy to accommodate your
15   interests of when to have a trial within reason, but with the
16   understanding that when I set a trial date, it is a firm date
17   and everybody needs to understand that.
18           All right.  Anything else to discuss other than speedy
19   trial?
20           MR. SCHNEIDER:  No.  We're fine, Judge.  Thank you.
21           THE COURT:  All right.
22           Ms. McLeod, is there an application with respect to
23   the Speedy Trial Act?
24           MS. McLEOD:  Yes, your Honor.
25           The government would move to exclude time until May

1  11th, 2020, the next conference date, in order to allow the
2  government to complete production of discovery and allow
3  defense counsel to review that discovery, contemplate any
4  motions, and discuss a possible pretrial disposition with the
5  government.
6              THE COURT:  Any objections, Mr. Schneider?
7              MR. SCHNEIDER:  No, your Honor.
8              THE COURT:  All right.
9              I will exclude time under the Speedy Trial Act between
10 today and May 11th, 2020.  I find that the ends of justice
11 served by excluding that time outweigh the interests of the
12 defendant and the public in a speedy trial, to allow the
13 government to produce the discovery, but, more importantly, to
14 allow defendant and his counsel an opportunity to review that
15 discovery, consider what, if any, motions to bring, and to
16 prepare those motions.
17             Anything else, Ms. McLeod?
18             MS. McLEOD:  No, your Honor.
19             THE COURT:  Mr. Schneider?
20             MR. SCHNEIDER:  No, your Honor.  Thank you.
21             THE COURT:  All right.  Have a pleasant weekend.
22             We are adjourned.  Thank you.
23                            *   *   *