

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, NY 10007*

May 20, 2020

**By Email, with Redacted Copy to Follow on ECF**
The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    **United States v. Mustapha Raji,**
              19 Cr. 870 (JMF)

Dear Judge Furman:

    The Government respectfully submits this letter, as directed by the Court, in response to defendant Mustapha Raji's letter requesting that the defendant be released from custody (*see* Dkt. No. 20) ("Bail App."). The Government does not believe that the conditions that defense counsel proposes sufficiently mitigate the serious and substantial risk that the defendant—who lacks any substantial ties to the United States, and most certainly will face inevitable deportation upon his conviction—would flee upon his release. Because the conditions that the defendant presently proposes to the Court do not suffice to reasonably assure that Raji will appear as required, the defendant's request for release should be denied. *See* 18 U.S.C. § 3142.

## BACKGROUND

    In July 2018, a Manhattan-based hedge fund was the victim of an email compromise scheme, which led to an unauthorized takeover of an email account and its use to fraudulently send a $1.7 million wire from the victim hedge fund. That wire was sent to a bank account in the name of "Unique Bamboo Investments," a company Mustapha Raji ran with his co-conspirator, Nancy Martino-Jean. Shortly thereafter, Raji and Martino-Jean worked together to disburse the stolen funds from the "Unique Bamboo Investments" account into various other accounts. These transfers included a $50,000 wire to an account owned by Raji, as well as a $25,000 wire sent to a co-conspirator, $10,000 of which was further disbursed to a Canadian company controlled by Raji's brother. The Government anticipates that testimony at trial will establish that Raji had provided the Unique Bamboo bank account to co-conspirators, so that the funds stolen from the victim hedge fund could be deposited therein.

    In August 14, 2018, Martino-Jean received an email from the bank indicating that it was seeking the return of the $1.7 million on the grounds that it was a fraudulent payment. Raji and

Hon. Jesse M. Furman
May 20, 2020
Page 2

Martino-Jean then worked to develop a cover story to justify the $1.7 million transfer. Raji forwarded to Martino-Jean documents which purported to be a loan agreement between Unique Bamboo Investments and the victim hedge fund. The signature page bore a notarization stamp, but no signatures. In light of evidence that has been gathered since his arrest, the Government anticipates that the evidence at trial will establish that this notarization stamp was fraudulently used by Raji to doctor a false set of loan documents to justify the transfer of stolen funds.

      A grand jury in this District returned a four-count Indictment against Raji, charging him with (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; (3) receipt of stolen funds, in violation of 18 U.S.C. § 2315; and (4) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Raji was arrested on December 20, 2019 in the Southern District of Florida.[1]

      On January 7, 2020, Magistrate Judge Lurana S. Snow of the Southern District of Florida held a bail hearing. The court found that "no condition or combination of conditions will reasonably assure the appearance of [Raji] as required" because Raji "presents a serious risk of flight if released prior to trial," and ordered him detained. *See* Detention Order, No. 19-mj-06620-AOV (Dkt. No. 9) (S.D.F.L. Jan. 12, 2020) (Exh. A). In reaching this conclusion, the court concluded the following facts, relevant to its assessment under 18 U.S.C. § 3142(g), "were supported by clear and convincing evidence." *Id.* at 2. First, the court found that "[t]he weight of the evidence against the Defendant is substantial," relying on much of the information the Government proffers above. *Id.* The court further found that Raji is "a national of Ghana" and is "unlawfully present in the United States," after having used a Canadian passport to enter on a tourist visa which has since expired. *Id.* The court also found that Raji "claims self-employment at a company called Emergent Development Corporation, earning approximately $80,000 a year, but he has no assets or liabilities," and that Raji "suffers from hypertension and a heart condition, for which he takes medication." *Id.* The court concluded that, although Raji "has no criminal record, [he] has minimal ties to this community and strong ties to Ghana and Canada" and thus "[h]e has no incentive to appear for trial" and "must be deemed a risk of flight." *Id.* at 2.

## ARGUMENT

**I.    Applicable Law**

      If a court has already made a determination that a pre-trial defendant should be detained, the law permits a detention hearing to be reopened at any time before trial "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably

---

[1] Martino-Jean was arrested by Complaint in September 2018, in light of the fact that law enforcement had learned that she had made arrangements to leave the United States and travel to native Haiti.

Hon. Jesse M. Furman
May 20, 2020
Page 3

assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).

Under 18 U.S.C. § 3142(i), the Court has the legal authority to grant relief from an order of detention entered under 18 U.S.C. § 3142(e). Section 3142(i) permits the temporary pretrial release of a defendant otherwise requiring detention into the custody of a U.S. marshal or other "appropriate" person where "the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). In considering whether there is a "compelling reason" for a defendant's release under this provision, a court must "balance the reasons advanced for such release against the risks that were previously identified and resulted in the order of detention. In turn, whether temporary release under § 3142(i) is proper requires an individualized analysis of the facts of each case." *United States v. Gonzalez*, No. 19 Cr. 906 (JMF), 2020 WL 1911209, at *1 (S.D.N.Y. Apr. 20, 2020).

## II.     Discussion

Raji's request—which makes no reference to the previous detention order that was entered in the Southern District of Florida—does not identify the specific statute or subsection under which he seeks release. As a practical matter, however, the arguments Raji makes about the existence of COVID-19 and the consequent conditions at the MCC cannot be seen as sufficient to meet the standard under 18 U.S.C. § 3142(f), because "[t]he information to which he points (that is, conditions within the MCC) does not address the flight risk" that was the reason for his original detention order. *See United States v. Vizcaino*, No. 20 Cr. 241 (RMB), 2020 WL 1862631, at *1 (S.D.N.Y. Apr. 14, 2020).

Although the Court may conclude that the COVID-19 pandemic, when coupled with a defendant's medical condition, constitute a "compelling reason" to warrant temporary pretrial release under 18 U.S.C. § 3142(i), the conditions that Raji proposes do little to assuage the real and serious risk of flight that resulted in his order of detention in the first place. Moreover, medical records from the MCC, as well are representations the BOP has made regarding Raji's health issues, suggest that the sum of his medical conditions may not be as severe as he suggests, and are being adequately addressed within the confines of the MCC.

### A.     Raji's Proposed Bail Package Does Not Mitigate His Serious Risk of Flight

Raji has presented no new material information regarding his flight risk. The fact remains that the case against Raji is strong, consisting of documentary and testimonial evidence that establish Raji's planning of the offense and the provision of the business account for the company he shared with his charged co-conspirator, his receipt of the proceeds of the fraud into that account, his further personal receipt of $50,000 into his own account, and his creation and possession of fraudulent documents designed to cover up the fraud once it had been detected. Raji has no valid immigration status in the country, and has an ICE detainer presently lodged against him. A conviction on any of the felony charges would likely lead not only to

incarceration,[2] but also to deportation proceedings against Raji, permanently barring him from reentering the country. In addition, Raji has no strong ties to the United States, let alone this District. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ In addition, his main source of income prior to his arrest was not an established business tied to Florida, but rather self-employment through his own consultancy firm, Emergent Development.[3] Although he reported his annual income as $80,000, he also disclosed he had no assets. He now suggests that he will be able to live alone at the same address, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ as well as pay for medical expenses and visits relating to his conditions.[4] Whatever assets he may have access to—including the $50,000 that he stole and received personally as proceeds of this crime, which the Government has not recovered—are assets that he could use to flee this country.[5]

In light of these concerns, the proposed $100,000 personal recognizance bond with no collateral, co-signed by two individuals[6] who have yet to be determined to be solvent for that amount, is insufficient to mitigate against the real and substantial risk of Raji's flight in this case, especially due to his lack of family ties to this country, and his strong ties to Canada and Ghana. *See, e.g., United States v. Zhang*, No. 17 Cr. 560 (JMF) (Chinese national charged with hacking and intellectual property crimes released on $100,000 personal recognizance bond, secured by one financial responsible person and $10,000 cash, with family ties to United States, fled country to China after obtaining new passport); *United States v. Marlon Sisnero-Gil*, No. 15 Cr. 605 (RJS) (defendant released on $100,000 bond with two sisters as co-signers and strict pretrial supervision failed to appear for trial after procuring fake passport and fleeing to the Dominican Republic). This risk of flight persists even if the defendant's conditions of release include home detention. *See, e.g., United States v. Rufai*, No. 18 Cr. 201 (DLC) (defendant in wire fraud case

---

[2] The Government represents that a conservative estimate of Raji's Guidelines range under U.S.S.G. § 2B1.1(a)(1), (b)(1)(I), and (b)(10) to be 57-71 months in prison after trial, or 41-51 months' assuming acceptance of responsibility.

[3] Of note, Raji used his Emergent Development email account to communicate with his co-conspirators in furtherance of the charged fraud.

[4] The Government, in considering the defendant's proposal, inquired as to how the defendant intended to maintain employment and his place of residence; defense counsel declined to provide additional information.

[5] Raji suggests that, because he did not flee after his co-conspirator Martino-Jean was arrested, he is not a flight risk. But Martino-Jean's conviction was a fact existed at the time of his bail hearing in January 2020. Moreover, if a defendant decides to risk staying in the United States after his criminal conduct was detected and being investigated, that does not necessarily mean he will stay once he is arrested and formally charged. *See, e.g., United States v. Zhang*, No. 17 Cr. 560 (JMF) (defendant remained in United States after his theft was detected by employer and his conduct referred to federal regulators, was subsequently arrested, and fled after discovery).

[6] Defense counsel previously proposed three co-signers for the bond at issue when requesting consent from the Government.

Hon. Jesse M. Furman
May 20, 2020
Page 5

involving business email compromise and romance scams released on $150,000 personal recognizance bond secured by two financially responsible people and home detention with electronic monitoring cut bracelet and fled to Canada prior to sentencing, after which he was able to obtain fake passport and fly to Ghana); *United States v. Ramon Felix-Leonardo*, No. 17 Cr. 636 (KPF) (defendant released on $100,000 bond with two co-signers including sister and home detention with electronic monitoring at home shared with sister failed to appear for trial and fled to the Dominican Republic); *United States v. Calderron-Cebbalos*, No. 17 Cr. 409 (KPF) (defendant on $100,000 bond secured by one co-signer cut electronic monitoring bracelet and attempted to flee to Canada prior to surrender date). Indeed, if anything, to the extent that Raji fears risk to his health due to incarceration, those fears only tip the scales to further his incentive to flee, for his conviction may lead not only to incarceration for his crime but also during deportation proceedings.

  **B. Raji's Medical Conditions are Not as Severe as Described and are Being Adequately Cared for at the MCC**

  The crux of Raji's argument for his release is that "Raji suffers from several preexisting medical conditions, including a history of congestive heart failure, high blood pressure, and kidney disease," which put him at risk for complications from COVID-19 (Bail App. at 1).[7] It is true that Raji has certain health issues, including heart and kidney problems. But the BOP has represented to the Government that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

  With regard to Raji's "congestive heart failure," BOP's medical staff has represented to the Government ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[7] Raji also notes that he has sleep apnea, obesity, and has suffered a brain aneurism in the past. (Bail App. at 3; *see also* ██████████████████████████████████████████████████████████████████████████ None of these conditions, however, place him in the high risk category for COVID-19. *Cf.* CDC Higher Risk Guidance (noting people with "severe obesity (body mass index [BMI] of 40 or higher").

Hon. Jesse M. Furman
May 20, 2020
Page 6



      Raji complains of the medical care that he has received since arriving at the MCC. Specifically, Raji asserts that "he has not been evaluated by a doctor since arriving at the MCC on February 5, 2020," and that he has made a variety of requests for treatment that have been ignored. (Bail App. at 4). However, the BOP records establish his conditions have been monitored by doctors since his arrival at the MCC.

---

[8] Although Raji states that he has made multiple written requests for treatment that have been ignored since arriving at the MCC (Bail App. at 4), his BOP medical records appear to contain only contain one such email, requesting dental adhesives on Feb. 10, 2020. (*See* Ex. B at 92).

Hon. Jesse M. Furman
May 20, 2020
Page 7

### C. The MCC Has Implemented Measures to Combat the Spread of COVID-19

The MCC has in place reasonable and appropriate policies and procedures to protect inmates and staff from infectious disease, and these protocols have been updated many times over the past few months in order to deal with the COVID-19 epidemic. The following is a summary of those policies in place as of May 1, 2020 with regard to inmate management to prevent transmission, quarantine/isolation, and testing for COVID-19; personal protective equipment; and hygiene and cleaning.[9]

**Inmate Management and Testing:** The MCC has been following BOP policies regarding inmate management, quarantining, and isolation regarding potential COVID-19 infection. *See generally* BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp. All inmates who test positive or are suspected of being infected as determined by medical staff are placed in a separate isolation ward. This is not the Special Housing Unit used to house certain high-security detainees; rather, it is an ordinary housing unit with 1-2 inmates per cell that has been set aside for this purpose (medically isolated inmates are put in single cells unless there is a space issue). In addition to confirmed or suspected infected inmates, all newly admitted inmates and all inmates who have left the MCC and returned are quarantined in this separate unit for 14 days and their symptoms monitored before they can be placed in the general population. As of May 1, 2020, there were no MCC inmates being medically isolated and 16 inmates being quarantined because they were new arrivals or returnees.

From the beginning of the epidemic until May 1, there were a total of 33 inmates who have been isolated for confirmed or suspected COVID-19 infection.[10] Inmates who need care that cannot be provided at the MCC can be sent to outside hospitals. Five inmates have been sent out for potential coronavirus issues, including for testing. When inmates develop symptoms consistent with COVID-19 infection, they will be tested and placed in isolation. If the inmate has respiratory complaints, a chest X-ray will be taken, and if the inmate has pneumonia, antibiotics will be administered. Members of his housing unit will be placed under quarantine, as explained below. If the inmate's test comes back negative, it is repeated after 24 hours due to the test's high rate of false-negative results (approximately 15%). If both tests came back negative, the inmate will be removed from isolation and the quarantine lifted from his unit.

In order to avoid the spread of infectious disease among the inmate population, measures have been instituted to separate MCC inmates into cohorts and implement quarantines as needed.

---

[9] This description is drawn from the Government's May 1, 2020 letter in pending civil litigation involving the MCC. *See Fernandez-Rodriguez et al. v. Licon-Vitale*, No. 20 Civ. 3315 (ER) (Dkt. No. 23) (S.D.N.Y. May 1, 2020).

[10] The first MCC inmate was isolated for suspected coronavirus infection on March 23. He tested negative at a hospital the following day. Several more inmates were isolated in the following days, a few of whom tested positive for infection.

Hon. Jesse M. Furman
May 20, 2020
Page 8

For most of the inmates, who are in cells holding 1-2 inmates each, their cohort group is no more than 10 inmates. Other inmates reside in dormitory-style rooms holding up to 26 inmates each, which makes up their cohort. When an inmate within a cohort has proven or suspected coronavirus and is placed in isolation, as discussed above, his entire tier or unit (larger groups than a cohort) is placed into quarantine. Under quarantine, inmates stay in their cells except to shower a few times per week, one-by-one. All inmates in each unit subject to quarantine are given daily temperature checks and symptom screening (following the CDC's updated COVID-19 symptom list) by MCC medical staff. Non-quarantined units are given such checks weekly. Any inmate with a fever or other symptoms is sent to the medical unit for evaluation and possible referral to isolation for potential infection. In the isolation unit, temperature and symptom checks are done twice per day.  There have been no ongoing quarantines at MCC for the last few weeks; the last one was lifted the last week of April when an inmate who was suspected of having COVID-19 and was isolated subsequently tested negative. The other units' quarantines were imposed beginning in late March as potential infections were identified, and have been lifted gradually thereafter as no new suspected cases have been seen within each unit.

When not under quarantine, cohorts are given daily access to common spaces separately from other cohorts, when they can shower, use the telephone, and use the computer. Inmates and staff are instructed to practice social distancing as much as possible. All meals are served in the inmates' cells.[11]

Although initially MCC did not have any COVID-19 test kits in-house and had to send inmates to an outside hospital for testing, in recent weeks the facility has been able to procure tests.  As of May 1, MCC had 17 test kits on hand, and had ordered 10 more; its vendors limit the number of test kits it can order at once to ten, given the limited available supply. In the opinion of MCC's medical director, the facility has sufficient tests available, given that there no inmates currently being isolated for potential infection. The CDC does not currently recommend testing asymptomatic individuals, and so no such testing is being performed.  Whenever a staff member tests positive for coronavirus, contact tracing is done to evaluate any other staff members—and now that inmate units are no longer under quarantine and subject to daily checks, inmates—who may have been in close contact with the staff member for potential symptoms.

**Personal Protective Equipment**:  Previously, inmates had been given one surgical mask per week. MCC has ordered washable cloth masks, which were to be distributed to inmates and staff on May 2, 2020. Each inmate should have received two cloth masks, and have been instructed and reminded to wear masks at all times, unless otherwise directed by prison staff. Staff members assigned to the isolation unit are given new N-95 masks daily, as well as goggles, gloves, shoe coverings, and full-body suits, which they are required to use whenever they come into contact with inmates who have confirmed or suspected COVID-19 infection. There are separate trash receptacles for these items. Staff assigned to other areas are given one N-95 mask

---

[11] In the isolation unit, inmates are let out of their cells three times per week, one at a time, to shower or use the phone and computer.

Hon. Jesse M. Furman
May 20, 2020
Page 9

each week, and until cloth masks are distributed to them tomorrow, have been given one new surgical mask each day. Staff are required to wear masks whenever they are around other staff members or inmates. Instructions on how to wear cloth masks properly will be posted throughout MCC, as will signs reminding inmates and staff that wearing masks is mandatory.

**Hygiene and Cleaning:** Each inmate is provided one bar of soap and one roll of bathroom tissue per week. Additional soap and tissue is available upon request from staff, free of charge. In addition, certain hygiene products (including other types of soap) are available for inmate purchase from the MCC commissary. Each cohort includes an inmate designated as an orderly, whose responsibilities include cleaning the common spaces. The orderlies are provided with heavy-duty gloves (in addition to their masks) and units are regularly replenished with disinfectant cleaner and cleaning cloths. Orderlies are instructed to clean all high-touch areas (such as telephones, computer keyboards, stair rails) before each 10-inmate cohort's common-space access time, to avoid cross-contamination between cohorts. Moreover, MCC is posting instructions to sanitize phones and computers before and after each use with the available disinfectant spray, and is looking into procuring dispensers for other types of cleaning supplies at each unit's telephone and computer stations. At the end of each day, after all the inmates return to their cells, the orderlies thoroughly clean their housing units. Non-orderly inmates are provided cleaner and cloths to clean their cells and rooms upon request. Starting this past month, each unit has its own washer and dryer for inmate use. The MCC also has an outside cleaning company that cleans the staff-only areas of the facility, on the first floor.

These and other steps belie any suggestion that the BOP and the MCC is failing to address meaningfully the risk posed by COVID-19 to inmates. To the contrary, these measures show that the BOP has taken the threat seriously, has instituted extraordinarily protective measures to ensure that its inmate population's risk from COVID-19 is minimized, and continues to update policies and procedures in accord with the facts and recommendations. As Chief Judge McMahon has described with regard to the MCC:

> The COVID virus, of course, presents new and complex challenges for protecting inmates' health, but it is not clear that the defendant is actually at any greater risk of contracting the virus inside the MCC than outside the MCC. Reports this Court has received—in its capacity as the Chief Judge for this district—from the Warden of the MCC indicate that the BOP has been successful at limiting the spread of the virus within the MCC. That result is possibly explained by the fact that, despite the close proximity of inmates, the BOP is able to impose restrictions on visitors and restrictions on internal movements that are more difficult to impose outside prison walls. There is no reason to believe at this juncture that Wright would be at any less of a risk from contracting COVID-19 if he were to be released.

*United States v. Wright*, No. 17 Cr. 695 (CM), 2020 WL 1922371, at *3 (S.D.N.Y. Apr. 20, 2020) (denying compassionate release claim of defendant who suffered from diabetes).

### D. Raji Has Not Established That He Will Be At Less Risk If He Is Released.

Finally, it is not apparent that Raji's medical conditions will be better addressed if he were to leave the MCC and return to Orlando. Although Raji claims that he would be able to procure medications and be regularly evaluated by his doctors, he provides no explanation as to how he will be able to have access to such care. His prior representations to pretrial services suggest he has no assets; it is thus an open question how he has been able to pay for his apartment by himself for the past five months while incarcerated and presumably unable to earn income from his consultancy. Moreover, he provides no information about how he would be gainfully employed or otherwise be able to pay for either his insurance premiums or out of pocket care for his "regularly recalibration" of his medicine and treatment upon his release. (*See* Bail. App. at 7). Nor does he make any representations as to whether his physicians would be regularly seeing him in-person for the adjustment of care if he were to be released, or how he would travel to or from such appointments. By contrast, the medical records from the BOP suggest he is being adequately cared for within the MCC, where he would have "immediate access to medical care in emergency situations." (*Contra id.*).

The unanswered questions of how Raji intends to support himself and pay for his home and his medical care are important ones the Court must consider in determining whether temporary release is warranted in this case. To the extent Raji has such assets available to him (contrary to what he represented to pretrial services), it suggests he also has assets to assist him in flight. If, on the other hand, he has no assets available to him, and no means to support himself, it would make any release for medical purposes futile, as there would be no reason to believe Raji's medical condition would be improved, or his risk from contracting COVID-19 be minimized, upon his release.

### CONCLUSION

Because the Government believes Raji remains a severe risk of flight, the Government respectfully requests that the Court deny the terms of release that he proposes.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____/s/_____
Dina McLeod / Eun Young Choi
Assistant United States Attorneys
Southern District of New York
(212) 637-1030/2187

cc: Defense Counsel (by email and ECF)