K5QPRAJC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                        19 CR 870 (JMF)
                                           Telephone Conference
5   MUSTAPHA RAJI,

6                Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           May 26, 2020
9                                          2:04 p.m.

10  Before:

11                   HON. JESSE M. FURMAN,

12                                         District Judge

13
                     APPEARANCES VIA TELEPHONE
14
    GEOFFREY S. BERMAN,
15       United States Attorney for the
         Southern District of New York
16  EUN YOUNG CHOI
         Assistant United States Attorney
17
    ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
18       Attorneys for Defendant
    BY:  JEREMY SCHNEIDER
19       RACHEL PERILLO

20

21  ALSO PRESENT:  FRANCESCA PIPERATO, Pretrial Services

22

23

24

25

K5QPRAJC

1          (The Court and all parties appearing telephonically)

2          THE COURT:  Good afternoon.  This is Judge Furman.

3    Let me confirm that the court reporter is on the line.  Rose,

4    are you there?

5          THE REPORTER:  Yes, your Honor.  I'm here.

6          THE COURT:  Good.  Good afternoon to you.

7          And for the government, if someone could state

8    appearances?

9          MS. CHOI:  Good afternoon, your Honor.  This is

10   EunYoung Choi for the government.

11         THE COURT:  Good afternoon, Ms. Choi.

12         And for the defendant?

13         MR. SCHNEIDER:  Afternoon, your Honor.  Jeremy

14   Schneider and Rachel Perillo for Mr. Raji.  Good afternoon to

15   you, your Honor.

16         THE COURT:  Good afternoon to you as well.

17         Let me run through a few preliminaries.  I hope that

18   everyone is safe and well.  First of all, just a reminder to

19   state your name before you say anything, just to confirm that

20   we know who is saying what.

21         No. 2, when you're not speaking, please place yourself

22   on mute so that there's no background noise, but remember to

23   unmute yourself if you want to say something.

24         Third, if there's a chime during the call, that means

25   that somebody has called in or dropped out, and I will pause to

K5QPRAJC

figure out what's going on.  I should also warn you that one or

two times I've been disconnected from telephone conferences.

If that happens, then stay put and I will make my way back to

you.

          I should also remind you that this is a public

proceeding, as it would be if it were being held in the

courtroom; so someone could well be listening in from the

public.  Just keep that in mind, and with that, I think we can

proceed.

          I'm also told by my deputy that pretrial services is

on the line.  I don't know if the officer wants to state his or

her appearance.

          MS. PIPERATO:  Good afternoon, your Honor.  Francesca

Piperato from Pretrial Services.

          THE COURT:  Good afternoon.  Could you just spell your

last name?

          MS. PIPERATO:  Yes.  P -- as in Peter -- i-p -- as in

Peter-- e-r-a-t -- as in Tom -- o.

          THE COURT:  Good afternoon to you.  I hope you're safe

and well.

          MS. PIPERATO:  Thank you.

          THE COURT:  Mr. Schneider, let me confirm with you

that we have the defendant's consent to proceed by telephone

and in his absence, given the circumstances that we are dealing

with in the wider world?

K5QPRAJC

1          MR. SCHNEIDER:  Good afternoon, your Honor.  Again,

2     yes, this is Jeremy Schneider speaking.  I have spoken to

3     directly to Mr. Raji, as well as Ms. Perillo speaking to him.

4     He has been informed of his right to be present at all

5     proceedings and as well to be present for this particular

6     application.  He has knowingly, intelligently and voluntarily

7     waived his presence for this proceeding.

8          THE COURT:  All right.  Thank you.

9          And does everybody agree, under the CARES Act, I do

10    have authority to conduct this proceeding by telephone, if

11    video is not, quote unquote, reasonably available, given the

12    circumstances and the limited options for dealing with these

13    things by telephone?  I'm prepared to make a finding that it's

14    not reasonably available, and we can proceed by telephone.  Is

15    that good with the government?

16         MS. CHOI:  Yes, your Honor.

17         THE COURT:  Mr. Schneider?

18         MR. SCHNEIDER:  Yes, your Honor.

19         THE COURT:  All right.  With that, then let's proceed.

20         At the outset, Mr. Schneider, let me just confirm what

21    the procedural basis is for your application, since I'm not

22    sure it was spelled out in your motion.  As the government

23    noted, I think there are two plausible bases:  One is a motion

24    pursuant to 3142(f), to reopen the bail hearing, which requires

25    a showing of changed circumstances that would have a material

K5QPRAJC

bearing on the issues under 3142; and the second is under

3142(i), that allows for temporary release for compelling

reasons.

          Can you just clarify which of those grounds you're

seeking bail on or both?

          MR. SCHNEIDER:  I'm glad you added the last thing.  It

is on both grounds, your Honor.  I do believe that there are

compelling reasons, as well as changed circumstances which

would allow you to make decisions on Mr. Raji's bail.

          THE COURT:  All right.  So then let's take them one at

a time.  First, start with 3142(f).  Can you just tell me what

the changed circumstances are?

          I certainly recognize that the pandemic is a changed

circumstance, but under that provision, if I'm not mistaken, it

requires a showing that the change has a material bearing on

essentially the risk of flight or the danger to the community.

And how is that the case here?

          MR. SCHNEIDER:  Okay.  Actually, I was going to do the

changed circumstances at the end.  I just need to reshuffle my

papers; so give me one second, your Honor.

          Okay.  I think it's clear that the main change to

circumstance is the Covid pandemic and given the fact that --

and it's our position that MCC is not equipped -- whether it's

unwilling or unable, that doesn't matter -- to deal with

Mr. Raji's medical condition because of this pandemic.  I think

K5QPRAJC

1    that's significant.

2           And I just think one of the interesting parts is that

3    when Mr. Raji was in Florida, before he was brought here to

4    this district, he had seen the doctor every three days in Miami

5    for two weeks.  In fact, yet, he has not seen a particular

6    actual doctor in MCC.  So you have the Covid pandemic, No. 1.

7           No. 2, you have Mr. Raji's possible deteriorating

8    medical condition because of MCC's inability to deal with his

9    present condition.  I also believe that at the time of the

10   initial bail hearing -- by the way, in our letter we said this

11   is our first request for bail.  It turns out that we were

12   wrong.  I meant to say it was our first request in this

13   district.

14          We have learned that, in fact, there was a detention

15   hearing -- and I use that word, that phrase in quotes -- in

16   Florida before the judge there.  And we have reviewed the

17   judge's decision, the detention decision in that detention

18   order in that matter.  But what's different is that at the time

19   being there were no medical records.

20          I just heard a bleep.  Should I stop?

21          THE COURT:  No, I think you're good.  Go ahead.

22          MR. SCHNEIDER:  Okay, I'm sorry.

23          At the time of the hearing, there were no medical

24   records available to the judge.  There was no information about

25   the co-defendant's arrest, which we cited to in our letter,

K5QPRAJC

1    indicating that she had been arrested in, I think it was,

2    September of 2018, and our client knew about it.  And,

3    therefore, would have known that he could have fled if he was

4    going to flee there.

5           Really, also, there was also no substantial bail

6    package presented at the time because it was one of those

7    initial presentments.  They really didn't have much information

8    at the time.  The CJA attorneys representing Mr. Raji didn't

9    really have a chance.  I'm not blaming anybody, but just given

10   the circumstances, he didn't really have much time to speak to

11   people, to get a package.

12          We have presented a package of two responsible

13   individuals who are financially responsible and who are both

14   working.  So we have that.  And also, we're suggesting home

15   incarceration with electronic monitoring.

16          So I think those factors all together -- just for the

17   government to rely on the initial application and the judge's

18   detention order, I think is not really evaluating the entire

19   case, given that now that we're in MCC, now that we have the

20   Covid pandemic, now that we have more specific information

21   about Mr. Raji's medical condition and how he has been treated

22   at MCC, I think those are very compelling factors which, in my

23   view, overcome any risk of flight.

24          I don't think danger to the community was ever at

25   issue, but if it is, I can address that as well.  But I just

K5QPRAJC

1    don't think it was or is.  But I think the changed

2    circumstances, in my view, are what I just indicated to the

3    Court.

4              THE COURT:  All right.  Let me ask you about some

5    things that you raised; first are his medical conditions, and

6    second, his alleged lack of seeing a doctor, et cetera.

7              No. 1, both seem to be belied a little bit by the

8    medical records and the evidence submitted by the government

9    which suggests, No. 1, that his conditions aren't perhaps as

10   severe or even as they are described in your letter, in

11   particular, the congestive heart failure possibility.

12             No. 2, suggest that he is being monitored and

13   addressed, his medical circumstances are being addressed.  For

14   instance, you know, that he is getting his pills and that those

15   claims are not borne out by the record.

16             And then, third, to the extent that that isn't the

17   case, wouldn't the first remedy or step be for me to enter some

18   sort of order directing that he be provided with whatever

19   medical care he should be provided, which certainly happens, as

20   you know, in the normal course.  And it may be it's true that

21   they can't provide for him under the current circumstances,

22   given the pandemic, but it seems like that would be the sort of

23   right first move if he's not getting the care that he needs at

24   present.

25             So can you address those things?

K5QPRAJC

1          MR. SCHNEIDER:  Certainly, your Honor.  Okay.  It's

2    funny because, at first blush, when you read the government's

3    letter and look at the few citations that she -- I'm sorry, not

4    "she," but that the government refers to certain, I want to

5    say, inconsistencies in the medical records.  If you look a

6    little bit closer, it's not really as clear as the government

7    makes it sound.

8          And let me, if I may, just cite to your Honor what I

9    believe his condition is and then what I think the medical

10   records show that the government puts forth to the Court, to

11   the Judge, your Honor.

12         No. 1, the phrase "congestive heart failure," the

13   government's position is that it may be, may be, it's the BOP's

14   belief, that that may be self-reporting.  I can't imagine

15   somebody walking into a doctor's office or walking into a

16   hospital and say:  Hi, Doctor, my name is Mustapha Raji, and I

17   have congestive heart failure.  It seems to me that that

18   doesn't make sense, but let's move past that, if you want.

19         You do have something that the government agrees is

20   non-ischemic cardiomyopathy.  He was hospitalized for that in

21   December 2017.  He has heart failure, systolic failure, acute

22   exacerbation of systolic heart failure.  He was hospitalized

23   for that in August of 2019.

24         And how about the fact that when he was arrested in

25   December of -- on this case, December 20th, I believe, and he

K5QPRAJC

1    was brought in to custody in Miami, whether it's Broward or

2    Miami, he was in the ICU for four days.  He was in the

3    infirmary for one month.  He also had a scheduled test in

4    January of this year, but he couldn't make it because he was in

5    jail, for a possible stent and a pacemaker.

6         So it seems to me that the government is saying, yes,

7    he has heart issues, but you know what, it's not serious

8    enough.  It seems like, based on the records, they are serious.

9         He also has essential hypertension, which is I think a

10   fancy way of saying high blood pressure, but he had dangerously

11   high blood pressure and that's why he was in the ICU when he

12   was in custody down in Florida.

13        He is also obese.  Again, the government says, yes,

14   he's overweight but not overweight enough.  I also think the

15   government kind of ignores his kidney disease.  He has Stage

16   III chronic kidney disease.  The government again says, oh,

17   yes, he has kidney disease --

18        THE COURT:  Hold on.  Did somebody just join this

19   conference?

20        Let me just make sure that everyone is still present.

21   First of all, is the court reporter still here?

22        THE REPORTER:  Yes, your Honor.  I'm still here.

23        THE COURT:  All right.  Ms. Choi, are you still on?

24        MS. CHOI:  Yes, your Honor.

25        THE COURT:  All right.  And, Mr. Schneider, you're on;

K5QPRAJC

so I guess we can continue.  Go ahead.  Okay.  The government

says, yes, he has kidney disease, but he's not on dialysis;

therefore, it's not serious enough.  Well, I think in our

letter we indicated that research shows that Covid can cause

kidney disease.  So clearly, if it can cause kidney disease,

you would think it makes sense that it could clearly exacerbate

it if you already have Stage III chronic kidney disease.

It appears to me like the government is asking your

Honor to say that the only time that we should take these

medical conditions into consideration, and they're only serious

enough, is if you would have an outright heart attack or if he

had kidney failure.  So it just seems to me -- like, on the one

hand, they're acknowledging that he has these diseases or

conditions, and on the other hand, saying it's not really that

bad.

So let's take a look at the records that the

government submitted.  It seems like when you first read the

government's letter, that he has been seen by a doctor or

doctors a number of times and has received treatment.  He has

never once seen an actual, physical doctor when he was in MCC.

He did see a doctor in Miami.  He did see a doctor every few

days in Miami, but not in the MCC.  The government was very

clear.  They said he'd been monitored by doctors.  Okay; so

that's No. 1.

No. 2, he did see some of the medical staff, not a

K5QPRAJC

1    doctor, and I don't even believe a nurse, the day he entered on

2    February 4th, 2020.  That was a quick evaluation and his blood

3    pressure was taken on that date.  The date after he arrived, on

4    February 5th -- by the way, this is -- I think it's at page 6

5    not of the letter but of the BOP medical records.

6            And the government didn't refer to this February 5th

7    notation, but it's a notation that says:  Need to follow up

8    with cardiac clinic.  Guess what?  That has not happened,

9    whether, if ever, in New York.

10           February 12th there is a notation that says:  Patient

11   was enrolled in cardiac clinic prior to arrival and needs to be

12   enrolled in HTN clinic.  Guess what?  That has not happened.

13           It also says:  Blood tests needed.  Scheduled for

14   March 11th.  March 11th has come and gone.  He has not had a

15   blood test.

16           On April 2nd of 2020 -- yes.  I'm sorry.  Let me back

17   up.  I think it was April 14th the government refers to his

18   blood pressure or medication had been changed.  Let's be clear

19   why.  On April 2nd, which is page 52 of the records, his blood

20   pressure medication was adjusted because his blood pressure was

21   taken at his insistence during a routine Covid symptoms check

22   at his own cell.

23           Okay?  At that point, as your Honor knows, people at

24   the MCC go around from cell to cell periodically and have some

25   checks.  He doesn't go to the clinic.  He didn't have a doctor

K5QPRAJC

1    come see him.  He didn't go see a doctor.  At his cell someone

2    came for a routine Covid symptoms check, and here, the

3    defendant said:  Please take my blood pressure.

4              As a result of his insistence and outright luck, I

5    think, that there was a routine check that happened to come to

6    his cell, his medication was changed on April 14th.  That's the

7    only date.  Period.

8              There's a notation the government refers to an

9    May 18th.  Okay?  Well, you know what, blood tests that were

10   originally scheduled for March 11th, those blood tests were

11   still not done as of May 18th.  They were rescheduled for

12   June 16th.  The notation says:  Overdue lab.  That needs to be

13   reconciled in BEMR.

14             He has not received a healthy diet, either for his

15   heart, his blood pressure or his kidneys.  I don't care how

16   many times the BOP tells the government that they're doing it.

17   He has not, for weeks and weeks, up until recently, they were

18   only serving baloney sandwiches for dinner to the inmates.  So

19   let's just be clear -- I'm sorry.

20             THE COURT:  Let me interrupt you for a second.  So I

21   hear you, but if you could, No. 1, address my question about to

22   the extent that that's all correct and concerning, isn't the

23   first course of action to try and get him whatever medical

24   attention and care he needs in the MCC, rather than to

25   disregard what may well be a genuine flight risk;

K5QPRAJC

1          And, No. 2, some of those dates and delays that you

2   cited go back as far as February, which was actually before the

3   pandemic really hit in full force and is close to three months

4   before you wrote your letter.  So I guess that raises the

5   question of why, did you wait until May 18th?  If he's not

6   getting medical care for the last three months, why did it take

7   you until May 18th to seek bail and seek his release on that

8   basis?

9          MR. SCHNEIDER:  Okay.  I have a few answers to that.

10   No. 1, the reason I'm mentioning these dates, the

11   February 12th, April 2nd, April 14th and May 18th, because

12   those are the specific dates that the government mentioned in

13   her letter.  That's why I referred to those dates.  So that's

14   that part.

15          And why did I wait so long?  Because, as your Honor

16   knows, we cannot visit our clients.  So it takes a long time,

17   sometimes days if not weeks, to schedule a phone calls.  We

18   scheduled phone calls.  We had phone calls with both him and

19   his family.  We also tried to negotiate with the government to

20   see if they would consent.  That took time between them getting

21   back to us, them having to confer with their supervisor, us

22   deciding what to do.  And we had to try to contact the lawyer

23   in Florida to see what happened there.  So that's why.

24          And we also, I guess, always hoping that there would

25   be some movement by MCC.  We had to get these records.  We had

K5QPRAJC

1    to have the family get the medical records and get them to us.

2              It's been difficult to speak to the client, in terms

3    of physically meeting him.  We can't.  So these phone calls you

4    have to put in a request via e-mail to get a phone call.  Then

5    they schedule it sometimes days or even a week or so after

6    that; so that's one problem.  So that's why I waited and,

7    again, I referred to those dates because those are the dates

8    that the government referred to.

9              So that's why.

10             THE COURT:  All right.

11             MR. SCHNEIDER:  If that answered your question.  I

12   hope it does.

13             THE COURT:  Yes.  Although, again, why isn't the first

14   course of action to just try to get him the attention or care

15   he apparently needs?

16             MR. SCHNEIDER:  Well, I guess one of the things I like

17   about your Honor is your Honor's optimism, and I guess I just

18   don't see it.  You know, your Honor has been....

19             THE COURT:  Hello?

20             MR. SCHNEIDER:  Can you hear me?

21             THE COURT:  I can, yes.

22             MR. SCHNEIDER:  Hello?  I'm sorry.  I apologize.  I

23   dropped the phone.  Excuse me.

24             Your Honor's been a judge.  You were a prosecutor.

25   I've been practicing for many, many years.  I think even

K5QPRAJC

1    anecdotally nobody can say that MCC can do what they're

2    supposed to do.  I'm not looking to blame them.  It's just the

3    reality.

4         I mean, we all know that people have a hard time at

5    MCC getting medical care, getting the correct food, but besides

6    that, let's also remember, right now it's a petri dish.  I

7    mean, what's happening at MCC is just impossible.  I would say

8    virtually every factor that the CDC or NIH, or anybody, says

9    you should try to follow to prevent the exposure, to prevent

10   contracting the disease is just the opposite in terms of

11   closeness, the ability to wash, the ability to remain, you

12   know, socially distant, to wear a mask.  I mean, it's just,

13   it's impossible.  Okay?

14        And what's happening -- and I didn't want to get into

15   all of the numbers, but your Honor has, I'm sure, known the

16   numbers.

17        THE COURT:  Yes.

18        MR. SCHNEIDER:  I'm not going to get into that.

19        THE COURT:  You don't need to get into that.  I'm well

20   aware on that front, and I'm hardly an optimist at all.  I

21   think I'm on the more pessimistic end of the spectrum with

22   respect to the handling of this.

23        Let me ask you one final set of questions, and then

24   I'll give Ms. Choi an opportunity to respond, which is, just

25   what his circumstances are in Florida?  According to the

K5QPRAJC

pretrial services report, he doesn't have any assets.  How he

has he been affording the apartment he has down there, and how

would he continue to do so, and what provisions would he have

to get the medical attention he needs down there?

The government raised a variety of questions along

those lines.  If you could just address them, please.

MR. SCHNEIDER:  Certainly.  He has insurance; so

that's how he would pay for the medical treatment he needs.

His brother, or other relatives, are willing to help, have

already been paying the rent since he has been incarcerated and

will continue to support him.

The friends that we had mentioned in our letter are

prepared to take him to his medical appointments, if necessary;

so the finances are not a problem.

While he doesn't have assets now, he did have some

money saved a while ago.  That money went to how he lives, but

in terms of going forward, his family and friends both are

prepared to do what is necessary to support him both

financially and emotionally and medically.

So that's -- in fact, we had given this information to

the government early on.  We gave her the names of some of our

potential cosigners.  She asked us a bunch of questions about

what it was, and we answered many of those questions.  We even

sent her the medical records early on, before we even wrote the

letter.

K5QPRAJC

1          And then after some period of time, she asked

2     questions that I didn't believe were appropriate, or were

3     appropriate at that point.  That's when she said, I declined to

4     give the information, and she's right, I did.  But I was very

5     clear and I did tell her significant information when she asked

6     initially.

7          And in terms of, you know, where he was, for how long

8     he'd been in Florida, what his ties to the area were, the

9     nature of the cosigners, who he'd be living with.  We told her

10    all that.  We gave her the medical records.  So there is

11    someone, or there are people who are prepared to stand up for

12    him and support him, like I said, financially and medically.

13          THE COURT:  And how would he get to Florida?  What

14    sorts of plans are there on that front if I were to release

15    him?

16          MR. SCHNEIDER:  His brother would make sure he would

17    get a flight.  He would fly.

18          THE COURT:  Okay.  I'm sorry, one last question that

19    just occurred to me, I meant to ask, which is, I gather there

20    is an ICE detainer in effect.  Your letter notes that,

21    according to the Federal Defenders, there are nine instances

22    where ICE has declined to enforce the detainer where pretrial

23    bail has been granted.

24          But what sorts of assurances -- I mean, how do you

25    think I should factor that in here?  And surely, you wouldn't

K5QPRAJC

1    want me to release him on bail only to be picked up and put

2    into an immigration facility, which as far as I have heard and

3    can tell, may not be even as good as the MCC?

4            MR. SCHNEIDER:  That's my understanding as well.

5    However, I don't know that personally, but that's what I've

6    heard, that he wouldn't want to be there either.  My

7    understanding is we're prepared to take that chance.  I don't

8    have any hard and fast rule as to who gets picked up on ICE

9    detainers.

10           But my feelings is this is someone who is here from

11   Canada, someone who has traveled back and forth on more than

12   one occasion from Canada.  He has a passport that the

13   government has.

14           I don't think he presents any kind of a danger in

15   terms of ICE having him on their radar specifically because of

16   the kinds of crimes he may have committed in the past, because

17   he has no prior record, or because of what they think where he

18   may go.  So we're prepared to take that chance.  We have

19   discussed it with our client, and he knows that there is a risk

20   that ICE may file a detainer and he may not get out.

21           But he's prepared to take that chance, given --

22   because he knows that we're here now.  He's only going to get

23   worse.  He's only going to get sicker.  So we believe that

24   ICE -- I say -- we hope, I should say, that ICE would not lodge

25   or would let him go, and maybe have him deal with it

K5QPRAJC

1   voluntarily from the street.  And his brother would be the one

2   who would make sure he gets down to Florida in a timely

3   fashion.

4          THE COURT:  All right.  Ms. Choi, let me turn to you

5   to get your response on, more or less, all these fronts, but if

6   you want to start with the detainer and just tell me what your

7   understanding is of that is, if the information in

8   Mr. Schneider's footnote is accurate and so forth.

9          MS. CHOI:  Your Honor, I don't have specific

10  information about the number of people who have not been picked

11  up as it relates to an ICE detainer given the current

12  circumstances.  I have been in receipt of communications with

13  ICE which has indicated that they are still picking individuals

14  up pursuant to detainers.

15         Although, as it was the case before Covid, the

16  Covid-19 situation started, a lot of that has to do with

17  resource allocation.  So it's true that there is some

18  possibility that any given defendant may not be picked up by

19  ICE pursuant to detainer if they were to be bailed, but that's

20  by no means a one hundred percent guarantee in either

21  direction.

22         So there remains a distinct and I think significant

23  risk that if there was a bail package to be entered in this

24  case, that we would have, you know -- it would lead to

25  potentially ICE picking up the defendant and detaining him for

K5QPRAJC

1    some period of time, even if he were ultimately bailed by us.

2            So I think the long and short of it is it's not clear

3    that it is happening in every case, but certainly it is

4    happening in some cases, that ICE is picking up people even if

5    they are bailed by the District Court.

6            THE COURT:  Okay.  And do you want to address the

7    medical conditions?  Mr. Schneider certainly is correct that

8    the defendant was hospitalized when he was picked up, I gather

9    in Florida, and I gather had previously been hospitalized.

10           Putting aside, you know, what the source of the

11   congestive heart failure diagnosis is and how much to rely on

12   that, it certainly seems like he has some pretty serious

13   medical conditions.  Is that not the case?

14           MS. CHOI:  Your Honor, it's true that he has a heart

15   condition and a kidney condition.  I think your Honor, though,

16   has narrowed down the question at issue, which is whether or

17   not he could get adequate medical treatment within the

18   facility, especially if your Honor were to facilitate that with

19   some sort of directives to BOP.

20           I would note, with regard to his prior medical history

21   and the fact that he was placed in an infirmary, I don't have

22   access to the earlier medical records because that was not

23   while he was in BOP custody.  It was while he was with the

24   marshals in Florida, but nevertheless, all of that prior

25   medical history was taken into account by the magistrate judge.

K5QPRAJC

1          In fact, it all happened prior to his hearing date.

2     There was a delay between his arrest in December, on

3     December 20th of 2019, and the date of the hearing, which was

4     January 7th of this year.  And you can see from the pretrial

5     services report and from the detention order, the magistrate

6     judge understood those medical conditions.

7          So that doesn't represent a changed circumstance, as

8     it were, that deals with, you know, the Covid-19 crisis beyond

9     perhaps the specific requests that Mr. Schneider might have

10     directed at BOP with regard to additional care that he might

11     receive at the MCC.

12          But nevertheless, I think that the medical records, as

13     your Honor notes, I mean, there has been monitoring of his

14     condition.  BOP advises that they have assessed his medical

15     condition, and there was some more recent chest X-ray, which

16     notes that there was no evidence of congestive heart failure or

17     heart failure that would require sort of the additional

18     scrutiny that would be involved with someone who is at a high

19     level of additional risk under CDC guidelines, which is the

20     criteria that the BOP is using to characterize individual

21     inmates accordingly.

22          So he's not been determined by medical officials at

23     BOP that have reviewed his records, he's not been determined to

24     be higher risk for Covid vis-a-vis other inmates, even with his

25     heart condition and his kidney condition as set forth in the

K5QPRAJC

1    government's letter.

2              THE COURT:  And do you know if he has seen a doctor

3    since his arrival at the MCC?

4              MS. CHOI:  Your Honor, the records themselves reveal

5    that he has.  I've asked the MCC to provide all of the medical

6    records and, you know, Mr. Schneider has gone through some of

7    them point by point and characterized them here.

8              But if you look specifically at the entry that's on

9    page 3, for instance, the provider that's specified is a

10   doctor, an MD, which indicates -- I mean, putting aside the way

11   in which Mr. Schneider has characterized the nature of how the

12   BP was taken and the medicine adjusted, it was a provider that

13   the records reveal was a doctor who saw him.

14             And if the question, is if there was specific dietary

15   restrictions or other needs that he needs that haven't been

16   attended to by the BOP, I think in the first instance it would

17   make sense for your Honor to ask the BOP to make sure that

18   they're attended to.

19             THE COURT:  All right.  Anything else that you want to

20   address that I discussed with Mr. Schneider or otherwise?

21             MS. CHOI:  Yes, your Honor.  With regard to the

22   circumstances in Florida, I mean, Mr. Schneider made the

23   representations previously that there would be, quote, family

24   members that could help the defendant, and the government does

25   not take much, you know, solace in that simply because there

K5QPRAJC

1    hasn't been any sort of identification of whether or not

2    that -- where this source of these funds are, including the

3    fact that it was outlined in the government's letter, that at

4    least one of the co-defendants -- one of the defendant's

5    brothers was the recipient of the proceeds of this particular

6    fraud.  So that does give the government some pause.

7           The government did ask for additional financial

8    information regarding the two -- the three potential cosigners

9    that were proffered by the defense counsel.  We did not receive

10   any of that information, which I think is relevant with regard

11   to determining a determination for temporary release with

12   regard to -- at least procedurally with regard to subsection

13   (i) of the Bail Reform Act.

14          And, your Honor, I think that the representation with

15   regards to health insurance and the like is -- and what kind of

16   care he can receive is sort of an important one simply because

17   the government, in preparing for this hearing today, for

18   instance, tried to run the defendant's name against Court Link,

19   which is the Lexis database of dockets, with regard to either

20   state and federal dockets.

21          And in an attempt to get this docket, I came across

22   two other dockets which appear to relate to the defendant in

23   which he was the subject of removal proceedings, removal of

24   tenancy from his place of residence, one that was dated in

25   early 2019 and one that was appears to be perhaps for an office

K5QPRAJC

1  area also in 2019.  And so I think there is a question with

2  regard to where these resources are coming from, whether or not

3  this defendant is going to, in fact, get better care if he were

4  to leave.

5          There hasn't been, you know, a probation, pretrial

6  service review of the residence at issue in Florida.  It's the

7  government's understanding that he would not be living with

8  anyone there.  Rather, he would simply have, at the defense's

9  urging, a bracelet, which as the government notes in its letter

10 is not necessarily an indication that the defendant will not,

11 in fact, flee.

12         In fact, there empirically have been multiple

13 instances in which defendants have fled, even with the home

14 detention in place.  And we simply think that two cosigners

15 whose relationship with the defendant is unknown, unknown real

16 sources of income with regard to his assets, in combination

17 with his historical difficulty in paying his bills on time,

18 suggest that it's not clear to the government, at least, that

19 release in the first instance makes the most sense here.

20         THE COURT:  Okay.  I understand that your position is

21 that there are no combination of conditions that could assure

22 his appearance, and I take it you're not arguing danger to the

23 community.  But assuming I disagreed, and I'm not suggesting

24 that I am making that assumption or that that assumption is a

25 valid one.  I'm, you know, just asking a question.

K5QPRAJC

1          What comment, if any, do you have on Mr. Schneider's

2     proposed bail package?  Are there other conditions that you

3     think would be appropriate in the event that I disagree with

4     you and did decide to release him?

5          MS. CHOI:  Well, I think that there needs to be -- the

6     issue that the government raised with defense counsel is that

7     we think at least some collateral is necessary on this bond.  I

8     mean, there's not any indication -- putting aside the fact that

9     we haven't even reviewed the financial documents or interviewed

10    these potential two cosigners or understand anything about

11    their relationship with the defendant, putting that aside in

12    the first instance, and whether or not they'd be financially

13    responsible cosigners, there's no incentive for the defendant

14    to stay.

15          If this brother is in fact the brother I believe it

16    is, which is a person that lives in Canada, a country with

17    which the defendant has strong ties, if he is the person who is

18    essentially sending -- allowing for any assets, it seems a

19    little bit strange to the government, at least, that, you know,

20    he could not also put up some sort of financial incentive to

21    keep the defendant in the United States when, for all intents

22    and purposes, he could have equal -- he has an equal risk of

23    flight as he did at the time that he was ordered detained, if

24    not greater.

25          THE COURT:  Okay.  All right.  Anything else you want

K5QPRAJC

1     to say?

2              MS. CHOI:  No, your Honor.  If you don't have any

3     other questions for the government, that's it.

4              THE COURT:  All right.

5              MR. SCHNEIDER:  Your Honor?

6              THE COURT:  Mr. Schneider, I have two brief questions

7     for you, and then I'll give you a brief chance to respond, and

8     then we'll close out.

9              MR. SCHNEIDER:  Okay.

10             THE COURT:  No. 1, 3142(i), on its face, seems to

11     require release to either the United States marshal or another

12     appropriate person, that is, some sort of third-party

13     custodian, but as I understand it, you're proposing that

14     Mr. Raji be released to live by himself.  So how does it

15     satisfy that requirement?

16             And, No. 2, could you respond to Ms. Choi's suggestion

17     about posting collateral?

18             MR. SCHNEIDER:  Yes.  That's why when your Honor asked

19     me at the beginning of the proceeding if I was relying on

20     3142(f) or (i), I said both because (i) does require a marshal

21     or a third person.

22             I mean, I guess I'm not so sure how that necessarily

23     translates because if someone is on home incarceration with

24     electronic monitoring, that may be considered under court

25     supervision.  So I've never really thought about it in terms of

K5QPRAJC

1    interpreting it that way.  That could be one view.  But even if

2    not, I think that under 3142(f), your Honor doesn't need to

3    find that a third person is available.

4          And regarding collateral, at this point, we don't have

5    collateral but, your Honor, I guess given all of the facts and

6    circumstances, it wouldn't make sense for him to go anywhere.

7    And for the government to talk about the fact that he has some

8    dockets regarding possible removal from his apartment or

9    removal from his office, sounds like eviction notices, which I

10   certainly hope that's not going to be used against anybody ever

11   in deciding if they should remain at MCC when they are in the

12   middle of a health crisis.

13         In terms of the source of the funds, of course, the

14   government has a right, and we welcome them interviewing the

15   cosigners once your Honor sets the bail.  I mean, obviously,

16   the request is to have, you know, three, we always say,

17   financially responsible people as cosigners, or two, whatever

18   the number is, right?  We are offering two.

19         And we're offering -- we gave the names.  We told you

20   how much they made.  And, obviously, before they should be

21   accepted by the government or by the Court, more importantly,

22   they will be interviewed, and they will provide supporting

23   documentation to the government to show the source of the

24   funds.

25         And I think that seems to me to make the most sense,

K5QPRAJC

1   that if your Honor sets our -- sets bail as we request, then

2   the information, as is the case in every situation bail

3   package, the government has a chance to interview them, whether

4   it's in person, on the phone, whether the people have to be

5   interviewed by people down in Florida, whatever it is.  That

6   has been done.

7        And for the government to cite in the letter all the

8   times people who are out on bail and ran away, I don't even

9   know what that means because how many times have people been

10  out on bail that they return?  So that just made no sense to me

11  at all.  This is someone who is a responsible person, who has

12  absolutely no prior criminal record.

13       Can you hear me, your Honor?

14       THE COURT:  Yes.

15       MR. SCHNEIDER:  Oh, I'm sorry.  Okay.  He has no prior

16  criminal record at all.  Not no convictions, no record, and

17  there's no violence.

18       So let's keep our perspective, in my view, and realize

19  that for someone -- for the government to say, well, he'll

20  probably get the good care that he needs in MCC better than if

21  he was home, I don't think they -- I don't want to say they

22  don't believe it.  I think it really flies in the face of

23  reality when you have people -- when he, himself, has an

24  interest in taking care of himself, when his friends and family

25  have an interest in taking care of him, when MCC does not have

K5QPRAJC

1    the same interest or the same capabilities.

2            And why don't we have to wait X number of months for

3    your Honor to order MCC to get somebody's medicine.  It

4    shouldn't be difficult.  It shouldn't be a concern.  It

5    shouldn't be a problem.  We shouldn't have to have a hearing

6    for you to tell MCC, make sure this guy gets the appropriate

7    medical treatment.

8            So all that being said, while we can't control the

9    pandemic, we can control where people live, and hopefully, in a

10   way that can control the future.  You know, every time people

11   talk about the pandemic, it's a question of risk and

12   prevention.  What's the risk of him getting it, and what can we

13   do to prevent or minimize that risk?  And I think if you look

14   at it that way, letting him go home, where he can go see his

15   doctors, as according to his own pretrial said so; when he can

16   get the treatment he needs; when he gets the tests he needs;

17   when he can get take the medicine not a day or two late; when

18   he can eat the food; when he can do all he has to do to

19   maintain his health, it seems to me that that the

20   risk-prevention analysis weighs in his favor.  Thank you, your

21   Honor.

22           THE COURT:  All right.  Thank you very much.

23           I am going to reserve decision.  I'd like to think

24   about it a little bit and reflect.  I think it's definitely a

25   close call in either direction, or a close call period in that

K5QPRAJC

1    sense, in it could go either direction.  But I'd like to think

2    about it and we'll reserve judgment.

3           Ms. Choi, I would like you, in the meantime, to

4    contact folks at the MCC and get whatever information you can

5    concerning, No. 1, whether and to what extent his medical needs

6    have been met; and, two, whatever assurances you can get that

7    they will be met going forward, and in particular, whether he

8    would need to see a doctor and, if so, when that would happen.

9           It sounded like there were some tests that were put

10   off from March to June.  If you can find out about those and

11   what they involve and whether they're going forward, I would

12   appreciate it.  And if you could, submit a letter let's say in

13   the next two days on that, I would appreciate it.  All right?

14          MS. CHOI:  Will do, your Honor.

15          THE COURT:  All right.  Thank you for convening by

16   telephone, and I will reserve judgment, try to issue a decision

17   as quickly as possible, and I hope everybody stays safe and

18   healthy.

19          We are adjourned.  Thank you.

20          MS. CHOI:  Thank you.

21          MR. SCHNEIDER:  Thank you, your Honor.  Stay safe and

22   healthy, everybody.

23          (Adjourned)

24

25