```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                              19-CR-870 (JMF)

 5   MUSTAPHA RAJI,

 6                  Defendant.

 7   ------------------------------x
                                               Oral Argument
 8

 9                                             New York, N.Y.
                                               May 10, 2021
10                                             10:30 a.m.

11

12   Before:

13                      HON. JESSE M. FURMAN,

                                               District Judge
14

15                          APPEARANCES

16   AUDREY STRAUSS
          United States Attorney for the
17        Southern District of New York
     DINA MCLEOD
18        Assistant United States Attorney

19   ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
          Attorneys for Defendant
20   JEREMY SCHNEIDER

21

22

23

24

25
```

1          (In open court; case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4          MS. MCLEOD:  Good morning, your Honor.  Dina McLeod

5    for the government.

6          MR. SCHNEIDER:  Good morning, your Honor.  Jeremy

7    Schneider for Mr. Dr. Raji.  I believe he is on the telephone.

8          THE COURT:  Good morning to both of you.

9          I would request that you stay seated notwithstanding

10   the usual protocols in court, I think it is a little easier to

11   speak into the microphone.  With masks and acoustics in this

12   room that definitely is better.

13         Mr. Raji, are you with us on the telephone?

14         THE DEFENDANT:  Yes, I am, your Honor.

15         THE COURT:  Good morning to you.

16         Let me just confirm you arguably have the right to

17   appear in court.  Although your presence I think is not

18   required given the purpose of today's proceeding under the

19   federal rules, but in any event my understanding is that you

20   consent to participate in this proceeding by telephone; is that

21   correct?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  Did you discuss that with Mr. Schneider?

24         THE DEFENDANT:  Yes, I did.

25         THE COURT:  Very good.

1          Do both counsel agree that we can proceed with

2    Mr. Raji on the telephone?

3          MS. MCLEOD:  Yes, your Honor.

4          MR. SCHNEIDER:  Yes, your Honor.

5          THE COURT:  All right.  I agree as well.

6          With that let's get to the main order of business.

7    There are two main order of business.  One is the motion and

8    the second is discussing a trial date.  With respect to the

9    motion, I did receive the government's supplemental affidavit

10   from Agent Ryan.  I think it does plug a number of the

11   potential holes in the original submission.  I am not quite

12   sure why it required an order from me to elicit it.  But in any

13   event, it is what it is.

14         My question for you, Ms. McLeod, is can you just

15   address the staleness issue to the extent that some of the

16   probable cause rested on evidence from the time of the offense

17   and the time of Ms. Martino-Jean's arrest in 2018, why wouldn't

18   it be stale come December 2019 when the search here took place?

19         MS. MCLEOD:  Sure, your Honor.  I do think that the

20   case that your Honor helpfully cited in your order touched on

21   this in that staleness is a factually specific question and the

22   question as to staleness is whether there was reason to believe

23   that at the time of the search there would be evidence on the

24   phone.  Because digital evidence is of a particular nature, it

25   can last indefinite amounts of time if not permanently or

```
 1      almost permanently on devices.  The questions about staleness
 2      are not the same as they would be, for example, if you had a CI
 3      telling that drugs were at a residence and there was reason to
 4      believe that maybe months later the drugs would no longer be at
 5      that residence.  In the case of a phone, certainly the digital
 6      data on that phone could be there for years because phones are
 7      essentially computers now.
 8            So I think because of the nature of the evidence
 9      staleness was not an issue.  There was reason to believe at the
10      time of the search that there would be evidence on the phone.
11      In addition to that as I think as Special Agent Ryan set forth
12      in his affidavit, and he was the seizing agent, he knew at the
13      time of apparently unrelated but possibly criminal activity
14      that may have been taking place on the phone in a more recent
15      time frame.  I think in the October time frame.  That was based
16      on his review of a SAR.  So based on those two considerations,
17      the government submits that the PC was not stale for this
18      search.
19            THE COURT:  Does it make a difference in your view the
20      fact that Ms. Martino-Jean was arrested in 2018?  I presume
21      that fact was known to Mr. Raji.  And one could imagine that
22      that gives him an incentive to wipe the phone or eliminate any
23      evidence of their criminal activity from the phone.
24            Does that affect the analysis in your view?
25            MS. MCLEOD:  It doesn't.  I actually think the case
```

1    law that your Honor cited mentions that the fact that someone

2    could delete the evidence doesn't obviate the PC if it could be

3    there.  We did not have concrete information that Mr. Raji knew

4    of the arrest.  I think you can presume often that such things

5    would be known to the defendant, but we hadn't interviewed him

6    or known about that nor had Ms. Martino-Jean told us that

7    specifically.  So I think given those facts that does not

8    affect the government's analysis in any case.

9           THE COURT:  Let me ask you assume for the sake of

10   argument that I agree that if Agent Ryan had reason to believe

11   that the two phones belonged to Mr. Raji that he would have

12   probable cause to search them, what is the evidence in the

13   record that supports the first belief?  That is to say it was

14   reasonable to believe that those two phones did belong to

15   Mr. Raji?

16          MS. MCLEOD:  First of all, the arrest happened at what

17   the agents believed to be Mr. Raji's residence.  I am not sure

18   if he was the only person in the house when they got there.

19   There were two phones that were sort of out.  So I think that

20   would be one of the first things, that there were two cell

21   phones that were located in the defendant's residence that were

22   there.  The defendant asked to make a phone call and the agent

23   asked, Are those your phones? and he said, Yes.  So based on

24   that --

25          THE COURT:  The problem with that is that is a

1    disputed fact.  The defendant in his affidavit disputes that

2    the agent made any inquiry of that sort or that he said they

3    were his phones; isn't that right?

4              MS. MCLEOD:  I don't know that he disputes that

5    specific fact.  Let me look at the defendant's affidavit.

6              You are right.  He says, Where are your phones?  I did

7    not respond.

8              The evidence in the record that they were his phones

9    would be those.  And in addition once they got to the FBI

10   office and were booking the defendant -- I think that is set

11   forth in some of the motions papers as well -- at that point

12   the defendant had to look through the phones in order to find

13   some contact information that was needed to fill out the

14   marshals forms and unlocked at least one of the phones to get

15   into it.  So if it wasn't clear to the agent before, it would

16   have been clear at that point that those were his phones.

17             THE COURT:  But the issue at--

18             MS. MCLEOD:  At the time of the seizure.

19             THE COURT:  Yes.  The issue in motion is whether the

20   seizure of the phones in the first instance was proper and in

21   that regard you cannot rely on evidence gained after the

22   seizure.

23             MS. MCLEOD:  There are a couple things.  One is that

24   there was a phone pinging at the house or in the vicinity.  At

25   the time of the arrest, the defense had prospective location

information on one of the phones.  The phone that was being

used to communicate with that bank investigator, that phone had

a GPS warrant on it.  So there would have been -- at that time

Agent Ryan would have known that a phone the defendant had used

in the recent past was in that vicinity.  Then when he got to

the house and saw the two phones, I think it is fair to assume

at that point that those were the defendants phones.

THE COURT:  All right.  Mr. Schneider, let me turn to

you.  First of all, I assume in light of Agent Ryan's

supplemental affidavit that the collective knowledge doctrine

is sort of irrelevant here.  That is to say it does seem like

there is one person in whom all the relevant knowledge resided

and we don't need to know who knew what when.

Do you agree?

MR. SCHNEIDER:  For the issue of collective knowledge,

yes, we agree.  Whether or not that should be the determining

factor that is a different discussion I would like to have in a

few moments if I may.

THE COURT:  Okay.

MR. SCHNEIDER:  I agree with your Honor that based on

the affidavit submitted by Agent Ryan, he did say he had

specific information in response to your Honor's order, slash,

questions.  So the answer is he did say he had information.

Whether or not that is sufficient is a different question.  I

agree that he did say he had enough information, yes, your

1    Honor.

2         THE COURT:  Can you address the last question that I

3    posed to Ms. McLeod?  That is to say is there any dispute that

4    these two phones were in fact Mr. Raji's, or more to the point

5    that Agent Ryan reasonably believed that they were Mr. Raji's?

6         MR. SCHNEIDER:  Yes.  Well, first I would like to

7    dispute what the government just said Agent Ryan knew that the

8    phone had pinged from the home, the same phone that was used to

9    speak to the bank investigator.  She just said, "In the recent

10   past."  My understanding that the conversation with the bank

11   investigator was in 2018.  Well over a year before this

12   warrant.

13        THE COURT:  I think she is referring to the calls I

14   think in August or September or September and October of 2019

15   that are referenced in the application for geolocation warrant.

16        I assume, Ms. McLeod, that is what you are referring

17   to?

18        MS. MCLEOD:  Yes, your Honor.

19        THE COURT:  Is it Agent Lai's?

20        MS. MCLEOD:  It is Agent Lai's affidavit.  I believe

21   those conversations were in late October and into November of

22   2019.

23        THE COURT:  I think there might have been confusion

24   about which communications she was referring to, but that is

25   what I understood.

1          MR. SCHNEIDER:  Okay.  Just so it is clear, there were

2     communications with an investigator in 2018 and 2019.  It is

3     interesting but the affidavit, the Lai affidavit, which talks

4     about the October 2019 conversation with the bank investigator

5     didn't seem to have anything to do with any illegal activity

6     according to the affidavit that Mr. Lai put forward.  In fact,

7     according to November 15th, 2019, it says -- this is page 4 --

8     *Raji called an investigator at Bank One from the number of the*

9     *target cell phone to inform Bank One that certain funds be*

10    *deposited into Raji's account within the next week.*  Well,

11    again, we're talking about a year after the alleged illegal

12    activity in July, August and September of 2018.  So that's a

13    whole different conversation about a whole possibly different

14    account, possibly a whole different set amount of money.  So I

15    am not sure how that is relevant to any discussion we're having

16    here today, your Honor.

17         THE COURT:  Let me push back on you that front.

18    Number one, wouldn't it be relevant to -- in other words, based

19    solely on those communications couldn't Agent Ryan reasonably

20    believe that Mr. Raji used his phone in connection with

21    financial transactions and therefore that he likely used his

22    phone back in 2018 when he was engaging in the financial

23    transactions relevant to this case?  In other words, some

24    people do banking all in-person.  Some people do banking using

25    their mobile device.  This suggests that he uses his telephone

1    when he engages in banking activity and therefore a reasonable

2    person could assume that evidence of banking activity from a

3    year earlier would continue to be on his phone.

4              Isn't that one argument?

5              MR. SCHNEIDER:  I don't think it is unreasonable put

6    it that way.  Whether it is reasonable is a different

7    discussion.  I don't think it is unreasonable, your Honor.

8              THE COURT:  The second thing is based on Agent Ryan's

9    supplemental affidavit of April 29th he says -- this is in

10   paragraph 4(e) I think it is -- that the financial institution

11   had flagged the transfers at issue in those 2019 calls as

12   quote/unquote fraudulent.  Granted I don't think there is any

13   suggestion that they are connected.  In fact, the same

14   paragraph says that he doesn't think they are connected to the

15   original conduct subject to investigation here, but whether

16   it's a different crime, it doesn't need to be the same crime to

17   support a finding of probable cause; correct?

18             MR. SCHNEIDER:  What you say is correct, but I think I

19   have a different take on paragraph (e), which is that a SAR is

20   a Suspicious Activity Report that banks file in general if

21   there is something suspicious.  It doesn't mean fraud.  It just

22   means they want further information.  Just because in this

23   affidavit Agent Ryan says is it -- he says it is not related to

24   fraud.  He didn't say what the SAR was related to.  He just

25   says there were a phone call.  Because a SAR does not mean it

1    is fraud.  It means it is suspicious.

2         It is interesting but I don't know why Agent Ryan

3    didn't follow up to find out what the result of that SAR was.

4    I think the absence of that in the affidavit is telling that it

5    probably wasn't fraud.  Because I think if it was fraud, we

6    would have heard about that, your Honor.  I don't think we can

7    rely on Agent Ryan's conclusions.  Yes, to be fair he did say

8    that he did not believe that those fund transfers were related

9    to the charged fraud scheme.  Meaning, this fraud.  So I think,

10   your Honor, it may have been helpful to know what the result of

11   his conversations were or investigations were with the bank

12   investigator about that SAR.

13        So I am not as convinced that the information he

14   provided is sufficient to give your Honor sufficient

15   information to find that there was probable cause to believe at

16   the time that, A, the phones were Mr. Raji's; but B, and more

17   importantly, that the phones were used in criminal activity

18   from over a year ago.

19        May I make one or two more points?

20        THE COURT:  Yes.  I want you to circle back to my

21   initial question, which was whether there was any dispute that

22   Agent Ryan could reasonably believe that the two phones

23   belonged to Mr. Raji.

24        MR. SCHNEIDER:  I thought you would forget about it if

25   I kept talking somewhere else.  It is hard to say that it was

1   an unreasonable assumption on his part.

2         THE COURT:   Okay.

3         MR. SCHNEIDER:   Now, a couple of points if I may, your

4   Honor.   I think after the fact -- just like you said a few

5   moments ago so Ms. McLeod that you can't use information you

6   learn after the fact to supply probable cause at the time of

7   the seizure, I think what is happening now is that you are

8   learning all these facts from Agent Ryan and the government and

9   maybe Agent Lai, but let's remember what happened at the time.

10   They did not have a search warrant.   If they had all this

11   information, they could have, and I believe should have, gotten

12   a search warrant at the time of the arrest.

13         I guess my concern is if your Honor accepts this legal

14   premise under these facts, then I think agents would be allowed

15   to have arrested Mr. Raji in his home, taken him somewhere

16   else.   Let's say the phone pinged at a different location.

17   Gone to that location without a warrant and had a right to be

18   there -- let's assume they had a consent to be at that

19   location -- and seized those phones without any warrant.   what

20   is the time frame?   Immediately?   A week?   A month?   So I think

21   this is a very dangerous premise to allow the seizure of a

22   phone that there was no specific information about at the time

23   of the seizure and was never used to obtain a warrant.

24         In talking about staleness, in the *Ali* case, which

25   your Honor had referred us to, let's remember that was

staleness of getting a warrant.  That was a piracy case where

they obtained warrants well after the crime occurred for

different items.  I think it was a computer and maybe a bag and

things like that.  Let's be very clear, in the affidavit in the

*Ali* case, the affidavit contained that *Ali*, the defendant,

continued to use his email accounts, cell phones, and computer

to communicate about piracy well after the CEC future incident.

I think is that very relevant because in that

situation you have agents go to a judge, submit an affidavit,

talk about an affidavit, talk about facts of what the defendant

did.  Said the defendant continued to use the same phone he

used before for criminal activity.  That makes sense.  That to

me is something that should have been done in this case and

what should have been done in this case.  That is my concern,

your Honor, the fact that if he had all this information about

what the phones were used for by Mr. Raji, then they should

have gotten a warrant.

THE COURT:  Mr. Schneider, let me interrupt you for a

moment.  I am not sure I disagree in the sense that it would

have been; but among other things, it would have put the

seizure on firmer ground if they had the blessing of a judicial

officer ex ante.  Isn't it basically the same question.  In

other words if the government presented all of the evidence

known to Agent Ryan on December 19th, or whatever date it was

in December, the 19th, and said, Here is all the evidence that

we know from 2018 about the use of electronic devices in
connection with this fraud scheme, here is the evidence that we
have that his co-conspirator had evidence on her electronic
devices, here is evidence a couple months ago he is continuing
to use his electronic devices in connection with banking
activity, and by the way banking activity that the financial
institution has at least flagged as potentially fraudulent, so
if we find a phone on his person at the time of his arrest or
within the time of his arrest, we're asking that you authorize
the seizure of it, wouldn't the question be the same, does that
rise to the level of probable cause?

          MR. SCHNEIDER:  100 percent yes.  If they gave that
information to a magistrate, the magistrate would have been
authorized to issue a warrant.  Yes, but then my question is
why should you ask that question?  Because if you are asking
that question that means you are excusing never getting a
warrant because you are allowing agents to say, you know what,
I know I have probable cause in my head, I know what I know,
why bother telling the judge.  They go and do it.  There was no
exigency here in this situation, your Honor.  There was no
emergency.  In fact they waited a year.

          So your Honor is correct that if they had done that --
given all that information to a judge -- we would be sitting
here looking at a warrant that was signed and authorized by a
judge.  My question to you is:  How dare they, meaning the

1    government or the agents, to think that they can do that just

2    because they know something.  That is precisely why you need to

3    get a warrant because you need to have a neutral magistrate

4    make that decision to see if that agent is correct, to see if

5    that agent is credible, to see if that agent is believable.

6    That to me is concerning that you, your Honor, would be

7    allowing an agent to bypass the judge, bypass presenting the

8    evidence for probable cause under oath and just getting a

9    warrant.  Because they say, I know what really happened and

10   therefore if I am ever asked later on, I can recite what the

11   probable cause is.  That concerns me if that was the situation,

12   your Honor.

13        THE COURT:  Fair enough.  I get the argument, but that

14   seems like an argument against the plain view exemption as much

15   as anything.  I think, for instance, one can make the same

16   argument with respect to an arrest on probable causes without a

17   prior complaint or indictment; right?  In certain circumstances

18   agents have enough to arrest somebody but they may wait to see

19   them do something and arrest them at that time and then they

20   have to go to a court and get a blessing that the arrest was

21   supported by probable cause after the fact, but we do allow

22   that.

23        MR. SCHNEIDER:  Your Honor, yes.  We all recognize

24   that there is a presumption that you get a warrant if you can.

25   There are exceptions to getting warrants -- exigency, plain

1    view.  We know all the exceptions.  If a crime happens in an

2    agent's presence, they shouldn't let the perpetrator get away.

3    We recognize that.  I think your Honor is presuming the

4    opposite.  Your Honor is presuming you don't need a warrant if

5    you have probable cause.  My position is that you must get a

6    warrant unless there is an exception.

7            The plain view doctrine gives specific exceptions.

8    The police have a right to be there.  The item that is looked

9    to be seized is part of a crime or whatever the phrase is.

10   They are allowed to be there if the incriminating nature is

11   readily apparent or there is probable cause to believe it is

12   evidence of criminal activity.  That is plain view.  I get it.

13   But that is when the police are there usually for another

14   reason.  Usually to arrest someone or usually to search for

15   something else.

16           So, for example, if they went in to arrest somebody

17   for narcotics and they see a book, a ledger, that has

18   connection to the crime that they are there for.  So there is a

19   reason to seize that.  Your Honor, I don't think anyone would

20   allow the seizure of phones.  We all know that phones are used

21   by everybody for everything.  I think in *Babilonia* case, which

22   was cited in our motion, that the Court there recognized, as

23   well as the *Key* case, it is increasingly common for individuals

24   to own more than one cell phone or mobile.  We all recognize

25   that.

1          I think it's a little bit disturbing also in Agent

2   Ryan's affidavit in paragraph 4 that he basically says, I know

3   that perpetrators of this type of crime frequently communicate

4   with co-conspirators using cell phones.  Again, he is saying, I

5   can always grab a cell phone because I think every criminal

6   uses a cell phone.  That is basically what he said.  While it

7   may be true, I don't think that is the law, that you can assume

8   a cell phone is used for criminal activity because everybody

9   uses cell phones.

10          THE COURT:  Well, two thoughts.  One is there is some

11   tension between that and -- I think I would agree in light of

12   *Babilonia* that a general statement by an agent that I have

13   based on my training and experience reason to believe that

14   criminals tend to use cell phones would not suffice.  I think

15   *Babilonia* stands for the proposition that just because cell

16   phones are ubiquitous and we all use them doesn't mean that

17   that is sufficient to search a phone or seize a phone.

18          Isn't it different whereas here there is demonstrable

19   reason to believe that a particular crime was committed using

20   an electronic device and that the defendant had issue used it?

21          MR. SCHNEIDER:  That's precisely why we're going in

22   circles, your Honor.  That is precisely why they should have

23   attempted to get a warrant, or made some kind of connection

24   before your Honor asked for an additional affidavit.

25          THE COURT:  All right.  Ms. McLeod, let me turn to you

1    and ask you to respond.  Maybe respond to Mr. Schneider's point

2    that if I were to bless this seizure after the fact, doesn't

3    that undermine the incentive to get a warrant in the first

4    instance?

5              MS. MCLEOD:  No, your Honor.  I think defense counsel

6    is sort of making up policy argument basically.  He is

7    quarreling with what is black letter law.  Whether or not that

8    has merit is a different question for a different day.  The

9    government and law enforcement have numerous exceptions to

10   seize things without a warrant.  And as Mr. Schneider was

11   making his argument, one of the things I was thinking of was

12   the same things your Honor raised, which is that of course we

13   allow law enforcement agents to make judgments the all the time

14   whether there is probable cause, whether or not they have a

15   warrant.  Probable cause arrests are less common in the federal

16   context, but they do happen.  NYPD does them every single day.

17             So there is room in the law for these sorts of

18   circumstances for precisely these reasons.  The argument that

19   Mr. Schneider is making is I think perhaps an interesting one

20   and one worth having but not one that relates directly to the

21   merits of the motion.

22             MR. SCHNEIDER:  Your Honor, may I say one final point?

23             THE COURT:  Yes. And then we'll close out.

24             MR. SCHNEIDER:  I agree, your Honor.

25             I guess the question is:  Why didn't the government on

1    February 19th get a warrant for the electronic devices?  They

2    had all this information.  They had the same information we're

3    talking about.  Why did they think they had a need to get a

4    warrant?  Why didn't they just open the phones?  The same logic

5    applies on February 19th as it did on December 20th when they

6    arrest Mr. Raji.

7              THE COURT:  I am not sure I follow.

8              MR. SCHNEIDER:  I am sorry.

9              THE COURT:  What's in the phone is not in plain view

10   so in that sense they cannot search a phone without obtaining a

11   warrant.  What is the exception that would justify a search of

12   a phone?

13             MR. SCHNEIDER:  The seizure of the phone is

14   irrelevant.  They always want to take a phone.  They, the

15   government, wants to take a phone to see what is inside of it;

16   right?  So the intent is also going to be, I am going to take

17   it and then I am going to try to see what is inside of it.  If

18   they can't take it, they can't look inside.  If they think they

19   can take it because they have probable cause that it was used

20   in a related criminal activity, then why do they need a warrant

21   to go inside the phone to find the connection to the criminal

22   activity?

23             Because the phones themselves are meaningless to the

24   government.  There is no evidentiary value to the actual phone

25   Evidentiary is what is in the phone.  So they had the same

1    information in February when they got the warrant to get the

2    contents as they did in December when they seized the phone.

3              That's my phone point, your Honor.

4              THE COURT:  Thank you.

5              Give me one moment, please.

6              Counsel, I am prepared to issue or give you my ruling

7    on the motion.

8              Mr. Raji moves to suppress evidence obtained from the

9    search of the two phones that were seized at the time of his

10   arrest on the ground that that seizure was unlawful.

11   The relevant facts are largely undisputed.  Mr. Raji is charged

12   with alleged participation in a wire fraud and money laundering

13   conspiracy that involved fraudulently obtaining approximately

14   $1.7 million from a Manhattan-based hedge fund through an email

15   compromise scheme or "phishing attack" conducted in July 2018.

16   To the extent relevant here, the receiving bank account was

17   held in the name of Unique Bamboo Investments, a company of

18   which Mr. Raji is the Vice-President and his alleged

19   co-conspirator, Nancy Martino-Jean, is the President.  Ms.

20   Martino-Jean allegedly wired $50,000 of the fraudulently

21   obtained funds directly to Mr. Raji, and Mr. Raji allegedly

22   facilitated the wiring of an additional $25,000 from Ms.

23   Martino-Jean to another person, who, in turn, wired $10,000 to

24   a Canadian company controlled by Mr. Raji's brother.

25              Additionally, the Government alleges that, in August

2018, Mr. Raji attempted to conceal the completed fraud by forwarding scanned documents to Ms. Martino-Jean that purported to be a loan agreement between Unique Bamboo Investments and the victim.

Over a year later, on December 20, 2019, Mr. Raji was arrested at his home in Florida.  Ms. Martino-Jean had been arrested and charged with wire fraud and receipt of stolen funds in 2018 and was later sentenced by Judge Buchwald after pleading guilty.  Among the agents who participated in Mr. Raji's arrest in December 2019 was Special Agent Michael Ryan, who had been a principal agent on the investigations of both Mr. Raji and Ms. Martino-Jean since the beginning of the overall investigation in August 2018.  ECF No. 69, which I will refer to as Ryan supplemental affidavit, paragraphs 2-3.

During the arrest, Special Agent Ryan observed two cell phones near a couch in Mr. Raji's home and seized them. Paragraph 3.  The parties dispute whether Mr. Raji told the agents that the phones belonged to him.  Compare ECF No. 56, paragraph 8, with Ryan supplemental affidavit paragraph 3.  The parties dispute whether Mr. Raji told the agents that the phones belonged to him.  Raji's affidavit, which appears at ECF 56, paragraph 8., with the Agent Ryan supplemental affidavit, paragraph 3.  There is no dispute that they were in fact Mr. Raji's phone and more to the point that Mr. Schneider has conceded that Agent Ryan reasonably believed them to be Mr.

1    Raji's phones.

2         The relevant legal standard is well established and

3    undisputed.  Under the plain view doctrine, a law enforcement

4    officer "may seize evidence without a warrant if (1) the

5    officer is lawfully in a position from which the officer views

6    an object, (2) the object's incriminating character is

7    immediately apparent, and (3) the officer has a lawful right of

8    access to the object."  *United States v. Babilonia*, 854 F.3d

9    163, 179–80 (2d Cir. 2017).  That quotation and all that follow

10   are cleaned up.  That is, extraneous matter is excluded

11        As to the second prong, an object's incriminating

12   character is immediately apparent if the seizing officer has

13   "probable cause to believe that the object contains or

14   constitutes evidence."  *Babilonia* at page 180.  Probable cause,

15   in turn, is "a flexible, common-sense standard.  It merely

16   requires that the facts available to the officer would warrant

17   a man of reasonable caution in the belief that certain items

18   may be contraband," considering the "totality of the

19   circumstances."  *United States v. Pughe*, 441 F. App'x 776, 777

20   (2d Cir. 2011) (summary order).  Although cell phones are

21   sufficiently ubiquitous that "the presence alone of a cell

22   phone, or even several cell phones, in a home is not inherently

23   incriminating," *Babilonia*, 854 F.3d at 180, courts have upheld

24   seizures of cell phones and other "everyday objects" discovered

25   in plain view where particularized facts establish probable

cause that they were used in connection with criminal activity,
see *Babilonia* at 180-81, which cites various cases.  See also,
*United States v. Kirk Tang Yuk*, 885 F.3d 57, 79 (2d Cir. 2018);
*United States v. Kidd*, 386 F. Supp. 3d 364, 372-73 (S.D.N.Y.
2019).

      Mr. Raji concedes that the officers were lawfully
present where and when they seized his cell phones and that the
phones were in plain view, or at least doesn't dispute that.
See ECF No. 61, defendant's reply at page 2.  Thus, the only
disputed issue is whether the officers had probable cause to
believe that the phones contained evidence.  Special Agent Ryan
attested that he believed they did, based on the following
facts:  He knew that in August 2018, Mr. Raji had emailed
fraudulent loan documents to Ms. Martino-Jean and that around
September 2018, Mr. Raji had exchanged text messages with a
cooperating witness regarding the disbursement of fraudulently
obtained funds.  Indeed, Special Agent Ryan had interviewed the
cooperating witness and reviewed screenshots of the text
messages before arresting Mr. Raji.  Agent Ryan's supplemental
affidavit paragraphs 4(a) and (c).  See ECF No. 55-1, Mulloy
affidavit at paragraph 14(b).

      A person of reasonable caution in Agent Ryan's
position could have assumed that records of these or other
incriminating emails and text messages were likely stored on
Mr. Raji's phones.  This assumption would have been all the

more reasonable given that when Ms. Martino-Jean was arrested,
she told FBI agents that emails and WhatsApp messages related
to the wire fraud scheme were stored on her cell phone -- Ryan
supplemental affidavit paragraph 4(b)-- further suggesting that
cell phones were a tool of the wire fraud conspiracy in which
Mr. Raji was alleged to have participated.

As to Mr. Raji's more recent conduct, Agent Ryan knew
that in October and December 2019 — just one to two months
before Mr. Raji's arrest — Mr. Raji participated in several
phone calls with a bank investigator regarding transfers of
funds that another financial institution had flagged as
"fraudulent."  Supplemental affidavit at paragraphs 4(d) and
(e).  Records of these phone calls would have suggested to a
reasonable officer both that Mr. Raji may have communicated by
phone about financial transfers in furtherance of the 2018
scheme.  That is, that he was prone to use his phone in
connectin with financial transactions and that may have engaged
in additional, more recent wire fraud, evidence of which would
likely be stored on his phones.  I would grant the evidence of
that is thin and probably would not suffice on its own, but
when paired with the earlier evidence and evidence of both the
wire fraud scheme and Mr. Raji's use of a phone in furtherance
of it, it is not an insignificant data point.  On that score
there is no requirement that officers must be actively
investigating a particular crime to seize evidence of that

1   crime that they discover in plain view.  See *United States v.*

2   *Masciarelli*, 558 F.2d 1064, 1067 (2d Cir. 1977).

3        Finally, Agent Ryan understood from his approximately

4   four years of experience investigating cyber financial crimes

5   that "conspirators in email compromise schemes almost always

6   use cellphones in furtherance of such schemes" and that records

7   of these communications are often stored on their cell phones.

8   Ryan supplemental affidavit paragraphs 1 and 4(f).  This

9   general knowledge as I have stated earlier would not suffice on

10  its own but when paired with other evidence specific to this

11  particular investigation, bolstered the reasonableness of his

12  Agent Ryan's probable cause determination.  In sum, considering

13  the totality of the information known to Agent Ryan at the time

14  of the seizure, he had probable cause to believe that Mr.

15  Raji's phones likely contained evidence of criminal activity.

16       I recognize that the information on which Agent Ryan

17  relied regarding Mr. Raji and Ms. Martino-Jean's suspected use

18  of their cell phones in furtherance of the charged scheme was

19  approximately a year and a half old by the time of the seizure

20  in December 2019.  That said, both the nature of the evidence

21  seized and the nature of Mr. Raji's suspected criminal activity

22  lead me to conclude that the information was not too stale to

23  establish probable cause.  As to the nature of the evidence,

24  courts have recognized that suspects tend to retain digital

25  evidence such as emails, contacts, and text messages longer

than physical evidence.  See, e.g., *United States v. McKormick,* 2019 WL 3718944, at *4 (D.D.C. Aug. 7, 2019); *United States v. Khateeb*, 2015 WL 6438755, at *4 (M.D. Fla. Oct. 21, 2015); *United States v. Ali*, 870 F. Supp. 2d 10, 34 (D.D.C. 2012); *United States v. Payne*, 519 F. Supp. 2d 466, 477-78 (D.N.J. 2007), aff'd, 394 F. App'x 891 (3d Cir. 2010).

Although it is certainly possible that Mr. Raji could have deleted digital evidence from his cell phone or obtained a new phone without transferring his data in the intervening months, for example, after he learned of Ms. Martino-Jean's arrest, probable cause does not require certainty; it requires only "a fair probability that evidence of a crime will be found." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); see *Ali*, 870 F. Supp. 2d at 34.

Moreover, as Agent Mulloy — a task force officer with the FBI — attested in support of the Government's application for a warrant to search Mr. Raji's phones after their seizure, "even when digital files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensic tools."  Mulloy affidavit paragraph.  See *United States v. Toups*, 2007 WL 433562, at *4 (M.D. Ala. Feb. 6, 2007).

As to the nature of Mr. Raji's suspected criminal activity, the Second Circuit has held that "facts of past criminal activity that by themselves are too stale can be

sufficient if the information available to the officer also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993).  Here, the charged fraud scheme was conducted over a period of months, establishing a pattern of continuing criminal activity, such that "the passage of time becomes less significant" for probable cause purposes. *United States v. Ortiz*, 143 F.3d 728, 732 (2d Cir. 1998).  The possibility that Mr. Raji may have conducted additional fraudulent financial transfers in October and November 2019, while not overwhelming and not dispositive, further suggested that more recent evidence may have been stored on his phones.   In these respects, *United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015), in which the Second Circuit held that "a single incident of access to thumbnail images of child pornography, absent any other circumstances suggesting that the suspect accessed those images deliberately or has a continuing interest in child pornography, fails to establish probable cause that the suspect will possess illicit images many months later," page 109, is readily distinguishable.  Here, Agent Ryan's determination that evidence of criminal activity was likely stored on Mr. Raji's phones was not based on "a single incident" of digital activity but rather on a series of messages, emails, and phone calls allegedly sent and received over a period of months, which

together suggested a "deliberate" and "continuing" pattern of conduct likely to result in a trove of digital evidence on Mr. Raji's phones long after the 2018 alleged wire fraud scheme was completed.

finally, although Mr. Schneider's arguments today about incentives that this would create for the government are interesting and not entirely unpersuasive, at the end of the day as I said I think they are more arguments against the plain view exception than they are arguments fore suppression here. The plain view exception of course is well established law. Nor do I find that the fact the government sought a warrant to search the phones to compel impression of the seizure in the first instance.  First, I am not being called upon to ask whether the government had to obtain that warrant.  It certainly was good practice and indeed as I stated before probably would have been better practice to obtain a warrant for the seizure in the first instance; but the fact that they obtained that warrant and perhaps even had to obtain that warrant doesn't follow that the seizure here wasn't supported by probable cause.

In sum I conclude based on the totality of Special Agent Ryan's knowledge at the moment of seizure that the incriminating character of the items seized was readily apparent to him when he saw the phones in Mr. Raji's home.

Accordingly, Mr. Raji's motion to suppress evidence

obtained from his cell phones is denied.  Given the parties'

agreement that Mr. Raji's challenge to the arresting officers'

retrieval of information from his phone to answer the pedigree

questions following is moot.  That disposes of Mr. Raji's

entire motion.

Mr. Schneider did include a preservation of rights

section in his memorandum and I don't think I need to address

that now.  If something comes up that could not have supported

a motion by the deadline, then we'll cross that bridge when we

goat it it.  Obviously that disposes of any motions that could

have been filed at that time.

I think we need to talk about a trial date.

Ms. McLeod, my notes indicate that the government's

estimate of a trial date in this matter would be -- the length

of a trial in this matter would be approximately one to two

weeks; is that still correct?

MS. MCLEOD:  I think that's right, your Honor.  I

would estimate five to seven trial days.

THE COURT:  Have the two of you discussed a possible

date?  I recognize that is a complicated thing these days both

given uncertainty about COVID restrictions and given the number

of trials that you all have scheduled coming down the pike.  I

certainly have my fair share as well.  Some with one or both of

you.

Have you discussed it?

1          MS. MCLEOD:  We have, your Honor.  Due to

2     Mr. Schneider's fall trial schedule, which is very busy, he

3     would request and the government has no objection to the trial

4     being held in next year in 2022.  Mr. Schneider I think ideally

5     we would like a trial to happen shortly after Passover but we

6     are open to what the Court is amenable.

7          THE COURT:  Mr. Schneider.

8          MR. SCHNEIDER:  She's right.

9          THE COURT:  Do you want to spell out your schedule so

10    I can confirm that we can't do it sooner.

11         MR. SCHNEIDER:  Of course.  I have a July 12th trial

12    before Judge Koeltl.  That is a murder-for-hire trial.

13    September 30thth before Judge Nathan.  Also, a murder for hire

14    trial.  I have a July 6th trial before Judge Ramos.  Again,

15    murder-for-hire.  I have a February 28th, 2022, to trial before

16    Judge Seybert in the Eastern District.  That is a racketeering,

17    murder trial.  I have another trial scheduled in May before

18    Judge Preska.  Also a murder trial.  But I don't expect the

19    May 1 to go.  That I expect to be resolved.  The other four

20    trials, I have no reason to think they will be resolved.  I

21    have every reason they will go forward as trials.

22         THE COURT:  I am not saying I am averse to the

23    post-Passover proposal; but if I caught your trial schedule

24    correctly, would there not be a window of January of next year?

25         MR. SCHNEIDER:  At this point it's possible.  I would

1    rather not do it.  The February 28th trial before Judge Seybert

2    is many, many acts of violence.  That is going to require

3    significant preparation.  Technically I don't have a scheduled

4    in July.  I would like to use my time in June.  I would like to

5    use my time in June to prepare.

6              THE COURT:  January I think.

7              MR. SCHNEIDER:  I am sorry.  January.  I apologize.

8              THE COURT:  Third time is a charm.

9              MR. SCHNEIDER:  I expect to using my time in January

10   to prepare for my February trial.

11             THE COURT:  All right.

12             MR. SCHNEIDER:  If I also may, your Honor, all of

13   those cases are older than this case and they are all

14   incarcerated defendants.

15             THE COURT:  When you say after Passover, Passover if I

16   am not mistaken ends on Friday April 22nd.  Would the following

17   week be too soon after Passover?

18             MR. SCHNEIDER:  That should be fine, your Honor.

19             THE COURT:  I am going put it to start on Tuesday,

20   April 26th, 2022.  That is further out than I would like in an

21   ideal world, but we're not in an ideal world at the moment.

22   While my trial schedule is not an adequate justification to

23   exclude time under the Speedy Trial Act, Mr. Schneider's is

24   because he cannot prepare two cases at the same time let alone

25   try two cases at the same time.  I want to ensure that he is

1       able to ensure to prepare for this case adequately.

2               If you do hear through the grapevine that a trial that

3       would be going on at that time.  So if both of them go forward,

4       then I will figure out what to do about it and I suspect that

5       different judges are going to have to pitch in and take trials

6       given the backlog that has emulated over the course of the last

7       year.  Bottom line is my own trial situation aside, you should

8       treat that April 26th, 2022, date as a firm trial date, which

9       means barring god forbid another pandemic or something of that

10      nature, that, is the date on which this case will proceed to

11      trial if indeed it goes to trial.

12              So what that means is if there is anything that could

13      affect your ability to affect our trial on that date, whether

14      it is late discovery issue, a new motion that the defense

15      thinks it could bring, issue between Mr. Raji and counsel, any

16      issue that could affect our ability to start trial on that

17      date, you better raise it sooner rather than later.  If you

18      wait to raise an issue of that sort that could affect your

19      ability to start trial, I could deny it on that basis alone if

20      it could affect that trial date.  I want to make sure everybody

21      understands that.

22              Ms. McLeod, do you understand that?

23              MS. MCLEOD:  Yes, your Honor.

24              THE COURT:  Mr. Schneider?

25              MR. SCHNEIDER:  Yes, your Honor.

1          THE COURT:  Mr. Raji, do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  As I think counsel know my practice is

4    about two months prior to trial to issue an order scheduling a

5    final pretrial conference and deadlines for the filing of any

6    request to charge, proposed voir dire and motions in limine.

7    So you should look for that roughly next February or

8    thereabouts.  My sincere hope is that we will be done with

9    COVID trial protocols long before then and we don't have to

10   worry about that.  I will not address that at the moment.

11         I think that covers what I need to cover aside from

12   speedy trial.  Anything else from either counsel?

13         Ms. McLeod.

14         MS. MCLEOD:  No, your Honor.  Other than speedy trial.

15         THE COURT:  Is there an application for exclusion of

16   time?

17         MS. MCLEOD:  Yes, your Honor.  The government would

18   move to exclude time from today until April 26th, 2022, the

19   trial date, so that both parties can adequately prepare for

20   trial.

21         THE COURT:  Any objection, Mr. Schneider?

22         MR. SCHNEIDER:  No, your Honor.

23         THE COURT:  I will exclude time between today and

24   April 26th, 2022.  I find that the ends of justice served by

25   excluding that time outweigh the interests of the defendant and

1    the public a speedy trial, to ensure that defense counsel and

2    the defendant have an adequate amount of time to prepare for

3    trial in this matter, and given defense counsel's other

4    competing trials and obligations.

5              Anything else, Mr. Schneider?

6              MR. SCHNEIDER:  No, your Honor.  Thank you.

7              THE COURT:  Thank you for the very helpful and good

8    argument.  Good to see you both.

9              MR. SCHNEIDER:  Good to see you, your Honor.

10             THE COURT:  All of you stay safe and well.

11             We're adjourned.

12             Thank you very much.

13                              o0o

14

15

16

17

18

19

20

21

22

23

24

25