M986RAJC                    Final Pretrial Conference

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                        19 CR 870(JMF)

5  MUSTAPHA RAJI,

6            Defendant.

7  ------------------------------x

8                                New York, N.Y.
                                 September 8, 2022
9                                11:15 a.m.

10 Before:

11                 HON. JESSE M. FURMAN,

                                 District Judge
12
                        APPEARANCES
13

14 DAMIAN WILLIAMS,
        United States Attorney for the
15      Southern District of New York
   BY:  JILAN KAMAL
16      ROBERT SOBELMAN
        CATHERINE GHOSH
17      Assistant United States Attorneys

18 JEREMY SCHNEIDER
        Attorney for Defendant
19
   Also Present:
20 Matthew Bailey, AUSA Paralegal

21

22

23

24

25

M986RAJC                    Final Pretrial Conference

1          (Case called)

2          THE COURT:  We are here in the matter of *United States*

3     *v. Raji,* 19 CR 870.  Counsel, please state your name for the

4     record.

5          MS. KAMAL:  Good afternoon, Jilan Kamal, Robert

6     Sobelman, Catherine Ghosh, and a paralegal, Matthew Bailey, on

7     behalf of the United States.

8          THE COURT:  Good morning.

9          MS. KAMAL:  Good morning.

10          MR. SCHNEIDER:  Good morning, your Honor.  Jared B.

11     Schneider for Mr. Raji, who is not present here.

12          THE COURT:  Good morning to you.  His lack of presence

13     is the first item on my agenda.  What is going on?  I was told

14     he missed a subway stop.  20 minutes does seem like an awful

15     long time.

16          MR. SCHNEIDER:  He actually called me.  I called him,

17     and he was on the subway, and he said what stop is closest, I

18     said Canal Street.  He was on the N Express train, which I

19     believe the next stop is Atlantic Avenue in Brooklyn, so I told

20     him to come off and come back and that was probably 20ish

21     minutes ago.  And I've tried calling him again and texting him,

22     and it goes to voicemail, which makes me think he's still on

23     the train.  I was hoping that it went to voicemail because he

24     gave his phone downstairs, but that's not the case because he's

25     not here yet.

M986RAJC                    Final Pretrial Conference

1          So I texted him and called him, and I have no doubt

2     that he'll be here, but I apologize about this.  As you know,

3     he's not from New York, and he thought the express would get

4     him here quicker, and that was the first mistake.  So I

5     apologize for his absence.  I'm prepared if you want to go

6     forward with non-substantive issues.  I'm prepared to do that

7     with your Honor, if you'd like to do that to save time.

8     However your Honor wants to proceed is okay with me.

9          THE COURT:  All right.  Well, if I need to I will do

10    that, but I would obviously prefer to have the defendant

11    present for what is an important conference, a final pretrial

12    conference before a trial.

13          Let's give it another couple minutes.  You can text

14    and see if you can reach him.  I'll call the CSOs and see if

15    there's a line or anyone waiting.  I find that hard to believe

16    given the days we're in, but let's see if we can find him.

17          MR. SCHNEIDER:  Your Honor, would you like me to step

18    out and go look for him?

19          THE COURT:  I give you permission to use your

20    cell phone and reach him from the courtroom.

21          MR. SCHNEIDER:  Thank you.

22          THE COURT:  I would think he should be able to get

23    texts or calls, wherever he may be, unless he's given up his

24    phone to the court.

25          MR. SCHNEIDER:  Well, for what it's worth, when I

1   texted him at 11:09, it does not indicate it was delivered or

2   read.  And, again, I've called him probably four or five --

3   I'll keep trying, your Honor.

4          THE COURT:  Thank you.

5          (Pause)

6          MR. SCHNEIDER:  Do you want the good news or bad news?

7   Good news is I reached him.  The bad news is the train passed

8   Canal Street going the wrong way.  He's now at 34th Street.

9   The express took him where he didn't know where to go.  So he

10  is -- and he saw I called, he got off the train to call me or

11  receive my call.  He's now running to wherever he can to

12  hopefully get a train to Canal Street.  And I apologize.

13  Believe me.  This is not how I wanted to start the day.

14         THE COURT:  Okay.  I would think a cab or Uber would

15  make more sense in the circumstances, but it is what it is.

16         It's 11:25.  Let's plan to reconvene.  I'll be back at

17  11:45.  I assume he'll be back before then, and we'll get done

18  whatever we can get done and reconvene later if need be.

19         MR. SCHNEIDER:  Thank you.  I'll try to reach him and

20  see if he can get a cab or Uber if he hasn't already gotten a

21  subway.

22         THE COURT:  I'll be back at 11:45.

23         (Recess)

24         THE COURT:  All right.  We are back in the matter of

25  *United States v. Raji*.  Counsel is still present.  Mr. Raji has

1    finally graced us with his presence.

2              Mr. Raji, I want to tell you it's not a good idea to

3    come -- I don't want to you to say anything.  All right?  I'm

4    going to speak.  Not a good idea for the final pretrial

5    conference before you are going on trial for four felony

6    counts, to show up an hour late.  Okay?

7              I have seen defendants remanded for less than that.  I

8    am not going to remand you on the basis of your allegedly

9    missing the subway stop, but I want to warn you:  You better do

10   everything you need to do to be here, not only on time, but

11   early for every day of the trial.  And if you are not, you will

12   be going to jail so that you are here courtesy of the Marshals.

13   Do you understand that?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Very good.

16             All right.  Let's get started.  We're here for the

17   final pretrial conference.  The trial is scheduled to start on

18   Monday.  I'm going begin by allocuting Mr. Raji in light of

19   *Lafler* and *Frye*, just to confirm that he's been apprised of any

20   plea offers made by the government.  Any objections to that

21   from either counsel?

22             MS. KAMAL:  No, your Honor.

23             MR. SCHNEIDER:  No, your Honor.

24             THE COURT:  All right.  Let me start with the

25   government.

M986RAJC                          Final Pretrial Conference

1        Ms. Kamal, can you confirm or tell me, has the

2   government extended a plea offer to Mr. Raji?

3        MS. KAMAL:  Yes, your Honor.  On May 12, 2022, the

4   government extended a plea agreement to Mr. Raji's counsel.  It

5   was rejected by e-mail from counsel on July 15, 2022.  That

6   plea agreement extended to the defendant consisted of a

7   one-count plea to conspiracy to commit wire fraud.  The

8   guidelines range reflected in the plea agreement was 51 to

9   63 months imprisonment.

10        Subsequent to that plea agreement, your Honor, on

11   August 24, 2022, the government transmitted a *Pimentel* letter

12   to advise the defendant of the potential guidelines were he

13   convicted of all four counts with which he's charged after

14   trial.  That guidelines range reflected 108 to 135 months

15   imprisonment, and defense counsel acknowledged receipt of that

16   *Pimentel* letter on August 24.

17        THE COURT:  Thank you very much.  Two notes, as of

18   this week, mask wearing is optional, and that is true in my

19   courtroom too.  Just so everybody knows, if you choose to wear

20   one, you don't have to.

21        Make sure you speak directly into the microphone.

22   We're having some issues, I think, with that microphone in

23   particular, but hopefully if you speak directly into it, it

24   will make it a bit better.

25        Now, Mr. Schneider, can you confirm that you have --

1    that you received the written plea offer and the *Pimentel*

2    letter that Ms. *Pimentel* mentioned?

3              MR. SCHNEIDER:  Yes, your Honor, I received the

4    letter, the *Pimentel* letter.  I've received the plea agreement.

5    I've discussed both the plea agreement and the *Pimentel* letter

6    with Mr. Raji.  I have sent him actual copies of the plea

7    agreement and the *Pimentel* letter.  We have discussed it, and

8    he had informed me to inform the government that he did not

9    accept the plea agreement, period.

10              THE COURT:  All right.  And I take it through the

11   *Pimentel* letter, if not otherwise, you have discussed with

12   Mr. Raji what his sentencing exposure is if he were to go to

13   trial and get convicted on all counts?

14              MR. SCHNEIDER:  I have discussed with him his exposure

15   after trial, both before I got the *Pimentel* letter, when I got

16   the *Pimentel* letter, and after I got the *Pimentel* letter, so

17   yes.

18              THE COURT:  And obviously, don't tell me what it was,

19   but can you tell me whether you made a recommendation to

20   Mr. Raji as to whether he should accept or reject the offer?

21              MR. SCHNEIDER:  I made -- the answer is I made the

22   recommendation on more than one occasion, the same

23   recommendation on numerous occasions.

24              THE COURT:  All right.  Mr. Raji, first, let me ask

25   you, have you taken any drugs, medicine, pills or had any

M986RAJC                        Final Pretrial Conference

1   alcohol within the last 24~hours?

2          THE DEFENDANT:  No medication that I was prescribed,

3   yes.

4          THE COURT:  Can you move the microphone a little

5   closer to you, please.

6          THE DEFENDANT:  Prescribed medications, yes.

7          THE COURT:  Can you just tell me what those

8   medications are?

9          THE DEFENDANT:  I don't know them offhand.  Do you

10  mind if I bring them out?

11         THE COURT:  Sure.  Let me ask you, do any of them

12  affect your thinking, the clarity of your thinking?

13         THE DEFENDANT:  No.

14         THE COURT:  All right.  And what are you taking the

15  medications for?

16         THE DEFENDANT:  Heart disease, high blood pressure,

17  those kind of -- kidney disease.

18         THE COURT:  But none of them affects your ability to

19  think clearly?

20         THE DEFENDANT:  Not significantly right now.  Not

21  right now.

22         THE COURT:  In general, do they affect --

23         THE DEFENDANT:  Sometimes, but not significantly right

24  now.

25         THE COURT:  What effects do they have?

1      THE DEFENDANT:  Just dizziness and some difficulty

2  breathing and hearing properly, but it's not -- you know.

3      THE COURT:  All right.

4      THE DEFENDANT:  Right now, I'm okay.

5      THE COURT:  Is your mind clear today?

6      THE DEFENDANT:  Yes.

7      THE COURT:  Do you understand what is happening here

8  today?

9      THE DEFENDANT:  Yes.

10      THE COURT:  All right.  Did you hear the questions

11  that I posed to the government and the government's responses

12  to those questions?

13      THE DEFENDANT:  Yeah.

14      THE COURT:  Did you hear what Mr. Schneider told me?

15      THE DEFENDANT:  Yes.

16      THE COURT:  And was Mr. Schneider description of

17  what -- of his dealings accurate?  Did he give you a copy of

18  the government's plea offer, written plea offer and a copy of

19  the so-called *Pimentel* letter?

20      THE DEFENDANT:  Yes.

21      THE COURT:  And did he discuss both of those with you?

22      THE DEFENDANT:  Yes.

23      THE COURT:  All right.  And again, don't tell me what

24  it was, but did he give you a recommendation about whether you

25  should accept the government's plea offer?

M986RAJC                          Final Pretrial Conference

1           THE DEFENDANT:  He gave me a recommendation.

2           THE COURT:  Okay.  And is it correct that you rejected

3    the government's plea offer and that you wish to go to trial?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Okay.  You understand it's your decision

6    whether you accept -- whether you plead guilty or you go to

7    trial, am I correct that you have made the decision not to

8    plead guilty and to proceed to trial; is that correct?

9           THE DEFENDANT:  Yes.  Yes.

10           THE COURT:  Okay.  Counsel, any additional questions

11    you think I should ask Mr. Raji?

12           MS. KAMAL:  Nothing further, your Honor, thank you.

13           THE COURT:  Mr. Schneider?

14           MR. SCHNEIDER:  No, your Honor.

15           THE COURT:  All right.  Moving along.  I want to

16    address the remaining motions *in limine*.  I resolved the

17    government's motions *in limine* by order on Tuesday.  The only

18    slightly open issue on that front is the third item.  I trust

19    that defense counsel knows the boundaries of any such evidence

20    that is regarding Mr. Raji's nationality and the like, but I

21    agree that those issues are not necessarily categorically

22    impermissible if, say, he, Mr. Raji were to testify or records

23    of any incorporations were introduced.  But as noted in my

24    order, I think those issues can and should be dealt with

25    through particularized objections at trial in the event that

1    any such evidence is offered.  So with that caveat, the motion

2    was denied as moot.

3              Moving to the defendant's motions *in limine*, based on

4    the government's response, the motion is moot with respect to

5    the evidence referenced in Paragraph 2 of the defendant's

6    motion as to which the government does not intend to offer

7    evidence or make argument.

8              That leaves the three categories addressed in the

9    government's response, and I'll take them in turn.

10             First is other acts' evidence prior to the charge

11   conduct, namely the so-called university scheme and hospital

12   scheme.  And based on the parties' written submissions, it does

13   seem that evidence would be clearly admissible pursuant to rule

14   404(b) for the reasons explained by the government in its

15   memorandum, namely as evidence of knowledge, intent, plan and

16   absence of stake.

17             Unless I'm missing something, this seems like a

18   classic case where the central issue or issues are knowledge

19   and intent, and defendant's arguments in his brief rest

20   primarily on Rule 403.  But I don't find those arguments

21   persuasive since the evidence is no more inflammatory than the

22   charged conduct.  And based on the government's

23   representations, the other acts' evidence will not take

24   particularly long.

25             Now, indeed, the fact that the conduct is,

M986RAJC                          Final Pretrial Conference

1    quote/unquote, practically identical, to use Mr. Schneider

2    words, the charged conduct is not the reason to keep any

3    evidence out.  It is precisely what makes it probative,

4    knowledge, and intent.

5           Mr. Schneider, am I missing something?  Anything else

6    you wish to say on that front?

7           MR. SCHNEIDER:  You're not missing anything, but I'd

8    like to say something else if that's okay.

9           May I remain seated for the microphone?

10          THE COURT:  You may.

11          MR. SCHNEIDER:  Thank you.

12          It's clear that the Second Circuit does take what's

13   called an inclusive approach to 404(b) evidence.  But I guess,

14   I am just hoping for one time the government will be held to

15   its standard of proving the case that they charged by evidence

16   related directly to the case in point.

17          They have a cooperator in this case.  They have

18   documentary evidence.  They have civilian witnesses.  They

19   have, in my view, more than enough evidence to present their

20   case on the $1.7 million business e-mail compromise scheme.

21          Yes, I know the case law makes these uncharged crimes

22   admissible.  It just seems to me, your Honor, that no matter

23   how many times you're going to tell the jurors what the purpose

24   of that evidence is for.  And they're going to hear you, and

25   they're going to believe you.  But I think it's almost

1    impossible to not have them think that, oh, my God, this guy

2    did this thing twice or three times before; he must have done

3    it now.

4              So I think that, yes, the 404(b) evidence or the

5    404(b) lack of knowledge, intent, lack of mistake, planning, I

6    understand all those exceptions.  And at this point, I'm not

7    prepared to acknowledge either -- acknowledge knowledge or

8    intent.  Maybe I will before we begin, in which case we can

9    revisit it.  But I'm not prepared to do that now.

10             But I just think we're undervaluing the 403 unduly

11   prejudicial aspect of this.  It doesn't have to be just a more

12   heinous crime to make it unduly prejudicial.  It doesn't have

13   to be one that more seriously affects the jurors'

14   sensibilities.  It has to be one that will make it, I believe,

15   impossible for a jury to bifurcate what the evidence is being

16   introduced for.  I know the government is going to tell the

17   jury what it's being introduced for.  I'm going tell them, and

18   your Honor is going to instruct them.

19             But let's all remember -- we also tell them to use

20   their commonsense.  And I believe that commonsense is going to

21   tell them that if he's done it before, he's done it now.  And

22   it's classic bootstrapping argument because the government is

23   going to assume that the other uncharged crimes are provable or

24   proven.  And therefore, if he did those, then they'd use that

25   to prove the underlying 1.7 million scheme.

1    So, again, you're not missing anything, your Honor.

2 The law is what it is.  Your Honor has a discretion.  These

3 situations are not unusual.  But I'm just hoping that one time,

4 based on the evidence that is relevant -- not -- based on the

5 evidence that's correctly on point to the 1.7 million, let the

6 government prove the case based on that and not bring in what I

7 consider to be extrinsic evidence of uncharged crimes, which I

8 believe are unduly prejudicial even though they are

9 particularly close, factually and even in time, to the crimes

10 charged.  Thank you.

11    THE COURT:  All right.  Thank you.  Needless to say, I

12 think that argument is taking issue with the law and the rule,

13 not with the implications of those things here.  I think you've

14 effectively conceded that under existing law, it is admissible,

15 and I agree so.

16    As to the first category, the motion is denied

17 substantially for the reasons stated in the government's

18 memorandum.  If, for offering of that evidence, the defense

19 changes its view and is prepared to concede knowledge and

20 intent, then obviously we can revisit it.

21    I'm also prepared, as Mr. Schneider's remarks

22 suggested, to give proper limiting instructions to the jury.

23 They are fairly standard instructions along those lines, but I

24 would ask you, Mr. Schneider, to provide the government with a

25 proposed limiting instruction.  And you can confer on it and

1   give it to me before opening so that I'm ready to go when the

2   time comes.

3           Moving to the second category, other acts and

4   communications with the cooperating witness, CW1, I want to

5   divide this into two subcategories.

6           First, as to prior communications and acts, that is

7   communications and acts before the charged conduct.  That also

8   seems clearly admissible substantially for the reasons

9   discussed by the government, namely as direct evidence of the

10  crime insofar as it is necessary to complete the story of the

11  charge conduct, his necessary background with respect to the

12  relationship between the defendant and CW1.  And in the

13  alternative, there's 404(b) evidence for the reasons I already

14  discussed Mr. Schneider, anything you want to say on that

15  subcategory -- other than what you've already said, I should

16  say?

17          MR. SCHNEIDER:  I'm not going to repeat myself,

18  your Honor.

19          THE COURT:  Okay.

20          MR. SCHNEIDER:  I do know that frequently, crimes or

21  uncharged crimes that a cooperator involves himself with

22  allegedly with a defendant is admissible to show either why

23  they trust each other or to show a certain relationship.  I

24  don't think that's necessary in this case.  And I don't think

25  there's any question that the government has sufficient

1    evidence to prove a connection between the cooperator who is

2    CW1 and the defendant.

3            So I don't think it necessarily -- and they also go a

4    little bit further in the facts presented here.  This isn't

5    just where a complaint -- a cooperator said well, I committed X

6    number of robberies with the defendant in the course of my

7    racketeering involvement.  This is where the cooperator's going

8    to talk about a couple of specific instances that the

9    government is going to also try to prove with extrinsic

10   evidence as well.  So I think that's a little bit different

11   than just having a cooperator explain his relationship with the

12   defendant, so I object on that ground as well.

13           THE COURT:  Okay.  Do you want to flesh that out?  As

14   I understand from the government's memorandum, the prior

15   conduct, namely in the spring of 2018, is offered to explain

16   how CW1 and the defendant basically met and their first

17   interactions, namely the CW's understanding of the defendant's

18   ability to receive and launder substantial proceeds of fraud.

19           MR. SCHNEIDER:  It's my understanding that they met in

20   2017, not 2018, and that there were discussions then.  I mean,

21   if they want to talk about that, that's fine.  But then they're

22   also going have to -- as you can see from the memorandum, they

23   have specific instances after the charged fraud here that

24   they're talking about.

25           THE COURT:  That's a separate category that I'll get

M986RAJC                    Final Pretrial Conference

1    into in a second.  I'm focused on the conduct before the

2    charged conduct.

3           MR. SCHNEIDER:  I apologize.  It's my position that

4    there is -- there's sufficient evidence based on conversations

5    the complainant had with the defendant in 2017 that don't

6    necessarily have to implicate a specific fraud -- a specific

7    fraud.  They have conversations in general about the use of

8    bank accounts possibly, so if the government wants to talk

9    about that, I'm fine with that.

10          Or, I also will be prepared to concede that I will not

11   attack either on cross-examination or summation, that the

12   cooperator did not know the defendant.  I will not say that.

13   It doesn't make sense for him have to argued -- agree with the

14   defendant to commit a crime out of nowhere.  I would not make

15   that argument.  So therefore that would make their position

16   moot regarding their trying to counter that argument from my

17   perspective.

18          THE COURT:  All right.  Ms. Kamal, anything you want

19   to say on this front?

20          MS. KAMAL:  Your Honor, the burden is on the

21   government to prove the schemes at issue and the relationships

22   between the cooperating witness and Mr. Raji.  In particular,

23   with respect to the conduct in 2017, that is there to provide

24   important context about the cooperating witness's introduction

25   to Mr. Raji.  And the conduct in spring of 2018 directly

M986RAJC                    Final Pretrial Conference

1   precedes the conduct at issue and, we would argue, constitutes

2   direct evidence.

3           As a result, Mr. Schneider's proposal not to challenge

4   certain allegations here, while salutary, shouldn't limit the

5   government's ability to prove its case in the manner and with

6   the evidence that it sees fit where that evidence is relevant

7   and admissible.

8           THE COURT:  I agree as to the conduct before the

9   charged conduct, so the defendant's motion on that score is

10  denied.  It's admissible both as direct evidence, relevant

11  background, and 404(b).

12          Turning to the second subcategory here, the conduct

13  after the charged conduct in 2019.  Here I would like a little

14  bit more detail from the government.  The government's

15  memorandum states -- this is on Page 13 -- that the evidence is

16  quote, critical context for CW1's prior interactions with the

17  defendant and inform the meaning of certain phrases and actions

18  during the charge conduct.

19          Now, I don't quite understand what that means in

20  evaluating its probative value and potential prejudice.  It

21  seems like that's important.  So can you spell that out a

22  little bit more?

23          MS. KAMAL:  Very briefly, your Honor, I can provide a

24  little more additional context of what that evidence would look

25  like.

M986RAJC                        Final Pretrial Conference

1              THE COURT:  Can you move the microphone a little

2      closer, please?

3              MS. KAMAL:  I'm not sure -- can you hear me better

4      now?

5              THE COURT:  Yes.

6              MS. KAMAL:  Got it.

7              So the conversations at issue in 2019 take place in

8      approximately May or June.  This is in the direct -- this is in

9      the aftermath, not the direct aftermath, of the fraudulent

10     scheme that was carried out, and that's the main scheme at

11     issue here which occurred in August and continued into

12     September of 2018.

13             After that 2018 and 2019 -- after that September 2018

14     conduct, the evidence will show that there was a lapse in

15     communication between the cooperating witness and the

16     defendant.  And that frankly, the proceeds at issue were not

17     disbursed as the other participants in this scheme had

18     expected.

19             The conversations in 2019 are relevant to establish

20     that the defendant knew that these -- that the scheme in 2018

21     was not just a fraudulent scheme that he joined and

22     participated intentionally, but that when the cooperating

23     witness went back to him again to offer him another opportunity

24     to participate in such a scheme, Mr. Raji jumped at the

25     opportunity and corresponded with the defendant -- sorry --

M986RAJC                      Final Pretrial Conference

1    corresponded with the cooperating witness to basically engage

2    in practically the very same scheme that had been undertaken in

3    September in 2018 against Marble Arch.

4            To be clear, the evidence of that May and June 2019

5    conduct would be testimony from the cooperating witness.  I

6    believe it was four to six pages of text messages, WhatsApp

7    messages between the cooperating witnesses and Mr. Raji.  And

8    the cooperating witness will explain the meaning of certain

9    terms used in those text messages that would also help to

10   enlighten exchanges that were had in the September 2018 period.

11           THE COURT:  Can you spell out what you mean by that?

12   In other words, what I'm trying to understand is, aside from

13   just piling on and saying that Mr. Raji was willing to and/or

14   did commit additional acts of fraud after the charged conduct,

15   how does that conduct -- how is it probative of his guilt or

16   innocence with respect to the charged conduct?  In other words,

17   how does it -- what evidence is it of intent, knowledge,

18   meaning of terms, et cetera, with respect to the charged

19   conduct?

20           MS. KAMAL:  So I'll answer that in two parts,

21   your Honor.  As an initial matter, we expect the defense may

22   attempt to argue that the lapse in communication between the

23   cooperating witness and Mr. Raji after the Marble Arch scheme

24   was intercepted and halted reflects and supports the

25   implication that Mr. Raji did not know that this was a

1    fraudulent scheme, that he had been swept up in it by accident.

2           As a result, the conversations in 2019 are probative

3    of the defendant's knowledge and intent in 2018 to engage in

4    just what it was, a scheme to defraud others and to receive the

5    proceeds of that fraud and to launder them.  So that's the

6    first -- that would be the -- that's my first response.

7           Secondly, with respect to your question about what

8    particular terms would be enlightened in the 2019 and the 2018

9    schemes, I believe -- and if you will give me one moment to

10   confer with my colleague -- I believe there's a particular term

11   at issue that's used in both schemes.  I want to make sure I'm

12   a hundred percent on that point.

13           (Attorneys confer)

14           MS. KAMAL:  Your Honor, the term at issue is CIS,

15   which is customer information.  What the government can do is

16   send the exhibit to the court today, and it can take a look and

17   reserve decision as to whether or not there's sufficient

18   overlap.  Mr. Schneider is already in receipt of the exhibits,

19   and so we can handle that issue that way if the Court is

20   amenable.

21           THE COURT:  Okay.  Can you -- that maybe appropriate,

22   and indeed, maybe I should look at all the exhibits that

23   pertain to the 2019 conduct to get a better sense.  But, is

24   there something about -- in other words, the fact that the same

25   term is used in two different -- let's assume for the sake of

M986RAJC                      Final Pretrial Conference

1    argument, criminal schemes doesn't mean that admitting evidence

2    of the second adds anything to proof of the first.  That is to

3    say unless there's something different about the 2019 scheme

4    that reveals that it was -- you know, either reveals its

5    meaning that isn't apparent from the 2018 scheme or reveals

6    knowledge and understanding that it's criminal or, you know --

7    you see what I mean?

8            In other words, the fact they both involve the same

9    term, if it doesn't have any, you know, sort of probative value

10   with respect to one, if it's just the same term, it's

11   presumably not going have to any greater probative value with

12   respect to the second.  So I'm trying to figure out what it

13   adds.

14           MS. KAMAL:  So two things, your Honor, it's not merely

15   the use of the term "CIS."  What CIS refers to, and is

16   accompanied by typically, is customer information, which is to

17   say information that is requested by banks when they suspect

18   there's a fraudulent transaction.  As the Court will see and as

19   the defense is aware from the review of the exhibits, many of

20   the communications between what the coconspirators and between

21   the cooperating witness and Mr. Raji, revolve around how to put

22   it colloquially to "paper over," what are the obvious

23   deficiencies in the information provided to support these

24   transfers of very large sums.

25           The 2019 conversations by text message are something

1    more explicit on that -- on why the CIS, the customer

2    information is necessary, why it is being provided and what it

3    is being provided in response to.  However, the government

4    believes there is a parallel rationale between the CIS requests

5    and information that are provided in 2019 with the use and

6    request for that CIS information in 2018.

7              THE COURT:  Mr. Schneider?

8              MR. SCHNEIDER:  I don't -- I guess I don't really

9    think that the government told you anything that you didn't

10   know.  They didn't answer you in terms of how the subsequent

11   information informs about his intent the year before.  They

12   already have evidence from 2017 and 2018 about his intent.  So

13   what he did afterwards, even if it's exactly the same, is not

14   going to help what he intended to do the year before.

15             Like I said, just because he used the same CIS

16   terminology or I think as government said to paper over the

17   scheme, I guess I don't really understand how it informs his

18   intent in 2018, unless we say -- well, withdrawn.

19             THE COURT:  Okay.  Do you intend to make any argument

20   with respect to the lapse in communications between Mr. Raji

21   and CW1?

22             MR. SCHNEIDER:  When you say "any argument," maybe.  I

23   don't want to preclude myself now.  I may.  So may I suggest,

24   then, that your Honor can hold this decision in abeyance, and

25   if at some point during cross -- it's going to come through the

1     cooperator.  So whenever he testifies prior to that, I will

2     inform the government, inform your Honor, what, if any,

3     argument I intend to make regarding the lapse of communication.

4              I don't really -- you know, I think the lapse of

5     communication almost speaks for itself, because I believe the

6     government's testimony is going to be that the cooperators,

7     cooperator singular, and coconspirators plural, were upset with

8     Mr. Raji because they didn't receive proceeds.  That's my

9     understanding.  So that explains -- so that explains

10    everything.  That explains -- I don't have to make any other

11    argument about it.  Because him talking to -- him meaning

12    Mr. Raji, talking to the cooperator a year later doesn't

13    explain the lapse because the lapse is going to be oh, Mr. Raji

14    tried to steal the money even from the coconspirators, that's

15    what the government is going to argue.

16             They're going to say he supposedly stole --

17    participated in stealing the money, that he's supposed to give

18    the money to other coconspirators.  He didn't do it, so

19    therefore, he's a, you know, a crook even among crooks.  Okay.

20    So that argument explains why he didn't communicate with the

21    other coconspirators if his intent was to steal from them.  So

22    they have to prove that, right?

23             So I don't see how him talking to them in 2019

24    addresses why he didn't give the money in 2018.  That lapse is

25    almost self-explanatory if you believe he's trying to scheme

M986RAJC                        Final Pretrial Conference

1    his own coconspirators.  So I don't think -- so 2019 adds to

2    anything in that regard, regarding the lapse.

3              THE COURT:  All right.  I think I will reserve

4    judgment.  Probably the only implication of that means that

5    unless it's resolved before openings, the government can't and

6    shouldn't open on this particular conduct.  It does seem to me

7    that the devil is very much in the details both with respect to

8    whether and to what extent it does shed light on terms that

9    were used in connection with the charged conduct and also

10   whether and to what extent it provides evidence of knowledge or

11   intent.

12             I mean, obviously, to give you a fairly stark

13   hypothetical, right, if two people participate in a flawed at

14   time one and then time two, one participant comes back to the

15   second participant and says, hey, you want to commit another

16   fraud with me?  And then the defendant says, yeah, you know, it

17   worked well last time.  That would obviously be quite powerful

18   evidence of intent and knowledge even though it's

19   retrospective.

20             I don't know if we're in that scenario or if it's more

21   ambiguous than that.  It seems to me it does turn on, you know,

22   whether it really is probative of knowledge and intent that

23   time one, which is 2018 here.

24             MR. SCHNEIDER:  That would be true.  That's why it's

25   the opposite here.  Here my understanding is that in 2019, they

M986RAJC                    Final Pretrial Conference

1   reach out to Mr. Raji after they didn't get their proceeds, so

2   that the fraud wasn't a success as far as they were concerned.

3   I think.  Maybe I'm wrong, but if that's factually correct, I

4   think it goes against the government's legal argument to the

5   admissibility of his intent in 2018.

6            THE COURT:  All right.  So I'm going to reserve

7   judgment.  Here's what I want to do.  I don't know if we'll

8   discuss in short order if I have all the government's exhibits

9   yet or not.  But in either case, I want you to point me to any

10  and all exhibits that relate to the 2019 communications and

11  conduct.  You can do that either by letter, just identifying

12  which exhibits they are, or if I don't have the exhibits and/or

13  you think it's easier to just submit those separately as a

14  discrete package, I'll leave that to you.  But in either case,

15  I want you to point me to it.

16           In the meantime, I will reserve judgment.  I may need

17  a more detailed proffer as to what the cooperating witness'

18  testimony would be on this score.  I suppose one scenario is I

19  even hear from the cooperator outside the presence of the jury

20  before making a determination.  The bottom line is I'll reserve

21  judgment.  So unless and until I say it's admissible, the

22  government shouldn't open on it.

23           Anything else to discuss on that front at the moment?

24           MS. KAMAL:  No, your Honor.  Understood.

25           MR. SCHNEIDER:  No, your Honor.

1          THE COURT:  Very good.  The last category is the

2     failure to pay income taxes or disclose income to the IRS.

3     Mr. Schneider, anything you want to say on this subject?

4          MR. SCHNEIDER:  I think there are a million reasons

5     why people don't file taxes.  I think if, in fact, he had filed

6     taxes in those years and did not declare the income, that would

7     be admissible to show he's trying to hide it.  But the fact

8     that he didn't file, we don't know if it was his CPA, if it was

9     his tax preparer who didn't file.  And I think it kind of

10     almost is shifting the burden to have him explain why he didn't

11     file, especially since I believe he filed -- when I say he, I'm

12     referring to him personally or the corporation that the

13     Government referred to, the Emergent Development Corporation, I

14     believe.

15          I think it's my understanding that I think taxes were

16     paid prior to that -- prior to those years.  So the fact that

17     they weren't paid for those 2017/'18, when he was arrested at

18     the end of 2019, I think is not really all that probative.  But

19     obviously, is unduly prejudicial, so it's unnecessary.

20          THE COURT:  All right.  So I've dealt with this in

21     another case in front of me in the not-too distant past.  But

22     Ms. Kamal or Mr. Schneider, do you have anything you want to

23     say on this?

24          MR. SOBELMAN:  Your Honor rejected precisely the same

25     argument in the *Avenatti* case.  First, the defense attorney's

M986RAJC                        Final Pretrial Conference

1    incorrect on the facts.  Not only does it not matter what

2    happened in years prior because we are talking about the

3    specific years here, Emergent did not file taxes before.  The

4    defendant has not filed taxes since, I think, 2013.  We're not

5    planning to elicit that unless the defense opens the door to

6    it, and we'll focus on 2017/2018, which is when the relevant

7    conduct here that's going to come into trial occurred.

8              With respect to shifting the burden, that's contrary

9    to law.  This type of testimony is admitted routinely in fraud

10   cases, if there's any other questions the Court has, but I

11   think this is an uncontroversial issue as a matter of law.

12             THE COURT:  I guess one of Mr. Schneider's argument

13   that there's a distinction between filing taxes but not

14   disclosing this income versus not filing any returns at all.

15             MR. SOBELMAN:  That goes to the weight of the

16   evidence, not the admissibility, so he can certainly make the

17   argument, well, Mr. Raji didn't have an intent to hide this

18   particular income.  He didn't file for some other reason.  That

19   is certainly an argument I've heard in other cases where we've

20   had similar testimony.  But it doesn't make the evidence

21   inadmissible.

22             THE COURT:  All right.  I agree.  The government is

23   correct, that it did project the same argument in the *Avenatti*

24   matter.  And I'll reach the same conclusion here, that is to

25   say the law is pretty clear that the failure to file tax

1    returns is relevant and probative of whether proceeds were, in

2    fact, legitimate proceeds, you know, that is, if the proceeds

3    were lawful, legitimate proceeds, you know, they would have

4    presumably been income and would have been reported to the IRS.

5    And the fact that he did not so report them tends to rebut any

6    claim that they were lawful and legitimate.

7           To the extent that there may have been other reasons

8    that the defendant did not file tax returns, that is argument

9    and/or fodder for cross-examination but not weight and

10   admissibility.

11          I would cite support for that in my decision in

12   *Avenatti*.  I will cite *United States v. Atuana*, 816 F.App'x

13   592, 595 (2d Cir. 2020*), United States v. Mitchell*, 613 F.3d

14   862, 866 (8th Cir. 2010), and *United States v. Memoli*, 2014,

15   WL 531, 730 at Page 9 (D. Conn. Oct. 16, 2014).  And the docket

16   number for *Avenatti* is 19 CR 374.  If I remember correctly, I

17   resolved that issue on the record at a conference in January of

18   last year.

19          So that resolves the defendant's motions *in limine*.

20   I'll reserve judgment on the one narrow issue of the

21   admissibility of conduct postdating the charges here, that is

22   the 2019 conduct.  And I expect the government to either submit

23   or point me to relevant evidence on that issue.  Otherwise, the

24   motion is denied.

25          And, Mr. Schneider, if you wish a limiting

1    instruction, you should present one to the government and

2    hopefully reach agreement and give it to me before openings.

3    All right.

4              Are there any other legal issues that either side

5    believes I should resolve now?  Obviously, anything that would

6    have a bearing on the parties' openings is certainly something

7    worth raising now.  I did review the joint request to charge

8    and didn't see any big-picture issues that seemed to be

9    necessary to resolve at this stage, but I want to check with

10   you.  So, Ms. Kamal?

11             MS. KAMAL:  Nothing further at this time, your Honor.

12             THE COURT:  Mr. Schneider?

13             MR. SCHNEIDER:  No, nothing now, Judge.

14             THE COURT:  All right.  As you know, I do look to you

15   to raise issues of that sort as they come up and outside the

16   presence of the jury.  So that's to say to the extent you can

17   identify and anticipate any issues and raise them in a timely

18   fashion to make things proceed more smoothly, that would be

19   great.

20             All right.  Turning to disclosures and the like, 3500

21   exhibits, I don't know if we received them yet.  But can the

22   government tell me where that stands in terms of disclosures to

23   the defense and to me?

24             MS. KAMAL:  Yes, your Honor.  As the Court's aware,

25   the parties entered a joint disclosure agreement.  The parties

1    have largely kept to that schedule.  The government, as it's

2    generated more than 3500 or has adjusted exhibits, has been

3    producing them in realtime to the defendant.  The Court will

4    have a final copy of our exhibits, the 3500 and the like, I

5    believe later today.

6           That will also be going to Mr. Schneider, although he

7    has also had the iterative versions of those exhibits over the

8    past ten days to two weeks.  So the parties are on schedule.

9           THE COURT:  Great.  So I do ask for them all to be

10   submitted to me electronically.  I think the government

11   traditionally uses the USA FX system, and that's fine with me.

12          Mr. Schneider, I don't know if you have anything that

13   you need to submit, but we do have a file transfer protocol

14   that can be used.  So if you have anything voluminous, you can

15   contact my chambers, and we can fill you in on how to handle

16   that.  Good?

17          MR. SCHNEIDER:  Yes, your Honor.

18          THE COURT:  Now, under my rules, you should submit

19   Word versions of exhibit lists.  It's fine to do that any time

20   before openings, you know, particularly if things are being

21   added or changed in a more up-to-date matter.

22          In the last case I tried, the government actually,

23   every day, provided me with a new copy of the exhibit list with

24   exhibits marked, that is by date as to when they were

25   identified and admitted into evidence.  I thought that was

M986RAJC                    Final Pretrial Conference

 1  quite nice and convenient.

 2            So I ask the government to do the same here, which is

 3  to say if you can provide Mr. Schneider and me with a running

 4  list each and every day, indicating which exhibits come in, I

 5  think that would ensure that everybody is on the same page in

 6  terms of what the record is.  Good?

 7            MS. KAMAL:  Yes, certainly, your Honor.

 8            THE COURT:  Great.

 9            All right.  Witness order, first of all, how many

10  witnesses does the government anticipate, how long?

11            MS. KAMAL:  On the assumption that certain

12  stipulations that have been traded by the parties are all

13  agreed upon, we anticipate seven witnesses.

14            MR. SCHNEIDER:  I'm sorry.  I couldn't hear.  Seven?

15            MS. KAMAL:  Seven.

16            THE COURT:  Are you prepared to tell me and

17  Mr. Schneider the order, or do you want more time before you

18  share the initial witnesses?

19            MS. KAMAL:  So we had one or two questions for the

20  Court about the schedule.  Many of our witnesses are coming

21  from out of town, and so it would help us to sort of nail down

22  their travel schedules.  And then we'd be able to more quickly

23  provide the witness order.  I believe our voluntary disclosure

24  schedule requires the government to update Mr. Schneider

25  tomorrow with the witness order.  We can do that later today if

1    we have a little more clarity on the length of the trial day

2    and the like.

3            THE COURT:  We'll discuss that in short order.  So one

4    of you, when you share with Mr. Schneider, the witness order,

5    you can disclose that to me too so that I have a sense.

6            I also need a list of names and places that are likely

7    to come up for the trial from both sides.  If you can do that

8    by the end of today so that we can prepare the jury voir dire

9    materials, that would be great.

10           So if you can do a joint list, all the better.  But in

11   either case, if both sides can submit that list by email to

12   Chambers by the close of business today, that would be helpful.

13   Please include names of witnesses and names that may come up at

14   trial locations that I should advise the jury pool of that may

15   come up at trial, and any members of the trial teams on either

16   side, folks who will be in court and visible to the jurors, I

17   should include their names.

18           So if it's not accurately reflected in your proposed

19   voir dire, make sure that you submit any updates or changes to

20   me by the close of business today.

21           All right.  Let's talk first about jury selection, and

22   then we'll talk about the schedule.  So we'll convene on

23   Monday.  You should be here by 9:30.  And, Mr. Raji, that means

24   9:30.

25           My intention -- we'll start jury selection as soon as

M986RAJC                    Final Pretrial Conference

1    the jury department is ready for.  Us, it's probably not going

2    to be 9:30.  But I'd rather have you here, and it also gives us

3    an opportunity to deal with any loose ends.  Now, my hope is

4    we'll have a jury done and picked on Monday.  You should be

5    prepared to open on Monday.

6           In theory, the government should be prepared to call

7    its first witness on Monday.  That might be ambitious, but in

8    any case, you should be certainly ready to do as much as we can

9    get done.

10          I intend to pick only 14 jurors.  My experience, you

11   know, I have not lost very many, even during the heights of

12   pandemic.  And I've been picking more than two alternates, but

13   that generally hasn't been necessary.  Anyone have reason to

14   disagree here?  I guess my question is does the government

15   still think this is a one-to-two-week trial?

16          MS. KAMAL:  Your Honor, the government contemplates

17   resting by Friday of next week.

18          THE COURT:  Okay.  And Mr. Schneider, does either side

19   think there's the need for more than two alternates?

20          MS. KAMAL:  No, your Honor.

21          MR. SCHNEIDER:  No, your Honor.

22          THE COURT:  Okay.  So then I will make 14 jurors, 12

23   regular jury and two alternates.  As you know, I'll conduct

24   voir dire myself.  I'll take into consideration the questions

25   you've submitted in your proposed voir dire.  I would be

1    inclined to ask about vaccination and booster status among the

2    jurors.  I think it's helpful for any number of reasons.  I

3    want to make sure there would be no objection to my doing so.

4    From the government?

5              MS. KAMAL:  One moment, your Honor.

6              Your Honor, do you plan to ask before the jury is

7    selected as part of the voir dire process or after the jury has

8    been selected?

9              THE COURT:  So I could do either.  I was proposing

10   asking as part of jury selection as part of the individual

11   questions, saying if you're comfortable answering the question,

12   are you fully vaccinated; are you boosted.  I've done that in

13   the last couple of trials.  I've also done it after jury is

14   selected.  I think it's helpful to know -- among other things,

15   it does have -- you know, I don't know what the latest is in

16   our protocols, but it may have implications if someone were to

17   test positive about what needs to be done and so forth.

18             So at a minimum, knowing with respect to those jurors

19   that are seated is helpful, and I do intend to ask them if we

20   don't do it as part of jury selection.  But I would be inclined

21   to ask as part of jury selection.

22             MS. KAMAL:  The government does not oppose.

23             THE COURT:  They do not oppose?

24             MR. SCHNEIDER:  I do not oppose either.  I actually

25   prefer that it be done during selection, not after they're

M986RAJC                    Final Pretrial Conference

1    seated.

2              THE COURT:  Great.  So I'll include that.  I do intend

3    to tell them that mask wearing is optional.  If anyone has a

4    concern about that, let me know now.

5              Mr. Schneider you should discuss with Mr. Raji whether

6    he wishes to be present for any sidebars or if he waives his

7    presence.  I'll leave it to you, to make that decision.  If he

8    wishes to come, since he's not in custody, it's less

9    complicated.  He can just join you, and if he waives his

10   presence, then he can just leave you to come up to sidebars on

11   your own.

12             Now, my law clerk, I think gave each side a written

13   description of the case that I intend to use in connection with

14   jury selection.  It's a little bit more detailed than the one

15   you had proposed in your joint submission.  I thought it made

16   sense to include some additional detail including some of the

17   entity names and the like, just to ensure that the -- there's

18   enough information to know if they have any knowledge or

19   awareness of the facts.  But bottom line, any objection to the

20   transcription that I gave you?

21             MS. KAMAL:  Your Honor, we have no objection.  We do

22   have one proposed edit to the paragraph, which we can hand up

23   to your law clerk, if it's easier to look on the page or read

24   into the record.

25             THE COURT:  Why not do both?

M986RAJC                          Final Pretrial Conference

1          MS. KAMAL:  Sounds good.

2          So the sentence that begins with the fourth line,

3    specifically, "the indictment alleges," the government would

4    propose making the following edit:  "Specifically, the

5    indictment alleges that Mr. Raji" -- inserted new language --

6    "participated with others in a scheme to" -- and now --

7    "fraudulently induce the hedge fund to send 1.7 million to a

8    bank."

9          THE COURT:  Okay.

10          MS. KAMAL:  I'll hand that up.

11          THE COURT:  I assume that theory is that just tracks

12    the language of the wire fraud statute more closely.  Is that

13    the theory?

14          MS. KAMAL:  And the "to wit" clause, your Honor.

15          THE COURT:  Now, Mr. Schneider, any objections to that

16    proposed change and any objections otherwise?

17          MR. SCHNEIDER:  No, but I would -- the answer is I

18    don't care if you want to keep your language or the

19    government's language.  It doesn't really matter to me, but I

20    would ask at the very end, the last thing "he has pled not

21    guilty to these charges," I would ask that would you say again

22    "and he is presumed innocent as is his right."

23          THE COURT:  All right.  I'll take that under

24    advisement.  My practice is to repeat that quite a few times in

25    this part of jury selection.  So whether I do it here or not, I

1    assure they will certainly understand that that is the case.

2           Great.  I'll adopt the government's suggestion, make

3    that one change and otherwise go with this.

4           And any questions about jury selection?  I think you

5    guys know I use the struck panel method.  It's described in

6    some detail in my individual rules and practices for trials,

7    which were recently updated.  So if you haven't looked at them

8    recently, I would urge to you do so.

9           Bottom line is I'll qualify 32 jurors, and then both

10   sides will simultaneously conduct peremptory challenges.  That

11   is to say each side will make a list of all peremptory

12   challenges, both with respect to the potential regular jurors

13   and with respect to the alternates.

14          So I want to be clear about how this works.  You'll

15   each make a list.  Now, the government has six strikes with

16   respect to the regular jury.  The defense has ten strikes with

17   respect to the regular jury.  Juror Numbers 1 through 28 of the

18   qualified jurors will be the prospective regular jurors.  So

19   the six and ten strikes should be from the first 28, and then

20   the lowest 12 remaining of those 28 will be the regular jury.

21          So if there are no overlapping strikes, there will be

22   only 12 remaining, and that will be the regular jury.  If there

23   are overlapping strikes, then it's the lowest numbered 12 of

24   that 28.

25          Now, in that same list, so the simultaneous list,

1   you'll make a separate list of your one strike with respect to

2   the alternates.  Prospective alternates are 29 through 32.

3   And, again, if there are no overlapping strikes, it will just

4   be the two remaining prospective jurors who are alternates.  If

5   there are overlapping strikes, it will be the lowest numbers

6   between 29 and 32.  Any questions about any of that?

7           MS. KAMAL:  No, your Honor.

8           THE COURT:  Mr. Schneider?

9           MR. SCHNEIDER:  Oh, I'm sorry.  No, your Honor.

10          THE COURT:  Great.  Turning to the schedule.

11          Until the jury is selected, we will sit until

12   5:00 p.m. full day.  Again, my hope is the jury is selected and

13   seated on day one on Monday, in which case, that would be the

14   one and only day we would sit 9:00 to 5:00.  Or 9:30 to 5:00.

15   Thereafter, my schedule, I think most of you know, is to sit

16   from nine to 2:30.

17          I know in *Avenatti*, we were a little longer because

18   the jury was deliberating on a separate floor, but we're back

19   to normal.  I'm back to my normal pre-COVID schedule, which is

20   9:00 to 2:30 with one half an hour break.  Any issues or

21   problems with that?

22          Bottom line is at 9:00 a.m., you would be ready to go.

23   We would discuss anything that needed discussion before the

24   jury begins.  And you would -- I would expect to begin with the

25   jury no later than 9:15 any given day and perhaps even earlier

1    if they're all here, ready to go and we don't have anything to

2    discuss.  We would break for a half hour lunch at or around

3    11:30, and then we would conclude each day at 2:30.

4          There may be some days where I might have to adjust

5    that schedule a little bit for one reason or another.  I would

6    give you a heads up a couple days in advance.  But does that

7    tell you what you need?  And any concerns, questions about

8    that?

9          MR. SCHNEIDER:  No.  Well...

10         MS. KAMAL:  Your Honor, if I may, only because we are

11   coordinating travel schedules.

12         If I may put to the court a hypothetical, if we

13   have -- if we have a jury by 11:30, are we then proceeding on

14   Monday until 5:00 or until 2:30?

15         THE COURT:  Till 5:00.  Because I've not told the jury

16   anything about our schedule, and they expect to be here until

17   5:00 on Monday.  That is the plan.  In my experience, also we

18   don't usually have a jury until the afternoon.  But that being

19   said, you need to be prepared for the unexpected.

20         MS. KAMAL:  Noted.  Thank you, your Honor.

21         THE COURT:  Okay.  Good.  As I said, you should

22   familiarize yourself with my individual rules and practices for

23   trials.  In particular, draw your attention to the rules and

24   practices regarding handling of exhibits and objections on the

25   latter.  Just note I don't entertain speaking objections in

1    front of the jury.

2              An objection should just simply be "objection," or if

3    it seems like I might not know the ground, you can say,

4    "objection, hearsay; objection, foundation" in one or two

5    words, you know, what the basis for the objection is.  But if

6    it goes beyond that, don't do in front of the jury.  If we need

7    to take it up outside the presence of the jury, I'll probably

8    wait for the next break.

9              I try not to have any sidebars.  I certainly try to

10   keep them to a minimum.  Do not assume that I'll grant your

11   request for a sidebar.  The bottom line is, as I said before,

12   you should try to anticipate as much as possible any issues

13   that may arise and try to discuss them before we begin with the

14   jury so that we don't need to take any sort of break, and

15   things are resolved in a timely fashion.

16             I would note that you need have to your witnesses

17   ready to go.  If a witness finishes and we're ready for the

18   next witness and the witness is not here, I will deem whatever

19   side is proceeding to have rested, and we'll proceed with the

20   next phase of the case.  So plan accordingly.

21             Now, I do let jurors take notes as I think is fairly

22   commonplace these days.

23             Now, any intention or thought that you'll use

24   demonstratives in your openings?  I think your order and

25   stipulation covers that, but I just want to see if there are

M986RAJC                    Final Pretrial Conference

1    any issues on that front.

2                MS. KAMAL:  We will not, your Honor.

3                THE COURT:  Mr. Schneider?

4                MR. SCHNEIDER:  No, your Honor.

5                THE COURT:  All right.  Anything we need to discuss

6    with respect to witnesses being present in the courtroom,

7    Rule 615 issues?

8                MS. KAMAL:  No, your Honor.

9                MR. SCHNEIDER:  No, your Honor.

10               THE COURT:  All right.  I know that the government, I

11   think, did a tech walk-through yesterday.  Bottom line is it's

12   incumbent upon you if either of you need anything from me,

13   orders or otherwise, to get me those requests in a timely

14   fashion so that you have whatever you need to proceed.

15               If you anticipate using the AV system, the computer

16   system, which I would encourage you to do, make sure that you

17   test it out, know how it goes, it works.  And also make sure

18   you have some sort of back-up plans since there are times it

19   doesn't work.

20               Bottom line is make sure you have whatever approvals,

21   authorizations you need, that you get in touch with my chambers

22   if you need to arrange anything in advance, and it is up to you

23   to make sure that everything is running and you have what you

24   need.  I will certainly be reasonably tolerant of technology

25   problems during trial.  But bottom line is once I have a jury

1     in the box, my priority is making efficient use of their time.

2     So I will expect you to have a back-up plan and, you know, not

3     have to waste time on those sorts of issues.

4            That, I think covers everything I wanted to cover

5     today.

6            Anything else that you want to raise?  Any other

7     issues, concerns, questions?

8            MS. KAMAL:  Nothing from the government, your Honor.

9            THE COURT:  Okay.

10           MR. SCHNEIDER:  Not an issue, Judge, but I would ask

11    you if you would authorize -- because I have a CJA counsel,

12    daily transcript or overnight transcript and manuscript that I

13    can receive the night of as well as the next day.

14           THE COURT:  I'm certainly prepared to do so.  I don't

15    remember if that's something that you need to submit through

16    eVoucher with the Court outside --

17           MR. SCHNEIDER:  I'll have my office figure it out, but

18    as long as it's okay with you, then we'll figure it out.

19           THE COURT:  It's okay with me.  Just make sure you

20    submit the request in whatever form it should be submitted, and

21    I'll grant it when I get it.

22           MR. SCHNEIDER:  Thank you.

23           THE COURT:  Do you need any permissions to bring in

24    electronic devices into the courthouse?

25           MR. SCHNEIDER:  I think my paralegal is preparing that

M986RAJC                         Final Pretrial Conference

1    right now.

2              THE COURT:  Okay.  So, again, make sure you get that

3    to me in a timely fashion.

4              With that, we're done for the day.  We'll see you --

5    again, please be in the courtroom, ready to go, at

6    9:30 promptly.  You can let my staff know if there's anything

7    substantive to discuss at that time, and we'll see when we get

8    a jury.  Thank you, good luck.

9              MR. SCHNEIDER:  Thank you.

10             THE COURT:  See you Monday.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25