M9DQraj1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4               v.                          19 CR 870(JMF)
                                                  Trial
 5
      MUSTAPHA RAJI,
 6
                     Defendant.
 7
      ------------------------------x
 8
                                             New York, N.Y.
 9                                           September 13, 2022
                                             9:00 a.m.
10    Before:

11                       HON. JESSE M. FURMAN,

12                                           District Judge
                                              -and a Jury-
13
                             APPEARANCES
14

15    DAMIAN WILLIAMS,
           United States Attorney for the
16         Southern District of New York
      BY:  JILAN J. KAMAL
17         ROBERT B. SOBELMAN
           CATHERINE E. GHOSH
18         Assistant United States Attorneys

19    ROTHMAN SCHNEIDER SOLOWAY & STERN LLP
           Attorney for Defendant
20    BY:  JEREMY SCHNEIDER

21
      Also Present:
22    Matthew Bailey, AUSA Paralegal
      Mayerlin Ulerio, Defense Paralegal
23

24

25
```

M9DQraj1

1           (Trial continued; jury not present)

2           THE COURT:  Good morning.

3           We are on trial.  Government ready to proceed?

4           MS. KAMAL:  We are, your Honor.

5           THE COURT:  Anything to discuss?

6           MS. KAMAL:  No, your Honor.

7           THE COURT:  Mr. Schneider, are you ready to proceed?

8           MR. SCHNEIDER:  Yes.

9           THE COURT:  Anything to discuss?

10          MR. SCHNEIDER:  No.

11          THE COURT:  All right.  In that case, can somebody

12  just test the mic before we bring the jury in.  I assume you

13  want to open here.

14          MR. SOBELMAN:  I tested it.

15          THE COURT:  In that case, Ms. Smallman is a couple

16  minutes away.  I will have my law clerk get the jury, and we

17  will proceed.

18          (Jury present)

19          THE COURT:  You may be seated.  Welcome back.  Good

20  morning to all of you.

21          First, let me start by commending you and thanking you

22  for being here on time and enabling us to start properly.  As I

23  told you, I will do everything I can do to make the most of

24  your time and get you out of here, but I need you to help me

25  out as well, so I appreciate you did that today.

M9DQraj1

1          I wanted to let you know I thought this was the case

2     yesterday, but I wanted to confirm in case you were wondering,

3     all 14 of you are fully vaccinated.  I imagine some people want

4     to know that, so I just wanted to share that with you.

5          At this time I'm going to swear you in as jurors in

6     this matter.  With apologies, I'll ask you to rise once again

7     and raise your right hands.

8          (A jury of 12 and 2 alternates was sworn and

9     impaneled)

10          THE COURT:  You may be seated.

11          With that, we will proceed with the first phase of the

12     case that I mentioned to you yesterday; namely, the opening

13     statements of the lawyers.  The government goes first, and then

14     the defense may give an opening.  I mentioned to you yesterday

15     they are not obligated to do so because they bear no burden at

16     all during this trial.

17          I want to remind you that what the lawyers say is not

18     evidence.  All right.  It is just a prediction from them as to

19     what the evidence in the case will be.  That being said, it's

20     very helpful, I think, in getting a better sense or a bigger

21     sense of what the case is likely to be.  As I mentioned to you

22     yesterday, it will come in witness by witness and not all in

23     one fell swoop like a movie.  So in that sense, the opening is

24     helpful to orient you and give you a sense of what to expect.

25     With that, I would ask you to please listen to them with care

1    beginning with the government.

2            And, Mr. Sobelman, you may proceed.

3            MR. SOBELMAN:   This is a case about fraud and money

4    laundering.  We are here because that man, Mustapha Raji, the

5    defendant, worked with others to receive money from a scam and

6    then to launder it.

7            Four years ago, back in July 2018, Adam was sitting in

8    his office in midtown Manhattan, and he received an email.

9    Adam was responsible for the finances at an investment company.

10   The email Adam received was meant to look like it came from

11   Adam's boss.  The email told Adam to sent $1.7 million to

12   another company.  So Adam sent out the money.

13           But that email wasn't actually from Adam's boss.  It

14   was sent by someone else, a scammer, who was part of a bigger

15   scheme, a scheme that used lies and fake emails to trick

16   people.  Once the scammers got the money into a bank account

17   they controlled, they had to move that money before the victims

18   figured out what happened.  The defendant was a member of that

19   crew of scammers.

20           He wasn't the fraudster who sent the fake emails.  He

21   wasn't the email guy.  He was the money guy.  His role was to

22   receive the stolen funds in bank accounts that he and others he

23   worked with controlled and then to launder that money, to move

24   it to other accounts, to take it out in cash so that he and the

25   fraudsters he worked with could keep the stolen money for

M9DQraj1                         Mr. Sobelman - Opening

1    themselves.  That's what this trial is going to be about.

2            This opening statement is the government's opportunity

3    to explain, first, what the evidence at this trial will show,

4    and, second, how we're going to prove it to you.  At this

5    trial, you are going to learn that the defendant was part of a

6    scheme to steal and launder money, and you're going to learn

7    how he did it and how he tried to get away with it.

8            Now, let's talk about how this scheme worked.  First,

9    the scammers pretended to be a real person, a real person who

10   the victim of the scam, Adam, would trust.  The fraudsters used

11   his boss's email account to trick Adam into sending them

12   $1.7 million.  Where did the fraudsters tell Adam to send that

13   money?  The stolen money from Adam's company went straight to a

14   bank account that the defendant provided, a bank account in the

15   name of one of the defendant's own companies.  Almost as soon

16   as the stolen money from Adam's company came into that account,

17   the defendant took his cut -- $50,000 sent directly to his own

18   personal bank account.

19           Once the defendant had his cut, he and his partners

20   kept the stolen money moving, funneling it from one bank

21   account to the next, and they withdrew thousands in untraceable

22   cash.  Why did the defendant and his partners do that?  Because

23   they knew that once the victims figured out that they had been

24   scammed, they would try to get their money back, and the banks

25   would catch up to them.  The defendant's role was to hide the

M9DQraj1                          Mr. Sobelman - Opening

1   money trail, to conceal it, to do whatever he could to keep the

2   stolen money for himself and for his partners in crime.  That's

3   what you're going to learn at this trial; that the defendant is

4   guilty of participating in a scheme to trick Adam and his

5   company into sending money to a bank account that the defendant

6   provided and then to launder that stolen money.

7         Now, let's talk about how we're going to prove beyond

8   a reasonable doubt that the defendant is guilty.  The evidence

9   will come in different forms, including witness testimony,

10  financial records, and the defendant's own text messages.

11        First, you will hear from witnesses.  You will hear

12  from the victims themselves, Adam and his boss, who will tell

13  you how they were tricked into sending $1.7 million to a bank

14  account the defendant chose, all because of the scam email I

15  told you about.  You will also hear testimony from one of the

16  defendant's former partners in crime.  He has pled guilty for

17  his role and has agreed to testify in the hope of getting a

18  lighter sentence.  He will give you an inside view of how the

19  scam worked.  And he will tell you how the defendant was the

20  one who provided the bank account that the stolen money was

21  sent to.

22        Now, this witness was a member of the defendant's

23  money laundering and fraud crew.  He will admit that he

24  committed crimes with the defendant.  For this witness, the

25  question before you is not whether you approve of what he has

1    done.  The only question before you is whether he is telling

2    the truth.  So when you're considering his testimony, listen to

3    that testimony very closely, very carefully.  If you do, you

4    will see that his testimony is consistent with all the other

5    evidence in the case.

6           The second type of evidence that you will see are

7    financial records and charts that will help you do one of the

8    most important things in a case like this:  Follow the money.

9    You will see the account opening documents, the wire

10   transactions, the checks, the cash withdrawals.  You will see

11   how stolen money flowed to the defendant and his partners in

12   crime and how the defendant took a cut for himself.

13          Third, you will hear and see the defendant's own words

14   in text messages and voice messages that he sent to his fellow

15   scammers.  These messages, the defendant's own words, are

16   powerful evidence of the defendant's guilt.  They show the

17   defendant's role in the scam, and you will see how the

18   defendant and his fellow fraudsters talked about how the stolen

19   money was coming into the bank account he provided.  And you

20   will see the text messages the defendant sent right after the

21   stolen money came in.  He wrote, "Thank God.  Let's start

22   moving it."

23          These three types of evidence -- witness testimony,

24   financial records and the defendant's text messages -- are the

25   main types of evidence that will prove the defendant is guilty.

M9DQraj1                        Mr. Schneider - Opening

1   After you see and hear the evidence, we will have a chance to

2   speak with you again.  Before then, I ask that you do three

3   things:

4           First, pay close attention to the evidence.

5           Second, follow Judge Furman's instructions on the law.

6           And, third, use your common sense, the same common

7   sense you use every day.

8           If you do those three things, the defendant will get a

9   fair trial, and the government will get a fair trial, and at

10  the end of that trial, you will return the only verdict that is

11  consistent with the law and the evidence:  The defendant is

12  guilty.

13          THE COURT:  Thank you, Mr. Sobelman.

14          Mr. Schneider.

15          MR. SCHNEIDER:  Thank you, your Honor.

16          Conspiracy to commit money laundering.  Conspiracy to

17  commit wire fraud.  Conspiracy to commit bank fraud.

18  Conspiracy to commit marriage fraud.  Conspiracy to commit

19  immigration fraud.  Conspiracy to commit or conspiracy to

20  destroy records of a federal investigation.  Wait a second.

21  You heard charges.  You didn't hear about marriage fraud,

22  immigration fraud from the government and records.  That's

23  because those are not the charges Mr. Raji is charged with.

24  Those are the charges that the government's star witness is

25  charged with and pled guilty to and is facing 145 years in

M9DQraj1                    Mr. Schneider - Opening

1    federal prison.  So I agree with Mr. Sobelman:

2                A.  Pay close attention to the evidence.

3                B.  Listen to Judge Furman's instructions at the end.

4                And, C.  Use your common sense, because when you do

5    that, you will see that the evidence -- just because it's

6    $1.7 million, just because Mr. Sobelman points to Mr. Raji

7    doesn't mean the evidence supports their accusations.  So I

8    suggest to you when the government's star witness, a civilian

9    witness who has pled guilty to these crimes facing 145 years in

10   jail, when he testifies, focus, scrutinize, as the Judge will

11   tell you, to see what that evidence, how it supports the

12   charges and how he is someone who needs to say things that help

13   the government in order for him to stay out of jail.

14               He pled guilty back a couple years ago, and you'll

15   hear all about that.  And let's also -- let's not get

16   hypnotized by flow charts because you're going to see a bunch

17   of flow charts from the government.  You're going to hear

18   witnesses talk about the money goes from this company to that

19   company to this person, here and there.  Let's focus and let's

20   remember when you listen to the evidence, you're going to see

21   that the 1.7 went into an account called Unique Bamboo.  The

22   evidence will show you that, the government's own evidence,

23   okay?

24               And Mr. Raji is a vice-president of that company.  But

25   the president of that company is a woman named Nancy

M9DQraj1                          Mr. Schneider - Opening

1    Martino-Jean.  She is the only one who has signatory powers for

2    the bank accounts; not Mr. Raji.  Unique Bamboo.  Yes, you're

3    going to see documents, you're going to see a ton of documents

4    and his name is listed as the vice-president, but above that,

5    you're going to see president, and you're going to learn that

6    the only one, not him, but the only one who has any power,

7    ability to move money, deposit, withdraw, whatever it is, is

8    Nancy Martino-Jean.

9            And you're going to learn 1.7, yes, there's no

10   dispute, he received $50,000, but you're not going to hear any

11   evidence from the government's witnesses as to what the

12   relationship is as to why he received that.  And he received it

13   in his own company, a different company in his own name.  Does

14   that sound like money laundering?  And when he disbursed some

15   of that money to other people with checks or cash, that can be

16   traceable.  You know how you know it can be traceable?  Because

17   it was traced, and the government found it.

18           So it's not all that complicated when you follow the

19   money and see, yes, he did it, but your question, really the

20   only question you have to figure out is what was in his mind.

21   What was in his -- what is his state of mind?  Did he know the

22   money was fraudulently obtained?  Did he know the money was

23   stolen?  Did he know the money was taken from people who were

24   unsuspecting?  Because you will hear from the evidence, and the

25   government's own witnesses will say they had no contact, no

M9DQraj1                        Mr. Schneider - Opening

1    direct knowledge, no direct interaction with Mr. Mustapha Raji.

2    They dealt with a company, and then later on that company sent

3    some money to Mr. Raji, Unique Bamboo, and he sent some money

4    to others in a way that was traceable, and that you'll see.

5             So let's do the three things that the government said.

6             Let's focus.  Let's listen to the law.  Let's use

7    common sense.  When you do that, and when you decide that I

8    have to think and I have to -- you as a juror, you have to say

9    to yourself, you know what?  There's a lot of government

10   exhibits that I'm going to see.  You have to think and say to

11   yourself, okay, how do those government exhibits not just point

12   to Mr. Raji being involved in financial transactions, but how

13   do those exhibits and the testimony tell you, convince you

14   beyond a reasonable doubt that he had the guilty knowledge to

15   know where the money came from and to steal that money, and

16   then decide.  The only way you can know that is through their

17   star witnesses who pled guilty to all of these frauds for a

18   potential 145-year sentence.  He's the one who is going to shed

19   light on the government's -- on what his state of mind is.  He

20   is the one who is going to tell you according to the government

21   what the scheme was, what the plan was, what Mr. Raji said and

22   did to show that he is a scammer, a schemer, a fraudster.

23            So, if you do the three things the government said,

24   that I agree with, I suggest that the evidence will show you

25   and convince you that, yes, he had some money; yes, he received

M9DQraj1                        Mr. Schneider - Opening

1   and transferred; but, no, he did not have the state of mind,

2   the guilty state of mind.  And he did it in a way, he received

3   the money from a way in a company that was legitimate, a

4   company that had been incorporated legally, and you'll see

5   that, you'll hear that, and you'll focus on that.  And I

6   suggest to you at the end of the case, after the government

7   speaks and I speak, the government speaks again, and after the

8   Judge charges you, you will be able to say to yourselves, I

9   have not been convinced by the evidence that Mr. Mustapha Raji

10  specifically had the state of mind to be a fraudster, to be a

11  schemster, to be a scam artist and to steal that money.

12          Thank you.

13          THE COURT:  Thank you, Mr. Schneider.

14          We will proceed with our first witness.  Hold on a

15  minute.  Let's have the government call the witness the first

16  witness, please.

17          MS. KAMAL:  The government calls Scott McLellan.

18   ROBERT SCOTT McLELLAN,

19       called as a witness by the Government,

20       having been duly sworn, testified as follows:

21          DEPUTY CLERK:  Can you please state and spell your

22  full name for the record.

23          JUROR:  Robert, R-O-B-E-R-T.  Scott, S-C-O-T-T.

24  McLellan, M-C-L-E-L-L-A-N.

25          THE COURT:  If you can move your seat up, please, and

SOUTHERN DISTRICT REPORTERS, P.C.

1    just situate yourself near the microphone so you're about an

2    inch or two away, that's the most ideal distance, and keep your

3    voice up so everybody can hear you.

4              Counsel, you may proceed.

5              MS. KAMAL:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MS. KAMAL:

8    Q.  Good morning, Mr. McLellan.

9    A.  Good morning.

10   Q.  How far did you go in school?

11   A.  I have an undergraduate degree and a master's in business.

12   Q.  And what line of work are you in?

13   A.  Investment management.

14   Q.  Now, I'd like to take you back to May or June of 2015.

15   Where were you working at that time?

16   A.  I ran a firm, an investment firm in New York City named

17   Marble Arch Investments.

18   Q.  What was your title?

19   A.  I was the portfolio manager and managing partner of the

20   firm.

21   Q.  And what roughly does a managing partner and portfolio

22   manager do?

23   A.  I made all investment decisions, so that the firm ran money

24   for pensions and endowments.  We invest primarily in public of

25   equity securities, so I'd make all the final decisions on

M9DQraj1                          McLellan – Direct

1    whether to buy or sell those securities and manage a team of

2    roughly 20 individuals.

3    Q.  You said you were buying and selling securities.  Is that

4    right?

5    A.  Correct.

6    Q.  For those of us without the background in finance, would

7    you mind explaining what a security is.

8    A.  So a stock that would be listed on NASDAQ or New York Stock

9    Exchange.  As for Microsoft, for example, would be a security

10   that we would do research on, and then if we concluded that it

11   was an interesting purchase, we would buy it through these

12   exchanges.

13   Q.  Now, in addition to any equity investing or investing in

14   securities -- withdrawn.  Can you remind me what the name of

15   your company was.

16   A.  Marble Arch investments.

17   Q.  Did Marble Arch extend credit or commercial loans to small

18   businesses?

19   A.  We did not.

20   Q.  Where were Marble Arch's headquarters?

21   A.  Manhattan.

22   Q.  Did Marble Arch have any other offices in the United

23   States?

24   A.  No.

25   Q.  Did Marble Arch have any offices overseas?

M9DQraj1                        McLellan - Direct

1    A.  We did not.

2    Q.  I'd like to focus your attention on June and July of 2018.

3    What was going on at Marble Arch at that time?

4    A.  So in late spring of 2018, we made the decision to close

5    the firm, which meant ultimately conveying and then returning

6    capital to all of our outside partners.  So, as I mentioned

7    previously, we managed money for endowments, pensions and a

8    large number of family offices.  We had communicated that, and

9    during the June timeframe, we were -- and July timeframe, we

10   were unwinding the books and records, making sure all of the

11   accounting was 100 percent accurate and ultimately returning

12   capital to those investors.

13   Q.  I may ask you to slow down just a little bit --

14   A.  Sure.

15   Q.  -- Mr. McLellan.

16             Approximately how long did it take to wind down Marble

17   Arch's investments?

18   A.  It was approximately a three-month process.

19   Q.  And at what stage of that process were you in early

20   July 2018?

21   A.  We were probably two-thirds of the way through the process.

22   At that point in time I -- as I mentioned previously, Marble

23   Arch had 20 employees.  We -- it was really just three of us

24   managing the unwind process, so we were substantially

25   concluded.

M9DQraj1                              McLellan - Direct

1    Q.  And by early July, approximately how much of the capital

2    from external investors had been returned, those pension funds

3    and endowments you mentioned?

4    A.  Yeah, so almost all of the capital that was external had

5    been returned at that point.

6    Q.  Now, after returning that external capital, did Marble Arch

7    have any cash left?

8    A.  Yeah.  So the employees of the firm, almost all of the

9    employees of the firm, kept money within the firm that we

10   invested alongside those external partners.  So, yes, a number

11   of employees still had capital within the management company of

12   Marble Arch.

13   Q.  So were you one of the people who was owed some of that

14   remaining capital?

15   A.  I was.

16   Q.  At this time, Mr. Bailey, I'd like to call up Government

17   Exhibit S-5, please.

18            MS. KAMAL:  It's a stipulation, your Honor.

19            THE COURT:  Any objection, Mr. Schneider?

20            MR. SCHNEIDER:  It's S-5?

21            MS. KAMAL:  S-5.

22            MR. SCHNEIDER:  No objection.

23            THE COURT:  Mr. Schneider, can you move the microphone

24   closer to you, please?

25            MR. SCHNEIDER:  Sorry.  No objection.

M9DQraj1                    McLellan - Direct

1           THE COURT:  S-5 is admitted.

2           (Government's Exhibit S-5 received in evidence)

3           Ladies and gentlemen, let me just tell you a couple of

4    things.  At the beginning of trial, I will give you some more

5    instructions just so you have a sense of what's going on as we

6    proceed.

7           First of all, until an exhibit is admitted, you are

8    not going to see it because the only evidence that you can

9    consider are the exhibits that are admitted into evidence and

10   the testimony that you hear from the witness stand.  So what

11   that means is that often the lawyers will ask that a document

12   be shown to a witness or brought up on the screen, until it's

13   actually admitted by me, you won't be able to see it, so I just

14   don't want you to be confused about that.

15          Second, this exhibit -- and you can publish it to the

16   jury if you'd like -- is a stipulation.  A stipulation I will

17   give you further instructions on at the end of the trial.  It's

18   a fancy lawyer term for an agreement, an agreement between the

19   parties as to certain facts or certain testimony that would be

20   given if a witness were called, and you can consider that as

21   you would any evidence that you hear during the case.

22          With that, you may proceed, counsel.

23          MS. KAMAL:  Thank you, your Honor.

24          The government offers Government Exhibit S-5.

25          THE COURT:  Thanks.  It was already admitted, but now

M9DQraj1                        McLellan - Direct

1   it's doubly admitted.

2          MS. KAMAL:   Thanks.

3   Q.   It is hereby stipulated and agreed by and between the

4   United States of America, Mustapha Raji, the defendant, that:

5          Microsoft 365 is a cloud-based office software and

6   office software subscription service.  Its applications and

7   software include, among other things, Enterprise email accounts

8   and account management for businesses, as well as Microsoft

9   Outlook and email and calendaring application.

10         Government Exhibits 803, 803A, 805, 805A, and 809 are

11  true and accurate copies of emails recovered from the Microsoft

12  365 email logs of Marble Arch Investments LLP.

13         Government Exhibits 801 and 802 are accurate

14  screenshots of security reports from Marble Arch Investments

15  LP's Microsoft 365 systems that reflect the creation of email

16  forwarding rules for the email accounts sm@marblearchlp.com and

17  aa@marblearchlp.com on particular dates and times and how many

18  emails were forwarded according to the forwarding rules.

19         Government Exhibits 807 and 808 are true and accurate

20  screenshot of forensic digital analysis reports that reflect

21  websites visited by the Microsoft 365 email account

22  SM@Marblearchllp.com on particular dates and times.

23         Government Exhibit 810 is a true and accurate

24  screenshot of a forensic digital recovery of the emails

25  received bite Microsoft 365 email account sm@marblearchlp.com

M9DQraj1                         McLellan - Direct

1   on particular dates and times.

2              Okay.  So with that, Mr. Bailey, would you please

3   bring up for the jury Government Exhibit 803.

4              THE COURT:  Ms. Kamal, are you offering the exhibits

5   that you just referenced?

6              MS. KAMAL:  Yes, we are, your Honor.

7              THE COURT:  Those are admitted.  So just for the

8   record I think it's 801, 802, 803, 803A, 805, 805A, 807, 808,

9   809 and 810.  Is that correct, Ms. Kamal?

10             MS. KAMAL:  It is your Honor.

11             THE COURT:  Those are admitted.

12             (Government's Exhibits 801, 802, 803, 803A, 805, 805A,

13   807, 808, 809 and 810 received in evidence)

14   BY MS. KAMAL:

15   Q.  Mr. McLellan, do you see in front of you Government Exhibit

16   803?

17   A.  I do.

18   Q.  Is it large enough for you to see on that screen?

19   A.  It is.  Thank you.

20   Q.  Okay.  Do you see at the top here the To and From field?

21   A.  Yes.

22   Q.  What does that appear to be?

23   A.  That appears to be an email from me to our chief financial

24   officer Adam Angelowicz.

25   Q.  What is the subject of this email?

1   A.  The subject is: "Please approve:  Management company cash

2   movement summary."

3   Q.  If you could zoom back out please, Mr. Bailey.  If you

4   wouldn't mind, Mr. Bailey, scrolling down to the bottom of this

5   document.

6           Mr. McLellan, is it fair to say that Government

7   Exhibit 803 contains more than one email?

8   A.  It is.

9   Q.  So let's start at the beginning here of this chain.  Can we

10  go to page ending 0056, please.

11          Do you see here, Mr. McLellan where it says "On

12  July 9, 2018?"

13  A.  I do.

14  Q.  Who does that email appear to be from?

15  A.  Again, that's from Adam Angelowicz, who was our chief

16  financial officer, and was responsible, primarily responsible

17  for the unwind process.

18  Q.  To whom is this email addressed?

19  A.  It is addressed to Scott and Tim.  Scott is me and then Tim

20  Jenkins is -- was my partner at Marble Arch Investments who was

21  also helping in the closure process.

22  Q.  If you could please read this email for us beginning with

23  "please" and then if you could stop when you get to the word

24  "summary."

25  A.  "Please see a summary."

1    Q.  If you could continue reading the body of the email.

2    A.  "Please see a summary below of upcoming cash movements at

3    the management company.  These numbers have been reconciled

4    between AA" -- that's Adam Angelowicz -- "and TJ" -- that's Tim

5    Jenkins -- "who the email address is, note that the rationale

6    for paying out JT, WT, AA, CAR, AP, SM and TJ at the end of

7    July is that we think it makes sense operationally to send all

8    of these wires at the same time.  We will need to pay AP at the

9    end of July, and it's close enough to the time we planned on

10   paying CAR and AA.  Also, we will have a good management

11   company profit estimate to pay SM and TJ 70 percent of the

12   respective cash balances.  Please approve, and I'll proceed

13   with the plan below.  Also please confirm where you'd like me

14   to send your cash wires.  Personal checking account on file

15   IBKR" -- refers to a brokerage called Interactive Brokers --

16   "or other.  Thank you."

17   Q.  So looking at the top there, what did you understand Adam

18   to refer to when he says upcoming cash movements of the

19   management company?

20   A.  I understood that to mean cash that was moving out of

21   Marble Arch Investments towards each of those respective

22   employees that are referred to by initials.

23   Q.  Can you tell us who SM is in that list of initials?

24   A.  SM is me, Scott McLellan.

25   Q.  Let's look down the email to where it says summary:  Do you

1    see halfway down that list where it says "end of July"?

2    A.  I do.

3    Q.  And then there is a list of initials.  Is that correct?

4    A.  Correct.

5    Q.  Do you see a reference to yourself under the header "end of

6    July"?

7    A.  Yeah, lower down that list I see myself, and it says

8    approximately $2.2 million.

9    Q.  So what does that mean?

10   A.  That means that we estimate -- Marble Arch estimated that I

11   was at $2.2 million.

12   Q.  So moving up the page, please, to the page ending 56,

13   middle of the page.  Thanks, Mr. Bailey.  So let's move to the

14   email above the chain.

15           Do you see where it says Scott -- Scott McLellan --

16   from Scott McLellan?

17   A.  Mmm-hmm.

18   Q.  What's the date of that email?

19   A.  Thursday, July 12, 2018.

20   Q.  Who did you send that email to?

21   A.  I sent that to Adam Angelowicz, our CFO.

22   Q.  What's the date of that email?

23   A.  July 12, 2018.

24   Q.  Could you please read the body of the email.

25   A.  "Adam:  For the roughly $2.2 million wire that we plan to

M9DQraj1                         McLellan - Direct

1   send out at the end of this month, could you distribute to me

2   as follows:  $500,000 to my Bank of America account and the

3   remainder into my Interactive Brokers account.  Thanks very

4   much, Scott."

5   Q.  Do you remember sending this email?

6   A.  I do.

7   Q.  So how much did you want wired to your Bank of America

8   account?

9   A.  $500,000.

10  Q.  Now, you don't specify a particular account here.  Why not?

11  A.  I've had the same Bank of America account for probably 20

12  years, and Marble Arch existed for 12 years.  Adam was our CFO

13  for the life of the fund, and he had only ever used that Bank

14  of America account for various movements of money.

15  Q.  So you mention here you wanted the remainder to go to an

16  Interactive Brokers account.  Is that right?

17  A.  Yes.

18  Q.  And so approximately how much were you expecting to go to

19  that Interactive Brokers account?

20  A.  The $1.7 million that remained.

21  Q.  So we could go up the chain now, please.

22          Do you see here from Government Exhibit 803, do you

23  see where Adam acknowledges receiving these instructions?

24  A.  I do.  He responds, "Sure thing, Scott."

25  Q.  Did you typically give Adam instructions about transfers of

M9DQraj1                         McLellan - Direct

1    funds by email?

2    A.   Both email and verbal.  He and I sat ten feet apart.

3    Q.   Do you recall at this time, July 12, talking about this

4    wire with Adam?

5    A.   I don't.  I recall receiving -- sorry, I do.  I recall both

6    receiving this email and then him actually acknowledging in

7    person.

8    Q.   Do you recall where you were working from at this time?

9    A.   Yeah.  I was in New York City, and Adam was in New York

10   City.

11   Q.   Other than the instructions that we just saw reflected here

12   in Government Exhibit 803, did you give Adam any other

13   instructions about the $1.7 million wire?

14   A.   No.

15   Q.   Let's go up the chain, please to the page ending -- let's

16   start on 0055.

17          Who does this email appear to be from?

18   A.   It appears to be from me, Scott McLellan.

19   Q.   And what is the date on this email?

20   A.   Wednesday, July 25, 2018.

21   Q.   Do you remember where you were geographically in or around

22   July 25, 2018?

23   A.   Yeah, I was either in Manhattan or in Long Island, roughly

24   an hour outside of Manhattan.

25   Q.   Now, would you please read this email.

M9DQraj1                        McLellan - Direct

1    A.   Sure.   "Adam:   As a follow up to this email thread, I still

2    intend on distributing the funds as stated, but would want the

3    remainder $1.7 million to go into another of my brokerage

4    accounts, not IBKR.   I will be sending you the wire

5    instructions to facilitate this transfer.   Thanks very much.

6    Scott."

7    Q.   Did you send this email to Adam?

8    A.   No, I didn't.

9    Q.   This is your Marble Arch email account, correct?

10   A.   It appears to be, yes.

11   Q.   Can we go up now to the mid page of 0055?

12            Now do you see here an email from Adam Angelowicz to

13   you?

14   A.   I do.

15   Q.   What is this date?

16   A.   I'm sorry, the date?

17   Q.   The date.

18   A.   Wednesday, July 25, 2018.

19   Q.   Would you please read the body of the email?

20   A.   "Okay, noted.   Thanks for following up Scott.   Please send

21   over instructions as soon as you get them so I can get them

22   updated at First Republic.   Thanks."

23   Q.   What does First Republic refer to?

24   A.   First Republic was the bank where Marble Arch had all of

25   their bank accounts.

M9DQraj1                        McLellan - Direct

1   Q.  Mr. McLellan, did you see this email on July 25, 2018?

2   A.  I did not.

3   Q.  Going up the chain once more all the way to the top,

4   please, Mr. Bailey.  Thank you.

5         We saw this at the very beginning, but I'll ask you

6   again, who does this email appear to be from?

7   A.  From myself to Adam Angelowicz.

8   Q.  Can you please read the body of this email?

9   A.  "Adam:  Please find attached the wire instructions as

10  promised.  I know you have all the wires scheduled for the 31st

11  of July, but I do want the $1.7 million to be sent out first

12  thing tomorrow morning.  The rest should go out as scheduled on

13  the 31st.  Please send me a confirmation email when it's done

14  tomorrow.  Thanks very much.  Scott."

15  Q.  Do you see an attachment to this email?

16  A.  I do.

17  Q.  And what's the title of the attachment?

18  A.  UBI wire instructions as a PDF document.

19  Q.  Did you send this email, Mr. McLellan?

20  A.  I did not.

21  Q.  Let's turn now to Government Exhibit 803A.

22        Mr. McLellan, can you tell us just generally what wire

23  instructions are.

24  A.  Generally, they are directions on movements of money from

25  one bank to another.

1    Q.  So is it fair to say that wire instructions give the

2    address of the bank account and identify the bank account

3    that's supposed to receive funds in a transaction?

4    A.  Yeah, they would typically give account numbers, account

5    names, and a routing address.

6    Q.  Can you please read the account name here?

7    A.  The account name is Unique Bamboo Investments, Inc.

8    Q.  And where is it located?

9    A.  1801 SE Hillmoor Drive, Unit C, 104, Port Saint Lucie,

10   Florida, and the zip code 34952.

11   Q.  At that time did you have any association with an entity

12   called Unique Bamboo Investments?

13   A.  No.

14   Q.  Had you even heard of Unique Bamboo Investment?

15   A.  I had not.

16   Q.  To this day, do you have any association with Unique Bamboo

17   Investment?

18   A.  No.

19   Q.  Was this a bank account that you controlled?

20   A.  No.

21   Q.  Did it belong to anyone in your family?

22   A.  No.

23   Q.  At any time did you send these wire instructions to Adam

24   Angelowicz?

25   A.  I did not.

M9DQraj1                          McLellan - Direct

1    Q.  If you can pull up Government Exhibit 803 again please,

2    Mr. Bailey.  If you could highlight the very top of the chain.

3            Could you remind the jury again the date of the email

4    that contained these wire instructions?

5    A.  It was sent on July 25, 2018 at 5:22 p.m.

6    Q.  Thank you, Mr. Bailey.  You can take that down.

7            When approximately was the next time that you

8    communicated with Adam Angelowicz about this $1.7 million wire?

9    A.  So I was expecting it to go -- the wire to go through to

10   the proper accounts at the end of July, and I checked into

11   those accounts right at the beginning of August, so it was

12   probably the 1st or 2nd of August, I noticed that the

13   $1.7 million that I expected to receive had not been received.

14   So I called him to talk about where that money was and whether

15   there had been a delay for a reason that had not been

16   previously communicated to me.

17   Q.  And so if I can break that down for a moment.  You called

18   Mr. Angelowicz about the wire you hadn't received.

19   A.  Yeah.  So I called -- I called him.  We quickly realized

20   that something had happened.  Adam then referred to the change

21   of instruction email that he had received in late July.  I

22   immediately told him I had never sent those changes of

23   instructions, and, you know, I would say it was a pretty

24   stressful call because he realized $1.7 had been misdirected.

25   So we immediately strategized as to who we could speak to to

M9DQraj1                        McLellan - Direct

1   try and address the issue.

2   Q.   Now, you said that Mr. Angelowicz referred to the change of

3   instructions emails that we just looked at in Government

4   Exhibit 803.   Is that correct?

5   A.   It is.

6   Q.   So at any time around this period when you discovered the

7   missing wire, did you go and look for these emails that

8   contained the wire instructions?

9   A.   Yeah.   No, I immediately -- I think actually while we were

10  on the phone, we went to look for -- I went to look for those

11  emails and could not find them in my, you know, in my Marble

12  Arch account.

13  Q.   Did Mr. Angelowicz ask -- did Mr. Angelowicz offer to send

14  you those emails?

15  A.   He also looked for the chain of events that he recalled

16  seeing in those emails and could not find them, so yes.

17  Q.   What was Mr. Angelowicz's demeanor when he could not find

18  those emails?

19  A.   I mean, look, we were on the phone together, but he was --

20  he is a -- he was an excellent chief financial officer who

21  prided himself on a hundred percent accuracy, and I think he

22  was pretty freaked out that we had potentially lost 1.7 million

23  that I had a right to.   So his demeanor was -- he was in a

24  state of, you know, he was in a state of panic, but at the same

25  time we were, you know, we immediately set out to try and

M9DQraj1                         McLellan - Direct

1   understand what had happened.

2   Q.  Did there come a time when you or Marble Arch retained a

3   forensic IT consultant to figure out what had happened?

4   A.  Yeah.  So probably within the next 24 to 48 hours, we were

5   referred to and engaged a forensic firm to investigate the

6   matter.

7   Q.  Was that forensic firm able to recover the email log and

8   login information associated with your email account on

9   Microsoft 365?

10  A.  Yes.

11  Q.  Can we bring up Government Exhibit 809, please.

12          While we wait for it to come up, Mr. McLellan, just to

13  be clear, are you familiar with Microsoft 365?

14  A.  I am.

15  Q.  And was it the email software that was used by Marble Arch

16  during the lifetime of its --

17  A.  Yeah, we -- the firm had only ever used Microsoft for both

18  the office products, Microsoft Word and Excel and then for

19  their email product Outlook.

20  Q.  So, continuing now to Government Exhibit 809, and if you

21  could enlarge the top portion please, Mr. Bailey.  Thank you.

22          What's the date on this email, Mr. McLellan?

23  A.  This email was sent Sunday July 22, 2018 at 10:11 p.m.

24  Q.  And to whom is it addressed?

25  A.  It is addressed to me, Scott McLellan.

M9DQraj1                    McLellan - Direct

1   Q.  And who does it appear to be from?

2   A.  It appears to be from the Microsoft support team.

3   Q.  Could you please read the subject line of the email.

4   A.  The subject is "Action required.  Inbox at 95 percent.

5   Seven incoming messages failed to deliver to your inbox at

6   July 22, 2018."

7   Q.  Do you remember receiving this email?

8   A.  I do.

9   Q.  And as Marble Arch's managing partner and portfolio

10  manager, were you generally familiar with the firm's IT

11  systems?

12  A.  I was quite familiar with their IT systems, yes.

13  Q.  What, if any, changes had been made to Marble Arch's IT

14  systems in or around July 2018?

15  A.  So we had made the decision that summer to move from

16  keeping all of our IT equipment -- so servers, racks, et cetera

17  -- within the office space that Marble Arch was leasing to

18  going to a fully outsourced solution.  So Microsoft had

19  previously launched something called Office 365 in the cloud,

20  and we were basically moving all the equipment from inhouse to

21  outsourced at that moment in time.

22  Q.  So at what point in that process was Marble Arch roughly

23  when you received this email?

24  A.  Well, we had engaged the IT -- we had an outsource provider

25  that was doing the transition.  We had communicated with them

M9DQraj1                        McLellan - Direct

1   regularly.  We were probably halfway through that transition

2   process, maybe a little bit more than halfway.

3   Q.  When you received this email, what went through your mind?

4   A.  I thought to myself this feels risky.  We have a lot of

5   important email messages, you know, that continue to go through

6   my account that I needed to address promptly.  I need to take

7   this action that Microsoft support team is recommending that I

8   take.

9   Q.  And, Mr. Bailey, if you could now focus on the bottom of

10  that page, the blue box at the bottom.  Thank you.

11          Do you see here the blue highlighted box?

12  A.  I do.  It reads: "clean up mailbox."

13  Q.  To be clear, when you received this email, was this a link

14  or did it appear just like this?

15  A.  It appeared like this, and it was a link to a different web

16  address.

17  Q.  Turning now to Government Exhibit 808, do you recognize

18  what we see here in Government Exhibit 808?

19  A.  I do.

20  Q.  And what does it appear to be to you?

21  A.  It appears to be where I entered my password.  Whenever

22  I've gone through to my Microsoft account in the past, it was

23  identical to that screen.

24  Q.  So you did enter your password?

25  A.  I did, yes.

M9DQraj1                         McLellan - Direct

1    Q.  And this was what happened after you clicked that link,
2    correct?
3    A.  This is the screen that I received after I hit that link,
4    yes.
5              THE COURT:  Just to be clear, that link is the link at
6    the bottom of what had been in Government Exhibit 809?
7              THE WITNESS:  Correct.
8              THE COURT:  So you clicked that link, and it took you
9    to this screen?
10             THE WITNESS:  That is true.
11   Q.  Mr. Bailey, can you please go to the web address at the top
12   and enlarge that.  Thank you.
13             Could you read for us please the web address at least
14   up to the .com if you would
15   A.  Https:\\bdea7ke.com.
16   Q.  To your knowledge, is this web domain or website used by
17   Marble Arch?
18   A.  No.
19   Q.  To your knowledge, is this website or domain used by
20   Microsoft 365?
21   A.  Not to my knowledge.
22   Q.  Did you realize when you clicked on the link in Government
23   Exhibit 809, that it would take you to a website outside the
24   Microsoft ecosystem?
25   A.  I did not.

M9DQraj1                        McLellan - Direct

1   Q.  You can take that down Mr. Bailey, thank you.

2           As the managing partner of Marble Arch, are you

3   familiar with a term administrative privileges when it comes to

4   Microsoft 360 user accounts?

5   A.  I am, yes.

6   Q.  What do you understand that to mean, roughly?

7   A.  So basically it would give someone rights to add new users

8   to their Microsoft account, to eliminate users from their

9   Microsoft account, to give them certain privileges that they

10  might want to add within the information texted at.

11  Q.  At the time you entered your password into the external

12  website we just saw in Government Exhibit 808, did your

13  Microsoft 365 account at Marble Arch have administrative

14  privileges.

15  A.  No.  Only one individual did.  I did not have

16  administrative rights.

17  Q.  At any time after you entered your password into that

18  website that we saw on Government Exhibit 808, at any time

19  after that, was your Microsoft 365 account given administrative

20  privileges?

21  A.  Yeah.  I learned this after we hired the forensic firm that

22  we referred to previously, but, yes, ultimately I -- my account

23  received administrative rights later.

24  Q.  When you say later, do you mean after July 22?

25  A.  After July 22, yes.

M9DQraj1                         McLellan - Direct

1    Q.  Did you ask for your account to be given those

2    administrative privileges?

3    A.  I never asked for those rights, no.

4    Q.  To be clear, did those administrative privileges give you

5    the ability to change your own -- the contents of your own

6    email account.

7    A.  It would give me an ability to change the contents of my

8    own account, yes.

9    Q.  And how about the contents of someone else at Marble Arch's

10   email account?

11   A.  It would allow you that as well.

12   Q.  Did you know at that time in or around July 22 to the 25

13   that your account had been given those administrative

14   privileges?

15   A.  I had absolutely no idea.

16   Q.  Can you please pull up Government Exhibit 801.

17            Based on your experience with Marble Arch IT systems,

18   are you familiar with the email tool known as email forwarding?

19   A.  I am, yes.

20   Q.  Could you explain it in your own words for the jury,

21   please.

22   A.  At its most basic level, when an email goes to a certain

23   account, it automatically re-routes it to another account.

24   Q.  What's the title of the document we see here in Government

25   Exhibit 801?

1   A.   The title is forwarding report.

2   Q.   And with Mr. Bailey's help to make it a little larger,

3   could you please read the two sentences underneath the title.

4   A.   Sure.   "This report shows your organization's automatically

5   forwarded messages to external domains.   You can view the

6   forwarding methods, target domains and source mailboxes that

7   were used.   You can also view the data as a summary chart or a

8   details table.   Learn more about this report."

9   Q.   You can take that part down at least, please, Mr. Bailey.

10        Now I'd like to focus here on the column that says

11  forwarders.   What are the two email addresses listed here as

12  forwarders?

13  A.   Aa@marblearchlp.com, which was the used account of Adam

14  Angelowicz, our CFO.   And then sm@marblearchlp.com which was

15  the account that I used.

16  Q.   If you could focus now please, Mr. Bailey, on the recipient

17  name and domain name together.

18        What is the recipient name?

19  A.   The recipient name in both of these rules was

20  redmisericoridia.

21  Q.   And what is the recipient domain?

22  A.   @gmail.com.

23  Q.   If you could just zoom out again, please, Mr. Bailey.

24        What do you understand with respect to the forwarding

25  rules for your email box based on this report?

M9DQraj1                    McLellan - Direct

1  A.  Based on this report, I understand that my -- emails that

2  came into my account were forwarded to the recipient name

3  account @gmail.com, and they show you the number of emails that

4  were forwarded there.

5  Q.  And what about the email account that's assigned Adam

6  Angelowicz, AA@Marblearch?

7  A.  So emails that went into Adam Angelowicz at

8  aa@marblearchlp.com were also automatically redirected to the

9  recipient name account @gmail.com.

10 Q.  If we could go to the column all the way on the right,

11 please, Mr. Bailey.

12         What's the date that this -- what is the date here for

13 the first forward?

14 A.  The date is July 25, 2018 at 12:00 a.m.

15 Q.  Mr. McLellan, did you create these email forwarding rules?

16 A.  I did not.

17 Q.  Did you ask someone else to create them for you?

18 A.  No.

19 Q.  Did you know that on or about July 25 these email

20 forwarding rules were created for yours and Adam Angelowicz's

21 accounts?

22 A.  No, I had no idea.

23 Q.  Did you ever use the email address

24 redmisericoridia@gmail.com?

25 A.  No.

M9DQraj1                         McLellan - Direct

1   Q.  To your knowledge, does anyone use that email address?

2   A.  No.

3   Q.  Now, you told us earlier that Adam, when you -- withdrawn.

4           You told us earlier that when the $1.7 million wire

5   was missing, you reached out to Adam Angelowicz, right?

6   A.  Mmm-hmm.

7   Q.  And he --

8           THE COURT:  Sorry.  Just if you can use words:  Yes,

9   no.

10  A.  Yes.

11          THE COURT:  Thank you.

12  Q.  At that time, he referred to the email in which you had

13  changed -- you had appeared to change the wiring instructions.

14  Is that right?

15  A.  He referred to it, and then we discussed it.

16  Q.  And at that time, I believe you told us he wasn't able to

17  find those emails, was he?

18  A.  That is correct.

19  Q.  Did there come a time after you hired the forensic IT

20  consultants that you learned why Adam couldn't find those

21  emails?

22  A.  Yeah.  They --

23          MR. SCHNEIDER:  Objection.

24          THE COURT:  Sustained.  Just the answer is yes, and

25  we'll leave it there.

M9DQraj1                        McLellan – Direct

1    A.   Yes.

2    Q.   Okay.  What did you learn --

3              MR. SCHNEIDER:  Objection.

4              THE COURT:  Counsel, is there a non-hearsay purpose?

5              MS. KAMAL:  Yes, your Honor.  It's to go to the

6    defendant's state of mind.

7              THE COURT:  Sustained.

8              MR. SCHNEIDER:  The defendant's state of mind?

9              MS. KAMAL:  Not the defendant's.  The witness's state

10   of mind, your Honor.

11             THE COURT:  Sustained.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

M9D6RAJ2                    McLellan - Direct

1   Q.  You testified earlier that you went to look for those

2   e-mails in your own e-mail account, correct?

3   A.  I did.

4   Q.  And that was after your conversation with Adam?

5   A.  It was.

6   Q.  Were you able to find them when you went to look for them?

7   A.  Not the ones that we referred to about the redirected --

8   the changed wire transfer instructions, no.

9   Q.  So you weren't able to find those e-mails when is you went

10  to look for yourself?

11  A.  I was not.

12  Q.  Do you know how the e-mails that we reviewed today were

13  recovered?

14  A.  Yeah, they --

15          MR. SCHNEIDER:  Objection.

16          THE COURT:  Sustained.

17  Q.  After you spoke with Mr. Angelowicz and realized that

18  something had happened, what actions did you take, generally

19  speaking, to try to investigate this incident?

20  A.  So, as I mentioned previously, we hired the forensics IT

21  firm to come and investigate.  I spoke with --

22          MR. SCHNEIDER:  Objection.

23          THE COURT:  Overruled.

24  A.  I spoke with a number of people that had more expertise on

25  this matter than I did.  So I -- first off, I spoke immediately

M9D6RAJ2                    McLellan - Direct

 1    to my partner, Tim Jenkins, to make him aware of the fact
 2    pattern and to seek his counsel.  I spoke with a number of
 3    lawyers that I was close to.  I'm not a legal expert.  I'm not
 4    a cyber crime expert.  I wanted advice on this matter.  And I
 5    spoke with someone that works within your department to see if
 6    they had any advice as to how I could ultimately recover the
 7    $1.7 million.  This was very important to me and sort of a
 8    stressful moment in my life.
 9              THE COURT:  When you say "your department," you mean
10    the U.S. Attorney's Office?
11              THE WITNESS:  Correct.
12    Q.  You mean my department?
13    A.  Yes.
14    Q.  Understood.
15              Were you eventually able to recover some of that
16    $1.7 million?
17    A.  I was able to recover some of it, yes.
18    Q.  Approximately how much?
19    A.  Probably 90 percent of it over the course of 12 months.
20    Q.  And from what sources were you able to recover -- able to
21    recover that money?
22    A.  I think two of them -- there were three primary sources,
23    two directly from -- from banks in Florida, and then one from
24    our insurance provider called Chubb.
25    Q.  Mr. McLellan, you told us at the beginning of your

M9D6RAJ2                        McLellan - Direct

1    testimony that Marble Arch was an investment firm, correct?

2    A.  That's right.

3    Q.  Now, as someone involved in finance, do you know what

4    commercial lending is generally?

5    A.  I do.

6    Q.  Can you explain it at a high level for the jury?

7    A.  Generally, it's a loan to a business that would need to be

8    repaid with interest, and the principal would need to be repaid

9    at some future point in time.

10   Q.  And did Marble Arch engage in any kind of commercial

11   lending?

12   A.  We never did.

13   Q.  Are you familiar with the term "secured financing"?

14   A.  Yes.

15   Q.  Could you explain it, again, at a high level for the jury?

16   A.  Generally, it would be lending behavior against an asset

17   that has a specific value and therefore, it is secured by the

18   value of that asset.

19   Q.  Did Marble Arch engage in any secured lending?

20   A.  We never did, no.

21          MS. KAMAL:  Can we pull up Government Exhibit 234A?

22   And just show it the witness, please.

23          If I could have a moment to talk to defense counsel,

24   please.

25          (Counsel confer)

1           MS. KAMAL:  Your Honor, 234A was the subject of a

2     separate stipulation that the government was planning to offer

3     later, so I would offer government Exhibit 234A now, subject to

4     objection.

5           THE COURT:  Any objection?

6           MR. SCHNEIDER:  No objection?

7           THE COURT:  All right.  Admitted.

8           (Government's Exhibit 234A received in evidence)

9           THE COURT:  So ladies and gentlemen, you just heard

10    counsel explain that this exhibit is the subject of a later

11    stipulation.  We're not going to admit or read the stipulation

12    now, but I'll admit this subject to connect.  What that means

13    is that there's something else that needs to happen before this

14    is fully in evidence.  That is the admission of a stipulation

15    later.  So assuming that that happens, this will then be

16    admitted in full.  But for now, defense counsel may show it to

17    you, and it is admitted subject to that contingency.

18    Q.  Mr. McLellan, can you please tell us the title of this

19    document?

20    A.  It is a security agreement and promissory note.

21    Q.  And if you could enlarge the top portion of that,

22    Mr. Bailey, please.  Thank you.

23          Now, who does this agreement purport to be between?

24    A.  Between Marble Arch Investment, LP, we were Marble Arch

25    Investments at my firm, and Unique Bamboo Investment,

M9D6RAJ2                    McLellan - Direct

1    Incorporated.

2    Q.  If you look here at the line where it says,

3    "Marble Arch Investment, LP," can you read the rest of the

4    description of Marble Arch Investment as reflected here well?

5    A.  Well, we are referred to as "A secured party," comma, "a

6    corporation organized and existing under the laws of the

7    United States with its head office located at:  Hong Kong SAR."

8    Q.  Did Marble Arch Investment ever have its head office

9    located in Hong Kong?

10   A.  No.  We were only located in Manhattan for the entire life

11   of Marble Arch's existence.

12   Q.  You can zoom out again, please, Mr. Bailey.

13          Did you ever -- well, withdrawn.

14          I think you testified earlier that Marble Arch never

15   engaged in any secured financing, correct?

16   A.  We never did.

17   Q.  If Marble Arch had engaged in secured financing, would you

18   have known about it?

19   A.  Yes.

20   Q.  Did you ever consider entering into a security agreement

21   with Unique Bamboo Investment?

22   A.  I did not, no.

23   Q.  Mr. McLellan, did you ever see this document before today?

24   A.  I had never seen this document before today, no.

25          MS. KAMAL:  No further questions, your Honor.

M9D6RAJ2                          McLellan - Cross

1            THE COURT:  Cross-examination?

2            MR. SCHNEIDER:  Thank you.

3   CROSS-EXAMINATION

4   BY MR. SCHNEIDER:

5   Q.  Good morning, sir.

6   A.  Good morning.

7   Q.  You can't wait to get out of here, can't you?  You'll be

8   done soon.  Thank you for coming.

9            Now, is it fair to say that there are probably three

10  ways that e-mails could have been sent from your account or

11  could appear to come from your account?  One would be if you

12  sent it, right; is that fair?

13  A.  That is true.

14  Q.  Okay.  Just so we're clear, try -- I'm not trying to trick

15  you.  I'm just going to be asking you questions.  I appreciate

16  if you give me straight answers if you could.  There's no

17  meaning to what I'm asking.

18            MS. KAMAL:  Objection, your Honor.

19            THE COURT:  Counsel, just ask the question, please.

20            MR. SCHNEIDER:  Thank you.

21  Q.  So if you were to send an e-mail from your account, that

22  would appear to come from your e-mail account, right?

23  A.  Yes.

24  Q.  And if someone else -- if you gave permission to someone

25  else to use your e-mail account, that could appear to come from

M9D6RAJ2                         McLellan - Cross

1    your account, right?

2    A.  It would appear to.

3    Q.  And the third one would be if someone hacked into your

4    account, which is what happened here, right?

5    A.  Again, I believe so, but I have no idea.

6    Q.  Right.  Fair enough.  I mean, you know that you didn't send

7    these e-mails that we referred to, right?

8    A.  Yes.

9    Q.  And you know you didn't give anyone permission to send

10   those specific e-mails that you referred to, right?

11   A.  Certainly the ones that were referred to in previous

12   testimony, yes.

13   Q.  I'm only talking about the ones you said you didn't

14   recognize or the ones you said you didn't send or the ones you

15   said you didn't receive.  That's what I am talking about.

16   A.  That's accurate.

17   Q.  So then the only other way they could have gone or appeared

18   would be if someone unlawfully hacked into your account, right?

19   A.  That's correct.

20   Q.  But the -- but upon first blush, unless you're an IT

21   expert, the e-mails that were sent and received appears --

22   appeared to be from your account?

23   A.  On first blush, yes.

24   Q.  And, in fact, when you and Adam exchanged e-mails, you both

25   thought they came from -- they were legitimate.  You thought

M9D6RAJ2                          McLellan - Cross

1    you sent it.  Adam received it.  Adam sent it.  You received

2    it; is that fair to say?

3    A.  To be clear, I had no involvement in any of those e-mails.

4    I was never aware of it until I spoke with Adam as I referred

5    to probably on August 1st or 2nd I can't really answer your

6    question.

7    Q.  Sorry.  Go ahead.  Finish.

8    A.  I can't answer your question because I was never aware of

9    it.

10   Q.  Okay.  But the -- the conversation with Adam, the ones that

11   he received, he thought they were legitimate, right?

12   A.  He did.

13   Q.  That's all I was trying to say.  He thought they came from

14   you?

15   A.  (Nods head)

16   Q.  You have to speak.

17   A.  Yes.

18   Q.  Thank you.

19          Now, you have no idea, do you, how those -- your

20   account or his account got hacked, do you?

21   A.  No.  I do have an idea.

22   Q.  Okay.  And do you have any -- tell us.

23   A.  We hired a forensics accounting firm.

24   Q.  Mm-hmm?

25   A.  They tracked the chain of events.

M9D6RAJ2                        McLellan - Cross

1    Q.   Mm-hmm?

2    A.   I clicked through on the Microsoft support e-mail that we

3    previously identified.  I then entered my password and clicked

4    proceed or whatever the choice was to move forward.  Someone

5    received that password.  And they had essentially access to my

6    account at that point.

7            They then sent our IT service provider instructions to

8    give me administrative rights.  Then whoever received those

9    administrative rights created the rules that we referred to

10   previously.  Those rules allowed various e-mails to be sent or

11   received that neither Adam nor I were aware of.

12   Q.   All right.  So that's what you spoke about on direct

13   examination.  You took us through that process a few minutes

14   ago, right?

15   A.   No, you objected to a couple of those.

16   Q.   I objected to conversation, but thank you for reminding me.

17   I didn't object to how you did it, what was done.  I objected

18   to what was said?

19            THE COURT:   Just ask the question.

20            MR. SCHNEIDER:   Thank you.

21   Q.   Now, so you were able to track how this e-mail hacking

22   scheme happened, right?

23   A.   Correct.

24   Q.   And when I say "you," I mean, it was determined by this

25   forensic accounting firm, and they informed you, right?

M9D6RAJ2                         McLellan - Cross

1   A.  That is true.

2   Q.  Okay.  Now, in any of the e-mails that you either sent or

3   were hacked, did you ever have any contact with someone named

4   Mustapha Raji?

5   A.  I did not, no.

6   Q.  In any of the e-mails you either sent, received or were

7   hacked, were there any contact with a company named

8   Emergent Development Corporation?

9   A.  No.

10  Q.  And you don't know -- I think you looked at the security

11  agreement as well as looked earlier at the receiving account,

12  Unique Bamboo.  Does the name sound familiar?

13  A.  That name sounds familiar, yes.

14  Q.  That is based on the security agreement and also looking at

15  the recipient that you referred to before, right?  The

16  recipient --

17  A.  The question is very vague.

18  Q.  I'll try to make it a little bit clearer.

19          This is Government Exhibit 803, which you had looked

20  at earlier, 803A; do you see that now?

21  A.  Yes, thank you.

22  Q.  So those are the wire instructions, and the account name

23  that was going to receive the money was

24  Unique Bamboo Investment, correct?

25  A.  That is correct.

M9D6RAJ2                         McLellan - Cross

1    Q.  Okay.  Thank you.

2              And now, did you ever hear of that company before?

3    A.  I have never -- I had never heard of it previously, no.

4    Q.  And did you at any point have any contact with anyone

5    representing Unique Bamboo Investment?

6    A.  I never did, no.

7    Q.  Okay.  Thank you.

8              MR. SCHNEIDER:  Can you put up the agreement, please.

9    Thank you very much.  I appreciate it.

10             MS. KAMAL:  No worries.

11   Q.  This is Government Exhibit 234A.  This is the one you had

12   looked at earlier, the security agreement, correct?

13   A.  That's right.

14   Q.  Do you see the name between Marble Arch and

15   Unique Bamboo Investment?

16   A.  I do.

17   Q.  Okay.  And had you had any contact at all with

18   Unique Bamboo Investment in relationship with this security

19   agreement and promissory note?

20   A.  I had not.

21   Q.  Did you have any contact at all with

22   Unique Bamboo Investment ever?

23   A.  No.

24   Q.  Do you have -- did you have -- back then, have any idea

25   what kind of business Unique Bamboo Investment was?

M9D6RAJ2                         McLellan - Cross

1    A.  I had no idea.

2    Q.  Did you ever hear the name of Nancy Martin-Jean?

3    A.  I have heard that name.

4    Q.  And you heard that name in relation to your preparation to

5    testifying when you spoke to the government?

6    A.  I heard that name -- I'm trying to remember the correct

7    fact pattern.  Roughly a year after this event occurred, I

8    heard that name through our lawyer, Marble Arch's lawyer, that

9    she was a defendant named that had been caught.

10   Q.  Okay.  And, in fact, did you receive an affidavit from the

11   FBI to look at?

12   A.  I was forwarded an affidavit by my lawyer.  And I'm

13   forgetting exactly which month, but roughly the same time

14   frame.

15   Q.  Okay.  And that was in relation to Nancy Martin-Jean?

16   A.  That's correct.

17   Q.  Did you have anything -- other than learning that name a

18   year later from your attorney, had you ever known the name

19   Nancy Martin-Jean in 2018?

20   A.  No.

21   Q.  Had you ever heard that name in connection with any

22   business dealings between you -- Marble Arch and

23   Nancy Martin-Jean?

24   A.  No.

25   Q.  Did you ever hear the name Mustapha Raji?

M9D6RAJ2                         McLellan - Cross

1    A.  No.

2    Q.  Did you ever hear the name Emergent Development

3    Corporation?

4    A.  No.

5    Q.  Do you have any idea what relationship, if any,

6    Mustapha Raji has with Unique Bamboo?

7    A.  I have no idea.

8    Q.  Do you have any idea what relationship, if any,

9    Unique Bamboo and Emergent Development have with each other,

10   any business dealings?

11   A.  I don't.

12   Q.  Any relationship at all, any knowledge at all about

13   Mustapha Raji and Nancy Martin-Jean?

14   A.  No.

15   Q.  Now, after the 1.7, that went into an unauthorized account,

16   the Unique Bamboo account, correct, as far as you know?

17   A.  It did, yeah.

18   Q.  After it was in that account, do you know specifically

19   where any of the money went after it went into that account?

20   A.  So, we did speak with Bank of America.  Obviously, I have a

21   relationship with Bank of America with a different account than

22   the one in which that wire was sent.  We spoke with someone

23   within Bank of America Florida who was able to track down some

24   of those moneys.  So as I mentioned previously, in terms of

25   recovering some of my $1.7 million, part of the recovery was

M9D6RAJ2                          McLellan - Cross

1    captured by a further transfer out of Bank of America.  So
2    that, I am aware of, and that's all I know.
3    Q.  And in terms of where the money went after --
4    A.  Yeah, that's all I know.
5    Q.  Okay.
6            THE COURT:  Just please wait for each other to finish.
7            MR. SCHNEIDER:  I apologize.
8            THE COURT:  Thank you.
9    Q.  Now.  Government Exhibit 234A, which is the security
10   agreement that you had -- that was in evidence, you say that
11   you never engaged in commercial lending, that -- not you
12   personally, your company?
13   A.  Our firm never did.
14   Q.  And you have no idea who sent that security agreement
15   between Marble Arch and Unique Bamboo, do you?
16   A.  I don't.
17   Q.  And you have no idea who received -- withdrawn.
18           Do you know who received that agreement, that security
19   agreement?
20   A.  I have no idea.
21   Q.  Do you know when that security agreement was ever sent?
22           THE COURT:  Counsel, I think the witness said he
23   hadn't seen that document until he testified today.  So I think
24   we can probably short circuit this a little bit.
25           MR. SCHNEIDER:  Fair enough.

                    SOUTHERN DISTRICT REPORTERS, P.C.

M9D6RAJ2                          McLellan - Cross

1    Q.   Had anybody mentioned to you -- anybody mentioned to you a

2    security agreement between Marble Arch and Unique Bamboo?

3    A.   No.

4    Q.   Now, was anybody in your company named Ariel, whose last

5    name begins with the letter R?  Ariel, A-R-I-E-L, R.

6    A.   No.

7    Q.   Back then?

8    A.   No.

9    Q.   Now, when you looked at this Government Exhibit 234 in the

10   security agreement, if somebody didn't know what kind of work

11   Marble Arch did or they didn't know that you did not involve

12   yourselves in commercial lending, is it fair to say that that

13   agreement looks legitimate on its face?

14            MS. KAMAL:  Objection.

15            THE COURT:  Sustained.

16   Q.   Well, in looking at that agreement -- do you happen to

17   know, in looking at that agreement that, A, the company was not

18   in Hong Kong, right?

19   A.   Correct.

20   Q.   So that part of agreement was wrong, correct?

21   A.   As was the name of Marble Arch.

22   Q.   I'm sorry?

23   A.   The name of Marble Arch was incorrect as well.

24   Q.   Okay.  But if someone did not know that, if I were to look

25   at that --

M9D6RAJ2                          McLellan - Cross

1    A.   Mm-hmm.

2    Q.   -- does that agreement appear to be a legitimate document?

3            MS. KAMAL:  Objection.

4            THE COURT:  Sustained.

5    Q.   Now, as far as you know, do you know anything at all,

6    either by seeing it or speaking about it, anything at all about

7    that security agreement?

8            MS. KAMAL:  Objection.

9            THE COURT:  Sustained.  Asked and answered.

10   Q.   And finally, as far as you know, did -- did Mustapha Raji

11   have any conduct as far as you know, with anyone at

12   Marble Arch?

13           MS. KAMAL:  Objection.  Asked and answered.

14           THE COURT:  First of all, counsel, please use the

15   microphone.  I'm not sure that question was asked, so you may

16   answer it.

17   A.   Do you mind repeating the question?

18   Q.   Sure.  As far as you know, did Mustapha Raji have any

19   contact with anybody at all at Marble Arch as far as you know?

20   A.   As far as I know, no.

21   Q.   Thank you, sir.  I appreciate it.

22           THE COURT:  Any redirect?

23           MS. KAMAL:  No, your Honor.

24           THE COURT:  All right.  Mr. McLellan, you may step

25   down.  Thank you.

1              All right.  Ladies and gentlemen, as we wait for the

2     next witness, if you wish to stand and stretch, you're welcome

3     to do so.  I know some people like to take advantage of that.

4     Just a reminder we'll keep going until about 11:30, at which

5     time we'll take our break, the next witness, please.

6              Ma'am, I meant stretch where you are.  Sorry.

7              If we can make it without the bathroom, that would

8     definitely be my preference.  But obviously, I don't want

9     anybody uncomfortable, let alone not be able to pay attention.

10    Let me know, and we'll take care of that.  But I meant stretch

11    where you are.

12             Government, please call your next witness.

13             MS. KAMAL:  The government calls Adam Angelowicz.

14             THE COURT:  Sir, please a make your way up to the

15    witness box.

16             Please remain standing.

17     ADAM ANGELOWICZ,

18         called as a witness by the Government,

19         having been duly sworn, testified as follows:

20             Once sworn.  Clerk.

21             THE COURT:  You may proceed.

22    DIRECT EXAMINATION

23    BY MS. KAMAL:

24    Q.  Mr. Angelowicz, do you mind sitting a little forward?

25    Sorry.  I find it a little hard to hear you.

M9D6RAJ2                        Angelowicz - Direct

1  A.  I'm sorry.  Is that good?

2           THE COURT:  Make sure you speak directly into the

3  microphone about an inch or two away and keep your voice up,

4  please.

5  Q.  How far did you go in school?

6  A.  Undergraduate.

7  Q.  Do you have any professional certifications?

8  A.  I do.  I'm a New York State CPA.

9  Q.  What is a CPA?

10  A.  Certified public accountant.

11  Q.  What year did you earn your CPA?

12  A.  2007.

13  Q.  I'd like to take you back to May 2018.  Where were you

14  working at that time?

15  A.  Marble Arch Investments.

16  Q.  What kind of business was Marble Arch Investments?

17  A.  Investment management business.

18  Q.  Where was Marble Arch's headquarters located?

19  A.  In Manhattan.

20  Q.  Did Marble Arch have any other offices?

21  A.  No.

22  Q.  What was your job title?

23  A.  I was the chief financial officer.

24  Q.  And when did you become the chief financial officer?

25  A.  In 2012.

1    Q.  And in 2018, who did you report to at Marble Arch?

2    A.  Scott McLellan and Tim Jenkins, the two founders of

3    Marble Arch.

4    Q.  Now, I'd like to focus your attention on this sort of June,

5    July period in 2018.  What was going on at Marble Arch at that

6    time?

7    A.  The business was closing.

8    Q.  And so what was the process, roughly speaking, of closing

9    down the business?

10   A.  The process was ultimately to sell the securities to cash,

11   and return the cash to our investors as well as ultimately

12   letting all the employees go and closing the office.

13   Q.  Approximately how long did it -- was that process taking?

14   A.  It took about, I'd say about a month and a half or so.

15   Q.  And at what stage of the process were you at by the end of

16   June, beginning of July 2018?

17   A.  We were completed with returning a majority of the capital

18   to the investors, and we were just ultimately closing the doors

19   to the business.

20   Q.  Now, to be clear, when you say -- when you refer to

21   Marble Arch's investors, are those folks outside of the firm

22   who had given capital to Marble Arch to invest, or is that the

23   capital of -- folks internal to Marble Arch?

24   A.  Folks outside of the firm.

25   Q.  So at the end of June 2018, whose investments in

1   Marble Arch had been returned?

2   A.  The outside investors.

3   Q.  Was there any capital remaining inside the firm?

4   A.  Only that of the founders.

5   Q.  And in June 2018, were you still reporting to

6   Scott McLellan and Tim Jenkins?

7   A.  I was.

8   Q.  You can call up Government Exhibit 803.  If we can go down

9   to page ending 56?  Actually, let's go further down, 57,

10  please.  Now a little further up.  I'm sorry, Mr. Bailey.  It's

11  the very bottom of the page.  There we go.

12          Now, do you see here at the bottom of the page ending

13  in 56 where it says, "On July 9th, 2018"?

14  A.  I do.

15  Q.  Would you mind reading that for us, the highlighted

16  portion?

17  A.  Sure.  "On July 9th, 2018, at 1:35 p.m., Adam Angelowicz,

18  AA@marblearchLP.com wrote."

19  Q.  You can take that down, Mr. Bailey.  Thank you.

20          Now, do you see here where it says, "Scott and Tim"?

21  A.  I do.

22  Q.  Who are Scott and Tim?

23  A.  Scott McLellan and Tim Jenkins, the two founders of

24  Marble Arch Investments.

25  Q.  Can you please read the first sentence, please?

M9D6RAJ2                          Angelowicz - Direct

1    A.   "Scott and Tim, please see a summary below of upcoming cash
2    movements at the management company."
3    Q.   When you say, "cash movements at the management company,"
4    what are you referring to?
5    A.   I'm referring to cash wires that needed to go out to
6    various employees and the founders from the management
7    company's bank accounts.
8    Q.   Can you please keep reading there where it says, "These
9    numbers"?
10   A.   "These numbers have been reconciled between AA and TJ.
11   Note that the rationale for paying out" --
12        THE COURT:   Can I stop you, counsel?   Since we just
13   read this and it's in evidence, let's move this along a little
14   more quickly.
15        MS. KAMAL:   Sure.
16   Q.   So do you see down here -- well, first of all,
17   Mr. Angelowicz, do you recall sending this e-mail?
18   A.   I do.
19   Q.   You did, in fact, send it?
20   A.   I did, in fact, send it.
21   Q.   You say here in the second line at the top of the page
22   ending 57.
23   A.   Second line?   Sorry.
24   Q.   Yeah, the second line.
25   A.   "Please approve, and I'll proceed with the plan below.

1    Also please confirm where you'd like me to send your cash

2    wires, personal checking account on file, IBKR or other.  Thank

3    you."

4    Q.  What method did Marble Arch typically use to pay out

5    investors?

6    A.  We used wires, electronic wires.

7    Q.  Can you explain at a high level what you mean by

8    "electronic wires"?

9    A.  An electronic wire is kind of a simple efficient way to

10   move capital between two different banks.

11   Q.  Does -- so it happens electronically?

12   A.  Electronically, correct.

13   Q.  So there's no check?

14   A.  No check.

15   Q.  Now, if you could please go down, Mr. Bailey, to page

16   ending 57, where it says, "summary."  If you could just enlarge

17   that area, please.

18           So you say here, "This week," and then there's --

19   there are three items, and then it says "end of July," and a

20   longer list.  Do you see that?

21   A.  I do.

22   Q.  Do you see underneath "end of July," any reference to

23   Scott McLellan?

24   A.  I do.  Further down, I see a reference to Scott McLellan,

25   $2.2 million.

M9D6RAJ2                        Angelowicz - Direct

1   Q.  And so what were you -- what did -- what did you intend --
2   withdrawn.  Withdrawn.
3           You can go up the chain.  Can you go to page ending
4   56, please, Mr. Bailey?
5           Now, do you see here in the middle of the page where
6   it says, "From Scott McLellan"?
7   A.  I do.
8   Q.  What is the date of that e-mail?
9   A.  Thursday, July 12, 2018.
10  Q.  And who does it appear to be from?
11  A.  It's from Scott McLellan.
12  Q.  And you don't have to read this out loud, but can you read
13  from where it says Adam to Scott, please?
14  A.  From Adam to Scott?
15  Q.  Just to yourself is fine.
16  A.  Oh, sure.
17  Q.  Do you remember seeing this e-mail?
18  A.  I do.
19  Q.  What did you under -- well, who did you understand it to be
20  from?
21  A.  Scott McLellan.
22  Q.  What did you understand him to be instructing you to do?
23  A.  Instructing me to send $500,000 to his personal bank
24  account at Bank of America and the remaining $1.7 million to
25  his brokerage account at Interactive Brokers.

M9D6RAJ2                          Angelowicz - Direct

1    Q.  When you received this e-mail, did you know which

2    Bank of America account he was referring to?

3    A.  I did.

4    Q.  How did you know that?

5    A.  I had sent wires there before.

6    Q.  Did you know what he was referring to when he said his

7    Interactive Brokers account?

8    A.  I did.

9    Q.  And how did you know that?

10   A.  He mentioned that he opened an account to move his

11   securities when Marble Arch was closing.

12   Q.  You can zoom out, please, Mr. Bailey.

13           And if you could just look above to the next e-mail,

14   please.  Do you see the response to Mr. McLellan?

15   A.  I do.

16   Q.  Moving up the chain to the page ending 55, that's right,

17   the bottom of the page.  Thank you, Mr. Bailey.

18           Can you tell me the date on this e-mail, please?

19   A.  July 25, 2018.

20   Q.  And who does it appear to be from?

21   A.  Scott McLellan.

22   Q.  And do you recall where you were when you received the

23   e-mail?

24   A.  I was in the New York City area.

25   Q.  Could you just look at this e-mail, look at it yourself,

M9D6RAJ2                          Angelowicz - Direct

1    and then I'm going to ask you a couple of questions?

2    A.  Sure.

3    Q.  Okay.  What did you understand Scott to be asking you to do

4    in this e-mail?

5    A.  He asked me to redirect the $1.7 million from his

6    Interactive Brokers account to another account, that he would

7    be sending instructions over shortly.

8    Q.  Do you remember speaking with him about this request at

9    this time?

10   A.  No.

11   Q.  Can we go up the page now to the second e-mail from the

12   top?

13           Do you see here your own reply to Scott?

14   A.  I do.

15   Q.  Okay.  And do you see the date here?  Is that the same day

16   or later or the following day from when he received that other

17   e-mail --

18   A.  Same day.

19   Q.  -- addressing the change.

20           And if you could please read the e-mail to yourself,

21   and then I'm going ask you more questions.

22   A.  Okay.

23   Q.  What do you mean here when you refer to "updating the wire

24   instructions with First Republic"?

25   A.  To send wire instructions from a bank, you need specific

M9D6RAJ2                           Angelowicz – Direct

1    instructions.  So I had to wait for Scott to send the updated
2    instructions to then forward on to First Republic to release
3    the capital.
4    Q.  Can you go up now to the top of Government Exhibit 803?
5         Okay.  And who does this appear to be from?
6    A.  Scott McLellan.
7    Q.  Is this e-mail to you?
8    A.  Correct.
9    Q.  What's the date on this e-mail?
10   A.  Also on July 25 of 2018.
11   Q.  Is that later the same day?
12   A.  Correct.
13   Q.  Do you see any attachments to this e-mail?
14   A.  I do.
15   Q.  Okay.  Did you open the attachment you see here?
16   A.  I did.
17   Q.  To be clear, did you receive this e-mail?
18   A.  I did.
19   Q.  Okay.  Can we open Government Exhibit 803A?
20        If you could enlarge that, please.  Thanks so much.
21        Mr. Angelowicz, does this look familiar to you?
22   A.  It does.
23   Q.  What does it appear to be?
24   A.  Wire instructions.
25   Q.  Do you see here the account name of these wire

M9D6RAJ2                        Angelowicz - Direct

 1   instructions?

 2   A.  I do.

 3   Q.  Can you just read it for us?

 4   A.  Sure.  Unique Bamboo Investments Inc.

 5   Q.  Have you ever heard Mr. McLellan ever talk about

 6   Unique Bamboo Investments before?

 7   A.  I had not.

 8   Q.  Did you ask him about it at that time?

 9   A.  I did not.

10   Q.  Why not, generally?

11           MR. SCHNEIDER:  Objection.

12           THE COURT:  Overruled.  You may answer.

13   A.  Can I answer?

14   Q.  Why didn't you ask him about it at that time?

15   A.  He made some private investments over the years that I was

16   aware of that I would help him with from time to time.  So I

17   figured that this was kind of a routine investment for him.

18   Q.  After you received these -- well, withdrawn.

19           Can we turn now to Government Exhibit 805?  And can we

20   go down to the page ending 0067?

21           Okay.  I'd like to draw your attention to the top of

22   the page, please.  Thank you, Mr. Bailey.

23           Now, who does this e-mail appear to be from?

24   A.  From me.

25   Q.  And what is the date on this e-mail?

M9D6RAJ2                              Angelowicz - Direct

1   A.  July 23, 2018.

2   Q.  Now to be clear, is that before or after you had received

3   the instructions from the updated wiring instructions?

4   A.  Before.

5   Q.  Okay.  Now, who's this e-mail addressed to?

6   A.  To Evan Chilanda and Paul DiBetta.  They are our contacts

7   at First Republic.

8   Q.  And what's the subject of this e-mail?

9   A.  "Marble Arch wires 7/13/18 release date."

10  Q.  Can you please read that e-mail?

11  A.  Sure.

12         "Hi, Evan.  Below are eight wires that need to be

13  released on July 31, 2018 from account ending in 7520.  Please

14  get these ready, and I'll do a final sign off on that day.

15  Thanks."

16  Q.  Mr. Bailey, if you can please zoom out, go to the next page

17  and highlight number three in the itemized list?

18         Now, to whom is this addressed?

19  A.  Robert Scott McLellan, which is Scott McLellan's full name.

20  Q.  And to what account is this wire supposed to be going?

21  A.  This is supposed to be going to his Interactive Brokers

22  account.

23  Q.  And how much money is supposed to be going into that

24  Interactive Brokers account?

25  A.  $1.7 million.

1    Q.  And to be clear, were you sending out these instructions

2    based on Mr. McLellan's first instructions to you?

3    A.  Correct.

4    Q.  What appear -- sorry.  Let me correct myself.

5          What appeared to be Mr. McLellan's first instructions

6    to you.

7    A.  Correct.

8    Q.  So if you can turn now to the page 65, at the bottom of the

9    page, the page ending 65.  If you can enlarge the bottom

10   portion of that e-mail, please.

11         Now, do you see who this e-mail is from?

12   A.  It's from me.

13   Q.  And to whom is it addressed?

14   A.  To the bankers at First Republic.

15   Q.  And Nick Pottenger, is he one of those bankers?

16   A.  Correct.

17   Q.  Can you please tell us the date on this e-mail?

18   A.  July 25, 2018.

19   Q.  Can you please read the body of the e-mail?

20   A.  Sure.

21         "Hi all, quick update on instruction number three.

22   Robert Scott McLellan.  He would like to change where he's

23   sending the $1.7 million.  I'll send over updated wire

24   instructions as soon as possible.  Thanks."

25   Q.  You can zoom out, please, Mr. Bailey.

1        And do you see up the chain here, the next e-mail

2    above the one we just looked at?

3    A.  Yes.

4    Q.  Can you tell us who that's from?

5    A.  From Nick Pottenger, the banker at First Republic.

6    Q.  Can you please read his response?

7    A.  Yes.

8        "Thanks, Adam.  Once we have the new instructions,

9    I'll call you to confirm."

10   Q.  Now, if we could go to the e-mail above that, please,

11   Mr. Bailey.  All the way down, please.  There we go.  Thank

12   you.

13       Now, do you see here where it says, "On Wednesday

14   July 25 at 7:44 p.m" -- below, Mr. Bailey -- there you go.

15   A.  I do.

16   Q.  Okay.  And can you please -- is that an e-mail from your

17   Marble Arch e-mail account?

18   A.  Correct.

19   Q.  And can you please read the body of that e-mail?

20   A.  Yes.

21       "Hi, See attached updated instructions for the

22   wife" -- I meant wire -- "number three, $1.7 million to

23   Robert Scott McLellan.  He would like this wire released first

24   thing tomorrow morning.  Please call my cell to confirm."

25   Q.  Now, for the e-mails that we've seen so far,

M9D6RAJ2                          Angelowicz - Direct

1   Mr. Angelowicz, do you -- did you -- well, withdrawn.

2            Do you remember sending these e-mails?

3   A.  I do.

4   Q.  So you, in fact, sent those?

5   A.  Yes.

6   Q.  And do you see here that there's an attachment to this

7   e-mail?

8   A.  I do.

9   Q.  If we can pull that up, please?  It's Government

10  Exhibit 805B.

11           I'm sorry.  It must be 805A.  Sorry.  Thank you,

12  Mr. Bailey.  Can you enlarge that, please?

13           Do you see in front of you wire instructions,

14  Mr. Angelowicz?

15  A.  I do.

16  Q.  And are these the wire instructions that you sent to

17  First Republic?

18  A.  Yes.

19  Q.  Can you zoom out, please, Mr. Bailey, and take us back to

20  805, please?

21           I'm sorry, Mr. Bailey, if you can zoom out again,

22  going to the response from Nick Pottenger.

23           Do you see here where Mr. Pottenger says, "Once we

24  have the new instructions, I'll call to you confirm"?

25  A.  I do.

M9D6RAJ2                          Angelowicz - Direct

1   Q.  Did you receive a call?

2   A.  I did.

3   Q.  Now, can you please pull up and put side by side,

4   Mr. Bailey, Government Exhibits 803A and 805A?

5          Mr. Angelowicz, do 803A and 805A appear substantially

6   identical?

7   A.  Yes.

8   Q.  With respect to 803A, are those the wire instructions you

9   received from Scott McLellan's e-mail account?

10  A.  Correct.

11  Q.  And with respect to 805A, are those the wire instructions

12  you sent to First Republic?

13  A.  Correct.

14  Q.  You can take those down.  Thank you, Mr. Bailey.

15         At any point in the last week of July 2018, did you

16  discuss the change in the wiring instructions with

17  Mr. McLellan?

18  A.  I did not.

19  Q.  When is the next time you spoke to him about the

20  $1.7 million wire?

21  A.  I want to say it was in late July, early August.  I don't

22  recall the exact date, but he reached out to me, asking where

23  his $1.7 million was at his Interactive Brokers account.  And I

24  said oh you sent me new wire instructions to send it to

25  Unique Bamboo Investments, I think.  And he said, no, I didn't.

M9D6RAJ2                    Angelowicz - Direct

1    That wasn't me.  Can you send me the e-mail that you received
2    from me?  And my stomach just completely dropped, and I
3    realized something weird must have happened.
4    Q.  Did you go and try to find those e-mail instructions that
5    we just reviewed, Government Exhibit 803?
6    A.  I did.  So right -- I think I even had him on speakerphone
7    on my phone.  I was searching my outbox, and there was nothing
8    there.
9    Q.  At that point -- so you said you looked on your phone.  Did
10   you look anywhere else?
11   A.  I did.  I rushed home.  I canceled my whole day and went
12   onto my work computer, and there was no record of the e-mail
13   that was sent to me or sent -- you know, even sent to the
14   bankers.  Everything was deleted.
15   Q.  So what steps were taken -- well, withdrawn.
16          Once you discovered you couldn't find these e-mails,
17   what did you do next?
18   A.  I panicked for a moment because I was just completely
19   confused and upset.
20          But then right away, you know, I connected with Scott
21   and Tim, the two founders of Marble Arch came together, you
22   know, with a plan ultimately to reach out to our IT providers
23   to see if someone had broken into our system and reach out to
24   our legal counsel to talk through kind of what our options
25   were.  And also, you know, talk through getting some cyber

1    forensic accountants involved to see if they could help us out.

2            And then lastly, but most importantly, reach out to

3    the bankers at First Republic to see if they could halt the

4    wire to see if they could get the money back.

5    Q.  So is it fair to say that you were involved in a lot of

6    those efforts?

7    A.  Very involved, yeah.  I was almost like quarterbacking it

8    all.

9    Q.  How much of your time did that take?

10   A.  Hundreds and hundreds of hours, yeah.  It was -- it was

11   quite a summer, put it that way.

12   Q.  Can you pull up Government Exhibit 801?

13           Mr. Angelowicz, are you familiar with e-mail

14   forwarding rules?

15   A.  A little, yeah.

16   Q.  What do you understand them to be, roughly?

17   A.  One more time?

18   Q.  What do you understand e-mail forwarding rules to be, just

19   roughly?

20   A.  Oh, roughly?  I believe in Office 365 and other systems,

21   you could have auto forward rules where e-mails, instead of

22   going to you, could be forwarded to another address.

23   Q.  Can you please -- can you please enlarge, Mr. Bailey, from

24   forwarder's to recipient domain?

25           Mr. Angelowicz, have you ever used an e-mail address

M9D6RAJ2                        Angelowicz - Direct

1    called redmisericoridia@gmail.com?

2    A.  I do not.

3    Q.  Do you know anyone who uses that e-mail address?

4    A.  I do not.

5    Q.  Any time that you were with Marble Arch, did you create an

6    e-mail forwarding rule to send your emails to the email

7    address, redmisericoridia@gmail.com?

8    A.  Never.

9    Q.  Did you direct anyone else to do that for you?

10   A.  Never.

11   Q.  Can you take that down, please, Mr. Bailey?  Can you go to

12   the first forward date?

13           What is the first forward date that you see reflected

14   here?

15   A.  July 25, 2018.

16   Q.  What's the timestamp?

17   A.  12:00 a.m.

18   Q.  Is that before or after you received new wiring

19   instructions for Scott McLellan's $1.7 million wire?

20   A.  Before.

21   Q.  You can take that down, Mr. Bailey.

22           Now, I think you testified at the beginning that

23   Marble Arch was an investment firm; is that right?

24   A.  Correct.

25   Q.  To your knowledge, did Marble Arch engage in any commercial

M9D6RAJ2                          Angelowicz - Direct

1   lending at all?

2   A.  No, never.

3   Q.  Any secured finance or secured lending?

4   A.  Never.

5          MS. KAMAL:  Your Honor, subject to the same connection

6   I mentioned earlier, the government would like to put up

7   Government Exhibit 234A.

8          THE COURT:  It's already in subject to connection, so

9   you may use it with that proviso.

10  Q.  Can you please enlarge the top of this agreement,

11  Mr. Bailey?

12         Now, you were the CFO of Marble Arch; is that correct?

13  A.  Correct.

14  Q.  Fair to say, that in that role, if Marble Arch were

15  engaging in a security agreement or any other lending, you

16  would have known?

17  A.  Definitely.

18  Q.  Okay.  Can you take a look at the top enlarged portion of

19  this document, and then I'm going to ask a couple of questions?

20         So to your knowledge, did Marble Arch ever enter into

21  an agreement to loan -- well, withdrawn.

22         Did Marble Arch ever contemplate or consider entering

23  into a security agreement and promissory note with

24  Unique Bamboo Investment Inc.?

25  A.  Never.

M9D6RAJ2                          Angelowicz - Cross

1   Q.  At any time did Marble Arch Investments go by

2   Marble Arch Investment singular?

3   A.  Never.

4   Q.  Did Marble Arch ever have a head office located in

5   Hong Kong?

6   A.  No.

7   Q.  In your experience as a CFO, would it have made sense for

8   Marble Arch to be extending a loan weeks before it was

9   scheduled to shut down?

10  A.  No.

11          MS. KAMAL:  One moment, your Honor.

12          No further questions, your Honor.

13          THE COURT:  Cross-examination?

14          MR. SCHNEIDER:  Yes, thank you.

15  CROSS-EXAMINATION

16  BY MR. SCHNEIDER:

17  Q.  Good morning, sir.

18  A.  Good morning.

19  Q.  Is it pronounced Angelowicz?

20  A.  You did.

21  Q.  I'm sorry, but we have to go with probably the worst

22  professional time in your life.  But it's just a few minutes.

23  Okay?

24          Now, you reviewed a number of e-mails that you

25  acknowledged some were sent, some were received, and some you

1  believed came from Scott; is that right?

2  A.  Correct.

3  Q.  And some of them that, while you believed they came from

4  Scott, in fact, you learned later on that they did not; is that

5  right?

6  A.  Correct.

7  Q.  And at some point, you received an e-mail from who you

8  believed to be Scott changing where the money was -- where his

9  1.7 was supposed to go; is that right?

10  A.  Correct.

11  Q.  It turns out that was a fake e-mail, right?  It was a real

12  e-mail, but it wasn't from Scott?

13  A.  Yeah -- no, I mean, yes.  It was not from Scott.

14  Q.  Right.  Take a breath.  It's okay.  All right.

15          Now, from the -- when you received the wire

16  instruction, I think it's 803A or 805A, you received the wire

17  instructions, which indicated that the money should go to --

18  the recipient would be Unique Bamboo; is that right?

19  A.  Correct.

20  Q.  And at some point, you didn't ask Scott about it because it

21  didn't seem out of the ordinary; is that right?

22  A.  Correct.  I'd say that as well as it was within the same

23  e-mail chain.

24  Q.  Right.  So it kind of made sense that you had no reason to

25  doubt it, given what you were reading in the context; is that

M9D6RAJ2                    Angelowicz - Cross

1  right?

2  A.  Correct.

3  Q.  And you also did a little bit of your -- as an accountant

4  dealing with high finance, it's important for you to exercise

5  your due diligence; is that right?

6  A.  Correct.

7  Q.  And, in fact, you did exercise some due diligence in this

8  case when you got the Unique Bamboo wire information, didn't

9  you?

10  A.  I certainly reviewed it.

11  Q.  I'm sorry?

12  A.  Correct.  I reviewed the wire instructions.

13  Q.  And in addition to reviewing, you also -- actually, you

14  looked up Unique Bamboo Investments, didn't you?

15  A.  I Googled.  Yeah, I Googled it.

16  Q.  Yeah.  It's not a trick.  I mean, at some point when you

17  saw Unique Bamboo, number one, you had already done some

18  private work for Scott, so it didn't seem crazy, right?

19  A.  Correct.

20  Q.  And then number two, it was also in Florida, kind of near

21  where Scott lived, right?  So again, it seemed consistent

22  context, right?

23  A.  Yeah.  I'm not -- he didn't live there.  But I think he'd

24  visit from time to time from what I recall.

25  Q.  I'm sorry?

M9D6RAJ2                          Angelowicz - Cross

1    A.   That's it.

2    Q.   Okay.  But you did Google Unique Bamboo Investment, and

3    when you did, nothing, no red flags went up, did they?

4    A.   No.  It came up as a company and showed Florida, that it

5    was based in Florida.

6    Q.   And when you looked it up and it showed up based in

7    Florida, when you read it, you had no reason at that time to

8    doubt the legitimacy of it, did you?

9    A.   Correct.

10   Q.   And because, obviously, if you did have any red flags or if

11   you did doubt it, you would continue to exercise due diligence

12   to make sure that $1.7 million of your boss' money didn't go to

13   the wrong place, you would do that, right?

14   A.   Of course.

15   Q.   Of course, and that makes sense, in general.  And that's

16   something you would do as an expert CPA, correct -- CFO as

17   well, right?

18   A.   Correct.

19   Q.   Once you received the information about Unique Bamboo and

20   you were satisfied, based on the information that you had, you

21   sent the money to this account at SunTrust Bank, right?  Or

22   Unique Bamboo?  It was a wire?

23   A.   I sent the wire instructions to First Republic Bank.

24   Q.   I'm sorry.  My apologies.  That's correct, my mistake.

25            Now, I think earlier on direct examination, you said

M9D6RAJ2                          Angelowicz - Cross

1    that when you send money from bank to bank, it's efficient to

2    use wires as opposed to paper hard copy checks, right?

3    A.  Correct.

4    Q.  But there are still certain security measures that banks

5    use to make sure that the wires go to the correct accounts, if

6    possible, right?

7    A.  Correct.

8    Q.  And, in fact, you know for a fact that First Republic Bank

9    does check the ID of driver's licenses for security, correct?

10   A.  IDs?  Maybe when you're onboarding.

11   Q.  I'm sorry?

12   A.  Perhaps when you're onboarding, but I don't recall ever

13   having a driver's license check.

14   Q.  Do you remember speaking to the government on a number of

15   occasions in preparation for your testimony?

16   A.  I do remember -- I did meet with them a couple of times.

17   Q.  A number of times?

18   A.  A few times.

19   Q.  Do you remember ever telling them that you know that

20   First Republic Bank checks client ID numbers of driver's

21   licenses for security?  Did you tell that to the government

22   during one of your meetings?

23   A.  I don't recall that.

24   Q.  If I showed you some -- a note or report, could that help

25   you -- could that refresh your recollection as to whether or

M9D6RAJ2                        Angelowicz - Cross

1    not on August -- no, again, I apologize.

2              You met with them a number of years ago, right?

3    A.  Yeah.  Right after this all happened, that summer.

4    Q.  Like August, summer, about August 22, give or take, 2018?

5    Sound about right?

6    A.  I don't remember the exact date, but I know that --

7              THE COURT:  Hold on.

8              MR. SCHNEIDER:  Sorry.

9              THE COURT:  One at a time.  All right.  The court

10   reporter can't do her job if you're both speaking at the same

11   time.  So you need to wait for the question to be posed, and,

12   counsel, you need to wait for the answer to be completed.

13             MR. SCHNEIDER:  I apologize, your Honor.

14             THE COURT:  Thank you.

15   Q.  So is it fair to say, then, August 22 of 2018 when you were

16   helping to figure out what happened, you were in the

17   U.S. Attorney's Office speaking to another U.S. Attorney and a

18   special agent, and you had a lawyer there as well,

19   Michelle Reed.  Does that sound correct?

20   A.  Correct.

21   Q.  And during that time, they, meaning the prosecutors asked

22   you question as to what happened, and you tried to answer as

23   best you could remember?

24   A.  Correct.

25   Q.  And obviously, if you didn't know something, you would not

M9D6RAJ2                          Angelowicz - Cross

1    make something up, would you?

2    A.  Never.

3    Q.  Of course.

4         And if you remembered, you would say what you

5    remembered.  If you didn't remember, you would say I don't

6    remember, right?

7    A.  Correct.

8    Q.  On August 22 of 2018, when you were being interviewed by

9    the U.S. Attorney's Office in their office, do you remember

10   telling them that FRB, which would be First Republic Bank,

11   checks the client identification number of driver's licenses

12   for security?  Did you tell that to the federal government back

13   in August?

14   A.  I really don't recall that.

15   Q.  Okay.

16   A.  Yeah.

17   Q.  If I were to show you a report, would that help you

18   remember?  Could that refresh your recollection?

19   A.  Sure.  I mean, if I -- if I said it -- I mean, if it was

20   factual.

21        THE COURT:  Counsel.  Do you have something you want

22   to show the witness?

23        MR. SCHNEIDER:  May I?

24        THE COURT:  You may.

25        MR. SCHNEIDER:  Thank you.  It's 3503-001, Page 2.

1   May I approach the witness?

2            THE COURT:  You may.

3   Q.  Just read this to yourself.  Do not read it out loud,

4   please.

5   A.  This, right?

6   Q.  Yes, please.

7            THE COURT:  Mr. Angelowicz, just read it to yourself.

8   When you're done, you can tell me and/or give the document back

9   to Mr. Schneider.

10            Mr. Schneider do you need the document to pose the

11   question?

12            MR. SCHNEIDER:  I guess not, no.

13            THE COURT:  Then go back to the podium, please.

14            MR. SCHNEIDER:  Sorry.

15            THE COURT:  Mr. Angelowicz, tell me when you've read

16   that and when you're ready for a question.  Just hold onto it.

17            So now just to be clear, first, let me explain what's

18   going on to the jury, and then I'll also explain to you.

19            Now, when a witness can't remember something, says

20   that they don't recall, the rules permit a lawyer to try to

21   refresh the witness' recollection by showing them anything.  It

22   doesn't matter what it is.

23            I had a law professor who used to say you can refresh

24   your witnesses with a bowl of fettuccini alfredo.  It doesn't

25   matter as long as it does the trick and the witness sitting on

M9D6RAJ2                          Angelowicz - Cross

the witness stand remembers whatever it may be, it is the

witness' testimony.

        When an exhibit is shown to the witness to refresh his

or her recollection, it is not in evidence.  It's not something

that you will see.  It's not something for to you consider.

The only evidence is the witness' testimony.  If it refreshes

his recollection, and he's able to say, having seen this, I now

recall and then testifies to something, you may consider that

evidence and that testimony as you would any.  You may also

consider it a fact that he, you know, refreshed his

recollection with something.

        Now, if he doesn't remember, sitting here today, and

he doesn't remember, that is the evidence.  All right?  So with

that understanding and that explains to you what's going on

here, Mr. Angelowicz.  Now, why don't you listen to the next

question?

        Go ahead, Mr. Schneider.

        MR. SCHNEIDER:  Thank you.

Q.  Now you that you've had a chance to review that document,

does that refresh your recollection?  Does it help you

remember, whether or not from August 22, 2018, you told the

government that FRB, First Republic Bank, checks the client

identification numbers of driver's licenses for security?  Does

that help you remember?

A.  It actually doesn't.  Yeah.  Because I -- I don't really --

M9D6RAJ2                          Angelowicz – Cross

1   if I could talk for a second, I don't understand the context

2   here.  I think if you go into any bank, you have to share your

3   ID, right?  But since these wires were all done via e-mail and

4   call back, there certainly was not any ID checking being done.

5                  (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SCHNEIDER:   (Continued)

2    Q.  Okay.  Thank you.

3            Now.  Is it fair to say that you usually get an

4    automated confirmation when the wire goes through from First

5    Republic Bank?

6    A.  Yes.

7    Q.  And did that happen in this case?

8    A.  Yes.

9    Q.  So you received a confirmation that 1.7 went to Unique

10   Bamboo Investments, correct?

11   A.  Correct.

12   Q.  Now, when you looked earlier at Government Exhibit 805 --

13   you don't have to memorize it -- but there were eight different

14   disbursements that had to be made to the owners as well as

15   employees, correct?

16   A.  Correct.

17   Q.  And all of those, the email that referred to the amounts to

18   each of those people and to each account, those were all

19   real -- that was a real email, correct?

20   A.  Correct.

21   Q.  And at some point on July 25 at about 11:53, the email you

22   referred to, that was to Nick Pottenger.  Is that right?

23   A.  Correct.

24   Q.  And that's when there was a change that the 1.7 million

25   should go into a different account of Scott McLellan, right?

M9DQraj3                         Angelowicz - Cross

1    A.  Correct.

2    Q.  And now that's the exchange between you and Nick Pottenger

3    confirming what was going to happen, where it should go, when

4    it should go, things of that nature, right?

5    A.  Correct.

6    Q.  And at that time when you had this email exchange with the

7    bank about change of the 1.7, based on what you knew at the

8    time, you had no reason to doubt that that was supposed to go

9    to Unique Bamboo, correct?

10   A.  Correct.

11             MR. SCHNEIDER:  May I just approach to take my

12   document back?

13             THE COURT:  You may.

14             MR. SCHNEIDER:  Thank you.

15   Q.  Other than the Googling of Unique Bamboo, you found out

16   they were a corporation in Florida, you didn't know that before

17   that, did you?

18   A.  I did not know them before that.

19   Q.  And you had -- did you ever hear of a company called

20   Emergent Development Corporation?

21   A.  No.

22   Q.  You ever hear of the name of a woman named Nancy

23   Martino-Jean?

24   A.  No.

25   Q.  You ever hear the name Mustapha Raji?

M9DQraj3                        Angelowicz - Cross

1    A.  No.

2    Q.  Have you ever -- not ever -- back then, in 2018, the summer

3    or a little bit after, did you ever know of the relationship

4    between any of those people or business entities?

5    A.  No.

6    Q.  And do you have any idea where the money went, you

7    personally, where the money went after the 1.7 went into the

8    Unique Bamboo account?

9    A.  I do not.

10   Q.  And this redmisericoridia, that's that email account that

11   you looked at?

12   A.  Yes.

13   Q.  Do you know anything at all about that person --

14   withdrawn -- that account, who it's connected to or anything

15   like that?

16   A.  Nothing, no.

17           MR. SCHNEIDER:  Thank you, sir.

18           THE COURT:  Any redirect?

19           MS. KAMAL:  No redirect, your Honor.

20           THE COURT:  You may step down, sir.

21           (Witness excused)

22           THE COURT:  Next witness, please.

23           MS. KAMAL:  The government calls Mr. Steven Larvick.

24     STEVEN EUGENE LARVICK,

25        called as a witness by the Government,

M9DQraj3                          Larvick - Direct

1          having been duly sworn, testified as follows:

2               DEPUTY CLERK:  Can you please state and spell your

3     full name for the record.

4               THE WITNESS:  Steven Eugene Larvick.  S-T-E-V-E-N.

5     Eugene, E-U-G-E-N-E.  Larvick, L-A-R-V-I-C-K.

6               THE COURT:  If you can situate your chair to the

7     microphone so that you're an inch or two away and keep your

8     voice up so that everybody can hear you, that would be great.

9               MS. KAMAL:  Your Honor, I just wanted to advise the

10    Court that this is the first 404(b) witness.

11              THE COURT:  So I will provide instruction at the

12    appropriate time.  You may proceed.

13    DIRECT EXAMINATION

14    BY MS. KAMAL:

15    Q.  Good morning, Mr. Larvick.

16    A.  Good morning.

17    Q.  How far did you go in school?

18    A.  I've got my master's degree.

19    Q.  What did you get your master's degree in?

20    A.  Business administration.

21    Q.  I'm sorry to ask you to do this, but if you could speak up

22    a little bit or pull the microphone closer to you, if possible.

23    I'm just having a hard time hearing you.

24              THE COURT:  The acoustics in here are very bad, so

25    project your voice into the microphone as much as you can.

1                    (Juror request)

2          THE COURT:  Tell you what, instead of taking a

3    bathroom break, let's take our break now and not lose some

4    precious minutes.  I understand.  I know it's the first

5    morning.  I would recommend using the facilities right before

6    you come out, and if we can't do it, we'll figure out some

7    other system, but hopefully we can stick with it.  I'm not here

8    to torture you, and I obviously want you to be able to pay

9    attention.

10         A couple quick reminders before you get going:

11         Number one, don't discuss the case.  You've heard

12   openings.  You've heard some of the evidence, but you should

13   not discuss the case with one another or with anyone else.  You

14   should continue to keep an open mind because, again, you

15   haven't heard all the evidence.  And don't do any research

16   about the case.

17         It is 11:12.  I want to keep to half hour, so if at

18   11:40 you can be ready to line up and come back out, we can get

19   started at 11:42.  Enjoy your break, and thank you very much.

20         (Jury not present)

21         THE COURT:  You may be seated.

22         Mr. Larvick, sorry to call you only to take a break,

23   but you may step down.  Just be ready back in here at 11:40

24   ready to go, please.  With that, enjoy your break, and we'll

25   see you in a few minutes.

1          THE WITNESS:  Okay.

2          THE COURT:  Counsel, my jury has come on a spectrum of

3    bladder control.  I hope this doesn't mean it's one we need to

4    take more breaks, but we'll see.

5          Anything the government needs to discuss before I give

6    you as much of a break as you can take?

7          MS. KAMAL:  No, your Honor.

8          THE COURT:  Mr. Schneider?

9          MR. SCHNEIDER:  No.

10          THE COURT:  Please be here ready to go at 11:40, and

11    we'll start as soon as the jury is ready, hopefully 11:42.

12    Enjoy your break.

13          (Recess)

14          (Jury present)

15          THE COURT:  Welcome back, ladies and gentlemen.  I

16    hope you enjoyed the break and it helped and didn't create any

17    issues.

18          A couple things:  First of all, just to make clear, I

19    am not here to torture you, and obviously I want to make sure

20    you can all pay careful attention to all the evidence you're

21    hearing.  So certainly let me know if the schedule that we are

22    following, now that you're more familiar with it, poses any

23    issues.  The reason I take one half hour break is to make the

24    most of your time.  If we can do it, it enables us.  The

25    problem is to take a quick bathroom break with 14 people is not

1    actually that quick.  If we take multiple breaks during the

2    day, it turns out that we end up losing a lot of trial time.

3         If we can keep to the schedule, great.  If we need to

4    adjust, we'll add just.  Just let Ms. Smallman or me know, and,

5    again, certainly not here to make you uncomfortable and want to

6    make sure you can pay careful attention.

7         With that, we will resume with direct testimony of

8    Mr. Larvick who remains under oath.  I think I will take the

9    opportunity to just give you a brief instruction about the

10   testimony I expect you will hear from this witness.

11        I anticipate that he is going to testify, and the

12   government will offer evidence regarding another occasion on

13   which the defendant allegedly engaged in criminal conduct that

14   is not charged in the indictment in this case.  So to be clear,

15   I believe this witness will be testifying about conduct that

16   does not form any of the charges in the indictment, any of the

17   charges on which you'll be asked to deliberate.  That is to

18   say, he is not on trial for committing anything that is not

19   charged in the indictment.  For that reason, you may not

20   consider evidence, the evidence that you're about to hear as a

21   substitute for proof that the defendant committed the charged

22   scheme or the charges in the indictment, nor may you consider

23   this evidence as proof that the defendant has a propensity to

24   commit crimes or has a bad moral character and, therefore,

25   committed the charged crimes.

1          Instead, this evidence is being admitted for a much

2     more limited purpose.  It is admitted only to help you decide

3     the defendant's knowledge, intent, absence of mistake, or lack

4     of accident with respect to the charged crimes.

5          Evidence of other acts may not be considered by you

6     for any other purpose.  That is, again, you may not use this

7     evidence to conclude that because the defendant may have

8     committed other acts, that he must also have committed the acts

9     that are charged in the indictment.  So that's an important

10    instruction.  And as I said to you earlier, any limiting

11    instructions that I give you, you should consider the evidence

12    only for the purposes that I've instructed you.

13         With that, counsel, you may proceed.

14         MS. KAMAL:  Thank you, your Honor.

15    BY MS. KAMAL:

16    Q.  Mr. Larvick, how far did you go in school?

17    A.  I went to my graduate -- got my graduate degree, master's

18    in business administration.

19    Q.  Did you say it was a master's in business administration?

20    A.  Correct.

21    Q.  I'd like to take you back to April 2017.  Where did you

22    work at that time?

23    A.  Southern Oregon University.

24    Q.  Is Southern Oregon University a public or private

25    university?

M9DQraj3                          Larvick - Direct

1    A.   It's public.

2    Q.   What was your title in April of 2017?

3    A.   I was the director of business services and controller.

4    Q.   And what were your responsibilities as the director of

5    business services and controller?

6    A.   Oversight of our accounting as well as our service center,

7    which is involved in contracting, procurement and purchasing

8    and our payroll office, as well as our bursar's office that

9    deals with collection on student accounts.

10   Q.   I'd like to focus on the service center.  What function

11   does the service center provide to the university?

12   A.   Largely, with contracting and to aid in procurement of

13   goods and services and payment of those.

14   Q.   So does the service center handle payments for major

15   vendors to the university?

16   A.   Yes.

17   Q.   So focusing now more generally sort of on the spring of

18   2017, what, if any, construction projects were under way at

19   Southern Oregon University?

20   A.   We had several, or a couple.  Primary one was one with the

21   construction of the recreation center.

22   Q.   And as the director of business services and the

23   controller, were you familiar with -- you said it was a

24   recreation center?

25   A.   Yes, student recreation center.

M9DQraj3                        Larvick - Direct

1    Q.  Were you familiar with the student recreation center

2    project?

3    A.  Yes.

4    Q.  And were vendors for the student recreation center's

5    construction being paid through the service center?

6    A.  Yes.

7    Q.  What was the name of the general contractor that was

8    responsible for building the student center?

9    A.  It was Andersen Construction.

10   Q.  How far along in the project was Andersen Construction in

11   April of 2017?

12   A.  It was getting to the final moments of it.  The project was

13   going from about 2014 to -- it went in service in 2017, the

14   fall term.

15   Q.  So it went into service at the end of 2017 or before --

16   A.  Yes, the end of.  Yes.

17   Q.  How often approximately did Andersen Construction invoice

18   SOU?

19   A.  Typically, it was monthly.

20   Q.  What methods of payment did SOU -- is SOU a sort of acronym

21   for Southern Oregon University?

22   A.  It is.

23   Q.  I'll use that going forward.

24            What payment did SOU use to pay Andersen

25   Construction's invoice?

M9DQraj3                    Larvick - Direct

1   A.  It was through ACH payments --

2            THE COURT:  Is ACH is a wire transfer direct deposit.

3   What is it?

4            THE WITNESS:  It's a direct deposit.  It stands for

5   automated clearing house.  It's for direct deposit into a bank

6   account.

7   Q.  Sorry to do this, Mr. Larvick.  I may ask you to slow down

8   and keep your voice up.  It's hard to hear you.

9            I'd like again now to focus in April of 2017.  At a

10  high level, could you please tell the jury what, if any, issues

11  arose regarding a payment to Andersen Construction at that

12  time?

13  A.  An email was received requesting that we change bank

14  account information on their behalf.

15  Q.  On whose behalf was the changed banking information

16  requested?

17  A.  For Andersen Construction.

18  Q.  Mr. Bailey, would you please bring up and show just the

19  witness Government Exhibit 50.

20           Could you scroll all the way down to the bottom,

21  please, so the witness has a chance to look at it.  We can go

22  back up to the top now, please.

23           Mr. Larvick, do you recognize this document?

24  A.  Yes.

25  Q.  What kind of document is it?

1    A.  It's an email.

2    Q.  What is the date on this email?

3    A.  May 2, 2017.

4    Q.  Focusing here at the very top, to whom is it addressed?

5    A.  It's to myself, Steve Larvick.

6    Q.  And do you recognize the email address there next to your

7    name?

8    A.  Yes.

9    Q.  Is that a personal email address or your business email

10   address?

11   A.  It's a business email address.

12   Q.  Now, other than the top of the document, does the portion

13   that you have reviewed look like a fair and accurate copy of an

14   email that you received on or about May 2, 2017?

15   A.  Yes.

16          MS. KAMAL:  Your Honor, the government offers

17   Government Exhibit 50.

18          THE COURT:  Any objection?

19          MR. SCHNEIDER:  No.

20          THE COURT:  Admitted.

21          (Government's Exhibit 50 received in evidence)

22   Q.  Mr. Bailey, if we could please go down in Government

23   Exhibit 50 to the page ending 9187.  If you could enlarge the

24   bottom half, please.  Thank you.

25          Do you see here, Mr. Larvick, where it says forwarded

M9DQraj3                          Larvick - Direct

1   message?

2   A.   Yes.

3   Q.   And what is the subject of this email?

4   A.   Vendor information.

5   Q.   What is the date?

6   A.   April 11, 2017.

7   Q.   Now, who does this appear to be from?

8   A.   It appears to be from Bill Eckhardt, chief financial

9   officer, at Andersen Construction.

10  Q.   Setting aside what is written here in the bottom of

11  Government Exhibit 50, were you familiar with Bill Eckhardt at

12  this time?

13  A.   Yes.

14  Q.   What was his role?

15  A.   He was chief financial officer in Andersen Construction.

16  Q.   Now, focusing here up top where it says "from Bill

17  Eckhardt," do you recognize this email address to be his?

18  A.   Yes, but not quite.

19  Q.   Could you explain what you mean by that?

20  A.   Andersen Construction comes under Bill Eckhardt at Andersen

21  dash it says C-O-N-S-T-R.  The R was added.  Their business

22  email address stops at C-O-N-S.

23  Q.   I want to make sure that was clear.  Let's take the

24  different parts of that email.  Looking here where it says

25  Bill.Eckhardt, do you see that?

M9DQraj3                              Larvick - Direct

1    A.  Yes.

2    Q.  And in your experience, is that how Mr. Eckhardt's email

3    appears?

4    A.  Yes, I believe so.

5    Q.  Now, let's -- then there's the @ sign.  And then do you see

6    the Andersen hyphen C-O-N-S-T-R.com?

7    A.  Yes.

8    Q.  Are you familiar with that domain name --

9    A.  Yes.

10   Q.  -- of the Andersen Construction email address?

11   A.  Yes.

12   Q.  And is this the domain name used by the Andersen

13   Construction -- by Bill Eckhardt's email address at Andersen

14   Construction?

15   A.  It is not.

16   Q.  How is it different from Mr. Eckhardt's actual Andersen

17   Construction email address?

18   A.  They end theirs at Andersen-const.  There is no "R" at the

19   end of their main domain name.

20   Q.  We see here on Government Exhibit 50 that an extra "R" has

21   been added to the domain name, correct?

22   A.  Correct.

23   Q.  To whom is this email being sent?

24   A.  It was initially sent to Patti, whose last name is Patti

25   Eliot, who is our accounting manager.

M9DQraj3                          Larvick - Direct

1   Q.  Can you please read this email beginning with "Good

2   morning, Patti"?

3   A.  It says: "Good morning, Patti.  We have moved our banking

4   facilities to another bank so therefore our banking details for

5   receiving payment via ACH and domestic wire transfer has

6   changed.  Could you please advise us on what we need to do to

7   make the necessary changes?  Thanks, Bill Eckhardt."

8   Q.  If we can go up the page here, please, to the middle of

9   9187 to the middle of the page.

10           Do you see again up here where it says forwarded

11  message?

12  A.  Yes.

13  Q.  Underneath that, do you see who that email is from?

14  A.  Yes.

15  Q.  Who is it?

16  A.  It's from Patti Eliot.

17  Q.  To whom is she forwarding that Bill Eckhardt email we just

18  saw?

19  A.  It's being forwarded to Janice Collins, who is our

20  associate director at the service center.

21  Q.  What's the date on that email?

22  A.  April 11, 2017.

23  Q.  Can you please read that for the jury, the body of that

24  email?

25  A.  It says, "Hi Janice.  Please send the proper form to

M9DQraj3                           Larvick - Direct

1    Andersen Construction."

2    Q.  Go up the page now, please, Mr. Bailey, to 9186, middle of

3    the page.

4            So do you see here at the bottom where it says, "On

5    2017-04-11"?

6    A.  Yes.

7    Q.  Who appears to have -- well, withdrawn.

8            Does this appear to be a response by Janice Collins?

9    A.  Yes.

10   Q.  Can you please read that email for the jury?

11   A.  "Hi Bill.  Attached is SOU's direct deposit form.  Please

12   complete it and return, along with a copy of voided check.  We

13   will therefore update our system.  Let me know if you have any

14   questions (sic).  Thanks.  Janice."

15   Q.  Looking above that -- well, withdrawn.  Looking above that

16   forwarded message just above, do you see another one from Bill

17   Eckhardt?

18   A.  Yes.

19   Q.  Is this the same Bill Eckhardt email address that we saw at

20   the bottom of the chain?

21   A.  Yes.

22   Q.  This is the same Bill Eckhardt email address with the extra

23   "R" in the domain name?

24   A.  Yes.

25   Q.  Can you please read that email?

1   A.  "Hi Janice.  See attached form and voided check.  Kindly

2   notify me once the necessary changes have been made.  Thanks."

3   Q.  Now, when you received this email that we see here in

4   Government Exhibit 50, did it have any -- did it have any

5   attachments to it?

6   A.  It did.

7   Q.  Can you please show just the witness, we'll start with

8   Government Exhibit 50A.  Do you recognize what you see here in

9   Government Exhibit 50A?

10  A.  Yes.

11  Q.  Does it appear to be a fair and accurate copy of the

12  attachment that you received when you received the email

13  chain --

14  A.  Yes.

15  Q.  -- that is in 50A?

16  A.  Yes.

17  Q.  That is in Government Exhibit 50?

18  A.  Yes.

19          MS. KAMAL:  Thank you.  The government would offer

20  Government Exhibit 50A.

21          MR. SCHNEIDER:  No objection.

22          THE COURT:  Admitted.

23          (Government's Exhibit 50A received in evidence)

24  Q.  Can you please put up now Government Exhibit 50B.

25          Mr. Larvick, do you recognize what you see here in

M9DQraj3                          Larvick - Direct

1   Government Exhibit 50B?

2   A.  Yes.

3   Q.  Is this a fair and accurate copy second attachment to the

4   email that was forwarded -- that was attached to the email

5   chain that you received?

6   A.  Yes.

7   Q.  And the email chain I'm referring to is the email chain in

8   Government Exhibit 50.

9   A.  Correct.

10          MS. KAMAL:  The government offers Government Exhibit

11  50B.

12          MR. SCHNEIDER:  No objection.

13          THE COURT:  Admitted.

14          (Government's Exhibit 50B received in evidence)

15  Q.  So if we could show the jury Government Exhibit 50B,

16  please.

17          If you could just take a look at that, Mr. Larvick.

18  Can you explain -- this appears to be a form used by Southern

19  Oregon University.  Is that right?

20  A.  Correct.

21  Q.  Can you read us the title and tell us what it's used for?

22  A.  Direct deposit enrollment or cancellation form.

23  Q.  So what does this form -- withdrawn.  To whom is this form

24  typically sent?

25  A.  Either to new vendors as the -- it will be sent to new

M9DQraj3                              Larvick - Direct

1    vendors to allow them to get set up for direct deposit or to

2    existing vendors if they want to change -- if they need to

3    change banking information.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9D6RAJ4                         Larvick - Direct

1   Q.  And so do you see here where the name on this form is

2   Anderson Construction Company; is that right?

3   A.  Correct.

4   Q.  And do you see down here under name of financial

5   institution, that the name of the financial institution is

6   Suntrust?

7   A.  Yes.  Correct.

8   Q.  And do you see the signature down here at the bottom?

9   A.  Yes.

10  Q.  Just based on looking at Government Exhibit 50B, what does

11  that appear to be to you, the signature?

12  A.  It appears to be from Bill Eckert.

13  Q.  What is the date on that?

14  A.  April 18, 2017.

15          MS. KAMAL:  Can we turn now to Government Exhibit 50A?

16  Q.  Do you see in front of you a blank check?

17  A.  Yes.

18  Q.  Now, was this also submitted along with the direct deposit

19  slip that we saw on Government Exhibit 50B?

20  A.  Yes.

21  Q.  Can we turn back to Government Exhibit 50, please.  If we

22  can go to the top of 50A16, please.  A little further.  Thank

23  you.

24          All right.  Now we're going to start with the bottom

25  e-mail here.  You see where it says, on Tuesday, April 18,

1    2017, "Janice Collins wrote"?

2    A.  Yes.

3    Q.  Can you just remind us again what Janice Collins' role is?

4    A.  She's the associate director of the service center.

5    Q.  Based on your understanding of SOU's service center, do you

6    know why Janice Collins may be receiving they e-mail or rather

7    would be sending this e-mail?

8    A.  She was passing it onto the staff member who was actually

9    the person who would be making changes, making records.

10   Q.  I'm sorry.  I lost the last part of your answer.

11           You said she would be sending it onto the person who

12   would be making the changes; is that right?

13   A.  Yes.  In our system, in the university's system.

14   Q.  And can you please read that e-mail for us, please?

15   A.  "Victoria, this vendor has a change in the banking

16   information for their direct deposit payments.  Are you the

17   proper person to update their records?  If not, let me know to

18   whom this should be forwarded to."

19   Q.  And do you see a response just above that?

20   A.  Yes.

21   Q.  And it's on the same day; is that right, April 18?

22   A.  Correct.

23   Q.  2017.  And what is the response?

24   A.  "Hi Janice, inactivated the previous banking information

25   and added the new.  Thanks, Victoria."

1  Q.  And who is Victoria -- is it Vannice or Vannice?

2  A.  It's Vannice.

3  Q.  Vannice.  Okay.

4       She's a staff member who is involved in actually

5  updating vendor information.

6       THE COURT:  Vendor information.

7       MS. KAMAL:  If you can please zoom out, please,

8  Mr. Bailey.  If you could go up.  A little further down, if you

9  don't mind.  Thank you so much.

10 Q.  Now, Mr. Larvick, based on what we see here in

11 Government Exhibit 50 and your own personal knowledge of

12 events, what actions did Patty Elliot and Janice Collins take

13 with respect to the Anderson Construction direct deposit

14 account on file with SOU?

15 A.  Well, Patty Elliot received the bill from Bill Eckert and

16 forwarded it to Janice Collins and who then forwarded it to

17 Victoria Vannice to actually make the changes.

18 Q.  Now, even looking at e-mails that are -- and I'm looking at

19 here at the page ending 9186, this is around April 18, 2017,

20 correct?

21 A.  Correct.

22 Q.  Do you recall what the status of Anderson Construction's

23 invoicing was around the time that this change was being made?

24 A.  They're just in the process of completion of a major

25 portion of a construction project, so they were still issuing

1    invoices to us at that point.  We received one shortly

2    thereafter.

3    Q.  Do you know -- did I hear you just say that they had --

4    they submitted an invoice shortly after this; is that correct?

5    A.  Yes.

6    Q.  Do you recall approximately how much that invoice requested

7    payment for?

8    A.  Approximately $1.9 million.

9    Q.  Did SOU pay the 1.9 million invoice from

10   Anderson Construction?

11   A.  Yes.

12   Q.  And how was that payment made?

13   A.  It was through direct deposit.  After the invoice had been

14   reviewed by the project manager, authorized by the project

15   manager, it was then processed and sent to them through the

16   direct deposit.

17   Q.  To be clear, was that invoice from Anderson Construction

18   separately validated by another part of the university, to your

19   knowledge?

20   A.  Yes.

21   Q.  Now, do you know, Mr. Larvick, whether

22   Anderson Construction actually received that $1.9 million

23   payment?

24   A.  They did not.

25   Q.  How did you learn that?

1   A.  I received a phone call from an individual at

2   Anderson Construction just trying to get an update on when they

3   could expect to receive payment.

4   Q.  And what did you do when you got that phone call?

5   A.  I looked at our records and notified them that payment had

6   already been sent out, at which time they acknowledged they had

7   not received it from the bank it had gone to.  At that point,

8   they clarified that was not their bank.

9   Q.  So to be clear, Anderson Construction informed you that

10  this was not their bank information, correct?

11  A.  Correct.

12  Q.  What did you do when you learned that Anderson hadn't

13  gotten the $1.9 million payment?

14  A.  First thing we did was reached out to -- I actually reached

15  out to the state treasury because we're connected through our

16  bank to the State of Oregon's treasury department.  I reached

17  out to the treasury to see if they could retrieve the payment.

18  And they engaged the FBI at the same time.

19  Q.  Was SOU able to recover any of that $1.9 million?

20  A.  Yes.

21  Q.  Approximately how much?

22  A.  About 610,000.

23  Q.  And was Anderson Construction ever paid the $1.9 million it

24  was owed by SOU?

25  A.  Yes.

M9D6RAJ4                          Larvick - Direct

1    Q.  So SOU issued a second payment for $1.9 million, correct?

2    A.  Correct.

3    Q.  Now, as the controller and the director of business

4    services, are you generally aware of SOU's largest vendors?

5    A.  For the most part, yes.

6    Q.  To your knowledge, has SOU ever done business with a

7    company called Best Janitor Services in Duluth, Georgia?

8    A.  No.

9    Q.  Are you aware of any reason why Best Janitor Services would

10   have received the $1.9 million that was owed to

11   Anderson Construction?

12   A.  No.

13   Q.  To your knowledge, did anyone from Best Janitor Services

14   ever approach SOU and return the $1.9 million payment that was

15   intended for Anderson Construction?

16   A.  No.

17   Q.  To your knowledge, has SOU ever done business with a

18   company called Emergent Development Corporation?

19   A.  No.

20   Q.  One last question.  You told us earlier that SOU was able

21   to recover some portion of that first payment to

22   Anderson Construction; is that right?

23   A.  Yes, right.

24   Q.  How was that money recovered?

25   A.  Bank accounts -- the bank account was frozen at SunTrust.

M9D6RAJ4                         Larvick - Cross

1  They just verified what was left in there, and funds came back

2  to the state treasury, which then came back to us.

3           MS. KAMAL:  One moment.

4           No further questions, your Honor.

5           THE COURT:  Cross-examination.

6           MR. SCHNEIDER:  Thank you.

7  CROSS-EXAMINATION

8  BY MR. SCHNEIDER:

9  Q.  Good afternoon, sir.

10 A.  Hi.

11 Q.  Do you have any idea how the e-mail account was hacked?

12 A.  How it was hacked, no.

13 Q.  And you had no idea who specifically hacked it, do you?

14 A.  No.

15 Q.  Now, I think you ended a few minutes ago saying that SOU

16 has never done business with Best Janitor Cleaning Service; is

17 that right?

18 A.  Best to my knowledge, no, correct.

19 Q.  And you don't know who that company is or what that company

20 does?

21 A.  No.

22 Q.  Do you know if you or anybody at SOU investigated who Best

23 Janitor Cleaning Service is or what it is?

24 A.  Didn't investigate.  All I did was look at were they in our

25 database in our records for anybody we do business with, and

M9D6RAJ4                          Larvick - Cross

1    they weren't.

2    Q.   So they were not in SOU's records?

3    A.   Correct?

4    Q.   But outside of SOU's records, did you or anybody in SOU

5    check outside, Google corporation in Oregon, anything like that

6    to see if Best Janitor Cleaning Services is, in fact --

7    A.   No.

8    Q.   Okay.  And do you know the name of Flor Caicedo?  Does that

9    name sound familiar to you?

10   A.   No.

11   Q.   Do you know if SOU has done any business with that person?

12   A.   I can't say.  I'd have to look.

13   Q.   Okay.  And Emergent Development Corporation, you said you

14   have never done business with them before.  Do you know what

15   that company is?

16   A.   No.

17   Q.   Do you know what kind of work that company does, if

18   anything?

19   A.   No.

20   Q.   And do you know what relationship, if any, exists between

21   Emergent Development and Best Janitor Cleaning Service?

22   A.   No.

23   Q.   Do you know if anybody -- any individuals from either of

24   those companies have anything to do with each other?

25   A.   No, no knowledge.

M9D6RAJ4                        Larvick - Cross

1    Q.  Do you know the name Mustapha Raji?

2    A.  No.

3    Q.  Do you know the name what relationship, if any, Best

4    Janitor Cleaning Services has with someone named Mustapha Raji?

5    A.  No knowledge.

6    Q.  Now -- now, it's clear -- by the way, you had mentioned

7    that you noticed in one of the exhibits that the e-mail for

8    Bill Eckert was incorrect.  Is that correct?

9    A.  Yes.

10   Q.  But as far as you know, the e-mail that was sent either to

11   or from Bill Eckert with that extra R went through; is that

12   right?

13   A.  Yes.

14   Q.  So that's how these people, whoever they were, that's how

15   it was hacked by adding this extra R; is that correct?

16   A.  Yes.

17   Q.  When did you first realize that that R was extra, that that

18   e-mail was wrong?

19   A.  This all came to my attention when I received a phone call.

20   We identified that the money had gone to the wrong account.  So

21   I then followed up with staff to find out what information they

22   had done, or had received and what actions they took to -- to

23   actually make the change, why they made the change.

24   Q.  And did you personally observe that the R was wrong, or did

25   somebody tell you about that?

1   A.  I looked at it.  Afterwards, I looked at it, because we

2   actually had a conversation with Bill Eckert himself.

3   Q.  Okay.  And at the time, I guess no one looked to see if it

4   was wrong at the time people responded to that e-mail, even

5   though it was a wrong e-mail address with an extra R?

6   A.  Correct.

7   Q.  It was only after that 1.9 million, which was now gone or

8   lost, that people began to focus and paid attention to the

9   exact e-mail address; is that right?

10  A.  Correct.

11  Q.  Now, Government Exhibit 50E, there was a signature that

12  appeared to be Bill Eckert's signature?

13  A.  Yes.

14  Q.  Did you speak to Mr. Eckert about that signature?

15  A.  Well, after the fact, yes.

16  Q.  Okay.  And after the fact, you found out that that

17  signature was what?

18  A.  Not his.

19  Q.  And do you have any idea who signed that name on behalf of

20  Bill Eckert?

21  A.  No, I have no clue.

22  Q.  Now, the $1.9 million plus invoice from Anderson, that was

23  a legitimate invoice, correct?

24  A.  Correct.

25  Q.  But the problem with SOU is that unfortunately, because of

M9D6RAJ4                          Larvick - Cross

```
 1  these fake e-mails, it went to a different bank account,
 2  correct?
 3  A.  Correct.
 4  Q.  And as the e-mails were exchanged, changing the bank
 5  account, that appeared -- to Janice and Patty and Bill and
 6  whoever else was involved, those all appeared to be aboveboard,
 7  correct?
 8  A.  Correct.
 9  Q.  At the time?
10  A.  Right.  But proper procedures weren't followed.
11  Q.  I'm sorry?
12  A.  Proper procedures were not followed.
13  Q.  Were not?
14  A.  Yeah.
15  Q.  But they didn't do anything illegal, did they?
16  A.  No.
17  Q.  And after the -- now, you did -- not, you personally, but
18  SOU was lucky to recover some of the money, 610, I think you
19  said?
20  A.  Yes, correct.
21  Q.  After the 1.9 went into the SunTrust account, do you have
22  any idea where any of the money went after it was in SunTrust?
23  A.  No.
24  Q.  Do you have any idea how that money was transferred out?
25  A.  No.
```

M9D6RAJ4                              Larvick - Cross

1    Q.  Or to whom?

2    A.  No.

3    Q.  By whom?

4    A.  No.

5    Q.  When it was transferred out?

6    A.  No.

7    Q.  In what form it was transferred, whether it was a wire,

8    check, cash, anything like that?

9    A.  No knowledge.

10   Q.  Now when these fraudulent e-mails were going back and forth

11   with people in accounting, you don't -- you at SOU do not know

12   who is the one behind those e-mail accounts, do you?

13   A.  No.

14   Q.  I mean, you don't have any idea who -- where that person

15   was physically located, do you?

16   A.  No.

17   Q.  Or who that person was or what company or what agency or

18   anything like that, who was doing those fake e-mails, do you?

19   A.  Correct.

20            MR. SCHNEIDER:  Thank you, sir.

21            THE COURT:  Any redirect?

22            MS. KAMAL:  No, your Honor.

23            THE COURT:  All right.  Mr. Larvick, you may step

24   down.  Watch your step, please.

25            (Witness excused)

1          THE COURT:  Next witness, please.

2          MR. SCHNEIDER:  The government calls Afolabi Adeusi.

3          THE COURT:  Just step up here, please, and then remain

4    standing when you get up here.

5     AFOLABI ADEUSI,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8          THE COURT:  If you can move your chair up a little bit

9    and bend the microphone down so you're speaking straight into

10   the microphone just an inch or two away inches, and keep your

11   voice up as loud as you can.

12         You may proceed, counsel.

13   DIRECT EXAMINATION

14   BY MR. SOBELMAN:

15   Q.  Good afternoon, Mr. Adeusi.

16   A.  Good afternoon.

17   Q.  What languages do you speak?

18   A.  I speak Yoruba language and English.

19   Q.  Sometimes do you have trouble understanding or speaking in

20   English?

21   A.  Yes.

22   Q.  If I speak slowly today, will you be comfortable testifying

23   in English?

24   A.  Yes, that's right.

25   Q.  If at any point I'm speaking to too quickly or you don't

M9D6RAJ4                        Adeusi - Direct

1    understand something I've said, will you tell me before

2    answering?

3    A.   Yes.

4    Q.   How old are you?

5    A.   I'm 46 years old.

6    Q.   Where were you born?

7    A.   I was born in Lagos, Nigeria.

8    Q.   Did you grow up there?

9    A.   Yes.

10   Q.   Did you later move to the United States?

11   A.   Yes.

12   Q.   Approximately when did you move to the United States?

13   A.   April of -- April 14, 2014.

14   Q.   April of 2014?

15   A.   Yes, that's right.

16   Q.   Where do you currently live?

17   A.   I live in Covington, Georgia.

18   Q.   How far did you go in school?

19   A.   My first degree, BLC.

20            MR. SCHNEIDER:  I'm sorry.  I couldn't understand

21   that, your Honor.  I'm sorry.

22            THE COURT:  Can you repeat that?  Your first degree

23   was what?

24            THE WITNESS:  Bachelor of science.

25            MR. SCHNEIDER:  Thank you.

M9D6RAJ4                        Adeusi - Direct

1    Q.  Where did you go to college?

2    A.  Lagos, Nigeria.

3    Q.  What do you do for work now?

4    A.  I drive Uber, S Lodge, and Lyft -- S Lodge.

5            MR. SCHNEIDER:  I'm sorry, your Honor.  I couldn't

6    understand that.

7            THE COURT:  Uber and Lyft, is that what you said?

8            THE WITNESS:  Yeah, Uber and Lyft.

9    Q.  Is that in the Atlanta, Georgia area?

10   A.  Yes.

11   Q.  Are you a United States citizen?

12   A.  No.

13   Q.  What is your current immigration status in the

14   United States?

15   A.  I don't have a status right now.

16   Q.  I'm going to turn to a different topic.

17           Mr. Adeusi, have you committed any crimes in your

18   life?

19   A.  Yes.  I've committed crimes.

20   Q.  Generally, what types of crimes have you committed?

21   A.  Committed a wire fraud, bank fraud, immigration fraud, so

22   on and so forth.

23           THE COURT:  Sorry.  The last thing you said was so on

24   and so forth?  Is that what you said?

25           THE WITNESS:  I said yes, so on and so forth.

1              THE COURT:  Just keep your voice up.

2              MR. SCHNEIDER:  I'm sorry, your Honor.  After

3    immigration fraud, he said what?  I'm sorry.

4              THE COURT:  So on and so forth.

5              MR. SCHNEIDER:  Thank you.

6              THE COURT:  Please, sir, please keep your voice up so

7    everyone can hear you.

8    Q.  I'll ask you some more questions about the specific crimes

9    you pled guilty to later in your testimony and ask you to

10   explain what those crimes were.  But for now, I want to ask you

11   this:

12             Have you committed any crimes with anyone that you see

13   in the courtroom today?  And if you need to stand up to make

14   sure you can see everyone in the courtroom.

15   A.  Yes.  That one.  Mr. Mustapha.

16             THE COURT:  Have a seat.

17   A.  Mustapha.

18   Q.  Okay.

19             THE COURT:  Indicating the defendant.

20   Q.  At the time you committed crimes with Mustapha, did you

21   know his last name?

22   A.  No, I don't.

23   Q.  What kinds of crimes did you commit with Mustapha?

24   A.  Wire fraud, bank fraud, money laundering.

25   Q.  Approximately when did you do that together?

M9D6RAJ4                          Adeusi - Direct

1    A.  Between 2017 and 2018.

2    Q.  Mr. Bailey, can you please show the witness what's been

3    marked for identification as Government Exhibit 1?

4            Mr. Adeusi, do you recognize the person in this

5    photograph?

6    A.  Yes.

7    Q.  Who is it?

8    A.  Mustapha.

9            MR. SOBELMAN:  The government offers

10   Government Exhibit 1.

11           MR. SCHNEIDER:  No objection.

12           THE COURT:  Admitted.

13           (Government's Exhibit 1 received in evidence)

14           MR. SOBELMAN:  Please briefly display it.

15           You can take it down.

16   Q.  Let's take a step back.  Approximately what year did you

17   first get in contact with the defendant?

18   A.  2017.  In 2017, early in March, 2017.  That's right.

19           MR. SCHNEIDER:  I'm sorry?

20           THE COURT:  Early.  Did you say early?

21           MR. SOBELMAN:  Early?

22           THE COURT:  Early.

23   Q.  And at that time, were you involved in fraud and money

24   laundering?

25   A.  That's right.

M9D6RAJ4                          Adeusi - Direct

1   Q.   What was your role in the fraud and money laundering

2   scheme?

3   A.   I was a middleman.

4   Q.   What do you mean by you were a middleman?

5   A.   I correspond between the people who steals money from

6   different victim and the people who receive the money on -- on

7   their behalf.

8   Q.   So just to be clear, on one side of you, if you're in the

9   middle, are the people who are communicating with the victims

10  and steal the money; is that correct?

11  A.   That's right.

12  Q.   And on the other side of you are the people who coordinate

13  the receipt of the stolen money?

14  A.   That's right.

15  Q.   Were the people on both sides of you in the scheme with

16  you?

17  A.   That's right.

18  Q.   Okay.  The people who are on the side that steal the money,

19  where were those people generally located?

20  A.   100 percent of them live in Nigeria.

21  Q.   And on the other side, the people who received the money

22  from the fraud, where were those people generally located?

23  A.   United States.

24  Q.   Why would the people who received the money be located in

25  the United States?

M9D6RAJ4                          Adeusi - Direct

1   A.  Say it again.

2   Q.  Why would the people who received the money be located in

3   the United States and not in Nigeria?

4   A.  Because they live here, so the people who receive the money

5   they are --

6           MR. SCHNEIDER:  I'm sorry, your Honor.  I couldn't

7   understand that.

8           THE COURT:  Let's try that again.

9   A.  Let me say it again, Judge.

10  Q.  Just speak slowly.

11  A.  Why they prefer people that live in United States who help

12  them get the money is because they believe they have assets to

13  open such an account.

14  Q.  Is it more difficult to send fraud money to accounts in

15  Nigeria than it is to accounts in the United States?

16  A.  Can you repeat the question, please?

17  Q.  Is it more difficult for the people who steal the money to

18  send fraud money directly to accounts in Nigeria than it is to

19  accounts in the United States?

20  A.  Yeah, that's right.  It's difficult.

21  Q.  What types of fraud schemes were being committed that you

22  were the middleman for?

23  A.  There are so many.  We have the romance scam.  We have the

24  e-mail compromise.  We do have the money they are taking from

25  individual that's called maga.

M9D6RAJ4                       Adeusi - Direct

1              MR. SCHNEIDER:  I'm sorry, your Honor?

2              THE COURT:  What was the last?

3              THE WITNESS:  Maga.  It's not English.  That's --

4        that's a slang.

5              THE COURT:  How would you spell it?

6              THE WITNESS:  Maga is M-A-G-A.

7              THE COURT:  Nothing to do with American politics, I

8        assume?

9              THE WITNESS:  No.

10             THE COURT:  All right.  Just checking.

11   Q.  Did the term predate 2016?

12   A.  Before I was born, it's been in existence.

13   Q.  Let's go through those one at a time.

14             First, you mentioned romance scam.

15   A.  Yes.

16   Q.  Generally, what is a romance scam?

17   A.  We call it a romance scam because in Nigeria, they create

18   profile with fake identities and they go online to speak to

19   Americans, Westerners, and claim the IDs.  And so they lure

20   them to let them believe they are in love.  And after a few

21   time of communications, you go to the next stage whereby

22   money -- acting in love, by telling them that they need to move

23   to United States, he or she, or they are stuck in Afghanistan

24   or Iraq.  But they need money, so that's where it comes from.

25   Q.  And generally, when you were the middleman for a romance

1    scam, what type of account would the money be sent to?

2    A.   Normally, the money is not typically you request a personal

3    account for that, if some, if the story changes -- the story

4    changes along the line, so you might still ask for a company or

5    business account, depends on the amount.

6    Q.   So the romance scam, if the money is not too big, you might

7    use a personal account?

8    A.   That's right.

9    Q.   To receive the fraud proceeds?

10   A.   Yes.

11   Q.   And if the money is bigger or it's a different story that's

12   being told to the victim, you might use a business account?

13   A.   That's right.

14   Q.   Okay.  And what is maga?  Is that the same as romance scam,

15   or is that's something different?

16   A.   It's same as romance scam, but let me clarify.

17          The maga is romance, and then another part is where

18   you sent the -- they call informants, like a form of a letter

19   saying that you have money in, let's say, Bank of England or

20   you have money in Central Bank of Nigeria.  Or they say Mr. A.

21   Mr. B, your name has popped up for a claim in Nigeria or

22   London, that you need to claim this money, $13 million,

23   $14 million.  So if you not apply -- the -- oh, that's you, I

24   am interested, yes, you become the maga.

25   Q.   So that type of scheme, just for example, there might be a

1   fake letter that says you're going to get a 10 million-dollar

2   inheritance, but you're going to pay $100,000 in taxes first?

3   A.  Yes, and then it goes on and on and on.

4   Q.  And that would be a lie?

5   A.  Yes, of course, it's a lie.

6   Q.  The third type of scam you mentioned was business.  I think

7   you called it an e-mail compromise?

8   A.  E-mail compromise.

9   Q.  Can you explain what an e-mail compromise scheme is?

10  A.  E-mail compromise is a -- it's a slang for, you call it

11  alibaba.

12              MR. SCHNEIDER:  I'm sorry, your Honor?

13              THE WITNESS:  Alibaba.

14              THE COURT:  Alibaba.

15              THE WITNESS:  Yes, that's another slang for it.

16              So this is whereby there are people online.  I don't

17  know, maybe hackers.  Sometimes it's just -- I don't know how

18  to get -- how they get people e-mail.  So they see them on

19  e-mails of corporations, companies, law firms.  And they see

20  everything that they do, and when these companies are going to

21  send money or make purchase or payment, so the switch the --

22              MR. SOBELMAN:  It's okay.  I ask you to go slowly

23  unless the judge has different instructions.

24              THE COURT:  No.  Slowly is fine.  You don't want to be

25  too close.  You want be about an inch away from the mic.

M9D6RAJ4                        Adeusi – Direct

1              MR. SCHNEIDER:  Your Honor, I'm sorry.  May we have a

2       sidebar for a brief second, please?  I promise it will be

3       quick.

4              THE COURT:  Okay.  Thank you.  Sorry, ladies and

5       gentlemen of the jury.  Bear with me one moment.  You may

6       approach, counsel.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (At the sidebar)

2         MR. SCHNEIDER:  It's impossible for me to understand

3    what this gentleman is saying.  I apologize.  It's not how

4    loud, it's the mumbling of the words.  It's not his fault.  I

5    guess I'm not sure why they couldn't have a translator

6    interpreter for him for his testimony.  I think it's too

7    difficult.  Anyway, so I think there should be a translator,

8    I'm having a hard time understanding what he's saying.

9         THE COURT:  I think I agree in the sense that it would

10   have been better  to an interpreter, but I'm not sure we can

11   get an Yoruba interpreter on short notice.

12        MR. SOBELMAN:  Your Honor, we explored that option.

13   He does have a very heavy accent.  He doesn't speak proper

14   Yoruba in the sense that an interpreter is actually somewhat as

15   difficult, if not more difficult to speak with him, because he

16   speaks a certain dialect that's not probably spoken in the

17   United States and includes slang.  We're happy to do whatever

18   your Honor wishes, but we're trying to go slow, and this is the

19   way this witness communicates, perhaps to the detriment of the

20   government, but it's certainly not to the detriment of the

21   defendant.

22        THE COURT:  Well, it's to the detriment to the process

23   in terms it's hard to understand what he's saying.  But I just

24   don't have a better idea if you're telling me that there's no

25   interpreter available, one with his dialect, that I think we

1    have to make due with what we're doing, but it's not ideal.

2              MR. SOBELMAN:  The only other idea we discussed is

3    trying to make the realtime available to the jury and defense

4    counsel.  We can see if that's --

5              THE COURT:  The realtime is definitely not being made

6    to the jury.  First of all, there's stuff on there that the

7    jury is not supposed to be privy to.  Second of all, it's not a

8    hundred percent accurate because it gets cleaned up.  I don't

9    know if defense has it.  If not, I am certainly happy to make

10   it available through CJA funds, but I'm not sure we can do that

11   immediately.

12             MS. KAMAL:  We have two screens, if it stretches,

13   we're happy to provide one to defense counsel right now.  I

14   certainly don't want to create any difficulty, but these are

15   the challenges we faced as well in communicating with the

16   witness.

17             THE COURT:  All right.  Why don't we try that?  And

18   either he can get realtime?  Does he need to hook it up to the

19   back computer?

20             DEPUTY CLERK:  The whole court reporter office would

21   need to come in and set up the computer.  It's a whole

22   different process.  It's not through the equipment here.  The

23   AV equipment.

24             THE COURT:  Well --

25             MS. KAMAL:  Your Honor, he can even sit at his table

M9D6RAJ4                         Adeusi - Direct

1    at my seat.

2              MR. SOBELMAN:  We don't want to disrupt the

3    proceeding.

4              MR. SCHNEIDER:  I want to go forward.  I agree if I

5    can either have their screen or if I can sit in the front, I

6    guess.  Maybe that will help.

7              THE COURT:  I don't think we can move the screen from

8    one table to the other.  It strikes me as far.

9              MS. KAMAL:  I'll move to the end.

10             MR. SCHNEIDER:  May we have a moment?

11             THE COURT:  It's a little unorthodox, but we'll make

12   due.

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2            THE COURT:  All right.  Sorry for the delay, ladies

3       and gentlemen.  Let me explain.  You've picked up that the

4       witness has a heavy accent, and as you've heard, Mr. Schneider

5       has some trouble just hearing him.  To facilitate, we're going

6       to do something slightly unorthodox, which is to relocate

7       Mr. Sobelman to the front table, which is typically the

8       government's table.  So don't be confused.  He's not becoming

9       the member of the government's team.  He remains Mr. Raji's

10      counsel, but we're going to put him there and hope that that

11      speeds things along and facilitates.  So fingers crossed.

12            All right.  Mr. Schneider, are we good?

13            MR. SCHNEIDER:  Yes, I appreciate it.

14            THE COURT:  Just move the microphone down.

15            MR. SCHNEIDER:  Thank you.  I appreciate it.

16            MR. SOBELMAN:  I'll just remind Mr. Adeusi to go slow

17      and try to speak as clearly as you can.

18            THE WITNESS:  Okay.

19      BY MR. SOBELMAN:

20      Q.  I believe you were in the midst of discussing what an

21      e-mail compromise is.  If I could ask you again, what is an

22      e-mail compromise scheme?

23      A.  That's a -- that's when they switch e-mails for original

24      e-mails that are made for corporations or companies initial --

25      initial business, switch to the fraud details, taking the

M9D6RAJ4                          Adeusi – Direct

1    accounts that are meant for -- meant for -- as meant for the

2    original transaction in that company to a fraud's details that

3    belongs to the people who give out -- who give me accounts to

4    give to the senders in Nigeria.

5    Q.   So just to be clear, if there's a transaction that is going

6    to happen?

7    A.   Yes.

8    Q.   An e-mail compromise is where someone intervenes in the

9    middle and switches it from the real payment party to a

10   different bank account?

11   A.   That's right.  That's right.

12   Q.   Okay.  And were you involved in the hacking of e-mails or

13   the switching of accounts?

14   A.   No.

15   Q.   You were in the middle?

16   A.   I'm the middle, yes.

17   Q.   Just generally, can you explain what was the defendant's

18   role?

19   A.   So Mustapha provides the accounts for the fraudulent

20   transactions.

21   Q.   As far as you know, was he involved in hacking e-mails or

22   sending fraudulent e-mails to victims?

23   A.   I don't know that.

24   Q.   Earlier, you testified you first were in contact with the

25   defendant in 2017; is that right?

M9D6RAJ4                          Adeusi - Direct

1    A.   That's right.

2    Q.   And in 2017, who first put you in contact with the

3    defendant?

4    A.   It's a friend.  His name is Ugo.

5    Q.   Ugo.  Is that U-G-O?

6    A.   Ugo.  That's right.

7    Q.   Do you know Ugo's last name?

8    A.   Yes.

9    Q.   Please spell it.

10   A.   A-N-A-Z-O-D-O.

11           MR. SOBELMAN:  Did you get that?

12           MR. SCHNEIDER:  No.

13   Q.   Can you do that again?

14           THE COURT:  A-N-A-Z-A-D-O.

15           THE WITNESS:  That's right.

16           MR. SCHNEIDER:  Thank you.

17   Q.   Approximately, how long have you known Ugo?

18   A.   I've known Ugo for about 15 years before that year.

19   Q.   In 2017, was Ugo involved in a fraud and money laundering

20   scheme with you?

21   A.   No.

22   Q.   Please explain that.

23   A.   Because at the time, Ugo lived in Nigeria, I lived here.

24   So Ugo -- after he call, Ugo moved into United States.

25   Q.   Let's take a step back.  At that no point was Ugo involved

1   in the fraud and money laundering scheme?

2   A.   In Nigeria, I don't know.

3   Q.   When he lived in the United States, was he involved in the

4   fraud and money laundering scheme?

5   A.   Yes.

6   Q.   And how did Ugo come to put you in touch with the

7   defendant?

8   A.   So Ugo called me, told me that, please, I'm going to send

9   you number, please call this number.  Told this person his name

10  is Mustapha, tell him to call me.  I said okay.  Before I make

11  the call, who is that.  Said okay.  He's a friend, that money

12  was wired to Canada, that Mustapha had paid them part of the

13  money, and he was supposed to send the rest of the money back

14  to them, and he's not answering his phone.  So he said just let

15  me call him, tell him it's from Ugo, that he should call him

16  back.  I said okay.

17  Q.   Based on your conversation with Ugo, did you understand

18  that the wire transaction at issue was fraudulent or

19  legitimate?

20  A.   It was fraudulent.

21  Q.   And why was that your understanding?

22  A.   Ugo kept complaining to me that he doesn't know why he's

23  not picking the -- he already has his own share, doesn't know

24  why he's not sending the money.

25           He told me that he doesn't know why he's not picking

M9D6RAJ4                        Adeusi - Direct

1    his phone, and he sent part of the money and the one directs of

2    the share back to them in Nigeria.

3    Q.  At that time --

4            THE COURT:  Can I just interrupt?  All right.  Here

5    are a couple of quick instructions.  This too is conduct that

6    Mr. Raji, the defendant, is not charged with in the indictment.

7    But instead, it's being offered for the same purposes as the

8    evidence that I discussed with you earlier.  It's also being

9    admitted because it's part of the story, the relationship

10   between this witness and the defendant, and you may consider it

11   in connection with that and with respect to what it leads to,

12   to the extent it leads to the conduct that the defendant is

13   charged with in the indictment.  Now, that's number one.

14           Number two, you may not consider the statements that

15   Ugo made to this witness for their truth but rather for the

16   fact that they were said and what effect it had on this witness

17   and what actions he then took in response.

18           You may proceed, counsel.

19           MR. SOBELMAN:  Thank you, your Honor.

20   Q.  Mr. Adeusi, you were just explaining what Ugo told you

21   about his dealings with the defendant.  Do you recall that?

22   A.  Yes.

23   Q.  And as you are explaining it, I think you said he, he

24   hadn't paid the money, he still owed money.  Who is "he" in

25   that conversation?

1   A.  Mustapha was the person who was not paying the balance.

2   Q.  And at that time, was Ugo, as far as you know, involved in

3   any legitimate international business transactions?

4   A.  At that time, Ugo is still in Nigeria.  I don't know what

5   he's doing at that time, but the call -- says to me -- relays

6   to me that what he's calling Mustapha for was a fraudulent

7   transaction --

8           MR. SCHNEIDER:  Objection, nonresponsive.

9           THE COURT:  Objection sustained.

10          MR. SOBELMAN:  It's the defendant's understanding.

11          THE COURT:  Overruled.  Not the defendant's, the

12   witness's.

13          MR. SOBELMAN:  The witness's.  Apologies.

14          THE COURT:  I'll allow it.  You may go ahead.

15  Q.  After you had that conversation with Ugo where he asked you

16  to reach out to Mustapha about this money that had been sent to

17  Canada, what did you do next?

18  A.  So I called Mustapha, the number.  So I say my name, he

19  said -- no, no.  I called him; he didn't pick up.

20  Q.  And did you call him on like a regular phone call or

21  something else?

22  A.  Oh, I call him on the What's Up app.

23  Q.  WhatsApp?

24  A.  Yes.

25  Q.  Just generally, what is WhatsApp?

1    A.   It's an encrypted app for sending and calling people just

2    to say it's safe --

3    Q.   Sorry.   What was the end of that?

4    A.   They say it's safe to talk on WhatsApp when you're talking

5    about fraud or anything, than talking directly on a phone.

6    Q.   And you said when you called Mustapha, he did not pick up;

7    is that correct?

8    A.   That's right.

9    Q.   What happened next?

10   A.   So a few minutes later, he called me back.

11   Q.   And just to be clear, how did you get the defendant's phone

12   number?

13   A.   Ugo gave it to me.

14   Q.   And when the defendant called you back, what did he say?

15   A.   He said, who is this?   So I say my name is Afolabi.   I'm

16   calling on behalf of Ugo from Nigeria.   He said, oh, yeah, Ugo.

17   He didn't even let me explain.   I said he's been calling you.

18   He said, don't mind Ugo.   I give Ugo everything I need to give

19   him, but what he's asking for, I can't give him, that's -- tell

20   him, but don't worry.   I'll call Ugo myself.

21   Q.   What happened next?

22   A.   So that was in the afternoon, later around 5:00, 6:00, Ugo

23   call me back, that he has not called him, that I should call

24   him again.   So I called, he did not pick, and he did not call

25   me back.

1  Q.  Just to be clear, after the conversation with Mustapha, Ugo

2  asked you to call him again?

3  A.  Yes, sir.

4  Q.  And you did call him again?

5  A.  Yes, that's right.

6  Q.  But the defendant didn't pick up your call?

7  A.  Yeah.  He didn't call me back.

8  Q.  Do you know now whether or not Ugo and the defendant ever

9  resolved whatever issue there was with that transaction?

10         MR. SCHNEIDER:  Objection.

11         THE COURT:  Sustained.

12 A.  No, don't --

13         THE COURT:  Just wait for the next question.

14         MR. SOBELMAN:  Your Honor, it was whether he shows or

15 knows or not, not the substance of his knowledge.

16         THE COURT:  Yes or no, do you know the answer to that?

17 Q.  Do you know how that transaction turned out?

18 A.  No.

19 Q.  Okay.  Mr. Adeusi, were you in touch with the defendant

20 again after that call in 2017 ever?  Were you ever in touch

21 with him again?

22 A.  Yes.

23 Q.  And in what year were you next in touch with the defendant?

24 A.  Same year of 2017, of summer.

25 Q.  2017 or 2018?

M9D6RAJ4                        Adeusi - Direct

1    A.  2000- –– 2000- –– 2018.  Sorry.

2    Q.  Okay.  Remember, if you're confused at all, just ask me to

3    repeat the question.

4    A.  Okay.

5    Q.  Who put you in touch or in contact with the defendant in

6    2018?

7    A.  So Ugo had moved then, so it was through Ugo I got his

8    number.

9    Q.  So in 2018, Ugo again put you in touch with the defendant?

10   A.  That's right.

11   Q.  And before Ugo put you in touch with the defendant, again.

12   In 2018, what, if anything, had you asked Ugo for?

13   A.  Okay.  So when Ugo moved in –– Ugo moved into the

14   United States 2007 –– 2017, yes.  2018, so he had told me

15   that ––

16          MR. SCHNEIDER:  Objection.

17          THE COURT:  Purpose.

18          MR. SOBELMAN:  To explain the actions and also at this

19   time they're coconspirators, which I think we're about to lay a

20   foundation for.  I can do that first if your Honor prefers.

21          THE COURT:  Why don't you do that first?

22   Q.  At the time Ugo lived in the United States, was he apart of

23   the fraud and money laundering conspiracy with you?

24   A.  Yes.

25   Q.  Including during the conversation we're about to discuss?

M9D6RAJ4                        Adeusi - Direct

1    A.  Yes.

2    Q.  And before Ugo put you in contact with the defendant again

3    in 2018, what, if anything, had you asked Ugo for?

4    A.  I asked Ugo for an account for a fraudulent transaction.

5    Q.  And why did you ask Ugo for an account for a fraudulent

6    transaction?

7    A.  Because Ugo had told me that if I know that guy he was

8    trying to talk to -- he asked me to call then, that he speak

9    now, yes, that if I have anything, I should let him know so he

10   can help him get it from him -- he asked me if I needed an

11   account, I should let him know so he can get account from --

12   from Mustapha.  So I said to him --

13   Q.  Let me pause you there to make sure we understand what

14   you're saying.

15          Between the conversation in 2017 and the conversation

16   you're telling us about now, it sounds like Ugo told you about

17   the defendant; is that right?

18   A.  That's right.

19   Q.  And so can you repeat what he had told you about the

20   defendant between those two conversations?

21   A.  He told me that Mustapha can give a good account, that if I

22   have a very good job, people are going to do something big that

23   has -- Mustapha will provide an account that is good account.

24   Q.  And in your scheme, what does it mean for an account to be

25   good?

M9D6RAJ4                              Adeusi - Direct

1    A.   First of all, the account -- the person will be willing to

2    be able to get a business account.  Then the person who has an

3    expertise to remove the account -- to remove the money when

4    money goes into the account.  So all of that characterized to

5    me is that's a good account.  You can't just go get account

6    when you can't guarantee who's giving you the account and how

7    to bring the money out from the account.

8    Q.   Just to be clear, good account, in your experience and the

9    scheme, was a business account that was controlled by someone

10   who could move the money out quickly?

11   A.   Yes.

12   Q.   And that's what you understand Ugo to be telling you the

13   defendant had?

14   A.   That's right.

15   Q.   Why did you ask Ugo for an account at this time?

16   A.   So when I make a request for a sum of about $150,000, the

17   last time, he made Ugo compromise job.  So I reached out to Ugo

18   that I have a job for $150,000.

19   Q.   You call it a "job."

20   A.   Yes.

21   Q.   Is that basically a code word?

22   A.   That's a code word.

23   Q.   It wasn't someone actually getting employed to do

24   something?

25   A.   No.

M9D6RAJ4                        Adeusi - Direct

1   Q.  It wasn't legitimate?

2   A.  No.  It's a fraud.

3   Q.  When you say someone was looking for an account, are those

4   the people who were in Nigeria who were doing the fraudulent

5   e-mailing?

6   A.  Yes.

7   Q.  So is this in your role as a middleman?

8   A.  They contact me, yes.

9   Q.  When Ugo suggested -- sorry.

10          Tell us more about the conversation when you asked Ugo

11  for an account.  How did he respond?

12  A.  He told me that Mustapha can get it.  They will reach out

13  to Mustapha and let me know -- let me know in the -- later that

14  same day.

15  Q.  And how, if at all, did you respond to Ugo when he said

16  that Mustapha could get you an account?

17  A.  So when I asked Ugo, is it not the same guy that he was

18  trying to get money from.  He told me, don't worry, after that

19  issue was resolved, I've done plenty things with him.

20  Q.  Plenty of things?

21  A.  Plenty of things.

22  Q.  What did you understand Ugo to mean when he said we've done

23  plenty of things together?

24  A.  Which means that they've -- they're going to exchange an

25  account, which the -- Mustapha would send money to -- send

1   money to Mustapha -- Mustapha would then receive the money and

2   send it back to them.

3   Q.  After that discussion with Ugo, what happened next?

4   A.  So Ugo sent me the account details from Wells Fargo.

5   Q.  What do you mean by Ugo sent me the account details from a

6   Wells Fargo?

7   A.  No.  He -- it's going to details of the account.  The bank

8   name that was in the account was a Wells Fargo -- Wells Fargo

9   bank that I got from Mustapha.

10  Q.  How do you know that Ugo got the account information from

11  Mustapha?

12  A.  Because Ugo told me that.

13  Q.  And do you recall the name of the company or person that

14  was on that bank account?

15  A.  I don't remember.  I know that it's -- it was a realty at

16  LLC, but there's still something before that.

17  Q.  Something to do with realty?

18  A.  Realty LLC.  LLC was the last word.  There were things that

19  were in front before Realty LLC.  That was what I remember.

20  Q.  So as of today, you think the company ended in Realty LLC?

21  A.  Yes, that's right.

22  Q.  So to be clear, it was a business bank account; it was not

23  a personal bank account?

24  A.  It was a business bank account.

25  Q.  After you received the bank information, that Wells Fargo

1   account from Ugo that had been provided to him by the

2   defendant, what did you do with that bank account information?

3   A.  So I sent it to the Nigerian people that requested it -- I

4   sent it to the Nigerian people that were processing it from me

5   that needed the account.

6   Q.  What type of scam was this one?

7   A.  That was an e-mail compromise.

8   Q.  And did you tell Ugo it was an e-mail compromise?

9   A.  I don't have to tell Ugo it was an e-mail compromise.  I

10  already told him the job, so he already know it's e-mail

11  compromise.  But he -- yes.  I didn't say e-mail compromise.

12  He already know.

13  Q.  So just to be clear, you didn't use the words "e-mail

14  compromise," but "job" is just a sort of code you --

15  A.  Ali Baba.  Ali Baba.

16  Q.  Ali Baba was one of the codes you used?

17  A.  That's what I told him, yes.

18  Q.  Did you use that word with Ugo?

19  A.  That's what I'm saying.  I told Ugo Ali Baba.

20  Q.  Did Ugo seem to understand what that meant?

21  A.  Yes.

22  Q.  And you explained what Ali Baba meant earlier?

23  A.  Yes, correct.

24  Q.  That was a code for e-mail compromise?

25  A.  That's right.

1    Q.  Why did you tell Ugo what type of scam it was?

2    A.  So he will know the kind of account he is going to get --

3    is -- he knows the account will be a personal account, not a

4    business account.  That's why I make it very clear.

5    Q.  If it was a maga, or a romance scam, would that mean he

6    needed a personal account instead of a business account?

7    A.  That's right.

8    Q.  What, if anything, did Ugo tell you he told the defendant

9    about the scam?

10   A.  Come again, please?

11   Q.  What, if anything, did Ugo tell you he told the defendant

12   about which type of scam it was?

13   A.  I -- I already told Ugo it's Ali Baba.  So Ugo already told

14   Mustapha, oh, I'm looking for the Ali Baba account.

15   Q.  What happened after you provided the bank account

16   information from the defendant, the Wells Fargo account to the

17   people in Nigeria who were in contact with the victim?

18   A.  I think two days later, the money was wired into the

19   accounts and...

20   Q.  What happened after the money came into the account that

21   the defendant had provided?

22   A.  The receipt of payment was sent to me.

23   Q.  Who sent you a receipt showing you that the money went in?

24   A.  The people from Nigeria who did the fraud.

25   Q.  What, if anything, did you do with that receipt?

M9D6RAJ4                           Adeusi - Direct

1    A.  So I forwarded it to Ugo.

2    Q.  Why did you forward it to Ugo?

3    A.  So Ugo can send it to Mustapha for confirmation, that the

4    money is there.

5    Q.  What happened next?

6    A.  So the people had told me, please tell your people not to

7    attack the money until after three to four days.

8    Q.  So who told you to tell Ugo and Mustapha not to, I think

9    you said attack the money for three to four days?

10   A.  The sender from Nigeria.

11   Q.  And did you have an understanding of why they gave that

12   instruction?

13   A.  Because if you -- if you tried to take some money out, you

14   might risk -- you might risk losing your money because they

15   want the money to rest in the account so it feels like it is

16   legitimate.

17   Q.  If it moves -- if one tries to move it right away, what

18   might happen?

19   A.  The money would be blocked.

20   Q.  Blocked by whom?

21   A.  The bank.  They will investigate.

22   Q.  After the people from Nigeria told you to have the money

23   rest for three to four days, did you communicate that to Ugo?

24   A.  I did, yes.

25   Q.  And did Ugo tell you whether he communicated that to the

M9D6RAJ4                          Adeusi - Direct

1   defendant?

2   A.   That's right.  Yes, he did.

3   Q.   What did Ugo say about that?

4   A.   Ugo told me, yes.  He told Mustapha to wait three to

5   four days, and it's a job whereby we're not rushing it.  Nobody

6   is taking the money out.  So we are to wait for it to settle

7   down.

8   Q.   You said Ugo said he likes the money to rest, and it's not

9   a rush to take the money out.  Who did you understand Ugo to be

10  referring to?

11  A.   Mustapha.

12  Q.   What happened after that?

13  A.   So I think the third day --

14  Q.   Sorry.  Say that again.

15  A.   The third day.

16  Q.   The third day?

17  A.   Yeah, three.  So Mustapha -- Ugo sent me a screenshot

18  showing $50,000 going to BB&T account.

19  Q.   So just to be clear, Ugo sent you on the third day -- after

20  the money went into the account that the defendant provided on

21  the third day, Ugo sent you a screenshot showing $50,000

22  into -- that went from the Wells Fargo account into a BB&T

23  account?

24  A.   That's right.

25  Q.   Is BB&T a bank?

M9D6RAJ4                          Adeusi - Direct

1    A.  Yes, it's a bank.

2    Q.  Do you know the name on the BB&T account?

3    A.  No, I don't remember.

4    Q.  What, if anything, did Ugo tell you about the $50,000 in

5    the BB&T account?

6    A.  He said to me Mustapha moved this 50k to this account so it

7    could be saved, and we will find a way to move the rest.

8    Q.  What happened after Ugo told you that the defendant moved

9    $50,000 of the fraudulent funds to a BB&T account that he

10   controlled?

11   A.  So I already thought that the 50K is going to show up to

12   the sender in Nigeria.  And Ugo had told me Mustapha say he's

13   going to pay them the following day of that day.  They will pay

14   them from the 50k, $50,000 of the BB&T.  So I told them that

15   you will get part of your money on the next day of the day the

16   50k was moved to that account.  It's okay.  So...

17   Q.  Just to be clear, Ugo told you that Mustapha would pay the

18   senders in Nigeria some of the money from the $50,000?

19   A.  That's right.

20   Q.  Okay.  What happened next?

21   A.  So second day come by, so I called Ugo by noon of the

22   second day that if -- if he needs me to send account, where

23   they will send money for the sender of the Nigerian account,

24   the naira account, which is an account from Nigeria, where they

25   will credit them the part of the 50k they already had in --

M9D6RAJ4                          Adeusi - Direct

1    Mustapha provided BB&T.  He said don't worry, let me reach out
2    to Mustapha.  I'll get back to you.
3    Q.  Let's break that down for a second.
4         So it sounds like you and Ugo spoke.  You said the
5    second day.  Do you mean two days after the third day?  So on
6    the third day, I believe you said $50,000 went from the
7    Wells Fargo account to the BB&T account; is that right?
8    A.  That's right.
9    Q.  And you said on the second day, do you mean two days after
10   that?
11   A.  No, one day.  Next day.
12   Q.  Sorry.  You meant the next day?
13   A.  Yes.
14   Q.  So the next day, you and Ugo had a conversation about
15   getting the account details for the sender in Nigeria; is that
16   right?
17   A.  Yes, that's right.
18   Q.  And why would you need the account details for the sender
19   in Nigeria?
20   A.  Because that's where they want the share of the money to be
21   sent.
22   Q.  You mentioned the word "naira" when you talked about the
23   account?
24   A.  Yes.
25   Q.  What is naira?

M9D6RAJ4                          Adeusi – Direct

1    A.   Naira is a Nigerian currency.

2    Q.   So the account that you expected to provide to the

3    defendant from the people in Nigeria would be a Nigerian bank

4    account?

5    A.   That's right.

6    Q.   In naira?

7    A.   Yes.

8    Q.   And that's how they would be paid, was in naira?

9    A.   Yes.

10   Q.   Not U.S. dollars?

11   A.   No.

12   Q.   Okay.  What happened after you talked to Ugo about getting

13   the account information for the people in Nigeria to provide to

14   Mustapha?

15   A.   After I contacted Ugo, he said, let me talk to Mustapha.  I

16   will get back to you.  That was in noon, 12:00 o'clock that

17   day.  Said I will get back to you.

18   Q.   Was it noon?  Was that the word you said?

19   A.   Noon, yes.

20   Q.   Around noon?

21   A.   Around noon, yeah.

22   Q.   What happened next?

23   A.   So he didn't reach out to me until about -- around

24   4:00 o'clock.

25   Q.   Do you need any water?

M9D6RAJ4                         Adeusi - Direct

```
1    A.  No, I'm fine.
2            So around 4:00 o'clock -- so he called me that -- that
3    Mustapha hasn't take his phone call, that he spoke -- spoke
4    around the time I called him.  But from then to this time, he
5    hasn't take his call.  So I say, well, the same thing, you -- I
6    said don't worry.  Don't worry.  Don't be scared.  The money is
7    going to come out.  I said, okay?  So...
8    Q.  So just to be clear, Ugo said that the defendant wasn't
9    answering his call?
10   A.  Yes.
11   Q.  You expressed concern that you and the other members of the
12   scheme weren't going to get the money out; is that right?
13   A.  That's right.
14   Q.  And Ugo told you not to worry, that the defendant would
15   come through with it?
16   A.  This is what I said.  I referred to the earlier
17   conversation I had with him regarding the fact that he had
18   complained about Mustapha not being straightforward with him.
19   So I referred to the fact when he first come -- before he moved
20   to the United States and told me about Mustapha not pay him, so
21   he -- so I said don't worry.  Don't worry.  It's good.  I told
22   you it will be sharing money.  He's going to bring the money.
23   Don't worry.
24           (Pause)
25   Q.  She wants you to move back from the mic just a little bit.
```

M9D6RAJ4                          Adeusi - Direct

1    Not too far, just a little bit.

2              THE COURT:  And could I ask the court reporter to make

3    sure the jurors can see the witness?

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9DQraj5                              Adeusi - Direct

1    Q.  What happened next after that conversation about how the

2    defendant was not picking up Ugo's calls?

3    A.  So now -- so that --

4            THE COURT:  A little closer to the microphone.

5    A.  So that was the next day.  So the next day, so they started

6    threats.  Started calling me and they started pressuring me.

7    So I called --

8    Q.  Let me just make sure everyone understands.  You said that

9    you got threats.  Is that the word you used?

10   A.  Yes.

11   Q.  Who was threatening you at that time?

12   A.  The senders from Nigeria.

13           MR. SCHNEIDER:  Excuse me, your Honor.

14   Q.  Mr. Adeusi, you left off, and you were telling us how the

15   senders of the money, the people in Nigeria were threatening

16   you.  Is that right?

17   A.  That's right.

18   Q.  Just generally, what are the kinds of things they were

19   saying to you at that time?

20   A.  Say we look for your family.  We believe you are taking our

21   money intentionally.  You don't want to give us back our own

22   part of the share.  You already make your own; that you are

23   keeping our own money.  If we don't get our money today, we

24   will visit your family.

25   Q.  So to be clear, they said if they don't get the money,

1    they're going to visit your family?

2    A.   That's right.

3    Q.   Did you take that to be a friendly visit or an unfriendly

4    visit?

5    A.   It's no good.  Nothing can stop them from going.

6    Q.   Sorry.  Please repeat your answer.

7    A.   They will go to my family because nothing can stop them.

8    Q.   Did you take that as a threat?

9    A.   It was a real threat, yes.

10   Q.   Did you communicate that threat to Ugo?

11   A.   Yes.  I forwarded all the messages, not just calls.  A

12   screenshot -- I sent to Ugo.  Ugo sent it to Mustapha.

13   Q.   How do you know Ugo sent it to Mustapha?

14   A.   He copy me.  He screenshot his own screen to let me know

15   that my messages had been forwarded to Mustapha.

16   Q.   Just to be clear, he took a screenshot of his messages with

17   Mustapha and sent that to you, and that screenshot showed you

18   that your messages about the threats had been forwarded to

19   Mustapha?

20   A.   That's right.

21   Q.   Okay.  What happened after that?

22   A.   So after back and forth, the threats continue.  So they now

23   sent me a voice saying you will call FBI and tell FBI the

24   details of the transaction; that they don't care any more if

25   you don't get the money.

1    Q.  Did you communicate that to Ugo?

2    A.  Yes.

3    Q.  And did you understand from Ugo that he communicated that

4    to the defendant?

5    A.  That's right.

6    Q.  So what happened next?

7    A.  Ugo had told me that -- so now I was asking Ugo, can you

8    give me Mustapha's number.

9          He said that's not happening.  I will not give you his

10   number.

11         So I said, okay, let me talk to him.

12         He said, I will not give you Mustapha's number never.

13         So are you two good friends?  Let me talk to him.

14         He said it's not happening, that he will not give me

15   the number for Mustapha.

16         So I asked can you please call?  So these people in

17   Nigeria would be on his call too so they will know exactly what

18   Mustapha is doing or what he has done with the money.

19         He say yes, I will do that.

20   Q.  And was there a conference call between people in Nigeria

21   who were in contact with the victim, you, Ugo and staff?

22   A.  Yes.  He set it up.  He set up the conference call.

23   Q.  Who set it up?

24   A.  Ugo.

25   Q.  Were you on that conference call?

1   A.   That's right.

2   Q.   And who did most of the talking on that conference call?

3   A.   It was Mustapha.

4   Q.   Generally, what happened on that conference call?  Please

5   go slowly.

6   A.   Okay.  The senders from Nigeria were the first to talk.

7   Were screaming, saying they going to kill someone if we don't

8   have their money, with this weapon, that weapon.  What happen

9   will be bad to everyone of us.  That going to go to FBI, going

10  to go to immigration, make sure that everybody suffer if they

11  don't get their money.

12           So Mustapha didn't spoke then.  So later on in the

13  call Mustapha had to talk now.  "Shut your mouth.  Who do you

14  think you are, that you are making this noise?  How much is the

15  money just one hundred thousand dollars?  And you making so

16  much noise?  In fact, I don't do transactions like this.  I

17  don't participate in small money like this.  I don't blame you.

18  I blame Ugo."

19  Q.   Let me just pause you.  Who was saying the things you just

20  said?

21  A.   Mustapha.

22  Q.   When you said, "I -- I don't participate in small

23  transactions like this, I do big transactions," that's the

24  defendant who said that?

25  A.   Yes, that's right.

M9DQraj5                        Adeusi - Direct

1    Q.   What was his tone when he was saying these things?

2    A.   His tone was harsh.

3    Q.   Harsh?

4    A.   Yes.  That was the first time I would see him talk like

5    that.

6    Q.   Please continue.  What else did the defendant say after he

7    said, "I don't do small transactions like this under $50,000, I

8    do bigger transactions"?

9    A.   He said to them -- so later on, he say, "Okay, you guys are

10   amateur."

11   Q.   You guys are what?

12   A.   Amateur.

13   Q.   Amateur?

14   A.   Yeah, amateur.

15   Q.   Okay.

16   A.   "You guys are amateur; that it isn't the case that the

17   account is no longer -- that they cannot take the money out

18   that the one he has, the BB&T, he kind of want to assess, which

19   means that the job is not a good job, and then he screaming and

20   shout."

21   Q.   Let me just pause.  The defendant said he couldn't take the

22   money out of either the Wells Fargo account or the BB&T

23   account?

24   A.   That's right.

25   Q.   And he shouted, he told them it wasn't a good job?

M9DQraj5                         Adeusi - Direct

1    A.  Yes.

2    Q.  Because the money had been frozen?

3    A.  Yes, that's right.

4    Q.  Please continue.

5    A.  So that money was frozen; that Ugo keep screaming.  So he

6    just cuts him off of the conversation conference.

7    Q.  He just hung up at some point?

8    A.  Yes.

9    Q.  He, meaning the defendant?

10   A.  Yes, the defendant.

11   Q.  After giving that response to the people in Nigeria?

12   A.  That's right.

13   Q.  What was your reaction to the defendant's tone and what he

14   said on the call?

15   A.  Honestly, I fell in love with him.  I fell in love with the

16   way he talked.  I like was stunned, your know.  Everybody was

17   screaming.  Shut up.  Everybody was talking.  Everybody stopped

18   talking.

19   Q.  Sorry, I think you're going to need to repeat that.

20   A.  Later in the call, he was screaming, shouting.  As soon as

21   he spoke, everyone shut their mouth when he spoke.

22   Q.  So he shut up the screaming fraudsters in Nigeria?

23   A.  Yeah, everybody shut up.

24   Q.  You said you fell in love with him?

25   A.  Yeah, I just love it.  He said, "This money is small.  I

M9DQraj5                          Adeusi - Direct

1   don't do small.  I'm trying to help Ugo.  This is not for me."

2   Q.  Just to be clear, he basically said, "I did this to help

3   Ugo.  I usually do bigger jobs?

4   A.  He said, "I do big transactions.  You have something big,

5   call me, call me, let me know."

6   Q.  Why did you like the way he responded?

7   A.  That's the first time I heard someone speak like that; not

8   being apologetic or trying to apologize or say sorry for what

9   he has done.

10          THE COURT:  Not being apologetic.

11  Q.  On that conference call, did the defendant express any

12  confusion about whether the transaction was fraudulent?

13  A.  Of course not.

14  Q.  Why do you say of course not?

15  A.  Because he knows that's not legitimate.  He knows it's

16  fraud.

17  Q.  What language did the defendant speak on that conference

18  call?

19  A.  He was speaking Yoruba.

20          THE COURT:  Yoruba is Y-O-R-U-B-A, is that correct?

21          THE WITNESS:  Yes.

22  Q.  Did he speak any English on that call?

23  A.  When he was lashing out at the guys, he spoke a little

24  English, but all along he spoke Yoruba.  To me he was -- a few

25  guys he speak around, just me and another guy.  Ugo doesn't

M9DQraj5                              Adeusi – Direct

 1    speak Yoruba, he speaks Ibo.

 2              THE COURT:  He speaks Ibo, I-B-O.

 3    Q.  Is Ibo another Nigerian language?

 4    A.  Yes, another ethnic group from the Eastern part of Nigeria.

 5    Q.  And is Yoruba a different ethnic group from a different

 6    part of Nigeria?

 7    A.  Yes, western part.

 8                        (Reporter inquires)

 9    Q.  Is Ibo an ethnic group with its own language from one part

10    of Nigeria?

11    A.  Yes.

12    Q.  And is Yoruba a different ethnic group with its own

13    language from a different part of Nigeria?

14    A.  Yes.

15    Q.  Which ethnic group is your heritage?

16    A.  Yoruba.

17    Q.  What, if anything, did the defendant say on that conference

18    call about who might be listening to the call?

19    A.  So he say, "You guys are talking as if you are doing

20    something legitimate.  Talking about fraud, stolen money on my

21    call" because it was a direct call.  It wasn't a WhatsApp.  "So

22    you're speaking like this on my call; that, you know, FBI could

23    be listening, anybody can be listening to what you are saying."

24    Everybody is on the phone screaming.

25    Q.  Let me pause you because I think it's getting a little

1   confusing.  The defendant said something about how you're

2   acting like you're talking about something legitimate, but we

3   all know this is fraud?

4   A.  Yes, that's right.

5   Q.  And it's -- it's not good to be doing that on a regular

6   phone call?

7   A.  Yes, that's right.

8   Q.  And then you said something about the FBI.  What did the

9   defendant say about the FBI?

10  A.  He said FBI might be listening to this conversation.

11  Q.  Do you know whether the FBI actually was listening to that

12  conversation?

13  A.  I don't know.

14  Q.  You don't know?

15  A.  I did not believe that.  When you are talking fraud,

16  something illegitimate, FBI is listening.

17  Q.  That's what the defendant said on the call or that's what

18  you believe?

19  A.  That's what I'm saying now.

20  Q.  You're saying now you believe if you're talking fraud, the

21  FBI might be listening?

22  A.  Yes, that's all I'm saying.

23  Q.  But the defendant raised that on the call?

24  A.  Yes, that's right.

25  Q.  Sometime after that conference call, did you get the

1  defendant's phone number?

2  A.  I did get defendant's -- yes.

3  Q.  A different phone number than the one you had called in

4  2017?

5  A.  Yes.

6        MR. SOBELMAN:  Your Honor, at this time the government

7  offers a stipulation between the parties that's marked as

8  Government Exhibit S-8.

9  A.  Can I say something?

10 Q.  There is no question pending.

11       THE COURT:  Any objection, Mr. Schneider, to S-8?

12       MR. SCHNEIDER:  No.  I'm sorry.  No, your Honor.

13       THE COURT:  S-8 is admitted.

14       (Government's Exhibits S-8 received in evidence)

15 Q.  Mr. Bailey, can you please display S-8 to the jury and go

16 to paragraph 2.  There are a couple of marks on the screen, I'm

17 going to try to clear it.

18       Stipulation in paragraph 2 reads:  A Special Agent

19 with the FBI and an investigative analyst with the United

20 States Attorney's Office with the Southern District of New York

21 lawfully made true and accurate copies of WhatsApp messages

22 contained on a cell phone used by Afolabi Adeusi (defined as

23 the Adeusi phone).

24       Paragraph 2A reads:  Government Exhibits 308, 312 and

25 318 are true and accurate copies of contacts saved in the

1    Adeusi phone's WhatsApp application.

2              And pursuant to this stipulation, the government

3    offers Government Exhibits 308, 312 and 318.

4              THE COURT:  Those exhibits are admitted.  I assume

5    paragraph one may be relevant later.  Is that correct?

6              MR. SOBELMAN:  That's correct, your Honor.

7              (Government's Exhibits 308, 312, 318 received in

8    evidence)

9    Q.  Mr. Bailey, if you could display what's in evidence it's

10   Government Exhibit 318.

11             Mr. Adeusi, what phone number does this contact show?

12   A.  Mustapha Florida Miami.

13   Q.  Why did you save this contact in your phone as Mustapha

14   Florida Miami?

15   A.  Because I know his name his Mustapha, and he lives in

16   Florida, South Beach.

17   Q.  Why did you think that he lived in Florida?

18   A.  Through Ugo told me that.

19   Q.  We can take this down.

20             Mr. Adeusi, after the conference call we just

21   discussed, approximately when were you next in contact with

22   defendant?

23   A.  Summer of 2018.

24   Q.  And in the summer of 2018, were you still involved in fraud

25   and money laundering?

M9DQraj5                          Adeusi - Direct

1   A.   Yes.

2   Q.   At that time, were you still serving as a middleman?

3   A.   That's right.

4   Q.   In the summer of 2018, who, if anyone, reached out to you

5   in your role as a middleman?

6   A.   Say it again, sir.

7   Q.   In the summer of 2018 --

8   A.   Yes.

9   Q.   -- who reached out to you to ask for your help as a

10  middleman?

11  A.   A guy from Nigeria, he put a -- he made an account, so Femi

12  made account to put money inside.  His name is Femi.  Femi

13  Adewunmi, yes.

14          THE COURT:  Can you spell that, please?

15          THE WITNESS:  Femi, F-E-M-I.  Last name is

16  A-D-E-W-U-N-M-I.

17          THE COURT:  And that's the person who contacted you?

18          THE DEFENDANT:  Yes, sir.

19  Q.   Was Femi involved in the fraud and money laundering scheme

20  with you?

21  A.   Yes.

22  Q.   When Femi reached out to you in the summer of 2018, what,

23  if anything, did he ask you to do?

24  A.   He told me, "I have a transaction for $1.7 million.  Can

25  you get" -- he ask for that.

M9DQraj5                          Adeusi - Direct

1   Q.  What did he ask you to do for the $1.7 million?

2   A.  He needed a house.  House means accounts where the money

3   can be transferred.

4   Q.  So he used the word house?

5   A.  Yes.

6   Q.  And that was a code word?

7   A.  Yes, part of a code word.

8   Q.  What did house mean when used by members of the conspiracy?

9   A.  House means account details.

10  Q.  Was it the same as a bank account?

11  A.  That's right.

12  Q.  And what type of bank account did he ask you for?

13  A.  Business account.

14  Q.  What, if anything, did Femi tell you about the type of

15  fraud that the account was going to be used for?

16  A.  Big money, email compromise, and wire fraud.

17  Q.  So big money, email compromise and wire fraud?

18  A.  That's right.

19  Q.  Did he use the words email compromise and wire fraud or did

20  he use a code word?

21  A.  He used a code word.

22  Q.  What code word did he use, if you can recall?

23  A.  Alibaba is most the common one.

24  Q.  Alibaba is the most common one, but it looks like you don't

25  remember which code word he used.

M9DQraj5                              Adeusi - Direct

1    A.  Not at the time, no.

2    Q.  But after your conversation with Femi, you understood it

3    was an email compromise, wire fraud?

4    A.  That's right.

5    Q.  After Femi asked for a business account that could receive

6    fraud money, big money, as Femi put it, what did you do next?

7    A.  So I reach out to Mustapha.

8    Q.  Why did you reach out to the defendant?

9    A.  Because he had said that he likes big money, and that's the

10   only thing he likes to do.  He doesn't do small money.

11   Q.  And let's just talk for a second about big money and small

12   money.  What was your understanding at that time what the

13   difference was between big money and small money?  Give us an

14   example of big money.  Give us an example of small money.

15   A.  Small money can be below hundred thousand dollars.  Then

16   big money can start from $200,000 to $20 million.

17   Q.  What did you say to the defendant when you reached out to

18   him?

19   A.  So I said, "I have a job for you.  It's big."

20          He said, "How big?"

21          I said, "$1.7 million."

22          "Yeah, that's my guy."

23   Q.  He said what?

24   A.  He said, "That's my guy."

25   Q.  That's my guy?

M9DQraj5                          Adeusi - Direct

1   A.   Yeah.

2   Q.   What was his tone when you told him you had a job for

3   $1.7 million for him?

4   A.   He was happy.

5   Q.   Did he appear to understand what kind of job you were

6   talking about?

7              MR. SCHNEIDER:  Objection.

8              THE COURT:  Sustained.

9   A.   Yes.

10             MR. SCHNEIDER:  Your Honor --

11             THE COURT:  Sorry.  The jury will disregard that

12  answer.

13  Q.   On that phone call, did the defendant express any confusion

14  about what type of job you were talking about?

15  A.   No.

16  Q.   When you reached out to the defendant, did you tell the

17  defendant what type of fraud was involved, what type of scheme

18  it was?

19  A.   I told him Alibaba.

20  Q.   Did he express any confusion about what Alibaba meant in

21  that context?

22  A.   He told me, "Is it Alibaba?"

23             I said, "Yes, it's Alibaba."

24  Q.   So he asked you if it was Alibaba --

25  A.   Yes.

M9DQraj5                        Adeusi - Direct

1   Q.   -- and you said yes it was?

2   A.   Yes.

3            THE COURT:  Just make sure, Mr. Adeusi, that you wait

4   for Mr. Sobelman to finish his question before you start

5   speaking, okay?  It's hard enough without that.

6   Q.   What happened next, Mr. Adeusi?

7   A.   So, he asked me how soon would you need the account?

8            I said, "Now.  Right now.  It's very urgent."

9            He said, "Okay.  Don't worry.  I'll get back to you."

10  Q.   Let's make sure everyone understood that.  The defendant

11  asked you how quickly you needed the account?

12  A.   Yes.

13  Q.   And how did you respond when he asked you how quickly you

14  needed the account?

15  A.   I said, "It's urgent.  I need it now."

16  Q.   Why did you tell him it was urgent and that you needed it

17  now?

18  A.   Because Femi had told me that it's very, very urgent.  If I

19  don't send it, someone else will give to different people.

20  Q.   That if you didn't send --

21  A.   Quickly.

22  Q.   -- to an account?

23  A.   Sorry.

24  Q.   Wait for me to finish.  If you didn't send the account

25  quickly, the money might go somewhere else?

M9DQraj5                        Adeusi - Direct

1   A.  Yes, someone else might supply the sender of the account.

2   Q.  Why did you and Mustapha and Femi want to be the ones to

3   supply the account for this job?

4   A.  Because Mustapha told me he can handle big money, and I

5   told Femi, "I'm the man who can deliver the money to them."

6   Q.  If this job went well, what did you hope to get?

7   A.  If it went well -- never go well, but let's say I'm looking

8   like $20,000.

9   Q.  You're hoping that you would get a cut from the money?

10  A.  Yes. (Unintelligible)

11  Q.  Repeat that slowly, please.

12  A.  I would be getting like $20,000.

13  Q.  That would be the cut you were hoping for of the

14  $1.7 million?

15  A.  Yes.

16  Q.  What happened after that conversation with the defendant

17  about the $1.7 million Alibaba job?  What happened next?

18  A.  So that day, he didn't send the account that day.

19  Q.  He didn't send the account that day?

20  A.  Yes, he did not.

21  Q.  What happened after that?

22  A.  Second morning, he sent it to me.  He sent the account

23  details from Oconee, Oconee.  That something that's the bank in

24  Florida.

25  Q.  Oconee?

M9DQraj5                        Adeusi - Direct

1   A.  I'm not sure.

2   Q.  So the defendant the next day sent you account details for

3   a bank account.  Is that correct?

4   A.  That's right.

5   Q.  And do you remember if that bank account was associated

6   with any particular company?

7   A.  It was a business account, but I don't remember the name.

8   Q.  How did he send you those account details?

9   A.  Through WhatsApp.

10  Q.  Through WhatsApp?

11  A.  Yes.

12  Q.  What did you do next after you received those account

13  details from the defendant?

14  A.  I sent it to Femi.

15  Q.  How did you send it to Femi?

16  A.  Through WhatsApp application.

17  Q.  Just to make sure we're clear, why did you send those

18  account details to Femi?

19  A.  Because Femi had requested for it and he need it to get

20  money, the 1.7 into the account.

21  Q.  What did you expect Femi to do with the account details

22  that you got from the defendant?

23  A.  To send it to the people that needs to put the money

24  inside.

25  Q.  The people in Nigeria?

M9DQraj5                        Adeusi - Direct

1   A.  Yes, later I knew was from Nigeria, but early on -- the

2   fraudsters from Nigeria.

3   Q.  The fraudsters from Nigeria.  Is that correct?

4   A.  Right.

5   Q.  What happened after you sent the account details to Femi?

6   A.  So Femi sent it to the people from Nigeria.

7   Q.  What happened after that?

8   A.  So same day, Mustapha called me back, and said, I have to

9   stop the accounts that he give me, that he has to change it,

10  and I ask why.

11  Q.  Let me make sure everyone heard your answer.  The defendant

12  called you back that same day?

13  A.  Yes, that's right.

14  Q.  And what did he say on that call?

15  A.  He ask me if I already sent the details of the account to

16  my people.

17  Q.  And how did you respond when he said that?

18  A.  I said yes.

19  Q.  What happened next?

20  A.  He said, "Please, can you tell them to stop it; that we

21  can't use that account."

22  Q.  What happened after the defendant told you not to use that

23  first account?

24  A.  So I contacted Femi and told Femi if he can stop it.  So

25  Femi contacted the people and told me they said they can stop

SOUTHERN DISTRICT REPORTERS, P.C.

M9DQraj5                         Adeusi - Direct

```
 1   it.  They haven't done anything inside the account.
 2   Q.  What happened next?
 3          MR. SCHNEIDER:  I'm sorry, did he say they can or
 4   can't stop it?
 5          THE WITNESS:  They cannot.
 6          THE COURT:  Sorry.  They said they can stop it; that
 7   they cannot do anything in the account.
 8          THE WITNESS:  They can stop it, C-A-N.
 9          THE COURT:  That they could successfully stop it?
10          THE WITNESS:  Yes, sir.
11   Q.  What happened after that conversation?
12   A.  So Mustapha sent me a new account from Bank of America.
13   Q.  He sent you account details for a second bank account.  Is
14   that right?
15   A.  Yes, that's right.
16   Q.  And that account was with Bank of America?
17   A.  That's right.
18   Q.  And was that a business account or personal account?
19   A.  It was a business account.
20   Q.  What was the name of the business on that account?
21   A.  Unique Bamboo.
22   Q.  Can you say that again, please?
23   A.  Unique Bamboo.
24   Q.  Unique Bamboo?
25   A.  That's right.
```

M9DQraj5                              Adeusi - Direct

1   Q.  Around the time that you received the Unique Bamboo Bank of

2   America account details from the defendant, did you speak with

3   the defendant about how the money from the fraud would be

4   divided up?

5   A.  Yes.

6   Q.  And what was that discussion between you and the defendant?

7   How would the money be divided up?

8   A.  First, he knows how the money is being divided.  But just

9   for clarity, I said, "This is a four, four, two."

10                  "Of course I know.  Why you telling me?"

11  Q.  You said to the defendant, "This is a four, four, two"?

12  A.  Yes.

13  Q.  And the defendant responded how?

14  A.  He said, "Of course I know.  Why you telling me?"

15  Q.  "Of course I know.  Why are you telling me?"

16  A.  That's right.

17  Q.  And can you explain to us what does four, four, two mean in

18  this scheme?

19  A.  Okay, four, four is a 40, 40, 20.

20  Q.  So 40 percent, 40 percent, 20 percent?

21  A.  That's right.

22  Q.  Who gets the first 40 percent?

23  A.  The sender.

24  Q.  The sender of the money?

25  A.  Yes, gets 40 percent of the money.

1    Q.  Those are the people who are doing the emails.  Is that

2    right?

3    A.  Yes, that's right.

4    Q.  Who gets the second 40 percent?

5    A.  It's the account holder.

6    Q.  So who is the account holder?  That's the person who's on

7    the bank account that gets the money?

8    A.  That's right.

9    Q.  Okay.  And what's the other 20 percent, who gets that?

10   A.  So 20 percent is between Mustapha, me, Femi, and one other

11   person.

12   Q.  One other person?

13   A.  Yes.

14   Q.  Who was that other person in this case?

15   A.  His name is Ade Prince.

16   Q.  Ade?

17   A.  Prince.

18   Q.  Is that A-D-E?

19   A.  That's right.

20   Q.  He also went by Prince?

21   A.  Yes.

22   Q.  How did the defendant respond when you guys talked about

23   how the money would be split it?

24   A.  He already know.  I only raise the question just to make

25   sure he understands.  It's my first time of dealing with him

M9DQraj5                          Adeusi - Direct

1   directly on that case.  So he say, "I already know.  Why are

2   you" --

3   Q.  He said he already knew --

4   A.  Yes.

5   Q.  -- but it sounds like you raised it because it was the

6   first time you were dealing with him directly?

7   A.  Yes, sir.

8   Q.  And you wanted to clarify to make sure you were both on the

9   same page --

10  A.  Yes.

11  Q.  -- about how the money would be split up?

12  A.  That's right.

13  Q.  Did the defendant ask you any questions about why the money

14  was being split up that way?

15  A.  No.

16  Q.  Did he express any confusion about the four, four, two?

17  A.  No.

18  Q.  What happened -- sorry.

19          After you received the Bank of America Unique Bamboo

20  details from the defendant, what did you do with that

21  information?

22  A.  I sent it to Femi.

23  Q.  What happened after you sent the Unique Bamboo account

24  details to Femi?

25  A.  Femi sent it to the people.

M9DQraj5                        Adeusi - Direct

1    Q.  What happened next?

2    A.  So the two days later, the transfer was done and receipt

3    was sent to me.

4    Q.  So two days later, you say the transfer was done?

5    A.  Yes.

6    Q.  What do you mean by that?

7    A.  The money was wired.  The Alibaba went successfully, and

8    money was wired to the account that was given to me by

9    Mustapha, Unique Bamboo.

10   Q.  Was that the $1.7 million?

11   A.  That's right.

12   Q.  And you said something about how you received a receipt.

13   Is that right?

14   A.  Yes, was a receipt of payment, confirmation slip.

15   Q.  Who sent you the confirmation slip --

16   A.  Femi.

17   Q.  -- showing that the money went from the victim's account to

18   the Unique Bamboo Bank of America account?

19   A.  Femi.

20   Q.  What, if anything, did you do with that receipt?  Did you

21   send it to anyone else?

22   A.  I sent it to Mustapha.

23   Q.  Why did you send it to Mustapha?

24   A.  That's how we do it, just to make sure he's aware that the

25   money is already in his account.

M9DQraj5                           Adeusi - Direct

1    Q.  What did you do after you learned that the money went into

2    the account?

3    A.  I send the receipt to him.

4    Q.  What happened after you sent the receipt to him?

5    A.  So he got back to me and say confirm the money is there.

6    Q.  He confirmed that the money was there?

7    A.  Yes.

8    Q.  What happened after the defendant confirmed that the money

9    had come into the Unique Bamboo account?

10   A.  Say it again.

11   Q.  What happened after the defendant confirmed that the

12   $1.7 million had gone into the Unique Bamboo account?

13   A.  So Alibaba called from Femi saying, "Your guys don't have

14   to rush the money.  Should let it rest for a few days."

15   Q.  And what did you do after Femi told you that you should let

16   the money rest for a few days?  Did you communicate that to

17   anyone?

18   A.  I communicated to Mustapha.

19   Q.  Was your understanding of why the money needed to rest for

20   a few days?

21   A.  Again, just to -- not to risk of money being plugged.  If

22   you approach the money immediately or you trying to get some

23   money out by any means, maybe by ATM, or transfer by cashier

24   check or something, then you also want to leave the money,

25   don't touch it, leave it for a few days.

M9DQraj5                          Adeusi - Direct

1   Q.  Did you communicate that to the defendant?

2   A.  That's right.

3   Q.  And how did he respond when you told him to make sure the

4   money rested for a few days?

5   A.  He was -- he said, "I like.  I think your people have

6   matured."

7   Q.  I think your people have matured?

8   A.  Yeah, matured.

9   Q.  What happened next?

10  A.  So we, we just talking on friendly level.  So Mustapha told

11  me, "Please get the accounts of all the senders money will be

12  delivered."  I said, "Okay, I will tell them that."  He said,

13  "Send it to me so that I could get it ready."

14  Q.  Just to be clear, Mustapha asked you to get the account

15  information for the people in Nigeria so he could send that

16  portion of the money to them?

17  A.  That's right.

18  Q.  What did you do after that?

19  A.  So I called Femi to tell him.  So Femi said, "I will get

20  it.  I need to get it now.  Don't worry, I will get it."

21  Q.  What happened after Femi told you that he would get the

22  account for the people in Nigeria?

23  A.  I think about two days later, Femi sent me two different --

24  I think, I'm not sure, I think it's two -- two or three

25  different Nigerian naira accounts.

1          THE COURT:  Nigerian naira accounts.

2   A.  That's right.

3   Q.  Were those accounts in Nigeria for their cut of the money?

4   A.  Yes.

5   Q.  Did you pass that information on to the defendant?

6   A.  I did, yes.

7   Q.  What happened next?

8   A.  So this time it's already the fifth day, which means that

9   they expect an action, to receive --

10  Q.  Let me pause you.  You said now is the fifth day?

11  A.  Yeah.

12  Q.  Do you mean the fifth day after the money went into the

13  account?

14  A.  That's right.

15  Q.  So what happened on the fifth day after the $1.7 million

16  went into the Unique Bamboo account?

17  A.  So Femi had reach out to me that, "Your guy should start

18  performing right now."

19  Q.  You've got to slow down, Mr. Adeusi.  Speak as clearly as

20  you can.

21  A.  He said, "This is fifth day.  Your guys have to start

22  performing right now."

23  Q.  "Your guy has to start performing right now?"

24  A.  Yes, performing right now.

25  Q.  This is what Femi told you.  Who is he referring to when he

1    said "the guy"?

2    A.  Mustapha.

3    Q.  What did you understand him to mean when he said "your guy

4    has to start performing"?

5    A.  By crediting the sender's account, by taking the money out

6    from the previous account, which is the Bank of America

7    account, and sending it to the account that was given to him

8    from Nigeria naira account.

9    Q.  What happened next?

10   A.  So I told Mustapha, after I have to call Femi.  So I called

11   him, I said, "How far?"  How far means what's going on?

12   Q.  How far?

13   A.  Yes.

14   Q.  Is that sort of a slang?

15   A.  Yes.  The answer is, "I'm already on it.  Don't worry."

16   Q.  Go slowly.

17   A.  He said, "I'm already on it.  You will receive your money

18   according to the instruction because each of the details in

19   front of it, you put so so amount of money in his account, put

20   so so amount of money this account, puts in this account."  So

21   every account has an amount that would go into the account.

22   Q.  Just to be clear, the instructions you had forwarded from

23   Femi had a list of accounts and a breakdown of how much money

24   needs to go into each account?

25   A.  That's right.

1    Q.  And the defendant told you he was going to do that?

2    A.  Yes, he said, "I follow the instructions that are placed in

3    front of each of the details."

4    Q.  What happened after he said on that call that he was going

5    to follow the instructions that was on the account details you

6    sent?

7    A.  So I left him.  Didn't talk to him for two days.

8    Q.  You didn't talk to him for two days?

9    A.  We might talk, but we didn't talk anything about because I

10   believe he's already in charge.  He knows what to do.  So

11   there's no -- then there was no pressure from me yet.

12   Q.  So you didn't bother him about this -- don't talk over

13   me -- about moving the money for about two days?

14   A.  Say it again.

15   Q.  You didn't bother him about moving the money for about two

16   days?

17   A.  Yes.

18   Q.  What happened after those two days went by?

19   A.  That's when the pressure starts.

20   Q.  What do you mean by the pressure?

21   A.  That Femi now telling me that, "You say your guy is an

22   expert.  So what's going on?"  The people in Nigeria, they have

23   not received a cent.  "That you claim your friend is an expert

24   in his field, so how come -- this is almost eighth day, so how

25   come he hasn't started crediting those people's accounts with

1   their share?"

2   Q.  To be clear, Femi was expressing concern that the money had

3   not been sent to the people in Nigeria?

4   A.  That's right.

5   Q.  What happened after Femi expressed concern that no money

6   had been sent from the defendant to the people in Nigeria?

7   A.  So I keep up pressure on him.

8   Q.  Who's him?

9   A.  Mustapha, I was calling him.  At this time, if I call ten

10  times, might just send me a voicemail, "I'm busy.  I'll call

11  you back."

12  Q.  What happened next?

13  A.  I keep calling for another maybe three, four, five days.  I

14  couldn't speak to him.

15  Q.  Then what happened after you kept trying to talk to him?

16  A.  So then Femi and the rest, they were asking, "We need his

17  number."

18  Q.  Femi was asking for the defendant's number?

19  A.  Yes.

20  Q.  And what happened after that?

21  A.  It's against the rules for me to give them Mustapha's

22  number without asking me first.

23  Q.  What rules is it against for you to give Femi Mustapha's

24  number without asking Mustapha first?  What rules are you

25  referring to?

M9DQraj5                          Adeusi - Direct

1   A.   Okay.  First of all, I was trying to protect my contacts.

2   So I believe if they start speaking directly to Mustapha, how

3   am I assessing the future to do -- to be between Femi and him

4   again.  So I make sure I prevent that they don't spoke; they

5   always go through me.

6   Q.   You didn't want them to be dealing with each other directly

7   and cut you out?

8   A.   That's right.

9   Q.   For future deals, future jobs?

10  A.   Yes, that's right.

11  Q.   So what happened after Femi asked you for Mustapha's

12  number?

13  A.   So Femi now called me and speak to me that he -- I have an

14  arrangement with Mustapha.  I need to talk to him; that he is

15  my brother; that this guy he's dealing with is powerful; that

16  we all going to get hurt.

17  Q.   So that the people who Femi is dealing with on the email

18  side --

19  A.   Yes.

20  Q.   -- are powerful people?

21  A.   Yes, that's what he told me.

22  Q.   And things are going to get hot?

23  A.   Yeah, me, Femi were referring to myself and him would come

24  after us, and we won't live this country.

25  Q.   What happened after Femi warned you about the people coming

M9DQraj5                          Adeusi - Direct

1    after you and him?

2    A.  I said so Femi, "I have nothing to hide.  I'm not

3    conspiring with Mustapha against your people" because the

4    general belief would be that we are trying to circumvent them

5    that we're trying to give the money to ourselves.  So I just

6    said, "Listen, I can't do that.  No, I can't do that."  So I

7    say, "You know what, this is Mustapha's number."

8    Q.  So you gave Femi Mustapha's number --

9    A.  Yes.

10   Q.  -- so that he could contact --

11   A.  No.  No sorry.  I first did a conference.

12   Q.  A conference call?

13   A.  Yes.

14   Q.  Between who?  Who was on the conference call?

15   A.  Mustapha, me, and Femi first.

16   Q.  Just generally, what happened on that conference call?

17   A.  So the conference call was not traced.  We were having a

18   very, I would say, like a kind of family kind of talk.  What

19   happened?  You said you can get it done.  Just tell us, explain

20   to us what you have done.  Why haven't you credited the account

21   of these guys in Nigeria.

22   Q.  Is that what you and Femi were saying to Mustapha?

23   A.  I wasn't talking.

24   Q.  Who was saying that?

25   A.  Femi and the other guy were.  Femi had called someone else.

M9DQraj5                          Adeusi - Direct

1   Q.  Who else?

2   A.  Ade, the Prince guy.

3   Q.  Prince?

4   A.  Yes.

5   Q.  Who was on the call?  It was you?

6   A.  Femi and Ade.

7   Q.  And was Mustapha on the call?

8   A.  And Mustapha, yes.

9   Q.  There were four of you?

10  A.  Four, yes.

11  Q.  Who did most of the talking?

12  A.  It was Prince.  I never met Prince.  I think Prince is kind

13  of an elderly person, an older person.  So he was one having

14  the conversation with him, he was trying to know what he is

15  doing at that time, why the money has not been moved yet or why

16  was it delayed, why they haven't received the money in Nigeria.

17  Q.  And so Prince did much of the talking on that call, is that

18  right?

19  A.  That's right.

20  Q.  And you said you haven't met him in person, but you know

21  him from the phone --

22  A.  Yes.

23  Q.  -- and maybe WhatsApp?

24  A.  And WhatsApp yes.  And the phone, yes.

25  Q.  And does Femi report to him?

1    A.  Yes.

2    Q.  Okay.  And you said Prince sounded more like an elderly

3    person?

4    A.  Yes.

5    Q.  And what was Prince asking or saying to the defendant on

6    that conference call?

7    A.  Was insistence on when you think you can get the money

8    across to the people to send us in Nigeria.

9    Q.  How did the defendant respond to Prince?

10   A.  He said, "I'm on it.  I have this Lebanese businessman who

11   lives in Florida; that he has a business in Florida, and he has

12   a business in Nigeria, so I'm making arrangement with him.  I

13   can help him get naira over to those people in Nigeria."

14   Q.  Just to be clear, the defendant said he had a Lebanese

15   businessman that he knew in Florida?

16   A.  Yes, that's right.

17   Q.  And that that person, according to the defendant, had a

18   business in Florida and a business in Nigeria?

19   A.  That's right.

20   Q.  And he was going to use that person's accounts or

21   businesses to get money from the Unique Bamboo account to the

22   people in Nigeria who had caused the money to be sent?

23   A.  He will get the money to the businessman that lives in

24   Florida.  So the businessman who lives in Florida will find a

25   way to get the people in Nigeria money because he has a

1    business in Nigeria too.

2    Q.  How did that call end?

3    A.  He just -- he assured them, "Don't worry.  I'm on it.

4    Promise you this will not be a problem.  Everybody will receive

5    their money."

6    Q.  Just to be clear, on that phone call, did the defendant

7    express any confusion about what was going on or whether this

8    was a fraudulent transaction?

9    A.  No, because he already know.

10   Q.  What happened next after that conference call?

11   A.  Keep going on.  Same story.  Same day.  Same thing.

12   Q.  Did there come a time when you met with the defendant in

13   person to talk about this?

14   A.  Yes.

15   Q.  And approximately when did that happen?

16   A.  I think it was after between two, two to three weeks after

17   the money was moved to the Unique Bamboo accounts.

18   Q.  Do you recall what month you met with him in 2018?

19   A.  Yeah, I met him 2018 about three weeks after the money was

20   sent to the account.

21   Q.  Do you recall what month you had the meeting?

22   A.  Was July.

23   Q.  Was it the beginning of July, middle of July, end of July,

24   if you remember?

25   A.  It was the end of July.

```
 1    Q.  The end of July?

 2    A.  Yes.

 3    Q.  And before the meeting we're about to talk about, had you

 4    ever met the defendant in person before?

 5    A.  No.

 6    Q.  And who suggested having the meeting?

 7    A.  Mustapha.

 8    Q.  Can you tell us about the conversation where he suggested

 9    having the meeting?

10    A.  Say it again.

11    Q.  Was there a conversation in which the defendant suggested

12    having the meeting?

13    A.  Yeah, we would be back and forth on that subject of when

14    would the money be credited to the people in Nigeria.  That's

15    our headache at that time.  So he said, "You know what?  I will

16    come to Georgia.  I will see you so we can talk."

17    Q.  The defendant said that?

18    A.  Yes.

19    Q.  At the time you were living in Georgia?

20    A.  That's right.

21    Q.  Where did you understand the defendant was living at that

22    time?

23    A.  He lives in Florida.

24    Q.  And did you end up meeting the defendant in Georgia?

25    A.  Yes.
```

M9DQraj5                          Adeusi - Direct

1   Q.  And where in Georgia did you meet the defendant?

2   A.  I met the defendant at a restaurant IHOP at Medlock Bridge

3   Road.

4   Q.  At IHOP?

5   A.  Yes IHOP.

6   Q.  On Medlock Bridge Road?

7   A.  Yes, Duluth.

8   Q.  Mr. Bailey, can you please show the witness what's been

9   marked for identification as Government Exhibit 601.

10          Mr. Adeusi, do you recognize this photograph?

11  A.  Yes, I do.

12  Q.  What is it?

13          THE COURT:  Speak into the microphone, please.

14  A.  This is the IHOP where I met Mustapha.

15          MR. SOBELMAN:  The government offers Government

16  Exhibit 601?

17          MR. SCHNEIDER:  No objection.

18          THE COURT:  Admitted.

19          (Government's Exhibit 601 received in evidence)

20          MR. SOBELMAN:  Please display it.

21          Your Honor, at this time the government would offer a

22  stipulation between the parties marked for identification as

23  Government Exhibit S-4.

24          THE COURT:  Assuming no objection, you may proceed.

25  Q.  Mr. Bailey, can you please display what's now in evidence

1   as Government Exhibit S-4:

2         S-4 states: Government Exhibit 601 is a true and

3   accurate photograph of an IHOP restaurant located at 11720

4   Medlock Bridge Road in Duluth, Georgia.

5         Mr. Bailey, you can take this down.

6         Mr. Adeusi, who arrived at the IHOP first, you or the

7   defendant?

8   A.   The defendant was there.  I met him there.  He was there

9   first.

10  Q.   He was there before you?

11  A.   That's right.

12  Q.   And did you sit at a table?

13  A.   Yes.

14  Q.   Was anyone else at that table with you other than you and

15  the defendant?

16  A.   No.

17  Q.   Generally, what do you recall the defendant saying to you

18  during that meeting?

19  A.   So I ask, "What's up?  What's happening?"  These people --

20  I talking by telling him what I've been going through; that

21  this hasn't been easy on me.  People are on my neck.  Femi were

22  calling me, you know.  He said, "Don't worry.  I'm on it.  I'm

23  making arrangements.  Don't worry.  I'm going back to Florida

24  today.  As soon as I arrive in Florida -- by the time I arrive

25  in Florida, I will make sure that the money goes to those

1   people accounts in Nigeria.  Don't worry.  You worry too much."

2   Q.  During the meeting at IHOP, did the defendant express any

3   confusion about the fraudulent nature of the transaction?

4   A.  No.

5   Q.  How did the meeting at the IHOP end?

6   A.  I was not happy because I don't -- everything he said to

7   me, he did not find any solution, nothing -- I can't say this

8   is what I came to talk about in IHOP because I couldn't get

9   anything back.  All the same thing, "Don't worry.  You'll get

10  your money.  I'm on it."  That's all he was talking about.

11  Q.  So he said you he didn't identify a solution to the

12  problem?

13  A.  There was no solution, that's right.

14  Q.  He just kept telling you, "Don't worry.  I'm on it.  I'm

15  going to get them their money"?

16  A.  Yes.  Yes.

17  Q.  Shortly after the meeting with the defendant at IHOP, were

18  you approached by law enforcement?

19  A.  Yes.

20  Q.  Is that the same day or a different day?

21  A.  A different date.

22  Q.  Do you recall approximately what day you were approached by

23  law enforcement?

24  A.  August, August -- 1st of August, August 1, 2018.

25          MR. SCHNEIDER:  I'm sorry, August 1?

M9DQraj5                          Adeusi - Direct

1           THE DEFENDANT:  August 1 yes.

2     Q.  Before you spoke with law enforcement on August 1, did you

3     learn that law enforcement was looking for you?

4     A.  Yes, I did.

5     Q.  And what did you do when you learned that law enforcement

6     was looking for you?

7     A.  I deleted every related messages on my phone regarding

8     fraud or my asking to anyone as regards any illegitimate

9     business, I deleted all of it.  I cleared my phone.

10    Q.  So you deleted all the messages on your phone regarding

11    illegitimate business.  Is that what you said?

12    A.  That's right.

13    Q.  Did that include deleting all your messages with the

14    defendant?

15    A.  That's right.

16    Q.  And did you also delete messages with other people?

17    A.  That's right.

18    Q.  One or two other people, or many other people?

19    A.  Many other people, almost every contact in my phone.

20    Q.  Most of the contacts in your phone?

21    A.  Yes, that's right.

22    Q.  Later that month, in August 2018, did you meet with the

23    government for the first time?

24    A.  Yes.

25    Q.  Why did you decide to meet with the government, without

M9DQraj5                          Adeusi - Direct

1    telling me anything that you discussed with your attorney.

2    A.  I just want to surrender.  I was going to surrender like I

3    feel like this is the end, finito, so -- so --

4    Q.  Was the purpose of the meeting to discuss potentially

5    cooperating with the government?

6    A.  That's right.

7    Q.  After you started meeting with the government at the end of

8    August 2018, did you delete any more messages after that?

9    A.  No, never.

10   Q.  Mr. Bailey, could you please display what's in evidence as

11   Government Exhibit S-8 and focus on paragraph 2D.

12          MR. SOBELMAN:  Government Exhibit 314 is a true and

13   accurate copy of a selection of WhatsApp text messages

14   exchanged between the Adeusi phone and a contact listed in the

15   Adeusi phone as Mustapha Florida Miami with the telephone

16   number 404-951-5594.

17          The government offers Government Exhibit 314.

18          THE COURT:  I assume no objection?

19          MR. SCHNEIDER:  Correct.

20          THE COURT:  Admitted.

21          (Government's Exhibit 314 received in evidence)

22   Q.  Mr. Bailey, please display what's in evidence as Government

23   Exhibit 314.

24          Mr. Adeusi, who are these messages between?

25   A.  These messages are between myself and Mustapha.

M9DQraj5                          Adeusi - Direct

1   Q.  And, Mr. Bailey, if you could just make these slightly

2   larger.  Thank you.  What's the date on the beginning of this

3   text message string?

4   A.  Saturday, September 1.

5   Q.  Was that of 2018?

6   A.  2019 -- 2018.

7   Q.  And, Mr. Adeusi, whose messages are in the green and whose

8   are in the gray?

9   A.  The green messages are from me.  The gray ones are for

10  Mustapha.

11  Q.  Just to make sure, the green are you?

12  A.  Green yes.

13  Q.  And the gray are the defendant?

14  A.  Yes, that's right.

15  Q.  Let's read through these very slowly, and I will pause you

16  at a few points to ask you questions about what the messages

17  mean, okay?

18          Why don't you read your messages and I'll read the

19  defendant's messages, okay?

20  A.  "Brother.  Brother.  You refuse to talk to me since 4 days

21  now.  I just want you to put yourself in my position.  You no

22  Dey like reply.  Why?  Westin I do.  Wetin I do you."

23  Q.  Let's pause for a moment.  There's a few word there that

24  might be unfamiliar to folks.  You wrote, "you no dey like

25  reply."  What does the word dey mean in this context?

SOUTHERN DISTRICT REPORTERS, P.C.

M9DQraj5                         Adeusi - Direct

1    A.  You don't like to reply.

2    Q.  What language is dey from?

3    A.  It's broken English, broken English from Nigeria.

4    Q.  And then lower below you wrote, "Wetin I do you."  What

5    does that mean?

6    A.  What did I do to you?

7    Q.  Just to be clear, did you tell the defendant at any point

8    that you were approached by law enforcement or that you were

9    beginning to cooperate with the government?

10   A.  No.

11   Q.  The defendant responded, "I text you yesterday now and

12   earlier today."

13   A.  "I, brother."

14           THE COURT:  Mr. Sobelman, can I suggest, why don't you

15   just read all of them, and then you can ask any questions that

16   are appropriate.

17           MR. SOBELMAN:  As you wish, your Honor.

18   Q.  Mr. Adeusi, you responded, "I brother you no text.  I no

19   see the message."

20           Then the defendant wrote, "Okay."

21           Mr. Adeusi then responded, "Bro."

22           Please go to the next page.

23           Mr. Adeusi then wrote, "Can anything be resolve at

24   this point?"

25           Mr. Adeusi, what are you and the defendant talking

M9DQraj5                         Adeusi - Direct

1   about in this conversation?

2   A.  This is as regards to the 1.7.  By this time nobody has

3   gotten any money.

4   Q.  The defendant responded, "Give me a few to call."

5            You responded, "Okay."

6            The defendant then wrote, "Yes, we still have a

7   chance."

8            Mr. Adeusi responded, "Okay.  The small thing wet you

9   wan give me NKO.  You know I'm not staying in my house again."

10            Generally, what are you trying to communicate to the

11   defendant here?

12   A.  Yeah, I was trying to see if he would give me some money,

13   so I just said to him that I'm not staying my house, if he can

14   give me some money.

15   Q.  Is that money from the 1.7 million?

16   A.  I was just asking for money.  I expect maybe like a hundred

17   or $200.

18            THE COURT:  Don't swallow your words.  Speak clearly

19   and loudly, okay?

20   A.  I was just talking to him if he could give me any money,

21   saying he should give me money, that I think my percentage.  I

22   was just asking for any kind of money.

23   Q.  The defendant responded, "I know."

24            Mr. Adeusi then wrote, "I don't want this people to

25   come back and meet me there.  I move to my Akata house."

1       What does that mean?

2   A.  So that conversation, I was just like saying that I move to

3   my wife's house now.  He knows if I'm home, I need to be

4   responsibly bringing in money and stuff; that I don't have

5   money, so I felt I was saying I need money.

6   Q.  Let's go to the next page.

7       At the very top, is that a voice message?

8   A.  Yes, sir.

9   Q.  Do you remember now what that voice message said?

10  A.  I can't remember.

11  Q.  You then wrote, "Now she done collect every cent I have.

12  okay?  Is better dem meet me for Akata place than in my own

13  place.  Na lawyer advice me to do that."

14      Did you actually get any lawyer's advice about where

15  to live?

16  A.  This statement, I just made it up.

17  Q.  And what were you trying to communicate to the defendant?

18  A.  I was trying to let him understand that I'm -- I just want

19  him to feel that I needed money; that I needed money, yes.

20  Q.  Defendant responded, "Okay."

21      Then you wrote, "Brother, anything you find for me

22  today, please."

23      The defendant responded, "God will see you through."

24      Mr. Adeusi responded, "Amen.  People need account.  I

25  just want make we Conor this one for neck.  Comot.  Because I'm

1   not happy like that."

2              What did those last few messages mean?

3   A.  Okay.  So I told him that people had been asking me for

4   other accounts were because the one we did, they send us still

5   have not gotten their share so it's going to be very hard to

6   just move forward with another one if we don't settle the one

7   that we did earlier.

8   Q.  Let's go to the next page.

9              You wrote, "Or send me new ones."

10             The defendant responded, "No problem."

11             You then wrote, "Especially Citi with the CIS.  Then

12  title account too."  What did you mean about Citi with the CIS?

13  A.  He told me he has other account from CitiBank, and that has

14  CIS, which is a client information sheet.

15  Q.  The defendant told you he had accounts with CitiBank that

16  he used?

17  A.  Yeah, he said he had CitiBank.

18  Q.  And is a CIS something that's used in the scheme?

19  A.  CIS is the a real conversation.

20  Q.  It's a real type of document.

21  A.  Yes.

22  Q.  But is it something that you or others in the scheme have

23  used before this conversation?

24  A.  Yes, that's right.

25  Q.  You then wrote, "People, they worry me for account every

M9DQraj5                        Adeusi - Direct

1    minute, but my mood is not good.  But lets start working how

2    far, bro."

3              What did you mean by that?

4    A.  So I was trying to tell him that people keep calling me,

5    contacting me for me to send new account, so that they can put

6    this further money aside, but because he has not done as he has

7    promised to get these other people their money, then I just

8    don't feel like going forward with the new -- new job.

9    Q.  Now we're getting to Monday, September 3, 2018.

10             You wrote, "How far bro?  You didn't get back to me.

11   This one you aren't picking up my call.  Hope all is good."

12             Tuesday, September 4, 2018.  "Hello.  Please text.

13   Call men.  Me.  Have been calling you."

14             Then Wednesday, September 5, 2018.  "this man, why you

15   dey disrespect me like this?  Have been calling, texting.  You

16   no response.  Then you send this people voice message.  Not

17   even reply for me.  I no dey beg you money.  Just wanna no

18   about the situation.  Please have the decency to call me

19   because I'm tired of this game.

20             Then Thursday, September 6, 2018.  "Are you there?"

21    And there are a couple of voice messages.  Do you remember

22   what those said now?

23   A.  I don't remember now.

24             (Continued on next page)

25   Q.  Let's go to the next page.

1          You wrote, "as I love you, reach see, as you dey

2     treated me like kids, you will not call me back, it's not nice.

3     We are supposed to go through this together, but you don't

4     communicate with me."  And then another couple of voice

5     messages.  Do you remember what any of those said?

6     A.  No.

7     Q.  You wrote, "baba, I beg, try call me, please."  And then

8     Friday, September 7, 2018, the defendant wrote, "good morning.

9     I'm hoping for good news today.  If God aids us, we will be

10    done.  Please don't be upset.  I'm still working."

11         What did you understand the defendant to mean when he

12    wrote that to you?

13    A.  So what he's trying to do is -- he wasn't -- what he's

14    trying to tell me, he's trying to move the money to this

15    account that's being put into Nigeria.

16    Q.  Next page, please.  You then wrote, "you are my brother."

17    What did you mean by that, you were my brother?  Are you his

18    brother?

19    A.  No --

20    Q.  Okay.

21    A.  It is --

22    Q.  Your brother is in this?

23    A.  You mean this?

24    Q.  This scheme.

25    A.  This scheme.

M9DQraj5                    Adeusi - Direct

1  Q.  "How far?  Are you there?"  And Saturday, September 8,

2  2018, "are you there?"  This is you writing to the defendant.

3  "Is your phone bad again because I don't understand why you

4  making me your enemy or why you aren't taking my call?  It's

5  absurd."  And Sunday, September 9, 2018, you wrote to the

6  defendant, "how far?  This is the fourth day you said you will

7  call back ASAP on Thursday."

8         And Monday, September 10, 2018, Mr. Adeusi wrote to

9  the defendant, "morning.  There's nothing holding you from

10  taking your call and speaking to everybody like human being.

11  But you just do this because you think" -- and there's an

12  emoji.  "This people cannot do anything to me.  Na Dauda Raji.

13  This people dey look for all over Toronto.  This isn't good for

14  you or us.  The more you avoid them, the more they dig deep.

15  Either you have the funds or not.  You gat to talk to people.

16  We aren't animals.  We are human being like yourself.  They

17  will go to that Unique Bamboo company address today or

18  tomorrow."

19         "I'm just giving you heads up because I can't do

20  anything when you want me to come to Florida with them, but I

21  don't have money to even buy bus ticket now, even to talk of

22  flying down.  You are going to blow his on yourself because I

23  know you don't have the funds in your possessions, but they

24  feel you do."

25         And Tuesday, September 11, 2018, Mustapha, "morning."

M9DQraj5                         Adeusi - Direct

1  Now, this is the last page of the exhibit.

2          Mr. Adeusi, you mentioned Dauda Raji in one of these

3  messages.

4  A.  Yes.

5  Q.  Who is Dauda Raji?

6  A.  It's the -- it's the brother to Mustapha.

7  Q.  He's the brother of Mustapha?

8  A.  Yes.

9  Q.  And his actual brother or like his brother in the scheme?

10 A.  His real brother.

11 Q.  Have you ever spoken with Dauda?

12 A.  Yes, I did -- I did.

13 Q.  Is that yes?

14 A.  Yes.

15 Q.  Have you ever exchanged text messages with Dauda?

16 A.  Yes.

17         MR. SOBELMAN:  Your Honor, the government offers the

18 stipulation marked for identification as S3.

19         THE COURT:  Admitted.  You may proceed.

20         (Government's Exhibit S3 received in evidence)

21 Q.  Mr. Bailey, can you display what's in evidence as

22 Government Exhibit S3?

23         The stipulation says, Dauda Raji is the brother of

24 Mustapha Raji, the defendant, during at least 2018, 2019

25 Dauda Raji used the telephone Number 705-274-5603.

M9DQraj5                        Adeusi - Direct

1          Mr. Bailey, can you please display what's in evidence

2    as Government Exhibit S8 and focus on Paragraph 2B?

3          Government Exhibit 309, any subparts such as 309A,

4    309B, et cetera, are true and accurate copies of a selection of

5    WhatsApp text messages and attachments to text messages

6    exchanged between the Adeusi phone and a contact listed in the

7    Adeusi phone as Dauda Mustapha with the telephone Number

8    705-274-5603.  And pursuant to the stipulation, the government

9    offers what was marked for identification as Government

10   Exhibits 309, 309A, 309B, and 309C.

11          THE COURT:  Admitted.

12          (Government's Exhibits 309, 309A, 309B, and 309C

13   received in evidence)

14   Q.  Mr. Bailey, can you please display what's now in evidence

15   as Government Exhibit 309?

16          Mr. Adeusi, who are these text messages between?

17   A.  This is between me and Dauda Raji.

18   Q.  And prior to exchanging these messages, did you speak with

19   Dauda on the phone?

20   A.  Yes.  That's right.

21   Q.  On the right, it says Dauda Mustapha.  Is that how you

22   saved Dauda on your phone?

23   A.  Yes.

24   Q.  Why did you save it as Dauda Mustapha?

25   A.  His name is Dauda and his brother's name is Mustapha.  For

M9DQraj5                        Adeusi - Direct

1   easy identification, so I put it as Dauda Mustapha.

2   Q.  And at that time, did you know Dauda's last name?

3   A.  No.

4   Q.  Prior to exchanging these messages, did you speak with

5   Dauda on the phone?

6   A.  Yes.

7   Q.  And just to point out, what date do these messages start?

8   A.  September 11, 2018.

9   Q.  And is that the same date as the end of the last chain of

10  text messages you looked at between you and the defendant?

11  A.  I have to check.

12  Q.  Why don't we put that up?  I think it's the end of

13  Government Exhibit 314.

14       You see the bottom here, it says Tuesday,

15  September 11, 2018?

16  A.  That's right.

17  Q.  In the beginning of this chain here with Dauda, it is the

18  same date?

19  A.  Yes.

20  Q.  So let's go back to 309?

21       THE COURT:  Mr. Sobelman, we're going to stop there

22  and we'll pick up tomorrow.

23       Ladies and gentlemen, that's the end of our day.  As

24  you may remember from yesterday, we'll go until 2:30 stop

25  sharply at 2:30 but I have a few minutes' worth to tell you and

M9DQraj5                          Adeusi - Direct

1      we'll pick up tomorrow.

2             So a few important reminders.  You've heard me say

3      these things a few times, but I'm sure you'll hear me say it a

4      few times because they are that important.

5             Number one, continue to keep an open mind.  You've

6      heard only some of the evidence thus far, not all of.  Your

7      deliberations have certainly not begun, so it's important to

8      keep an open mind.  Do not to talk to anybody.  Don't talk to

9      one another about the case, don't talk to your families,

10     friends, employers.  Just a reminder, you may tell folks that

11     you've been empanelled on a criminal jury, but don't tell them

12     anything else.  Don't tell them what it's about.  There will

13     come a day when you can tell them, but not today.  Until then,

14     it's critical that you not speak about the case.  And also,

15     don't do any research about the case or anyone involved in it.

16     Everything that you need to decide this case, you will hear and

17     see right here in this courtroom.

18            With that, a reminder, please, let's see if we can do

19     it another day in a row.  Be here on time, by 8:45.  Fingers

20     crossed, breakfast is there for you when you arrive.  And if

21     you're here on time, we'll get started on time, pick up where

22     we left off, and make the most of your time with us.

23            With that, thank you very much.  Have a pleasant

24     afternoon and evening, and see you tomorrow.  Thank you.

25            (Jury not present)

M9DQraj5                        Adeusi - Direct

1          THE COURT:  You may be seated.

2          All right.  Mr. Adeusi, you may step down.  You're

3     excused.  I'm sure the government will give you instructions

4     about where and when you need to be.  But you should be in this

5     courtroom a couple minutes before 9:00 a.m. tomorrow morning to

6     resume your testimony promptly thereafter.  Thank you.

7          All right.  Mr. Sobelman, can you give me a sense of

8     how much longer you have on direct with this witness?

9          MR. SOBELMAN:  Yes, your Honor.  I think I'm

10    two-thirds of the way through.  So maybe I don't know exactly

11    how long we've gone, maybe another half hour to hour.

12         THE COURT:  We've gone two hours and 18 minutes.

13         MR. SOBELMAN:  All right.  So I'm going to say another

14    hour, maybe hour and 15.

15         THE COURT:  All right.  Very good.  The witness order

16    of the remaining witnesses, can you tell me that?

17         MR. SOBELMAN:  Yes, your Honor.  Right now, we

18    anticipate calling Wayne Floyd after Mr. Adeusi is completed,

19    then Special Agent Gassert.  I think that will almost certainly

20    take us through tomorrow.  And then after that, we intend to

21    call Dustin Palmer, and then Victoria Hernandez.

22         MR. SCHNEIDER:  I'm sorry.  After Gassert?

23         MR. SOBELMAN:  Victoria Hernandez and Dustin Palmer.

24         THE COURT:  It seems like we're on track, assuming you

25    rest on or about Thursday, correct?

1          MS. KAMAL:  We anticipate resting on Thursday.

2          THE COURT:  Sorry.  That's what I meant.

3          MR. SOBELMAN:  Yes, closing our case.

4          MR. SCHNEIDER:  My knees buckled when you said

5   closings.

6          THE COURT:  I like to keep you on your toes.  Thank

7   you.  That's helpful.

8          Just a reminder, I've asked the government to provide

9   each night defense counsel and me with a running exhibit list

10  indicating exhibits that have been admitted.  You can just do

11  that by e-mail.  No need for a hard copy, or anytime between

12  now and the beginning of trial tomorrow morning.

13         MR. SOBELMAN:  Well, one minor question.  For the jury

14  at the end of the case, I know at least early in the pandemic

15  it was on -- exhibits were only provided electronically.  Is

16  that still the case, or do we need to have printed copies.

17         THE COURT:  That's an excellent question.  It's been

18  so long since we had a case before the pandemic.  Let me -- I

19  think the answer is printed because we don't have the system in

20  this jury room that we've had in the pandemic jury rooms, so

21  assuming, unless you hear otherwise shortly, that's the way you

22  should be prepared.

23         MR. SOBELMAN:  Your Honor prefers one copy for the

24  jury?

25         THE COURT:  Yes.

M9DQraj5                        Adeusi - Direct

1              MR. SOBELMAN:  All right.  That's what we'll do.

2              THE COURT:  Anything else to discuss on the

3       government's end?

4              MR. SOBELMAN:  No, your Honor.

5              THE COURT:  Mr. Schneider, anything from you?

6              MR. SCHNEIDER:  No.  Thank you.

7              THE COURT:  All right.  In that case, everybody should

8       be here no later than 9:00.  Let my staff now if you have

9       anything to discuss with me.  If not, we'll start promptly with

10      the witness at 9:00.  If so, we'll discuss those things and

11      then start as soon as we can thereafter.

12             See you in the morning.  Have a good night.

13             (Adjourned to September 14, 2022, at 9:00 a.m.)

14                                  * * *

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                      INDEX OF EXAMINATION

2   Examination of:                              Page

3    ROBERT SCOTT McLELLAN

4   Direct By Ms. Kamal  . . . . . . . . . . . . .19

5   Cross By Mr. Schneider . . . . . . . . . . . .51

6    ADAM ANGELOWICZ

7   Direct By Ms. Kamal  . . . . . . . . . . . . .62

8   Cross By Mr. Schneider . . . . . . . . . . . .82

9    STEVEN EUGENE LARVICK

10  Direct By Ms. Kamal  . . . . . . . . . . . . .95

11  Cross By Mr. Schneider . . . . . . . . . . . 117

12   AFOLABI ADEUSI

13  Direct By Mr. Sobelman . . . . . . . . . . . 123

14                    GOVERNMENT EXHIBITS

15  Exhibit No.                              Received

16   S-5   . . . . . . . . . . . . . . . . . . .23

17   801, 802, 803, 803A, 805, 805A, 807,  . . . .25

18          808, 809 and 810

19   234A   . . . . . . . . . . . . . . . . . . .49

20   50   . . . . . . . . . . . . . . . . . . . 103

21   50A   . . . . . . . . . . . . . . . . . . . 108

22   50B   . . . . . . . . . . . . . . . . . . . 109

23   1   . . . . . . . . . . . . . . . . . . . . 127

24   S-8   . . . . . . . . . . . . . . . . . . . 168

25   308, 312, 318   . . . . . . . . . . . . . . 169
</pre>

SOUTHERN DISTRICT REPORTERS, P.C.

601    . . . . . . . . . . . . . . . . . 195

314    . . . . . . . . . . . . . . . . . 199

S3     . . . . . . . . . . . . . . . . . 208

309, 309A, 309B, and 309C   . . . . . . . . 209