M9DQraj1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                          19 CR 870(JMF)
                                    Trial

MUSTAPHA RAJI,

              Defendant.

------------------------------x

                             New York, N.Y.
                             September 14, 2022
                             9:00 a.m.

Before:

                 HON. JESSE M. FURMAN,

                             District Judge
                             -and a Jury-

                    APPEARANCES

DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
BY:  JILAN J. KAMAL
     ROBERT B. SOBELMAN
     CATHERINE E. GHOSH
     Assistant United States Attorneys

ROTHMAN SCHNEIDER SOLOWAY & STERN LLP
     Attorney for Defendant
BY:  JEREMY SCHNEIDER


Also Present:
Matthew Bailey, AUSA Paralegal
Mayerlin Ulerio, Defense Paralegal

M9DQraj1

1          (Trial continued; jury not present)

2          THE COURT:  You may be seated.  Good morning.  Welcome

3     back.  The case on trial will resume.  My understanding is no

4     one has anything to raise, the witness is present, so that's

5     all correct, and we can get the jury and proceed.

6          (Jury present)

7          THE COURT:  Good morning.  Welcome back.  My sincere

8     thanks again for the fact that you were here on time and we can

9     start promptly.

10          I also want to start with an apology.  My

11     understanding is that the bulk of the breakfast, muffins and

12     bagels, were not delivered in a timely fashion.  Thankfully,

13     Ms. Smallman was able to rectify that, but I apologize.  I was

14     assured it won't happen again, but fingers crossed.  I didn't

15     realize when I took this job, it was partly a hospitality job

16     as well.  That's the part I'm struggling with.  In any event,

17     hopefully, that won't happen again.  Hopefully you had enough

18     time to consume whatever you wanted to consume, and presumably

19     you will have some of it left over for break.

20          With that, we'll pick up where we left off with the

21     remainder of the direct testimony of Mr. Adeusi.

22          Mr. Adeusi, I want to remind you that you remain under

23     oath.  In addition, just a reminder, please speak as slowly,

24     clearly and loudly as you can.  And if you can move the

25     microphone so that you're this close to it the way I'm

M9EQraj1                         Adeusi - Direct

1    speaking, we'll hopefully be able to proceed.

2            Mr. Sobelman.

3     AFOLABI ADEUSI, resumed.

4    DIRECT EXAMINATION CONTINUED:

5    BY MR. SOBELMAN:

6    Q.  Mr. Bailey, can you please display what's in the evidence

7    as Government Exhibit 309.

8            Mr.  Adeusi, yesterday when we stopped, we were

9    talking about someone named Dauda Raji.  Is that correct?

10   A.  Yes.

11   Q.  You knew him just as Dauda.  Is that correct?

12   A.  Yes.

13   Q.  Just remind us, who is Dauda?

14   A.  Dauda is Mustapha's brother.

15   Q.  Prior to exchanging the text messages that are on the

16   screen with Dauda, did you speak to him on the telephone?

17   A.  Yes.

18   Q.  How did you get Dauda's telephone number?

19   A.  So when Mustapha stop talking to me, picking my phone,

20   replying, I have to choice but to go back to Ugo.  I spoke to

21   Ugo.  "I can't reach Mustapha."

22            He said, "Why"?

23            I said, "I'm sorry that I went behind you to do

24   business with Mustapha.  This is what happened.  The wire fraud

25   was sent to the account he gave me, now he's been in irresponse

M9EQraj1                        Adeusi - Direct

1   to me and to the people involved.  And now I just need to get

2   ahold of him."

3          I ask if he has another number for him apart from the

4   one I have.  So he say, "Which one do you have?  Which number

5   do you have?"  I told him.  He say, "That's the number I have

6   too," but he has a brother in Canada who will give me a number

7   to call him and tell him what happened so maybe he could help

8   me.

9   Q.  Let's just make sure everyone understood that.  After

10  around September 10, 11, 2018, is that the time frame we're

11  talking about?

12  A.  Yes.

13  Q.  Around that time, as we saw in the text messages we looked

14  at yesterday, the defendant stopped picking up your calls,

15  stopped responding to your messages.  Is that right?

16  A.  That's right.

17  Q.  So you reached out to Ugo?

18  A.  Yes.

19  Q.  And you said you apologized to him?

20  A.  Yes.

21  Q.  Why did you apologize to Ugo?

22  A.  Because Ugo had no knowledge of my dealings with Mustapha,

23  but I got his number from Ugo indirectly when he was trying to

24  forward me messages from my previous dealing so he mistakenly

25  sent his number so I got it from Ugo and I saved it.  So when I

M9EQraj1                        Adeusi – Direct

1   had a 1.7 million request, so I contacted him directly instead
2   of going through Ugo.
3   Q.  And you apologized to Ugo because based on the rules you
4   described yesterday, you should have gone through Ugo to get to
5   the defendant?
6   A.  Yes.
7   Q.  How did Ugo respond when you apologized for not going
8   through him to get to Mustapha for the $1.7 million job?
9   A.  He was furious.  He was very angry.  Said that I messed up.
10  I betrayed him.  That I don't know Mustapha from Adam, but now
11  I went to him directly without of coming to him and now I
12  should face the --
13  Q.  Can you please repeat that?  That you should --
14  A.  I should go and face the dance.
15  Q.  Face the dance?
16  A.  Yeah, it means that face trouble.  It's a proverb.
17          THE COURT:  It's a proverb?
18          THE WITNESS:  Yes, it's a proverb.  Face the dance
19  means that face your trouble.
20          THE COURT:  Face the dance means face the trouble?
21          THE WITNESS:  Yes, sir.
22  Q.  And during that conversation, it sounds like you and Ugo
23  compared the phone number you had for the defendant.  Is that
24  right?
25  A.  That's right.

M9EQraj1                        Adeusi - Direct

1    Q.  And did Ugo have another phone number for the defendant?

2    A.  No.

3    Q.  What, if anything, did Ugo provide to you on that call?

4    A.  He said to me, "I have his brother number in Canada, I will

5    give it to you.  Call him, you might have luck."

6    Q.  Did Ugo give you a phone number for the defendant's

7    brother?

8    A.  That's right, yes.

9    Q.  And did he tell you what the defendant's brother's name

10   was?

11   A.  Yes, Dauda.

12   Q.  What did you do after you got Dauda's number from Ugo?

13   A.  I call Dauda.

14   Q.  Did you speak with Dauda?

15   A.  Yes.

16   Q.  Can you please tell us what you said what he said on that

17   conversation?

18   A.  Ask the question again.

19   Q.  Can you please tell us what did you say to Dauda when you

20   called him?

21   A.  So when Dauda -- I call Dauda, he picked up, and I told

22   him, "My name is Afolabi.  I'm a friend of Mustapha, your

23   brother.  We had a deal and money was sent to the account

24   Mustapha provided to me.  Now the people who made the transfer

25   need their money and they be on me on my neck.  They want their

SOUTHERN DISTRICT REPORTERS, P.C.

M9EQraj1                       Adeusi - Direct

1   money back so -- and your brother is not picking his phone.  Is

2   there any way you can help me reach him, tell him to call me or

3   text me."

4   Q.  How did Dauda respond when you said that?

5   A.  He said, "I know who you are."

6   Q.  Sorry.  He said, "I know who you are"?

7   A.  Yes.

8   Q.  Did he say how he knew who you were?

9   A.  Say it again.

10  Q.  Did he say how he knew who you were?

11  A.  He said, "My brother told me about it.  Don't worry.  He

12  will call you."

13  Q.  And do you remember anything else from that conversation

14  before the text messages on the screen?

15  A.  Yes.  So as we begin to talk, so he says something like, "I

16  think the business has gone bad;" that I should wait for

17  Mustapha to call me; that this is not -- it's only -- it's not

18  good shape right now.

19  Q.  It's not a good ship?  Oh, in good shape.

20  A.  Shape.

21  Q.  So Dauda told you the business has gone bad, it's not in

22  good shape right now?

23  A.  That's right.

24  Q.  After that telephone conversation, did this text message

25  chain start?

M9EQraj1                          Adeusi - Direct

1   A.  Yes.

2   Q.  Let's take a look at some of the messages:  The first

3   message on here -- sorry, the messages in white or gray, are

4   those from Dauda?

5   A.  Yeah, white is Dauda.

6   Q.  And the green is you?

7   A.  Yes.

8   Q.  This is September 11, 2018.  And the first thing, is that

9   an attachment?

10  A.  Yes, an attachment yes.

11  Q.  Above it, it says "forwarded."  Do you see that?

12  A.  Yes, sir.

13  Q.  When something says forwarded on WhatsApp, what does that

14  mean?

15  A.  It means it was forwarded from the original -- it means if

16  you receive as a forward message, that means it was coming from

17  somewhere.

18  Q.  So when you forwarded messages, is it -- there's a message

19  from one person, and if you send that message on to another

20  person, it shows up as forwarded?

21  A.  That's right.

22  Q.  And underneath that attachment, which we'll look at in a

23  second, there's a hand pointing up, and it says "from

24  Mustapha."  Is that right?

25  A.  That's right.

M9EQraj1                          Adeusi - Direct

1    Q.   What was your understanding about where Dauda got this

2    attachment?

3    A.   He got it from Mustapha.

4    Q.   Let's take a look at 309A, which is in evidence.

5            Does this appear to be a screenshot of an email?

6    A.   Yes.

7    Q.   And the subject line of the email is "fraudulent wire."  Do

8    you see that?

9    A.   Yeah, that's right.

10   Q.   Part of the side of it is cut off, but generally what did

11   you understand Dauda and Mustapha to be communicating to you by

12   sending you this screenshot?

13   A.   So they were basically saying that the transactions has

14   been detected as fraud and has been blocked.

15   Q.   I'm just going to read part of it.  It says, "Hi Nancy.  I

16   just found out today that the funds that you wired from Unique

17   Bamboo Investment will be interplead with the Court."  Then

18   it's cut off.

19           Then it says, "This issue is resolved.  You might want

20   to get with your bank to find out what is going on with your

21   monies.  And ask if."  Then it's cut off.

22           "Is anything that they would require which would

23   verify that the funds are really your funds?"

24           Let's go back to 309.

25           In your participation in the scheme, had you seen

M9EQraj1                          Adeusi - Direct

1   notices or letters or emails kind of like this before?

2   A.  Yes.

3   Q.  And generally what does that mean?

4   A.  It means that the monies got sent back to the owner or bank

5   to close the savings account.

6   Q.  It means the money might get sent back to the victim?

7   A.  Yes, sir.

8   Q.  And the account was going to be closed?

9   A.  Yes, that's right.

10  Q.  That's based on your experience, having done this a number

11  of times?

12  A.  That's right.

13  Q.  Let's continue reading the messages.

14          You wrote, "Okay, sir.  How is he doing?"  Who are you

15  referring to when you said "he"?

16  A.  Mustapha.

17  Q.  Let's go to the next page.

18          "Have been calling him."

19          Then Dauda responded, "His phone is not working.

20  Screen destroyed.  He said he'll call you guys."

21          You responded, "Okay.  Thank you very much."

22          Then September 12, 2018, you wrote, "Hello bros.  He

23  never get back to me.  He has a poor communication skill.

24  Imagine people reaching because of the business is doing with

25  another party.  It's just completely wrong, someone acting like

SOUTHERN DISTRICT REPORTERS, P.C.

1    his guilty of something and his not though.  He hasn't spoke to

2    me in a week."

3            Mr. Adeusi, When you wrote "someone acting like his

4    guilty and is not though," what did you mean by that?

5    A.  So I believe at the time that he probably don't have the

6    money because the impression of the sender was that he's

7    already taken the money for himself alone is trying to

8    circumvent them.  So I believe that he can't do that, that 1.7

9    is big money.  Why would he want to do that.  So I just believe

10   that he needs to communicate.  I didn't believe he took the

11   money, but they said, yes, he's been taking the money, he's

12   taking his own part of his share, trying to secure himself and

13   trying to abandon them.

14   Q.  Just to be clear, what you were saying here is that the

15   senders of the money in Nigeria, the folks who do the emails,

16   they believed or were accusing the defendant of taking all the

17   $1.7 million for himself?

18   A.  Yes.

19   Q.  And you were saying to Dauda, you didn't think that the

20   defendant would do that?

21   A.  Yes.

22   Q.  Okay.  Were you saying here that the defendant wasn't

23   involved in fraud?

24   A.  No.  No.

25   Q.  Were you saying here the defendant wasn't involved in money

M9EQraj1                         Adeusi - Direct

1   laundering?

2   A.  Of course not.

3   Q.  Dauda then responded, "I'll pass your message on.  I am

4   sure he'll be contacting you guys."

5          Mr. Adeusi then responded, "That's very unfair when I

6   dey give am the business he calls me every minute.  The moment

7   the funds comes in he stopped.  Is okay.  Thank you."

8          What did you mean when you wrote that message?

9   A.  When I contacted him for the wire fraud for 1.7, he was

10  excited.  He calls me every time.  We talk.  We joke.  As soon

11  as the money came in, a few days later everything changed.  He

12  doesn't take my calls any more.  He just sends sometimes voice.

13  He says, "I'll call you back, give me a few," stuff like that.

14  Q.  Now we're on September 18, 2018.  Is this another

15  attachment?

16  A.  Yes.

17  Q.  It also says "forwarded" here.  Do you see that?

18  A.  Yes.

19  Q.  And who do you understand Dauda forwarded this from?

20  A.  From Mustapha.

21  Q.  Let's take a look at the next page before we look at the

22  attachment.  There's another attachment here.  Is that right?

23  A.  Yes.

24  Q.  It also says "forwarded"?

25  A.  Yes.

M9EQraj1                                    Adeusi - Direct

1    Q.  Who do you understand it's forwarded from?

2    A.  Mustapha.

3    Q.  Let's take a look at -- if you can just go to the

4    attachments, you can take down 309 for the moment and put up

5    309B and 309C, which are in evidence.

6             Mr. Adeusi, can you please read on the left under

7    "charge comments" what it says?

8    A.  Wire fraud, receipt stolen funds.

9    Q.  And on the right, under arrest date, it says September 16,

10   2018.  There's a photograph of a woman.  Is that right?

11   A.  That's right.

12   Q.  Let's go back to the conversation in 309.  You can take

13   these down.

14            After Dauda sent you those two attachments which he

15   had forwarded from the defendant, you wrote "Who is this?  Hey

16   bro."

17            Dauda responded, "Business account holder."

18            You responded, "The woman?"

19            Dauda responded, "Yep."

20            Mr. Adeusi, who did you understand that this person in

21   the arrest record was?

22   A.  Is the account owner for Unique Bamboo.

23   Q.  You then wrote, "Really.  Jesus.  Tell Mustapha to call

24   us."

25            Then Dauda wrote, "He will call but don't expect

M9EQraj1                        Adeusi - Direct

1    immediately.  Things are too hot right now."

2              Mr. Adeusi, what did you understand Dauda to mean when

3    he said that the defendant would not call immediately because

4    things are too hot right now?

5    A.  Because my understanding is if the account owner has been

6    arrested, so it means that Mustapha needs to go very far away.

7    So he probably tell them Mustapha -- he probably tell the

8    investigator that Mustapha was the one that originates the wire

9    transfer for the fraud.

10   Q.  Just to be clear, you were concerned or perhaps you were

11   concerned that the defendant would be concerned that the woman

12   who owned the account would identify the defendant as the

13   person who had the money sent into the account?

14   A.  That's right.

15   Q.  You then wrote back to Dauda, "Okay.  Thank you brother.

16   Please tell him to be careful.  Make him go far, bro."

17             And Dauda responded, "I go tell am."

18             What did you mean when you wrote "make him go far,

19   bro"?

20   A.  I was telling him to let Mustapha leave the environment or

21   leave further, leave further so they won't start looking for

22   him or get him arrested too.  I just want him to go away.

23   Q.  Mr. Adeusi, did the government tell you what to say in

24   these text messages?

25   A.  No.

M9EQraj1                          Adeusi - Direct

1    Q.  We can take this exhibit down.

2          Actually, let's do one more quick thing.  If you can

3    put up Government Exhibit 309C next to S-8.  And the arrest

4    date on the record that Dauda sent you is September 16, 2018.

5    Is that right?

6    A.  That's right.

7    Q.  I'm going to read paragraph 1 of Government Exhibit 18.

8          On September 16, 2018, Special Agents with the Federal

9    Bureau of Investigation (FBI) lawfully obtained a cell phone

10   from Nancy Martino-Jean with telephone number 772-882-5632 (the

11   Martino-Jean phone) at the time of Martino-Jean's arrest and

12   subsequently made a true and accurate copy of its contents.

13         Mr. Adeusi, is the date on the stipulation,

14   September 16, 2018, the same as the record that Dauda sent to

15   you, September 16, 2018?  Both documents have the same date?

16   A.  Okay.  He want to see if I say yes.  Well, that's fine.

17   Q.  We could take these down.

18         Mr. Adeusi, I'm going to turn to a different topic.

19   At some point in your cooperation after the messages we just

20   looked at, did law enforcement agents direct you to continue

21   communicating with fraudsters and money launderers that you had

22   dealt with in the past?

23   A.  Yes.

24   Q.  And, Mr. Bailey, can you please put up Government Exhibit

25   S-8 and focus on paragraph 2C.

M9EQraj1                        Adeusi - Direct

1          Government Exhibit 313 and any subparts (such as 313A,

2     313B, et cetera) are true and accurate copies of a selection of

3     WhatsApp text messages and attachments to text messages

4     exchanged between the Adeusi phone and a contact listed in the

5     Adeusi phone as "Mustapha New" with the telephone number

6     305-924-0360.

7          Pursuant to this stipulation, the government offers

8     Government Exhibit 313, 313A, 313B and 313C.

9          THE COURT:  Admitted.

10          (Government's Exhibits 313, 313A, 313B and 313C

11     received in evidence)

12     Q.  Mr. Bailey, if you could please focus now on paragraph 4 of

13     this stipulation.  The following transcript exhibits are true

14     and accurate transcripts of the following audio recording

15     exhibits.

16          I'm just going to note that in this list, Government

17     Exhibit 313A-T is listed as a true and accurate transcript of

18     Government Exhibit 313A which is already in evidence, and at

19     this time the government offers 313A-T.

20          THE COURT:  Admitted as well.  Well, let me clarify.

21     Is this a transcript of an English --

22          MR. SOBELMAN:  It is.  It's offered as an aid to the

23     jury.  All the audio recordings are in English.

24          THE COURT:  So, ladies and gentlemen, let me just give

25     you a brief instruction on this.  What you just heard

M9EQraj1                          Adeusi – Direct

1    Mr. Sobelman say is the transcript that the government is

2    offering is a transcript of a recording of a conversation that

3    is in English.

4           So, strictly speaking, it is the conversation, the

5    recording, that is evidence that you should consider.  That

6    being said, the parties are permitted to provide a transcript

7    of the recording just because sometimes it makes it easier to

8    listen and to hear the words, and so on and so forth, but the

9    transcript itself is just an aid to help you in understanding

10   the evidence that is the recording.

11          It is the recording that is the evidence and on which

12   you should rely, and you could just use the transcript to aid

13   you in listening to it.  If you think there's any difference

14   between the recording and the transcript, it is the recording

15   that governs because that is the evidence, and what weight, if

16   any, you give to the evidence, as with any evidence is

17   entirely, up to you.  With that understanding, it's admitted as

18   an aid to the jury.

19          MR. SOBELMAN:  Your Honor, just for a clarification,

20   the audio recordings are all voice messages, not conversations,

21   but --

22          THE COURT:  Forgive me.

23          With that clarification, the instruction stands.

24   Thank you.

25   Q.  Mr. Bailey, can you please display what's in evidence as

M9EQraj1                          Adeusi - Direct

1    Government Exhibit 313?

2              Mr. Adeusi, who are these messages with?

3    A.   The gray ones are for Mustapha.  The green ones are for me.

4    Q.   The gray are Mustapha, and the green ones are you?

5    A.   Yes, that's right.

6    Q.   Is this with the same phone number we talked about earlier

7    that was saved as Mustapha Florida Miami?

8    A.   No.

9    Q.   Or was this with a different phone number?

10   A.   No, this is a new number.

11   Q.   It's a new number that you got for the defendant?

12   A.   No, from --

13   Q.   For the defendant?  Why don't you explain?

14   A.   Yes.  So after almost six months, so I went back to -- I

15   contacted Dauda, Mustapha's brother.  I said to him, "People

16   are calling me, and they want to bring a new fraudulent deal

17   and they need new accounts.  I don't know how to reach -- reach

18   out to Mustapha."  So and he say, "Oh wow.  People, they are

19   very big one?"

20             And I say, "Yes, as usual.  Big ones."

21             He say, "Don't worry.  He will contact you."

22   Q.   Let me just pause you there.  Just to be clear, before

23   these messages that we're looking at on the screen, you reached

24   out to Dauda by telephone?

25   A.   Yes, by telephone.  Yes.

M9EQraj1                         Adeusi - Direct

1    Q.  And why did you reach out to Dauda?  What had you been

2    instructed to do by law enforcement agents?

3    A.  That I should continue to talk to everyone like I'm still

4    part of the scheme.

5    Q.  Can you repeat that very slowly?

6    A.  That I should continue to talk to everyone like I'm still

7    part of the scheme, the fraud.

8    Q.  Did law enforcement agents tell you to talk to specific

9    people like, "Make sure you talk to Mustapha" or "make sure you

10   talk to Dauda" or was it a general instruction of "just keep

11   talking to the people you talked to before"?

12   A.  It was a general instruction that everyone I been dealing

13   with or anybody that contact me for new account, I should

14   follow up but I should not ever send an account of my own.

15   Q.  For that last piece that you should not ever send an

16   account --

17   A.  Yes.

18   Q.  -- was that an instruction that you should not actually

19   facilitate a fraud?

20   A.  Can you repeat the question?

21   Q.  Yes.  That last instruction, was that -- the law

22   enforcement agents told you that you should not actually help a

23   fraud be done?

24   A.  That's right.

25   Q.  That you should talk with people but not actually help any

M9EQraj1                        Adeusi - Direct

1  victims lose money?

2  A.  That's right.

3  Q.  And aside from Dauda and the defendant, did you talk to

4  many other people over the last three years that you've been

5  following that instruction?

6  A.  Yes, a lot of people, multiple people.

7  Q.  Dozens of people?

8  A.  Dozens of people, yes.

9  Q.  And you've continued doing that until the last few days.

10  Is that right?

11  A.  Till now, yes.

12  Q.  And did law enforcement agents tell you specifically what

13  to say to any of these people?

14  A.  No.

15  Q.  So when you called Dauda and told him that you had another

16  job --

17  A.  Yes.

18  Q.  -- did you use the word fraudulent transaction or did you

19  use code words with Dauda?

20  A.  I used code words.

21  Q.  And when you told -- what code words did you use with

22  Dauda?

23  A.  I said I have a new job request.

24  Q.  And did he seem to understand what you meant when you said

25  job request?

M9EQraj1                          Adeusi - Direct

1    A.  Yes.

2    Q.  And was there actually a person being defrauded?

3    A.  No.

4    Q.  Is this something that you were just telling him?

5    A.  Yes.

6    Q.  And after you told him that, what did he -- how did he

7    respond to you?

8    A.  He say, "That's a good thing.  I will reach out to my

9    brother.  He will contact.  You don't worry."

10   Q.  And what happened after Dauda told you that the defendant

11   would get in touch with you?

12   A.  In less than ten minutes, he called.

13   Q.  In less than ten minutes, the defendant called you?

14   A.  Yes.

15   Q.  Did he call you using the phone number that you had saved

16   as Mustapha Florida Miami or did he call you using a different

17   number?

18   A.  Different phone number.

19   Q.  Is that the phone number you then saved as Mustapha New?

20   A.  Yes.

21             THE COURT:  Let me just interrupt for a second.

22             Ladies and gentlemen, as you have heard and seen,

23   these are events that took place in 2019 after the charged

24   conduct in the indictment.  The charges in the indictment all

25   relate to conduct in 2018.  So as I said yesterday -- this is

M9EQraj1                          Adeusi - Direct

1    similar to what I said yesterday; that is to say, that the

2    events that the witness I think is about to testify about are

3    not part of the charged conduct.

4            That being said, you may consider them for the

5    purposes that I mentioned yesterday; namely, intent, knowledge,

6    lack of mistake, plan, those sorts of things.  You may not

7    consider them with respect to -- as evidence that the defendant

8    has a bad character or has a propensity to commit crime.

9            In this case, you can also consider it as part of the

10   relationship and story between the witness and the defendant,

11   and with respect to the credibility of this witness.  That is

12   to say, you can consider it for those purposes as well.  But as

13   with the conduct yesterday, these are not part of the charges

14   that you will be considering, so you may only consider it for

15   the purposes I just identified.

16           You may proceed, Mr. Sobelman.

17           MR. SOBELMAN:  Thank you, your Honor.

18   Q.  When the defendant called you, what did you say to him and

19   how did he respond?

20   A.  I said, "I have a new job.  The new job need an account."

21   Q.  You said you had a new job, you need an account?

22   A.  Yes.

23   Q.  And did he ask what you meant by job?

24   A.  No.

25   Q.  Did he seem to understand what you meant by job?

M9EQraj1                          Adeusi - Direct

1    A.  Yes.

2    Q.  How did he respond when you said you had a new job and you

3    needed another account?

4    A.  So he said, "I was going to say, why you don't reach me

5    since" -- this is what he said.  "Forget about it.  Let's

6    work."

7    Q.  So you said why haven't you reached out to me since last

8    year?

9    A.  Yes.

10   Q.  And he said -- and how did he respond?

11   A.  He said, "Forget about that.  Now you have brought

12   something new.  Don't worry.  Everything will be fine."

13   Q.  It sounds like he said something like "let's work"?

14   A.  Yes, "let's work."

15   Q.  What did you understand him to mean "let's work"?

16   A.  That he's going to provide what he usually provide; that I

17   will send it, and the money will be sent there --

18   Q.  You have to keep your voice up.

19   A.  It means that he's going to provide what he normally

20   provide for me, which is the account details.  And I would do

21   what I do best by sending the details to the fraudsters who

22   send money there.  Then he will continue bringing out the

23   funds, yes.

24   Q.  When he said "let's work," did you understand him to mean

25   that he was going to do some kind of legitimate work?

1   A.  No.

2   Q.  Do you recall anything else from that phone conversation?

3   A.  What I can remember.

4   Q.  I'm sorry?

5   A.  This is what I can remember.

6   Q.  That's what you remember?

7   A.  Yeah.

8   Q.  During that phone conversation and the other conversation

9   before the text messages on the screen, did you describe at all

10  what type of scam this job would be?

11  A.  Yes.

12  Q.  What did you tell the defendant about what type of scam it

13  was?

14  A.  He asked me first, "What kind?"  I say, "Alibaba."

15  Q.  The defendant asked you what kind, and you responded

16  "Alibaba"?

17  A.  Yes, that's right.

18  Q.  Is that the same code word you talked about yesterday?

19  A.  Yes, for email compromise.

20  Q.  Did the defendant seem to understand the term Alibaba when

21  you used it?

22  A.  Yes.

23  Q.  Did he ask you what it meant?

24  A.  No.

25  Q.  How did he respond when you told him it was an Alibaba

M9EQraj1                          Adeusi - Direct

1    scam?

2    A.   He was excited.

3    Q.   He was excited?

4    A.   Yes.

5    Q.   Do you remember what he said?

6    A.   He said, he spoke in our language like --

7    Q.   He spoke in Yoruba?

8    A.   No, our language.  That's he said to me like, "Okay, let's

9    start."  I said, "Now."

10          THE COURT:  You have to keep your voice up.  All

11   right.  Say that again.  He spoke in your language and said.

12   A.   He spoke in my language --

13          THE COURT:  You don't need to use your language.  Just

14   tell us what it means.

15   A.   He said, "How soon?  Do it now?  When?  So I can get an

16   account for you."

17          THE COURT:  Just a reminder.  Please keep your voice

18   up.  Make it as if somebody is in the very back of the room,

19   and as if you want them to hear you without a microphone.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  All right?  Thank you.

22   Q.   How did you respond when the defendant asked you excitedly

23   "How soon?"How did you respond to the defendant?

24   A.   I said, "they need it now."

25   Q.   You said they need it now?

M9EQraj1                      Adeusi - Direct

1    A.  Yes.

2    Q.  How did that call end?

3    A.  He just said, "I will get back to you.  I will get the

4    account and get back to you."

5    Q.  After that call, you exchanged WhatsApp messages with the

6    defendant?

7    A.  That's right.

8    Q.  Let's take a look at Government Exhibit 313.  At the top,

9    it says May 27, 2019.

10            The defendant wrote, "Hello."

11            You responded, "Bro, by tomorrow all the info will be

12   ready."

13            What did you mean by that?

14   A.  I made him believe that the job we're about to do is an

15   insider job; that the accountant is in collaboration with me.

16   He is going to help in everything we need to do, but he ask me

17   if he can get some specific information about the transfer.

18   Q.  So to be clear, is that information you had told the

19   defendant prior to these messages; that it's an insider job?

20   A.  Yeah, insider job.  What he wants where is the money coming

21   from, the name of the company, purpose of transfer, why --

22   what's the reason for the money being transferred.  He want

23   this specific information.  He said, "I need this information

24   so that I can tell my people to open the bank and say when to

25   expect the money.  The money is big."

M9EQraj1                        Adeusi - Direct

1    Q.  Let's just break that down.  You told the defendant it was
2    an insider job?  Is that what you said?
3    A.  Yes.
4    Q.  What is an insider job in this context?
5    A.  Okay.  It means that if someone in the company aware money
6    is coming from, that he is conspiring with us.  In particular,
7    once he receive the money, that he's going to do the details of
8    how the money will be moved.
9    Q.  There's someone inside the company who's going to help you
10   steal the money from the company?
11   A.  That's right.
12   Q.  And this is -- this was not a real scam, right?
13   A.  No, it's make up.
14   Q.  But you didn't tell the defendant it wasn't a real scam?
15   A.  No.
16   Q.  After that, do you see a voice mail?
17   A.  Yes.
18   Q.  Let's play that, which is Government Exhibit 313A, and put
19   up next to it Government Exhibit 313A-T.  Just to be clear,
20   that voicemail was sent by the defendant or was it sent by you?
21   Was it sent to you or did you send it out?
22   A.  It was sent by me by Mustapha.
23   Q.  It was sent to you --
24   A.  It was sent to me by Mustapha.
25   Q.  Let's just play that now.

M9EQraj1                          Adeusi - Direct

1                (Audio played)
2     Q.  Mr. Adeusi, do you recognize the voice that was on that
3     recording?
4     A.  That's right.
5     Q.  Whose voice is it?
6     A.  That's Mustapha's voice.
7     Q.  Let's go back to 313, please.
8                After that voice message, the defendant wrote, "Okay."
9                You then wrote, "Because today holiday the guy
10    couldn't access the company info but said by tomorrow morning."
11               The defendant responded, "Okay.  No problem."
12               On May 28, 2019, the defendant wrote, "Good afternoon.
13    Any word?"
14               Mr. Adeusi responded, "Yes.  I wan go cafe pull up the
15    info and text it to you.  I just dey wait person pick me, my
16    car no good."
17               The defendant wrote back, "okay."
18               Mr. Adeusi then wrote, "He send it since 8:00 a.m.
19    today."
20               The defendant wrote back, "God will change everything
21    for the better."
22               Mr. Adeusi then responded, "The account name you are
23    giving me will represent facilitator payment center."
24               Go down, please.
25               "Amen."

M9EQraj1                          Adeusi - Direct

1              The defendant then wrote, "Okay.  We will get slip,

2      correct?"

3              Mr. Adeusi wrote, "Yes."

4              Mr. Adeusi, what did you understand the defendant to

5      mean by "we will get slip"?

6      A.  He wants to make sure that there will be confirmation paper

7      saying that the money was sent at a particular time, that it

8      has arrived, and it was received in the recipient's account at

9      a particular time with a reference number.

10     Q.  And in these schemes, who do you and the defendant get the

11     slip from?

12     A.  The sender send receipt.

13     Q.  The sender, the person who is doing the fraud?

14     A.  Yes.

15     Q.  Doing the email part of the fraud?

16     A.  Yes.

17     Q.  The defendant then wrote, "Okay."

18             You responded, "There will be slip."

19             The defendant wrote, "Okay."

20             You then responded, "But he want you guys to do a memo

21     to your bank that you are expecting."

22             The defendant then wrote, "And we'll get at least two

23     weeks to clean house."

24             Mr. Adeusi, what did you understand the defendant to

25     mean when he wrote, "And we'll get at least two weeks to clean

M9EQraj1                        Adeusi – Direct

1  house"?

2  A.  He was trying to get an assurance that the money will stay

3  in the account for at least two weeks before it goes bad.

4  Q.  What is your understanding of why the defendant would ask

5  that of you?

6  A.  So he will act swiftly, will quickly move the money.  So I

7  told him no, it's going to take one week, which means that he

8  knew he's going to work within three days to move all the

9  money.

10  Q.  What does "clean house" mean?

11  A.  To remove every cent that's wired to the specific account,

12  to move -- to move it to different account or give the people

13  who send the money their own part of the share by moving it to

14  their own share too.

15  Q.  The defendant then responded, "Yes.  No problem."

16          Mr. Adeusi then wrote, "Yes, even to M-I-N-R-H."

17          What did you mean to write there?

18  A.  I was going to say within two months.

19  Q.  The defendant then wrote "Okay."

20          Mr. Adeusi, you then sent a long message with

21  information under the titles "buyer's company representative in

22  America" and "seller's company representative in Malta."

23          What did you want the defendant to think that that

24  was?

25  A.  So I -- the details (indiscernible) that represent the

M9EQraj1                        Adeusi - Direct

1    original company that was supposed to receive the funds, and

2    the details that the seller's company represents the company

3    where the money is coming from in Malta.

4    Q.  Just to be clear, the seller's company was the company that

5    the money was going to be stolen from?

6    A.  Yes, that's right.

7    Q.  That was sending the money.  And the buyer company was the

8    company -- sorry, maybe I have it the other way around.  Let's

9    just be clear.

10          One of these companies was supposed to be the company

11   that the money was coming from.  The other company was the

12   company that's supposed to be receiving the money.  Is that

13   right?

14   A.  That's right.

15   Q.  And what you were proposing to the defendant was that the

16   money is going to be switched from the place it's supposed to

17   go to, to an account that he controls?

18   A.  That's right.

19   Q.  And that was the Alibaba-type of scheme?

20   A.  That's right.

21   Q.  The defendant responded, "Okay."

22          You then wrote, "I give sales product and quantity.

23   Product L S02 degassing system.  Total amount of purchase

24   104.90 million.  Facilitator fees is 2.3 million."

25          Just to be clear, Mr. Adeusi, where did you get these

M9EQraj1                              Adeusi – Direct

1   company names and information?

2   A.  I just Google them.

3   Q.  You just looked stuff up on Google?

4   A.  I Google the information at that time.  Send it to him.

5   Q.  The defendant responded.

6           "Okay.  We only going after facilitator fees."

7           Mr. Adeusi, what did you understand the defendant to

8   mean when he wrote "we only going after facilitator fees"?

9   A.  According to our conversation, I led him to understand that

10  the money that will be going to an account that he control

11  would be 2.3, which is the money assigned for the facilitators

12  of the whole deal.

13  Q.  Of the whole deal?

14  A.  The whole deal.

15  Q.  So the job you described to him, there was a big

16  transaction over a hundred million dollars, a smaller

17  transaction along with it for $2.3 million, and you and he and

18  the other people in the involved would steal the $2.3 million?

19  A.  That's right.

20  Q.  And when the defendant asked you, "We only going after

21  facilitator fees."

22          You responded, "Yes.  The purchase fees go to the

23  company.  We don't have anything to do with that."

24          The defendant responded, "Okay.  Cool."

25          You wrote, "You will give me the account tomorrow?"

M9EQraj1                          Adeusi - Direct

1              The defendant responded, "Yes."

2              You then wrote, "This guys need CIS."

3              Just remind us, what's CIS?

4    A.   The client information sheet.

5    Q.   The defendant responded, "By tonight."

6              You then wrote, "Because the guy wanna leave the

7    company once the Dow."  Is that Dow?

8    A.   Dough.

9    Q.   What does dough mean?

10   A.   Money.

11   Q.   "Once the dough is our."  Then you wrote, "Na insider job."

12   What does "na insider job" mean?

13   A.   Just to give me an assurance that the job was be conducted

14   by somebody works in the company, so it's going to be a hundred

15   percent -- a hundred percent going to be successful.

16   Q.   Let's go down to the next page.

17             Defendant wrote, "question mark, question mark."  Then

18   he wrote, "Okay."

19             Then there's an attachment.  Do you see that?

20   A.   Yes.

21   Q.   Let's just briefly pull up 313B next to this.

22             Mr. Adeusi, is this the attachment that the defendant

23   sent you?

24   A.   Yes.

25   Q.   Just generally what is it?

M9EQraj1                          Adeusi - Direct

1   A.   It's the bank details that I was meant to give to the

2   sender from Europe.

3   Q.   You can take that down.

4           After the defendant sent you the attachment that's

5   marked as Government Exhibit 313B, you responded, "Okay.  Good.

6   But they need the CIS, please."

7           The defendant responded, "I'm working on it."

8           You wrote back, "Okay."

9           The defendant then sent you another attachment.  Can

10  we pull up 313C beside this?

11          Mr. Adeusi, while that's being pulled up, are these

12  the same types of documents that the defendant had provided you

13  in the prior schemes we talked about?

14  A.   Yes, that's right.

15  Q.   Are they also the same kind of documents you have gotten

16  from other people who had provided you accounts --

17  A.   Yes.

18  Q.   -- during your years in the conspiracy?

19  A.   The CIS.  No, I just get account details.  I don't ask for

20  the CIS.

21  Q.   So you hadn't usually got CIS's, but you did get account

22  details from other people?

23  A.   That's right.

24  Q.   And what do we see here on the right?  Is this the client

25  information sheet?

M9EQraj1                           Adeusi - Direct

```
1    A.  Yes.
2    Q.  We can take that down.  Go back to 313.
3            The defendant after sending the attachment wrote,
4    "Confirm you see CIS."
5            Mr. Adeusi responded, "Okay bro.  I don forward
6    everything.  He will send us copy of the job by Monday.  We
7    will get the money too next week end maybe Friday."
8            The defendant responded, "Okay."
9            Mr. Adeusi wrote, "Your people should let it rest for
10   four days.  Nothing dey happen."
11           Mr. Adeusi, what did you mean by "your people should
12   let it rest for four days"?
13   A.  I meant that they should allow the money to stay in the
14   account for at least four days before they start taking it.
15   Q.  Just remind us, what's the point of letting money rest or
16   stay in an account for days or weeks before moving it out?
17   A.  Before -- if money is wired to an account and you go, let's
18   say, the next day to make a wire transfer or make a withdrawal
19   or use an ATM, there's the possibility that the bank can stop
20   it and block it to investigate why you are rushing.
21   Q.  The defendant responded, "I'll finish my end with our bank
22   by morning."
23           You then wrote back, "Na accountant dey do the job."
24   What did you mean by "Na accountant dey do the job"?
25   A.  I was still referring to the insider, who was an accountant
```

M9EQraj1                          Adeusi - Direct

1    at the company.

2    Q.  The defendant responded, "Okay."

3              And you wrote, "Okay.  Good."

4              Then on May 31, 2019, you wrote, "Everything is good

5    bro.  Very good."

6              The defendant responded, "Okay."

7              You then wrote, "He will send me something next week

8    confirmation.  Everything came back good."

9              The defendant responded, "Okay.  Good."

10             Then on June 3, 2019, the defendant wrote, "Good

11   morning."

12             You wrote, "Bro.  Morning."

13             The defendant wrote, "K."

14             You wrote, "Everything dey fine for their end."

15             The defendant wrote, "We all set on our end."

16             You wrote, "Approval is on Thursday."

17             The defendant wrote, "And finding will be next week."

18             You then wrote, "Funds will be credited seven working

19   days after."

20             The defendant wrote, "Okay."

21             You wrote, "So we are good."

22             The defendant wrote, "Okay.  Keep me posted and let's

23   coordinate."

24             You then wrote, "Okay.  The job na very sweet job and

25   no pressure."

M9EQraj1                       Adeusi - Direct

1            We can take this down.

2            Just to be clear, Mr. Adeusi, you kind of came up with

3    this new job to have something to talk about with the

4    defendant?

5    A.   That's right.

6    Q.   And before we move to another topic, let's just listen to

7    one more audio clip.  If we can put up Government Exhibit S-8

8    and focus in on paragraph 1B.

9            Government Exhibits 302 and any subparts (such as

10   302A, 302B, et cetera) are true and accurate copies of a

11   selection of WhatsApp text messages and attachments to text

12   messages exchanged between the Martino-Jean phone and a contact

13   listed in the Martino-Jean phone as Mustapha Raji with the

14   telephone number 305-924-0360.

15           MR. SOBELMAN:  Pursuant to this stipulation, the

16   government offers Government Exhibit 302AB.

17           THE COURT:  Admitted.

18           (Government's Exhibit 302AB received in evidence)

19   Q.   Can we please go to paragraph 4 of the stipulation?

20           THE COURT:  Just to be clear, that's 302A and then

21   302B, correct?

22           MR. SOBELMAN:  No, your Honor, 302AB.  There are a

23   number of attachments to that that have many different letters

24   on them.

25           THE COURT:  Thank you.

M9EQraj1                            Adeusi - Direct

1                MR. SOBELMAN:  I note that in paragraph 4, Government

2      Exhibit 302AB-T is a true and accurate transcript of Government

3      Exhibit 302AB.

4                The government offers Government Exhibit 302AB-T as an

5      aid to the jury.

6                THE COURT:  Admitted, with the same instruction I gave

7       earlier.

8                (Government's Exhibit 302AB and 302AB-T received in

9      evidence)

10     Q.  Please play now Government Exhibit 302AB and display

11     Government Exhibit 302AB-T on the screen while it's played.

12               (Audio played)

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M9E6RAJ2                        Adeusi - Direct

1   Q.  Mr. Adeusi, do you recognize the voice in that recording?

2   A.  Yes.

3   Q.  Who is it?

4   A.  Mustapha.

5   Q.  You can take these down.  Let's move to another topic.

6           Mr. Adeusi, earlier you testified that you decided to

7   cooperate at some point after you were approached by law

8   enforcement; is that correct?

9   A.  That's right.

10  Q.  Why did you decide to cooperate?

11  A.  Well, after I was approached by the agents, I see no way

12  for me to -- to lie anymore.  So I just don't want to destroy

13  myself.  I just feel like -- just come out clean, surrender.

14  Q.  Can you repeat that?

15  A.  After I was approached by agents, I -- I -- I don't want to

16  lie anymore.  I just feel that I should just come out.  I

17  should surrender and take my -- clear for my head.

18  Q.  After deciding to cooperate, did you participate in

19  meetings with the government?

20  A.  Yes.

21  Q.  Approximately how many meetings with the government have

22  you had since August 2018?

23  A.  Almost between 15 and -- less than 15, yes.

24  Q.  Around 15 meetings?

25  A.  15.

M9E6RAJ2                          Adeusi - Direct

1    Q.  During those meetings, did you have to tell the government
2    about all the crimes you committed?
3    A.  Yes.
4    Q.  Did you have to tell them about just crimes the government
5    knew about or all the crimes you ever committed?
6    A.  All the crimes I've ever been involved with.
7    Q.  During those meetings, did you have to tell the government
8    about everyone else you committed crimes with?
9    A.  Yes.
10   Q.  Did you just provide information about the defendant or
11   about other people too?
12   A.  Other people too.
13   Q.  Did you provide information about a couple other people or
14   many other people?
15   A.  Many people.
16   Q.  Did you ultimately enter into a cooperation agreement and
17   plead guilty to certain crimes?
18   A.  Yes.
19   Q.  Did you plead guilty to conspiracy to commit bank fraud and
20   wire fraud?
21   A.  Yes.
22   Q.  What did you do that made you guilty of conspiracy to
23   commit bank fraud and wire fraud?
24   A.  Because I was the link between the people that sent money
25   and the people who received the money on their behalf.

M9E6RAJ2                         Adeusi - Direct

1    Q.   Did you also plead guilty to what's called substantive wire

2    fraud and bank fraud?

3    A.   That's right.

4    Q.   And what did you do that made you guilty of those crimes?

5    A.   By providing assistance and helping the sender of the money

6    and the people receive the money here -- getting proceeds -- to

7    get money back to Nigeria and that's it.

8    Q.   Did you plead guilty to conspiracy to commit money

9    laundering?

10   A.   Yes.

11   Q.   And what did you do that made you guilty of conspiracy to

12   commit money laundering?

13   A.   Because I was helping them to get money out and I was --

14   provide assistance, solutions, and help these people who send

15   this money get their share of the money.

16   Q.   Did you plead guilty to marriage fraud?

17   A.   Yes.

18   Q.   What did you do that made you guilty of marriage fraud?

19   A.   I paid an American citizen to enter into a fraudulent

20   marriage with me.

21   Q.   Did you plead guilty to immigration fraud?

22   A.   Yes.

23   Q.   What did you do that made you guilty of immigration fraud?

24   A.   I filed for American to have a permanent residence -- a

25   green card.

M9E6RAJ2                          Adeusi - Direct

1   Q.  You filed to get a green card?

2   A.  Yes.

3   Q.  And in that application, did you tell the immigration

4   authorities that your marriage was real?

5   A.  Yes, I said my marriage was real, yes.

6   Q.  That was false at that time?

7   A.  Yes.

8   Q.  Did you plead guilty to aiding and abetting the use of an

9   immigration identification document that was not lawfully

10  issued to the user of that document?

11  A.  Yes.

12  Q.  What did you do that made you guilty of that crime?

13  A.  Please, can you repeat the question.  I'm sorry.

14  Q.  Yes.  Did you plead guilty -- withdrawn.

15          What did you do that made you guilty of aiding and

16  abetting the use of an immigration identification document that

17  had not been lawfully issued to the person who used that

18  document?

19  A.  Okay.  One of my family friend who lives here too, he has

20  kids and family, and he has no job, so I give him my work

21  authorizations to get a job so he can feed his family.

22  Q.  Just to be clear, you had a work authorization from

23  immigration authorities?

24  A.  Yes.

25  Q.  And you let a friend of yours use that card?

M9E6RAJ2                        Adeusi - Direct

1    A.   That's right.

2    Q.   And you knew he was using it?

3    A.   Yes.

4    Q.   And you knew it wasn't issued to him?

5    A.   That's right.

6    Q.   And you knew that was wrong?

7    A.   Yes.

8    Q.   Did he pay you so that he could use your card?

9    A.   No.

10   Q.   Why did you let him use it?

11   A.   Just wanted to take care of his family.

12   Q.   Did you plead guilty to destruction of records in a federal

13   investigation?

14   A.   Yes.

15   Q.   And what did you do that made you guilty of that crime?

16   A.   When the agent approached me, I deleted every conversation

17   I had with defendant and every other person who has been in

18   a -- in conspiracy with us with regards to fraud, wire transfer

19   fraud.

20   Q.   And just to be clear, you deleted those messages before you

21   met with the government for the first time; is that correct?

22   A.   That's right.

23   Q.   In connection with your guilty plea, did you enter into a

24   cooperation agreement with the government?

25   A.   Yes.

M9E6RAJ2                          Adeusi - Direct

1    Q.  And what is your understanding of what you have to do under
2    that cooperation agreement?
3    A.  I have to be truthful and I -- at all time.  I have to be
4    available when the government needs me.  I have to -- I cannot
5    do -- commit any crime, cannot get involved in fraud, bank
6    fraud, can't make profit from it, I can't conspire with anyone
7    without the government's approval.
8    Q.  Just to be clear, you have to tell the truth?
9    A.  That's correct.
10   Q.  I believe you said at all times?
11   A.  All the time.
12   Q.  That's when you meet with the government, you have to tell
13   the truth?
14   A.  Yes.
15   Q.  When you testify, you have to tell the truth?
16   A.  Yes, to tell the truth.
17   Q.  And you said you have to attend meetings and be available
18   to meet with the government?
19   A.  That's right.
20   Q.  And you have to testify if you're asked to testify?
21   A.  Yes, that's --
22   Q.  And are you testifying today pursuant to that agreement?
23   A.  Yes.
24   Q.  And I believe you also said you are not allowed to commit
25   any new crimes; is that right?

M9E6RAJ2                        Adeusi - Direct

1    A.   That's right.

2    Q.   If you hold up your end of the agreement and you do those

3    things, what do you expect to get from the government under

4    that agreement?

5    A.   The government will write me a 5K letter.

6    Q.   What is your understanding of what a 5K letter is?

7    A.   That everything I've done with the government will be

8    listed and everything I've done -- everything I've done, all

9    the help I've done, everything I've agreed with, I've done to

10   tell the truth and do other -- all the good things I've done

11   will be included in the letter.

12   Q.   And who does that letter go to?

13   A.   It goes to the judge.

14   Q.   And is that in connection with your sentencing?

15   A.   Come again.

16   Q.   Is that letter sent in connection with your sentencing?  Is

17   that for the judge to consider at your sentencing?

18   A.   Yes.

19   Q.   Okay.  Have you been sentenced yet?

20   A.   No.

21   Q.   Okay.  And the letter that you talked about will include a

22   description of all the crimes you committed?

23   A.   That's right.

24   Q.   And I think you were trying to explain it will also include

25   a description of the cooperation you've provided; is that

M9E6RAJ2                              Adeusi - Direct

1    correct?

2    A.   That's right.

3    Q.   So it would include that you've met with the government,

4    right?

5    A.   Yes.

6    Q.   And that you were truthful, right?

7    A.   Yes.

8    Q.   And in addition to testifying today and giving information

9    about the defendant, you testified that you provided other

10   cooperation as well; is that right?

11   A.   That's right.

12   Q.   To your knowledge, were you able to provide information to

13   the government that helped disrupt a number of other frauds?

14           MR. SCHNEIDER:   Objection.

15           THE COURT:   Sustained as to form.

16   A.   Can you rephrase the question, sorry.

17           THE COURT:   Yes.  He has to.

18   Q.   Yes, and I will.

19           During your cooperation, did you provide -- what types

20   of information about other frauds, unrelated to the defendant,

21   did you provide to the Secret Service?

22   A.   Okay.  Every other fraud that -- anyone who approached me

23   of a fraud and -- and we have been able to recover money that

24   has been returned back to the victims.

25   Q.   Just to be clear, your understanding is the information you

1   provided helped recover money that's gone back to victims?

2   A.  That's right.

3   Q.  And that's something that would be in that letter?

4   A.  Yes, sir.

5   Q.  Do you expect the government's letter to recommend any

6   particular sentence for you?

7   A.  No.

8   Q.  What sentence are you hoping for at the end of this

9   process?

10  A.  I guess -- I -- I don't want to go to prison.  I just want

11  the judge to know I'm a changed person.  I'm a changed person

12  now.  I'm a better person.  I made a mistake.  And if he allow

13  me to -- to -- mercy for my being, I will -- know I'm

14  truthfully be a better person.  I have been helping people to

15  steal money --

16  Q.  Why don't you take a moment, okay?

17  A.  I was bad.

18          THE COURT:  Just wait for a minute, please.  When

19  you're prepared, you can continue.

20  A.  Because people have lost their -- lost their health

21  insurance.  There are divorces.  That happens when you steal

22  moneys from these victims.  Some of them commit suicide.

23  Q.  Just to make sure the jury heard you, what sentence are you

24  hoping to get at the end of this process?

25  A.  I don't want to go to prison.

M9E6RAJ2                        Adeusi - Cross

1   Q.  Will the government's letter change depending on the jury's

2   decision in this case?

3   A.  No.

4   Q.  What is your understanding of what happens under the

5   cooperation agreement if you did not tell the truth at this

6   trial?

7   A.  There won't be any letter for me.

8   Q.  Has anyone told you what sentence you're going to get?

9   A.  I already told them that.

10  Q.  Has anyone promised you any particular sentence?

11  A.  No.

12  Q.  Has the government or anyone else made you any promises

13  about whether you're going to be permitted to remain in the

14  United States?

15  A.  No.

16          MR. SOBELMAN:  One moment, your Honor.

17          No further questions.

18          THE COURT:  Cross-examination.

19          MR. SCHNEIDER:  Yes, your Honor.

20  CROSS-EXAMINATION

21  BY MR. SCHNEIDER:

22  Q.  Do you consider yourself an honest person?

23  A.  Yes, I'm honest person.

24  Q.  And do you consider marriage fraud being an honest person?

25  A.  Well, no.

M9E6RAJ2                          Adeusi - Cross

1   Q.  Do you consider -- and you mentioned a few seconds ago

2   people's insurance was stolen and you helped do that, right?

3   A.  Can you repeat the question?  Sorry.

4          THE COURT:  Can you both move the microphones a little

5   closer to you, please.

6          MR. SCHNEIDER:  Certainly.

7   Q.  You said a few moments ago before you started crying that

8   you helped steal people's money, right?  Didn't you say that

9   just a few moments ago?

10  A.  Can you let me rephrase that?  What I say is I was part of

11  this -- I don't deal with this victims directly.

12  Q.  So, sir, a few moments ago your --

13         MR. SOBELMAN:  May the witness be permitted to finish

14  his answer?

15         THE COURT:  No.  Go ahead Mr. Schneider?

16  Q.  A few moments ago, did you just say you helped steal

17  people's money.

18  A.  Like I said, I said I did not have -- I have zero contacts

19  with all the victims.  What I have done is I have helped

20  provide an account to the fraudsters, whoever is sending the

21  money to whoever receive the money in United States.

22  Q.  I'll ask you again.  We know what you say you didn't, but

23  what you did, was that part of helping steal people's money?

24  A.  That's right, if you say that.

25  Q.  And whatever you did, did you plead guilty to wire fraud?

M9E6RAJ2                          Adeusi - Cross

1    A.   That's right.

2    Q.   And does an honest person commit wire fraud?

3    A.   That's -- let me say this --

4    Q.   Sir, listen to the question.  Do you understand the words?

5    Do you consider stealing people's money -- committing wire

6    fraud an honest act?

7    A.   I did not initiate any of this.  I was just in the middle

8    of this.

9    Q.   Thank you.  So no one is saying you hacked, no one is

10   saying you initiated, no one is saying you dealt with the

11   victims.  But you were part of -- you were knowingly,

12   intentionally helping other people steal money, right?

13   A.   That's right.

14   Q.   And now, before you were approached by law enforcement in

15   August of 2018, you knew that they were looking for you,

16   correct?

17   A.   Yes.

18   Q.   And how did you find out?  How did you learn that federal

19   agents were looking for you?

20   A.   My wife told me then that the agent called -- called and

21   said they were going to come to the office, and she said she's

22   at work, that they should come to the house.

23   Q.   Okay.  So federal law enforcement agents went looking for

24   you, and when you weren't home, spoke to your wife, right?

25   A.   Yes.

M9E6RAJ2                          Adeusi - Cross

1   Q.   Now, was that Yvonne?

2   A.   Yes.

3   Q.   Was that the woman you married, paid to marry?

4   A.   Yeah.  I paid to marry.

5   Q.   And is she the one that's part of the marriage fraud that

6   you engaged in?

7   A.   That's right.

8   Q.   Okay.  So when law enforcement told you -- told your wife

9   to contact them, did you call them?

10  A.   No, they -- they were at the house -- they went to the

11  house.

12  Q.   Yes.  And when they went to your house, you weren't there?

13  A.   She wasn't there, I wasn't at home.  She was at work.  They

14  called her.  Got the number from --

15  Q.   So the federal agents called your wife?

16  A.   Yes.

17  Q.   Did they call you, the federal agents call you on your

18  phone?

19  A.   I can't remember if they called me.

20  Q.   But do you remember calling your wife?

21  A.   Yeah.  I know my wife called me and told me what was going

22  on --

23  Q.   One person at a time.

24            As far as you know, federal agents called your wife?

25  A.   That's right.

M9E6RAJ2                          Adeusi - Cross

```
 1   Q.  And after they called your wife, your wife called you
 2   right?
 3   A.  That's right.
 4   Q.  And your wife told you that federal agents were looking for
 5   you, correct?
 6   A.  That's right.
 7   Q.  Did you know that your wife gave you the names and phone
 8   numbers of any of those agents?
 9   A.  No.
10   Q.  Did you know who the agents were?
11   A.  No.
12   Q.  Did you know what they were calling you about?  You had an
13   idea, right?
14   A.  They didn't tell her what -- why they were looking for me.
15   Q.  I'm sorry.  I'll go slower.
16          As far as they -- when they told your wife, you had an
17   idea what they were looking for you for, didn't you?
18   A.  At that time, I was contemplating why they were looking for
19   me.  I don't know exactly why at that time.
20   Q.  You didn't know exactly what, but you knew that for the
21   last 10 or 15 years you have been committing fraud, right?
22   A.  That's not right.
23   Q.  Well, how many years were you committing fraud before you
24   decided to --
25   A.  2015.  So after a year I moved to the United States.
```

M9E6RAJ2                          Adeusi - Cross

1   Q.  Well, in Nigeria weren't you committing fraud in 2004?

2   A.  I was a CEO in Nigeria.

3          THE COURT:  Say again.

4   A.  I'm a CEO in Nigeria.

5   Q.  Yes.  Whether it was CEO or not, in 2004, weren't you also

6   helping people commit fraud?

7   A.  Well, I don't remember that.

8   Q.  We'll get to that in a while.

9          Now, so at some point after you were told by your wife

10  that law enforcement was looking for you, you did something to

11  your phone, didn't you?

12  A.  That's right.

13  Q.  Did anybody tell you to do that?

14  A.  No.

15  Q.  Did a lawyer tell you to do that?

16  A.  No.

17  Q.  Did any federal agents tell you to do that?

18  A.  No.

19  Q.  On your own, did any coconspirators tell you to do that?

20  A.  No one told me.

21  Q.  So out of your own decision, if you wait a second, before I

22  do anything else, before the police find me, before they check

23  my phone, I'm going to get rid of all incriminating evidence on

24  my phone, right?

25  A.  That's right.

M9E6RAJ2                          Adeusi - Cross

1    Q.  And so you got rid of any text messages you had, correct?

2    A.  That's right.

3    Q.  You got rid of all contact information you had, correct?

4    A.  That's right.

5    Q.  So there was -- contact information means those are the

6    names and numbers in your, like, phone directly, correct?  Is

7    that what you mean by contact information?

8    A.  I deleted messages, not contact.

9    Q.  So you deleted messages, not the contact information?

10   A.  I deleted no contact on my phone.

11   Q.  I'm sorry?

12   A.  I did not delete any contact on my phone.

13   Q.  Okay.  So the messages you deleted were not just from

14   Mr. Raji but from everyone who you thought you had committed

15   crimes with, correct?

16   A.  That's right.

17   Q.  And there was over 20 people probably, different

18   individuals, correct?

19   A.  More than.

20   Q.  More than 20?

21   A.  Yes.

22   Q.  So you got -- you were kind of scared, weren't you?  You

23   were nervous?

24   A.  Now?

25   Q.  No, then?

1    A.  Yes, of course, I was.

2    Q.  Because you didn't know what was going to happen if federal

3    agents came and arrested you.  You didn't know what was going

4    to happen if federal agents came and handcuffed you and

5    arrested you, right?

6    A.  Yes.

7    Q.  So you were afraid; you didn't want that to happen; did

8    you?

9    A.  That's right.

10           THE COURT:  Just keep your voice up, please.

11           THE WITNESS:  Sorry.

12   Q.  Now, after you were told by your wife that agents were

13   looking for you, sometime later -- actually on August 1 of

14   2018, you were physically approached by federal agents,

15   correct?

16   A.  Can you rephrase the question, please.

17   Q.  Sure.  At some point after you knew that -- after you had

18   already deleted the stuff in your phone?

19   A.  Yes.

20   Q.  You got rid of all the incriminating evidence?

21   A.  Yes.

22   Q.  You were -- federal agents approached you, didn't they?

23   A.  Yes.

24   Q.  When I say -- federal agents met with you before you

25   decided to surrender, right?

M9E6RAJ2                        Adeusi - Cross

1    A.  Yes.

2    Q.  And did you give the agents your -- before you decided to

3    meet with the government, when the agents first approached you,

4    you didn't give them your phone; did you?

5    A.  Before I met, I gave them my phone, yes.

6    Q.  No, that was after you met with the government.  I'm

7    talking about when you first were approached by agents on the

8    street.  Before you met with the prosecutors, before you

9    decided to try to surrender yourself, did you give your phone

10   to federal agents?

11   A.  Yes.

12   Q.  Who did you give it to and when?

13   A.  I don't remember when I did, but the first time I met with

14   the agents they got my phone.

15   Q.  I'm sorry?

16   A.  The first time I met with the agent, before I came to

17   New York, he got my phone.

18   Q.  Okay.  Now, is it fair to say that a few days after the

19   agents approached you, you spoke to Mr. Raji in August of 2018?

20   A.  After -- after the agent approached me -- yeah, Raji and I

21   were still talking.

22   Q.  I'm sorry?

23   A.  Raji and I were still talking after the agent approached

24   me.

25   Q.  Him meaning Mr. Raji, you asked Mr. Raji for money?

M9E6RAJ2                        Adeusi - Cross

1   A.   That's right.

2   Q.   And you asked Mr. Raji for money for an immigration lawyer,

3   correct?

4   A.   That's right.

5   Q.   And at that point, when you asked Mr. Raji for money for an

6   immigration lawyer, he told you he would give you money for an

7   immigration lawyer, right?

8   A.   Yes.

9   Q.   And he told you he would recommend a good immigration

10  lawyer for you?

11  A.   That's right.

12  Q.   At that time, after the federal agents were looking for you

13  and when you speak to Mr. Raji about a lawyer, why did you

14  think you needed an immigration lawyer?

15  A.   So, first of all, if you -- in that circumstance, if you --

16  I speak to Raji -- Mr. Mustapha about what was going on.

17  Automatically, I was banished.  If I told him what was

18  happening, I can't tell him that, oh, agent approached me.  You

19  know, I can't say that.  So I went -- I started to --

20  immigration came, and then immigration came to the house.  I

21  had to talk to them and everything, but I didn't tell him that

22  agent came looking for me.  So I give the story of immigration

23  came to the house, that I need you to help me with some money.

24  He said okay, don't worry.  I will give you -- if you go to

25  Florida, I'll pay for it.  I said okay, thank you.

M9E6RAJ2                        Adeusi - Cross

1   Q.  So the fact is he never gave you money, did he?

2   A.  No.

3   Q.  And he never recommended an immigration lawyer for you?

4   A.  That's right.  That's right.

5   Q.  And that upset you; didn't it?

6   A.  Say it again.

7   Q.  That upset you; didn't it?

8   A.  No.  I'm used to him --

9   Q.  You are used to him saying he will do things and not do it,

10  right?

11  A.  No.  I mean, I'm used to him telling -- saying I'll call

12  you back, and he doesn't call back.

13  Q.  Correct.  So you're used to him saying I'll do something

14  and him not doing it, correct?

15  A.  That's correct.

16  Q.  You're used to him saying I'll give you money and not

17  giving you money, correct, correct?

18  A.  Say again.

19  Q.  You are used to him saying to you I'll give you money,

20  don't worry, but he ends up not giving you money.  You were

21  used to that; weren't you?

22  A.  What was the last thing you said?

23          THE COURT:  You were used to that.

24  A.  Yes.

25  Q.  By the way, you said earlier you were involved in about 15

M9E6RAJ2                          Adeusi - Cross

1    or so meetings?

2    A.  That's right.

3    Q.  With the prosecutors and agents, right?

4    A.  That's right.

5    Q.  During those meetings you spoke English, did you not?

6    A.  Yeah, I did.

7    Q.  You didn't have any interpreter, any translator, you spoke

8    English to them all the time, correct?

9    A.  Yes, that's right.

10   Q.  Now, by the way, before you decided in August of 2018 to

11   surrender, to get ahead, so to speak, you knew someone named

12   Bones, a nickname, B-O-N-E-S?

13   A.  Yeah, yeah.

14   Q.  And bones is someone you had dealt with in these scams,

15   correct?

16   A.  Bone --

17   Q.  This is the question, sir:  Did you deal with Bones during

18   your scams, yes or no?

19   A.  Say again.

20   Q.  Scams, schemes, thievery, fraud?

21   A.  Yeah, that's right.

22   Q.  And at some point, you also knew someone named

23   Raymond George, correct.

24   A.  That's right.

25   Q.  Also someone else who you have been dealing with in your

1   scheme, your fraud, correct?

2   A.  Yes, that's right.

3   Q.  Didn't Raymond George tell you that Bones was arrested and

4   was cooperating with the government?

5   A.  I don't remember him telling me that.

6   Q.  No?  Now, you told the jury and the government and

7   everybody -- sorry -- that you met with them about 15 or so

8   times, right?

9   A.  Yes.

10  Q.  Now, the fact is the first time you met with them

11  officially with agents and prosecutors was on August 31, 2018;

12  does that sound right?

13  A.  Yes.

14  Q.  And, in fact, you had a lawyer with you, correct?

15  A.  That's right.

16  Q.  Gentleman by the name of Glenn Fogle?

17  A.  That's correct.

18  Q.  He was a private lawyer you had paid for?

19          MR. SOBELMAN:  Objection.

20          THE COURT:  Sustained.

21          MR. SCHNEIDER:  Well, I misunderstand, your Honor.

22  Q.  He's a lawyer you obtained.  He wasn't an assigned lawyer.

23  Someone you used money to obtain?

24          MR. SOBELMAN:  Objection.

25          THE COURT:  Do you understand the ruling?

1       MR. SCHNEIDER:  I do not, but I'll move on.

2               THE COURT:  The ruling I made, you can't ask the

3       question.

4               MR. SCHNEIDER:  Oh, I understand that part.

5               THE COURT:  Okay.  Next question, please.

6  Q.  Now, is it fair to say that August 31, 2018, the very first

7  time that you were speaking to the government, they told you

8  you have to tell the truth, right?  The very first time that

9  you were speaking to the government on August 31st of 2018, you

10 were told to tell them the truth, right?

11 A.  Yes.  I was asked to be truthful.

12 Q.  And they -- a few moments ago, you said that you gave them

13 information, not just about what you did, but what other people

14 committed crimes with, also, right, other people who you

15 committed crimes with, correct?

16 A.  That's correct.

17 Q.  And isn't it fair to say --

18              MR. SCHNEIDER:  3501-002, Page 5.

19 Q.  -- didn't you tell the government on August 31 of 2018,

20 that George, meaning Raymond George, told you that Bones was

21 arrested and was cooperating with authorities?

22              MR. SOBELMAN:  Objection.  Hearsay.  Relevance.

23              THE COURT:  Overruled.

24 Q.  Didn't you say that to the prosecutors back then?

25 A.  I don't -- there were many names that was part of my --

M9E6RAJ2                          Adeusi – Cross

1    people I told I have dealings with.  But I can't remember if --

2    that George told me Bone was cooperating.  I can't remember me

3    saying that George told me that Bone was cooperating with the

4    government.

5    Q.  Well, so you say right now that you don't know if you told

6    the government that?  You don't remember that?

7    A.  I don't remember, yes, yes.

8    Q.  Well, let me ask you, did Raymond George ever tell you that

9    Bones was arrested and cooperating with the authorities?

10   A.  I don't remember.

11   Q.  Well, in addition to August 31, you also met with the

12   government on February 13 of 2019, okay, during one of your --

13   you said one of your proffer sessions?

14   A.  Okay.

15   Q.  Yes?  Isn't it a fact on that date, on February 13 of

16   2019 --

17            MR. SCHNEIDER:  It's 3501-10, Page 4.

18   Q.  -- you told the government that Raymond told you that Bones

19   had been arrested.  Did you say that to the government in

20   February of 2019, or you don't remember that either?

21   A.  Can't remember.

22   Q.  You don't remember?

23            THE COURT:  Just keep your voice up, please.

24   A.  Yes, sir.  I can't remember.

25   Q.  Now, during your proffer sessions with the government, you

M9E6RAJ2                          Adeusi - Cross

1    were given what's called a proffer agreement?

2    A.  That's right.

3    Q.  And that's a document that explains your rights and your

4    obligations, correct?

5    A.  That's right.

6    Q.  And you reviewed that proffer agreement with the lawyer

7    that you were with, right?

8    A.  Yes.

9    Q.  And, by the way, every time you met with the government,

10   until you ultimately signed up as a cooperator, you had

11   counseled with a lawyer; didn't you?

12   A.  Yes.

13   Q.  And you were told, were you not, that you should not tell

14   anybody else that you're meeting with the government, right?

15   A.  The government didn't tell me that.

16   Q.  The government never told you that?

17   A.  No.

18   Q.  The government never told you you should keep your meetings

19   to yourself?  They never told you that?

20   A.  I keep my meetings to myself.  I didn't --

21   Q.  I didn't hear that.

22   A.  I didn't need the government to keep the meeting to myself

23   because I was keeping the meeting to myself.

24   Q.  I know you may know it, but you said the government never

25   told you that.

M9E6RAJ2                        Adeusi - Cross

1          MR. SOBELMAN:  Objection.  Asked and answered.

2          THE COURT:  Sustained.

3   Q.  Now, do you have a spiritual adviser, sir?

4   A.  Do I have what?

5   Q.  A spiritual adviser.

6   A.  Spiritual?

7   Q.  Do you have a spiritual -- do you know what a spiritual

8   adviser is?

9          THE COURT:  Spiritual adviser.

10  A.  Yes, I do.

11  Q.  You have one, right?

12  A.  Yeah, yes.

13  Q.  And that person, is it a man or a woman?

14  A.  I have multiples of people that --

15  Q.  You have multiple?

16  A.  Yes.

17  Q.  Okay.  And did you have a spiritual -- do you still have

18  now?

19  A.  Yes.

20  Q.  A spiritual adviser in Nigeria?

21  A.  I have here, I have Nigeria.

22  Q.  Did you have one in Nigeria?

23  A.  I do have in Nigeria, yes.

24  Q.  Did you speak to that spiritual adviser in the last few

25  days?

M9E6RAJ2                              Adeusi - Cross

1    A.  I do.

2    Q.  Yes?

3    A.  Yes.

4    Q.  Okay.

5                THE COURT:  Just keep your voice up, please.  A

6    reminder to both of you, wait for the question to finish and

7    wait for the answer to end.

8    Q.  Did you call the spiritual adviser last week?

9    A.  Yes, sir.

10   Q.  And did you tell the spiritual -- did you tell that person

11   that you had a dream?

12   A.  Yes, sir.

13   Q.  And did you tell the spiritual adviser that if you tell the

14   truth in this case, you will have a way forward?

15   A.  Yes, sir.

16   Q.  And did the spiritual adviser tell you that if you are to

17   lie, you would perish?

18   A.  That's right.

19   Q.  Now, did the spiritual adviser know that you were

20   testifying?

21   A.  Yes, that's right.

22   Q.  Okay.  So you spoke and you did, in fact, convey to someone

23   other than law enforcement that you were testifying,

24   cooperating with the government, right?

25   A.  Because spiritual adviser and the people who have kept me

M9E6RAJ2                          Adeusi – Cross

1   here to date because they have been praying with me, they
2   have -- I've told them what I've done, the bad things I got
3   involved in.  Only God can forgive me.  So they be praying with
4   me, asking God for mercy on my behalf and asking for
5   forgiveness for all the bad things I got involved with.
6   Q.  When was the first time you asked the spiritual adviser for
7   forgiveness for all of your sins?
8   A.  Since this case started, I have been --
9   Q.  Since you got arrested?
10  A.  Yes, sir.
11  Q.  All right.  Did you speak to your spiritual adviser in 2015
12  when you were scamming people out of their money?
13  A.  No.
14  Q.  Did you speak to a spiritual adviser in 2016, '17, and '18
15  up and through August when you were stealing people's money --
16  when you were helping steal people's money?
17  A.  When I?
18  Q.  Did you speak to your adviser when you were stealing
19  people's money before you became a cooperator?
20  A.  Say it again.  Sorry.
21  Q.  Did you speak and seek advice from your spiritual adviser
22  before you became a cooperator for the government?
23  A.  No.
24  Q.  So you were -- withdrawn.
25          Now, when you go in to proffer with the government,

M9E6RAJ2                        Adeusi - Cross

1   and you signed what's called a proffer agreement that you

2   talked about, right?

3   A.   Yes.

4   Q.   And that proffer agreement is specifically not a

5   cooperation agreement, is it?

6   A.   That's right.

7   Q.   What?

8   A.   It was not a cooperation agreement.  That's right.

9   Q.   And the whole goal of proffering, from your perspective, is

10  to see if the government will want to use you as you a

11  cooperator, right?

12  A.   Yes.

13  Q.   So they have to see if they hear what you have to say,

14  right?

15  A.   I guess so, yes.

16  Q.   They make a decision to see if they think the information

17  you have could help them going forward, right?

18  A.   You know, I don't know that.

19  Q.   Okay.  But you know from your perspective, when you go in,

20  you want them to use you and sign you up and accept you as a

21  cooperator somewhere down the road, right?

22  A.   I just want to say the truth, surrender.

23  Q.   I know.  I understand that.  But when you're telling the

24  truth and surrendering, are you hoping that the government will

25  sign you up as a cooperator?

M9E6RAJ2                          Adeusi – Cross

1    A.   Yes.

2    Q.   Because if you don't get signed up as a cooperator, you

3    have to face federal charges of wire fraud, bank fraud,

4    marriage fraud, et cetera, right?

5    A.   Yes.

6    A.   Yes, that's right.

7    Q.   Now, the first time you proffered, I think you agreed, that

8    was August 31, 2018, correct?

9    A.   Correct.

10   Q.   And then you ultimately signed -- the government agreed to

11   give you a cooperation agreement, right?

12   A.   Right.

13   Q.   They sent a cooperation letter to your lawyer who reviewed

14   it with you, correct?

15   A.   Correct.

16   Q.   And at that point, you signed the cooperation agreement.

17   One second.   You signed the cooperation agreement.   The first

18   one was April 10 of 2019.   Does that sound about right?

19   A.   I don't remember the date, but if you say that, that's the

20   date.

21   Q.   But you know it was sometime the next year.   It wasn't

22   sometime in 2019 when you signed the cooperation agreement?

23   A.   Yes.

24   Q.   In that cooperation agreement where you had agreed that you

25   would plead guilty to eight different charges, different

M9E6RAJ2                          Adeusi - Cross

```
 1    counts, right?
 2    A.  Right.
 3    Q.  Conspiracies, wire fraud, bank fraud, marriage,
 4    immigration, things you spoke about a few moments ago, right?
 5    A.  Yes.
 6    Q.  And that agreement told you that you were facing possibly
 7    145 years in jail if you were convicted of all of those
 8    charges, possibly, correct?
 9    A.  Correct, sir.
10    Q.  And part of that agreement, you agreed to make was what's
11    called restitution, to pay some victims back, correct?  That's
12    in the agreement, isn't it?
13    A.  Yes.
14    Q.  And there's also in the agreement forfeiture, which means
15    giving up, surrendering any money or property you have that's
16    as a result of the illegal activity that you engaged in,
17    correct?
18    A.  Correct, sir.
19    Q.  Correct?
20    A.  Yes, sir.
21    Q.  And the government asked you a while ago, saying that there
22    were no promises made to you; is that right?
23    A.  Yes, sir.
24    Q.  And your sentence doesn't depend on what the jury does or
25    doesn't do, correct?
```

M9E6RAJ2                        Adeusi – Cross

1   A.  Yes, sir.

2   Q.  But I think the words you said -- the government asked you

3   what you hoped for, what you expect, what you expect to get.

4   Is that correct, and you are hoping not to go to jail?

5   A.  Yes, sir.

6   Q.  Now, isn't it fair to say that when you say that your job

7   is to tell the truth, the government decides to give you a

8   letter or not, right?

9   A.  Can you please rephrase this, please?

10  Q.  I'm sorry?

11  A.  Can you rephrase the question, please?

12  Q.  Sure.  The only question -- the only -- withdrawn.

13          You said a few moments ago that you hope the

14  government will write a 5K letter, right?

15  A.  That's right.

16  Q.  So that 5K letter -- excuse me, is only written if the

17  government believes that you provided substantial assistance,

18  right?

19  A.  Yes.

20  Q.  And that 5K letter is written by the government only if

21  they believe that you've been truthful, correct?

22  A.  Yes, sir.

23  Q.  It's not up to the judge to decide if you've been truthful

24  and write a 5K, is it?  The judge is not involved in the 5K

25  letter, is he?

1    A.  No.

2    Q.  The jury doesn't decide about a 5K letter, do they?

3    A.  No.

4    Q.  So the only one deciding who to write -- whether or not

5    they will write that 5K letter to give to the judge is the

6    government; is that right?

7    A.  That's right.

8    Q.  And if the government decides that you have not been

9    providing substantial assistance, they can decide not to write

10   that 5K letter, is that right?

11   A.  That's right.

12   Q.  Now, as a result of you signing that cooperation agreement,

13   on August 26 of 2019, you pled guilty, right?

14   A.  Yes, sir.

15   Q.  And you pled guilty in front of a magistrate judge, right?

16   A.  Yes, sir.

17   Q.  And, by the way, when you pled guilty, that was in open

18   court, right?

19   A.  Yes.

20   Q.  You had a lawyer with you, didn't you?

21   A.  I do.

22   Q.  And when you pled guilty, you were speaking to the judge

23   and she was speaking to you in English; is that right?

24   A.  That's right.

25   Q.  You didn't have any translator, an interpreter, it was

M9E6RAJ2                          Adeusi - Cross

1    English, everybody spoke English, right?

2    A.   Yes.

3    Q.   And as you began to begin what's called a plea process, the

4    guilty plea process, the judge's clerk placed you under oath;

5    is that right?

6    A.   That's right, sir.

7    Q.   The judge's clerk had you raise your right hand and swear

8    to tell the truth?

9    A.   Yes, sir.

10   Q.   And the Judge asked you questions about your health, about

11   your schooling to make sure you understood what was happening?

12   A.   Yes.

13   Q.   Did the judge ask you questions about whether you had

14   conversations with your lawyer and know what was about to

15   happen to you?

16   A.   No.

17   Q.   The judge didn't ask if you were conferring with your

18   lawyer before you pled guilty?

19   A.   Oh, yes.

20   Q.   And the judge wanted to make sure that your mental state

21   was okay before she would accept the guilty plea, right?  She

22   wanted to make sure you were feeling okay, right?

23   A.   The judge didn't ask me that question.

24   Q.   Didn't the judge ask if you had taken any medication,

25   right?

M9E6RAJ2                        Adeusi - Cross

1    A.  Well, it's been a long time, sir.  I really don't remember.

2    I don't remember.

3    Q.  The judge asked you a bunch of questions to make sure you

4    understood what was happening, right?

5    A.  Yes, well, I don't know if that was part of the question.

6    I can't remember if I was asked by the judge.

7    Q.  I don't understand you.

8    A.  Those particular references that you just made mention of,

9    I don't remember being asked by the judge at the time.

10   Q.  Well, do you remember the judge asking you about your

11   education?

12   A.  I don't remember, sir.  Sorry.

13   Q.  You don't remember telling the judge that you went to

14   school in Lagos, Nigeria?

15   A.  I don't remember.

16   Q.  You don't remember that?

17   A.  I don't remember.

18   Q.  You don't remember any conversations at all -- this is you

19   pleading guilty to eight separate counts of federal felonies.

20   Do you remember that?

21   A.  I remember that.

22   Q.  And -- well, at some point -- though, under oath, the judge

23   asked you what you did that makes you guilty of all the charges

24   you pled guilty to, right?

25   A.  The charges were read in court, and would say -- and I

M9E6RAJ2                          Adeusi - Cross

1    pleaded guilty.

2    Q.  You pleaded guilty you, you said you read -- you and your

3    lawyer prepared what's called an allocution, a piece of paper,

4    that you are allowed to read to the judge, correct?

5    A.  I didn't read it to the judge that day.

6    Q.  You didn't what?

7    A.  I did not read anything to the judge that day.

8    Q.  So you just -- you told the judge what you had done?

9    A.  So someone was reading these charges in court, and I was

10   saying guilty, I think the judge was -- was saying it.  I was

11   saying guilty.

12   Q.  Well, in addition to the judge saying guilty, you -- when

13   the judge asked you if you did certain things and you said,

14   yes, I'm guilty, right?

15   A.  Yes.

16   Q.  Well, didn't the judge at some point say to you, tell me in

17   your own words what you did that makes you guilty.  And then

18   you said to the judge what you did.  You don't remember that?

19   A.  I don't remember if I've ever, if I recall I did -- if I

20   ever read anything to the judge.  If that happened, I don't

21   remember.

22   Q.  Well, isn't it a fact that on -- that on August 26 --

23   August 26, 2019, when you were under oath, the Court, the judge

24   — not this judge, a different judge — said to you, tell me in

25   your own words what you did that makes you guilty of these

M9E6RAJ2                          Adeusi - Cross

1    crimes.  And you, the defendant, said between about 2015 to

2    2018, I knowingly assisted other individuals who I knew had

3    illegally paid money to two different types of fraudulent

4    schemes.  I did so by obtaining bank accounts from individuals,

5    money obtained by fraud, and then the judge asked you to slow

6    down.  And then you kept talking.  You said I did this -- this

7    is you talking?

8    A.   Okay.

9    Q.   Not the judge.

10            I did so by obtaining bank accounts through other

11   individuals so that the money obtained by fraud could be

12   deposited into the accounts and transferred to accounts in

13   Nigeria.

14            I used a cell phone to communicate with the other

15   members of the conspiracy.  And funds were, at times, wired

16   into the various accounts.  The different bank accounts

17   obtained funds which were obtained to fraud.  I was aware that

18   more than $10,000 was deposited into the account that I

19   obtained.

20            You continue talking.

21            In about 2015, I paid a U.S. citizen to marry me so I

22   could obtain legal status in the United States.  I then signed

23   and filed forms with the U.S. immigration authorities

24   pretending I was legally married to a U.S. citizen.

25            And then you continued talking.

M9E6RAJ2                    Adeusi - Cross

1              From about October 2017 to August 2018, I let other

2       individuals use my work authorization card so they could work

3       in the United States because they did not have a work permit.

4              Then you continued.

5              In or about August 2018, I got information from a

6       cell phone when I became aware that federal enforcement agents

7       were looking for me.

8              When I did all of these things, I knew that what I did

9       was wrong and against the law.  I'm sorry.

10             Did you say that to the judge under oath?

11             THE COURT:  Hold on.

12      A.  I'm trying to understand if I stood and read those

13      confession to the judge.

14      Q.  Okay.  Listen, sir.

15             THE COURT:  The question is:  Did you say those things

16      to the judge.

17      A.  Yes, yes, I --

18             THE COURT:  Sorry.  Just hold on.  Yes, the answer is,

19      yes, you said those things to the judge?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Very good.  Next question.

22      Q.  And we'll continue later on.  During this plea allocution

23      with the judge, the judge asked you -- this is Page 18 -- Page

24      30.

25             This is the judge asking you:  Was the purpose of

M9E6RAJ2                        Adeusi – Cross

1    paying your spouse to marry you to evade the immigration laws,
2    and you said yes, your Honor.  And then the judge said,
3    continuing, in connection with this marriage fraud, you're also
4    charged with Count Six, with immigration fraud.  You had to
5    complete some paperwork to give to the U.S. government related
6    to immigration status.  You said that you completed that
7    paperwork, and it contained information that you knew was
8    false; is that correct?  And you said that's right, your Honor.
9            Did you say that?
10   A.  That's right.
11   Q.  The judge continued further down.  Did you know that paying
12   somebody else to marry you for purposes of violating the
13   immigration laws was unlawful?  You said, yes, I knew it was
14   unlawful.
15           Did you say that to the judge?
16   A.  Yes, sir.
17   Q.  Now, all those things you said was after the judge put you
18   under oath?
19   A.  That's right, sir.
20   Q.  What?
21   A.  That's right, sir.
22   Q.  Now, you mentioned yesterday this thing called romance
23   fraud, right?
24   A.  Yes.
25   Q.  Is that -- if I remember correctly, that's when some people

1   go online to try to trick other people into some kind of a

2   relationship so they could send them money?

3   A.   That's right.

4   Q.   They can kind of like make believe they're available, that

5   they're looking for a relationship?

6   A.   Yeah, you're right.

7   Q.   You try to get the victim to believe the scammer, right,

8   the fraudsters?

9   A.   Right.

10   Q.   And that point, it continues for a period of time during

11   this romance fraud, and you hope that you will -- one hopes to

12   get the victim to begin to have feelings for the other -- for

13   the fraudsters, right?

14   A.   Yes, sir.

15   Q.   And you want to have feelings so they will be comfortable

16   enough to send that person as much money as you can get out of

17   them?

18   A.   Yes, sir.

19   Q.   Now, speaking of marriage fraud again, you came to this

20   country in -- on April 14 of 2014, right?

21   A.   Yes, sir.

22   Q.   And when you first came here, you were here legally, were

23   you not?

24   A.   I was here legally.

25   Q.   You came here legally, L-E-G-A-L, not illegally, legal?

M9E6RAJ2                         Adeusi – Cross

1   A.   That's right, sir.

2   Q.   About a year or so later, about a year and a half later,

3   you married someone named Yvonne Robinson?

4   A.   Yes, sir.

5   Q.   And you paid Yvonne Robinson money to marry her?

6   A.   Yes.

7   Q.   You gave her some money, some in cash and some in an

8   account?

9   A.   Yes.

10  Q.   Now, that was purely for the purpose of being able to try

11  to stay here and tell immigration, I'm married to a citizen,

12  right?

13  A.   Yes.

14  Q.   And you met her at a party, right?  You met her at a party?

15  A.   Yes.

16  Q.   Now, is it fair to say that after a period of time, you

17  began to develop feelings for Ms. Robinson?

18  A.   Yes.

19  Q.   That it started out as a fake marriage, and then you

20  believed it was real?

21  A.   Yes, sir.

22  Q.   By the way, do you still have a wife in Nigeria?

23  A.   No, I don't.

24  Q.   Did you have a wife in Nigeria when you were married to

25  Yvonne Robinson?

M9E6RAJ2                        Adeusi - Cross

1    A.  No, I do not.

2    Q.  Did you ever have a wife in Nigeria before you married

3    Yvonne Robinson?

4    A.  When I came to the United States, I came to America in 2014

5    with -- we came together.  My wife then got here before I

6    came.  So when I came, I was still living with my wife that

7    left Nigeria together.

8    Q.  So the wife you had in Nigeria came with you to the

9    United States?

10   A.  Yeah, came -- we didn't came together.  Came -- came first,

11   then I came later.

12   Q.  And was she here with you when you married Yvonne Robinson?

13   A.  She -- yeah, before I married Yvonne Robinson we already

14   were divorced.

15   Q.  Now, you told us a few moments ago that you had pled guilty

16   under oath to a number of these different crimes, specifically

17   marriage fraud and immigration fraud, right?

18   A.  That's right.  That's right.

19   Q.  But as time went on, about a year or so later, in 2020, you

20   began to have second thoughts about whether or not you wanted

21   to continue to cooperate with the government, right?

22   A.  That's right.

23   Q.  And you began to rethink what you had done, you were

24   sitting somewhere at some time and you were believing that you

25   really had not committed marriage fraud, right?

M9E6RAJ2                           Adeusi - Cross

1    A.  No, marriage fraud.  Marriage fraud was committed.

2    Q.  I know it was committed.  But at some point in October of

3    2020, you believed that you did not commit marriage fraud,

4    didn't you?

5    A.  That's right.

6    Q.  And you also believed in October 2020, that you did not

7    commit immigration fraud, right?

8    A.  No.  Immigration was committed.

9    Q.  Well, at some point, you said on October 15 of 2020, you

10   and your lawyer had a phone call with certain members of the

11   prosecution, right, with Mr. Sobelman and another prosecutor

12   who's not on the case now?

13   A.  Can you please repeat the question?

14   Q.  On October 15 of 2020, October 15 of 2020, you and your

15   lawyer had a conference call with two prosecutors?

16   A.  That's right.

17   Q.  And during that call, there was a discussion because you

18   wanted to withdraw, take back your guilty plea, right?

19   A.  That's right.

20   Q.  And you were discussing with your lawyer and the

21   prosecutors that you wanted to go to trial to contest the

22   different charges, right?

23   A.  That's right.

24   Q.  And at one point during the conversation, a prosecutor, not

25   one of these here, but a different prosecutor, told you that

M9E6RAJ2                        Adeusi - Cross

1   you were doing great as a cooperator, right?

2   A.  No.

3   Q.  Do you know the name Dina McLeod?

4   A.  I know Dina.  I know what Dina is --

5   Q.  One at a time.

6           Do you know the name Dina McLeod?

7   A.  I know Dina McLeod.

8   Q.  All right.  She was a prosecutor on this case from the

9   beginning?

10  A.  Yes, sir.

11  Q.  And do you remember Dina saying to you on this phone call

12  you're doing great as a cooperator?

13  A.  I remember what she told me after I --

14  Q.  Listen to that question.  Very simple question.  We'll get

15  to what she said later.

16          Did she say to you you were doing great as a

17  cooperator?

18  A.  No, sir, she didn't say that.

19  Q.  Did she say to you that you will get -- she believes you

20  will get a great 5K letter?

21  A.  No, I -- at the time, I don't even know a 5K.  I just --

22  Q.  Sir, October of 2020, you already pled guilty, right?

23  A.  Yes, sir.

24  Q.  You already signed the cooperation agreement?

25  A.  That's right, sir.

M9E6RAJ2                         Adeusi - Cross

1    Q.  You were beginning to cooperate, give information to the

2    government, right?

3    A.  Yes, sir.

4    Q.  So you knew what a 5K letter was, right?

5    A.  No.  No.  At the time, nobody told me about 5K letter.

6    Q.  Okay.  Sir --

7    A.  Recently.  That's when I found out 5k.

8    Q.  When?

9    A.  Recently, few days ago.

10   Q.  Okay.  I want to show you a cooperation agreement?

11   A.  Okay, sir.

12   Q.  I'm going to show you the first cooperation agreement.

13   Perfect.  This is 3501-011.

14           MR. SCHNEIDER:  May I approach the witness, your

15   Honor?

16           THE COURT:  You may.

17   Q.  Do you recognize that document?

18           THE COURT:  Can you question from the podium, please?

19           MR. SCHNEIDER:  Sorry, your Honor.

20   A.  Yes, sir.  Yes, sir.

21   Q.  Was that, in fact, your signature on the last page?

22   A.  Yes, sir.

23   Q.  And that's the cooperation agreement that you entered into

24   with the government back in 2019, right?

25   A.  Yes.

M9E6RAJ2                          Adeusi - Cross

1    Q.   I'm sorry?

2    A.   Yes, sir.

3    Q.   And that's the agreement that tells you what you are

4    supposed to do; that's the agreement that talks to you about

5    the different charges you pled guilty to, right?

6    A.   Yes.  Yes, sir.

7    Q.   And that's the agreement that talks to you about -- you

8    have to tell the truth, right?

9    A.   Yes, sir.

10   Q.   Why don't you look at Page 4 of that agreement?  By the

11   way, is that the agreement you reviewed with your lawyer,

12   right, before you signed it?

13   A.   Yes.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M9EQraj3                          Adeusi - Cross

1    BY MR. SCHNEIDER:   (Continued)

2    Q.  And you understood it, right?

3    A.  I do.

4    Q.  So look at page 4.

5    A.  Yes.

6    Q.  Look at the very last paragraph on page 4.

7    A.  Okay?  I'm there.

8    Q.  Just read the last couple sentences starting with "in

9    addition."  Don't read it out loud.

10   A.  "This office" --

11   Q.  No.  Read it to yourself, please.

12          THE COURT:  Read it to yourself.  Just read in your

13   head, please.

14   A.  Okay.  "This office" --

15   Q.  No, not out loud.

16          THE COURT:  Don't read it out loud.  Just read to

17   yourself.

18          THE WITNESS:  Yes.

19   Q.  Isn't it a fact that on page 4, the last sentence on page 4

20   specifically talks about a 5K letter, doesn't it?

21   A.  Yes.

22   Q.  Right, doesn't it?

23   A.  Yes.

24   Q.  Doesn't it specifically say that the office, if the

25   government decides or determines that you provided substantial

M9EQraj3                        Adeusi - Cross

1    assistance, and if you fully complied, they will file a motion

2    pursuant to Section 5K1.1.  Doesn't that agreement say that?

3    A.   That's right.

4    Q.   So this is an April of 2019, right?

5    A.   Yes.  Yes.

6    Q.   So in April of 2019, you knew about a 5K letter, didn't

7    you?

8    A.   I knew if I don't lie, if I don't do any more fraud, if I

9    do everything honestly, I was going to -- I didn't know they

10   call it 5K letter, but I would get a recommendation or

11   something.  I would get a light sentence, I know that.  I don't

12   know then it was called 5K.  I wasn't focused on the 5K, that

13   word.  Everything that comes with a 5K was what I been told.  I

14   know truthfully, don't commit any fraud.  Don't do anything

15   again bad, then you will get a light sentence, like that.

16   That's it.  That's what I know.  I don't know about 5K.  I

17   don't know it was called 5K.

18   Q.   When the judge asked you when you had pled guilty if you

19   reviewed the cooperation agreement with your lawyer, and you

20   said yes, and when the judge asked you if you understood it,

21   and you said yes, and the cooperation agreement specifically

22   has the words 5K1.1, you don't remember that?

23             MR. SOBELMAN:  Objection.  Compound.

24             THE COURT:  Sustained as to form.

25             Hold on, Mr. Adeusi.  Just wait for a new question.

1   Q.  So I want to refer back to the October 15, 2020

2   conversation that you, your lawyer, and the prosecutors had.

3   At some point, you were worried, were you not, about your

4   immigration status if you didn't cooperate, right, because you

5   knew you'd get deported, right?

6   A.  Please repeat your question.

7   Q.  Were you afraid you would get deported with these felony

8   convictions?  Were you concerned about that?

9   A.  Yes, I was concerned about that.

10  Q.  At one point during the conversation with the prosecutors,

11  your lawyer asked about what's called an S1 visa.  Have you

12  ever heard of that?

13  A.  No, sir.

14  Q.  No?

15  A.  No.

16  Q.  You never heard of an S1 visa which would allow you to stay

17  in the country under certain circumstances even if you pled

18  guilty?

19  A.  Sir, I might forget.  This is a long --

20  Q.  Well, this is your life you're talking about.  You don't

21  want to go back to Nigeria, do you?

22  A.  I don't want to go back.

23  Q.  You want to stay here, right?

24  A.  That's right.

25  Q.  You want to do whatever you can to stay in this country,

M9EQraj3                          Adeusi - Cross

1   correct?

2   A.  I want to protect myself.

3              THE COURT:  Hold on.  First of all, keep your voice

4   up.

5              Second of all, wait for the answer to finish before

6   you ask a question.  Thank you.

7   Q.  Didn't the government say that they would look into the

8   possibility, no promises, but the possibility of getting you an

9   S1 visa for you to stay in the country?

10  A.  No, sir.

11  Q.  Never said that?

12  A.  No.

13  Q.  Okay.  Did the prosecutors specifically say to you that you

14  may be eligible to hold off your removal, your deportation for

15  a period of time?

16  A.  No, sir.

17  Q.  No?  Did the prosecutors tell that you this particular

18  prosecution was not an effort to try to have you removed from

19  the United States?  Did they tell you that?

20  A.  Please, can you it rephrase, please?

21  Q.  Sure.  When you had this conversation -- when you decided

22  -- you were thinking about trying to take your plea back, this

23  conversation about taking your plea back, correct, right?  This

24  conversation on October 15 of 2020 was about the possibility of

25  you withdrawing, taking back your guilty plea, right?

M9EQraj3                    Adeusi - Cross

1  A.  That's right.  That's right.

2  Q.  So during that conversation, isn't it fair to say that the

3  government lawyers were trying to convince you not to do that;

4  they were trying to tell you don't try to take your plea back?

5  A.  Can I just explain, please?

6  Q.  No.  Answer the question, please.

7  A.  Yes, that's what I'm trying to do.

8  Q.  The question is --

9  A.  I know.

10 Q.  -- during the meeting in October 15 of 2020, on the

11 telephone with your lawyer and the prosecutors, weren't they

12 trying to convince you not to try to take your plea back?

13         THE COURT:  The question is, did you understand that

14 that is what the prosecutors were doing?  Did you understand

15 that they were trying to persuade you not to take your plea

16 back?

17 A.  No, they asked me why.  Why.  And I explained.

18 Q.  Well, you explained why by saying that you didn't think you

19 committed marriage fraud, right?

20 A.  No, I said that I did not go to the victim.  I never had

21 contact with the victim.  I was just the middleman.

22 Q.  You didn't --

23 A.  I never contacted a victim.  I never had contact with the

24 victims.  I never opened bank accounts.  I never use my ID or

25 fake ID's to go to the bank to steal money; that it shows that

M9EQraj3                         Adeusi - Cross

1    I'm not guilty.  So Dina told me that's a conspiracy.  You are

2    helping.  You are part of it.  So take your pick.  Rob said if

3    you think you want to withdraw, we'll prosecute you.

4    Q.  When you said Rob, did you mean Mr. Sobelman here?

5    A.  Yes.

6    Q.  Well, he said more than that, didn't he, during this

7    conversation?

8    A.  That was all he said.

9    Q.  Well, didn't he say that all the government can control if

10   you are a cooperator, is how long the case goes?  How much time

11   would pass before you get sentenced?  Didn't the government say

12   that?

13   A.  What was the question?

14             THE COURT:  Just keep your voice up, please.

15   Q.  I'll rephrase it because I don't understand it myself.

16             Didn't the government tell you, as you said Rob,

17   Mr. Sobelman, told you that if you don't cooperate, if you take

18   your plea back, they cannot delay your sentencing, and you will

19   probably be sentenced or go to trial by the next year.  Didn't

20   they tell you that?

21   A.  Yes, say that.

22   Q.  And didn't Rob -- sorry, Mr. Sobelman -- I'm sorry,

23   Mr. Sobelman said that if you do not cooperate, there's going

24   to be a trial set, and you're going to go to trial, correct?

25   A.  Yes, he said that.

M9EQraj3                        Adeusi - Cross

1   Q.  And didn't he say that you will, in all likelihood, lose,

2   be convicted if you go to trial?

3   A.  He said that.

4   Q.  And didn't he also say that if you lose at trial, you will

5   probably receive a substantial prison sentence.  Didn't the

6   prosecutor tell you that?

7   A.  Yeah, he told me that.

8   Q.  And didn't he tell you that if you don't plead guilty, if

9   you don't cooperate, if you go to trial, that there will not be

10  a 5K letter?

11  A.  Yes, he say that.

12  Q.  And he said you will probably spend a number of years in

13  jail, correct?

14  A.  He said that.

15  Q.  And didn't he say that they would not try to help you get

16  an S1 visa if you go to trial?

17  A.  He didn't mention visa.

18  Q.  Well, didn't he say -- he didn't say that?

19  A.  Sir --

20  Q.  He did not say that?

21  A.  He don't say about visa.  I don't remember.

22  Q.  Didn't he tell you that if you go to trial, when you lose

23  and go to Bureau of Prisons' custody, after you finish your

24  sentence, your going to be transferred to immigration custody

25  before you're deported.  Didn't he tell you that?

M9EQraj3                    Adeusi - Cross

1   A.  He didn't tell me that.

2   Q.  Didn't he say to you that all the statements that you made

3   in your proffer sessions would now be used against you if you

4   go to trial, right?

5   A.  He said --

6   Q.  Sir, did he say to you that all the statements that you

7   made in your proffer sessions would be used against you if you

8   went to trial?

9   A.  No.  Don't remember if he said that.

10  Q.  Didn't he tell you that if you went to trial, Special Agent

11  Holm, H-O-L-M, who was present during many of your meetings

12  would get on the stand and testify that you made all of these

13  different admissions, confessions?  Didn't he tell you that?

14  A.  He said there were witnesses.  He said there were

15  witnesses.  He didn't mention Agent Holm.  I don't remember.  I

16  don't remember if he mentioned Agent Holm, but he said there

17  will be witnesses.

18  Q.  Well, didn't he also say to you that between your own

19  admissions and the evidence, which is strong, you would

20  probably get convicted?

21  A.  No, he didn't say evidence.  I don't know about -- he

22  didn't say that.  I just told you what I remember.

23  Q.  And didn't Dina, Ms. McLeod, say to you that if you don't

24  have a real defense, most people don't go to trial, and you

25  shouldn't go to trial.  Didn't Ms. McLeod say that to you?

M9EQraj3                          Adeusi - Cross

1   A.  Can you repeat that, please, sir?

2   Q.  Sorry?

3   A.  Can you repeat that?

4   Q.  Did Ms. McLeod say to you that if you don't have a real

5   defense, most people don't go to trial, and you should not go

6   to trial.  Didn't Ms. McLeod say that to you?

7   A.  She didn't say that.

8           THE COURT:  She did or did not?

9           THE WITNESS:  She did not say that.

10  Q.  Didn't Ms. McLeod say to you that you have absolutely no

11  benefit by going to trial because you confessed already?

12  Didn't she say that to you?

13  A.  Yes.

14  Q.  Didn't Mr. Sobelman say that while you have a right to try

15  to take your plea back, it would be a big mistake because you

16  will be convicted and go to jail.  Didn't Mr. Sobelman say that

17  to you?

18  A.  Yes, he say that.

19  Q.  So that's during the meeting in October.  So then about a

20  month later, you and your lawyer had a video meeting with the

21  prosecutors, right, like a remote video meeting, correct?

22  A.  That's right.

23  Q.  And at that meeting, the government told you basically that

24  you would be convicted if you went to trial and kind of

25  highlighted the evidence against you, right, on this video

M9EQraj3                          Adeusi - Cross

1    meeting?

2    A.  Yes, sir.

3    Q.  And they tried to explain to you what the benefit of you

4    cooperating were.  This is in November 19 of 2020, right?

5    A.  Yes, sir.

6    Q.  And is that when you specifically said to them on this

7    video meeting, "I have never committed fraud."  Did you say

8    that to the prosecutors on November 19 of 2020?

9    A.  I --

10   Q.  Listen to my words.  Did you say to the prosecutors on

11   November 19, 2020 in the presence of your lawyer, in the

12   presence of the prosecutors, "I have never committed fraud."

13   Did you say that?

14   A.  I took my first meeting or second meeting because we have

15   two meetings on Zoom.

16   Q.  Listen to me.  You know what?  Forget which meeting it was,

17   okay?

18   A.  Okay.

19   Q.  Did you ever after you pled guilty in front of a judge ever

20   say to the prosecutors, "I have never committed fraud"?

21   A.  What I say was --

22   Q.  Sir, very simple.

23         THE COURT:  Just yes or no.  Yes or no, did you say

24   those words?

25   A.  I don't remember what I said.

SOUTHERN DISTRICT REPORTERS, P.C.

M9EQraj3                          Adeusi - Cross

Q.  Did you say anything like that?  Did you say anything --
did you ever convey or try to convey to the prosecutors that
you were innocent; that you didn't commit fraud?  Yes or no.
A.  What I said to them was I was not the one directly
contacting victims.  That what I have done is I was in between
coordinating between the senders of the money and the receiver;
that that should -- I shouldn't be convicted or I shouldn't be
charged for that.
Q.  I'll try again.  Did you ever use these words, specific
words -- I hear what you're saying, but in addition to all of
that, did you ever use the words, "I never committed fraud"?
A.  I don't remember.
          MR. SOBELMAN:  Objection.  Asked and answered.
          THE COURT:  Overruled.
          You don't remember saying that?
          THE WITNESS:  Yes, sir, I never say that.  I don't
know why I would say that I never committed fraud when it was
fraud.  I was just trying to get -- by that time I was -- I was
not myself, like I don't get to sleep, so everything make me to
go crazy.
          MR. SCHNEIDER:  Your Honor, would you like to take
that break now?
          THE COURT:  No.
          MR. SCHNEIDER:  No?
          THE COURT:  No.  11:30.

M9EQraj3                        Adeusi - Cross

1            MR. SCHNEIDER:  I made a mistake.  You're right.  I

2    apologize.

3            THE COURT:  All right.  Ask a question, please.

4    Q.  By the way, you're divorced, right?

5    A.  Sir?

6    Q.  You're no longer married; you're divorced from Yvonne,

7    right?

8    A.  Right now, yes.

9    Q.  And even though you paid Yvonne to marry you, you believe

10   you married her out of love, right?  Is that true?

11   A.  Can you please say that again?

12   Q.  Did you marry Yvonne out of love?

13   A.  Would you explain to me, please?

14   Q.  You know when you pay somebody to get married, that's

15   usually a business deal, right?  That's not love, right?

16   A.  Yes, it wasn't love.

17   Q.  Did you ultimately -- when you married Yvonne, did you

18   marry her because you love her or because you paid money to

19   become a citizen?

20   A.  Because I paid money to become a citizen.

21   Q.  Didn't you tell the government on November 4 of 2020 that

22   you married Yvonne out of love?

23   A.  When I met Yvonne first, it was not love --

24   Q.  This is my question.  Did you tell the government, these

25   people here, on December 4 of 2020 that you married Yvonne out

M9EQraj3                        Adeusi - Cross

1    of love?

2    A.   Married out of love?

3    Q.   Yes or no.  Did you say that?

4    A.   Yvonne and I, we live together, so --

5    Q.   Listen to my question, sir.  I'm asking a very simple

6    question.  Did you say -- you understand the words I'm saying,

7    right?

8    A.   Yeah, I understand.

9    Q.   Okay.  So did you use the words, did you tell the

10   prosecutors and agents that you married Yvonne out of love?

11   Did you say that on December 4 of 2020?

12   A.   I don't remember saying that.

13   Q.   Now, during this period of time, you and your lawyer are

14   still thinking about taking your plea back and going to trial,

15   right?  This is the end of 2020, right?

16   A.   The dates is a problem.

17   Q.   Well, forget the date then.  Let's just get to the concept.

18   The concept is after you pled guilty, you were having second

19   thoughts about cooperating versus going to trial, right?

20   A.   That's right.

21   Q.   So at some point, did you say to the prosecutors that you

22   would likely go along with the plea if, if the marriage fraud

23   and the immigration fraud were not included?  Did you say that

24   to the prosecutors?

25   A.   Yes, I said that.

M9EQraj3                        Adeusi - Cross

1    Q.  And that's because at the time in December of 2020, you

2    believed in your heart of hearts that you did not commit

3    marriage fraud, right?  You believe that?

4    A.  Yes, because --

5    Q.  Yes, you believed that, right?

6    A.  I believe -- let me explain, please.

7    Q.  And you also believed in 2020 in your heart of hearts that

8    you did not commit immigration fraud, right?

9    A.  Right.

10   Q.  Now, continuing during this time period when you're still

11   contemplating going to trial or continuing to keep your guilty

12   plea, a few days later you again spoke to the prosecutors, and

13   you told them that when you filed the papers, the immigration

14   papers --

15   A.  Yes, sir.

16   Q.   -- your marriage was real.  Did you tell them that?

17   A.  I did, yes, that's right.

18   Q.  And at some point during this meeting or this conversation

19   in December of 2020, you indicated that you would be prepared

20   to continue your plea to the fraud charges, the wire fraud,

21   bank fraud charges, but you do not want to plead to the

22   marriage or immigration fraud.  Isn't that right?

23   A.  That's right, sir.

24   Q.  Now in terms of the timing, this is 2020, and you pled

25   guilty in 2019, right?

M9EQraj3                           Adeusi - Cross

1    A.   Yes, sir.

2    Q.   And a few days later, on December 11, didn't you tell the

3    prosecutors that you cannot admit letting your friend use your

4    work papers, you cannot admit marriage fraud, and you cannot

5    admit your ex-wife paid money to marry a man.  Didn't you say

6    that to the prosecutors?

7    A.   Yes.

8    Q.   And didn't you specifically say that you were legally

9    married?  On December 11 of 2020, didn't you say to the

10   prosecutors that you were legally married?

11   A.   To Yvonne, yes.

12   Q.   To Yvonne?

13   A.   Yes.

14   Q.   And that was after you admitted to a judge that you were

15   not legally married, correct?

16   A.   Correct.

17   Q.   Is it fair to say that while you were in Nigeria before you

18   came to this country, you helped friends commit romance scams,

19   business compromise scams, but you don't remember specific

20   instances of which ones.  Is that right?

21   A.   I don't commit any crime when I was in Nigeria.

22   Q.   Did you tell the prosecutors on February 13 of 2019 that

23   you may have helped friends commit fraud?

24   A.   No.

25   Q.   No?

M9EQraj3                         Adeusi - Cross

1    A.  I don't remember, sir.  I don't remember.

2    Q.  Let me ask you, did you help friends commit fraud while you

3    were in Nigeria?

4    A.  No.

5    Q.  Now, you told you also a number of times that you didn't

6    meet victims, you didn't do accounts, so you were the

7    middleman.  Is that right?

8    A.  That's right.

9    Q.  And you were the middleman for, I think you said, well over

10   20 other scammers, correct?

11   A.  Yes, sir.

12   Q.  Were you ever involved personally in any of the romance

13   scams?

14   A.  Say it again.

15   Q.  Were you ever involved in the romance scams?

16   A.  Never, no.

17   Q.  So you were only the money stuff, email compromise bank

18   accounts?

19   A.  Bank accounts.

20   Q.  By the way, when you were involved in the email compromise

21   bank account scams, you didn't care who the victims were, did

22   you?

23   A.  I don't know who the victims were.

24   Q.  Right.  So you didn't know if they were old, young, rich,

25   poor; you had no idea.  As long as there was money, you'd be

SOUTHERN DISTRICT REPORTERS, P.C.

M9EQraj3                          Adeusi - Cross

1    prepared to take it, right?

2    A.   Yes.

3    Q.   Now, just so we determine a timeline, you began working

4    with the government in August of 2018, correct?

5    A.   Yes.

6    Q.   And you were involved in scams for a number of years with a

7    number of different people using different scams at that time,

8    right?

9    A.   That's right.

10   Q.   And at that time, you did not expect when you were

11   committing the scams, you were hoping you wouldn't get caught,

12   right?

13   A.   Yes.

14   Q.   When you were committing the scams, you didn't expect that

15   you would ever become a cooperator on a witness stand, did you?

16   A.   Yes.

17   Q.   You didn't know you would ultimately have to come to court

18   and relate maybe conversations you had years ago; you didn't

19   know that?

20   A.   No.

21   Q.   And you didn't take notes of any of these conversations you

22   had with any of your other fraudsters, did you?  Did you keep

23   like a diary of notes?

24   A.   No.

25   Q.   Did you put any notes in your phone, anything like that, to

1   try to help you remember who said what and when?

2   A.  No.

3   Q.  And any of the conversations that you had back in 2015, 16,

4   17, 18, before you were a cooperator, you did not record any of

5   those conversations, did you?

6   A.  Of course I do remember a lot of them.

7   Q.  You don't remember?

8   A.  I do remember some, some of them.

9   Q.  You think you may have recorded conversations with other

10  fraudsters?

11  A.  Recording, you say recording?

12  Q.  Record, you know, tape-recording, video recording?

13  A.  No, I didn't record.

14  Q.  You didn't record it?

15  A.  No.

16          THE COURT:  We're going to stop there for our break.

17          Ladies and gentlemen, you have heard me say it before,

18  but I'll say it again.  Don't discuss the case with each other

19  or anyone else, for that matter.  Don't do any research about

20  the case or anyone involved in it.  You need to keep an open

21  mind.  You've heard more evidence, but definitely not all of

22  it.  With that, it is 11:29.  I'll give you 31 minutes.  Please

23  be ready to line up just before noon, and hopefully we'll pick

24  up where we left off.  Enjoy your break.  You're excused at

25  this time.

M9EQraj3                         Adeusi - Cross

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Mr. Adeusi, you may step down, but before you do, two

4    instructions:  First, because you are on cross-examination--

5          THE WITNESS:  Yes, sir.

6          THE COURT:  -- you are not permitted at this time to

7    speak with the government about your testimony.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  So you shouldn't communicate with them

10   during the break.  Please be back in the courtroom ready to go

11   a couple minutes before 12:00.  So in about 25 minutes, please

12   be back ready to go.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Okay?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  And you're excused at this time.

17         Mr. Schneider, any prediction of how much longer you

18   have on cross?

19         MR. SCHNEIDER:  The answer --

20         THE COURT:  Go ahead.

21         MR. SCHNEIDER:  I don't, only because I --

22         THE COURT:  Microphone.

23         MR. SCHNEIDER:  I don't have a specific estimate, and

24   I apologize.  It depends on how the witness goes.

25         THE COURT:  I mean, are we talking half hour, an hour,

320 of 211

M9EQraj3                         Adeusi - Cross

1    three hours?

2              MR. SCHNEIDER:  Not a half hour and not three hours.

3              THE COURT:  All right.  So somewhere just right.  Very

4    good.

5              Now, anything to discuss before I give you as much of

6    a break as I can?  For the government?

7              MR. SOBELMAN:  No, your Honor.

8              THE COURT:  Mr. Schneider?

9              MR. SCHNEIDER:  No, your Honor.  Thank you.

10             THE COURT:  Please be back a couple minutes before

11   noon ready to go, even assuming there's nothing to discuss, the

12   witness should be back on the stand ready to go.  Thank you

13   very much.

14             (Recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
 1                          AFTERNOON SESSION

 2                             12:00 p.m.

 3             THE COURT:  Hope you guys enjoyed the break.  We'll

 4     pick up where you left the off with the cross-examination of

 5     Mr. Adeusi.

 6             (Pause)

 7             THE COURT:  Now, we'll continue with the

 8     cross-examination of Mr. Adeusi.  Mr. Adeusi, I remind you that

 9     you remain under oath.  One second.

10             THE JUROR:  I accidentally took my cell phone.

11             THE COURT:  Ms. Smallman can take it into the jury

12     room.

13             Mr. Adeusi, I remind you remain under oath.  And,

14     Mr. Schneider, you may continue.

15             MR. SCHNEIDER:  Thank you.

16     Q.  Before you became a cooperator when you were committing

17     your scams, you didn't know that you would be required to

18     testify years later, did you?

19     A.  That's right.

20     Q.  That's right.  You did not know?

21     A.  I did not know, yes.

22     Q.  Did you know?

23     A.  I did not know.

24     Q.  You didn't.

25             And, now, in 2004, were you in the United States, or
```

M9E6RAJ4                         Adeusi - Cross

1    were you in Nigeria?

2    A.  I was in Nigeria.

3    Q.  And when you were in Nigeria in 2004, did you help other

4    people in Nigeria use Western Union to commit fraud?

5    A.  It wasn't fraud because what I explained to them was when I

6    was young, I used to -- someone -- when I -- in 2004 or --

7    before that time, someone had called me to use my name to

8    receive a Western Union money transfer.

9    Q.  And you knew back then in 2004 that the money was fraud?

10   A.  No.

11   Q.  On February 13, 2019, you were having one of your proffer

12   sessions with the government.  Okay?

13   A.  Okay.

14   Q.  Isn't it a fact that you told them on February 13, 2019,

15   that in 2004, you first gave your name for Western Union to

16   send fraud money from the U.S., and you gave your real name.

17   Did you say that to the prosecutors on February 13, 2019?

18   A.  I can't remember I say that -- yes, I say that.

19   Q.  Yes, you did, right?

20   A.  Yes.

21              THE COURT:  Sir, can you bend the microphone?  Bend

22   that -- this part, just bend it down.  Thank you.  So it's

23   closer.  Thank you.

24   Q.  Now, you talked earlier about having many, many, other

25   people you committed frauds with, right?

M9E6RAJ4                          Adeusi - Cross

1    A.  That's right.

2    Q.  Wasn't one of those people a guy named Bones?  That's his

3    nickname, B-O-N-E-S?

4    A.  That's right.

5    Q.  And you met Bones in 2014, right?

6    A.  That's right.

7    Q.  And he was shipping cars to Nigeria, right?

8    A.  That's right.

9    Q.  And he offered you to get a cut?

10   A.  Say it again.

11   Q.  Did he offer you to get a cut, a piece of that, shipping

12   cars?

13   A.  So I --

14   Q.  Yes or no, did he offer you a cut, a percentage, a piece to

15   help him ship the cars to Nigeria?

16   A.  No.  That's if I get him to buy car for me.  He's the one

17   that has a license.  I don't have a license.

18   Q.  I don't understand a word, sir.  I'm sorry.  What did you

19   say?

20   A.  I said Bones was one that has the license to buy car from

21   the auction.  So I give Bones money to get cars.  So he doesn't

22   give me any cars.  I just give the money.  He buys the car, and

23   then I ship.

24   Q.  Now, in 2016, a couple -- by the way, you met Bones at a

25   car auction.  That's where you first met, right?

M9E6RAJ4                         Adeusi - Cross

1    A.  That's right.

2    Q.  And at that point, you were not committing crimes with

3    Bones in 2014, were you?

4    A.  No.

5    Q.  But sometime later, a couple of years later, you and Bones

6    met up again, right?

7    A.  That's right.

8    Q.  And at that time in 2016, Bones told you that he had opened

9    accounts for fraud, right?

10   A.  That's right.

11   Q.  And at that point when he told you that he had opened

12   accounts for fraud, he offered to help you move money if you

13   knew other people who wanted accounts, right?

14   A.  That's correct.

15   Q.  Now, had you ever told Bones before this first meeting that

16   you were involved in scams?

17   A.  No.

18   Q.  Did you ever tell Bones that you were involved in fraud or

19   stealing money before this 2016 meeting?

20   A.  No.

21   Q.  So he offers you to be part of his scam, not knowing

22   anything about you; is that right?

23   A.  We have common friends.

24   Q.  Okay.  And those common friends, were they scammers with

25   you?

M9E6RAJ4                         Adeusi – Cross

1   A.  Some of them, yes.

2   Q.  So at some point, though, Bones offered to see if you

3   wanted to become a scammer as well, right?

4   A.  He just told me he has an account if I need, that he can

5   give me fraud accounts.

6   Q.  I know.  You keep saying that, but an account for fraud?

7   A.  Yes, an account for fraud.

8   Q.  He wasn't offering you a bank account to open up legitimate

9   money.  He was trying to see if you wanted to get involved in

10  fraud?

11  A.  That's right.

12  Q.  Now, there's a whole bunch of people that you were doing

13  accounts with, someone named June, Onos, Femi, Raymond George,

14  and a number of other people; is that right?

15  A.  That's right.

16  Q.  Rather than getting into all the names, you were doing fake

17  business deals with those guys, right?  They would give you

18  accounts or transactions, right?

19          MR. SOBELMAN:  Objection, compound.

20          MR. SCHNEIDER:  Fair enough.  I agree.

21  Q.  Is it fair to say that each one of those guys that I named

22  plus others, were involved in individual scams with you?

23  A.  That's right.

24  Q.  Now, does the name, Naandi, N-a-a-n-d-i, Damba, D-a-m-b-a,

25  sound familiar?

1    A.  That's right.

2    Q.  You know him from Atlanta, right?

3    A.  Yes, sir.

4    Q.  And you also met him at the same car auction that you met

5    Bones, right?

6    A.  Yeah -- car auction.

7    Q.  Car auction?

8    A.  Yeah.

9    Q.  So you met Bones at a car auction, and you also met Naandi

10   at the same car auction?

11   A.  That's right.

12   Q.  We'll call him -- if I may call him Naandi.

13   A.  Yeah.

14   Q.  He gave you accounts to get involved with these scams,

15   right?

16   A.  That's right.

17   Q.  And as far as you know, he was interviewed by the FBI at

18   least three occasions, correct?

19   A.  Yes, sir.

20   Q.  And he told you that, right?

21   A.  He didn't tell me himself, but I just hear from just --

22   Q.  You hear from the streets?

23   A.  The streets, yeah.

24   Q.  Okay.  Now, he was very successful, wasn't he?  He was very

25   flashy, right?

M9E6RAJ4                          Adeusi - Cross

1    A.  That's right.

2    Q.  In fact, he drove around in a Bentley, right?

3    A.  That's right.

4    Q.  Now, you also knew someone named James Dwight, D-w-i-g-h-t,

5    right?

6    A.  That's right.

7    Q.  He was the biggest of them all.  He had the biggest fraud,

8    right?

9    A.  That's right.

10   Q.  He was into big frauds, and as far as you can tell, he was

11   involved in the biggest of all of them?

12   A.  Yeah, that's right.

13   Q.  And there's someone else named Ayo, A-y-o, right?

14   A.  Say that again.

15   Q.  One of the other fraudsters who you dealt with was named

16   Ayo, A-y-o?

17   A.  Do you have the last name?

18   Q.  I don't.

19   A.  Yes.

20   Q.  And he was also involved in very, very big frauds, correct?

21   A.  That's right.

22   Q.  Now, since you have become a cooperator -- withdrawn.

23        Since you've become involved with law enforcement in

24   August of 2018, you've been contacted almost on a daily basis

25   by other fraudsters to commit other frauds, right?

M9E6RAJ4                          Adeusi - Cross

1    A.  That's right.

2    Q.  And in the past six months alone, over 20 people had been

3    contacting you, correct?

4    A.  Say it again.  Sorry.

5    Q.  Withdrawn.

6           In the six months prior to 2019, you had been

7    contacted by over 20 people to commit fraud, right?

8    A.  That's right.

9    Q.  Now, the money that you made from these fraudulent schemes,

10   you didn't declare any of that on your income tax, did you?

11   A.  No.

12   Q.  And, in fact, you did file income tax, did you not?

13   A.  Because I was working.

14   Q.  Yes, so you filed, I think, twice, right?

15   A.  Yeah, I file all the -- all the work I did, I filed for.

16   Q.  I can't hear you, sir.  Say it again.

17   A.  All the work I did, all the legitimate work I did, I did

18   the filings, sir.

19   Q.  But in all the years you've been in this country, you have

20   filed taxes on two occasions only, right?

21   A.  That's not correct.

22   Q.  Well, didn't you tell the government on February 13 of 2019

23   that you think you filed twice?

24   A.  You have to --

25   Q.  So listen to my question.

SOUTHERN DISTRICT REPORTERS, P.C.

M9E6RAJ4                          Adeusi - Cross

1                On February 13 of 2019 when you were meeting with the

2       government and you were discussing with them the crimes you

3       were involved in, didn't you tell them that you filed taxes in

4       the United States, but you think only twice?

5       A.  Yes.  That's the -- amount of time I have the work

6       authorization.  I have the legitimate work I was doing, yes.

7       Q.  So the answer is you filed twice?

8       A.  Filed for the years I worked.

9       Q.  And when you filed, I assume you didn't declare this stolen

10      fraud money, did you?

11      A.  Well, no.

12      Q.  And by the way, the government has not charged you with any

13      Internal Revenue Services crimes, have they, any tax

14      violations, have they?

15      A.  No.

16      Q.  Have you begun to save money for the day when you may be

17      required to make restitution to the victims?  Have you done

18      that?

19      A.  No.

20      Q.  Have you put any money -- offered any money to the

21      government to put in a special account for when it's time for

22      to you pay the victims back?

23      A.  No.

24      Q.  Now, I think you said yesterday -- if I'm wrong, please

25      correct me -- that you first were introduced to Mr. Raji in

M9E6RAJ4                          Adeusi - Cross

1   early 2017.  Did I hear that right?

2   A.  That's right.

3   Q.  And you were introduced by Ugo, right?

4   A.  That's right.

5   Q.  Now, before Ugo introduced you in 2017, you didn't know who

6   Mustapha Raji was, did you?

7   A.  No.

8   Q.  You didn't know his name; you didn't know what he looked

9   like, nothing about him, correct?

10  A.  That's correct.

11  Q.  At some point Ugo gave you Mr. Raji's phone number and

12  asked you to call him, right?

13  A.  That's right.

14  Q.  And, again, just so I'm clear, you had never spoken to,

15  seen, or heard of or from Mustapha Raji until Ugo mentioned

16  him, right?

17  A.  That's right.

18  Q.  Now, I think -- again, if I'm wrong, please, I apologize --

19  but yesterday, you said that Mr. Raji speaks efficient English,

20  and he speaks Yoruba, right?

21  A.  That's right.

22  Q.  And Ugo speaks Igba?

23  A.  That's right.

24  Q.  And Ugo does not speak Yoruba?

25  A.  That's right.

1    Q.  Does Ugo speak English?

2    A.  Yes.

3    Q.  Now, in early 2017, that's when Ugo had asked you to call

4    Mr. Raji because basically, without getting into the details,

5    Ugo was not getting the money he expected from Mr. Raji, right?

6    A.  Ugo, he give details.

7    Q.  I'm sorry?

8    A.  He gave details.

9    Q.  I know he did.  But rather than go through it again, the

10   idea was that Ugo wanted you to convince Mr. Raji to pay the

11   money?

12   A.  Not to convince, just to tell him to call him.

13   Q.  Okay.  And you tried to reach him?  You tried to reach

14   Mr. Raji, right?

15   A.  That's right, sir.

16   Q.  And at some point, when you did reach him, he said, who's

17   this?  He had no idea who you were, correct?

18   A.  I called him.  He didn't call me back.

19   Q.  At some point later on, when you finally spoke to

20   Mr. Raji --

21   A.  Yes.

22   Q.  -- he didn't know who you were, did he?

23   A.  No, he doesn't.

24   Q.  And after you had explained what the -- Ugo told you the

25   problem was, Mr. Raji said, don't worry and basically just kind

```
1   of, you know, told you don't worry about it; I'll take care of
2   it, or words to that effect, right?
3   A.  That's right.
4   Q.  You have no idea what happened to that, do you?
5   A.  No.
6   Q.  So after that conversation, you don't know what occurred
7   between Mr. Raji and Ugo afterwards, do you?
8   A.  I never asked.
9   Q.  Now, again, you did say this happened in 2017, right?
10  A.  Yes.
11  Q.  Okay.  Not 2018, right?  2017?
12  A.  Yes.  Yes.
13  Q.  And on August 31st of 2018, the very first time when you
14  spoke with the prosecutors, and you were trying to be complete
15  and accurate and truthful, you gave them information about what
16  you knew about Mr. Raji, correct?
17  A.  That's right.
18  Q.  And if you didn't know something, you'd say, I don't know,
19  right?
20  A.  Yes.
21  Q.  If you don't remember, you'd say, I don't remember,
22  correct?
23  A.  Yes.
24  Q.  Back in the first meeting, August 31, 2019, you only told
25  the government Femi, F-e-m-i, his first name.  You didn't know
```

M9E6RAJ4                        Adeusi - Cross

1    his last name back then, did you, right; is that right?

2              MR. SOBELMAN:  Objection, your Honor.  I believe the

3    date was wrong.

4              MR. SCHNEIDER:  August 31, 2018.  I'm sorry.

5              THE COURT:  Why don't we start the question over?

6    Q.  On August 31, 2018, that was the first time you spoke to

7    the government, correct?

8    A.  Yes.

9    Q.  And at that time, if you knew something, you would say, I

10   know it.  And if you don't, you would say I don't know, right?

11   A.  That's right.

12   Q.  In fact, during that specific meeting, you gave them Femi,

13   F-e-m-i, his name first name, right?

14   A.  Yes.

15   Q.  But back then, you didn't know his last name, did you?

16   A.  I do know.  I just do not know the -- I know it start with

17   A-d-e, but I don't know the rest of it.  Maybe, maybe not.  So,

18   yeah.

19   Q.  But is it fair to say that on August 31, when you first

20   spoke to the prosecutors, you said that you had first messaged

21   and spoken to Mr. Raji in March of 2018.  Did you say that to

22   the prosecutors on August 31?

23   A.  Say it again.

24   Q.  Yes, I will.

25              When you spoke to the prosecutors on August 31, didn't

M9E6RAJ4                          Adeusi – Cross

1   you tell them that you first messaged and spoke to Mr. Raji in
2   March of 2018; isn't that fair to say?  Did you say that to
3   them or not?
4   A.  That was my first encounter with him.
5   Q.  Listen to me.  Did you say that to the prosecutors?
6   A.  Can I understand -- did I say that was my first encounter
7   with Mustapha?
8   Q.  Yes.  Did you say your first encounter, either by message
9   or by speaking, was March of 2018, and you did not mention
10  2017?
11  A.  Well, that might be a mess up.  Maybe I don't remember.
12  Q.  Well, so are you saying you didn't say it but you don't
13  remember?  What are you saying ow about it?
14  A.  What I'm saying, as regards to the date and the year,
15  I'm -- I was probably just don't know when.  Maybe -- it might
16  be a little bit -- a little -- let me say that -- a little
17  confusion with the year.
18  Q.  Okay.
19  A.  Yeah.
20  Q.  So is it also fair to say that in the very same meeting,
21  you said that you first met him in July of 2018, that he had a
22  development company.  Didn't you say that to the government?
23  A.  A development company.
24  Q.  Did you say to the government -- I'll break it down.
25              Number one, did you say that you first met him in July

M9E6RAJ4                          Adeusi - Cross

1    of 2018?  Did you tell that to the government on August 31 of

2    2018?

3    A.  I don't remember if I told the government.

4    Q.  Okay.  And did you tell the government that you first met

5    him -- withdrawn.

6             Did you first tell the government that Mr. Raji has a

7    development company?

8    A.  I don't know to what context he has a company.

9    Q.  Well, forget the context.  Did you use those words?  Did

10   you tell the prosecutors on August 31 that Mr. Raji has a

11   development company?

12   A.  Development -- I didn't say that.

13   Q.  No?  Now, you mentioned yesterday that in the summer of

14   2018, you needed a big account for a big scam, so you asked Ugo

15   for Mustapha Raji's phone number, right?

16   A.  That's right.

17   Q.  Now, from 2017 and 2018, you had no dealings with Mr. Raji,

18   did you?

19   A.  2017 to 2018 -- 2017 was when late -- summer of 2017,

20   that's when the -- the first transaction happened, the

21   $150,000.  That's when he --

22   Q.  In what, 2017?

23   A.  Yes.

24   Q.  Is that when it didn't happen?  The 150,000 scam was not

25   successful, was it?

1    A.  No.

2    Q.  And, in fact --

3    A.  I don't know if it was successful.

4    Q.  You have no idea.  You didn't get paid, did you?

5    A.  No, I didn't get paid.

6    Q.  That 4-4-2 you didn't get anything of that 4-4-2

7    percentage, right?

8    A.  That's right.

9    Q.  And in that time period, before the summer of 2018, you did

10   other scams with other people, right?

11   A.  That's right.

12   Q.  Who gave you other accounts, right?

13   A.  That's right.

14   Q.  Now, you did -- you're right.  This $150,000 scheme, you

15   said it was for a Nigerian who wanted it, right?

16   A.  It was a Nigerian, yes.

17   Q.  What's the name of that person?

18   A.  Of who?

19   Q.  The name of the person who wanted this $150,000 e-mail

20   scheme?

21   A.  I can't remember the guy who sent it, but I knew that was a

22   scheme for Nigeria.

23   Q.  I don't understand what you said.

24   A.  Huh?

25   Q.  I don't understand what you said.

M9E6RAJ4                    Adeusi - Cross

1   A.  So I don't remember the name of who sent the fraud money in

2   2017 for $150,000.  But all I remember that the person --

3   Q.  Sir, sir.  I asked you a simple question, the name of the

4   person in Nigeria who sent the scheme, that one name?

5   A.  I don't remember.

6   Q.  This is the person whose idea it was, who's the main guy

7   for 150,000, right?

8   A.  I said I don't remember the name, sir.

9   Q.  Okay.  And this is the one, the scheme that Ugo sent you a

10  Wells Fargo information, right?

11  A.  That's right.

12  Q.  And you only remembered partial of the name, Realty, LLC,

13  but you don't remember the beginning of it, right?  You were

14  the middleman of that scheme, right?

15  A.  That's right.

16  Q.  And at some point, the people said to let that money,

17  quote, rest for a few days, right?

18  A.  Yes.

19  Q.  And then a few days later, you got a screenshot from Ugo,

20  right?

21  A.  That's right.

22  Q.  Is that screenshot deleted in your phone as well?

23  A.  That was deleted before the agent approached me in 2018.

24  Q.  Yes.  So you, the answer is yes, you deleted that

25  screenshot?

M9E6RAJ4                          Adeusi - Cross

1    A.   That's right, yes.

2    Q.   And this is another situation where you were having trouble

3    getting money from Mr. Raji, right?  The Nigerians wanted the

4    money, and you weren't able to get -- not you, but Mr. Raji

5    wasn't coming up with any money, correct?

6    A.   Correct.

7    Q.   And I assume in addition to the Nigerians wanting money,

8    you wanted your cut as well?

9    A.   That's right.

10   Q.   And Ugo wanted his cut as well?

11   A.   That's correct.

12   Q.   So it seems like as far as you can tell, nobody got paid in

13   that -- for that scam, right?

14   A.   That's right.

15   Q.   And you reminded Ugo that this is the same thing that

16   happened before with Raji, right?

17   A.   That's right.

18   Q.   So here it is, you have the 2017 scam.  Supposedly,

19   Mr. Raji is not paid, right?

20   A.   That's right.

21   Q.   2018 scam later, the 150, Mr. Raji is not paid, correct?

22   A.   That's correct.

23   Q.   So in either of those -- so both of those scams, you got

24   nothing?

25   A.   Yes.

M9E6RAJ4                              Adeusi - Cross

1   Q.  Yes, you got nothing, or yes --

2   A.  I did not get anything.

3   Q.  Okay.  Now at some point, there was some threats by

4   Nigerians, right?

5   A.  Yes, sir.

6   Q.  By the way, whenever these threats were made, in all of

7   these years, nobody, not you, not your family, nobody was ever

8   hurt, were they?

9   A.  There were two occasions where my brother was hurt in

10  Nigeria.

11  Q.  In Nigeria?

12  A.  Yes.

13  Q.  Nothing to do with Mr. Raji?

14  A.  No.  No.  No.  Correct.

15  Q.  Now, in the summer of 2018, Femi needed a business account

16  with 1.7 million, right?

17  A.  Yes, sir.

18  Q.  And that's when you reached out to Mustapha Raji?

19  A.  That's right.

20  Q.  So this is -- maybe I am misunderstanding, so I apologize.

21  So you're reaching out to him, you say, who's the same guy who

22  didn't come through on any of the previous scams, right?

23  A.  That's right.

24  Q.  And you didn't reach out to the other people you had done

25  these scams with, who drove a Bentley or who were involved in

1  big scams, you didn't reach out to them, did you?

2  A.  No, I did not.

3  Q.  But not only did you not get paid from 2017 to 2000 --

4  earlier in 2018, Mr. Raji wasn't even returning your phone

5  calls, right?

6  A.  That's right, sir.

7  Q.  And you had hoped, I think you said -- if I'm wrong,

8  correct me.  You were hoping to get $20,000 --

9  A.  Yes.

10  Q.  -- right?

11  A.  Yes, sir.

12  Q.  But you got nothing?

13  A.  Yes, sir.

14  Q.  And that's when we talked yesterday about the 4-4-2 right,

15  which is 40 percent, 40 percent, and 20 percent, how it's

16  divided up, correct?

17  A.  Yes, sir.

18  Q.  So the plan was to get 40 percent -- that would be the

19  total amount, the 1.7 million, right?  4-4-2 of the

20  1.7 million?

21  A.  Of -- of -- that's the sharing part would be for the 1.7.

22  Yes.

23  Q.  I don't understand you.  I'm sorry.  What did you say?

24  A.  I don't understand what you're saying.

25  Q.  I'll try to fix it.

M9E6RAJ4                          Adeusi – Cross

1           The goal was if you got the 1.7 million, okay, it
2    would be divided 40, 40, and 20, correct?
3    A.  That's right.
4    Q.  And the 40 would go to the sender of the e-mails, correct?
5    A.  That's right.
6    Q.  And the other 40 would go to the account holder?
7    A.  That's right.
8    Q.  And I think you said yesterday the 20 would be divided by
9    you, Mustapha, Femi, and Ade, A-d-e, also known as Fritz,
10   correct?
11   A.  Correct.
12   Q.  So the plan was to do the 40, 40, 20 of the 1.7; isn't that
13   right?
14   A.  Yes, sir.
15   Q.  And you got nothing?
16   A.  No, sir.
17   Q.  And then as time went on, after Femi had indicated that the
18   money was there, he said, don't rush, or words to that effect.
19   Let's let it sit, right?
20   A.  Yes, sir.
21   Q.  And then after a few days, about five or so days later, the
22   pressure began to mount, right?
23   A.  That's correct, sir.
24   Q.  And you called Mr. Raji at least ten times, either
25   voicemails, or he just didn't pick up.  You couldn't get ahold

M9E6RAJ4                        Adeusi - Cross

1   of him, correct?

2   A.  Correct, sir.

3   Q.  He ignored your calls and requests, right?

4   A.  Yes.

5   Q.  Now, one reason you didn't want to give Femi Mr. Raji's

6   phone number was because you said it was against the rules,

7   right?  Without asking the other guy first, right?  That's the

8   rule.  The rule is before give a phone number out, you have to

9   ask the guy, is it okay if I give your number to so and so?

10  A.  That's right.

11  Q.  But the other reason is that you wanted to not lose the

12  chance of making money in the future, right?

13  A.  That's right.

14  Q.  You didn't want to get cut out of any future deals, right?

15  A.  That's right.

16  Q.  And, again, you were thinking about future deals with a guy

17  who had given you nothing on every single prior occasion,

18  right?

19  A.  Right.

20  Q.  And at some point, there was a conference call, and time

21  had passed.  And still, the money had not been dispersed,

22  correct?

23  A.  Correct, sir.

24  Q.  And you got the same story.  Don't worry.  I'll take care

25  of it, things like that, right?

1    A.  Yes, sir.

2    Q.  And then you said, you know, you kind of had enough.  And

3    then you wanted to meet Mr. Raji in person.  You'd never met

4    him before, right?

5    A.  No.

6    Q.  So you wanted to meet him in person, right?

7    A.  Yes.

8    Q.  And you said you met him at this IHOP, which was the

9    photograph shown, in Georgia, right?

10   A.  That's right, sir.

11   Q.  And you were kind of hoping either that he'd have some

12   money for you or he would have information that would make you

13   feel like the deal is going to go forward and you'll get paid

14   down the road?

15   A.  Yes, sir.

16   Q.  Except you were very upset, right, because you had no

17   satisfactory information from Mr. Raji, did you?

18   A.  That's correct.

19   Q.  It was the same story.  Don't worry.  Don't worry.  I'll

20   take care of it, right?

21   A.  Yes, sir.

22   Q.  And you didn't get one penny, did you?

23   A.  No.

24   Q.  Do you want to stay out of jail?

25   A.  Yes, I want to stay out of jail.

M9E6RAJ4                        Adeusi - Cross

1    Q.  Do you want to stay in this country?

2    A.  Yes, I want to stay in this country.

3    Q.  You hope -- you hope that if the government decides to

4    write you that 5K letter, you hope you won't go to jail, right?

5    A.  That's the -- that's the decision of the judge, not me.

6    Q.  I understand that.  I'm not asking about the judge.  I'm

7    asking you what you hope, what you want, what you want inside.

8    You hope -- you know what "hope" means, right?

9    A.  Yes.

10   Q.  So you hope that if the government writes you that 5K

11   letter, you hope the judge won't send you to jail, right?

12   A.  The judge has a decision to make, so the government --

13   Q.  Listen to the words, because you're an intelligent man.

14   Okay?  You had no problem speaking to the government when they

15   questioned you, so listen to my question.

16   A.  Okay.

17   Q.  Do you hope to stay out of jail?

18   A.  That's right, yes.

19   Q.  And do you hope that one of the ways of staying out of jail

20   is that if the government writes you a 5K letter, right?

21   A.  No.  The government already told me -- give me a 5K letter

22   and say my conduct was good.  I didn't lie.  So the rest

23   depends on the judge.  That's all.

24   Q.  Yeah.  I know that when you were meeting with the

25   government, they told you to say that, but try to listen to the

1    question, sir.  Okay?

2              MR. SOBELMAN:  Objection.

3              THE COURT:  Sustained, sustained.

4    Q.  It's very simple.  There are only three more questions I

5    have, and then you're done from my perspective.  Okay?

6    A.  Okay.

7    Q.  Do you hope -- you know what "hope" means, right?

8    A.  Yeah.

9    Q.  You hope the government writes you the 5K letter?

10   A.  Yes.  I hope the government writes.

11   Q.  Do you hope that if they write you that 5K letter, you

12   won't go to jail?

13   A.  I hope the judge will have mercy on me.

14   Q.  Do you hope that if the government decides to write the 5K

15   letter, that you hope that you may not get deported to Nigeria?

16   Do you hope for that?

17   A.  That's -- yeah, that's what I hope for.

18   Q.  That's what you want?

19   A.  Yes.

20   Q.  If you knew -- if you knew --

21   A.  Yes.

22   Q.  -- that you could stay out of jail if you lied, would you

23   lie?

24   A.  Can you repeat, please?  I'm sorry.

25   Q.  Sure.  I'll repeat.

M9E6RAJ4                        Adeusi - Redirect

1              If you knew you could stay out of jail -- if somebody

2     promised you, I promise you, you will stay out of jail if you

3     tell a lie, would you lie?

4     A.  I would not lie.  I won't lie because if I lie --

5     Q.  If you knew, if somebody promised you -- let's say I had

6     the power.  Okay?  If I had the power to say, you know what?  I

7     promise you you're not going to go to jail, but I want you to

8     lie, would you lie?

9              MR. SOBELMAN:  Objection.

10    A.  Give me --

11             THE COURT:  Sustained.

12    A.  I will not lie.

13             THE COURT:  You don't need to answer that question.

14    Q.  My last question is, if you -- forget what I can promise.

15    If you knew -- if you knew -- that you could stay in this

16    country if you lied, would you lie?

17             MR. SOBELMAN:  Objection.

18             THE COURT:  Sustained.

19             MR. SCHNEIDER:  I have nothing further.

20             THE COURT:  Redirect?

21             MR. SOBELMAN:  Very briefly, your Honor.

22    REDIRECT EXAMINATION

23    BY MR. SOBELMAN:

24    Q.  Mr. Bailey, can you please show the witness what's been

25    marked for identification as Government Exhibit 31?

1           Mr. Adeusi, do you recognize this?

2   A.  Yes, sir.

3   Q.  What is it?

4           If you need your reading glasses -- there you go.

5   A.  Do you want me to read it?

6           THE COURT:  No.  Identify it.  What is it?  Do you

7   recognize that document?

8           THE WITNESS:  Yeah.  I think I know what it is.

9           THE COURT:  So what is it?  Just a description of what

10  it is.

11          THE WITNESS:  I think this is my --

12          THE COURT:  Into the microphone.

13          THE WITNESS:  I think this was my -- my -- the

14  punishment I will get if I lie.  I don't know.  I'm sorry.

15          THE COURT:  Just -- what is this document?  Do you

16  know what this document is?

17          THE WITNESS:  No, sir, if I read it.

18          MR. SOBELMAN:  Let's go to the last page.

19  Q.  Did you sign this document?

20  A.  This is my cooperation agreement.

21          MR. SOBELMAN:  The government offers

22  Government Exhibit 31.

23          THE COURT:  Any objection?

24          MR. SCHNEIDER:  None.

25          THE COURT:  Admitted.

1          (Government's Exhibit 31 received in evidence)

2          And just to be clear, you said that's your cooperation

3    agreement?

4          THE WITNESS:  Yes, sir.  Yes, sir.

5    Q.   Let's go to page 3.  If we can display it for the jury.

6    Thank you.

7          And just focus on the paragraph in the middle, please.

8          Mr. Adeusi, is this a list of what you have to do

9    under the cooperation agreement?

10   A.   Yes, sir.

11   Q.   Under E, it says, "Shall truthfully testify before the

12   grand jury and at any trial and other court proceeding with

13   respect to any matters about which this office may request his

14   testimony."

15         Do you see that?

16   A.   That's right.

17   Q.   If we can take this down.

18         All right.  Can you just remind us, if you don't tell

19   the truth today, what happens to the cooperation agreement?

20   A.   I don't -- it's gone.  No good letter.

21   Q.   You were asked questions on cross-examination about

22   meetings that you had with me and other members of the

23   government in October and November of 2020.  Do you recall

24   that?

25   A.   That's right, yes.

M9E6RAJ4                        Adeusi - Redirect

1   Q.  You were asked a series of questions about that; is that
2   right?
3   A.  Say that again.
4   Q.  You were asked a number of different questions about what
5   you said, what I said, what other people said, correct?
6   A.  That's correct.
7   Q.  Around that time, what was going on in your life?
8   A.  Around the time, I was miserable, because I -- I stay up,
9   I.  Don't sleep.  I -- because of the problem, you know, I keep
10  thinking about it.  I keep thinking about if I really, really,
11  really this bad person, why would I involve myself with this
12  scam and others?  So it giving me -- I'm not well at the time.
13  Q.  You were not well?
14  A.  Yes.  I wasn't myself -- I was angry at myself.  I was.  I
15  was basically not just happy.  I was depressed and stuff like
16  that.
17  Q.  You were depressed?
18  A.  Depressed.
19  Q.  Looking back on it now, were you thinking clearly then?
20  A.  Say it again.
21  Q.  Looking back on that time period now, were you thinking
22  clearly then?
23  A.  I wasn't thinking clearly at that time.
24  Q.  In those meetings, do you remember -- they happened about
25  two years ago, right?

M9E6RAJ4                      Adeusi - Redirect

1    A.  Yes.

2    Q.  And do you remember every word that every person said?

3    A.  I don't remember all the words, if you're asking specific

4    word that was said to me.

5    Q.  You don't remember; is that correct?

6    A.  Yes.

7    Q.  Were you taking notes on those calls or meetings?

8    A.  No.

9    Q.  Did you review anyone else's notes before testifying today?

10   A.  No.

11   Q.  You were also asked questions about other meetings you had

12   with the government, right?

13   A.  Say it again.  Sorry.

14   Q.  Defense counsel also asked you about other meetings you had

15   with the government?

16   A.  Yeah, that's right.

17   Q.  And he asked you whether you said certain things or whether

18   certain things were said to you; is that right?

19   A.  Yes.

20   Q.  Did you take notes in any of the meetings with the

21   government?

22   A.  No.

23   Q.  Have you ever seen the government's notes or reports from

24   those meetings?

25   A.  Never.

1    Q.  So some of those meetings happened two, three, four years

2    ago; is that right?

3    A.  That's right.

4    Q.  You don't remember specifically what you said and on what

5    date you said it; is that right?

6    A.  That's right.

7    Q.  Did you do your best at those meetings to remember things

8    and tell the truth?

9    A.  That's right.

10   Q.  Are you doing that same thing today?

11   A.  Yes.

12   Q.  Generally, are you very good at keeping track of certain

13   dates and years?

14   A.  No, sir, no.

15   Q.  Sometimes you have trouble remembering whether something

16   was one year or another year?

17   A.  That's right, yes.

18   Q.  Or which exact month it happened?

19   A.  I have that issue.  I have that problem, trying to -- years

20   and months.

21   Q.  You were asked a couple of questions about why you went to

22   the defendant instead of going to other people in the scheme;

23   is that right?

24   A.  Yes.

25   Q.  You were asked about Naandi, the Bentley driver, right?

M9E6RAJ4                        Adeusi - Recross

1    A.  That's right.

2    Q.  Was Naandi arrested?

3    A.  Naandi is in jail right now.  He was sentenced.

4    Q.  So the defendant when you went to him in the summer of

5    2018, he wasn't in jail, right?

6    A.  No.

7    Q.  He hadn't been arrested, right?

8    A.  No.

9    Q.  But Naandi, he's in jail?

10   A.  Yes.

11   Q.  Let's talk about Bones.  Do you remember talking about

12   Bones?

13   A.  Yes.

14   Q.  What happened to Bones?

15   A.  Bones was arrested and sentenced.

16   Q.  Okay.  But the defendant wasn't in jail, right?

17   A.  That's right.

18   Q.  Bones was?

19   A.  Yes.

20   Q.  Okay.

21           MR. SOBELMAN:  No further questions, your Honor.

22           THE COURT:  Any recross?

23           MR. SCHNEIDER:  Thank you.

24   RECROSS EXAMINATION

25   BY MR. SCHNEIDER:

M9E6RAJ4                          Adeusi - Recross

1    Q.  You were just asked by the government about the meetings

2    that you don't remember every word from a couple of years ago,

3    right?

4    A.  Not every word.  Some of the words, I remember some.

5    Q.  But those meetings that you had with the government and the

6    conversations you had with the government were more recent than

7    the conversations you had with Mr. Raji and Dauda and other

8    people, right?  Those meetings were more recent, right?

9    A.  The meetings with the government?

10   Q.  Yes.

11   A.  Yes, that's right.

12   Q.  The others were a few years after the 2017 and 2018

13   conversations you said you had, right?

14   A.  That was almost --

15   Q.  Right?

16   A.  Yes.

17   Q.  And by the way, you said you weren't in the right frame of

18   mind during the October, November conversations with the

19   government.  You were talking about your life and your future,

20   right?

21   A.  That's right, sir.

22   Q.  And you had a lawyer, right?

23   A.  Yes.

24   Q.  And you and the lawyer, without telling us what was said

25   between you, were trying to decide what the best thing was for

M9E6RAJ4                        Adeusi - Recross

1    you to do, going forward?

2              MR. SCHNEIDER:  Objection.

3              THE COURT:  Sustained.  Sustained as asked.

4    Q.  You, in these -- this time of October, November of 2020,

5    you were telling the government that you were innocent, right?

6              MR. SOBELMAN:  Objection.  Scope.

7              THE COURT:  Overruled.

8    Q.  Right?

9    A.  I wasn't saying I was innocent.  I was trying to point out

10   my crimes as what I was assisting with at the time, and not

11   knowing that those were crimes.  You know, I'm not a lawyer.  I

12   did --

13   Q.  You were telling the government back in October and

14   November of 2020 that you were legally married, right?  Yes or

15   no, did you say that or not?

16             MR. SOBELMAN:  Objection, scope.

17   A.  Let me explain, please.

18             THE COURT:  Scope objection is overruled, but asked

19   and answered.  Next question.

20   Q.  Did you tell the government that you did not commit fraud

21   during those meetings in 2020?

22             MR. SOBELMAN:  Objection.  Asked and answered.

23             THE COURT:  Sustained.

24             MR. SOBELMAN:  Your Honor, he asked, if I may.

25             THE COURT:  Sustained.

M9E6RAJ4                            Adeusi - Recross

1   Q.  Now you said that Naandi's in jail now.  Was Naandi in jail

2   back in 2017?

3   A.  No.

4   Q.  Was Naandi jail back in 2018?

5   A.  No.

6   Q.  Okay.  Was Bones in jail in 2017 and '18?

7   A.  I don't know when Bones was sentenced, but I know a picture

8   of the account says the year.  I can't remember.

9   Q.  Well, not exact.  How about within a two-year period?  Do

10  you have any idea when?

11  A.  I know Bones was in jail in 2018, yes.

12  Q.  But you were dealing with Bones for scams in 2017 and '18,

13  weren't you?

14  A.  Yes, that's correct, yes.

15  Q.  Now, I just want to be clear.  Government Exhibit 31 is

16  your cooperation agreement, which is dated January 23 -- 29th

17  of 2020, okay?

18  A.  Okay.

19  Q.  But we spoke earlier about a different cooperation

20  agreement at a different time.  But it's basically -- the jury

21  knows, it's basically the same cooperation agreement that was

22  just edited for technical reasons, right?

23  A.  Yes.

24  Q.  So what we spoke about earlier is the same exact

25  cooperation agreement as Government Exhibit 31?

M9E6RAJ4                          Floyd - Direct

1    A.  Yes, sir.

2             MR. SCHNEIDER:  Okay.  I have nothing else.

3             THE COURT:  All right.  Can we excuse the witness?

4             MR. SOBELMAN:  Yes, your Honor.

5             THE COURT:  All right.  Mr. Adeusi, you may step down.

6    You're excused.

7             (Witness excused)

8             THE COURT:  Thank you.  Next witness.

9             MR. SOBELMAN:  The government calls Wayne Floyd.

10            THE COURT:  Please make your way up here, and when you

11   get up, please just remain standing.

12            Witness sworn.

13    DALE WAYNE FLOYD,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16            THE COURT:  If you can move your chair up another inch

17   or two.

18            THE WITNESS:  Sorry, sir.

19            THE COURT:  Just speak loudly and clearly into the

20   microphone an inch or so away from yourself.

21            MR. SOBELMAN:  If you need to pull it toward yourself.

22   DIRECT EXAMINATION

23   BY MR. SOBELMAN:

24   Q.  Good afternoon, Mr. Floyd.

25   A.  Hello.

M9E6RAJ4                          Floyd - Direct

1    Q.   What organization do you work for?

2    A.   St. Francis Medical Center.

3    Q.   Is that also known as St. Francis Healthcare System?

4    A.   It is.

5    Q.   Do you sometimes refer to it for short as St. Francis?

6    A.   We do.

7    Q.   What is your title at St. Francis?

8    A.   I'm the cyber security officer.

9    Q.   Just make sure you speak slowly so that everyone can hear

10   you, especially the court reporter.

11   A.   I'm the cyber security officer.

12   Q.   When did you become the cyber security officer for

13   St. Francis?

14   A.   July 2017.

15   Q.   What are your duties and responsibilities as the cyber

16   security officer?

17   A.   There's a lot of things I do.  I maintain our defenses, try

18   to get our defenses from a cyber attack, where they need to be,

19   investigate any possible issues, educate our users on what to

20   look for.  Also review any purchases to make sure they don't

21   have any cyber risk.  I maintain management functions -- human

22   resource functions, I have as well.

23   Q.   I'd like to direct your attention to May and June of 2018.

24        At a high level, what, if any, unusual incident

25   occurred during that time period?

M9E6RAJ4                          Floyd - Direct

1    A.  We had a business e-mail compromise incident where the

2    e-mail account for our chief financial officer, Dave Prather,

3    was compromised.  And invoices were sent and paid from that

4    incident.

5    Q.  Mr. Bailey, can you please show the witness what's been

6    marked for identification as Government Exhibit 22?

7           Mr. Floyd, do you recognize this document?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  This is one of the e-mails that was sent as a result of the

11   business e-mail compromise incident.

12          MR. SOBELMAN:  The government offers

13   Government Exhibit 22.

14          MR. SCHNEIDER:  No objection.

15          THE COURT:  Admitted.

16          (Government's Exhibit 22 received in evidence)

17   Q.  Mr. Bailey, can you please explain what's now in evidence

18   as Government Exhibit 22 for the jury?  And if you could focus

19   on what -- the bottom e-mail on the chain, which is the bottom

20   of that page.

21          Mr. Floyd, what is the date on this e-mail?

22   A.  May 21, 2018, at 8:56 a.m.

23   Q.  Who is this e-mail sent by?

24   A.  This e-mail was sent by Dori Bigler.  She was the manager

25   of accountant.

1    Q.   Who was this e-mail sent to?

2    A.   It was sent to Dave Prather, our chief financial officer

3    and copied to Erika Russel.  She's an accounts payable clerk to

4    be specific.

5    Q.   So those are all employees of St. Francis?

6    A.   Yes, they are.

7    Q.   What is the subject line of this e-mail?

8    A.   "Julie."

9    Q.   Can you please read the e-mail starting with "Dave"?

10   A.   Dave, we were unable to export them after all.  One report

11   shows the transaction history.  Then we downloaded the detail

12   which shows Julie adding the dates and then Marie approving

13   them.  Let us know if you need anything else, Dori.

14   Q.   Mr. Bailey, if you could now please focus on the top e-mail

15   of the chain, which is at the top of the page.

16           Mr. Floyd, what's the date on this e-mail?

17   A.   May 21st, 2018 at 11:33 a.m.

18   Q.   What's the subject line?

19   A.   "Urgent payment."

20   Q.   Just to be clear, is the subject line the same or different

21   than the e-mail below in the chain?

22   A.   It is different.

23   Q.   Were you able to determine whether this e-mail was actually

24   sent and received?

25   A.   This e-mail was sent and received.

M9E6RAJ4                         Floyd - Direct

1    Q.  And just briefly, what kind of methods do you use to reach

2    that determination?

3    A.  Various things we do.  This incident, I accessed

4    Dave Prather's e-mail account, confirmed it was in his sent

5    items folder.  I accessed Dori's e-mail account, confirmed it

6    was in her inbound.  I looked through our Office 365 logs to

7    determine that the e-mail had transmitted through as well.

8    Q.  Who does this mail appear to be sent by?

9    A.  Dave Prather.

10   Q.  Were you able to determine whether Mr. Prather actually

11   sent this e-mail?

12   A.  He did not actually send the e-mail.

13   Q.  Aside from what he may have told you, how did you determine

14   that?

15   A.  So one of the things we did, when you're doing anything on

16   the Internet, there's an IP address or Internet protocol

17   address.  And we traced the Internet protocol of this e-mail,

18   and it was not from the St. Francis location.  It was not from

19   Mr. Prather's home.  It was from another location.

20   Q.  What is an IP address?

21   A.  It's your address on the Internet.  Anytime you connect to

22   the Internet, anytime you send e-mail, receive e-mail or do

23   anything, it allows us to trace back to where you are.

24   Q.  Were you able to determine who sent this e-mail if it

25   wasn't Mr. Prather?

M9E6RAJ4                          Floyd - Direct

1   A.  Unfortunately, we were not.

2   Q.  Can you read the e-mail, starting with, "Please see"?

3   A.  "Please see attached and proceed with the payment today.

4   Send me a confirmation immediately after the payment goes out."

5   Q.  Were there any attachments to this e-mail?

6   A.  There were.  There were two.

7   Q.  Mr. Bailey, can you please show the witness what's been

8   marked for identification as Government Exhibits 22A and 22B?

9            Mr. Floyd, do you recognize these?

10  A.  Yes, these were the attachments to the e-mail.

11           MR. SOBELMAN:  The government offers

12  Government Exhibit 22A and B.

13           MR. SCHNEIDER:  No objection.

14           THE COURT:  Admitted.

15           (Government's Exhibits 22A and 22B received in

16  evidence)

17           And let me just interrupt and take the opportunity to

18  say that this testimony is similar to what you heard yesterday,

19  about which I gave you instructions yesterday.  That is to say

20  it's not part of the charges in this case.  And therefore, you

21  may consider it only for the limited purposes that I mentioned

22  yesterday, namely the defendant's knowledge, intent, identity,

23  absence of mistake and lack of accident with respect to the

24  actual charges in the case.  So with that understanding, you

25  may consider this evidence.

M9E6RAJ4                        Floyd - Direct

1              You may proceed.

2     Q.  Mr. Bailey, can you please display what's now in evidence

3     as Government Exhibit 22A?

4              Mr. Floyd, what's the name of the company listed on

5     this invoice in the upper right-hand corner?

6     A.  Emergent Development Corporation.

7     Q.  And prior to the incident involving these e-mails, had you

8     ever heard of Emergent Development Corporation?

9     A.  I had not.

10    Q.  As far as you are aware, did Emergent Development

11    Corporation have any relationship with St. Francis?

12    A.  They did not.

13    Q.  Focusing on the middle of the page, how much does -- how

14    much money does this invoice request?

15    A.  95,406-dollars and 14 -- 15 cents.  Sorry.

16    Q.  As far as you are aware, were any of the supposed services

17    listed in this invoice actually provided by Emergent

18    Development Corporation to St. Francis?

19    A.  They were not.

20    Q.  Mr. Bailey, can you please focus on the bottom part of the

21    page where it states, "Please pay by bank wire or ACH"?

22             Mr. Floyd, just generally, what appears here?

23    A.  It's the -- excuse me.  It's the bank account, the bank

24    routing number, the bank name, and the address of the bank

25    where the funds were sent to.

M9E6RAJ4                         Floyd - Direct

1   Q.   Was the payment requested in this invoice made by

2   St. Francis?

3   A.   It was.

4   Q.   Was St. Francis ever able to get that money back?

5   A.   We were not.

6   Q.   Mr. Bailey, can you please display what's in evidence as

7   Government Exhibit 22B?

8            Mr. Floyd, is this the other attachment to the e-mail

9   we looked at?

10  A.   Yes, sir.

11  Q.   Generally what is this document?

12  A.   This is IRS Form W9.

13  Q.   And what is IRS Form W9?

14  A.   It would have the taxpayer identification number of a

15  vendor.  It is a required before we set up a vendor.  It's

16  required before we can pay a vendor, so it's a crucial document

17  in our accounting work flow.

18  Q.   What company is listed on this W9?

19  A.   Emergent Development Corporation.

20  Q.   Can you please show the witness what's marked for

21  identification Government Exhibit 21, Mr. Bailey?

22            Mr. Floyd, do you recognize this document?

23  A.   Yes, I do.

24  Q.   What is it?

25  A.   This is another one of the e-mails that was part of the

M9E6RAJ4                         Floyd - Direct

1    business e-mail compromise incident.

2              MR. SOBELMAN:  The government offers Government

3    Exhibit's 21.

4              MR. SCHNEIDER:  No objection.

5              THE COURT:  Admitted.

6              (Government's Exhibit 21 received in evidence)

7    Q.  Mr. Bailey, can you please display it for the jury and

8    focus on what looks like the bottom e-mail on the chain, which

9    is at the bottom of the first page?

10             Mr. Floyd, who does this e-mail appear to be from?

11   A.  Emergent Development Corporation.

12   Q.  And who does it appear to be sent to?

13   A.  To Maryann Reese and Dave Prather.

14   Q.  Who is Maryann Reese?

15   A.  She was our chief executive officer at the time.

16   Q.  And Mr. Prather, please you remind us who he was.

17   A.  He was our chief financial officer at the time.

18   Q.  And before we read through this e-mail, were you able to

19   determine whether this e-mail in the chain was actually sent?

20   A.  This part of the e-mail is a forgery?

21   Q.  How were you able to determine that, the same methods you

22   used earlier?

23   A.  Same methods I used earlier.  I went through Maryann's

24   inbound inbox.  Dave Prather's inbox.  Looked through the

25   Office 365 logs, and we could find no trace of this e-mail.

M9E6RAJ4                        Floyd - Direct

1    Q.  This is not a real e-mail.  How could someone make it look

2    like this?

3    A.  It's pretty easy to do.  You could either take an existing

4    email, copy it, paste it, edit it.  You can do it within the

5    e-mail, or you can do it within Word and copy it back into the

6    e-mail.

7    Q.  And would someone just basically put that at the bottom of

8    whatever e-mail they were sending?

9    A.  They would.

10   Q.  What is the subject line on this fake e-mail?

11   A.  "External:  Past due invoice."

12   Q.  Can you please read the fake e-mail starting with, "Good

13   morning, Maryann"?

14   A.  "Good morning, Maryann.  There are two invoices on your

15   account currently showing past due.  Would you please provide

16   the payment status on the following at your earliest

17   convenience?"

18          It lists invoice I-297710 for $95,406.15 and I-196491

19   for $65,624.45.

20   Q.  How is it signed at the bottom?

21   A.  "Sincerely, Emergent Development Corporation."

22   Q.  Mr. Bailey, let's go up to the next e-mail that appears in

23   the chain.

24          Mr. Floyd, were you able to determine whether this

25   e-mail was actually sent?

1    A.   This e-mail is a forgery as well.

2    Q.   Who was this fake e-mail supposedly sent to?

3    A.   Supposedly sent to Dave Prather.

4    Q.   Who was it supposedly sent to?

5    A.   Maryann Reese.

6    Q.   What was the date on this fake e-mail?

7    A.   May 30th, 2018 at 8:50 a.m.

8    Q.   What is the subject line on this fake e-mail?

9    A.   "Forward:  External:  Past due invoice."

10   Q.   Can you please read the fake e-mail starting with "Dave"?

11   A.   "Dave, okay to pay.  Thanks, MA."

12   Q.   Mr. Bailey, can you go up to the first e-mail in the chain?

13        Mr. Floyd, were you able to determine whether this

14   e-mail was actually sent?

15   A.   This e-mail was sent.

16   Q.   And did you determine that using the same methods you

17   described earlier?

18   A.   Yes, we did.

19   Q.   And who does this e-mail appear to be sent by?

20   A.   Appears to be sent by Dave Prather.

21   Q.   Were you able to determine whether Mr. Prather actually

22   sent this e-mail?

23   A.   He did not send it.

24   Q.   Did you use the same methods you discussed earlier to reach

25   that determination?

M9E6RAJ4                          Floyd - Direct

1   A.  Yes, I did.

2   Q.  Were you able to determine who sent it?

3   A.  We were not.

4   Q.  What is the date on this e-mail.

5   A.  May 30th, 2018, at 12:23 p.m.

6   Q.  Who is the e-mail sent to?

7   A.  Dori Bigler, manager of accounting and Robin Boyd,

8   accounting clerk.

9   Q.  Can you please read the e-mail starting with, "Please pay"?

10  A.  "Please pay the attached invoices today and send me a

11  confirmation once done."

12  Q.  Were there any attachments to this e-mail?

13  A.  There were.

14  Q.  Mr. Bailey, can you please show the witness what's been

15  marked for identification as Government Exhibits 21A and 21B?

16         Do you recognize these?

17  A.  Yes.

18  Q.  What are they?

19  A.  These were the attachments to the e-mail.

20         MR. SOBELMAN:  The government offers

21  Government Exhibits 21A and 21B.

22         MR. SCHNEIDER:  No objection.

23         THE COURT:  Admitted.

24         (Government's Exhibits 21A and 21B received in

25  evidence)

M9E6RAJ4                        Floyd - Direct

1   Q.  Mr. Bailey, can you please now display what's in evidence

2   as Government Exhibit 21A, please?

3          Mr. Floyd, what's the name of the company listed on

4   this invoice in the upper right-hand corner?

5   A.  Emergent Development Corporation.

6   Q.  Focusing on the middle of the page, how much money does

7   this invoice request?

8   A.  $95,406.15.

9   Q.  As far as you are aware, were any of the supposed services

10  listed in this invoice actually provided --

11  A.  They were --

12  Q.  -- to Emergent Development Corporation from St. Francis?

13  A.  They were not.

14  Q.  Mr. Bailey, can you please focus on the bottom part of the

15  page where it says, "Please pay by bank wire, or ACH"?

16          Mr. Floyd, is this is the same information that we saw

17  on the other fake invoice?

18  A.  It is.

19  Q.  Was the payment requested in this invoice made by

20  St. Francis?

21  A.  It was.

22  Q.  Was St. Francis ever able to get that money back?

23  A.  We were not.

24  Q.  Mr. Bailey, can you please display what's in evidence as

25  Government Exhibit 21B?

M9E6RAJ4                        Floyd - Direct

1              Is this the other attachment to the e-mail we just

2       looked at, Government Exhibit 21?

3       A.  Yes, it is.

4       Q.  Is this from the same company as the last invoice?

5       A.  Yes.  It was Emergent Development Corporation.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9EQraj5                              Floyd - Direct

1    BY MR. SOBELMAN:  (Continued)
2    Q.  And focusing on the middle of the page, how much money does
3    this invoice request?
4    A.  $65,624.45.
5    Q.  As far as you were aware, were any of the supposed services
6    listed in this invoice actually provided by Emergent
7    Development Corporation to Saint Francis?
8    A.  They were not.
9    Q.  Was the payment requested in this invoice actually made
10   by -- excuse me -- was the payment request in this invoice
11   actually made by Saint Francis?
12   A.  Yes, we paid the funds.
13   Q.  Was Saint Francis ever able to get that money back?
14   A.  We were not.
15   Q.  As far as you know, did anyone from Emergent Development
16   Corporation ever reach out to Saint Francis to return the
17   money?
18   A.  They did not.
19          MR. SOBELMAN:  No further questions.
20          THE COURT:  Cross-examination.
21          MR. SCHNEIDER:  No questions.
22          THE COURT:  Sir, you are excused at this time.  You
23   may step down.
24          (Witness excused)
25          THE COURT:  Next witness.

M9EQraj5                         Gassert - Direct

1              MS. GHOSH:  The government calls Special Agent Michael

2    Gassert.

3     MICHAEL GASSERT,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6              DEPUTY CLERK:  Can you please state and spell your

7    full name for the record?

8              THE WITNESS:  Yes.  My name is Michael Gassert.

9    M-I-C-H-A-E-L.  G-A-S-S-E-R-T.

10             THE COURT:  If you could just move your chair a little

11   forward and bend the microphone so that you're speaking

12   directly into it an inch or two away, that would be great.

13   Keep your voice up.

14             You may proceed, counsel.

15   DIRECT EXAMINATION

16   BY MS. GHOSH:

17   Q.  Good afternoon, Special Agent Gassert.  Where do you work?

18   A.  I work for the FBI.

19   Q.  What's your title?

20   A.  Special agent.

21   Q.  How long have you been a special agent with the FBI?

22   A.  Since approximately February 2020.

23   Q.  Which office do you work out of?

24   A.  The Manhattan office.

25   Q.  Are you assigned to any particular FBI squad or group?

M9EQraj5                    Gassert - Direct

```
 1    A.   Yes.  I'm on a cyber financial crime task force.
 2    Q.   I'd like to turn to your work on this case.  What role, if
 3    any, have you played in preparing for this trial?
 4    A.   Nothing outside of preparation for today.
 5    Q.   Are you familiar with the term summary charts?
 6    A.   Yes.
 7    Q.   In preparation for your testimony today, did you assist in
 8    the creation of summary charts?
 9    A.   Yes.
10    Q.   What was your role specifically?
11    A.   I reviewed and made sure the charts themselves were
12    accurate as well as provided some edits to it.
13    Q.   What type of evidence did you review for those charts?
14    A.   Bank records.
15    Q.   Who decided which documents you should review when you were
16    looking at those charts?
17    A.   The prosecution team.
18    Q.   Did you review all of the documents in this case?
19    A.   Not all the documents.
20    Q.   With respect to the investigation that led to the charges
21    in this case, was that investigation carried out by your squad?
22    A.   Yes.
23    Q.   Did you personally ever work on the investigation?
24    A.   I personally did not.
25    Q.   Have you had any involvement in preparing for this trial
```

M9EQraj5                              Gassert - Direct

1     other than what you described in looking at the exhibits and

2     confirming that the summary charts are accurate?

3     A.  No.

4               MS. GHOSH:  The government offers Government Exhibit

5     S-9, which is a stipulation between the parties.

6               THE COURT:  All right.  Admitted without objection.

7               (Government's Exhibit S-9 received in evidence)

8               MS. GHOSH:  Mr. Bailey, could you please display

9     Government Exhibit S-9.

10              I'll read paragraph 1.

11              The following government exhibits consist of true and

12    correct copies of account information, statements, wire

13    records, and other bank records from the following financial

14    institutions.

15              Mr. Bailey, if you could go to page 2 now, please.

16    I'll read paragraph 2.

17              The aforementioned Government Exhibits are business

18    records created and maintained by the financial institutions

19    listed above, that were made at or near the time of their

20    creation by, or from information transmitted by, a person with

21    knowledge of the matters set forth in the records, and were

22    kept in the course of a regularly conducted activity of the

23    financial institutions listed above as a regular practice of

24    that activity.

25              Mr. Bailey, if you could please go back up to the

M9EQraj5                        Gassert - Direct

1    chart.  Thank you.

2            And this chart includes Government Exhibits 106A

3    through 106C, which are records from Regions Bank for the bank

4    account in the name of Emergent Development Corporation and

5    account ending in 0511, as well as 109A through 109C, which are

6    records from TD Bank for an account in the name of Emergent

7    Development Corporation, account ending in 2518, and Exhibits

8    114A through 114C from Suntrust, which are account records from

9    Best Janitor Cleaning Services LLC account ending in 6757.

10           The government offers Exhibits 106A through C, 109A

11   through C, and 114A through C pursuant to the stipulation.

12           THE COURT:  Admitted.

13           (Government's Exhibits 106A-106C, 109A-109C, 114A-114C

14   received in evidence)

15   Q.  Mr. Bailey, if you could take down S-9, and if you could

16   just put up for the witness Government Exhibit 509.

17           Special Agent Gassert, I'm showing you what has been

18   marked for identification as Government Exhibit 509.  Do you

19   recognize this?

20   A.  Yes.

21   Q.  And generally what is it?

22   A.  This is a chart summarizing April and May 2017 transfers

23   starting with Southern Oregon University.

24   Q.  Did you review this chart in preparation for your testimony

25   today?

M9EQraj5                        Gassert - Direct

1   A.  Yes.

2   Q.  Did you review the exhibits referenced in the chart?

3   A.  Yes.

4   Q.  Are those records voluminous?

5   A.  Yes.

6   Q.  Did you confirm that the chart accurately reflects those

7   records?

8   A.  I did.

9           MS. GHOSH:  The government offers Government Exhibit

10  509 into evidence pursuant to Rule 1001.

11          THE COURT:  I think you mean 1006.

12          MS. GHOSH:  Sorry, your Honor.

13          THE COURT:  Any objection?

14          MR. SCHNEIDER:  No.

15          THE COURT:  Admitted.

16          And, ladies and gentlemen, let me just explain to you

17  that Rule 1006 permits parties in certain circumstances to

18  offer charts or summaries in place of, or in addition to, the

19  underlying documents that they represent in order to save time

20  and avoid unnecessary inconvenience, particularly in

21  circumstances where the underlying documents are voluminous and

22  contain a lot of information.

23          Charts and summaries are no better than the testimony

24  or the documents upon which they are based, therefore, you are

25  to give no greater consideration to them than you would to the

1    evidence upon which they are based.  And as with all evidence,

2    it is for you to decide whether they correctly present the

3    information contained in the testimony or documents on which

4    they are based, and to decide what weight, if any, to give to

5    them.  But with that, this is admitted into evidence.

6              (Government's Exhibit 509 received in evidence)

7    Q.  Mr. Bailey, could you please display Government Exhibit 509

8    for the jury.

9              Special Agent Gassert, I'm going to ask you to explain

10   this chart, but first, is all of the information contained in

11   this chart from the list of sources at the bottom of each box?

12   A.  Yes.

13   Q.  Those are all government exhibits, correct?

14   A.  They are.

15   Q.  Mr. Bailey, could you please zoom in on the first section

16   on the left-hand side, the first two boxes please.  Thank you.

17             Special Agent Gassert, the first box on the far left

18   says Southern Oregon University.  What does the arrow pointing

19   to the right with the date April 27, 2017 indicate?

20   A.  That indicates an outgoing transaction starting with

21   Southern Oregon University and ending in the account named Best

22   Janitor Cleaning Services LLC.

23   Q.  And do you see the name Flor Caicedo in parentheses there?

24   A.  Yes.

25   Q.  What does it mean that that name is in parentheses after

1   the account name?

2   A.   She is the signator for that account.

3   Q.   What is a signator for a bank account?

4   A.   That's the individual or individuals that opened the

5   account.

6   Q.   And underneath that, do you see Suntrust 6757?

7   A.   Yes.

8   Q.   What does that refer to?

9   A.   That's the bank which the account was opened at as well as

10  the last four digits of the account number.

11  Q.   The account that received the approximately $1.9 million

12  transfer?

13  A.   Yes.

14  Q.   Mr. Bailey, if you could please pull up Government Exhibit

15  114A which is now in evidence.   Thank you.

16       Generally speaking, Special Agent Gassert, what is

17  this document?

18  A.   This is a business account signature card.

19  Q.   What is a signature card for a bank?

20  A.   Those are the documents used for the individual or

21  individuals that want to open a bank account.

22  Q.   Does that individual sign the signature card?

23  A.   Yes.

24  Q.   What are the last four digits of the account that this is

25  for?

M9EQraj5                         Gassert - Direct

1    A.  The last four digits are 6757.

2    Q.  Who is listed as the authorized signer on this account?

3    A.  Flor Caicedo.

4    Q.  What is the date that this account was opened?

5    A.  The account was opened on February 27, 2017.

6    Q.  Mr. Bailey, you could take down 114A and please put up 114B

7    for the jury.

8           Generally speaking, what is this document?

9    A.  These are an account statement for a Suntrust Bank account.

10   Q.  Isn't this the account statement or bank statement for the

11   account we just saw on Exhibit 114A?

12   A.  Yes.

13   Q.  Is the $1.9 million transaction on the summary chart we saw

14   reflected in this bank statement?

15   A.  It is.

16   Q.  Mr. Bailey, could you please zoom in on the middle portion.

17   Perfect.  Thank you.

18           Could you please read the description listed next to

19   the 1.9, approximately $1.9 million amount.

20   A.  "Electric/ACH credit, Southern OR University invoice."

21   Q.  What does "Electronic/ACH credit" mean in this context?

22   A.  A deposit, an electronic deposit.

23   Q.  Focusing on -- if we could focus on the first page.  If you

24   could zoom out of that, Mr. Bailey, please.

25           Special Agent Gassert, can you see on this first page

1   how much money was in this account at the beginning of the

2   month?

3   A.  The beginning balance is $601.63.

4   Q.  Could we please go back to Government Exhibit 509,

5   Mr. Bailey.  Could you now zoom in on the middle box that

6   begins "in addition."

7           Special Agent Gassert, could you please tell us what

8   this box on this summary chart indicates.

9   A.  Sure.  This box indicates the money taken out of the

10  account we just looked at between April 27 and May 2, 2017.

11  Q.  And what are the two transactions referenced in this box?

12  A.  The first transaction is a $56,500 outgoing transfer to

13  Emergent Development Corporation.  And the second is a $58,000

14  outgoing transaction to Emergent Development Corporation.

15  Q.  And in addition to those two transactions, there were 35

16  other disbursements of that money.  Is that correct?

17  A.  Correct.

18  Q.  If you could zoom out of that, Mr. Bailey, please, and

19  we'll just look at this last box on here.

20          What does this show?

21  A.  This shows the totality of the outgoing transactions.

22  Q.  And over what time frame did these outgoing transactions

23  occur?

24  A.  The starting date is April 27, and the ending date is

25  May 2.

M9EQraj5                          Gassert - Direct

1    Q.  What are the two checks highlighted in red?

2    A.  Those were the two outgoing transfers we just looked at to

3    Emergent Development Corporation.

4    Q.  Mr. Bailey, could you zoom out from that for a moment?

5    Thank you.

6              How much was withdrawn from the 1.9 million over that

7    time frame April 27 through May 2?

8    A.  From April 27 to May 2, 2017, $1,559,950 was disbursed.

9    Q.  Mr. Bailey, could you please put up Government Exhibit 106A

10   which is in evidence.  You can take down 509.

11             Special Agent Gassert, what is this document?

12   A.  This is an account signature document with Regions Bank.

13   Q.  What is the company name that it's for?

14   A.  The company name is Emergent Development Corporation.

15   Q.  Who is the authorized signer, if you look at the bottom?

16   A.  Mustapha Raji.

17   Q.  Is anyone else listed?

18   A.  No.

19   Q.  Mr. Bailey, could you please take that down and put up

20   106C.  Thank you.  If you could go to the second page and zoom

21   in on that top portion.  Thank you.

22             Special Agent Gassert, what is this?

23   A.  This is a copy of a check.

24   Q.  And who is this check made out to?

25   A.  Emergent Development Corporation.

M9EQraj5                          Gassert - Direct

1    Q.  Was this one of those two transactions in red on the

2    summary chart?

3    A.  Yes.

4    Q.  When you reviewed the chart that was Government Exhibit

5    509, did you also review the bank statements for Emergent

6    Development Corporation account at Regions Bank?

7    A.  I did.

8    Q.  Did those bank statements reflect the other check from Best

9    Janitor Services?

10   A.  Yes, they did.

11   Q.  And are all of those bank statements identified on the

12   chart?

13   A.  Not all the bank statements are, no.

14   Q.  Sorry.  Let me clarify that.  Are the bank statements that

15   you looked at identified by a Government Exhibit number on the

16   chart?

17   A.  Oh, yes, they are.

18        MS. GHOSH:  The government offers stipulation S-2, a

19   stipulation between the parties.

20        THE COURT:  All right.  Admitted.

21        (Government's Exhibit S-2 received in evidence)

22   Q.  If you could put that up please, Mr. Bailey.

23        Thank you.  And I will read from paragraph 8 if you go

24   to the second page.

25        Government Exhibit 408 is a true and accurate copy of

M9EQraj5                              Gassert - Direct

1    a 2017 Florida profit corporation amended annual report filed

2    electronically with the Florida Secretary of State on

3    December 19, 2017.

4            The government offers Government Exhibit 408 pursuant

5    to the stipulation.

6            THE COURT:  Admitted.

7            (Government's Exhibit 408 received in evidence

8    Q.  Mr. Bailey, could you please put up Government Exhibit 408

9    for the jury.

10           THE COURT:  While you're doing that, let me just tell

11   the jury, during your deliberations, you are going to get

12   copies of all the exhibits that are admitted into evidence.  So

13   I recognize that some of this is passing relatively quickly.

14   Have no fear, you'll have plenty of time to review any and all

15   documents that you wish to review as part of your

16   deliberations.

17   Q.  Special Agent Gassert, what company are these records for?

18   A.  These records are for Emergent Development Corporation.

19   Q.  Who is the registered agent?

20   A.  The registered agent is Mustapha Raji.

21   Q.  Thank you.  Who is the president?

22   A.  The president is Mustapha Raji.

23   Q.  Mr. Bailey, could you please put back up stipulation S-9.

24           And this stipulation includes Government Exhibits 108A

25   through D, which are records from CitiBank for an account in

M9EQraj5                         Gassert - Direct

1    the name Emergent Development Corporation, an account ending in

2    4598; and 113A, which is an account at TD Bank from Miami Shops

3    LLC, an account ending in 6839.

4            You can take that down, Mr. Bailey.  If you could

5    please put up Government Exhibits 507 and 508 side by side just

6    for the witness.

7            THE COURT:  Are you offering 108A through D and 113A.

8            MS. GHOSH:  I apologize, yes, your Honor.  The

9    government offers 108A through D and 113A pursuant to the

10   stipulation.

11           THE COURT:  They are admitted.

12           (Government's Exhibits 108A-108D and 113A received in

13   evidence)

14   Q.  Special Agent Gassert, do you recognize these two

15   documents?

16   A.  Yes.

17   Q.  Generally, what are they?

18   A.  They are documents showing the May and June 2018 transfers

19   starting from Saint Francis Medical Center.

20   Q.  Did you review these charts in preparation for your

21   testimony today?

22   A.  Yes.

23   Q.  Did you review the exhibits referenced in the charts?

24   A.  Yes, I did.

25   Q.  Are those records voluminous?

1    A.   Yes.

2    Q.   And did you confirm that the charts accurately reflect

3    those records?

4    A.   I did.

5              MS. GHOSH:   The government offers Government Exhibits

6    507 and 508 into evidence.

7              MR. SCHNEIDER:   No objection.

8              THE COURT:   Admitted.

9              (Government's Exhibits 507 and 508 received in

10   evidence)

11   Q.   We'll start with Government Exhibit 507.   If you could put

12   that up for the jury, please.   Thank you.

13             Special Agent Gassert, starting at the box from the

14   far left that says Saint Francis Medical Center, what does that

15   box and the arrow to its right indicate?

16   A.   That indicates an outgoing transaction starting from Saint

17   Francis Medical Center and ending at Emergent Development

18   Corporation.

19   Q.   Why is the name Mustapha Raji in parentheses next to

20   Emergent Development Corporation?

21   A.   He was the signator for that account.

22   Q.   And what does CitiBank 4598 refer to?

23   A.   That shows the bank the account was opened at and the last

24   four digits of the account number.

25   Q.   There are two arrows, one from the top and one from the

1    bottom, coming out of that box.  What do those two arrows

2    indicate?

3    A.  Those indicate outgoing transactions starting from May 22,

4    2018 and another on May 25, 2018.

5    Q.  Starting with the May 22 transactions, what occurred on

6    that date?

7    A.  Two transactions.  One was an outgoing transaction of

8    $48,500 to Miami Shops LLC, and another was a $22,000

9    transaction to Miami Shops LLC.

10   Q.  But to two different bank accounts for Miami Shops LLC?

11   A.  Correct.

12   Q.  The bottom arrow coming out of the Emergent Development

13   Corporation box, what does that bottom arrow show?

14   A.  That bottom arrow shows three different forms of outgoing

15   transactions.  The first one was a $12,080 check to Mustapha

16   Raji.  The second was $2,800 in cash withdrawals.  And the

17   third was $6,288.11 to another recipient for rent.

18   Q.  If you could look at the box at the bottom outlined in red,

19   what does that indicate?

20   A.  That indicates the total of May 2018 transfers from

21   Emergent Development Corporation.

22   Q.  What was that total?

23   A.  $91,668.11.

24   Q.  Out of the original approximately $95,000?

25   A.  Yes.

M9EQraj5                          Gassert – Direct

1   Q.  And over how many days was it that that $91,000 was moved

2   out of the Emergent Development Corporation account?

3   A.  Approximately three days.

4   Q.  If you could take down this and put up, Mr. Bailey,

5   Government Exhibit 108A.  Thank you.

6           Generally, what is this document?

7   A.  This is a signature card for a savings account.

8   Q.  What are the last four digits of the account number?

9           Mr. Bailey, if you could zoom in on the top portion

10  there, that would be great.  Thank you.

11  A.  The last four digits for the account number are 4598.

12  Q.  And what name is the account in?

13  A.  Mustapha Muhammad Raji.

14  Q.  What is the business name on the account first?

15  A.  Emergent Development Corporation.

16  Q.  And who is the authorized signer?

17  A.  Mustapha Muhammad Raji.

18  Q.  Mr. Bailey, could you please turn to page 5 of this

19  exhibit.  Thank you.

20          Generally speaking, what type of information does this

21  page show?

22  A.  This is a business deposit account application.

23  Q.  Is this information provided when the account is first

24  being opened?

25  A.  Yes.

M9EQraj5                         Gassert - Direct

1    Q.  Is this provided by the person opening the account?

2    A.  Yes, it is.

3    Q.  At the bottom of the business information section, if you

4    could zoom in on the top third or so that says business

5    information.  Thank you.

6             At the bottom of that, who is listed as the primary

7    contact name?

8    A.  The primary contact name is Mustapha Muhammad Raji.

9    Q.  What is the contact primary phone number listed?

10   A.  305-924-0360.

11   Q.  If you look a few rows above that, do you see where there's

12   a row that starts number of locations?

13   A.  Yes.

14   Q.  How many locations are listed?

15   A.  One.

16   Q.  What is the annual gross revenue listed?

17   A.  The annual gross revenue is $2 million.

18   Q.  What is the annual net profit listed?

19   A.  The annual net profit is $600,000.

20   Q.  What is the number of employees/agents listed for Emergent

21   Development Corporation?

22   A.  11.

23   Q.  Do you know whether CitiBank took any steps to

24   independently verify this information?

25   A.  I do not.

M9EQraj5                        Gassert - Direct

1    Q.  Mr. Bailey, could you please put up Government Exhibit
2    108B.
3          What is this document?
4    A.  This is an account statement for an account in the name of
5    Emergent Development Corporation.
6    Q.  Is this the same account that we were just looking at in
7    108A?
8    A.  Yes.
9    Q.  Looking at the top right, what is the month that these
10   statements are for?
11   A.  These are for the month of May.
12   Q.  At the list of transactions at the bottom of page 1, can
13   you first read what the account balance was on May 14, 2018?
14   A.  The beginning balance was negative $25.08.
15   Q.  Thank you.
16          Mr. Bailey, if you could zoom out of that and zoom in
17   on the list of dates.  Yes, that whole section, please, and all
18   the way over.  Thank you.
19          On May 14, if you can just read over to the balance,
20   the last balance listed on May 14, Special Agent Gassert.
21   A.  Yes, the last balance listed on May 14 was negative $21.13.
22   Q.  What transaction is listed on May 22, 2018 just after that?
23   A.  A wire from Saint Francis Medical Center was listed.
24   Q.  For how much money?
25   A.  $95,406.15.

M9EQraj5                          Gassert - Direct

1    Q.  Mr. Bailey, could you please pull up Government Exhibit 508

2    now?

3              MR. SCHNEIDER:  I'm sorry, which number?

4              MS. GHOSH:  508.

5              MR. SCHNEIDER:  Thank you.

6    Q.  Starting on the left, what is the first transaction that

7    this chart shows?

8    A.  The first transaction this chart shows is an outgoing

9    transaction from Saint Francis Medical Center to Emergent

10   Development Corporation.

11   Q.  For how much money?

12   A.  $161,030.60.

13   Q.  What happened after that transaction?

14   A.  After that transaction, on June 1, 2018, there were several

15   other outgoing transactions.

16   Q.  Some of these are listed as checks.  There's a $9,000 check

17   to Mustapha Raji and a $10,000 to Comcristal.  When the chart

18   says that happened on June 1, is that the date the check was

19   written or the date the check cleared?

20   A.  The date the check was written.

21   Q.  Where was the $100,001 transaction sent?

22   A.  That was sent to 9848614 Canada Inc.

23             MS. GHOSH:  Mr. Bailey, if you could put up Government

24   Exhibit S-2 next to this 508, please.  Thank you.  I will read

25   from paragraph 5.

M9EQraj5                        Gassert - Direct

1            Government Exhibit 406 is a true and accurate copy of

2     corporation information obtained from the government of Canada

3     on August 30, 2022.

4            The government offers Government Exhibit 406 pursuant

5     to the stipulation.

6            THE COURT:  Admitted.

7            (Government's Exhibit 406 received in evidence)

8     Q.  Mr. Bailey, if you could take down S-2 and put up

9     Government Exhibit 406 in its place, please.  Thank you.

10           What company is this a corporate record for?

11    A.  This is a record for 9848614 Canada Inc.

12    Q.  Who is listed as the corporation director on page 1?  It's

13    right in the middle of the page.

14           Exactly, Mr. Bailey.  Thank you.

15    A.  The corporation director is listed as Mustapha Raji.

16    Q.  And if you could turn to page 2, Mr. Bailey.

17           Who is listed as the officer director?

18    A.  The listed officer is Mustapha Raji.

19    Q.  Thank you.  We can take down 406.

20           Turning back to Government Exhibit 508, what is the

21    total that was transferred out of the Emergent Development

22    CitiBank account in these June 1, 2018 transactions?

23    A.  The total was $169,754.50.

24    Q.  And were all of those funds withdrawn where checks were

25    written the day after CitiBank account received 161,000 from

M9EQraj5                         Gassert - Direct

1    Saint Francis Medical Center?

2    A.  Yes, those were all after that transaction.

3              MS. GHOSH:  The government now offers stipulation S-6

4    between the parties.

5              I'm sorry, Mr. Bailey, you can take down 508.

6              THE COURT:  Admitted.

7              (Government's Exhibit S-6 received in evidence)

8              MS. GHOSH:  Thank you.  Mr. Bailey, if you could put

9    up S-6.

10             I'll read paragraphs 1 and 2.  Google is an internet

11   service provider that offers email services and cloud storage

12   services.  It provides free email services for email addresses

13   with a @gmail.com domain extension.

14             Government Exhibits 201 through 244 and any subparts

15   are authentic copies of online account records, emails and

16   their attachments produced by Google pursuant to court

17   authorized search warrants for the following accounts:

18   imaginehealthinc@gmail.com, emergentfl@gmail.com,

19   pthimot@gmail.com, and nancynmartino@gmail.com.

20             Exhibits in this series ending in a letter, such as A

21   or B, are attachments to the main exhibit.  For example,

22   Government Exhibits 215A and 215B are attachments to the email

23   that is marked as Government Exhibit 215.

24             The from, to, cc and bcc fields accurately display the

25   email addresses that sent or received the emails.  The sent

M9EQraj5                          Gassert - Direct

1    field accurately displays the dates and times on which the

2    emails were sent.

3            Pursuant to this stipulation, the government offers

4    the following exhibits:  201, 202, 208, 212 and 212A, 217, 232,

5    232A and 232B, 233, 233A, 234A, which the government notes was

6    previously admitted subject to connection, 235, 235A, 236,

7    236A, 240, 242, 243 and 244.

8            THE COURT:  Those are all admitted.  And in case

9    counsel's comment didn't make it clear, that one Exhibit 234A

10   was the document that was shown to you the other day and

11   admitted subject to later connection; that is, assuming there

12   was another piece of the puzzle that was admitted.  So that has

13   now been done, which is to say that that exhibit is now fully

14   in evidence.

15           You may proceed.

16           (Government's Exhibits 201, 202, 208, 212 and 212A,

17   217, 232, 232A and 232B, 233, 233A, 234A, 235, 235A, 236, 236A,

18   240, 242, 243 and 244 received in evidence)

19   BY MS. GHOSH:

20   Q.  Mr. Bailey, you can take down S-6, and if you could please

21   put up Government Exhibit 201.  Thank you.

22           Special Agent Gassert, who is this email from?

23   A.  This is from Emergent Development Corporation.

24   Q.  With which email address?

25   A.  Emergentfl@gmail.com.

M9EQraj5                          Gassert - Direct

```
 1   Q.  I'll come back to this email in a moment.  I first want to
 2   pause for a minute.  Mr. Bailey, if you could please put up
 3   Government Exhibit 242.  Thank you.
 4            Special Agent Gassert, what does this document show?
 5   A.  This appears to be subscriber information.
 6   Q.  Are you familiar with how subscriber information is
 7   collected by a company like Google?
 8   A.  Yes.
 9   Q.  Who provides this information?
10   A.  The user does.
11   Q.  What email address is listed here.
12            The third row down, Mr. Bailey.
13   A.  Emergentfl@gmail.com.
14   Q.  Do you see the row SMS near the bottom?
15   A.  Yes.
16   Q.  What phone number is listed there?
17   A.  Plus 1-404-769-1683.
18   Q.  What does SMS refer to here?
19   A.  Text messages.
20   Q.  And why would a phone number be provided to Google?
21   A.  For two-factor authentication or simply for notifications
22   from the Google account.
23   Q.  You can take down Exhibit 242.
24            THE COURT:  Can you explain what you mean by
25   two-factor authentication?
```

M9EQraj5                          Gassert - Direct

1              THE WITNESS:  Sure.  So usually with online accounts,

2     you'll have a user name and a password.  Along with that, you

3     can also set up a numeric code to get sent to your phone so

4     when you log in, you'll log in with the user name and password

5     plus this five to ten digit numeric code to make sure it's not

6     someone else logging in.

7              MS. GHOSH:  The government offers stipulation S-1?

8              THE COURT:  Admitted.

9              (Government's Exhibit S-1 received in evidence)

10             MS. GHOSH:  Mr. Bailey, could you please put that up.

11    I'll read paragraph 1.

12             Government Exhibit 701, which consists of subscriber

13    records for cellular telephone number 404-6769-1683, is a true

14    and correct business record of the cellular phone service

15    provider AT&T, which was created, kept and maintained by AT&T

16    in the course of its regularly conducted business activity.

17             Government Exhibit 701 reflects that Mustapha Raji was

18    the subscriber of cellular telephone number 404-769-1683 from

19    approximately July 13, 2015 through December 6, 2018.

20             The government offers Exhibit 701 pursuant to the

21    stipulation

22             THE COURT:  Admitted.

23             (Government's Exhibit 701 received in evidence)

24    Q.  Mr. Bailey, you can take down S-1.  And if you could please

25    go back to 201.  Thank you.

M9EQraj5                        Gassert - Direct

1              What do you see -- what is the subject line of this

2      email?

3      A.   The subject line is RE:  Account number last four digits

4      ending in 4598.

5      Q.   And who is the email to?

6      A.   The email is to carlos.juez@citi.com.

7      Q.   In your experience, what company uses the domain name

8      @citi.com?

9      A.   CitiBank.

10     Q.   Could you please read the first sentence of the email?

11     A.   Sure.

12              "Dear Mr. Carlos Juez:  Thank you for taking the time

13     to meet with me regarding the account of our company:  Emergent

14     Development Corporation."

15     Q.   Who signed this email?

16     A.   The email was signed by Mustapha Raji.

17     Q.   What is written under that name?

18     A.   Emergent Development Corporation.

19     Q.   And what are the last four digits of the phone number under

20     that name?

21     A.   0360.

22     Q.   Mr. Bailey, could you please put up Government Exhibit 243

23     which is already in evidence.  I'm also going to ask you to put

24     up -- first, Special Agent Gassert, what does this show?

25     A.   This appears to be a Google search history.

1     MS. GHOSH:  Mr. Bailey, could you please put up

2  Government Exhibit S-6, a stipulation.  Thank you.  Please go

3  to the second page.  Thank you.

4     Government Exhibit 243 accurately reflects the search

5  terms, dates and times that certain search terms were entered

6  into the Google search engine by the emergentfl@gmail.com

7  account.  You can take that down, Mr. Bailey.

8  Q.  Going back to Exhibit 243, what is the date of the four

9  searches that are displayed here?

10  A.  The date is July 31, 2018.

11  Q.  Could you read the bottom one starting after the date and

12  time?

13  A.  Directions to 11720 Medlock Bridge Road, Duluth, Georgia,

14  30097.

15  Q.  Thank you.  Could you read the top search next to the date

16  and time?

17  A.  Directions to IHOP.

18  Q.  Mr. Bailey, could you please put up Government Exhibit S-4

19  side by side with 243?  Thank you.

20     Special Agent Gassert, looking at the address in 243,

21  is that the same as the address in paragraph 1 of S-4?

22  A.  Yes, those are the same addresses.

23  Q.  We'll return to Government Exhibit 201, please.

24     The account listed in the subject line here ending in

25  4598, is that the same bank account that was referenced in

1    Government Exhibit 508 regarding the Saint Francis Medical

2    Center transfers?

3    A.  Yes.

4            MS. GHOSH:  Mr. Bailey, we can take that one down.

5    Can you please bring up Government Exhibit S-1.  I'll read

6    paragraph 2.

7            Government Exhibit 702, which consists of subscriber

8    records for cellular telephone number 305-924-0360, is a true

9    and correct business record of the cellular phone service

10   provider T-Mobile U.S. Inc., which was created, kept and

11   maintained by T-Mobile in the course of its regularly conducted

12   business activity.

13           Government Exhibit 702 reflects that Emergent

14   Development Corporation was the subscriber of cellular

15   telephone number 305-924-0360 from approximately June 12, 2017

16   through December 23, 20178.

17           The government offers Exhibit 702 pursuant to that

18   stipulation.

19           THE COURT:  Admitted.

20           (Government's Exhibit 702 received in evidence)

21           MS. GHOSH:  You can take that down, Mr. Bailey.

22           Could you please bring up Government Exhibit S-8.  I

23   will read paragraph 1.

24           I'll read paragraph 1A and B.  Actually, if you want

25   to highlight that section.  Thank you

M9EQraj5                          Gassert - Direct

1          On September 16, 2018, special agents with the Federal

2     Bureau of Investigation lawfully obtained a cell phone from

3     Nancy Martino-Jean with telephone number 772-882-5632 (the

4     Martino-Jean phone) at the time of Martino-Jean's arrest and

5     subsequently made a true and accurate copy of its contents.

6          Government Exhibit 301 and any subparts (such as 301A,

7     301B, et cetera) are true and accurate copies of a selection of

8     WhatsApp text messages and attachments to text messages

9     exchanged between the Martino-Jean phone and a contact listed

10    in the Martino-Jean phone as Mustapha Raji with the telephone

11    number 404-952-5594.

12         Government Exhibits 302 and any subparts (such as

13    302A, 302B, et cetera) are true and accurate copies of a

14    selection of WhatsApp text messages and attachments to text

15    messages exchanged between the Martino-Jean phone and a contact

16    listed in the Martino-Jean phone as Mustapha Raji with the

17    telephone number 305-924-0360.

18         The government offers Government Exhibits 301, 301A

19    and 301B, 302, 302A through 302Z, 302AA through 302AL.

20         MR. SCHNEIDER:  I'm sorry, AA through?

21         MS. GHOSH:  AL.

22         MR. SCHNEIDER:  Thank you.

23         THE COURT:  Just so the record is clear, what is

24    admitted first 301, 301A, 301B are admitted, 302, 302A through

25    Z are admitted, and just so I know the number is 302 is it AA,

M9EQraj5                          Gassert - Direct

1    AB, AC through AL?

2              MS. GHOSH:  That's correct.

3              THE COURT:  They are admitted as well.

4              (Government's Exhibits 301, 301A, 301B, 302,

5    302A-302Z, 302AA-302AL received in evidence)

6    Q.  Mr. Bailey, if you could please take down Government

7    Exhibit 308 and put up Government Exhibit 302.

8              Did you have an opportunity to review this exhibit in

9    preparation for your testimony today?

10   A.  I did.

11   Q.  What is it?

12   A.  This is an extract of a WhatsApp conversation.

13   Q.  What is WhatsApp?

14   A.  WhatsApp is an encrypted messaging service.

15   Q.  What does encrypted mean in this context?

16   A.  In this context, it means that when the messages are in

17   transit, they're encoded in a way that only the sender and the

18   receiver can decode.

19   Q.  And in this particular chain, who are the participants.

20             Mr. Bailey, if you could zoom in on that top part.

21   Thank you.

22   A.  The participants are Mustapha Raji and Nancy.

23   Q.  What is the phone number of the account in the name of

24   Mustapha Raji?

25   A.  1-305-924-0360.

M9EQraj5                          Gassert - Direct

1    Q.   And what is the account phone number for Nancy?

2    A.   1-772-882-5632.

3    Q.   That 5632 number, is that the same number referenced in the

4    stipulation as belonging to the phone seized from Nancy

5    Martino-Jean?

6    A.   Yes.

7    Q.   Is the 0360 number the same one that was referenced in the

8    signature block in Government Exhibit 201, that email?

9    A.   Yes.

10   Q.   You could zoom out of that, please, Mr. Bailey.

11              Still looking at the top portion of this, what time

12   period are these messages from?

13   A.   The start time is May 28, 2018, and the last activity date

14   is September 16, 2018.

15   Q.   Is Government Exhibit 302 the entire WhatsApp chain that

16   was extracted from the Martino-Jean phone between these two

17   numbers or just some of the messages?

18   A.   Just some of the messages.

19   Q.   Who selected the messages included in Government Exhibit

20   302?

21   A.   The prosecution team did.

22   Q.   Mr. Bailey, could you please go to page 2 of Exhibit 302.

23              Are all of the messages -- withdrawn.

24              Looking at the first message here in blue on the left,

25   who is that message from?

M9EQraj5                        Gassert - Direct

1   A.  The first message is from Mustapha Raji.

2   Q.  Are all the messages on the left side in blue from the Raji

3   phone number?

4   A.  Yes, they are.

5   Q.  We can zoom out of that.  There is an example in green

6   here, if we could zoom in on that.  Who is this message from?

7   A.  This message is from Nancy.

8   Q.  Are all the messages in green on the right side from that

9   Nancy phone number?

10  A.  Yes, they are.

11  Q.  Okay.  I'd now like to review this chain.  Mr. Bailey, if

12  you could zoom in on the message beginning "when you have a

13  chance" in the middle of that page, from there to the bottom of

14  the page.  Thank you.

15        Special Agent Gassert, if you could read the green

16  messages on the Nancy phone, I'll read the blue messages from

17  the Raji phone.

18  A.  "When you have a chance call me.  I called them and the

19  funds are in."

20  Q.  "Okay.  I'll call you within minutes."

21  A.  "I did not get the call."

22  Q.  "Good morning.  Do you have another Wells or BoA that you

23  have not given me yet?"

24  A.  "Yes, I do.  BoA.  I also have a savings Wells for Martinos

25  group."

M9EQraj5                         Gassert - Direct

1    Q.  I'm going to pause there.  What date and time was that last
2    message you read sent?
3    A.  The last message was sent on May 29, 2018 at approximately
4    12:19 p.m.
5    Q.  Mr. Bailey, could you please put up Government Exhibit 301
6    which is in evidence.
7            Just first, what time does this chain start?
8    A.  This chain starts on May 29, 2018 at approximately
9    12:43 p.m.
10   Q.  Approximately 25 minutes after the last message we saw?
11   A.  Yes.
12   Q.  Who are the participants in this chain?
13   A.  The participants are Mustapha Raji and Nancy.
14   Q.  And is this the same phone number for Nancy that we saw in
15   Government Exhibit 302?
16   A.  This is the same number for Nancy.
17   Q.  What's the phone number for Mustapha Raji?
18   A.  The phone number is plus 1-404-952-5594.
19   Q.  Mr. Bailey, could I ask you to put up Government Exhibit
20   318 next to this one.
21           Do you see the phone number on Exhibit 318 under the
22   words Mustapha Florida Miami?
23   A.  Yes.
24   Q.  Is that the same number in this WhatsApp chain in
25   Government Exhibit 301?

M9EQraj5                        Gassert - Direct

1   A.  Yes, that is the same number.

2   Q.  Thank you.  You can take those down and go back to 301,

3   Mr. Bailey.

4            So, again, we'll read through the chain.  I'll read

5   the blue portions, and you can read the green portions.

6            "This is me.  My other phone is down for a bit.  You

7   can send me the BoA.  Here."

8            And what is the next message that Nancy sends?

9   A.  The next message is an attachment titled Unique Helping

10  Hands.

11  Q.  Mr. Bailey, could you bring up 301A, which is the

12  attachment:  What does this appear to be?

13  A.  This appears to be a screenshot of a global application

14  resembling Bank of America's.

15  Q.  You can take that down, Mr. Bailey, and continue with the

16  chain.

17           If you could start with the message underneath that

18  attachment that was just sent, Special Agent.

19  A.  "How are we doing the funds now so I know what to use out

20  of it."

21  Q.  "Because it's a cash deposit, it's generally less

22  percentage, but I gave negotiated 30 percent."

23  A.  "Meaning?"

24  Q.  And at this point, the defendant attached a screenshot.

25  It's 301B.  Is that correct?

M9EQraj5                    Gassert - Direct

1    A.  Yes, that's correct.

2    Q.  Could you pull that up, Mr. Bailey?

3              THE COURT:  Counsel, it's for the jury to decide if

4    this is the defendant, so please...

5              MS. GHOSH:  I apologize, your Honor.

6              THE COURT:  Thank you.

7    Q.  The Mustapha Raji phone ending in 5594 sent an attachment

8    301B, correct?

9    A.  Correct.

10   Q.  We have that up here on the screen.  What does this appear

11   to be, first of all?

12   A.  This appears to be a screenshot of a messaging application

13   on a mobile phone.

14             MR. SCHNEIDER:  I couldn't hear the answer.  I'm

15   sorry.

16             THE WITNESS:  This appears to be a screenshot of a

17   messaging chain on a mobile application, a mobile phone.

18             MR. SCHNEIDER:  Thank you.

19   Q.  What is the name listed at the top?

20   A.  The name is Agnes Fortune CA.  The rest of the text is cut

21   off.

22   Q.  Could you please read the chain?

23   A.  "1.5 plus 2.500 equals 4K.  Let her send back 70 percent.

24   We keep 30 percent.  Do they can keep the account going with

25   cash.  I hope you will take care of the naira and us today.

M9EQraj5                        Gassert – Direct

1    The calls are coming.  I told them you are on it.  Everyone are

2    on standby the two guys are with me for their 10 percent, they

3    are in Ghana."

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Thank you.  We can go back to the chain.  It's 301.

2             And after sending that, the Raji phone writes, keep

3    30 percent and keep 70 percent.

4    A.  Said where?

5    Q.  I'll give you the name to do money gram or wu to.

6    A.  Why they take so much.

7    Q.  Agnes W. Cannon.  Either Western Union or money gram,

8    Accra, Ghana.  It's a cash deposit.

9    A.  Okay.

10   Q.  Will be okay.

11   A.  Also phone number because they going to ask a lot question

12   for anything more than 1k.

13   Q.  When we meet tomorrow, I'll explain.  If they ask too many

14   question, well have to find another way.

15   A.  And for others how -- for others, how.  Does it work like

16   wires and stuff.

17   Q.  What time is that last message sent?

18   A.  The last message is sent at approximately 2:21 p.m.

19   Q.  Mr. Bailey, can you take down Exhibit 301.  And please

20   return us to the bottom of Page 3  at Exhibit 302.  Thank you.

21            Special Agent Gassert, you said the last message, 301,

22   was sent at 2:21.  What time is the last message on this page?

23   A.  The last message is at approximately 3:22 p.m.

24   Q.  Approximately one hour later?

25   A.  Yes.  Approximately an hour later.

M9E6RAJ6                         Gassert - Direct

1   Q.  We'll continue reading.  Send to me the BOA.

2            And if you could start after the attachment?

3   A.  It was sent and the one as well.  The name on the account

4   is Unique Helping Hands.

5   Q.  And then there's a phone number +233.  Are you familiar

6   with what country uses that -- beginning with that phone

7   number?

8   A.  I am.

9   Q.  What country?

10  A.  Ghana.

11  Q.  And the Raji phone continues.

12           Use this number for her.

13  A.  I am here waiting.

14           The need her date of birth and the name of her mother

15  and father.  Do you want me to check money gram and my

16  relationship with her.

17  Q.  We'll find another way.

18           The next message has an orange traffic cone.  Do you

19  see that, Special Agent Gassert?

20  A.  Yes.

21  Q.  What does this signify in this WhatsApp chain?

22  A.  An audio file was attached.

23  Q.  Mr. Bailey, if you can please pull up Government Exhibit

24  S8?  If you could go to the second page, or sorry, the third

25  page.  Thank you.

M9E6RAJ6                        Gassert - Direct

1          The following transcript exhibits are true and
2   accurate transcripts of the following audio recording exhibits.
3          And this includes 302AF-T, 302D-T, 302F-T, 302G-T,
4   302H-T, 302Q-T, 302R-T, 302V-T, 302W-T, 302X-T, and 302Y-T as
5   transcripts related to the corresponding exhibits.  The
6   government offers those transcripts into evidence as an aid
7   pursuant to the stipulation.
8          THE COURT:  Subject to the same instructions I gave
9   earlier.
10          (Government's Exhibits 302AF-T, 302D-T, 302F-T,
11   302G-T, 302H-T, 302Q-T, 302R-T, 302V-T, 302W-T, 302X-T, and
12   302Y-T received in evidence)
13  Q.  Mr. Bailey, can you take that down.  If you could please
14  play Government Exhibit 302D and also put up on the screen the
15  transcript 3O2D-T.
16          (Audio played)
17  Q.  You can take that down, Mr. Bailey.  If we can turn to 302?
18          The Raji phone next sends this e-mail, Johnnie B.
19  Cannon, Bank of America account ending in 3005 SWIFT code.
20          Special Agent Gassert, do you know what a SWIFT code
21  is?
22  A.  Yes.
23  Q.  What does that refer to?
24  A.  Those are codes for electronic transactions between banks
25  and financial institutions.

SOUTHERN DISTRICT REPORTERS, P.C.

M9E6RAJ6                        Gassert - Direct

1    Q.  You can zoom out of that.

2    A.  Do you have a number for Johnnie?

3    Q.  And there's an attachment, 302E.  Can you pull that up,

4    Mr. Bailey?

5            What does this show?

6    A.  This appears to be a receipt from a checking account.

7    Q.  You can go back to 30E2.

8            You can continue reading the messages.

9    A.  As of now, nothing shows.  Do you know what happened?

10   Q.  I think it went out today.  It should be ready tomorrow.

11   At least show tomorrow.

12   A.  Okay.

13   Q.  Could you please play 302F and display 302F-T as well?

14   Thank you.

15           (Audio played)

16   Q.  Would you please play and display the transcript for 302G?

17           (Audio played)

18   Q.  Could you please play 302H and display the transcript?

19           (Audio played)

20   Q.  You can take those down and return to the chain at 302,

21   please.

22           Special Agent Gassert, if you could continue reading

23   the first message from Nancy?

24   A.  I did not receive any warning, what account, and how much

25   where it's coming from.  Like that I can contact the bank.

M9E6RAJ6                          Gassert - Direct

1    Q.   It's the same 1M to TD for the BOA, Unique Helping Hands.

2    What's the proper name, is it LLC or Inc.?

3    A.   All are Inc.

4    Q.   Do you have escrow account?  The client is paying tomorrow.

5    Good morning.  Send me the lawyer e-mail address, names, and

6    telephone number.  $650,000 from China and 25m from Brazil.  A

7    lawyer must be in control of the account.  Use your e-mail and

8    phone, just get the lawyer account.  Okay.  Let's control this

9    deal.

10   A.   Okay.  But he is going to ask question.  How do I tell him

11   the funds is for?  Who is our clients and what service it's

12   for.

13              THE COURT:  That said what do I tell him the funds is

14   for.

15              THE WITNESS:  Yes.

16   Q.   What do I tell him the funds is for.

17              And then the Raji phone answers I'm waiting for the

18   answer.

19   A.   Okay.

20   Q.   Just to pause there.  What time is this message "okay" sent

21   on June 10?

22   A.   The message is sent at approximately 10:46 a.m.

23   Q.   What time is the next message from the Raji phone?

24   A.   The next message is sent at approximately 10:30 p.m.

25   Q.   So over 12 hours later?

M9E6RAJ6                        Gassert - Direct

1    A.  Yes, approximately 12 hours later.

2    Q.  And the Raji phone continues.  It is for commodities and

3    investment.  We'll get documentation.  See if you can provide

4    the coordinates ASAP.  Thanks.

5    A.  You want the lawyer or the title company?

6    Q.  If you have an escrow, any escrow will do.

7    A.  Yes.  I'll send to you in a bit.

8    Q.  Okay.  I'm up.  Send it as soon as you can.

9    A.  I sent it.

10   Q.  Where did you send it to?

11   A.  Your e-mail.

12   Q.  Which e-mail address?

13   A.  The one you gave me before, Emerge.

14   Q.  There's no SWIFT code on it.  We'll need swift.

15   A.  That's what the bank gave.

16   Q.  Okay.  Special Agent Gassert, what's the date of the last

17   message that we read?

18   A.  The last message was sent on June 11, 2018.

19   Q.  Mr. Bailey, if we could go to the next page of this

20   document?

21        And what is the date of the top message here, just to

22   situate ourselves?

23   A.  The date of the top message is June 18, 2018.

24   Q.  Okay.  And the first two messages here have attachments

25   302-I and 302-J.  Mr. Bailey, could you please pull those up?

1           Thank you.  And looking first at 3302-I, what.

2           302-I.  What does this appear to be?  Can we zoom in,

3    Mr. Bailey?  Thank you.  Perfect.

4    A.  This appears to be a copy of a cashier's check.

5    Q.  What is a cashier's check?

6    A.  A cashier's check is a check given against the account of

7    the bank where an individual would go into the bank itself, the

8    individual would go into the bank itself in order to obtain the

9    check.

10          THE COURT:  Keep your voice up, please.

11   Q.  Who is this check made out to?

12   A.  This check is made out to Bell Claps Enterprise LLC.

13   Q.  How much is the check for?

14   A.  The check is for $85,000.

15   Q.  And if you could zoom out of that?  We can look at 302-J at

16   the bottom here.

17          What does this appear to show?

18   A.  These appear to show the endorsement pages of checks.

19   Q.  Mr. Bailey, could you take down these, and we'll go back to

20   302, please.  Thank you.  And what does Nancy write after these

21   images are sent to her.

22   A.  Okay.  They sending something blank like that one.

23   Q.  The next message sent by the Raji phone is 302K, if you

24   could please pull that up, Mr. Bailey?

25          What is this on the first page?

M9E6RAJ6                        Gassert - Direct

1    A.  This appears to be a copy of a cashier's check.

2    Q.  Who is this made out to?

3    A.  This is made out to Brendan Opra.

4    Q.  For how much?

5    A.  For $32,000.

6    Q.  Can you please go to the second page of 302K?

7            Who is this check made out to?

8    A.  This check is made out to Unique Bamboo Investment Inc.

9    Q.  For how much?

10   A.  For $75,000.

11   Q.  And could you please go to the third page, Mr. Bailey, of

12   302K?

13           Who is this check made out to?

14   A.  This cheek is made out to Unique Loan Origination Inc.

15   Q.  For how much?

16   A.  For $58,500.

17   Q.  If we can get out of the attachment and go back to 302,

18   please?

19           We don't need to open up all these.  We can keep going

20   after the exhibits, which are in evidence.

21           Can you continue reading from Nancy at the bottom.

22   A.  You on your way?

23   Q.  Yes.  On the way to you.

24   A.  Okay.

25   Q.  Now, what is the date and time of that last message you

M9E6RAJ6                          Gassert - Direct

1   read?

2   A.  June 19, 2018, at approximately 2:39 p.m.

3   Q.  Okay.  You'd like to pause in our view of this exhibit and

4   put up government exhibit 208, Mr. Bailey?  We will be

5   returning to 302.  If you want to, it may be easier to do the

6   half screen.  Thank you.

7          What is the date of the e-mail at the top of this

8   page, Special Agent?

9   A.  The date is June 19, 2018.

10  Q.  And if we could zoom out of that and look at the lower

11  e-mail here, yep, exactly, thank you.

12         What is the -- who is this original e-mail from?

13  A.  Wells Fargo Online.

14  Q.  Who is it to?

15  A.  EmergentFL@Gmail.com.

16  Q.  What is the subject of the e-mail?

17  A.  The subject is closure of your deposit account ending in

18  3522.

19  Q.  Can you please read the first two sentences of the e-mail

20  beginning with "dear" to the bottom of this blow-up?

21  A.  Yes.  Dear Mustapha Raji.  We want to let you know that we

22  will be closing your account by June 29, 2018, because we have

23  made a business decision to end your deposit account

24  relationship with Wells Fargo.  Until your account is closed,

25  deposits to the account are blocked.

M9E6RAJ6                    Gassert - Direct

1    Q.  You can zoom out of that.

2          Was that e-mail from Wells Fargo forwarded to anyone?

3    A.  Yes.

4    Q.  Who was it forwarded to?

5    A.  It was forwarded to Nancy@uniquemultiservice.com.

6    Q.  Mr. Bailey, you can take down 208 and go back to 302,

7    please.

8          And the next message is an audio.  So, Mr. Bailey, if

9    you can pull up 302Q and 302Q-T, please?

10          (Audio played)

11   Q.  You can take that down, Mr. Bailey, and go back to the

12   e-mail chain.

13          The next message after 30Q-T is from the Raji phone.

14   Hello, Martino's Group.  What's the e-mail attached?

15   A.  Info@martinorealty.com.

16   Q.  What's the tax ID?

17   A.  82-40867777.

18          You good?  Am I to receive any documents or something

19   for Martino's Group?

20   Q.  Next is an audio message sent by the Raji phone.

21   Mr. Bailey, if you can please pull up 302R and 302R-T for the

22   jury?

23          (Audio played)

24   Q.  You can take that down, and we'll go back to the chain.

25   A.  Okay.  Please call me.  Urgent.

SOUTHERN DISTRICT REPORTERS, P.C.

M9E6RAJ6                          Gassert - Direct

1   Q.   Unique Bamboo is BOA?

2   A.   Yes.

3   Q.   And Unique Loan is TD?

4   A.   Yes.  We have TD as well for Unique Bamboo.  You want to

5   use it.

6   Q.   Pausing there, what is the date of that last message you

7   read?

8   A.   The date is June 20, 2018.

9   Q.   Okay.  Mr. Bailey, we can go to the next page.

10          And just to situate ourselves, what is the date of the

11  next message on this page?

12  A.   The date is June 26th, 2018.

13  Q.   And the Raji phone writes:

14          In addition to the receivers, U.S.A. Passport, and

15  company registration, we need the following details.  Bank

16  name, bank address, zip code, account holder, account number,

17  account type, routing number.

18          Good morning.  How are you?  Do you have a trusted

19  receiver with a U.S.A. passport and Bank of America corporate

20  account that can receive wire transfers?  We need only Bank of

21  America account in U.S.A.  May 2018.

22          And then Special Agent Gassert, generally speaking,

23  what's in this next message?

24  A.   This appears to be banking information.

25  Q.   For an account in what name?

M9E6RAJ6                          Gassert - Direct

1   A.   Unique Bamboo Investment Inc.

2   Q.   What is the bank?

3   A.   The bank is Bank of America.

4   Q.   What are the last four digits of the account?

5   A.   The last four digits are 4615.

6   Q.   And I'll continue reading the Raji messages after that one.

7   Please send it to Agnes.

8          Funds would be an interbank transfer, Bank of America.

9   The account holder must be able to receive large funds and also

10  be able to transfer out easily.  Once you send me the file,

11  funds sender will call the account holder directly.  If the

12  call is successful, he will issue the contract and wire the

13  test tranche of 200k today.  Please handle this fast.  This is

14  a new group.  This is a very serious group.  They did 5m for

15  someone last month.  It did not bounce.  Older guys.  Please

16  get this account.  With everything, they will test us with

17  200k.  After that, more.  I am working trying to get us good

18  senders.

19         Get all necessary docks with this account if it is

20  okay to use.  Okay.  Let's move fast.  This is a hot deal.

21  From Agnes.

22         And before we go on, Special Agent Gassert, the

23  messages just before the one that says "from Agnes," what is

24  the date and time that those were all sent, the nine messages

25  before "from Agnes"?

1    A.   They were sent on approximately -- well, on June 26, 2018,

2    at approximately 8:17 a.m.

3    Q.   What time is the "from Agnes" message sent?

4    A.   The "from Agnes" message is sent at approximately 9:44 a.m.

5    Q.   Okay.   You can continue reading, please, beginning at the

6    bottom.

7    A.   When would you know they'll do the deposit?

8    Q.   We have Government Exhibit 302S.   Mr. Bailey, if you could

9    bring that up, the next message the Raji phone sends?   If you

10   could just zoom in on the top third of the page or so?   Thank

11   you.

12                   Who is this letter addressed to?

13   A.   Emergent Development Corporation.

14   Q.   Who is it from?

15   A.   It's from Citibank.

16   Q.   And looking at the top left, what does it say under

17   Citibank NA?

18   A.   Fraud prevention.

19   Q.   What is the text in the middle of the top of the page?

20   A.   Your Citibank accounts are blocked.

21   Q.   What account is that referring to, just next to that?

22   A.   The account ending in 4598.

23   Q.   Mr. Bailey, could you please put up Government Exhibit 108A

24   and this one, 302S, side by side?   Thank you.   And if you could

25   zoom in on the account number at the top there?

1    Special Agent, is the account that Citibank says is

2    blocked in 302S the same account that was -- that is referenced

3    in 108A?

4    A.  Yes, these appear to be the same account.

5    Q.  You can take down 108A, and we'll go back to 302S for a

6    moment.

7         Special Agent, could you please read the first two

8    sentences of the letter?

9    A.  Dear Emergent Development Corporation, a recent review of

10   your account, which is part of our ongoing commitment to ensure

11   the safety and security of your Citibank account has revealed

12   irregular account activity.  In order to safeguard your

13   accounts, your account ending in 4598 and your other related

14   Citibank accounts have been placed in a restricted status

15   pending further investigation by Citibank.

16   Q.  Mr. Bailey, you can take this down and bring us back to

17   302, Page 22.

18        Special Agent Gassert, what time is the first message

19   on this page sent?  What is the date, rather?

20   A.  This message was sent on June 28th, 2018, at approximately

21   5:46 p.m.

22   Q.  And this attachments 302U, if you could please bring that

23   up, Mr. Bailey?

24        And what does this appear to show, Special Agent?

25   A.  This appears to show transactions for a bank account.

M9E6RAJ6                        Gassert - Direct

1   Q.   What transaction is shown on June 25, 2018?

2   A.   A counter credit transaction.

3   Q.   For how much?

4   A.   $52,000.

5   Q.   And what is shown just above that?

6   A.   A hold on June 28 for approximately $52,000.

7   Q.   We'll go back to 302.  You can take down 302U.

8            And, Special Agent, if you can read the next message

9   that Nancy sends to the Raji phone after sending that

10  attachment?

11  A.   They taking it back.

12           THE COURT:  All right.  And that's where we'll leave

13  it for today.

14           Ladies and gentlemen, I'm sure you can recite it with

15  me, but I'll recite it:  Number one, don't discuss the case

16  with each other, or anyone else, for that matter.  Don't do any

17  research about the case.  Continue to keep an open mind.  We're

18  making good progress.  I'll get an update from the lawyers

19  after you leave and may be in a better position to give you a

20  sense of where we are tomorrow.  But, in any event, we'll pick

21  up tomorrow morning where we left off here.  So don't discuss

22  the case, don't do any research about the case, continue to

23  keep an open mind.

24           Have a wonderful afternoon and evening.  Please be in

25  the jury room same time 8:45.  Fingers crossed we have your

M9E6RAJ6                           Gassert - Direct

1   muffins and bagels awaiting you tomorrow morning, and we'll see

2   you tomorrow.  You're excused.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9E6RAJ4

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Special agent, you may step down.  Please be here a

4   few minutes before 9:00 so we're ready to go as soon as the

5   jury is ready.  All right?

6          Counsel, government counsel, can you give me an update

7   on where we are?  Are we on pace, and how much do you expect on

8   direct with this witness?

9          MS. GHOSH:  Your Honor, I think we're making good

10  progress.  As you can see, there's a lot of reading, and I'm

11  trying to read very slowly for the court reporter.  So I would

12  estimate two to two and a half hours.  There's also the

13  additional summary charts.  So we're making good progress but

14  still some more to go with this witness.

15         THE COURT:  All right.  And obviously you don't know

16  how long the cross will be, but any sense on whether you

17  anticipate resting tomorrow?

18         MR. SOBELMAN:  Assuming the cross is not overly long,

19  we do expect to rest tomorrow.  We only have two witnesses,

20  who's the money laundering expert.  We expect him to be less

21  than an hour on direct, and the IRS witness, Victoria

22  Hernandez, who probably will only be 15 or 20 minutes on

23  direct.

24         THE COURT:  All right.  Good.  Anything the government

25  needs to raise?

M9E6RAJ4

1          MR. SOBELMAN:  Your Honor, we just would like to

2     confirm that in the event we rest tomorrow, the defense does

3     not put on a case, we're not going to go directly into

4     closings.

5          THE COURT:  We have to have a charge conference.

6     That's a fair assumption, given the estimates you just gave.

7     I'll ask Mr. Schneider, and I am not holding him to it

8     tomorrow, but whether he has any sense whether there's a

9     defense case coming down the pike.  If your prediction holds,

10    and there's no defense case, and the government rests, I'll aim

11    to hold the charge conference tomorrow afternoon, and then we

12    should anticipate closing on Friday.

13         Now, we'll have to play it a little by ear.  It is

14    possible to have the charge conference first thing Friday.  In

15    that case, we would have the charge conference and have the

16    jury come in a bit late and proceed with closings on Friday.

17    Obviously, if there's a defense case, that changes things and

18    we'll have to deal accordingly.

19         So, Mr. Schneider.

20         MR. SCHNEIDER:  Yes.

21         THE COURT:  Microphone, please.

22         MR. SCHNEIDER:  Yes, yes.

23         If we rest tomorrow, is there any chance that we can

24    have the charge conference Friday and sum up on Monday?

25         THE COURT:  There's a chance we'll have the charge

M9E6RAJ4

1   conference as I just mentioned.

2           MR. SCHNEIDER:  No, I know, but the second part.  I'm

3   much more concerned about the second part of my request, is

4   that we sum up on Monday.

5           THE COURT:  I think the answer is no.  We have a jury.

6   I want to get them back to their lives as quickly as we can,

7   and in that sense, to use all the days we have.  If we can get

8   the case to them on Friday, we're going to get the case to them

9   on Friday.

10          Mr. Schneider, do you have any anticipation of either

11  how long your cross is likely to be as to this witness — this

12  seems like the most significant of the remaining three — or as

13  to whether you have a defense case?  Again, recognizing that

14  you'll need to talk to your client, and we'll revisit it

15  tomorrow.

16          MR. SCHNEIDER:  At this point, I have -- sorry.  At

17  this point, I do not expect a case, but that, as you know,

18  could change.  I'll speak to my client about that to finalize

19  that.  I also do not expect my cross, if any, will be long for

20  any of the upcoming witnesses.

21          THE COURT:  All right.  In that case, it does some

22  like the government is likely to rest tomorrow.

23          Mr. Schneider, you know what to do, but Raji, I would

24  urge you to talk to Mr. Schneider tonight about whether you

25  intend to present a case, and, in particular, whether you

M9E6RAJ4

1    intend to testify.  That is a decision for a defendant to make.

2    You should certainly take into consideration any recommendation

3    and advice that Mr. Schneider gives you and talk to him about

4    it so you can make that decision in an informed way.  But

5    whatever decision you make, I will inquire of you that it is

6    your decision, that you did have an opportunity to discuss it

7    with Mr. Schneider, but ultimately it is your decision.

8              So I just wanted to give you a head's up about that so

9    that you have an opportunity to, and do, speak with

10   Mr. Schneider about it tonight.  So, Mr. Schneider, I trust

11   that you will follow up on that and talk to Mr. Raji as

12   appropriate, to the extent you haven't already.

13             MR. SCHNEIDER:  Yes.

14             THE COURT:  Anything that you need to discuss or

15   raise?

16             MR. SCHNEIDER:  No, your Honor.

17             THE COURT:  All right.  In that case, I think we're

18   going to go.  See you same time, same place tomorrow.  Let my

19   staff know if you have anything to discuss at 9:00.  If not,

20   and the jury is here, we will start as quickly as we can with

21   them.  See you tomorrow.  Thank you.

22             (Adjourned to September 15, 2022, at 9:00 a.m.)

23                            * * *

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    AFOLABI ADEUSI

 4   Direct By Mr. Sobelman . . . . . . . . . . . 219

 5   Cross By Mr. Schneider . . . . . . . . . . . 264

 6   Redirect By Mr. Sobelman . . . . . . . . . . 346

 7   Recross By Mr. Schneider . . . . . . . . . . 352

 8    DALE WAYNE FLOYD

 9   Direct By Mr. Sobelman . . . . . . . . . . . 356

10    MICHAEL GASSERT

11   Direct By Ms. Ghosh  . . . . . . . . . . . . 371

12                     GOVERNMENT EXHIBITS

13   Exhibit No.                              Received

14    313, 313A, 313B and 313C  . . . . . . . . . 232

15    302AB   . . . . . . . . . . . . . . . . . . 253

16    302AB and 302AB-T  . . . . . . . . . . . . . 254

17    31   . . . . . . . . . . . . . . . . . . . . 348

18    22   . . . . . . . . . . . . . . . . . . . . 358

19    22A and 22B  . . . . . . . . . . . . . . . . 361

20    21   . . . . . . . . . . . . . . . . . . . . 364

21    21A and 21B  . . . . . . . . . . . . . . . . 367

22    S-9  . . . . . . . . . . . . . . . . . . . . 373

23    106A-106C, 109A-109C, 114A-114C  . . . . . . 374

24    509  . . . . . . . . . . . . . . . . . . . . 376

25    S-2  . . . . . . . . . . . . . . . . . . . . 381
```

1   408   . . . . . . . . . . . . . . . . . . . 382

2   108A–108D and 113A  . . . . . . . . . . . . 383

3   507 and 508   . . . . . . . . . . . . . . . 384

4   406   . . . . . . . . . . . . . . . . . . . 390

5   S–6   . . . . . . . . . . . . . . . . . . . 391

6   201, 202, 208, 212 and 212A, 217, 232,  . . . 392

7            232A and 232B, 233, 233A,

8            234A, 235, 235A, 236, 236A,

9            240, 242, 243 and 244

10  S–1   . . . . . . . . . . . . . . . . . . . 394

11  701   . . . . . . . . . . . . . . . . . . . 394

12  702   . . . . . . . . . . . . . . . . . . . 397

13  301, 301A, 301B, 302, 302A–302Z,  . . . . . . 399

14           302AA–302AL

15  302AF–T, 302D–T, 302F–T, 302G–T,  . . . . . . 408

16           302H–T, 302Q–T, 302R–T,

17           302V–T, 302W–T, 302X–T, and

18           302Y–T

19

20

21

22

23

24

25