M9F6RAJ1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4               v.                          19 CR 870(JMF)
                                             Trial
 5    MUSTAPHA RAJI,

 6               Defendant.

 7    ------------------------------x

 8                                           New York, N.Y.
                                             September 15, 2022
 9                                           9:00 a.m.

10    Before:

11                    HON. JESSE M. FURMAN,

12                                           District Judge
                                             -and a Jury-

13
                              APPEARANCES
14

15    DAMIAN WILLIAMS,
           United States Attorney for the
16         Southern District of New York
      BY:  JILAN KAMAL
17         ROBERT SOBELMAN
           CATHERINE GHOSH
18         Assistant United States Attorneys

19    JEREMY SCHNEIDER
           Attorney for Defendant
20
      Also Present:
21    Matthew Bailey, AUSA Paralegal
      Mayerlin Ulerio, Defense Paralegal
22

23

24

25
```

M9F6RAJ1

1    (Trial resumed; jury not present)

2    THE COURT:  Good morning.  Welcome back.  I understand

3 there's some sort of technical issue, but we have at least a

4 temporary fix.

5    Okay.  Mr. Schneider, my understanding is you had

6 something you wished to raise.

7    MR. SCHNEIDER:  Yes, your Honor.  Good morning.

8    THE COURT:  I see that the witness is here.  Is there

9 any issue with him being present?

10    MR. SCHNEIDER:  No, it's fine.

11    THE COURT:  Okay.  In that case, why doesn't the

12 witness make his way to the witness box to save us some time.

13    MR. SCHNEIDER:  Sure.

14    THE COURT:  Go ahead.

15    MR. SCHNEIDER:  I have been informed at a quarter to

16 8:00 this morning that my client's medical condition has

17 worsened, specifically his symptoms have exacerbated to the

18 point where his leg is swollen and he's having difficulty

19 breathing because of the buildup of fluid in both his lungs and

20 his heart.  And, as you know, he does have a confirmed medical

21 condition of both heart disease and stage four kidney disease.

22 He is on medication.  And, normally, the medication that he

23 takes, I think he says he takes it at 4:00 o'clock in the

24 morning so it doesn't adversely affect his ability to sit

25 through the trial.

M9F6RAJ1

1          Well, the medication is obviously not working now.  So

2     he feels he either has to double the dose of his medication or

3     go to the emergency room probably by the end of today.  The

4     buildup of the fluid affects not just his physical condition

5     but his mental condition as well.  It affects his ability to

6     concentrate and stay awake.

7          So my request is that we finish today's proceeding and

8     that he then take his required medication and/or go to the

9     hospital, either tonight or tomorrow, and that we resume the

10    trial on Monday.  That we sit a normal day today, hopefully

11    finish the witnesses today, that's the expectation.  So that's

12    my request.

13         THE COURT:  Government.

14         MR. SCHNEIDER:  For the record, also, I've informed

15    the government before your Honor came down.

16         THE COURT:  And when you say you were advised a

17    quarter to 8:00, that was by your client.  Is there any doctor

18    who has opined on this?  Has he been in touch with any doctor?

19    This is obviously his subjective reporting to you?

20         MR. SCHNEIDER:  This is.  He told me himself in person

21    when he was in my office this morning, yes.

22         THE COURT:  Has he been in touch with a doctor?

23         MR. SCHNEIDER:  No.

24         THE COURT:  I would think someone with his serious

25    medical conditions would have a physician who's overseeing his

M9F6RAJ1

1    medical care, and he might be able to contact that person.  Am

2    I wrong?

3              MR. SCHNEIDER:  I don't think you're wrong.  First of

4    all, his doctors are in Florida.  And he told us at 8:00 this

5    morning.  I think your Honor would very well know there are

6    very few doctors who are available, who have normal clinic

7    hours.  So the answer is he hasn't spoken to a doctor.  He has

8    been functioning on his medication, so there's no need to.

9    It's now happened.  So he is telling your Honor what the

10   situation is.

11             Frequently, when he has issues, the doctors that he

12   has seen just send him to the emergency room.  That's where

13   he's been a number of times before the trial began down in

14   Florida.  We have records of him being in the hospital on a

15   couple of occasions in the emergency room.  So the answer is a

16   doctor hasn't opined on this.  This is him telling me what the

17   situation is.

18             THE COURT:  All right.  Maybe we can wait until we see

19   what we get to for the end of the day, since there's no

20   application to postpone for today, before I make a definitive

21   decision.  Does the government wish to be heard at this time?

22             MR. SOBELMAN:  Your Honor, obviously, if the defendant

23   has a medical condition that's impacting his ability to attend

24   the trial, you know, we would defer to the Court on how to

25   address that.  It's difficult to take the defendant's

M9F6RAJ1

1   representations to his attorney at face value given the

2   litigation and representations that have been made regarding

3   his medical condition in the past.

4          MR. SCHNEIDER:  Your Honor, I'm not really sure what

5   that last sentence means.  He's never ever, nor have I, based

6   on his statements, ever misrepresented his medical condition to

7   the government or to your Honor.  So whether the government

8   chooses to believe him, whether your Honor chooses to believe

9   him, is not really the issue.  But the issue is we all know

10  that he has serious heart disease.  No one disputes that he has

11  stage four kidney disease.  The question is whether or not

12  those conditions affect his ability to sit at a trial.

13         So neither he nor I have ever, ever misrepresented how

14  he was feeling or what he was doing.  The only question was

15  whether or not your Honor was dissatisfied with a doctor's

16  letter that we had submitted prior to trial.  But no doctor, no

17  hospital has ever said he does not have a serious -- and I'm

18  underlining the word serious -- heart disease or serious stage

19  four kidney disease, which, as you know, is a stage right

20  before he has to go on dialysis, if he ever gets to stage five.

21         So I don't think it's a question of you choosing not

22  to believe him because he's misrepresenting the past.  That, I

23  don't know where that's coming from.

24         THE COURT:  All right.  I don't know if this is what

25  Mr. Sobelman is referring to.  I would certainly not suggest

M9F6RAJ1

1    that you, Mr. Schneider, misrepresenting anything.  I want to

2    be clear about that.  But I think the issue that Mr. Sobelman

3    may be referring to, which I certainly share the view a little

4    bit, is that in July, there was an application to adjourn trial

5    on the basis that that trial would pose a serious medical risk,

6    so on and so forth.  I said I would be open to it if you could

7    provide medical evidence to support it and then was told that

8    there was no such evidence to be provided.  A month and a half

9    later, there was an 11th hour request to adjourn the trial

10   again, this time supported by a medical record but as I noted

11   in my letter, denying it.  It came from an Urgent Care facility

12   and didn't really support the request.

13        So I don't know what's going on.  Maybe he just

14   doesn't have the kind of care that I would expect someone in

15   his condition to have, but I think that's probably what's

16   coloring Mr. Sobelman's reaction.

17        Be that as it may, there's no application to adjourn

18   trial today, no representation made that he can't assist in his

19   defense today.

20        MR. SCHNEIDER:  That's correct.

21        THE COURT:  So we're going to proceed today.  And my

22   guess is if the government rests, we'll obviously need to

23   excuse the jury so we can take care of other items that we need

24   to take care of.  We'll see if there's a defense case, and then

25   we can decide what to do then.  I do want to make a decision

M9F6RAJ1

1    before I excuse the jury today so they know whether they're

2    coming back tomorrow or not.  But why don't we see where things

3    are later, particularly because circumstances may change

4    between now and then.

5              MR. SCHNEIDER:  Understood, your Honor.

6              THE COURT:  All right.  Unless there's anything else,

7    we'll get the jury and proceed.

8              Anything from the government?

9              MS. GHOSH:  No, your Honor.

10             THE COURT:  All right.  Very good.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning and welcome back.  Once

3    again, thank you for being here on time.  You guys are earning

4    a gold star as a jury.  I appreciate that and also very pleased

5    to hear that breakfast service succeeded this morning.  So

6    fingers crossed that continues.

7          Sorry we're starting 11 minutes after the hour, but we

8    had some technical issues that we needed to resolve with our

9    systems here.  But we will pick up where we left off with the

10   remainder of the direct testimony of Special Agent Gassert.

11         Agent Gassert, I remind you, you remain under oath.

12   And with that, counsel, you may proceed.

13   MICHAEL GASSERT,

14   DIRECT EXAMINATION (Continued)

15   BY MS. GHOSH:

16   Q.  Mr. Bailey, can you please take us to Page 22 of Government

17   Exhibit 302, right before we ended yesterday?  Thank you.  And

18   can you please pull up 302U?

19         Special Agent Gassert, we looked at 302 yesterday.

20   Can you please just remind us what transactions we saw at the

21   top of this Bank of America screenshot?

22   A.  On June 25, 2018, we see a counter credit for $52,000 and

23   just above that, we see a hold on June 28 for $52,000.

24   Q.  Thank you.  You can take that down, Mr. Bailey.

25         And Special Agent Gassert, what was the text message

1   that Nancy sent to the Raji phone after sending that

2   screenshot?

3   A.   They taking it back.

4   Q.   Next is a voice message sent by the Raji phone.

5           Mr. Bailey, can you please play 302V for the jury?

6           MR. SCHNEIDER:   E?

7           MS. GHOSH:   V as if Victor.

8   Q.   And put up the transcript, please.

9           (Audio played)

10  Q.   Mr. Bailey, can you please play 302W and put up the

11  transcript, which is the next message sent from the Raji phone

12  to Nancy?

13          (Audio played)

14  Q.   Special Agent Gassert, can you please read the next message

15  from Nancy?

16  A.   The date is showing on the screenshot.

17  Q.   Can you please play 302X for the jury?

18          (Audio played)

19  Q.   Special Agent Gassert, what was the date of that last

20  recording that we saw?

21  A.   The date was June 28, 2018.

22  Q.   And if we could zoom out of that.

23          When is the next message from the Raji phone sent to

24  Nancy?

25  A.   The next message was sent on July 2nd, 2018, at

1    approximately 4:25 p.m.

2    Q.  And the Raji phone writes, this is on the BOA.  They want

3    to know if I really know the receiver.

4               Can we please play 302Y?

5               (Audio played)

6               THE COURT:  Mr. Bailey, can you please just scroll up

7    to the first page of the transcript just so the jury can see

8    the abbreviation, UI, what it stands for?

9               Thank you.

10   Q.  Mr. Bailey, can you please go to the next page of 302 and

11   the defendant -- the Raji phone writes, please do it now.

12   Okay?  From Agnes pple, and there's a missed voice call.  And

13   the phone writes, Eman online loader lib.  If he's doing with

14   from a phone, let him send a video instead.  Agnes Fortune

15   Cannon:  Okay.  Agnes Fortune Cannon:  I will tell him now.

16              And the next message sent by the Nancy phone is an

17   attachment, 302C.  Actually, Mr. Bailey, can you please put up

18   302AA?

19              MR. SCHNEIDER:  AA?

20              MS. GHOSH:  That's correct.

21   Q.  Special Agent Gassert, what does this appear to show?

22   A.  This appears to show a picture of a phone with what looks

23   like Bank of America's mobile application up, showing a balance

24   of negative $4,663.58.  And then behind that on a white piece

25   of graph paper is a name written on it.

M9F6RAJ1                        Gassert - Direct

1  Q.  Before returning to the text messages in 302, Mr. Bailey,

2  could you please put up Government Exhibit 212, which is in

3  evidence?

4          Who is this from?

5  A.  This is from Mustapha Raji.

6  Q.  And who is it to?

7  A.  This is to Emergent Development Corporation.

8  Q.  What is the date that it was sent?

9  A.  This was sent on July 11, 2018.

10  Q.  And who is copied on the e-mail?

11  A.  Emergent Equity Group.

12  Q.  What's the subject line?

13  A.  CIS Unique.

14  Q.  Can you see whether there's an attachment to this e-mail?

15  A.  Yes.  There appears to be an attachment.

16  Q.  Mr. Bailey, can you please pull up Government Exhibit 212A,

17  which is the attachment to the e-mail?  What is this document

18  titled?

19  A.  Client information sheet.

20  Q.  And do you see a date on the paper?

21  A.  Yes.  July 10, 2018.

22  Q.  Mr. Bailey, if you could just zoom in on the first

23  paragraph on the top?

24          And, Special Agent Gassert, can you please read the

25  first sentence?

1    A.   In accordance with Articles Two through Five of the Due

2    Diligence Convention and the Federal Banking Commission

3    Circular of December 1998 concerning the prevention of money

4    laundering and Article 305 of the Swiss Criminal Code, the

5    following information may be supplied to banks and/or other

6    financial institutions for the purpose of verification of

7    identity and activities of the principal and the nature and

8    origin of the funds that are to be utilized.

9    Q.   Thank you.  Can you please zoom in on the section of

10   personal information on Page 1 of 212A?

11            Whose name is listed in this section?

12   A.   Mustapha Muhammed Raji.

13   Q.   And what phone number is listed?

14   A.   (404)769-1683.

15   Q.   What e-mail address is listed?

16   A.   Mustapha.Raji@gmail.com.

17   Q.   Mr. Bailey, can we go to Page 2 of this document and zoom

18   in on the corporate information section?

19            What company is listed here?

20   A.   Unique Bamboo Investment Inc.

21   Q.   What is the mobile number listed for Unique Bamboo?

22   A.   The mobile number is (404)769-1683.

23   Q.   And what is the e-mail address?

24   A.   Mustapha.Raji@gmail.com.

25   Q.   Mr. Bailey, can you zoom in on the bank information at the

M9F6RAJ1                          Gassert - Direct

1    bottom of Page 2?

2              Which bank is listed here?

3    A.  Oculina Bank.

4    Q.  What's the account name?

5    A.  The account name is Down Home Title Services Inc.

6    Q.  Can you please read the sentence at the bottom of this that

7    starts "I, Mustapha Muhammed Raji"?

8    A.  I, Mustapha Muhammed Raji, hereby swear under penalty of

9    perjury that the information provided herein is accurate and

10   true as of this date, Tuesday, July 10, 2018.

11   Q.  Turning to Page 3, whose name is written underneath that

12   signature?

13   A.  Mustapha Muhammed Raji.

14   Q.  And looking at the bottom of the page just under where it

15   says Page 3 of 4, what company is listed?

16   A.  Unique Bamboo Investment Inc.

17   Q.  If we could turn to the last page, Page 4, of Exhibit 212A?

18              What is this an image of?

19   A.  This appears to be a passport.

20   Q.  And whose name?

21   A.  Mustapha Muhammed Raji.

22   Q.  I'd like to return to the WhatsApp chain, Government

23   Exhibit 302, please.  And, Mr. Bailey, if you can take us to

24   Page 25.

25              Special Agent Gassert, what's the date of the top

1    message on this page?

2    A.  The date is July 26, 2018.

3    Q.  And based on your review of bank records for this case,

4    what was the date of the $1.7 million transfer from Marble Arch

5    to Unique Bamboo?

6    A.  The date was July 26, 2018.

7    Q.  First message here is an audio, Mr. Bailey.  Can you please

8    play 302AB for the jury?

9          (Audio played)

10   Q.  Special Agent Gassert, what time was that message sent?

11   A.  That message was sent on approximately 2:29 p.m.

12          MR. SCHNEIDER:  I'm sorry.  I couldn't hear.

13          THE WITNESS:  2:29 p.m.

14          MR. SCHNEIDER:  Thank you.

15   Q.  And looking at this next message, what time is the next

16   message sent?

17   A.  The next message was sent at 3:58 p.m.

18   Q.  Approximately an hour and a half later?

19   A.  Yes.  Approximately an hour and a half.

20   Q.  Mr. Bailey, can you please put up Exhibit 302AC, which is

21   the attachment to that message from the Raji phone?

22          Looking at the top of this document, what does this

23   appear to be?

24   A.  This appears to be an e-mail.

25   Q.  Who is the sender?

M9F6RAJ1                        Gassert - Direct

1    A.  Wire_room@firstrepublic.com.

2    Q.  What is the date and time of this e-mail?

3    A.  July 26, 2018, at 8:37 a.m.

4    Q.  Is there a recipient listed?

5    A.  There is no recipient listed.

6    Q.  If we could zoom out of that part, Mr. Bailey?

7            And, Special Agent Gassert, if you could read from the

8    beginning of the message beginning with "from" until "banker"?

9    We'll zoom in on that part.

10   A.  From First~Republic bank wire operations.  In accordance

11   with your instructions, we have debited your account ending in

12   7520 for $1,700,000.  If you have any questions, please contact

13   your banker.

14   Q.  What does debited your account mean?

15   A.  Taken money out of the account.

16   Q.  So this message appears to be something that was sent to

17   the sender of the $1.7 million?

18   A.  Yes, that's what it appears to be.

19   Q.  And zooming out of this part, Special Agent Gassert, what

20   is the sender bank listed here?

21   A.  First Republic Bank.

22   Q.  What is the receiving bank?

23   A.  Bank of America, New York City.

24   Q.  Who is the originator?

25   A.  Marble Arch Investments LP.

M9F6RAJ1                        Gassert - Direct

 1   Q.  And who is the beneficiary?

 2   A.  Unique Bamboo Investment Inc.

 3   Q.  We can take down 302AC and return to 302 and continue on

 4   Page 25.

 5           After that message was sent, there's a missed voice

 6   call at 4:00 p.m.  And then the Raji phone writes, please send

 7   account slip at 4:02 p.m.  Then there's a missed call at

 8   4:07 p.m. and 4:28 p.m. and a missed call at 4:37 p.m.  Then

 9   the Nancy phone sends an attachment, which is 302AD.

10           Can we please put that up?

11           What is the most recent transaction showing here?

12   A.  A wire transfer credit on July 26.

13   Q.  For how much?

14   A.  $1,700,000.

15   Q.  If you could take that down, Mr. Bailey?  And just zoom in

16   on the Nancy message and the messages after that.  Perfect.

17           What time, what exact time was that message sent from

18   Nancy?

19   A.  That message was sent from Nancy on July 26, 2018, at

20   5:40 p.m.

21   Q.  And what time is the response from the Raji phone?

22   A.  The response was at 5:41 p.m.

23   Q.  Is that about 22 seconds later?

24   A.  Approximately 22 seconds later.

25   Q.  The Raji phone writes, thank God.  Let's start moving it.

M9F6RAJ1                          Gassert - Direct

1   We keep 30 percent.

2               If you can zoom out of that part, Mr. Bailey?

3               I can't talk about it on the phone.

4   A.   Okay.  We will set up a meeting.

5   Q.   Please move it, and let's pay for the office so you can get

6   in.  Move it out ASAP.

7               I'd like to now turn to some additional summary

8   charts.  Mr. Bailey, can you please display for the witness,

9   one by one, Government Exhibits 501 through 506?

10              Special Agent Gassert, generally, what are these

11  documents?

12  A.   These documents are summaries of transfers from

13  Unique Bamboo Investment.

14  Q.   Were these charts prepared in the same manner as the other

15  charts we looked at yesterday, Exhibits 507 through 509?

16  A.   Yes, they are.

17  Q.   Were the bank records they're based on voluminous?

18  A.   Yes.

19  Q.   Do the charts accurately reflect those bank records?

20  A.   They do.

21              MS. GHOSH:  The government offers governments

22  Exhibit 501 through 506 pursuant to Rule 1006.

23              THE COURT:  Any objection?

24              MR. SCHNEIDER:  No objection.

25              THE COURT:  Admitted.

M9F6RAJ1                    Gassert - Direct

1              (Government's Exhibits 501-506 received in evidence)

2              MS. GHOSH:  I'll also read from -- Mr. Bailey, if you

3     can please put up S9, a stipulation which is in evidence?

4              Pursuant to this stipulation, this covers Government

5     Exhibits 101A through E which, is Bank of America records for

6     the Unique Bamboo Investment Inc. account ending in 4615;

7     Exhibits 102A through 102C, which are First Republic records

8     for the Marble Arch Investments LP account ending in 7520;

9     Exhibits 103A through 103G which are TD Bank records in the

10    name Mustapha Muhammed Raji for an account ending in 2190; 104A

11    through 104D, which are Wells Fargo records under an account in

12    the name Misan Olayinka Megbuluba ending in 3713; Exhibits 105A

13    through 105D, Suntrust records for an account in the name

14    Comcristal Company, Timothy Adekaye Oyewole ending in 9325;

15    107A through 107C.  Del-one Credit Union records, for an

16    account in the name ML Morris Inc. ending in 4370; 110 -- going

17    onto Page 2.  110A through 110C, TD Bank records for Unique

18    Multi Services Company Inc. ending in 1647; 111A through 111D,

19    TD Bank records for Unique Loan Origination Inc. ending in

20    6682; and 112A, TD Bank records for Unique Bamboo Investment

21    Inc, ending in 5692.

22             Pursuant to this stipulation, the government offers

23    those records.

24             THE COURT:  Admitted.

25             (Government's Exhibits S9; 101A-101E; 102A-102C;

M9F6RAJ1                          Gassert - Direct

1   103A-103G; 104A-104D; 105A-105D; 107A-107C; 110A-110C;

2   111A-111D; 112A received in evidence)

3   Q.  Thank you.  Mr. Bailey, can you take that down?  Can you

4   please put up Government Exhibit 506?

5            There's a lot on this chart, but generally, what does

6   it show?

7   A.  This generally shows a summary of transfers from Unique

8   Bamboo.

9   Q.  What time frame are these transactions from?

10  A.  They start on July 30th, 2018, and end on August 6th, 2018.

11  Q.  Are these transactions broken out in more detail on some of

12  the other summary charts?

13  A.  Yes, they are.

14  Q.  We'll discuss the details in a moment, but just starting on

15  the far left with the box that says Marble Arch Investments,

16  what does this show?

17  A.  This shows an outgoing transfer starting with Marble Arch

18  Investments LP and ending in an account in Unique Bamboo

19  Investment.

20  Q.  And how much was that transaction?

21  A.  It was $1,700,000.

22  Q.  Mr. Bailey, can you please put up Government Exhibit S9

23  again?  And I'll read from Paragraph 3.

24            Government Exhibit 101F consists of true and correct

25  copies of wire transfer records that were made at or near the

1    time of their creation by or from information transmitted by a

2    person with knowledge of the matters set forth in the records

3    and that were kept in the course of the regularly conducted

4    activities of Bank of America as a regular practice of that

5    activity.  Bank of America received the wire transfer reflected

6    in Government Exhibit 101F in New York, New York, from sender

7    First Republic Bank in San Francisco, California.

8              Pursuant to this stipulation, the government offers

9    101F.

10             THE COURT:  Admitted.

11             (Government's Exhibit 101F received in evidence)

12   Q.  Mr. Bailey, you can take down S9?  We'll go back to 506,

13   please.

14             What was the balance of the Unique Bamboo just before

15   the transfer?

16   A.  Just before the transfer, the account had a negative

17   balance.

18   Q.  I'd like to read from stipulation, Government Exhibit S2.

19             Thank you.  I'm reading from Paragraph 3.

20   Government Exhibit 403 is a true and accurate copy of the 2018

21   Florida Profit Corporation Annual Report filed electronically

22   with the Florida Secretary of State on July 12, 2018.

23             I'll also read Paragraph 4.

24             Government Exhibit 405 is a true and accurate copy of

25   corporation information obtained from the government of Canada

M9F6RAJ1                          Gassert - Direct

1    on October 7, 2019.

2             Government offers 403 and 405 pursuant to this

3    stipulation.

4             THE COURT:  Admitted.

5             (Government's Exhibits 403 and 405 received in

6    evidence)

7    Q.  And, Mr. Bailey, if you can please pull up Government

8    Exhibit 403?

9             What company is this June 2018 annual report for?

10   A.  This company is for Unique Bamboo Investment Inc.

11   Q.  And who is listed as president?

12   A.  The president is listed as Nancy Martino-Jean.

13   Q.  Who is vice president?

14   A.  The vice president is Mustapha Raji.

15   Q.  We can take this down and go back to 506, please?

16            Before we go to the charts that show these transfers

17   in more detail, what is the total amount that was successfully

18   transferred out from Unique Bamboo after it received the

19   1.7 million from Marble Arch?

20   A.  Approximately $1,478,310.

21   Q.  And over what time frame was that money transferred out?

22   A.  Starting on July 30, 2018, and ending on August 6, 2018.

23   Q.  Was any money able to be returned to Marble Arch by the

24   banks?

25   A.  Yes.

M9F6RAJ1                        Gassert - Direct

1    Q.  Approximately how much?

2    A.  On August 29, 2018, approximately $212,442.46 was returned,

3    and then on October 2, 2018, approximately $776,000 was

4    returned.

5    Q.  Was that Unique Bamboo Investment account closed?

6    A.  Yes.

7    Q.  Approximately when?

8    A.  I can't remember the date.

9    Q.  We'll come back to that in a few minutes.

10            If we could put up Government Exhibit 501, please?

11           THE COURT:  I think this is 501.

12           MS. GHOSH:  That was 506.

13           THE COURT:  Sorry.  My bad.

14   Q.  Special Agent Gassert, does this summary chart show a piece

15   of what we were looking at in Exhibit 506?

16   A.  Yes.

17   Q.  Which part does 501 show?

18   A.  501 shows the transfers from Unique Bamboo Investment on

19   July 30 and 31st of 2018.

20   Q.  So the first two boxes, Marble Arch to Unique Bamboo are

21   the same July 26 transaction we saw before?

22   A.  Yes.  That's the same transaction.

23   Q.  Based on the records summarized in this chart, what

24   happened first after the 1.7 million was transferred to

25   Unique Bamboo?

M9F6RAJ1                     Gassert - Direct

1    A.  On July 30, 2018, there was $2,400 sent to three

2    recipients.

3    Q.  And what happened next?

4    A.  And then on July 31, 2018, we see several other outgoing

5    transfers.

6    Q.  The first one, $50,000 to Mustapha Raji -- Mr. Bailey, can

7    you please put up Government Exhibit 101C next to this chart?

8    If we could go to Page 4 of 101C?  And can you please zoom in

9    on the second section down?  Thank you.

10        What does this document show, Special Agent Gassert?

11   A.  This document shows a wire transfer.

12   Q.  What is the payment detail listed at the bottom?

13   A.  The payment detail is loan repayment.

14   Q.  How much was this wire for?

15   A.  $50,000.

16   Q.  Who was it sent to?

17   A.  It was sent to Mustapha Raji.

18   Q.  We can take down 101C and go back to 501, please.

19        MR. SCHNEIDER:  The last one was 101C.

20        MS. GHOSH:  C, yes.

21        MR. SCHNEIDER:  Thank you.

22   Q.  The next one down says $28,500 for Unique Loan Origination

23   transfer failed.  Can you explain what that means?

24   A.  Yes.  It means there was an attempted transfer of $28,500,

25   but the transfer did not go through.

M9F6RAJ1                        Gassert - Direct

1    Q.  Do you know why the transfers to Unique Loan Origination
2    weren't able to go through?
3    A.  Yes.  The account was closed.
4    Q.  Which account was closed?
5    A.  Unique Loan Origination.
6    Q.  The next one is $70,000 to Unique Multi Services.  Is that
7    transaction discussed in more detail in another summary chart
8    we'll look at?
9    A.  Yes.
10   Q.  And then the $780,000 to Down Home Title Services, which
11   bank did that go?
12   A.  Oculina Bank.
13   Q.  Mr. Bailey, can you please put up side by side with this
14   Page 2 of Government Exhibit 212A?  And if you could just focus
15   in on the bottom portion, the bank information?
16          Is this the same bank and account name -- withdrawn.
17   Is the $780,000 transfer that you see in the chart to the same
18   bank and account name that we see in Government Exhibit 212A?
19   A.  Yes.
20   Q.  Can you take that down, Mr. Bailey?  And we'll go to
21   Government Exhibit 502.
22          What does this chart show?
23   A.  This chart shows transfers on August 2, 2018, from
24   Unique Bamboo investment.
25   Q.  And, again, is the first two boxes, Marble Arch to

M9F6RAJ1                    Gassert - Direct

1    Unique Bamboo, that's the same transaction we looked at

2    previously?

3    A.  Yes.

4    Q.  Just going briefly through these August 2 transactions.

5    The first one, 17,000 to ML Morris, is that one that's

6    discussed in more detail on another chart?

7    A.  Yes, it is.

8    Q.  And the three blue boxes, are those all related to unique

9    companies associated with Nancy Martino-Jean?

10   A.  Yes, they are.

11   Q.  And the second one down is $25,000 to Comcristal Company.

12   Is that also discussed in another chart?

13   A.  Yes, it is.

14   Q.  I'd like to turn to Government Exhibit 217 which is in

15   evidence.

16             Who is this e-mail from?

17   A.  Timothy Oyewole.

18   Q.  Who is it it sent to?

19   A.  Emergent Development Corporation.

20   Q.  On what date?

21   A.  On July 29, 2018.

22   Q.  What does the subject say?

23   A.  Info.

24   Q.  Can you read the first line of the e-mail?

25   A.  Suntrust Bank.

1    Q.  And then the next paragraph, could you please read the

2    first line?

3    A.  Comcristal Company.

4    Q.  Do you see the account number listed?

5    A.  Yes.

6    Q.  What are the last four digits?

7    A.  9325.

8    Q.  And is this bank account referenced here the same account

9    that was referenced in Government Exhibit 502 showing the

10   transfer to Comcristal on August 2?

11   A.  Yes, this is the same one.

12   Q.  Okay.  And two rows down it says SWIFT code.  Can you

13   remind us what a SWIFT code relates to?

14   A.  SWIFT code are codes sent between banks and financial

15   institutions for different types of transactions.

16   Q.  What name is listed at the bottom of this?

17   A.  Timothy Oyewole.

18   Q.  You can take that down, Mr. Bailey.  Please put up

19   Government Exhibit 503.

20         Does this chart show some additional detail about the

21   transfers from Unique Bamboo to Mustapha Raji and ML Morris and

22   Misan Megbuluba?

23   A.  Yes, it does.

24   Q.  Starting at the red box at the top, $50,000 to Mustapha

25   Raji on July 31, can you explain what happens after the money

1   is transferred to the Mustapha Raji account?

2   A.   Sure.   After the money is transferred to the Mustapha Raji

3   account, on August 2, 2018, there is a $5,000 transfer to

4   ML Morris Inc.   And then on August 6, 2018, there's a $5,000

5   transfer to Misan Megbuluba.   And then going back to August 2,

6   there is a $10,608 check written.   $5,000 in cash is taken out,

7   and on August 6, $3,000 in cash was taken out.

8   Q.   And turning to the transfer to ML Morris on August 2, can

9   you explain what transactions happened from that account?

10  A.   On August 10, 2018, $17,000 was transferred from ML Morris

11  Inc. to Misan Megbuluba.

12  Q.   And turning to that Misan Megbuluba account that received

13  $5,000 from the defendant and then $17,000 from ML Morris, what

14  did that account do next?

15  A.   On August 4, $4,000 in cash was withdrawn.   On August 11, a

16  $1,841.19 check was written.   On August 11, $9,000 in cash was

17  withdrawn.   And on August $14, $2,500 in cash was withdrawn.

18  Q.   Mr. Bailey, can you please take this down and put up

19  Government Exhibit 504?

20       Does this chart show some additional detail for the

21  transfer to Unique Bamboo to Comcristal Company.

22  A.   Yes.

23  Q.   Could you explain what happened after Comcristal Company

24  received the $25,000 from Unique Bamboo on August 2?

25  A.   On August 3, 2018, there is a $10,000 transfer to an

1   account in the name of Timmins Property LTD.  And within the

2   month of August, there are a total amount of withdrawals in

3   $14,500.

4   Q.  Mr. Bailey, could you please put up Government Exhibit 405,

5   which is in evidence?  What is the company or the corporate

6   name listed on this document?

7   A.  Timmins Properties Limited.

8   Q.  This is a recipient of $10,000 from Comcristal that we just

9   saw?

10  A.  Yes.

11  Q.  And scrolling down to Page 2, who is listed under

12  directors?

13  A.  Dauda Raji.

14  Q.  You can take that down.  Please put up Government Exhibit

15  505.

16        Does this chart show some additional details from the

17  transfers to Unique Bamboo to Unique Multi Services?

18  A.  Yes, it does.

19  Q.  There's a lot going on here, so we'll take it step by step.

20        First, how much did Unique Multi Services receive

21  between the two transactions we saw on July 31st and August 2?

22  A.  $270,000.

23  Q.  And what happened on August 13th?

24  A.  There were two transfers, one transfer for $175,000 to an

25  account in the name of Nancy Martino-Jean and a second transfer

M9F6RAJ1                        Gassert - Direct

1   for $27,500 to an account in the name of Unique Loan

2   Origination.

3   Q.  And those are shown by the black arrows coming out of the

4   Unique Multi Services box?

5   A.  Yes.

6   Q.  Looking first at the account that received $175,000 on the

7   top there into Nancy's TD account ending in 4261, what does the

8   blue arrow on the left indicate?

9   A.  That indicates money going out of Nancy Martino-Jean's

10  account and into the Unique Multi Services.

11  Q.  So back to the account that had transferred money in?

12  A.  Correct.

13  Q.  On what dates were the transfers back to Unique Multi

14  Services?

15  A.  August 20, 2018, and September 17, 2018.

16  Q.  How much was transferred back?

17  A.  On August 20th, $10,500, and September 17, $17,000.

18  Q.  Now let's look at the Unique Loan account that received the

19  $27,500 on August 13.  First, can you explain the transactions

20  indicated by the blue arrow?

21  A.  Yes.  Those transactions are outgoing transfers from Unique

22  Loan Origination to Unique Multi Services.

23  Q.  Those are going back to the account that had transferred

24  money in previously?

25  A.  Correct.

M9F6RAJ1                          Gassert - Direct

1    Q.   How much was transferred back to Unique Multi Services?

2    A.   A total of $6,400.

3    Q.   And then what does the black arrow coming down from the

4    Unique Loan Origination indicate?   Can you explain those

5    transactions, please?

6    A.   Sure.   On August 2, 2018, $1,000 was sent from Unique Loan

7    Origination to Unique Bamboo Investment, and on August 22,

8    2018, there was a $5,000 cash withdrawal.

9    Q.   Last, turning to the red arrow on the side, can you explain

10   what that indicates?

11   A.   Yes.   On August 13, 2018, $110,000 was sent to -- or was

12   sent from Unique Bamboo Investment to an account in the name of

13   Nancy Martino-Jean.   And on August 31, 2018, $110,000 was sent

14   from Nancy Martino-Jean to Unique Bamboo investment.

15   Q.   So back to the same account that had sent the $110,000?

16   A.   Yes, correct.

17   Q.   Mr. Bailey, can you please put up Government Exhibit 101B,

18   and could you go to Page 2?   Sorry, Page 3.   Could you go down

19   one more page?   I apologize.   Another page and another page.

20   If we can go into August.   Thank you.   Next page.   Here we are.

21   If you could zoom in on August 13 in the middle of the page

22   under withdrawals, the last line there?   Yes.   Thank you.

23        Special Agent Gassert, I had asked you earlier about

24   when the Unique Bamboo Investment account was closed.   First of

25   all, can you read the account name at the top of this page,

M9F6RAJ1                    Gassert - Direct

1    what these bank statements are for?

2    A.   Yes, these statements are for Unique Bamboo Investment Inc.

3    Q.   The account ending in 4615?

4    A.   Correct.

5    Q.   And that's the account that received the $1.7 million?

6    A.   Yes.

7    Q.   Okay.

8    A.   Same account.

9    Q.   And looking at this, can you see when the account was

10   closed?

11   A.   Yes.  The account was closed on August 13, 2018.

12   Q.   Thank you.

13         Mr. Bailey, can you take this down, and we'll go back

14   to Government Exhibit 302, the WhatsApp messages.  And we are

15   on Page 28.  Perfect.

16         So just to situate ourselves, Special Agent Gassert,

17   what is the date of the first message on this page?

18   A.   The date is August 6, 2018.

19   Q.   Was that also the date of the last attempted transfer of

20   funds that we saw in Government Exhibit 506?

21   A.   Yes, same date.

22   Q.   And this message from Nancy attaches an attachment, which

23   is 302AE.  If we can pull that up, please.

24         What is the account name listed at the top of this?

25   A.   Unique Bamboo Investment Inc.

M9F6RAJ1                        Gassert - Direct

1   Q.  What is the balance for the account ending in 4615?

2   A.  Negative $1,623,327.99.

3   Q.  You can take that down, Mr. Bailey.

4          And returning to 302, Special Agent Gassert will

5   continue reading the message that Nancy sent after sending

6   that.

7   A.  And they called for all the funds.

8   Q.  And there are a series of missed voice calls on August 6

9   and August 8.

10         Move on to the next page, please.

11         What is the date of the next message from the Raji

12  phone after the missed voice calls?

13  A.  August 8, 2018.

14  Q.  Okay.  I'm not going to read each of these messages, but

15  generally speaking, looking at this, what type of information

16  is being sent by the Raji phone to Nancy?

17  A.  Bank account information.

18  Q.  All right.  If we could just scroll down through some of

19  these and move onto the next page, and I'll just stop you,

20  Mr. Bailey.  At the top message on this page, could you please

21  zoom in on that one?

22         What company is listed in this message, Special Agent

23  Gassert?

24  A.  Timmins Properties Limited.

25  Q.  Is that the company ran by Dauda Raji that we saw in

M9F6RAJ1                          Gassert - Direct

1   Government Exhibit 504?

2   A.   Yes.

3   Q.   If we can zoom out of that and look at the next one?

4            What company is listed here?

5   A.   Comcristal Company.

6   Q.   And is that the company that sent the money to Timmins in

7   Government Exhibit 504?

8   A.   Yes, same company.

9   Q.   If we could take that down and look at this next one,

10  please?

11           Do you see in the middle of this what the name is just

12  under the account?

13  A.   Yes.   Miami Shops LLC.

14  Q.   If we can pull up side by side Government Exhibit 507 that

15  we looked at yesterday?

16           And looking on the right side of that chart, is Miami

17  Shops LLC the company that Emergent Development Corporation

18  sent money to in this chart related to the St. Francis scheme?

19  A.   Yes.

20  Q.   Returning to the text chain in 302.  You can take that

21  down, Mr. Bailey.  Thank you.  We can just scroll down.  Yep.

22  We can scrolling down.  Head to this message that attaches

23  Exhibit 302AG sent on August 9.  If we could please pull up

24  that attachment?

25           What account is this screenshot for?

M9F6RAJ1                          Gassert - Direct

1    A.   Unique Bamboo Investment Inc.

2    Q.   And account ending in 4615?

3    A.   Yes.

4    Q.   What is the balance at this time?

5    A.   Negative $678,145.24.

6    Q.   Can you take that down, Mr. Bailey?

7              And if you can please read the message at the bottom

8    that Nancy sent after sending that screenshot?

9    A.   So far, they requested money be return from all sources,

10   and that is what is left behind.

11   Q.   Thank you.  At this point, I want to read from Government

12   Exhibit S8, if you could pull that up, please?  And I'll read

13   Paragraph 1C.

14             Government Exhibit 315 is a true and accurate copy of

15   a portion of the Internet search history from the Martino-Jean

16   phone.

17             Pursuant to this stipulation, the government moves to

18   admit Government Exhibit 315?

19             THE COURT:  Admitted.

20             (Government's Exhibit 315 received in evidence)

21   Q.   Mr. Bailey, can you please display 315?

22             Just so we're clear, looking at this, what order do

23   these messages go in?

24   A.   Descending order with the most recent searches starting at

25   the bottom.

M9F6RAJ1                     Gassert - Direct

1   Q.  Okay.  Can we please zoom in on Row 8, the bottom row?  And
2   what was the date of this search?
3   A.  August 12, 2018.
4   Q.  At what time?
5   A.  Approximately 10:59 p.m.
6   Q.  And what was searched for?
7   A.  Marble Arch Investments.
8   Q.  Returning to Exhibit 302, could you please look at the top
9   of Page 32?  What is the date and time of this message?
10  A.  August 12, 2018, at approximately 11:08 p.m.
11  Q.  So approximately ten minutes after the search we just saw?
12  A.  Yes, approximately ten minutes.
13  Q.  Mr. Bailey, can you please put up Government Exhibit 302AH.
14          What does this show?
15  A.  This shows a screenshot of an account locked page on a Bank
16  of America mobile application.
17  Q.  We will return to the text.  You can take that down,
18  Mr. Bailey, and go back to 302, please.
19          And after Nancy sends that, the Raji phone responds,
20  please make sure it's done early this morning and give me
21  confirmation so I can update them.
22  A.  She's working on them.
23  Q.  Okay.  Please confirm as soon as it's done.
24  A.  K.
25  Q.  Martino Group Wells Fargo, is it still okay?

1   A.  Yes.

2   Q.  Agnes want to know if she should go ahead and use BOA

3   Bamboo.  I'll call BOA when I'm done, but the account is still

4   active.  Pierre just told me it's only 150.  Can she use

5   another account?  The BOA is 6m.  The 150 is separate.  He's

6   confused.  That's going to Wells Fargo, Martino Group?

7   A.  Got you.

8   Q.  Could you please pull up Government Exhibit 302AI,

9   Mr. Bailey, which is the next message sentence by Nancy?

10          What does this appear to be?

11  A.  This appears to be an e-mail.

12  Q.  What is the subject at the top of this?

13  A.  Action needed.  Call USAA about wire transfer.

14  Q.  Could you please read the heading in the dark blue banner?

15  A.  USAA has been asked to return wire transfer.

16  Q.  Who is this message addressed to?

17  A.  Lindel Williams.

18  Q.  Can you please read the first line of the message?

19  A.  Dear Lindel Williams, we received a request from Bank of

20  America NYC to return the wire transfer below.

21  Q.  And what is the wire transfer being referenced here?

22  A.  A transfer on July 31, 2018, for $30,000.

23  Q.  Is that wire transfer reflected in some of the bank records

24  you reviewed for the summary charts as one of the parties that

25  received money from Unique Bamboo?

M9F6RAJ1                          Gassert - Direct

1    A.  Yes, it is.

2    Q.  We'll return to the messages in 302.  Can you take that

3    down?  If you could just zoom in on 302 on the lower half of

4    the page?  Thank you.

5             Which account is this?

6    A.  This is what I sent to the secure account I was telling you

7    about that equal 50k.  Check yours to make sure it's still

8    there.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

M9FQraj2                              Gassert - Direct

1    BY MS. GHOSH:   (Continued)

2    Q.  "All of mine is already spent.  As I told you, I already

3    spent it all by sending it to them."

4    A.  "Okay.  I just want you to be aware trouble."

5    Q.  Mr. Raji sends question marks.

6    A.  "Same thing requesting return."

7    Q.  I'm just going to pause there.  What is the date and time

8    of that message that you just read?

9    A.  August 13, 2018 at approximately 8:03 p.m.

10   Q.  Mr. Bailey, could you please put back up Government Exhibit

11   315, which was the Nancy Martino-Jean iPhone search history.

12   If we could look at rows 7 up through 4.

13           What is the date of these searches?

14   A.  August 13, 2018.

15   Q.  And between what time were these searches done?

16   A.  Between approximately 8:17 p.m. and 9:01 p.m.

17   Q.  Could you please read the searches beginning in the

18   earliest one row 7 up through row 4?

19   A.  Yes.  "How to wipe out a wondow computer.  How to wripe out

20   a computer.  How to remove everything from a computer.  BoA

21   fraud department."

22   Q.  You mentioned wondow computer.  Are you familiar with a

23   wondow computer?

24   A.  No.

25   Q.  Are you familiar with a computer with a similar name?

M9FQraj2                        Gassert - Direct

1    A.   Yes.

2    Q.   What would that be.

3    A.   A windows computer.

4    Q.   And you can take that zoom out, and zoom in on rows 3 and

5    2, please.

6            What date are these searches from?

7    A.   August 24, 2018.

8    Q.   Could you read these searches, please?

9    A.   "St. Lucie County sheriff.  How to find out if you are

10   being investigated by the FBI."

11   Q.   Take that down, Mr. Bailey, and return to 302, the bottom

12   of page 35.

13           The Raji phone sends Emergent Equity Group LLC and the

14   tax ID number.

15           Go on to the next page, please.

16           Emergent Development Corporation, another tax ID

17   number.

18           Also the registration of the four new corporations

19   question mark, question mark, question mark.

20   A.   "No problem, I'll take care of them today."

21   Q.   "Any new updates from the title company if payment has been

22   confirmed?"

23   A.   "Call Pierre, please."

24   Q.   "Okay."

25           And then the Nancy phone sends an attachment which is

M9FQraj2                              Gassert - Direct

1    302AJ.  Could we please bring that up, Mr. Bailey.  Could we

2    also please bring up next to this Government Exhibit 232.

3              Government Exhibit 232, who is the original message

4    from?

5              Sorry, Mr. Bailey.  If you could go down to the

6    bottom.

7    A.   The original message is from Susan M. Sotkovsky.

8    Q.   What domain name is her email address?

9    A.   Ssotkovsky@oculinabank.com.

10   Q.   What is the subject of this email?

11   A.   BoA wire messages.

12   Q.   What's the date?

13   A.   August 14, 2018.

14   Q.   Zooming out of that, could you please read the email?

15   A.   "Hi Cindy Lou.  As per our conversation this morning,

16   attached are both service messages received from Bank of

17   America, and the second attachment was our message requesting

18   additional information and contact number.  Please let me know

19   if you need anything else.  Susan."

20   Q.   Was that email forwarded to someone else?

21   A.   Yes, it was.

22   Q.   Who was it forwarded to?

23   A.   Nanly123.

24   Q.   What's the email address?

25   A.   Nancynmartino@gmail.com.

M9FQraj2                         Gassert - Direct

1    Q.  Are there attachments to that email?

2    A.  Yes, there are.

3    Q.  Mr. Bailey, if you could please put up 232A, which is the

4    first attachment.  We have 232A side by side with Government

5    Exhibit 302AJ.

6            Is 302AJ fairly blurry, Special Agent Gassert?

7    A.  Yes, it is.

8    Q.  Comparing 302A to 302AJ, as best you can tell, does this

9    appear to be what Nancy sent to the Raji phone on August 14?

10   A.  Yes, they appear to be the same document.

11   Q.  Let's look at 232A, which is the clearer copy.  On page 1,

12   under basic information about three rows down, what is the

13   amount listed?

14   A.  The amount is $780,000.

15   Q.  And at the bottom of that, what does it say next to "free

16   formatted text"?

17   A.  "Please clarify what more details you need regarding this

18   fraudulent payment.  Regards WT Investigations.  Julia Miller."

19   Q.  You can take that down, Mr. Bailey.  And I'd like to turn

20   to Government Exhibit 233.

21            What is the date of this email?

22   A.  August 14, 2018.

23   Q.  Who is it from?

24   A.  Pierre Thimot.

25   Q.  Who is it to?

M9FQraj2                          Gassert - Direct

1    A.   Mustapha Line.

2    Q.   What email address?

3    A.   Emergentfl@gmail.com.

4    Q.   What's the subject line?

5    A.   Security agreement.

6    Q.   What does sentence email say?

7    A.   "Thank you."

8    Q.   Are there any attachments to this email?

9    A.   Yes, there are.

10   Q.   Mr. Bailey, could we please pull up 233A, the attachments

11   to this email.  What is the title of this document?

12   A.   Security Agreement and Promissory Note.

13   Q.   Could you please read the first line?

14   A.   "This security agreement (the Agreement) is made and

15   effective July 2, 2018."

16   Q.   Who is the secured party listed?

17   A.   Marble Arch Investment LP.

18   Q.   Who is the debtor listed?

19   A.   Unique Bamboo Investment, Inc.

20   Q.   Zoom out of that and look at the paragraph just below that.

21        Could you please read the first sentence?

22   A.   "For the value received, the undersigned debtor promises to

23   pay to the order of Marble Arch Investment LP, together with

24   any other holder of this note (secured party) at its office at

25   Hong Kong (SAR) one million seven thousand dollars with

1    interest at the rate of 12 percent per annum."

2    Q.  Thank you.

3         Please turn to page 6 of this document 233A.

4         Could you please read the section at the top beginning

5    "we understand."

6    A.  "We understand that we are swearing or affirming under oath

7    the truthfulness of the claim made in this affidavit, and that

8    the punishment for knowingly making a false statement includes

9    fines and/or imprisonment."

10   Q.  Based on your experience as a special agent with the FBI,

11   are you familiar with affidavits?

12   A.  Yes.

13   Q.  Generally speaking, what are they?

14   A.  Generally speaking, they are sworn statements.

15   Q.  Have you ever signed an affidavit?

16   A.  Yes, I have.

17   Q.  And did it contain a written statement of facts?

18   A.  It did.

19   Q.  Based on your experience, is this document titled Security

20   Agreement and Promissory Note an affidavit?

21   A.  No.

22   Q.  Are there any signatures or stamps on this page we're

23   looking at?

24   A.  There are not.

25   Q.  At this point, I'd like to pull up Government Exhibit 235

M9FQraj2                           Gassert - Direct

1    please, Mr. Bailey.

2                  Who is this email from?

3    A.   Imagine Health.

4    Q.   With what email address?

5    A.   Imaginehealthinc@gmail.com.

6    Q.   Who is it to?

7    A.   Pierre Thimot.

8    Q.   What is the subject?

9    A.   Port St. Lucie.

10   Q.   What is the date of this email?

11   A.   August 15, 2018.

12               MS. GHOSH:  Mr. Bailey, could you please put up

13   stipulation S-9 which is in evidence.  I apologize.  S-2,

14   please.

15               2.  Government Exhibit 402 is a true and accurate copy

16   of an application for certificate of authority for a foreign

17   corporation filed electronically with the Georgia Secretary of

18   State on January 23, 2015.

19               The government offers Exhibit 402 pursuant to the

20   stipulation.

21               THE COURT:  Admitted.

22               (Government's Exhibit 402 received in evidence)

23   Q.   Take that down and put up Government Exhibit 402.

24               What is the name of the corporation reflected in

25   exhibit 402?

M9FQraj2                    Gassert - Direct

1    A.   Imagine Health, Inc.

2    Q.   Who is listed as the officer?

3    A.   The officer is Mustapha Raji.

4    Q.   And at the bottom, who signed as CEO?

5    A.   Mustapha Raji.

6    Q.   Please take that down and put up Government Exhibit 244.

7         Special Agent Gassert, could you remind us what this

8    type of document is?

9    A.   Yes.   This is a Google subscriber information document.

10   Q.   What email is this subscriber information for?

11   A.   Imaginehealthinc@gmail.com.

12   Q.   What is listed next to recovery email?

13   A.   Mustapha.raji@gmail.com.

14   Q.   What is a recovery email?

15   A.   This is an email the user creates whenever they make the

16   email so they could receive notifications or if they lose

17   control of the account, they can use the recovery email to

18   regain control of the account with Google.

19   Q.   You can take down 244 and return to 234A, which is the

20   attachment to the email sent by Imagine Health that we were

21   just looking at.  Mr. Bailey, could you also please put up side

22   by side with this Government Exhibit 233A.  On 233A, which was

23   the attachment to the email we were looking at a moment ago,

24   can you please go to page 6.

25        Special Agent Gassert, setting aside the handwritten

M9FQraj2                         Gassert - Direct

1    parts, does this in 235A appear to be the same page 607 that we

2    were looking at in 233A?

3    A.  Yes.

4    Q.  Mr. Bailey, you can take down 233A, and we'll just look at

5    235A.  Thank you.

6              What information is now filled in?

7    A.  The date and the notary signature line along with a stamp.

8    Q.  What date is listed?

9    A.  July 2, 2018.

10   Q.  Are there any signatures on the page under that text that

11   says "we understand that we are swearing or affirming under

12   oath"?

13   A.  There is no signature on that line.

14   Q.  You can zoom out of that part, Mr. Bailey.  And zoom in on

15   the middle portion, or the bottom portion is fine as well,

16   under notary page.  Thank you.

17             Could you please read the part beginning "sworn to"?

18   A.  "Sworn to or affirmed and signed before me on this second

19   day of July 2018 by" blank.

20   Q.  Are there any signatures there besides the notary

21   signature?

22   A.  There is no other signature.

23   Q.  You can take that down, Mr. Bailey, and please put up

24   Government Exhibit 236.  Thank you.

25             Looking first at this top email, who is that from

1    A.   This is from Pierre Thimot.

2    Q.   Who is it sent to?

3    A.   Nancy Jean.

4    Q.   What's the subject?

5    A.   Forward:  Port St. Luci.

6    Q.   Is there an attachment to that email?

7    A.   Yes.

8    Q.   Looking at the bottom portion, does this appear to be

9    forwarding the email we were just looking at in Government

10   Exhibit 235?

11   A.   Yes, this does appear to be forwarding that email.

12   Q.   Mr. Bailey, we'll return to Exhibit 302, the WhatsApp

13   chain, so you could take this down please.  Go to page 38 of

14   Exhibit 302.

15            What is the date of the first text on this page?

16   A.   September 10, 2018.

17   Q.   Could you please read?

18   A.   "Any news?"

19   Q.   "Yes.  Call you in one hour."

20            And then the Nancy phone sends attachment 302AK.  Can

21   you please pull that up?

22            What does this attachment appear to be?

23   A.   This appears to be a picture of an email.

24   Q.   Who is the email from?

25   A.   Cindy Wilhoite.

M9FQraj2                          Gassert - Direct

1   Q.   Who is it sent to?

2   A.   Nanly123.

3   Q.   What's the email address for Nanly 123?

4   A.   Nancynmartino@gmail.com.

5   Q.   What is the date of this email?

6   A.   The date is September 10, 2018.

7   Q.   What's the subject line?

8   A.   Fraudulent wire.

9   Q.   Mr. Bailey, if you could zoom in on the text.

10          And, Special Agent Gassert, understanding it's a bit

11  cut off on the side, can you please read this email?

12  A.   "Hi Nancy.  I just found out today that the funds that you

13  wired from Unique Bamboo Investment will be interplead with the

14  court.  This issue is resolved.  You might want to get with

15  your bank to find out what is going on with your monies and ask

16  if is anything that they require which would verify that the

17  funds are really your funds.  My bank cannot continue to hold

18  funds since Bank of America and the first bank that the funds

19  were generated from are still stating that the wired fund was a

20  fraudulent transaction.  Regards."

21  Q.   We can take that down, Mr. Bailey, and go back to 302.  The

22  next message sent by the Raji phone after that is on

23  September 11, 2018 and its attachment 302AL.  Please pull that

24  up.

25          Special Agent Gassert, what does this appear to be?

M9FQraj2                          Gassert - Cross

1   A.   This appears to be an email.

2   Q.   Mr. Bailey, could you please display this side by side with

3   302AC that we looked at previously.

4             Does 302AL sent on September 11 appear to be the same

5   document sent on July 26 in 302AC?

6   A.   Yes, they appear to be the same document.

7             MS. GHOSH:   Just a moment, your Honor.

8             No further questions.

9             THE COURT:   Cross-examination.

10             MR. SCHNEIDER:   Yes, your Honor.

11   CROSS-EXAMINATION

12   BY MR. SCHNEIDER:

13   Q.   Good morning, sir.

14   A.   Good morning.

15   Q.   I'd like to just ask you a few questions, if I can, about a

16   number of the exhibits that you referred to?

17             THE COURT:   Mr. Schneider, can you just move the

18   microphone a little closer, please.

19             MR. SCHNEIDER:   Sorry, your Honor.   Is that better?

20   Q.   Mr. Bailey, if you can put up Government Exhibit 212a,

21   please.

22             You looked at this earlier.   Is that right?

23   A.   Yes.

24   Q.   And this is what's called a client information sheet,

25   right?

M9FQraj2                        Gassert – Cross

1    A.  It is.

2    Q.  And this has personal information, Mr. Raji's first, middle

3    and last name.  Is that right?

4    A.  Correct.

5    Q.  It has his date of birth, correct?

6    A.  It does.

7    Q.  It has an email address allegedly for him, Mustapha Raji,

8    right?

9    A.  Yes.

10   Q.  And could you also look at the -- there's an attachment

11   which showed a passport before.  Can you find that?  Is that

12   the same page, same attachment?  It's just further down,

13   Mr. Bailey.  Thank you.

14        You see that's also part of Government Exhibit 212a.

15   Is that right?

16   A.  Yes, it is.

17   Q.  And that's a photograph of Mr. Raji?

18   A.  That appears to be a photograph of Mr. Raji.

19   Q.  The gentleman seated right there, right?

20   A.  Yes.

21   Q.  Okay.  And that's a passport with his first name --

22   A.  Yes.

23   Q.  -- and middle name and last name?

24   A.  Correct.

25   Q.  And that information that's there appears -- whatever it is

SOUTHERN DISTRICT REPORTERS, P.C.

M9FQraj2                          Gassert - Cross

1    appears to be consistent with the information given on the

2    personal information sheet.  Isn't that right?

3    A.  Yes, they appear to be similar.  I didn't -- if we could go

4    back and like put them side by side or anything to know a

5    hundred percent?

6    Q.  Would you, Mr. Bailey?  Thank you.  You can't because it's

7    the same.  Actually, for technological reasons, we can't put

8    them side by side.

9          Let's just save time.  Basically, it's the same name.

10   Is that right?

11   A.  Yes, same name.

12   Q.  All right.  And whatever information could be matching, if

13   you could look at it, you could just -- whoever has the

14   information sheet could look at the passport to see if it

15   matches or not, right?

16   A.  Yes, they could.

17   Q.  Okay.  You could take that down.  Thank you.  Now, if you

18   could pull up Government Exhibit 304, please.

19         That's the one that says the president of Unique

20   Bamboo is Nancy Martino-Jean.  Is that right?

21   A.  On this document, yes.

22   Q.  Yes.  And it says vice-president Mustapha Raji, correct?

23   A.  Yes.

24   Q.  Okay.  Now, there's nothing -- withdrawn.

25         Can you take that down and put up Government Exhibit

M9FQraj2                          Gassert - Cross

1    101E as in Edward, please.

2              This is also a document for Unique Bamboo Investment,

3    correct?

4    A.  Correct.

5    Q.  And the next to last line, it says, "authorized user."  Is

6    that right?

7    A.  It does.

8    Q.  It says Nancy Martino-Jean, right?

9    A.  Yes.

10   Q.  It does not say Mustapha Raji, does it?

11   A.  Not on this document.

12   Q.  Have you -- and you've reviewed documents in preparation

13   for preparing charts, right?

14   A.  Correct.

15   Q.  Have you ever seen any document or any record that -- in

16   connection with this case to indicate that Mustapha Raji has

17   any kind of signatory powers for this Unique Bamboo account?

18   A.  We'd have to pull the signature page again, but I can't

19   recall right now seeing him as a signator on the Unique Bamboo

20   account.

21   Q.  Thank you.  And in your knowledge, in your experience, is

22   it fair to say that if someone is not a signator, they can't

23   withdraw money, correct?

24   A.  In my training and experience, that is not correct.

25   Q.  So, in other words, if I -- well, tell me an example of how

M9FQraj2                    Gassert - Cross

1    someone could withdraw money from the account if they don't

2    have the authorization to sign for that account?

3    A.   Sure.  So I've had several cases with ATM withdrawals.  So

4    you can have a debit card from the account.  A, say a friend --

5    or it doesn't even have to be a friend, but as long as you have

6    a debit card and pin code for that account itself, you can go

7    to an ATM and withdraw money from that account.

8    Q.   Okay.  So right under where it says authorized user Nancy

9    Martino-Jean, it has debit cards and some numbers, right?

10   A.   Yes.

11   Q.   Do you see any debit cards connected to Mustapha Raji for

12   this Unique Bamboo account?

13   A.   No, I do not.

14   Q.   So separate apart from withdrawing money, how about wiring

15   money?  You mentioned using a debit card for an ATM, right?

16   A.   Sure.

17   Q.   So if someone is not a signatory on a particular account,

18   can that person authorize a wire transfer?

19   A.   I think it depends.

20   Q.   Okay.  Tell us what it would depend on.

21   A.   Sure.  So some banks I know, you have to go in person,

22   you'd have to show them your ID, and you'd have to go through

23   like an identification process.

24        Now I know there's online mobile applications where

25   you can initiate wire transfers.  Just like on my phone, I can

1  pull up my U.S. Bank app and initiate a wire transfer.  So in

2  that case, I think it would depend on the user of the phone and

3  what information you have.  And in the case of going into a

4  bank itself, I think it would be up to the teller to verify

5  that, yes, this is the account, this is the identification, it

6  all matches up.

7  Q.  Okay.  So is it fair to say that in your review of any

8  records or charts, you have not seen anything to indicate that

9  Mustapha Raji had the ability in this case for Unique Bamboo to

10 authorize any wire transfers.  Is that right?

11 A.  What do you mean by authorize?

12 Q.  Well, do it.  I mean, he doesn't -- in other words, if I go

13 to a bank, I don't send a wire.  I tell the bank personnel to

14 send a wire, right?

15 A.  Correct.

16 Q.  So in this case, the Unique Bamboo account and Mustapha

17 Raji, have you seen any records, any documents, any charts

18 anywhere to indicate that Mustapha Raji had the ability to tell

19 someone at a bank to wire any money to anybody else?

20 A.  I can't recall a specific document saying so.

21 Q.  Let me ask you, in this case, you were given certain

22 documents by the prosecution, right?

23 A.  Correct.

24 Q.  And they asked you to prepare certain charts or at least

25 edit charts based on a review of those documents, correct?

M9FQraj2                          Gassert - Cross

1    A.  Yes, correct.

2    Q.  As you see -- now the charts you prepared, those are the

3    charts -- or edited, those are the charts based on the records

4    that the prosecutors gave you, correct?

5    A.  Correct.

6    Q.  And there's nothing, as far as you saw in any of those

7    records in preparation for those charts, to indicate Mustapha

8    Raji personally authorized any wire transfers.  Isn't that

9    right?

10   A.  Yes, correct.

11   Q.  Thank you.

12           Now, pull up Government Exhibit 501, please.

13           Now, 501 indicates those are certain transfers from

14   Unique Bamboo Investment, correct?

15   A.  Yes.

16   Q.  And at the top, it says, "$2,400 to three recipients and

17   refers to 101B and 101C, right?

18   A.  Correct.

19   Q.  Can you pull up now 101B, please, Mr. Bailey.

20           Now, in reviewing 101B, can you tell how much money

21   was sent to the three different recipients of the $2,400?

22   A.  Not on 101B.

23   Q.  Can you see it -- well, is there any other page on 101B?

24   Let's make sure there's more than one page.  Let's be careful.

25           Have you had a chance?

1    A.   Could we scroll up a little bit.  Stop there.  Could we

2    pull up side by side the chart -- and the bank statement.

3    Q.   Absolutely.  Thank you.

4    A.   So on 101B, let's go to the July statement.  I guess that

5    would be one or two up.  Scroll down a little bit.  Yeah, we've

6    scrolled through it, and I don't think I saw it anywhere.

7    Okay.  Yeah, hold up right there.  Scroll up a little bit more.

8    Is it on the top page?  There we go.

9              Okay.  So there July 30 there's the $700 -- yes.  So

10   we have $1,700 coming out of those two highlighted

11   transactions.  One to Hamilton Bazelais and the other to Edward

12   Fuller.  And then just below that, there was another $700

13   transaction to Leon Odain.

14   Q.   Right.  So on the chart, it just says to three recipients,

15   but if you were asked, you could say specifically how much was

16   sent to who the recipient was, right?

17   A.   Correct, the three recipients.

18   Q.   It just said $2,400, but you really now know that it's

19   $1,000, $700 and $700 to three specific entities, correct?

20   A.   Yes, correct.

21   Q.   And that's not in this chart though, is it?

22   A.   Those details are not in the chart.

23   Q.   And the same thing with below the right side of Government

24   Exhibit 501, it says 47,000 to three other recipients.  That's

25   based on 101B and 101C.  Rather than go through the specifics,

M9FQraj2                          Gassert - Cross

1    you could probably, if you looked at them, figure out specific

2    amounts it sent to what entities, right?

3    A.  Yes.

4    Q.  It's not included in the chart, but it does exist in the

5    exhibit, right?

6    A.  Correct.

7    Q.  Can you go to 103D as in David, please.

8           Those are -- you indicated earlier that this shows TD

9    Bank Mustapha Raji check withdrawal of $10,608 and $5,000.

10   Isn't that right?

11   A.  Yes.

12   Q.  That's in the same bank, TD Bank, correct?

13   A.  TD Bank, correct.

14   Q.  On the top, it has a particular -- what's the handwritten

15   number on top, the LP number?  See the handwritten number on

16   the top left of each of those?

17   A.  Yes.

18   Q.  What are those, do you know?

19   A.  I'm not sure what an LP number is.

20   Q.  Okay, but it's the same number on both of those checks,

21   right?

22   A.  Yes, they appear to be the same number.

23   Q.  Now, could it be a driver's license?  Could it be some form

24   of identification?

25           MS. GHOSH:  Objection.

M9FQraj2                        Gassert - Cross

1    Q.  In your experience?

2            THE COURT:  Sustained.

3    Q.  Now, just so it's clear also, they're both on the same day,

4    they're both August 2, right?

5    A.  They're both August 2nd.

6    Q.  And they're both from the same bank?

7    A.  TD Bank.

8    Q.  Now, Government Exhibit 505, please.  Thank you.

9            505 this is talking about Unique Bamboo and

10   multiservices dealing with Nancy Martino-Jean, right?

11   A.  Correct.

12   Q.  This shows that money went from her Unique Bamboo to Nancy

13   Martino-Jean and then back to the very same account.  Isn't

14   that right?

15   A.  Some of the money did, yes.

16   Q.  Some.  Yeah, not all of it, just some.  The one that

17   shows -- show us again which is the money and which are the

18   arrows that show that money went from one account to Nancy and

19   then back from Nancy to that same account?  Which arrows?

20   A.  Are you asking which arrows show they went from Nancy back

21   to Unique Bamboo?

22   Q.  I want to do both.  Show, in other words, it went to Nancy.

23   It now shows it goes back from Nancy to the same account,

24   right?  Just show us which that is.  There are too many arrows

25   to figure out.

M9FQraj2                       Gassert – Cross

1    A.  All right.  So on August 13, we have the $175,000 going

2    from Unique Multiservices with Nancy as the signator to a TD

3    Bank account in Nancy's name.  And then on August 31, 2018, we

4    have $110,000 going from that Nancy TD Bank account back to the

5    Unique Bamboo account, which is where the money was originally

6    started at.

7    Q.  Just so I'm clear, these are the accounts -- you just said

8    Nancy was the signator on one of the accounts you just

9    mentioned, right?

10   A.  Yes.

11   Q.  Now, it's fair to say that these accounts in this chart

12   deals with Unique Bamboo and Nancy Martino-Jean, but there's

13   nothing here about Mustapha Raji.  Isn't that right?

14   A.  There is nothing on the chart with Mustapha Raji's name on

15   it.

16   Q.  Not just that, but there are no charts that you prepared

17   based on the records you reviewed to show Mr. Raji getting

18   money from one account and then putting it back into the very

19   same account.  No record of that, is there, as far as you can

20   tell?

21   A.  From one account to the same account, I don't --

22   Q.  In other words the same kind of chart we have here for

23   Nancy Martino-Jean --

24   A.  Right.

25   Q.  -- you don't have a chart like that for Mustapha Raji, do

M9FQraj2                        Gassert - Cross

1    you?

2    A.  No, not the same chart we see here.

3    Q.  Just, finally, Government Exhibit 315, please?  I

4    appreciate it.  Thank you.

5         These are the extraction reports to show different

6    searches.  Is that right?

7    A.  Correct.

8    Q.  Just so I'm clear, this is the extraction from Nancy

9    Martino-Jean's computer.  Isn't that right?

10   A.  We'd have to double check wherever we put it in.  But as

11   far as the exact source, I don't want to say right now because

12   I don't know a hundred percent.

13   Q.  Could we have the stipulation then, please?  It's S-8, I

14   believe.  Is that right?  Yes.  Could we have S-8 please, thank

15   you.

16        I guess it's C, right?  Government Exhibit 315, which

17   is, the extraction report you're looking at now is a true and

18   accurate copy of a portion of the internet search history from

19   the Martino-Jean phone.  Is that now something you remember?

20   A.  Yes.

21   Q.  That search is for Nancy Martino-Jean, right?  That's what

22   the search was about:  How to find, how to erase, how to

23   remove, how to find out if you're investigated?  That's all

24   from her, right?

25   A.  Correct.

M9FQraj2                         Gassert – Redirect

1    Q.  You don't have any extraction report like that indicating

2    anything for Mr. Raji's phone or computer or any other

3    electronic item?  You don't have any extraction as far as you

4    know of any device connected to Mr. Raji?

5              MS. GHOSH:  Objection.

6              THE COURT:  Overruled.

7    A.  I don't know.

8              MR. SCHNEIDER:  I have nothing further.  Thank you

9    sir.

10             THE COURT:  Any redirect?

11             MS. GHOSH:  Just one moment, your Honor.

12   REDIRECT EXAMINATION

13   BY MS. GHOSH:

14   Q.  Just briefly, your Honor.

15             Special Agent Gassert, do you work in a cyber crime

16   unit in the FBI?

17   A.  Yes.

18   Q.  In your experience, if a cell phone is seized from an

19   individual and the cell phone is locked or encrypted, are you

20   always able to extract a search history from it?

21   A.  No, we are not.

22             MS. GHOSH:  No further questions, your Honor.

23             MR. SCHNEIDER:  Nothing.  Never mind.

24             THE COURT:  Agent Gassert, you may step down.  You're

25   excused.

M9FQraj2                         Palmer - Direct

1              (Witness excused)

2              Next witness.

3              MS. GHOSH:  The government calls Dustin Palmer.

4   DUSTIN KARL PALMER,

5        called as a witness by the government,

6        having been duly sworn, testified as follows.

7              DEPUTY CLERK:  Can you please state and spell your

8   full name for the record.

9              THE WITNESS:  Yes.  Dustin Karl Palmer.  D-U-S-T-I-N.

10  K-A-R-L.  P-A-L-M-E-R.

11             THE COURT:  You may proceed.

12  DIRECT EXAMINATION

13  BY MS. GHOSH:

14  Q.  Mr. Palmer, if you could just adjust the microphone so it's

15  pretty close but not too close to your mouth.  What do you do

16  for work?

17  A.  I am a consultant who helps financial institutions like

18  banks and credit unions to build and run their

19  anti-money-laundering programs.

20  Q.  How long have you been doing that?

21  A.  For eleven years.

22  Q.  I'd like to go back a bit and just briefly discuss your

23  education and employment history starting with education.  Did

24  you attend college?

25  A.  Yes, I attended Brigham Young University.

M9FQraj2                         Palmer - Direct

1    Q.  What did you get a degree in there?

2    A.  I got a bachelor's degree in economics.

3    Q.  Did you do any secondary schooling?

4    A.  Yes, I went to the University of Chicago for a law degree.

5    Q.  After graduating from law school, where did you work?

6    A.  I worked for one year for Judge Karen Williams on the

7    Fourth Circuit, and then I went to a law firm, Gibson Dunn &

8    Crutcher in Washington D.C. for almost four years.

9    Q.  Did you enter the government at some point?

10   A.  Yes.  In 2007, I joined the Department of Homeland

11   Security.

12   Q.  And what office were you in within the Department of

13   Homeland Security?

14   A.  I was in the office of legal counsel.  I was an attorney

15   mainly working with the customs and border protection and

16   immigration and customs enforcement groups on their

17   anti-money-laundering investigations where we helped to

18   evaluate what they were seeing and then make recommendations to

19   the Department of Justice.

20   Q.  Have you had any other government positions?

21   A.  Yes.  After about a year at the Department of Homeland

22   Security, I went to the U.S. Treasury Department where I for

23   the first six months worked on TARP, which is the troubled

24   asset relief program.  And then after that, I continued working

25   on anti-money-laundering at the treasury department.

M9FQraj2                         Palmer - Direct

1   Q.   What are some examples of things you did relating to money

2   laundering while you were at the department of treasury?

3   A.   At treasury, I worked very closely with the undersecretary

4   for terrorist financing and financial crimes.  He broadly

5   oversaw everything related to terrorist financing, the laws and

6   regulations there, anti-money-laundering, and economic

7   sanctions.

8        He oversaw a couple groups within treasury.  One is

9   FinCEN, which is the Financial Crimes Enforcement Network.

10  That's the group that actually writes the anti-money-laundering

11  regulations and pushes those out to the bank regulators.  Also

12  OFAC, which is the Office of Foreign Assets Control, which

13  oversees --

14  Q.   If you could speak a little bit more slowly.

15  A.   Sorry.

16  Q.   Did you leave government at some point?

17  A.   Yes.  In 2011, I left government and joined a private

18  consulting firm Promontory Financial.

19  Q.   Is that where you are now?

20  A.   No.  About a year and a half ago, I left Promontory and

21  joined Berkeley Research Group, although though I'm doing the

22  same thing, consulting regarding anti-money-laundering.

23  Q.   Specifically, what sort of work do you do as a consultant?

24  A.   I work for all sorts of financial institutions, mainly

25  banks, to help them build and run their anti-money-laundering

M9FQraj2                        Palmer - Direct

1    programs to be able to recognize what is money laundering and
2    then report suspicious activity to the government.
3    Q.  Have you published articles regarding money laundering?
4    A.  Yes.
5    Q.  Have you lectured or given speeches about money laundering?
6    A.  Yes.
7    Q.  Have you been involved in the design of money-laundering
8    detection programs?
9    A.  Yes.
10   Q.  Have you testified in court before?
11   A.  Yes.
12   Q.  Were you qualified as an expert?
13   A.  Yes.
14          MS. GHOSH:  Your Honor, the government requests that
15   Mr. Palmer be qualified as an expert in the techniques, means,
16   and methods of money laundering.
17          THE COURT:  Any objection?
18          MR. SCHNEIDER:  No.
19          THE COURT:  All right.  He is so qualified.
20          Ladies and gentlemen, let me just briefly explain.  An
21   expert witness is someone who, by education or experience, has
22   acquired learning or experience in a specialized area of
23   knowledge.  Such a witness is permitted to express his or her
24   opinions on matters about which he or she has specialized
25   knowledge or training, and the party is permitted to present

1    expert testimony to you on the theory that someone who is

2    experienced in the field can assist you in understanding the

3    evidence or in reaching an independent decision on the facts.

4    I will give you more instructions at the conclusion of the case

5    about how to assess the credibility of witnesses, and those

6    instructions, as I will remind you then, apply to experts as

7    well as other witnesses.

8           But for now, understand that in weighing an expert's

9    opinion, you may consider the expert's qualifications,

10   education and reasons for testifying, as well as all the other

11   considerations that ordinarily apply, including all of the

12   other evidence in the case.  If you find that the opinion of an

13   expert is based on sufficient data, education and experience,

14   and the other evidence does not give you reason to doubt his or

15   her conclusions, you would be justified in placing reliance on

16   his or her testimony.  However, you should not accept witness

17   testimony simply because the witness is an expert.  The

18   determination of the facts in this case rests solely with you.

19          One additional instruction specific to this particular

20   expert.  As you heard, he's testifying about money laundering,

21   anti-money-laundering, those sorts of things.  Now, as I told

22   you, and as I will instruct you further, one of the charges in

23   this case, Count Four, charges the defendant with conspiracy to

24   commit money laundering.  It is up to you to decide -- first of

25   all, I will give you instructions on what that means and what

1  the elements of that crime are.  And second of all, it is up to

2  you, and you alone, to decide if the facts -- if the government

3  has proved beyond a reasonable doubt that those elements are

4  satisfied.

5          The witness, I suspect, may use some terms that are

6  legal terms and overlap with the instructions that I will give

7  you.  To the extent I'll permit him to do so just in the sense

8  or to enable you to understand what he's talking about and the

9  like, but suffice it to say that any instructions I give,

10 control and govern.  So if there's any conflict between what we

11 say, it's my instructions that govern, and ultimately you're

12 the exclusive judges of the facts in this case.

13         You may proceed.

14 BY MS. GHOSH:

15 Q.  Mr. Palmer, in cases in which you have testified, have you

16 been compensated?

17 A.  Yes.

18 Q.  Are you being compensated in connection with your work

19 involving this case?

20 A.  Yes.

21 Q.  What's your hourly rate?

22 A.  $750 per hour.

23 Q.  Is your rate for testifying any different from your rate

24 for preparing to testify?

25 A.  No.

1   Q.  Does that money go to you directly or are you paid in a

2   different way?

3   A.  I am simply paid on a salary basis, and the money or my

4   hourly rate goes to my firm.

5   Q.  Have you met with the government previously to prepare for

6   your testimony today?

7   A.  Yes.

8   Q.  Do you have an estimate of approximately how many hours

9   you've billed to date on this matter?

10  A.  Approximately 12 hours.

11  Q.  Does your pay or salary depend at all on the outcome of

12  this case?

13  A.  No.

14  Q.  So, in other words, you get paid regardless of what

15  happens?

16  A.  Yes.

17  Q.  I want to talk briefly about your involvement in this

18  particular case.  Do you have any personal knowledge regarding

19  the particular facts of this case?

20  A.  No.

21  Q.  Are you aware of the charges in this case?

22  A.  Yes.

23  Q.  Have you reviewed any of the evidence in this case?

24  A.  No.

25  Q.  Have you been asked to render any kind of opinion whether

M9FQraj2                          Palmer - Direct

1  | the conduct of the defendant in this case constitutes money

2  | laundering or other offenses?

3  | A.  No.

4  | Q.  What kind of information are you here to testify about

5  | today for the jury?

6  | A.  I'm here to testify about the ways and means that are

7  | typical for money laundering.

8  | Q.  Is there just one way to do money laundering?

9  | A.  No.

10 | Q.  In your training and experience, are there different types,

11 | patterns or characteristics of money laundering?

12 | A.  Yes, there are.  For individuals and small businesses,

13 | there are somewhere around 18 that are more typical, what we

14 | usually call red flags or typologies for money laundering.

15 | Q.  Can you just explain what you mean by a red flag or

16 | typology?

17 | A.  It's simply a pattern of transactions or actions by usually

18 | a customer of a financial institution that are indications or

19 | potential indications of money laundering.

20 | Q.  How would you become familiar with these red flags?

21 | A.  Through a few different ways.  First, through the

22 | government, through my work at the Department of Homeland

23 | Security, at the treasury department, we received the reports

24 | from financial institutions of suspicious activity or potential

25 | money laundering.

1          Second of all, through my work as a consultant.  I've

2   worked with financial institutions for the last eleven years

3   and got to see the money laundering happening through their

4   institutions, including working with certain industry groups.

5   So the banks actually get together, they talk about what

6   they're seeing, and there are a couple of major industry

7   groups.  One is the Wolfsberg Group where international banks

8   get together and they talk about money-laundering pattern

9   they're seeing.  Another is called the Egmont Group.  They also

10  get together to discuss the typologies and red flags they see.

11  Q.  Just to be clear, did you come up with the red flags we'll

12  be discussing shortly?

13  A.  No.  These are common red flags that most banks use.

14  Q.  Mr. Bailey, can you please put up for the witness what is

15  marked for identification as Government Exhibit 512.

16          Mr. Palmer, do you recognize this?

17  A.  Yes.

18  Q.  Generally, what is this?

19  A.  It is a PowerPoint slide that I created that outlines the

20  common money-laundering typologies.

21  Q.  Would it aid in your testimony today?

22  A.  Yes, it will.

23          MS. GHOSH:  The government offers Exhibit 512 as a

24  demonstrative.

25          MR. SCHNEIDER:  No objection.

1          THE COURT:  Admitted.

2          (Government's Exhibit 512 received in evidence)

3          THE COURT:  Ladies and gentlemen, just so you know,

4    counsel said this is offered as a demonstrative.  What that

5    means is it's just an aid in helping you to understand the

6    witness' testimony.  Strictly speaking, it's the witness's

7    testimony that is the evidence.  This is not an exhibit that is

8    in evidence per se, but you can consider it in weighing and

9    understanding the witness's testimony.

10   BY MS. GHOSH:

11   Q.  Mr. Bailey, can you please put that up for the jury.

12          Mr. Palmer, we'll discuss the details in a moment, but

13   generally, what does this chart show?

14   A.  This shows four different categories of common

15   money-laundering typologies, and then I have the specific

16   typology or red flag grouping itself under each of the

17   different categories.

18   Q.  Mr. Bailey, could you please zoom in firm on the top

19   category, information.

20          Mr. Palmer, starting here, could you explain this set

21   of red flags or typologies?

22   A.  Sure.  I'll start with the top left.  This first red flag

23   deals with unusual identification information.  So when

24   somebody opens up a new account at a bank, they have to provide

25   name, address, date of birth, tax ID number, that type of

M9FQraj2                          Palmer - Direct

1    information.  And if there's something that's unusual, say 123
2    Main Street, something that's odd or unusual there, that's one
3    red flag.
4    Q.  And the next one under that is incomplete account
5    information.  Could you explain that, please?
6    A.  Yeah, that's, you know, somewhat similar except there might
7    just be one that's missing that the customer refuses to give or
8    for -- for one reason or another.  So somewhat similar but just
9    a blank category that needs to be provided.
10   Q.  What about incomplete transaction information?
11   A.  So somewhat similar to the incomplete account information
12   but on the transaction side, especially certain transaction,
13   like wires or especially if they're large wires or
14   international wires.  Information is required to be able to
15   fully send that wire.  For example, the beneficiary information
16   about the address of the beneficiary.  Especially if it's
17   larger or international, there should be something in the memo
18   line that describes why a transaction like this is happening.
19   Q.  Just to pause for a moment, if someone provides incomplete
20   account or transaction information to a bank, what does the
21   bank typically do next?
22   A.  So they typically -- it depends on what they think is
23   happening.  So if they think it is money laundering, they will
24   do it an internal investigation and they'll gather the
25   information that they need to be able to decide if it is

M9FQraj2                        Palmer – Direct

1    suspicious or not.  If they think it's suspicious, then they

2    will file it with the government.

3          If they think it's fraud, then they oftentimes reach

4    out to the customer to gather more information to confirm

5    information about the transaction to determine if there's

6    something fraudulent happening.

7          Sometimes there's both involved with the fraud and

8    money laundering investigation for something, and then they

9    reach out carefully to only talk about the fraud side to gather

10   information to determine if it's fraudulent, and the money

11   laundering side they usually keep that to themselves and do

12   that investigation on their own.

13   Q.  As one step if the bank is investigating fraud, do banks

14   sometimes freeze the account or close the account?

15   A.  They do.  Again, depending on the facts and circumstances

16   and their investigation, they might freeze it.  They might

17   close.  It they might exit the customer, if they think it's

18   something fraudulent or some money laundering is happening

19   there, yes.

20   Q.  The last red flag in this category is above market

21   invoicing.  Could you just explain what that refers to?

22   A.  Yes.  This refers to a common money laundering pattern

23   where somebody might want to transfer a lot of money, say

24   $20,000, but on the invoice it may say something very simple

25   like "a pair of shoes," something that clearly is well above

M9FQraj2                        Palmer - Direct

1    what the invoice should be for a pair of shoes or if it

2    actually should be $20,000, there should be more in the memo

3    line that describes why it's actually $20,000.  So this is a

4    common way to launder.

5    Q.  Just going to ask you again to slow down a little bit for

6    the court reporter's sake and all of us.

7           We can zoom out of that section of information, and

8    can we please go to the next category here, unusual behavior

9    general.  Please explain these.

10   A.  This category describes money-laundering patterns that are

11   generally true regardless of the customer type.  The first one

12   involves round dollar transactions.  So if there are multiple

13   round dollar -- when I say round dollar, meaning there are

14   three, four, five zeros (10,000, 100,000, etc.) transfers of

15   money.  In a situation where it's typical for it not to be

16   round, for example, invoices, then that's one red flag.

17   Q.  The next one down is layering.  Please explain that.

18   A.  Layering is a very common one.  When you think about what

19   money laundering is, individuals want to conceal either the

20   origin or destination of the funds.  So one way to do so is

21   rather than just one transaction, say you want to send the

22   money from person A to person B, rather than just going from

23   person A to person B, they might layer, so send it to multiple

24   other accounts first to be able to conceal, for example, that

25   it came from A or that it's going to B.  So this layering

M9FQraj2                          Palmer - Direct

1    simply means a lot of transactions in the middle of those two.

2    Q.  You give an example of moving it from one account and then

3    several before it reaches the ultimate account.  Would layering

4    also include moving money from one account into another account

5    and then back into the first account?

6    A.  Yes.  Anything that adds an extra what we call hops, adds

7    an extra hop in between the ultimate destination is layering

8    because oftentimes we just look back to the last transaction of

9    where it came from, and you don't look back multiple hops to be

10   able to see where it ultimately came from.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Q.   Next here is structuring.  Can you please explain that?
A.   Sure.  Structuring is where someone changes a withdrawal or
a deposit to make it look smaller than it actually is, to make
it look less suspicious.

         So one easy example is let's say you have $60,000 that
you want to deposit into an account.  The easiest way is just
to deposit the $60,000.  But if you want to structure it so it
looks less suspicious, you might do tens of $6,000 each.  Or
you can change it however you want to, but it's usually trying
to make it look smaller to make it look less suspicious.
Q.   To give you an example of breaking up $60,000 into
multiple smaller transactions, does structuring also include
sending money to two different accounts for the same person or
entity instead of sending it to one account for that person or
entity?
A.   Absolutely.  Anytime where it's going where -- you know,
the ultimate beneficiary is the same, it doesn't matter if it's
different accounts.  But it's still structuring if you break it
apart instead of just doing it all at once.
Q.   Next is smurfing.  Can you explain what that is?
A.   Yes.  So smurfing is a term of making it really small.  So
what happens if the financial institutions obviously caught on
to the structuring and what was going on -- Congress even
passed a law talking about structuring.  So money launderers
knew that, so they made it even smaller.

         So instead of, in my example of $60,000, instead of

M9F6RAJ3                    Palmer - Direct

1    ten transactions of $6,000 each, they might do 60 transactions

2    of a thousand dollars or a 120 transactions of $500 to make

3    them really, really small.

4    Q.  Do you know where the term smurfing comes from?

5    A.  Yes.  I'll date myself a little bit here.  It comes from

6    the cartoon characters back in the '70s, the little blue

7    cartoons because they were short and small.  That's where it

8    comes from.

9    Q.  You said a moment ago that money launderers knew about the

10   structuring and so began to use even smaller transactions.  In

11   your experience, is it common that money launderers may be

12   aware of some of these red flags and take steps to alter their

13   behavior to try to avoid triggering a red flag?

14   A.  They do.  They do.  These are not classified.  They're out

15   there if you really look into it.  It is hard to avoid all of

16   them, however, because of the way money moves in our financial

17   system.  They do know about them, and they try to get around.

18   Q.  The last one here is money mule.  Can you please explain

19   that?

20   A.  Money mule is a -- this one actually came out of the drug

21   trade because it was common there, but it happens all over.

22   It's similar to layering.  But you're layering with an

23   unknown -- an unknown person or someone who is not you or the

24   other party.  So instead of just taking the transaction, going

25   from, you know, A to a couple of -- a few accounts in the

M9F6RAJ3                    Palmer - Direct

1    middle, and ultimately to B.  With the money mule, you can

2    actually send the money to the mule, in this case, and he or

3    she will take 5, 10, 15 percent and then transfer the rest on

4    to B.  That's sort of their cut for being part of the money

5    laundering transaction.

6    Q.  You can zoom out of that and go into the third set, please,

7    which is unusual behavior, customer specific.

8           Can you please explain this category?

9    A.  Now, this category deals with -- whereas the previous

10   category was sort of generally unusual.  So generally applied

11   to everyone, to all customers.  This one is customer specific.

12   Where some customers, this may be somewhat more normal

13   behavior, whereas -- but for many it is not normal behavior.

14   And in those situations, it is a red flag for money laundering.

15   Q.  The first one is living beyond means.  Can you please

16   explain what that means?

17   A.  Sure.  In this case, this is where an individual, you know,

18   is living a certain way.  So you have a classic middle-class

19   lifestyle.  You know, they go on one vacation a year, they have

20   a car payment, et cetera, and it's very consistent.  And what

21   usually happens here is the lifestyle changes.  All the sudden,

22   for example, in the transaction information, they see more

23   vacations or purchasing a boat, or, you know, purchasing extra

24   cars, and the things that indicate that the lifestyle has

25   dramatically and usually quickly changed for that individual.

1   Q.  Next is high volume elaborate movements.  Please explain

2   that.

3   A.  Now, this involves usually wire transactions where there

4   are -- wires come in and usually immediately go back out.  And

5   sometimes with elaborate movements, they might hop around with

6   the layering as well on top of that -- the wires going in and

7   wires going back out.  Again, common.  There's a high volume of

8   them.  It's not just one choosing multiple to come in and then

9   immediately going back out of.

10  Q.  Does that include money moving very quickly out of an

11  account that receives money in?

12  A.  Yes.

13  Q.  Next is same person multiple accounts.  Please explain

14  that.

15  A.  Yeah.  This is, you know, again a somewhat similar theme to

16  the one I just described.  But it involves a situation where

17  one person may have multiple accounts at the same financial

18  institution, or they may have accounts in their own name or in

19  the name of their business at other banks.  So, for example,

20  you might have a bank account, Bank of America, and they might

21  transfer amongst multiple accounts in their name, maybe go into

22  a business account and then pop in and back out to Person B.

23  Or they may start in Bank of America and then sent to their

24  account at Wells Fargo and their account at Citibank, and

25  ultimately get it to Person B.

1   Q.  Next is mingling of business and personal.  Please explain

2   that.

3   A.  Yes.  So this is a situation, in banks, you're not supposed

4   to -- you're supposed to have a separate account for your

5   personal and a separate account for your business.  But in

6   business accounts, it's typical for there to be more

7   transactions, a higher dollar amounts.  And so when that's the

8   case, it's easier to hide or conceal money that you're trying

9   to launder through the system.  So people will mingle their

10  personal accounts with that business account to make it harder

11  for the financial institution to detect the money laundering.

12  Q.  I want to follow up on that.  From the bank's perspective,

13  is there a difference in identifying red flags of money

14  laundering for a business account as opposed to a personal

15  account?

16  A.  There are.  There are.  Usually, we call them thresholds

17  because we try to program these into computers, but they are

18  higher threshold.  Typically, businesses have higher thresholds

19  before they trigger a red flag for the bank to investigate.

20  Q.  And by threshold, can you explain what you mean by that?

21  A.  Yeah.  A threshold might be, you know, as an example for a

22  personal account, if they see some of this behavior and it

23  rises above, say, $5,000, it might create a red flag.  Whereas

24  for a business account, they may set a threshold of $20,000.

25  So it may be significantly higher before any red flag will go

1    off to allow more transactions to happen before they were to

2    investigate something.

3    Q.   Next is cashing out checks.  Can you please explain that?

4    A.   Yeah.  This involves, you know, again, somewhat similar to

5    the business versus personal, but it's specific to checks and

6    cash to a certain degree, where it is not as common, especially

7    in today's world for people to go into a bank and cash a lot of

8    checks.  It's not just cashing them out, but it's also

9    depositing them in, although it's usually called cashing out

10   check.  But it's the use of a lot of checks which is simply

11   unusual, but if you're trying to get around some of automated

12   systems banks have for wires and other things, checks is one

13   way -- checks are one way to get around that and be able to

14   move a lot of money without potential detection.

15   Q.   And what about writing a large amount of checks at once,

16   multiple checks at one?  Is that included in that typology?

17   A.   Absolutely.

18   Q.   The last one, unusual patterns, please explain that.

19   A.   Yeah.  This one is a sort of catch-all for significant

20   behavior change.  So we are creatures of habits, and we tend to

21   do the same thing, and if there's an unusual pattern for a bank

22   customer, then that will be flagged.  Not necessarily just

23   one-off events like when you're buying a home.  Usually

24   something dramatically in a customer's behavior, then it will

25   create a red flag.

1    Q.  You can zoom out of that.  And please, Mr. Bailey, zoom in

2    on the last category, related parties.

3              Mr. Palmer, can you explain what this category relates

4    to?

5    A.  This relates to the use of parties who are related to the

6    individual to launder the money.  Again, oftentimes they

7    figured out that just moving it amongst their own accounts may

8    not be as efficient, so they try to use other people, usually

9    related people or entities to help them do so.

10   Q.  First one is friends and family.  Please explain that.

11   A.  This is a classic pattern where, you know, maybe an

12   individual, you know, is sort of doesn't -- an individual,

13   wants to get the money to someone who looks as innocent as

14   possible.  Right?  So instead of the money going directly to

15   his account, he might give it to his spouse or his daughter or

16   his parents, someone who just do regular things, even though

17   that person might be doing some more intense things or some

18   money laundering.  So it's the use of other people, again,

19   similar to a layering pattern, but just using related parties

20   for them.

21   Q.  Charities and nonprofits.  Can you explain that red flag?

22   A.  Yes.  This is a -- think of the friends and family

23   situation, but this is just the use of charities, nonprofits,

24   just those related entities to move the money through.

25   Especially if you move money, you know, a lot of money through

1    charities, move a lot of money, so you're hiding it similar to

2    the commingling of personal and business accounts and then it

3    looks like it's coming from a charity or a nonprofit rather

4    than through somebody who could cause other suspicion.

5    Q.  Last is shell companies.  Please explain that.

6    A.  Again, somewhat similar to the last one, but instead of

7    using a nonprofit, friends and families or charity, people will

8    set up a shell company.  So a shell company is a company that

9    typically does not produce anything.  It's just set up,

10   established, and then they have the money flow through it.

11   Again, rather than having Dustin Palmer, it's actually going

12   through a shell company, LLC, and sometimes with an invoice

13   that makes it look official.

14   Q.  And zoom out.  We'll keep the chart up for now.

15           This list, 18 typologist or red flags, are these all

16   the ways someone can commit money laundering?

17   A.  No.

18   Q.  In cases of money laundering that you've seen, are all of

19   these characteristics typically there?

20   A.  No.

21   Q.  Should we expect half of these to be present?

22   A.  No.  Typically there are maybe somewhere between two and

23   five of these.

24   Q.  And just to be clear, if some of these red flags are

25   present, does that mean that there definitively is money

M9F6RAJ3                          Palmer - Direct

1   laundering going on?

2   A.  No, not definitive.  Depends on facts of the case, of the

3   investigation.

4   Q.  In your experience, how does the amount of bank scrutiny

5   apply to an international transaction compare to a domestic

6   transaction?

7   A.  It is -- banks apply significantly more scrutiny over the

8   international transactions.  They require something to be in

9   the memo line to explain what it's doing.  And especially a

10  high-risk jurisdiction, high-risk country, they'll scrutinize

11  it even more, asking for more information upfront or calling

12  the sender to make sure they have the information they need.

13  Q.  So if a transfer is from one account in the U.S. to another

14  account in the U.S., that would typically receive less scrutiny

15  from the banks than if one of those parties was overseas?

16  A.  Yes.

17  Q.  One final category.  Are you familiar with the concept of

18  papering or papering a transaction?

19  A.  Yes.

20  Q.  What does the term "papering" refers to?

21  A.  Papering refers to creating documents, usually after the

22  fact, after a transaction has happened, to describe what

23  happened in the transaction or what they want people to believe

24  happened in that transaction.

25  Q.  What types of documents have you seen in your experience as

M9F6RAJ3                          Palmer - Direct

1    part of papering?

2    A.   All sorts of documents.  They could be invoices, contracts.

3    Those are probably the most common documents to describe what

4    happened in a transaction.

5    Q.   Could a promissory note or loan document be used to paper a

6    transaction?

7    A.   Absolutely.  I think of those as contracts.

8    Q.   From your experience, what are some signs that a

9    transaction has been papered?

10   A.   Some signs -- most commonly, situations, when it's papered,

11   there is missing or incomplete information, or it might be

12   incorrect information, oftentimes afterwards, you're trying

13   to -- focusing on what you want to have happened, and there's

14   information missing or simply incorrect.

15   Q.   I believe you said that these are often created after the

16   fact; is that correct?

17   A.   Yes.

18   Q.   In your experience, are documents used to paper a

19   transaction sometimes backdated?

20   A.   Yes, yes.

21   Q.   Can you explain what backdating means?

22   A.   Mm-hmm.  Backdating means putting a date that's previous to

23   the actual date on there, to, again, make it appear that the

24   parties created the contract, promissory note or whatever it

25   may be before the transaction actually happened, and then

SOUTHERN DISTRICT REPORTERS, P.C.

1   they'll usually sign with that backdated date, again, to make

2   it appear this all happened before the transaction.

3   Q.  In the context of papering a transaction, do the false

4   documents sometimes bear a notary stamp or notarization?

5   A.  Yes, they do, especially because many of them require a

6   notary stamp on them.

7   Q.  Just to step back for a moment, what is a notary?

8   A.  A notary is a stamp given by a notary public, which is an

9   individual who has been licensed by the state to confirm

10  people's identity and to confirm the authenticity of documents

11  and many documents require that promissory notes, deeds, wills,

12  and other things require those notary -- those notarizations on

13  them.  And so even for papering a document, you still have to

14  have a notary on there if you want to make it look authentic.

15  Q.  When a document is notarized legitimately, what is the

16  procedure for that?

17  A.  So the procedure is to take the document, and usually in

18  person, to sit with the notary public, the people who are

19  signing the document would have to show identification so that

20  the notary public can confirm that they are who they claim to

21  be.  And then they sign the document in front of the notary

22  public, and then he or she will stamp it at the bottom -- once

23  it's signed, stamp it at the bottom as sufficient, and then

24  they'll sign it and date it.

25  Q.  So the person presents identification and signs the

M9F6RAJ3                          Palmer - Cross

1   document before the notary stamps and signs it?

2   A.   Correct.

3              MS. GHOSH:  Just one moment, your Honor.

4              Nothing further, your Honor.

5              THE COURT:  Cross-examination.

6              MR. SCHNEIDER:  Yes, your Honor.

7   CROSS-EXAMINATION

8   BY MR. SCHNEIDER:

9   Q.   Good morning, sir.

10  A.   Good morning.

11  Q.   How are you today?

12  A.   Doing well.  Thank you.

13  Q.   Good.  Now, as a consultant for financial institutions in

14  the area of money laundering, the goal is to find suspicious

15  activity and to try to prevent money laundering, if possible,

16  right?

17  A.   Correct.  And to report it, yes.

18  Q.   One question at a time.

19             And the next one would be if you see something

20  that's -- that, one, see something that may be suspicious or a

21  red flag or something, you report it to investigative

22  authorities for them to act further, correct?

23  A.   Yes.

24  Q.   And another way to engage in this consultation is to maybe

25  apprehend people who are involved in money laundering -- not

M9F6RAJ3                      Palmer - Cross

1    you personally, but to give the information to law enforcement
2    so they can focus their investigation and then hopefully
3    apprehend money launderers?
4    A.  Correct.  Banks also take some of their own actions, but
5    that is the main.
6    Q.  So you have bank action, then you can have governmental
7    action as well, law enforcement; is that right?
8    A.  Yes.
9    Q.  Now, so I want to be clear, you did not examine any bank
10   records in this case, did you?
11   A.  I did not.
12   Q.  You did not examine any contracts or deeds or brokerages in
13   this case, did you?
14   A.  Correct.
15   Q.  You didn't look at charts or speak to any witnesses, did
16   you?
17   A.  Correct.
18   Q.  But you spoke to the government in preparation for your
19   testimony?
20   A.  Yes.
21   Q.  And you are not here today expressing any opinion as to the
22   facts of this case, are you?
23   A.  Correct, not to the facts.
24   Q.  Now, is it fair to say in layperson's terms, money
25   laundering, I guess, is the use of financial transactions to

M9F6RAJ3                          Palmer - Cross

1   conceal the origin of the illegal or the illegally obtained

2   funds; would that be a generalization?

3   A.   Yes.   Although it can be to conceal the origin or

4   destination.

5   Q.   That was my next part.

6   A.   Okay.   But I just want to be complete.

7   Q.   I appreciate that.

8           So the idea is that you want to deal with people who

9   are dealing in illegally obtained funds.   Money laundering is

10  used to protect the ones who received it and protect the ones

11  who are sending it.   That's what money launderers try to do.

12  You know what?   That was a terrible question.   I apologize.   I

13  withdraw the question.   Okay?

14          The idea is to conceal the origin of the funds as well

15  as conceal the beneficiary of the funds.   That's what money

16  launderers do?

17  A.   Yes.

18  Q.   And in the past when you testified, you said money

19  launderers are kind of creative in their ways to try to get

20  around experts like you.

21  A.   Yes.

22  Q.   There are people like you who prepare certain documents,

23  certain manuals, right, the fact there is a manual that you

24  have referred to in the past; isn't that right?

25  A.   Yes.

M9F6RAJ3                          Palmer - Cross

1    Q.  And the manual includes a number of different factors and

2    red flags in both typologies, so you can try to find money

3    launderers and prevent it, right?

4    A.  Yes.

5    Q.  And then as that happens, money launders, find out how they

6    get caught, and then they try to figure out other ways to get

7    around guys like you -- not you personally, but you.

8    A.  Yes, some of them do.

9    Q.  Now, the goal -- one of the ways that money launders would

10   try to hide the origin of the funds, they put it through

11   different hops, as you say, right?  They get in the way to make

12   it harder to track the source and the ultimate beneficiary,

13   right?

14   A.  That is one method.

15   Q.  And the more hops, the more transactions, the more people

16   that are involved between Point A and Point B, that is more of

17   an indication, possible indication of money laundering?

18   A.  Yes.  That's one method.

19   Q.  Now, the red flag, there are about 18 or 20 or so typical

20   that you indicated on this diagram, but also you testified

21   previously, you talked about probably 20 or so, correct?

22   A.  Right.  Those are just estimates.

23   Q.  Yes.  Just estimates.  And, in fact, these are just ideas.

24   For example, one person could not do any of these things that

25   you talked about and still be a money launderer, right?

1   A.  Correct.  There are other ways to launder money other than

2   the 18 I've listed, yes, sir.

3   Q.  Somebody can actually try to conceal illegal money without

4   doing any of these things?

5   A.  That's --

6   Q.  They may get caught -- they could somehow maybe slip

7   through and not get caught even though they're guilty?

8   A.  That is possible.

9   Q.  It's also possible that someone can be doing all of these

10  things and not be a money launderer?

11  A.  That is much less likely, especially because some of them

12  are actually illegal all by themselves, like structuring.

13  Q.  Fair enough.  Well, structuring is, like, for example, when

14  you deal with over 10,000 cash, right, that is to be when you

15  deal with over $10,000 of cash, a certain report has to be

16  filed; is that right?

17  A.  To give context, there's a currency transaction report that

18  is required to be filed by banks when --

19  Q.  Those are called CTRs?

20  A.  When there's over $10,000 in cash or cash equivalents

21  deposited or withdrawn from a bank, from a financial

22  institution, so structuring is something when you structure

23  around that is actually illegal to do so.  If you're trying to

24  avoid the filing of that CTR, although it doesn't just apply to

25  cash, that typology or red flag can involve all sorts of

M9F6RAJ3                          Palmer - Cross

1    different transactions.

2    Q.  And just so I'm clear, if there's a $10,000 or more, so

3    $10,000 or more withdrawal, that would require a CTR to be

4    filed, right?

5    A.  Technically it's over $10,000.  So 10,000 and one penny,

6    but, yes, if that's in cash or cash equivalent, then the bank

7    would file a CTR with the government.

8    Q.  So, for example, I went to withdraw $10,600 from my

9    account, a CTR is required to be filed?

10   A.  Correct.  If it's cash or cash equivalents.

11   Q.  Now, you talked earlier about information, that somehow the

12   lack of sufficient information could be one of the red flags.

13   Unusual ID, right, is that right?

14   A.  Correct.  That is one of the red flags.

15   Q.  And is it fair to say that a passport would be

16   considered -- a legitimate passport would be considered a valid

17   ID in the bank for financial transactions?

18   A.  Yes.  So for that one item that is required to open an

19   account, yes, a passport is considered a good ID.

20   Q.  Good?

21   A.  A sufficient ID, yes, sir.

22   Q.  Okay.  And you also talked about something -- invoices are

23   used, and I think you said $20,000 for shoes, but if there's an

24   invoice, that's specified that matches the work done, that's

25   not a red flag, is it?

M9F6RAJ3                          Palmer - Cross

1    A.   It would depend on the facts and circumstances of the

2    situation.  So even in my example where I talked about a pair

3    of shoes, there may have actually been a pair of shoes that

4    were transferred for $20,000.

5    Q.   Don't tell my wife.

6    A.   But because of the dollar amount, the facts and

7    circumstances really depend on the situation.

8    Q.   Well, I mean, what would happen, for example, there could

9    be the memo line, $20,000 for shoes, that would be a red flag.

10   And then somebody would investigate and then find out, oh, my

11   God, someone really paid $20,000 for this particular pair of

12   shoes, so then it's okay, right?

13   A.   Not necessarily, no.  It's very common, and I'll continue

14   using this example.  It's very common to actually transfer the

15   shoes.  The shoes may be worth $100, but they're trying to

16   launder the $19,900, and so they pay 20,000 for the shoes but

17   they're actually laundering.

18   Q.   Very much, that would be another indication because it's

19   above market value.  Normally, shoes wouldn't cost 20,000.  I

20   would pay you 20,000 to try to hide the 19,000?

21   A.   That is one mechanism of laundering money.

22             THE COURT:  All right.  That's where we're going to

23   stop for our break.  It's 11:29.  You know the drill.  Don't

24   discuss the case with each other or anyone else for that

25   matter, don't do any research about the case, continue to keep

M9F6RAJ3                          Palmer - Cross

1    an open mind, we're making good progress, but we still haven't

2    heard all the evidence, let alone the parties' closing

3    arguments or my instructions.

4            With that, please be ready to be back at noon, and

5    we'll pick up where we left off.  Thank you.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Mr. Palmer, you may step down.

3           Two instructions, first, please be back in the

4    courtroom a minute or two before noon.  Second of all, because

5    you're on cross-examination, as you may know, you are not

6    permitted to speak with anyone from the government concerning

7    the subject matter of your testimony.  So refrain from doing

8    that, please.  And with that, you may step down.

9           THE WITNESS:  Okay.

10          THE COURT:  Mr. Schneider, any estimate on how much

11   you have on cross with Mr. Palmer?

12          MR. SCHNEIDER:  Not much longer.

13          THE COURT:  Okay.  And anything that you all need to

14   discuss before the break?

15          MS. GHOSH:  Not from the government, your Honor.

16          MR. SCHNEIDER:  No, your Honor.

17          THE COURT:  All right.  Obviously, it sounds like the

18   government will be resting not too long after the break, so

19   defense should be prepared at that time to indicate whether

20   there's any defense case.

21          MR. SCHNEIDER:  In that regard, your Honor, yes, we

22   will be prepared to address whether the defendant will be

23   testifying and any other witnesses.  But we're in the process

24   now -- I have been mentioning it to the government about a

25   possible stipulation regarding prior inconsistent statements of

M9F6RAJ3                    Palmer - Cross

1    the cooperator.  So I told the government that we are

2    identifying the specific portions in the transcript.  We will

3    give those portions to the government, and then they'll decide

4    if they consent or not.  And if they don't, we'll either argue

5    what's admissible, or I may ask to call one of the prosecutors

6    who were present for the inconsistent statements.

7         So my suggestion would be that we -- until the

8    government and I decide that, we don't -- "we" meaning the

9    defense -- doesn't rest in front of the jury just for that

10   purpose, but it will only be for that.  It would not be to call

11   other witnesses.

12        THE COURT:  All right.  I mean, part of the reason

13   that I keep the trial that I do and end at 2:30 is to enable

14   you to do those sort of things in the afternoon.  You were well

15   aware the government planned to rest at some point today and

16   well aware the next step is your case and well aware of my

17   admonition that if you didn't have a witness ready to go, that

18   I would deem you to have rested.  I would recommend that you

19   use the next 27 minutes to confer with the government and try

20   to sort that out.  I'm not interested in -- you're asking to

21   delay the trial tomorrow, you're now asking to keep the record

22   open.  I need to move things along.

23        MR. SCHNEIDER:  Your Honor.

24        THE COURT:  Mr. Schneider, just confer with the

25   government in the next 27 minutes.  We'll see where things

M9F6RAJ3                        Palmer - Cross

1    stand.

2              (Recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9F6RAJ3                        Palmer - Cross

1                              AFTERNOON SESSION

2                                 12:00 P.M.

3             THE COURT:  All right.  Can we get Mr. Palmer back on

4    the stand?

5             All right.  Get the jury.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9FQraj4                         Palmer - Cross

 1 |  (Jury present)

 2 |  THE COURT:  Welcome back.  Hope you enjoyed your

 3 | break.  We will continue with the cross-examination of

 4 | Mr. Palmer who remains under oath.

 5 |  And with that, Mr. Schneider, you may proceed.

 6 | BY MR. SCHNEIDER:

 7 | Q.  Mr. Palmer, in addition to some of the red flags you spoke

 8 | about, there are other indications of suspicious activity that

 9 | could lead one to investigate money laundering, right?

10 | A.  Yes.

11 | Q.  In fact, sometimes if people have unusual activity

12 | regarding safe deposit boxes, that's an indication, right?

13 | A.  Sure.  There are many ways to launder money.

14 | Q.  If someone deals with purchases of many cashiers checks,

15 | money orders, travelers checks for large amounts, that could be

16 | a red flag for suspicious money laundering, right?

17 | A.  It could be.

18 | Q.  If someone purchases open-ended prepaid cards, that could

19 | be evidence of money laundering, right?

20 | A.  Depending on the facts and circumstances, yeah.

21 | Q.  Well, that's in everything we're talking about, depends on

22 | the facts and circumstances.  So you should assume that's what

23 | the question is about.  Okay, sir?

24 |  Now, also if someone receives frequent online

25 | deposits, yet they don't apparently have an online business,

M9FQraj4                        Palmer - Cross

1    that's another indication of suspicious activity that could

2    lead to money laundering, right?

3    A.   It could be.  I don't fully understand the question about

4    online deposits.  Like wires?

5    Q.   Well, how about the fact that the customer may receive

6    large and frequent deposits from online payments, online

7    payment systems, yet has no apparent online or auction

8    business.  Would that be a factor?

9    A.   It could be.

10   Q.   Well, I mean, you talked earlier about a manual that has

11   helped prepared --

12   A.   Yep.

13   Q.   -- and compiled, right?

14   A.   Mmm-hmm.

15   Q.   In fact, there is an appendix F, as in Frank, called Money

16   Laundering and Terrorist Finance "Red Flags."  Isn't that

17   right?

18   A.   Yes.

19   Q.   And you're familiar with that document, right?

20   A.   Yes, I am.

21   Q.   Did you help prepare that document?

22   A.   I did not.

23   Q.   But you reviewed it and use it in your preparation and

24   investigation, right?

25   A.   Yes, I do.

M9FQraj4                    Palmer - Cross

1    Q.  And is it fair to say that in that document, part of the

2    manual specifically says:  Customer receives large and frequent

3    deposits from online payment systems, yet has no apparent on

4    line or auction business.  Haven't you read that in that

5    manual, sir?

6              MS. GHOSH:  Objection.

7              THE COURT:  Sustained.

8              MR. SCHNEIDER:  Well, as an expert, your Honor, I

9    think what he relies on is okay.

10             THE COURT:  Mr. Schneider.

11             MR. SCHNEIDER:  Yes.

12             THE COURT:  Sustained.

13   BY MR. SCHNEIDER:

14   Q.  Have you -- in preparation for your testimony, have you

15   relied on reviewing certain manuals and specifically the

16   appendix, appendix F, regarding the red flags?

17   A.  For this testimony, I did not -- you are referring to the

18   FFIEC Manual --

19   Q.  Exactly.

20   A.  -- which is the manual used by bank regular regulators when

21   they do their examination of banks.  The manual itself, the far

22   majority of it was written 10 to 20 years ago, and I did not

23   use that manual to create this testimony because a lot of the

24   things in there, especially red flags, are a bit outdated.  And

25   that's why I relied on the Egmont Group, the Wolfsberg Group,

M9FQraj4                          Palmer - Cross

1    these are industry groups talking about more modern ways of

2    laundering money and then just my experience working with the

3    banks.

4    Q.  Is it also fair to say that an indication of possible

5    suspicious activity for money laundering would be if someone

6    puts money into -- takes money out of bank one, puts it into

7    bank two, and then that same person sends it right back to bank

8    one.  Is that right?

9    A.  As a potential red flag?

10   Q.  Yes.

11   A.  Yes, that could be layering.

12   Q.  And fair to say that another indication could be if

13   multiple branches of the same bank are used to make unusual

14   deposits?

15   A.  Yes, it's another red flag.

16   Q.  How about a group of people enter the same bank at the same

17   time and deal with the same account.  Is that another

18   indication?

19   A.  It could be, yes.

20   Q.  Well, how about repeated use of a bank that is not

21   geographically reasonable for either the individual or the

22   business?

23   A.  Yes, another red flag.

24   Q.  And is it also an indication of -- possible indication of

25   renting multiple safe deposit boxes?

M9FQraj4                         Palmer - Cross

1                 MS. GHOSH:  Objection.

2                 THE COURT:  Ground?

3                 MS. GHOSH:  Form.

4                 THE COURT:  Let's just rephrase the question, but

5    possible indication of --

6    Q.  Well, is it a possible -- is it a red flag -- talking about

7    suspicious activity.  Could it be a red flag if someone rents

8    multiple safe deposit boxes?

9    A.  It could be depending -- again, depending on the facts and

10   circumstances.

11   Q.  Of course, let's take that as a given.

12                It's right, is it not, that -- like we said earlier,

13   anybody could have any number of these different red flags but

14   not necessarily be involved in money laundering?

15   A.  It is not necessarily the case, I agree there.  It is

16   generally the case that the more red flags, the more likely the

17   person is, but that's also not always true.  There could just

18   be one red flag, which is like the Bernie Madoff case, a

19   pyramid scheme, and there's one red flag.  But it's generally

20   the case, the more red flags, the more likely --

21   Q.  Exactly, like you could have -- I didn't mean to interrupt.

22   You could have one flag and be a money launderer. You could

23   have two to three or four and not; or the more you have, the

24   more these flags exist, the greater likelihood it is that

25   you're involved in money laundering?

M9FQraj4                    Palmer - Cross

1    A.  As a general case, yes.

2    Q.  And as a general proposition, the money launderer wants to

3    hide the origin if the funds are illegal?

4    A.  Yes.

5              MR. SCHNEIDER:  Thank you so much.

6    A.  And the destination.

7              MR. SCHNEIDER:  Okay.  You got it.  And the

8    destination as well.  Thank you.

9              THE COURT:  Any redirect?

10             MS. GHOSH:  No, your Honor.

11             THE COURT:  All right.  Mr. Palmer, you may step down.

12             (Witness excused)

13             THE COURT:  Next witness.

14             MR. SOBELMAN:  The government calls Victoria

15   Hernandez.

16    VICTORIA HERNANDEZ,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19             DEPUTY CLERK:  Can you please state and spell your

20   full name for the record.

21             THE WITNESS:  Victoria Hernandez.  V-I-C-T-O-R-I-A.

22   H-E-R-N-A-N-D-E-Z.

23             THE COURT:  You may proceed.

24

25

1  DIRECT EXAMINATION

2  BY MR. SOBELMAN:

3  Q.  Good afternoon, Ms. Hernandez.

4  A.  Good afternoon.

5  Q.  Where do you work?

6  A.  I work for the Internal Revenue Service.

7  Q.  Is that also known as the IRS?

8  A.  Yes, it is.

9  Q.  What is your title with the IRS?

10 A.  I'm a court witness coordinator.

11 Q.  How long have you worked at the IRS?

12 A.  I've worked for the IRS for 14 years.

13 Q.  What are your duties and responsibilities with the IRS?

14 A.  As my role as a court witness coordinator, I represent the

15 commissioner in his role as custodian of records.  I certify

16 that tax documents and transcripts are true and valid copies of

17 what are on the IRS's system.

18 Q.  In general terms, what are the activities of the IRS?

19 A.  We -- the IRS provides taxpayers with help understanding

20 and meeting their tax responsibilities and also enforcing the

21 tax administration laws.

22 Q.  Is the IRS the entity that receives filings by taxpayers

23 and tax-paying companies?

24 A.  Yes, it is.

25 Q.  How do individuals report income to the IRS?

M9FQraj4                         Hernandez - Direct

1  A.  Individual taxpayers would report their income on a form

2  1040 U.S. individual income tax return.

3  Q.  Just make sure you're speaking loudly and slowly, please.

4  A.  Okay.

5  Q.  How often are individuals generally required to file a tax

6  return with the IRS?

7  A.  Annually.

8  Q.  Annually means once a year?

9  A.  Yes.

10  Q.  Generally, what time of year is the tax return due?

11  A.  Tax returns are typically due April 15.

12  Q.  How does the tax year run?  Is it January 1 of a year to

13  December 31 of that year?

14  A.  Yes.

15  Q.  So, for example, for the year 2018, it would be January 1,

16  2018 to December 31, 2018?

17  A.  Yes.

18  Q.  And the tax return would be due April 15 of 2019.  Is that

19  right?

20  A.  Correct.

21  Q.  How does the IRS define income?

22  A.  Income can be in the form of money or property.  It can be

23  received through W-2 wages.  It can also be received through

24  self employment, business income, things like that.

25  Q.  I'll ask you a question about the W-2 a little later.

1          Can income include cashiers checks, cash and wire

2    transfers that an individual receives as part of his or her

3    earnings?

4    A.  Yes, it can.

5    Q.  Are you familiar with the name Mustapha Raji?

6    A.  Yes, I am.

7    Q.  And in preparation for your testimony today, you conducted

8    a search of IRS records for any tax returns that may have been

9    filed by Mr. Raji for the tax years 2017 and 2018?

10   A.  Yes, I have.

11   Q.  In addition, have you conducted a search of IRS records for

12   any income that an employer or other business may have reported

13   for Mr. Raji in the tax years 2017 and 2018?

14   A.  Yes, I have.

15   Q.  Mr. Bailey, can you please show the witness what's been

16   marked for identification as Government Exhibit 513?

17          MR. SCHNEIDER:  Excuse me, 513?

18          MR. SOBELMAN:  Correct.

19   Q.  Ms. Hernandez, do you recognize this?

20   A.  Yes, I do.

21   Q.  What is it?

22   A.  It is a summary of Mustapha Raji's tax return filings for

23   2017 and 2018.

24   Q.  Does this chart accurately reflect the information

25   contained in it?

1    A.  Yes, it does.

2            MR. SOBELMAN:  The government offers Government

3    Exhibit 513 as a demonstrative.

4            MR. SCHNEIDER:  No objection.

5            THE COURT:  Admitted as a demonstrative.

6            (Government's Exhibit 513 received in evidence)

7    Q.  Mr. Bailey, can you please now display it for the jury?

8            Ms. Hernandez, what's the name at the top of this

9    exhibit?

10   A.  Mustapha Raji.

11   Q.  What are the four digits after his name?

12   A.  That is the last four digits of Mustapha Raji's social

13   security number.

14   Q.  And there are five columns, let's go through each one.  The

15   first column says tax year.  What appears under the column tax

16   year?

17   A.  Those are the years for the tax returns in question.

18   Q.  And under IRS income threshold for filing taxes, what

19   appears there?

20   A.  This is the filing threshold for individuals, the amount of

21   money that would require them to have to file a tax return.

22   Q.  Just to be clear, in 2017 if an individual had more than

23   $10,400 in income, they would be required to file a tax return

24   for that tax year?

25   A.  Yes.

M9FQraj4                         Hernandez - Direct

1    Q.   And same thing for 2018, but the threshold was $12,000?

2    A.   Yes.

3    Q.   Let's go to the next column.  Tax returned filed.  What is

4    signified under that column?

5    A.   If there was a tax return filed for that year.

6    Q.   And did you conduct a search of IRS records in the last

7    week or two to determine whether tax returns were filed by

8    Mr. Raji for those two years?

9    A.   Yes, I did.

10   Q.   And did he file a tax return in -- for either of those tax

11   years?

12   A.   There was no return on file for those years.

13   Q.   And one could file a return late, right?

14   A.   Correct.

15   Q.   There might be penalties or interests associated with

16   filing late.

17   A.   Yes.

18   Q.   But you could file a tax return even two or three years

19   late, right?

20   A.   Yes.

21   Q.   Let's go to the W-2 filed question mark column.  What is a

22   W-2?

23   A.   It is A wage and income statement from employers.

24   Q.   Is that filed by an individual taxpayer or is that filed by

25   an employer?

1    A.   An employer.

2    Q.   And the employer -- generally, what does the employer

3    disclose to the IRS in the W-2?

4    A.   The amount of income that the employee received for that

5    year.

6    Q.   Is an employer generally required to file a W-2 with the

7    IRS for income paid to one of their employees?

8    A.   Yes.

9    Q.   Did you conduct a search of IRS records for any W-2s that

10   any type of employer might have filed for Mr. Raji in 2017 and

11   2018?

12   A.   Yes.

13   Q.   And were any W-2s filed by any type of business for

14   Mr. Raji for either of those tax years?

15   A.   No.

16   Q.   Let's go to the last column, 1099 filed question mark.

17   What is a 1099?

18   A.   That is an income statement for miscellaneous income.

19   Q.   What is an example of miscellaneous income?

20   A.   If you have services that you did for a contractor, any

21   income you receive from someone other than an employer.

22   Q.   So some type of non-employment income?

23   A.   Yes.

24   Q.   So if you're a contractor for a business or you're hired

25   for a specific purpose but you're not an employee, you would

1   get a 1099?

2   A.  Correct.

3   Q.  Is the 1099 filed by the individual taxpayer or is it filed

4   by the company or business or person that paid the taxpayer?

5   A.  It would be the company or the person that paid the

6   taxpayer.

7   Q.  And did you conduct a search of IRS records for 1099s filed

8   reporting income to Mr. Raji for the tax years 2017 and 2018?

9   A.  Yes, I did.

10  Q.  And what did you find?

11  A.  There was nothing on file for those years.

12  Q.  Before we move on, were you able to determine whether

13  Mr. Raji has ever filed a tax return?

14  A.  He had filed prior tax returns.

15  Q.  Before these years?

16  A.  Correct.

17  Q.  Let's turn to a different topic, and we can take this one

18  down.

19          Do corporations also have to report income to the IRS?

20  A.  Yes, they do.

21  Q.  And how do corporations generally report income to the IRS?

22  A.  Income is reported on a form 1120 U.S. Corporation Return.

23  Q.  How often are corporations generally required to file a tax

24  return with the IRS?

25  A.  Those are also annually.

1    Q.   Once a year?

2    A.   Yes.

3    Q.   Is it on the same general schedule that we talked about

4    earlier, April one year for the prior tax year?

5    A.   Yes.

6    Q.   And can income for a business include cashiers checks, cash

7    and wire transfers that a corporation receives as part of its

8    business?

9    A.   Yes.

10   Q.   Are you familiar with a corporation named Unique Bamboo

11   Investment Inc.?

12   A.   Yes, I am.

13   Q.   In preparation for your testimony today, have you conducted

14   a search of IRS records for any tax returns that may have been

15   filed by Unique Bamboo Investment for the tax year 2018?

16   A.   Yes, I have.

17   Q.   In addition, have you conducted a search of IRS records for

18   any W-2s and 1099s that may have been filed by Unique Bamboo

19   for the tax year 2018?

20   A.   Yes, I have.

21   Q.   Mr. Bailey, can you please show the witness what's been

22   marked for identification as Government Exhibit 514.

23            Ms. Hernandez, do you recognize this?

24   A.   Yes, I do.

25   Q.   What is it?

1   A.  It is the summary for Unique Bamboo Investment of tax year

2   2018.

3   Q.  Does this chart accurately reflect the information

4   contained in it?

5   A.  Yes, it does.

6           MR. SOBELMAN:  The government offers exhibit 514 as a

7   demonstrative for the jury.

8           MR. SCHNEIDER:  No objection.

9           THE COURT:  Admitted.

10          (Government's Exhibit 514 received in evidence)

11  Q.  Mr. Bailey, please display it for the jury.

12          Ms. Hernandez, what is the name at the top of the

13  exhibit?

14  A.  Unique Bamboo Investment Inc.

15  Q.  What is the number next to Unique Bamboo Investment Inc.?

16  A.  That is the employer identification number.

17  Q.  What's an employer identification number?

18  A.  It is a number received for the business.  It's a unique

19  number for that business to have their business entity.

20  Q.  Is it kind of like a social security number as to an

21  individual, an employer identification number is to a company?

22  A.  Yes, it is.

23  Q.  Is it also known as a EIN?

24  A.  Yes.

25  Q.  There are five columns in this chart.  Let's go through

1   them.  First is tax year.  Is that the same information that

2   was in the last chart we looked at?

3   A.  Yes, it is.

4   Q.  And the next column is form 1120, annual filing

5   requirement.  What is indicated in that column?

6   A.  For the tax year 2018, Unique Bamboo Investment Inc. had a

7   filing requirement for that year.

8   Q.  How are you able to determine that?

9   A.  Through the research on my systems and the fact that it was

10  an entity on its own, business entity.

11  Q.  And is that filing requirement communicated to Unique

12  Bamboo in some way?

13  A.  Yes, it is.

14  Q.  How is it communicated to Unique Bamboo?

15  A.  The IRS would have corresponded with them.

16  Q.  You mean sent a letter?

17  A.  Yes.

18  Q.  Is that a standard practice that a letter goes out to every

19  business that is registered with the IRS?

20  A.  Yes.

21  Q.  That indicates what forms you have to file and when?

22  A.  Yes.

23  Q.  Let's go to the next column, tax return filed.  Did you

24  search for a tax return for the year 2018 for Unique Bamboo?

25  A.  Yes, I did.

1    Q.   Was one filed?

2    A.   There was no record of a return filed.

3    Q.   It says W-2s filed.  Did you look for any W-2s filed for

4    Unique Bamboo for the tax year 2018?

5    A.   Yes, I did.

6    Q.   Were there any?

7    A.   No.

8    Q.   So no income reported for any employees at all?

9    A.   Correct.

10   Q.   Let's go to the last column 1099s filed.  Did you also look

11   to see if Unique Bamboo filed any 1099s on behalf of any

12   contractors or businesses they might have dealt with?

13   A.   Yes, I did.

14   Q.   Did they file any?

15   A.   No, they did not.

16   Q.   Let's take this down.  Move to one last topic.  Are you

17   familiar with a corporation named Emergent Development

18   Corporation?

19   A.   Yes, I am.

20   Q.   In preparation for your testimony today, have you conducted

21   a search of IRS records for any tax returns that may have been

22   filed by a Emergent Development Corporation for the tax years

23   2017 and 2018?

24   A.   Yes, I did.

25   Q.   In addition, have you conducted a search of IRS records for

M9FQraj4                          Hernandez - Direct

1    any W-2s and 1099s that may have been filed by Emergent

2    Development Corporation for the tax years 2017 and 2018?

3    A.  Yes, I did.

4    Q.  Mr. Bailey, please show the witness what's been marked for

5    identification as Government Exhibit 515.

6              Ms. Hernandez, do you recognize this?

7    A.  Yes, I do.

8    Q.  What is it?

9    A.  It's a summary for Emergent Development Corporation for tax

10   years 2017 and 2018.

11   Q.  Does this chart accurately reflect the information

12   contained in it?

13   A.  Yes, it does.

14             MR. SOBELMAN:  The government offers Government

15   Exhibit 515 as a demonstrative.

16             MR. SCHNEIDER:  No objection.

17             THE COURT:  Admitted.

18             (Government's Exhibit 515 received in evidence)

19   Q.  Please display it for the jury.

20             Ms. Hernandez, what's the name at the top of the

21   exhibit?

22   A.  Emergent Development Corporation.

23   Q.  What's the number next to that name?

24   A.  That is the employer identification number.

25   Q.  Is this chart set up the same way as the chart we just

1    looked at for Unique Bamboo?

2    A.  Yes, it is.

3    Q.  And for the tax years 2017 and 2018, did Emergent

4    Development Corporation file a tax return?

5    A.  No, they did not.

6    Q.  For the tax years 2017 and 2018, did Emergent Development

7    Corporation file any W-2s or any 1099s?

8    A.  There was none found.

9    Q.  By the way, let's just put back up 514 for one more second.

10   Were you able to determine whether Unique Bamboo previously had

11   filed tax returns?

12   A.  -- I'm sorry, I didn't.

13   Q.  Prior to 2018, did Unique Bamboo actually file tax returns

14   in some years?

15   A.  I didn't see any.

16   Q.  Let me see if I can refresh your recollection.  We can pull

17   up Government Exhibit 40 for the witness.  Sorry, 41, please.

18          MR. SOBELMAN:  Your Honor, can I just hand the witness

19   a hard copy?

20          THE COURT:  You may.

21          While the witness is looking through that, let me take

22   the opportunity to just say similar to my prior instructions.

23   The defendant is not charged with any tax violations.  So in

24   that regard, although you're hearing testimony about whether he

25   did or didn't file tax returns, those are not among the charges

1   that you're being asked to consider.

2            That being said, to the extent that you find that he

3   earned income and was required to file tax returns for the

4   relevant period and didn't file them, you may consider that

5   number one, as evidence that any proceeds that you find that he

6   earned during that time were not lawful and legitimate; that

7   it's part of a plan to conceal transactions; and with respect

8   to his motive intent and knowledge all with respect to the

9   charges that you are being asked to consider.  That's the

10  relevance of this testimony and the basis and the purpose for

11  which you may consider.

12           MR. SOBELMAN:  Thank you, your Honor.

13  Q.  Let's actually move to a different topic.

14           Based on your review -- we can take this off the

15  screen -- based on your review of IRS records, did the two

16  companies we talked about, Unique Bamboo and Emergent

17  Development Corporation and for Mr. Raji, did any banks report

18  cash withdrawals by these companies and Mr. Raji in 2017 and

19  2018?

20  A.  Yes, they did.

21  Q.  Just approximately how much cash was withdrawn in each of

22  the transactions that were indicated in those reports?

23  A.  It was over $10,000 each.

24  Q.  Just to be clear, was there one cash transaction reported

25  for those companies and Mr. Raji or were there multiple cash

M9FQraj4

1    transactions?

2    A.   There were multiple.

3    Q.   Just to be clear those transactions were reported by the

4    banks, not by Mr. Raji, not by the companies?

5    A.   Correct.

6    Q.   Just one more question.  Aside from reviewing certain tax

7    information and preparing to testify today, did you have any

8    other role in the investigation or prosecution of this case?

9    A.   No, I did not.

10            MR. SOBELMAN:  No further questions.

11            THE COURT:  Cross-examination.

12            MR. SCHNEIDER:  No questions.

13            THE COURT:  All right.  Ms. Hernandez, you may step

14   down and hand that document to counsel on your way out.

15            (Witness excused)

16            THE COURT:  All right.  Mr. Sobelman.

17            MR. SOBELMAN:  Yes, your Honor.  If I can just have

18   one moment, I think we can proceed.

19            THE COURT:  Sure.

20            (Counsel consult)

21            MR. SOBELMAN:  The government rests, your Honor.

22            THE COURT:  Ladies and gentlemen, you just heard some

23   magical words:  The government rests.  That is to say, that is

24   the end of the government's case in chief.  Now, that is a big

25   moment.

M9FQraj4

1          I told you will yesterday, I might have a better sense

2     for you today of where things stand.  And there you go, that is

3     partially where we stand.  Now, I mentioned when I gave you my

4     preliminary instructions that from time to time, I might have

5     to excuse you because there are things I would need to talk to

6     the lawyers about.  This is one of those times because there

7     are certain legal things that we need to cover and address

8     after the government rests its case.  One of those things is

9     determining whether the defense intends to put on a case.

10         I remind you that the defendant has no obligation

11    whatsoever to call any witnesses, to put in any evidence, to do

12    anything, and that's because in our criminal justice system,

13    the government bears the burden at all times of proving the

14    defendant's guilt beyond a reasonable doubt.  The defendant

15    does not have to do anything whatsoever.  He is presumed to be

16    innocent, unless and until you determine that the government

17    has carried that burden.  So in that regard he doesn't have to

18    do a thing.

19         That being said, because it will certainly affect our

20    schedule and how we will proceed, I will find out during our

21    break whether the defendant intends to put on a case.  All of

22    which is to say I'm going to excuse you for a few minutes.

23    I'll try to keep this as short as possible so that we can

24    proceed and I can advise you where we are and what our plans

25    are.

M9FQraj4

1    During the break, however long it may be, my usual

2    reminders:  Don't discuss the case with one another.  You've

3    now heard all of the government's evidence as part of its case

4    in chief.  There may be more evidence.  in either case, there

5    will be closing arguments and my instructions.  So don't

6    discuss the case.  You need to keep an open mind.  And don't do

7    any research about the case.  Enjoy your break, however long it

8    may be, and we'll see you in short order.  Thank you very much.

9         (Jury not present)

10        THE COURT:  You may be seated.

11        So, Mr. Schneider, first any motions?

12        MR. SCHNEIDER:  Yes, your Honor.  Under Rule 29(a), I

13   would ask this Court to issue a judgment of acquittal, given

14   the fact that I believe all four counts have not been proven.

15   The evidence is insufficient as a matter of law in general.

16        Specifically, with regard to money laundering, I don't

17   think there is sufficient evidence to sustain a conviction for

18   the money laundering charge regarding Mr. Raji.  Whether other

19   participants may have acted a certain way, I don't think any of

20   the conduct or the charts or the testimony indicates activity

21   on behalf -- by Mr. Raji to indicate he was involved in money

22   laundering.  So that's our application.

23        THE COURT:  All right.  Motion is denied.

24        Mr. Schneider, what is the defense intention with

25   respect to a defense case?

M9FQraj4

1          MR. SCHNEIDER:  We have prepared a stipulation.  We've

2     emailed it to the government during the 29-minute break that we

3     had.  Briefly, I don't know if whether or not -- I guess

4     because they were in court, they may not have seen it, and we

5     can't print it out where we are.  That's why we emailed it as

6     soon as we could.

7          THE COURT:  Before we get to that --

8          MR. SCHNEIDER:  Sure.

9          THE COURT:  Do you intend to call any witnesses?

10          MR. SCHNEIDER:  Depending on your Honor's ruling on

11     the stipulation, it could depend on calling one witness.  We

12     just -- just so it's clear, there's nothing secret here.  We

13     don't have any independent case.  The only evidence we intend

14     to present would providing a prior consistent statement or

15     statements.  So it would just be whether someone from the

16     government's office would be testifying about that.  We have no

17     other independent witness testimony or documents, and also

18     Mr. Raji himself has chosen not to testify.  And I assume your

19     Honor will allocute him about that as well.

20          THE COURT:  Why don't I take care of that, and then we

21     can discuss the stipulation, or lack thereof.

22          Mr. Raji, first of all, I know this morning your

23     lawyer indicated you weren't -- hang on.

24          (Pause)

25          THE COURT:  First of all, how are you feeling right

M9FQraj4

1   now?

2           THE DEFENDANT:  Still not a hundred percent.

3           THE COURT:  All right.  But from my observations,

4   you've appeared alert and engaged during the proceeding this

5   morning.

6           THE DEFENDANT:  Yes.

7           THE COURT:  Are you able to understand what I'm saying

8   right now?

9           THE DEFENDANT:  Yes, I do, because I did what I have

10  been doing prior to and during this trial period, which allowed

11  me to be able to stay, but now it was getting difficult.  That

12  is why I spoke to him this morning, that's all.

13          THE COURT:  But right now you understand what I'm

14  saying?

15          THE DEFENDANT:  Absolutely, yes.

16          THE COURT:  And you understood what Mr. Schneider was

17  talking about before I started speaking to you?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Is your mind clear right now?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Other than your usual medication, have you

22  taken any medicine, pills, drugs or drunk any alcohol within

23  the last 24 hours?

24          THE DEFENDANT:  No.

25          THE COURT:  Your usual medication, when did you take

M9FQraj4

1    that?

2              THE DEFENDANT:  I took it around 4:00 a.m. this

3    morning to allow me to be able to participate now.  If I took

4    it during my regular period, I would not have been able to

5    function here, so I took it earlier to allow me to be able to

6    carry on here.

7              THE COURT:  I take it that means that by this point in

8    the day, that any affect that medication would have on your

9    clarity of thinking, it's worn off, and you're able to

10   understand what I'm saying.  Is that correct?

11             THE DEFENDANT:  I understand you.

12             THE COURT:  And do you understand what's happening

13   here today?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you understand that a defendant in a

16   criminal case -- that as a defendant in a criminal case, you

17   have the right to testify on your own behalf if you want to

18   testify.  Do you understand that?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Do you also understand that you have the

21   right not to testify?  Do you understand that?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Do you understand if you did not testify,

24   then no one, including the jury, could draw any inference or

25   suggestion of guilt from the fact that you did not testify.  Do

M9FQraj4

1   you understand that?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Do you understand that whether you testify

4   or don't testify, that that is a decision for you to make; that

5   you should certainly take into consideration any advice or

6   assistance you get from your lawyers, but ultimately the

7   decision is for you to make, not for your lawyers to make.  Do

8   you understand that?

9              THE DEFENDANT:  Yes.

10             THE COURT:  I don't want you to tell me the substance

11  of anything you have discussed with Mr. Schneider, but have you

12  discussed with him your decision whether to testify or not

13  testify in this case?  Just yes or no.

14             THE DEFENDANT:  Yes.

15             THE COURT:  Did you have enough time to do that, to

16  talk to him about that and about the advantages and

17  disadvantages about testifying?  Did you have enough time.

18             THE DEFENDANT:  I don't want to be difficult, but I'll

19  say no.

20             THE COURT:  Can you explain that?

21             THE DEFENDANT:  Because my leg, we had a good

22  discussion -- but my leg has swollen, and generally when I have

23  a swollen leg and difficulty breathing, I need to up the dosage

24  of my medication, which allows -- does not allow me to come

25  here and be able to function and participate with you.  And I

1    don't want to create an impression that I'm trying to avoid

2    coming here, so I did not double the dosage, so --

3            THE COURT:  But listen to my question carefully.  My

4    question was:  Did you have enough time to talk to

5    Mr. Schneider about your decision whether to testify or not?

6            THE DEFENDANT:  That's what I'm trying to answer, by

7    saying that because of the condition of the health, we

8    discussed, but I wasn't in the best of circumstances.  Like I

9    don't want to be -- I don't want to be a difficult person for

10   you.  I didn't want to not show up here today, but health-wise

11   I'm not in the best position right this minute.  That's why I

12   ask him to say if I could get a day tomorrow to double the

13   dosage overnight.  The doctors already told me what I should do

14   when I'm in this kind of condition:  Swollen legs, difficulty

15   breathing, gaining more than two and a half pounds in a few

16   days, I should double the dosage, take care of it and lift my

17   feet up so that the diuretics will work in my system, and I

18   will be able to get it all out of the system without going to

19   the emergency room.  Where if I am denied that opportunity, I

20   may have to go to the emergency room when it's not necessary.

21           THE COURT:  Slow down.  That doesn't really answer my

22   question.  My question is, I alerted you yesterday, and I'm

23   sure you knew about it even before that, that I would be asking

24   you questions about whether you intend to testify or not, and

25   that you should discuss that with Mr. Schneider; that that's an

M9FQraj4

1    important decision.

2              So you've had plenty of time to discuss it with him.

3    I'm not asking you how you're feeling now.  I asked you those

4    questions before.  My question is, did you have enough time to

5    talk to him about that subject?  In other words, yesterday you

6    reported to Mr. Schneider this morning that you weren't feeling

7    so well, but you had all of yesterday to talk to him about

8    this.  Did you have enough time to talk to him about this

9    topic?

10             THE DEFENDANT:  I had time to talk to him about it

11   yesterday.

12   Q.  Did you have enough time to talk to him about this topic?

13             THE DEFENDANT:  No.

14             THE COURT:  Would you like some time right now to

15   discuss with him and --

16             THE DEFENDANT:  Let me just try to.  Maybe I'm not

17   understanding you clearly.  He has advised me and he --

18             THE COURT:  I don't want to know what he advised you.

19   I want to be clear about that.

20             THE DEFENDANT:  Okay.

21             THE COURT:  He gave you advice.  You told me that.  My

22   question is, do you want additional time to talk to him about

23   your decision to testify or not?

24             THE DEFENDANT:  No.

25             THE COURT:  Okay.  Now, is it your decision not to

M9FQraj4

1    testify at your trial?

2              THE DEFENDANT:  Yes.

3              THE COURT:  And is that your decision, and not

4    Mr. Schneider's decision?  Is that your decision?

5              THE DEFENDANT:  Yes.

6              THE COURT:  That's the decision you made after

7    receiving whatever advice Mr. Schneider may have given you.  Is

8    that correct?

9              THE DEFENDANT:  Yes.

10              THE COURT:  Does anyone think I should ask additional

11    questions of Mr. Raji?

12              From the government?

13              MR. SOBELMAN:  No, your Honor.

14              THE COURT:  Mr. Schneider?

15              MR. SCHNEIDER:  No, sir.

16              THE COURT:  Very good.  That brings us to the question

17    of the stipulation.  I can have my deputy print it out, since I

18    think we received a copy.

19              MR. SOBELMAN:  Your Honor, we received it at 12:13, so

20    it's after we were in court.  We're looking at it now.  It's

21    going to take a few minutes to match up the 3500 with the

22    transcript to make sure it's accurate, so we're not prepared to

23    sign it at this moment.

24              THE COURT:  How long to you think it would take you

25    guys to sort this out?  Why don't I get down from the bench and

M9FQraj4

1   give you a few minutes to try and work through this, and let's

2   see if we can get it done.

3        MR. SOBELMAN:  I have one question for the Court as to

4   one category of his statements to see if they're admissible in

5   the way defense counsel has proposed.

6        There are two categories here, paragraphs 1 through 5

7   of the proposed stipulation are all statements that members of

8   the government made to Mr. Adeusi.

9        Paragraphs 6 and 7 are statements that Mr. Adeusi

10  made.  I think in principle we agree that those statements --

11  assuming they're accurately represented in the stipulation and

12  that he was in fact confronted and denied them on the stand --

13  would be admissible and we would be prepared to stipulate. But

14  paragraphs 1 through 5 are statements that other people may

15  have made to him that we don't see how that's a prior

16  inconsistent statement.  It's not his statement.

17        THE COURT:  I certainly agree it's not a prior

18  inconsistent statement, but I don't think that necessarily

19  means it's inadmissible because it may be admissible as

20  impeachment if he denied that something was said to him, and it

21  is relevant, probative and admissible as impeachment, the fact

22  that it was said to him may well be admissible.  So if it's

23  offered for that -- I'm not saying that it would be admissible.

24  I'm just saying I think that's presumably the theory of

25  admission is not -- the theory isn't a prior inconsistent

M9FQraj4

1    statement.  Is that correct, Mr. Schneider?

2            MR. SOBELMAN:  It wasn't the theory articulated by

3    defense but maybe the theory will shift based on your Honor's

4    guts.

5            THE COURT:  Sometimes I articulate things better than

6    the defense.  Mr. Schneider?

7            MR. SCHNEIDER:  I agree with what you said.

8            THE COURT:  Excellent.

9            MR. SOBELMAN:  In that event, our position -- and,

10   again, we want to make sure the stipulation is accurate, the

11   conversation would be in light of the cross, which covered this

12   ground at length, and which the defendant admitted multiple

13   times different -- sorry --the cooperator said multiple times

14   different -- admitted different statements that myself and

15   other members of the government made to him during sessions,

16   it's cumulative under 403.

17           THE COURT:  Why don't you take a few minutes?  You

18   said you needed some time to walk through this and compare it

19   to the 3500 and what have you.  Why don't you do that.  And

20   since you obviously haven't had a chance to talk it through

21   with Mr. Schneider, talk to him, see if you can guys can sort

22   through your agreements or disagreements, I guess.  And if you

23   can, great.  If not, I will resolve them.  One way or another,

24   we should get this done and settled here now so the record is

25   closed, and we can proceed with the next phase of the case.

M9FQraj4

1            MR. SOBELMAN:  We'll do this as quickly as possible.

2            THE COURT:  Let's aim for the next -- I'll give you

3    ten minutes.  We'll aim to be back at 12:55.

4            MR. SOBELMAN:  Could we ask for 15?

5            THE COURT:  We're going to aim for 10.  Let my deputy

6    now if you need some additional time, and I will take that

7    under advisement.  Hopefully, we'll see you in ten minutes.  If

8    not, I'll see you when I see you.

9            (Recess)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9F6RAJ5

1          THE COURT:  You may be seated.

2          All right.  That was a very long ten minutes.  So

3    where do we stand?

4          MR. SOBELMAN:  Your Honor, we made great progress.

5    There are two --

6          THE COURT:  Is the mic on?

7          MR. SOBELMAN:  Sorry.  Is it?

8          THE COURT:  Go ahead.

9          MR. SOBELMAN:  Okay.  There are two issues in the

10   proposed statement -- proposed stipulation that we'd like your

11   Honor to rule on.  We included them so that your Honor could

12   consider them.

13         THE COURT:  Go ahead.

14         MR. SOBELMAN:  One is the -- it's in there as 1B, and

15   the relevant part of the transcript that it refers to is

16   Page 307.

17         Mr. Schneider asked Mr. Adeusi a few times about

18   whether the government said something to him about an S1 visa.

19   The first couple of times he says -- the first time he said he

20   didn't mention that.  And then ultimately it's re-asked, and he

21   says "I don't remember."  The government's view is that because

22   the ultimate answer was "I don't remember," failure of

23   recollection, it's not a prior inconsistent statement.  It's

24   not prior inconsistent statement.  It doesn't impeach him if

25   it's something he doesn't remember as opposed to denying it

M9F6RAJ5

1    happened.

2              So we would want to strike 1B, assuming your Honor

3    rules that it's not admissible because it's not impeachment.

4              THE COURT:  Mr. Schneider.

5              MR. SCHNEIDER:  I disagree.  A couple reasons.  One, I

6    think he first said "no."  And then after further questioning

7    he said "I don't remember."  But besides that, it's my position

8    that a witness cannot insulate him or herself through prior

9    statements when they testify and say "I don't know." "I don't

10   remember."  It's my belief and my understanding that if a

11   witness on the stand says I don't know, I don't remember, you

12   can still -- you don't have to refresh.  You can impeach with a

13   prior inconsistent statement, even if they say "I don't know"

14   or "I don't remember."  But in this case, the witness said "no"

15   first and then said "I don't remember" to try to protect

16   himself.  So I think it goes to weight, not admissibility, in

17   my view.  I think the jury should hear about it.

18             So, for example, if you ask a witness on the stand, is

19   it sunny out?  And the witness says, I don't know if it's

20   sunny, but then the witness earlier said, oh, it's sunny, that

21   witness can't get away with that.  The jury has to hear that

22   the witness previously said it was sunny.  So it's the same

23   concept.

24             MR. SOBELMAN:  No, your Honor.  That would be a prior

25   inconsistent statement, which this is not.  This is a failure

M9F6RAJ5

1    of recollection, and it's not impeachment to offer something to

2    prove that someone might have said something and now the

3    witness fails to recollect it.

4              THE COURT:  How do you get around Page 303 of the

5    transcript where:

6    "Q.  At one point during the conversation with the prosecutors,

7    your lawyer asked about what's called an S visa.  You heard

8    about that."

9              "Have you heard that" is a different question.

10             MR. SOBELMAN:  I'm just looking at the page defense

11   counsel pointed me to, which was 307.  I didn't review the full

12   colloquy.

13             THE COURT:  304 was what I was referring to.  "Didn't

14   the government say that they would look into the possibility,

15   no promises, but the possibility of getting you an S visa, an

16   S1 visa, for you to stay in the country?"

17   "A.  No, sir.

18   "Q.  Never said that?

19   "A.  No.

20             MR. SOBELMAN:  I think your Honor is right.  It should

21   be in the stipulation.

22             THE COURT:  Okay.

23             MR. SOBELMAN:  Application withdrawn.  We didn't

24   review that page.

25             THE COURT:  All right.

M9F6RAJ5

1          MR. SOBELMAN:  That's resolved.  The only other item

2     to raise is with respect to 1D, that AUSA McLeod stated, if you

3     don't have a real defense, most people don't go to trial.  The

4     defendant -- sorry.  The witness did deny that having been

5     said.  That being said, this particular statement, we think, is

6     more prejudicial than it is probative under 403 and should not

7     be put before the jury.

8          THE COURT:  Mr. Schneider.

9          MR. SCHNEIDER:  Surprisingly, I disagree.  I think

10    this is a situation where the government was clearly trying to

11    convince this witness to do something, and whatever they said,

12    and whatever affect it had on his mind is relevant.  For

13    example, they said to him, also, you can go to jail for many,

14    many, years.  Okay?  He admitted -- luckily he admitted on the

15    stand that they said that to him.  So this is no different.  So

16    I just state that --

17         THE COURT:  How is it probative of his credibility,

18    his believability?

19         MR. SCHNEIDER:  Because he said that they didn't say

20    it.  So they're not saying it's not relevant.  They're saying

21    it's unduly prejudicial.

22         THE COURT:  Well, 403 involves a weighing of its

23    probative value against its undue prejudice.

24         MR. SCHNEIDER:  Right.

25         THE COURT:  So the first step is to evaluate how it's

M9F6RAJ5

1   probative.  It seems marginally probative.

2          MR. SCHNEIDER:  I don't think it's marginally.  I

3   think that him, A, denying that they said it is relevant

4   because this goes to whether or not he is going to decide to

5   cooperate or not.  Okay?  So whether he -- whatever decision he

6   makes is based on what his lawyer said, which we didn't get

7   into, but what the government said and his own decision.

8          So, A, it's inconsistent; B, it's probative of his

9   state of mind as to why he chose to testify; C, it's also

10  relevant because the government always -- they did it in this

11  case and they're going to continue it on summation -- say that

12  no promises were made, you have to tell the truth, you have to

13  do everything.

14         But they don't talk about statements that are made to

15  a witness, specifically this witness, when they're talking

16  about issues about -- if you don't have a defense, you

17  shouldn't go to trial.  So they're trying to convince him to

18  cooperate, and for them to tell him, on one hand, to go before

19  the jury and say he's doing this because he wants to tell the

20  truth, because he wants to clear his mind.  But yet they are

21  also -- I'd be allowed to possibly say, if I choose to, I don't

22  know, if I want to say that he's doing this because he felt

23  pressure to please the government.  Okay?  And that, I think,

24  is very relevant to his testimony.  His desire to please the

25  government.  Therefore, his state of mind as to what he's

M9F6RAJ5

thinking, when he's talking to the government, when he makes a decision to cooperate or not.

The government is going to say he made a decision to cooperate because it's the right -- because he wanted to tell the truth and save himself.  They always say he benefits more by telling the truth than by lying, right?  So I want to argue that.  It's not about truth or lie; it's about pleasing the government.

It's the same argument that every government makes and every defense lawyer makes.  It's what he hopes to get, not that the government made a promise to him, but what he hopes to get by making them -- not by making him -- by believing that they will believe what he says and giving him an agreement.  So I think it's relevant and it's not unduly prejudicial, given all the other evidence that we talked about.  This is no more prejudicial than anything else he said.

THE COURT:  I agree with the government.  I think it has minimal probative value.  There's plenty of other material you can make those arguments with respect to, both in the cross and in the other paragraphs of this stipulation.  So it has minimum probative value.  To the extent it does, I think it's substantially outweighed by the danger of undue prejudice to, the extent it, for example, treads on the jury's contemplation about why Mr. Raji is contesting the charges or not, not to mention that it's cumulative of the other items that are in the

M9F6RAJ5

1    record.  So I'll strike that paragraph.

2           I think unless I made the mistake, that looks like

3    there was a typo at the top of the caption before

4    United States, so I've deleted that.  I also think that we need

5    Mr. Siegel's name in Paragraph 1 since he's referenced in

6    Paragraph 1B.  So I'll propose to add Jessie M. Siegel after

7    Mr. Adeusi's attorney.

8           Any objection to that?

9           MR. SCHNEIDER:  Not from me, your Honor.  No.

10          MR. SOBELMAN:  Your Honor, I just want to -- I think

11   it's the same attorney.  Sorry.  Mr. Adeusi switched attorneys

12   at some point.  I am just confirming it's Mr. Siegel.  So, yes,

13   we will make those changes unless your Honor --

14          THE COURT:  I already made them, printed it, added

15   today's dated.  You can review it, and we'll bring the jury out

16   and then proceed from there.

17          MR. SCHNEIDER:  Your Honor, where would you like me to

18   put defendant's exhibit sticker?  Front?  Back?  It's up to

19   you.  Do you care?

20          THE COURT:  I don't really care, but I would say the

21   top of the first page seems like standard practice.

22          MR. SCHNEIDER:  Okay.

23          THE COURT:  All right.  So before we bring the jury

24   back out, we need to resolve the question of whether we're

25   proceeding tomorrow or Monday.  I don't know if anyone has

M9F6RAJ5

1   anything else to say on that front.  If not, I can tell you

2   what I plan to do.

3           All right.  Slightly against my better judgment, that

4   is to say with some misgivings, I'm going to grant the request

5   to adjourn, and we'll resume on Monday.  I'm going to tell the

6   jury that that is because, number one, we've made faster

7   progress than expected than lead to believe; and number two, I

8   ask when we get to summations and deliberations that they stay

9   until 5:00, and that will give them a couple days to make

10   whatever arrangements they need to make on that front.  And

11   that way, Mr. Raji can deal with any medical issues that he's

12   dealing with.

13           Obviously, you better do that and do whatever he needs

14   to do on that front to ensure that he is here on Monday, and I

15   don't expect to hear at the 11th hour an issue on Monday

16   morning.  So let me put it that way, Mr. Schneider.

17           MR. SCHNEIDER:  I want to say thank you very much.  I

18   know it's hurting you to say this and do this, because I know

19   it's not your practice, but we really do appreciate it.  Thank

20   you.

21           THE COURT:  Okay.  It does indeed pain me, but I'll

22   get over it.

23           MR. SCHNEIDER:  I can see it in your face.

24           THE COURT:  Let's get the jury out.  I'll fill them in

25   on developments, and the defense can present their stipulation

M9F6RAJ5

1       and then rest, and then we will go from there.

2               My intention is to do the charge conference this

3       afternoon.  By the way, I do have a draft prepared, ready to

4       give you.  So we can discuss how long you need to review it,

5       and then we'll talk about when we reconvene.

6               MR. SCHNEIDER:  Depending on what your practice is, do

7       you intend to go through every page, or do you want us to tell

8       you what we object to?  That depends how much time -- if you

9       say to me I want you to tell me what page do you object to, I

10      need more time than if you say let's go through Page 1, Page 2,

11      as you do it.

12              THE COURT:  I'm going to ask you to tell me any issues

13      or objections you have.

14              MR. SCHNEIDER:  Right.

15              THE COURT:  And then we will focus only on those.  I'm

16      not going to go through every page if you don't have a problem.

17              MR. SCHNEIDER:  That's fine.

18              THE COURT:  I will discuss that at the end and figure

19      it out.

20              MR. SCHNEIDER:  Okay.

21              THE COURT:  All right.

22

23

24

25

M9F6RAJ5

1          (Jury present)

2          THE COURT:  Welcome back.  Sorry about the length of

3     that break.  I think you guys have picked up by now I like to

4     keep things running.  It seems like an apt metaphor today with

5     respect to the potential strike on that front.

6          In any event, I told you also that occasionally I

7     would need to excuse you and to understand that that sometimes

8     has the effect of keeping things or making the trial faster.

9     This is a good example of that.  We've made productive use of

10    the break.

11         And there is a defense case, but it will be in the

12    form of a stipulation, which I think will just be more

13    efficient and a good use of our time.  All of which is to say

14    now is the time for the defendant to present the case.  I

15    remind you the defendant has no obligation to present any

16    evidence whatsoever, to call any witnesses, to do anything

17    because the government bears the burden at all times.

18         Having said that, my understanding is that defense

19    intends to introduce a stipulation, and with that,

20    Mr. Schneider, you may proceed.

21         MR. SCHNEIDER:  Thank you, your Honor.  This is

22    Defense's Exhibit A.

23         It is hereby stipulated and agreed by and between the

24    United States of America and Mustapha Raji, the defendant,

25    that, one, the government's shorthand notes of a telephone call

M9F6RAJ5

on October 15, 2020, in which Mr. Adeusi; Mr. Adeusi's

attorney, Jesse M.Siegel; Special Agent Gregory Holm,

United States Secret Service; AUSA Dina McLeod; and

AUSA Robert Sobelman participated, reflect the following:

A, AUSA McLeod stated, among other things, "doing

great job as a cooperator.  Would get a great 5K.  Can't make

any promises."

B, Mr. Siegel asked, "S1 visa?"  AUSA McLeod responded

"a certain number per year.  Could look into it."

C, AUSA Sobelman stated, with respect to "an alternate

path, removing guilty plea," among other things, "we aren't

going to help with the visa, et cetera.  Would go into ICE

custody from BOP custody."

Number two, the government's notes of a

videoconferencing meeting on November 19, 2020, in which

Mr. Adeusi, Mr. Adeusi's attorney, Special Agent Holm, AUSA

McLeod, and AUSA Sobelman participated, reflect that:  "At some

point in the meeting, Adeusi began to say in sum and substance,

'I have never committed fraud.' It was difficult to hear, and

Adeusi was cut off by his counsel."

Number three, the government's notes of a meeting on

February 13, 2019, in which Mr. Adeusi, Mr. Adeusi's attorney,

Special Agent Holm, Special Agent Christopher Wright,

United States Department of Homeland Security, AUSA McLeod, and

AUSA Sobelman participated.  Reflect that Mr. Adeusi:  "May

M9F6RAJ5

1    have helped friends who were committing frauds (romance scams

2    and business compromise scams) throughout this time in Nigeria

3    but can't recall specific instances."

4            It is further stipulated and agreed that this

5    stipulation may be received into evidence at trial as

6    Defendant's Exhibit A.

7            THE COURT:  Defense exhibit a is admitted.

8            (Defendant's Exhibit A received in evidence)

9            THE COURT:  All right.  And, Mr. Schneider, at this

10   time, does the defense rest?

11           MR. SCHNEIDER:  Yes.  The defense rests, your Honor.

12           THE COURT:  So, ladies and gentlemen, there you have

13   it.  The evidence is now closed.  You have heard all of the

14   evidence in this case.

15           Here's the plan.  The next step for your purpose is

16   the parties' closing arguments and then my instructions.  We're

17   not going to start that now, number one.  There are actually

18   some additional legal issues we need to take care of — in

19   particular, as you will see, the jury instructions are fairly

20   lengthy and actually will be given to you in writing.  I'll

21   read them to you, but they will be given to you in writing, and

22   that's because precision is very important.  And for that

23   reason, it's something that I need to discuss with the parties

24   and make sure that everybody is on the same page.

25           Now, on top of that, it's 1:38, and, obviously, we

M9F6RAJ5

1    won't have enough time to do both sides of summation, let alone

2    get to my instructions.  So we're not going to do that today.

3    Instead, I'm going to let you out early.  You know, like

4    students let out of school early, I imagine no one will be too

5    unhappy about that.  But be that as it may, I'll let you out

6    early.

7              Here's the catch:  I made the decision instead of

8    resuming tomorrow morning, I'm going to give you tomorrow off,

9    and we're going to start on Monday, and that's for the

10   following reason:  Number one, we've made better time and

11   progress than I anticipated and that I led you to believe.  I

12   told you that this trial may last up to two weeks.  We're not

13   even done with week one, and the evidence is now in.

14             Now, number two, I also told you, and this may be more

15   important when it comes time for summations and deliberation,

16   that I will ask you to stay a longer day, until 5:00 p.m.

17   That's to give us more flexibility, because it's a little

18   harder to manage things, and I don't want to interrupt the

19   parties in the middle of their summations, so on and so forth.

20             In order to give you a couple days to arrange things

21   since this may have come more quickly than anticipated, I think

22   that starting tomorrow, and rather than going until 5 o'clock

23   on Friday, we start on Monday, same time, and I'll ask you to

24   be prepared until 5:00.

25             We will take appropriate breaks.  I assure you of

that.  And we are also going to arrange -- I would hope, that

you might have started your deliberations by lunch.  But in

either case, we are going to arrange to have lunch order forms

for you in the jury room when you arrive on Monday.  Each of

you should fill one out.  And then we will arrange for lunch to

be delivered to the jury room so that you can eat in the jury

room, and we can either continue and make the most effective

use of our time or you can begin your deliberations with lunch

provided.  So look for that on Monday morning.

          With that, my usual instructions apply.  You have now

heard all of the evidence.  Nevertheless, you haven't heard the

parties' arguments, which are a very important part of the

process.  And you haven't heard my instructions, which are also

a very important part of the process.  So, for that reason, you

should continue to keep an open mind, and you should not

discuss the case with each other or with anyone else.

          The time will come when you will begin your

deliberations and you may discuss the evidence with each other,

but that time has not yet come, so continue to hold off.  In

addition, please continue to refrain from doing any outside

research, anything looking into anything about the case or

anyone involved.  You know the drill.  But it's important to

remind you of each of these things.

          Now, with that, I'm going to excuse you until, again,

Monday morning, same time.  Please be in the jury room by 8:45,

M9F6RAJ5

1    ready to go.  Barring something unexpected, we will begin

2    promptly with the parties' closing arguments, and then my

3    instructions, and finally your deliberations.

4              So, with that, I wish you a very pleasant, long

5    weekend, and we'll see you on Monday morning.  Thank you very

6    much.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9F6RAJ5

1          (Jury not present)

2          THE COURT:  You may be seated.  So my law clerk has a

3    copy of the draft charge, which she can give to each side now.

4    It's 51 pages, not including the verdict form, which may be a

5    little shorter because that does include the table of contents.

6    It's about 50 pages.

7          This is the way it works when we reconvene:  I will

8    ask first the government and then the defense to just identify

9    any page and line to which you have an objection, correction,

10   or suggestion.  All right?

11         You will see that there are line numbers on each page.

12   That's to facilitate the conversation, which is to say that I

13   expect you to be able to say Page 3, Line 4, something of that

14   nature, to actually identify with specificity what text you

15   have an issue with.

16         I also expect you, not only to raise a problem, but

17   also to present a solution, which is to say that you have a

18   specific suggestion for curing any problem that you identify.

19         I will ask you to do us the favor, while you're

20   reading this, to proofread as well.  Typically, there will be

21   mistakes and errors, so if you find them, bring them to my

22   attention.  No shame, no ego here.  I prefer to correct those

23   errors before they go to the jury.  So please alert us to

24   those.

25         Starting with the government and then the defense, and

M9F6RAJ5

1   you should go from beginning to end.  Point me to whatever page

2   you have an issue with, whatever line you have an issue with,

3   and raise any objections or make any suggestions that you may

4   have.

5           For your information purposes, I will leave the line

6   numbers in when I give this to the jury because it enables them

7   to identify things with specificity in any jury notes.  But the

8   annotations which are provided with respect to some of the

9   instructions, I didn't include them with respect to my standard

10  instructions.  But with respect to anything slightly more

11  bespoke, I have put in annotations, what they're based on.

12          To a decently large extent, I think it's based on the

13  joint requests to charge.  I appreciate how much you guys were

14  able to agree.  But those annotation will be stripped from the

15  final version that will go to the jury.  That's just to your

16  benefit and understanding during the charge conference.

17          Any questions about any of that?

18          MR. SOBELMAN:  No, your Honor.

19          MR. SCHNEIDER:  No.

20          THE COURT:  Great.  So how much time do you all need?

21  It's 1:45.  Good news is my afternoon is wide open, so I'm

22  happy to reconvene, shall we say at 3:30?  Does that work for

23  everybody?

24          MR. SCHNEIDER:  I would say even sooner.  I don't

25  think we need that much time.

M9F6RAJ5

1          THE COURT:  Even better for my purposes.

2          MR. SOBELMAN:  The government respectfully would like

3    that much time.

4          THE COURT:  How about we say 3:15?

5          MR. SOBELMAN:  Yes, your Honor.

6          THE COURT:  Okay.  There are three of you.  You can

7    split things up.  All right?

8          MR. SCHNEIDER:  Can I stay here?

9          THE COURT:  Yes, absolutely.  You can stay here.  I'll

10   leave it to you, Mr. Schneider, whether Mr. Raji wants to be

11   present.

12         MR. SCHNEIDER:  I was going to ask him.

13         THE COURT:  He doesn't need to remain, as far as I'm

14   concerned, if you want to waive his presence.

15         MR. SCHNEIDER:  Give me one second.

16         (Defendant and counsel confer)

17         MR. SCHNEIDER:  He is prepared to waive his presence

18   for the actual charge conference.

19         THE COURT:  All right.  Mr. Raji, let me just say, you

20   have the right to be present, it is an important part of the

21   trial, but we're only going to be discussing the proposed

22   charge and legal issues relating to it.  So in that regard,

23   certainly you don't need to be present.

24         Is it correct that you have discussed it with your

25   lawyer and you are prepared to waive your presence and let

M9F6RAJ5

1    him --

2              THE DEFENDANT:  Yeah.  I waive my presence, but I'll

3    stay for as long as I can, but if you see me get up, I hope you

4    don't mind.

5              THE COURT:  I'm going to leave, and we're going to

6    reconvene in an hour and a half.  You don't need to be here, is

7    the point.  If you're not here, then I'll understand that you

8    have made the decision not to remain.  And as I said earlier,

9    you should certainly tend to any medical issues that you need

10   to deal with given the break.  All right?

11             The only last thing, which I guess I'll say now since

12   it popped into my head is, between now and Monday, I expect

13   both sides to, number one, ensure that everybody is on the same

14   page with respect to what exhibits came into evidence; number

15   two, to compile those exhibits so they are ready to go to the

16   jury promptly when they begin their deliberations.

17             MR. SCHNEIDER:  I may need extra time to compile my

18   exhibits, Judge.  You don't mind.

19             THE COURT:  I like that one.

20             All right.  So, again, make sure between now and

21   Monday morning that you have an agreed-upon exhibit list, that

22   those exhibits are compiled and ready to go promptly to the

23   jury.

24             As you'll see in the jury instructions, I am going to

25   send a copy of the indictment to the jury and also think it --

M9F6RAJ5

1    they should have an exhibit list as well which includes

2    Defense Exhibit A and the government's exhibits.  Everyone

3    should agree how the exhibits are referred to.  Certainly, it

4    should be neutral, but I think it is helpful to them to have an

5    index, if you will, to what they are receiving.

6            Any questions before I give you time to review the

7    charge?  If not, I'll see you at 3:15.  And, Mr. Schneider, you

8    may remain here.

9            MR. SCHNEIDER:  Thank you.

10           THE COURT:  And I'll see you at 3:15.

11           (Recess)

M9FQraj6

1                    (In open court; jury not present)

2                    THE COURT:  We are here for the charge conference.  I

3     see Mr. Raji is not here, so Mr. Schneider I take it he's

4     elected to waive his presence?

5                    MR. SCHNEIDER:  That's correct, your Honor.

6                    THE COURT:  So as discussed, we'll start with the

7     government.  Page and line begin at the beginning.

8                    MR. SOBELMAN:  Page 3, line 21.  We propose inserting

9     "you determine that" between "until" and "the government" and

10    changing "proves" to "proved."

11                   THE COURT:  Unobjectionable, Mr. Schneider?  Any

12    objection?

13                   MR. SCHNEIDER:  That is correct, it is

14    unobjectionable.

15                   THE COURT:  Take the microphone so we can all hear

16    you.

17                   MR. SCHNEIDER:  I do not object.

18                   THE COURT:  Next.

19                   MR. SOBELMAN:  Our next is page 7, line 10.  Insert

20    "I" between "that" and "gave."

21                   THE COURT:  Next.

22                   MR. SOBELMAN:  Page 10, line 17.

23                   MR. SCHNEIDER:  Me too.

24                   MR. SOBELMAN:  Strike "accomplice" and insert

25    "cooperating witness."

M9FQraj6

 1              THE COURT:  Mr. Schneider, I assume you agree as well.

 2              MR. SCHNEIDER:  I actually had made that note as well,

 3      so yes.

 4              THE COURT:  Thank you.  Next.

 5              MR. SOBELMAN:  Page 15, line 3, strike "electronic

 6      service providers."

 7              THE COURT:  Hold on.

 8              MR. SOBELMAN:  Sorry.  Strike "electronic service

 9      providers" and insert "email accounts."

10              MR. SCHNEIDER:  Email accounts?

11              MR. SOBELMAN:  Yes.

12              THE COURT:  Mr. Schneider?

13              MR. SCHNEIDER:  No objection.

14              MR. SOBELMAN:  Page 16, line 8.  Strike "government's"

15      at the end of the line and insert "parties" since they were

16      stipulated transcripts.

17              THE COURT:  The second reference to government in the

18      line?

19              MR. SOBELMAN:  Correct, your Honor.

20              THE COURT:  Mr. Schneider, any objection?

21              MR. SCHNEIDER:  No.

22              THE COURT:  Next.

23              MR. SOBELMAN:  Page 17, line 21, strike "a hedge fund"

24      and insert "an investment firm."

25              And same change on line 22.


                    SOUTHERN DISTRICT REPORTERS, P.C.

M9FQraj6

1          THE COURT:  Any objection?

2          MR. SCHNEIDER:  No.

3          THE COURT:  Okay.

4          MR. SOBELMAN:  Page 21, line 19, insert "defraud or"

5     in between "to and obtain" -- I'm sorry in between -- yes, in

6     between "to and obtain."

7          THE COURT:  Page 21?

8          MR. SOBELMAN:  Line 19.  It says "course of action to

9     obtain."  We suggest it say, "course of action to defraud or

10    obtain."

11         THE COURT:  Doesn't that violate the rule that is

12    taught in kindergarten that you don't define a word with the

13    same word?

14         MR. SOBELMAN:  Well, maybe.  So, I actually think --

15    hold on.  I think maybe I misread it, and I think it's fine as

16    is.

17         MR. SCHNEIDER:  I didn't hear what he said.

18         THE COURT:  He withdrew the suggestion.

19         MR. SOBELMAN:  Suggestion withdrawn.

20         On page 23, it just will only take a second to explain

21    the change.  We propose striking some language here and moving

22    it, in part, to the following element.  There's a discussion of

23    the government not needing to prove the defendant realized any

24    gain from the scheme, and that is true, but it really goes to

25    the defendant's participation in the scheme rather than the

M9FQraj6

1    existence of the scheme.  So it's going to be sort of a

2    two-part strike from one place, insert similar language in

3    another.

4                 THE COURT:  Okay.

5                 MR. SOBELMAN:  The proposal for page 23, line 6 is to

6    strike "the defendant realized any gain from" and strike on the

7    next line, line 7 "the scheme, or that."

8                 THE COURT:  Okay.

9                 MR. SOBELMAN:  And then on page 24, line 13, we would

10   propose inserting after the end of the sentence there: "The

11   government also is not required to prove that the defendant

12   realized any gain from the scheme, although you may consider

13   any gain the defendant realized in determining whether the

14   defendant participated in the scheme."

15                THE COURT:  Let me just see if I got that.  So page

16   23, would read:  "Nor is the government required to prove that

17   the scheme or artifice to defraud actually succeeded -- that

18   is, the government is not required to prove that the intended

19   victim suffered any loss or harm," correct?

20                MR. SOBELMAN:  Correct.

21                THE COURT:  Then your proposal is a new sentence at

22   the end of the line on page 24, line 13.  Is that correct?

23                MR. SOBELMAN:  Yes, your Honor.

24                THE COURT:  And it states:  "The government is also

25   not required to prove that the defendant realized any gain from

M9FQraj6

1    the scheme, although you may consider any gain the defendant

2    realized in determining whether the defendant participated in

3    the scheme."  Correct?

4              MR. SOBELMAN:  Yes, your Honor.

5              THE COURT:  Mr. Schneider?

6              MR. SCHNEIDER:  I don't think the addition on page 24

7    is necessary.  I mean, a lot of this language on page 23, 24

8    keeps talking about what the government is not required to

9    prove, so I don't think it's necessary.

10             It's almost like giving signals.  So I think it's

11   important to say what they are required to prove, and what is

12   said earlier without the insert is sufficient.  So I would

13   object to that added language.

14             THE COURT:  Is it your view that it would be error to

15   add it or simply that you don't think it's not necessary?

16             MR. SCHNEIDER:  Well, it's not for me to decide.  I

17   think if it's not necessary, that it's error, so --

18             THE COURT:  Let me put it differently.  Do you think

19   it misstates the law?

20             MR. SCHNEIDER:  I don't think it misstates the law.  I

21   think the law is already stated sufficiently enough without

22   giving any kind of additional statements about it.  So the

23   answer is, I don't think it misstates the law, but I don't

24   think it's necessary.  And by making it cumulative, it may

25   unnecessarily highlight what the government does not have to

M9FQraj6

1    prove as opposed to focusing on what the government does have

2    to prove.

3            THE COURT:  Can you point me somewhere else in the

4    charge that I explain the government does not need to prove

5    that the defendant realized any gain from the scheme, because

6    that does seem like an important principle.  The jury could

7    obviously conclude at the end of the day Mr. Raji didn't get

8    anything, but that's not a defense and doesn't defeat the

9    government's proof if it satisfies the element.

10           MR. SCHNEIDER:  I'm just looking at page 23 again,

11   your Honor.  I guess I was looking at the portion that the

12   government is asking to take out on page 23.  That's where it

13   was said.  So if you're just moving it from 23 to 24, then I

14   don't object.  I apologize.

15           THE COURT:  Thank you.  I'll make that change.

16           Next Mr. Sobelman.

17           MR. SOBELMAN:  Page 27, lines 6 and 7, we would

18   propose the Court cut "violate the laws of the United States

19   that make it a crime" and have it simply read "to commit wire

20   fraud."  That's consistent with the way the money laundering

21   conspiracy is listed later.

22           THE COURT:  I think that makes sense.

23           Mr. Schneider, any objection?

24           MR. SCHNEIDER:  Just so I'm clear, so that sentence

25   should read:  "Between two or more persons existed to commit

M9FQraj6

1    wire fraud" and take out --

2              THE COURT:  Yes.

3              MR. SCHNEIDER:  Then that's fine.

4              MR. SOBELMAN:  Line 10.

5              THE COURT:  Same page?

6              MR. SOBELMAN:  Yes, your Honor.  "Objects" should be

7    singular and later in the sentence it should be "that" instead

8    of "those" and "objects" again should be singular.

9              THE COURT:  Agreed.  Next.

10             MR. SOBELMAN:  The following page, page 28, line 3,

11   consistent with the removing "to violate the law" language, we

12   propose it read "had formed a conspiracy" either striking "to

13   violate the law" or simply replace it with "to commit wire

14   fraud."

15             THE COURT:  I'll do "to commit wire fraud."

16             Next.

17             MR. SOBELMAN:  Page 29, line 14, striking "a purpose

18   to violate the law" and replacing it with "an unlawful

19   purpose."

20             THE COURT:  Is there a meaningful difference?

21             MR. SOBELMAN:  It's slight, your Honor, but we

22   wouldn't want the jury to have a misimpression that mistake of

23   law is some type of defense, and the rest of the charge talks

24   about having an unlawful purpose rather than trying to violate

25   a particular law.

M9FQraj6

1           THE COURT:  All right.  Any objection, Mr. Schneider?

2           MR. SCHNEIDER:  No.

3           THE COURT:  Okay.  Next.

4           MR. SOBELMAN:  Your Honor, we have a proposal for an

5      insert.  It would be between the last paragraph on 29 and the

6      second to last paragraph on 29.  We had some language in our

7      joint charge regarding responsibility for others' actions and

8      statements in a conspiracy, essentially the principal agency.

9      I can hand up the proposal or I could read it into the record,

10     whatever your Honor prefers, or perhaps both.

11          THE COURT:  Why don't you just maybe point me to the

12     relevant language in your joint request.

13          MR. SOBELMAN:  I'm not sure we have that reference,

14     but I do have a printed version if I can hand it up to the

15     Court.

16          THE COURT:  Do you have a copy for Mr. Schneider?

17          MR. SOBELMAN:  Yes, we already gave it to him.  It's

18     the one on the bottom of the first page with the star next to

19     it, your Honor.

20          THE COURT:  All right.  For the record, on page 14 of

21     the joint requests to charge, and your proposal is to put it

22     after line 21 on page 29?

23          MR. SOBELMAN:  That's correct, your Honor.

24          THE COURT:  Mr. Schneider, any objection?

25          MR. SCHNEIDER:  I don't love it.  I mean, I know that

M9FQraj6

1    it's in the joint request because I think that is the law, but

2    I don't know that I really have a legal basis to object other

3    than the fact that it's, you know, I don't like it.  That's all

4    I can say.

5            THE COURT:  Not the strongest legal argument, so I'll

6    grant the request.

7            Next.

8            MR. SOBELMAN:  Page 33, line 5.  Insert "took" between

9    "unlawfully" and "it."

10           THE COURT:  Yes.  Thank you.  Next.

11           MR. SOBELMAN:  Line 15, same page.  Change "of" to

12   "or."

13           MR. SCHNEIDER:  Say again?

14           MR. SOBELMAN:  Page 33, line 15, change "of" to "or."

15           THE COURT:  Yes.  Thank you.  Next.

16           MR. SOBELMAN:  Page 40, line 11, just needs a comma

17   after "first."

18           THE COURT:  Thank you.  Next.

19           MR. SOBELMAN:  Page 45, we have a suggested addition I

20   think would go on this page.  We didn't have time to write it

21   out, but I believe we would like an instruction on aiding and

22   abetting with respect to Counts Two and Three.  Unfortunately,

23   it was not in our joint requests to charge.  We could obviously

24   submit something to the Court, although it's fairly standard if

25   the Court prefers to use a standard instruction, and it is in

M9FQraj6

1    the indictment.

2              THE COURT:  And even if it weren't in the indictment,

3    it would be implicit in the indictment.

4              MR. SOBELMAN:  That's correct, your Honor.

5              THE COURT:  Mr. Schneider, any objections first?

6              MR. SCHNEIDER:  No.

7              THE COURT:  And, Mr. Sobelman, is it your proposal to

8    include it before venue?

9              MR. SOBELMAN:  I think that's the most sensible place,

10   but we would have no issue if your Honor wished to put it

11   somewhere else.

12             THE COURT:  I think that makes sense.  Now I'm finding

13   a prior charge of mine on aiding and abetting so we can agree

14   upon relevant language.  Let's keep going for the moment, and

15   then I'll circle back to that.

16             MR. SOBELMAN:  I think we only have one more, which is

17   that same page on 45, line 19.  Instead of "a meeting with

18   others involved in the criminal scheme within this district,"

19   we've proposed, "for example, a wire transfer in or out of this

20   district."

21             MR. SCHNEIDER:  I disagree.  I mean, I object.  I

22   don't think -- that is just kind of marshaling the evidence and

23   directing the jurors' attention to something.  So I think this

24   is fine.  Your language the way you have it is fine.

25             THE COURT:  Well, let me ask you, do you think that

M9FQraj6

1    misstates the law?  I think -- I mean, I hear your point, but

2    it's not obvious to a lay person that a wire transfer into or

3    out of the district qualifies, satisfies venue, and to the

4    extent that that is apposite here, it seems appropriate to make

5    clear that it does.  I take it you assume -- I mean, you agree

6    that that is an accurate statement of the law.

7            MR. SCHNEIDER:  It certainly is an accurate statement

8    of the law.  My whole defense would be venue in this case --

9    I'm kidding.  I object to it.  It is an accurate statement of

10   the law, I agree.

11           THE COURT:  All right.  So I think it does make sense

12   to clarify that.  So it could, for example, be a wire transfer

13   into or out of the district.  Is that the proposed language?

14           MR. SOBELMAN:  Yes, your Honor.

15           THE COURT:  All right.  Anything else, Mr. Sobelman?

16           MR. SOBELMAN:  I suppose -- Ms. Kamal says, and she's

17   correct, it should actually say "into, out of or through the

18   district."

19           THE COURT:  How can a wire go through a district,

20   but --

21           MR. SOBELMAN:  Well, it can.  Maybe not in this case,

22   but I did have such a case in front of Judge Sullivan.

23           THE COURT:  Anything else, Mr. Sobelman?

24           MR. SOBELMAN:  No, your Honor.  Thank you.

25           THE COURT:  The verdict form looks okay to you?

M9FQraj6

1          MR. SOBELMAN:  Yes, your Honor.

2          THE COURT:  I'll circle back on the aiding and

3     abetting.

4          Mr. Schneider, your thoughts?

5          MR. SCHNEIDER:  I think the conspiracy language kind

6     of is enough in terms of --

7          THE COURT:  What page are we on?

8          MR. SCHNEIDER:  You asked about aiding and abetting,

9     I'm sorry as --

10          THE COURT:  No.  I said we'll circle back to that.

11          MR. SCHNEIDER:  I'm sorry.  I apologize.

12          THE COURT:  That's okay.  Let's go through your

13     comments from beginning to end.

14          MR. SCHNEIDER:  Certainly.  Page 3, after line 17, I

15     would ask you to include language, for example, "The fact that

16     the defendant presented evidence does not shift the burden to

17     him."

18          THE COURT:  Mr. Sobelman?

19          MR. SOBELMAN:  Your Honor, we don't think it's legally

20     incorrect, but it is cumulative of what the Court would have

21     just said before, but if the Court is inclined to include it,

22     we don't have a particular objection.

23          THE COURT:  I think I made quite clear to them the

24     burden is always on the government.  That being said, throw

25     Mr. Schneider a bone, and I'll add it.

M9FQraj6

1          MR. SCHNEIDER:  I can use all the bones I can get.

2          Page 4, also I'd like you to after line 10 insert

3     language such as:  "Let me remind you that beyond a reasonable

4     doubt is a higher standard than a mere preponderance of the

5     evidence, as those of you who sat on civil juries may

6     remember."

7          Your Honor may remember during jury selection, you did

8     say that to them.  You also do mention preponderance of

9     evidence standard in the venue section.  I think what happens

10    with these reasonable doubt charges specifically, it almost

11    sounds like reasonable doubt is the lowest standard.  You say

12    what it's not.  It's not a mathematical certainty.  It's not

13    beyond all possible doubt.  I think the jurors should get a

14    sense of how serious or how high the standard is, especially

15    since we have jurors who sat on civil cases.

16         I think it's important here.  It's not just throwing

17    it in.  I think it's important jurors know what reasonable

18    doubt is higher than, not just what it's lower than.

19         THE COURT:  I think that's unnecessary and quite

20    clear, and I emphasized it repeatedly during jury selection and

21    have emphasized the instruction as a whole makes clear what the

22    relevant standard is.

23         Next

24         MR. SCHNEIDER:  Page 6, after line 17 -- I'm sorry.

25    Page 6, line 6, I apologize.  It says "it is the witnesses'

M9FQraj6

1    answers."  I've always had a hard time with that because it's

2    not the witnesses' answers.  It's the witnesses' answers with

3    the questions, because if the answer is no, you don't know what

4    the question is.  So I think you should just add the words,

5    "the witnesses answers to questions" or "with the question."

6          THE COURT:  All right.  I don't think that's ever

7    caused confusion to anyone.  It's implicit.  I'll leave it.

8          Next.

9          MR. SCHNEIDER:  Page 6, line 18, I think you say

10   "statement during his opening or summation."  I think it should

11   be either "his or her" because I assume one of the government

12   prosecutors will be a her in the summation.  So it kind of

13   focuses on me, and I'd rather you didn't do that.

14         THE COURT:  Fair point.  Thank you.

15         MR. SCHNEIDER:  Page 9, line 14 where it says, "The

16   government must take its witnesses."  This is what we had

17   included or at least I included in a request to charge.  I

18   think you should add the words after "The government,

19   frequently argues, as it may do, that it must take its

20   witnesses" because the way you say it now, you're kind of

21   making a statement to the jurors in support of what the

22   government is doing.  And kind of that they have to -- that

23   they must take them.  They don't have to take the witnesses as

24   they want.  That's their choice.  So I think it's an argument

25   that the government can make, but I don't think it should come

M9FQraj6

1    from the Court.  And that was suggested in our requests to

2    charge as well earlier.

3              THE COURT:  I have an alternative suggestion, which is

4    to strike the beginning of that sentence altogether and merge

5    it with the prior sentence, so it would read:  "Experience will

6    tell you that the government sometimes must rely on the

7    testimony of so-called cooperating witnesses, because otherwise

8    it would be difficult or impossible to detect and prosecute

9    wrongdoers."

10             Any objection, Mr. Schneider?

11             MR. SCHNEIDER:  No.  I like that even better.

12             THE COURT:  Any objection, Mr. Sobelman?

13             MR. SOBELMAN:  Your Honor, we do want the language

14   that your Honor just suggested striking.  We think it's

15   accurate, both legally and factually, and we prefer it to be in

16   so the jury has proper context for the use of cooperating

17   witnesses.

18             THE COURT:  All right.  I think the fact of the matter

19   is you don't always have to take your witnesses as you find

20   them because you choose which witnesses to call.  So in that

21   sense, you can argue the point, and I think this provides

22   sufficient basis for you to make that argument.

23             Next.

24             MR. SOBELMAN:  Your Honor, before we move on, the

25   second clause that your Honor cut, are we able to preserve

M9FQraj6

1    that: "sometimes must use such testimony in a criminal

2    prosecution."

3         THE COURT:  I think that's in the first sentence.

4    It's also in that sense redundant.

5         MR. SOBELMAN:  I see what you're saying.  Okay.  Thank

6    you, your Honor.

7         THE COURT:  Mr. Schneider.

8         MR. SCHNEIDER:  Page 15, I think lines 13 to 20 are

9    not necessary because there was never any cross-examination or

10   discussion about particular investigative techniques, and I'm

11   not going to argue that they should have done wiretaps or

12   something like that, so I just think it's unnecessary.

13        THE COURT:  Government?

14        MR. SOBELMAN:  Your Honor, we want to maintain this

15   instruction.  It's standard.  There are certain techniques that

16   were used and not used.  You know, this is a jury including

17   people that watch things like Law and Order and CSI.  And we

18   don't want to have anyone speculating about why certain things

19   were done or not done.  The cooperating witness testified that

20   the defendant suspected the FBI could be listening to them.

21   Obviously, there were no wiretaps in this case.  We think this

22   instruction is important to maintain.

23        THE COURT:  I agree.  And just to cite one minor

24   example, there was testimony today that the government

25   introduced the search results from Nancy Martino-Jean's Gmail

M9FQraj6

1    account, but there were no results from the defendant's, and

2    then some redirect with respect to whether you could access

3    searches on a locked phone, which I think implied something.  I

4    think the bottom line is that it makes sense to include it.

5          Next.

6          MR. SCHNEIDER:  Page 16, lines 1 through 5, I don't

7    think that's necessary, the whole area, subject.  It just kind

8    of have like a burden shifting sense to it unnecessarily.

9          THE COURT:  All right.  It's a standard instruction.

10   I think important for the jury to understand if they've heard

11   different names, people, documents that they haven't

12   necessarily seen, that that doesn't mean that the government

13   has failed to satisfy its burden.  I'll leave it.  Next.

14         MR. SCHNEIDER:  Page 16, line 17, I don't think it

15   should say "the defendant did not testify."  I think it should

16   say "the defendant's right not to testify."

17         THE COURT:  Fair enough:  Okay.  Next.

18         MR. SCHNEIDER:  Page 17, line 3.

19         THE COURT:  Page 17 line 3?

20         MR. SCHNEIDER:  Yes.  I would ask you to -- before the

21   last sentence which says, "You may not consider this," I would

22   ask you to include --

23         THE COURT:  Go ahead.  Sorry.

24         MR. SCHNEIDER:  Okay.  17, line 3 before the last

25   sentence, "I would ask you to include, you may not speculate as

M9FQraj6

1    to why he did not testify."  That was included in our

2    initial -- when I say our, I meant the defense request to

3    charge, so I'd ask you again to reconsider that.

4             THE COURT:  "May not speculate as to why he did not

5    testify"?

6             MR. SCHNEIDER:  Yes.

7             THE COURT:  All right.  I hardly believe it's

8    necessary since telling them that they can't consider it in any

9    way includes that, but in any event, Mr. Sobelman, any

10   objection?

11            MR. SOBELMAN:  No, your Honor.

12            THE COURT:  All right.  I'll add that.  Next.

13            MR. SCHNEIDER:  Page 17, line 19 which says, "Your

14   verdict on One Count Should Not Control Your decision as to any

15   other count."  When we argue the verdict sheet, that may

16   change, so I don't know if you want to argue the verdict sheet

17   now, my position, or just come back to it?

18            THE COURT:  I'll come back to it.

19            MR. SCHNEIDER:  Okay.

20            17, line 23, which says "called Unique Bamboo

21   Investments," I would ask you to take out "of which Mr. Raji

22   was vice-president."  Again, I think that's unnecessarily

23   marshaling the evidence.  You could also say, "of which Nancy

24   Martino-Jean was the president."  You could also say, "of which

25   Mr. Raji was not a signatory," so --

M9FQraj6

1          THE COURT:  I think it came from the summary I read

2     during voir dire, but I will take it out.

3          Next.

4          MR. SCHNEIDER:  Page 20, line 22, it says, "In order

5     to find the defendant guilty," I would ask you to take out --

6     it should read instead: "In order to sustain its burden of

7     proof with respect to Count Two."  Just so you know, I said

8     this a few times going forward.  So that's what my language is

9     to not focus the jurors on their job of finding the defendant

10    guilty.  It should be their job to see if the government

11    sustained its burden.  It makes it sound like if they don't

12    find the defendant guilty, they haven't done their job being

13    jurors.  I would like you to take out "finding defendant guilty

14    of" and instead substitute "in order to sustain its burden of

15    proof with respect to Count Two, the government must prove the

16    following."  I believe we submitted that as well in our

17    requests to charge.

18         THE COURT:  I think that was the subject of

19    disagreement in the request.  I hear your point.  I don't think

20    that there is any issue with this, which is my standard

21    formulation, so I'll leave it.

22         Next.

23         MR. SCHNEIDER:  Page 27, line 3, it's in the same

24    neighborhood.  I'd ask you again to take out "to find the

25    defendant guilty" and include the words "in order for the

M9FQraj6

1    government to sustain its burden of proof with respect to Count

2    One."

3            THE COURT:  I will deem you to have made that

4    suggestion with respect to all four counts, and I will leave it

5    as is in all four counts.

6            MR. SCHNEIDER:  Okay.  28, lines 11 through 14, I

7    don't think it's necessary.  I think it's unnecessary language.

8    Again, because it -- well, that's my position.  I think it's

9    unnecessary, it kind of focuses on what the government does not

10    have to do.

11            THE COURT:  All right.  I disagree.  I'll leave it.

12            Next

13            MR. SCHNEIDER:  Next is 36, line 18, same objection

14    about -- for line 18, take out "to find the defendant guilty"

15    and insert "for the government to sustain its burden of proof

16    with respect to Count Four."

17            THE COURT:  All right.  Next.

18            MR. SCHNEIDER:  37, line 18 to 19 take out the words

19    "to find the defendant guilty."  I would ask you to include "in

20    order for the government to sustain its burden of proof with

21    respect to Count Four."

22            THE COURT:  I'll leave it.  Next.

23            MR. SCHNEIDER:  39 line 17, take out the word "only."

24    I think it should say, "The government has to prove that the

25    defendant."  Not "only."  Again, I think it minimizes the

M9FQraj6

1    burden.

2              THE COURT:  I think the point is to underscore that

3    the government does not have to prove that the defendant knew

4    the particular crime of which it was proceeds; that, instead,

5    it only has to prove that he knew that it was the proceeds of a

6    crime, so I think --

7              MR. SCHNEIDER:  I understand, and I just think using

8    that word "only" kind of dilutes the burden.  That's my

9    feeling.

10             THE COURT:  No, I disagree, but tell you what, to make

11   the point that it's a contrast more clear, I think instead of

12   the period and then starting a new sentence at the end of line

13   16, I'll change it to a semicolon and make it part of the same

14   sentence, so it's clear that it's by contrast.

15             Next.

16             MR. SCHNEIDER:  As we did in our -- when I say our,

17   the defense objection to conscious avoidance.  Just that would

18   be page 42, beginning line 8 all the way through page 44, line

19   9.

20             THE COURT:  I see line 22.

21             MR. SCHNEIDER:  I'm sorry.  Page 42 starts on line 8

22   is conscious avoidance.

23             THE COURT:  Yes.

24             MR. SCHNEIDER:  I'm asking the entire conscious

25   avoidance charge be stricken.

M9FQraj6

```
1          THE COURT:  So first question, assuming that I
2    disagree, do you have any issue with the language of these
3    instructions?
4          MR. SCHNEIDER:  No.  The language is legally accurate,
5    but I just don't think it's necessary to include.  I have the
6    issue with Pinkerton liability so I have an issue with this as
7    well, so...
8          THE COURT:  I don't want to talk about Pinkerton.  It
9    seemed to me that the predicates for a conscious avoidance
10    charge are squarely met here.  That is to say, this is a
11    classic conscious avoidance case.
12          Number one, the defendant's defense, as far as I can
13    tell from the opening, is denial of knowledge and intent;
14    namely, he doesn't dispute that he participated in these
15    transactions.  He disputes that the government has proved that
16    he knew that they were fraudulent.  That's the first step.
17          Second, underscored by testimony earlier today of both
18    the expert, I think the government's theory is that whether or
19    not it has proved that he had actually did have knowledge,
20    there were abundant red flags, and in that regard he
21    consciously blinded himself to the apparent fraud, including
22    the various, you know, banks that froze the accounts, the
23    notices they received in relation to it, so on and so forth.
24    Tell me why given that, the predicate is not there to include
25    it.
```

M9FQraj6

1          MR. SCHNEIDER:  The government's theory is not that

2    the defendant wasn't involved.  The government's theory is that

3    he was a moving party here.  So if they're saying -- they're

4    not saying he hid his eyes and didn't pay attention.  They're

5    saying he did it.  He led it.  He was participating, knowingly,

6    all of that, right?  So what happens now his conscious

7    avoidance basically shifts the burden for me to have to explain

8    why he supposedly, you know, closed his eyes, right?

9          So I just think it's an issue that takes the case out

10   of the government's burden of proof and moves it the defense to

11   explain why he did or didn't do certain things.  Again, their

12   theory is very clear; that he did it knowingly with his eyes

13   wide open.

14         THE COURT:  I don't dispute or assume that the

15   government's primary theory is that he had full knowledge and

16   they have proved that beyond a reasonable doubt, and the jury

17   should infer from the circumstantial language, what have you,

18   that he absolutely knew what he was doing.  I think the law is

19   clear that the government can argue in the alternative, that

20   even if the jury finds that he didn't actually know that by

21   blinding himself to what should have been obvious to somebody

22   in his shoes can be treated as having the relevant knowledge.

23         MR. SCHNEIDER:  I understand.

24         THE COURT:  Am I wrong?

25         MR. SCHNEIDER:  I understand what your Honor is

SOUTHERN DISTRICT REPORTERS, P.C.

M9FQraj6

1    saying.

2            THE COURT:  Mr. Sobelman, anything you want to add on

3    that?

4            MR. SOBELMAN:  No, your Honor.  We agree with the

5    Court.

6            THE COURT:  I agree with myself, and I will therefore

7    include it.

8            MR. SCHNEIDER:  Page 44, line 9, it says, "As I

9    explained earlier, to find the defendant guilty," I'd like you

10   to take out "to find the defendant guilty" and instead say, "as

11   I explained earlier, in order for government to sustain its

12   burden of proof with respect to Count Two."

13           THE COURT:  Same ruling.  I'll leave that.  Next.

14           MR. SCHNEIDER:  Page 44, line 11, rather than say "to

15   find the defendant guilty," I'd ask you to take out the word

16   "to" say "before you may find the defendant guilty."

17           THE COURT:  Same ruling.  Next.

18           MR. SCHNEIDER:  That's a little different, your Honor,

19   I mean, I just think it's a significant difference.

20           THE COURT:  I'll throw you a bone on that one then.

21           MR. SCHNEIDER:  Thank you.

22           THE COURT:  "In order to find the defendant guilty on

23   Count Three."

24           MR. SCHNEIDER:  Page 44, lines 44 through 20 talks

25   about conscious avoidance again, so same objection as earlier.

SOUTHERN DISTRICT REPORTERS, P.C.

M9FQraj6

1          THE COURT:  Same ruling again.  Next.

2          MR. SCHNEIDER:  Page 41, line 21 through 22, it now

3    reads:  "Whether the government has proved that the defendant

4    is guilty of the crimes charged."  I would ask you to take that

5    out and say "whether the government has sustained its burden of

6    proof."  And then also after the word "evidence" where it says

7    "solely on the basis of the evidence," I'd ask you to add the

8    words "or lack of evidence."

9          THE COURT:  All right.  I'm inclined to throw you

10   another bone.

11          Mr. Sobelman, any objection?

12          MR. SOBELMAN:  With respect to the lack of evidence or

13   to sustain the burden?

14          THE COURT:  Both.

15          MR. SOBELMAN:  We object to the prior formulation.  I

16   think it's confusing.  I'm not sure a jury knows what it means

17   to sustain a burden.  My view is that is why the Court used

18   more colloquial language elsewhere, so we would object to that.

19   If the defendant wants "lack of evidence," it balanced almost

20   everywhere in the charge.  We don't think it's unnecessary, but

21   we don't object.

22          THE COURT:  How about this:  I'm going to throw you a

23   partial bone, Mr. Schneider, and make it "sustain its burden of

24   proving the defendant's guilt beyond a reasonable doubt" so

25   that it's clear what burden I'm referring to and what that

M9FQraj6

1    means.

2                MR. SCHNEIDER:  That's even better.

3                THE COURT:  Otherwise, I will adopt your suggestion.

4    Next.

5                MR. SCHNEIDER:  49, lines 11 through 12, at the end it

6    says "whether the government has proved the defendant's guilt."

7    I'd ask you to take it out and insert "sustain its burden of

8    proof beyond a reasonable doubt."

9                THE COURT:  I don't think I'll do that one.  Next.

10               MR. SCHNEIDER:  Page 50, line 1, it begins on 49.  "On

11   the other hand, do not surrender your honest convictions and

12   beliefs."  I'd ask you to take out "convictions."  It's totally

13   not necessary.  It should be "Do not surrender your honest

14   beliefs."  And this is what I had also suggested in our

15   requests to charge as a defense suggestion.

16               THE COURT:  The issue being that conviction has a

17   different meaning in this context?

18               MR. SCHNEIDER:  Conviction can mean -- the

19   government's word that the jury may not know what sustain means

20   as to burden of proof, so I'm concerned that they may think if

21   you think he's convicted, don't give it up.  It's just not

22   necessary, I don't believe.

23               THE COURT:  That's fine.  Any objection, Mr. Sobelman?

24               MR. SOBELMAN:  No, your Honor.

25               THE COURT:  Next.

M9FQraj6

1          MR. SCHNEIDER:  I'm done as to that, but as to the

2     verdict sheet now?

3          THE COURT:  Yes.

4          MR. SCHNEIDER:  Did you say go or no?

5          THE COURT:  Yes.

6          MR. SCHNEIDER:  We had submitted our -- the defense

7     requests with the verdict sheet, and I think it's important to

8     include, I guess, a special verdict form under Count Three

9     because as your Honor's charge refers to Count Three, I believe

10    it's on page 34 of your charge, or thereabouts, you say that

11    the jurors have to agree unanimously as to which one of the

12    five different -- I'm sorry -- which one of seven, which one of

13    seven different possibilities deal with the stolen funds:

14    Received, possessed, concealed, stored, banked, sold, or

15    disposed of.

16          So if your Honor has said in your charge that they

17    must be unanimous, I think we need to know because otherwise

18    they could be mistaken.  If they misunderstand that portion of

19    your charge, and if six believe it's received, but six believe

20    it's concealed, that wouldn't be an appropriate verdict.  And I

21    think you should know that before its -- before there's a

22    verdict, so to avoid any mistake and finding out later on.

23          THE COURT:  All right.  I'm inclined, as you can see,

24    to disagree.  I think the instructions are clear and presume

25    that they understand and follow the instructions.  And given

M9FQraj6

1     that, I don't think we need to complicate the verdict form by

2     suddenly with respect to one count, and one count only,

3     breaking it out into the subparts as to which they need to be

4     unanimous.  I think we can and should presume that they have

5     followed the instructions.

6            Number one, I'll hear from the government.  And number

7     two, I guess, on that score, does it not follow that I should

8     omit the two objects with respect to Count Four because there's

9     some inconsistency between those two.

10           MR. SOBELMAN:  Your Honor, we agree with the Court

11    with respect to Count Three.  We don't think it needs to be or

12    should be broken out.  It's just unnecessary complication.  The

13    reason Count Four has to be broken out is that they have two

14    different statutory maximums, so we need to know which object

15    or both --

16           THE COURT:  I stand corrected and appreciate your

17    pointing that out.

18           Mr. Schneider?

19           MR. SCHNEIDER:  So we're not doing what I'm asking, is

20    that what I'm hearing?

21           THE COURT:  Happy to hear if you have any --

22           MR. SCHNEIDER:  I have nothing else to add.

23           THE COURT:  All right.  Then we're not doing what you

24    asked.

25           MR. SCHNEIDER:  Okay.  And, finally, unless I

M9FQraj6

misunderstand, I don't think they can deliberate on Count Four

if they happen to find him not guilty of Counts One and Two.

So that's why I added in our request, "If you find the

defendant not guilty of Count One and Two, do not consider

Count Four."

THE COURT:  Explain that to me.

MR. SCHNEIDER:  Well, because I think -- and if I'm

wrong, I apologize if I misunderstand, but in order to have --

if you look at what object one and object two is withdrawn.  If

you look at Count One and Count Two, if he's not guilty of

those counts, the money laundering refers to either one of

those counts.  So if you're not guilty of Count One and Count

Two, which is specifically referred to in the money laundering

count, how can they even address the money laundering count?

Because he's not charged with money laundering in general.

He's charged with money laundering in relation to Count One and

Count Two.  And he's not even charged with money laundering in

relation to Count Three.

THE COURT:  I think here is one response.  In theory,

could the jury not conclude that somebody committed wire fraud

and conspiracy to commit wire fraud, but Mr. Raji was not

actually a participant in that crime, but that he participated

in a conspiracy to launder the proceeds from that crime.

MR. SCHNEIDER:  You see, I think that would be an

inconsistent verdict because he would have to have known that

M9FQraj6

1  they were -- Count One and Count Two is illegal.  If he's found

2  not guilty under --

3          THE COURT:  Let's imagine a hypothetical.  It's

4  certainly not this case, but a hypothetical in which, you know,

5  person A comes to person B and says, "Hey, I committed wire

6  fraud.  Here are proceeds from my wire fraud.  Can you help me

7  conceal it?"  And person B agrees and assists in concealing it.

8          Person B was not a participant in the wire fraud but

9  certainly knows that it's the proceeds of a specific unlawful

10  activity.  That person is not -- there is a crime of wire

11  fraud.  Let's assume that person A is accurate in that regard.

12  So somebody committed the crime of wire fraud, but the

13  defendant, person B did not.  Nevertheless, I think he's guilty

14  of conspiracy to commit money laundering.

15          MR. SCHNEIDER:  Under that hypothetical, I guess

16  that's probably accurate or true, except there's not one

17  scintilla of evidence in this case that that happened.  So that

18  wouldn't be based on evidence.  The jury would be speculating.

19  They'd be making stuff up.  There's no evidence at all,

20  according to the government, that he didn't participate and

21  somebody came to him as an innocent person and said, "Hey, by

22  the way, I know you didn't do it, but I stole this money.  It's

23  illegal.  I want you to launder it for me."  Their position,

24  their theory, which is the whole case, is about him doing the

25  crimes and him specifically -- him specifically acting in a way

M9FQraj6

1    to hide the money as money laundering.  So your hypothetical is

2    true if there were some facts to that.  There's no facts like

3    that at all in this case.  That's not their theory.  It can't

4    be their theory because they couldn't even argue that to the

5    jury because that would not be based on the facts of this case.

6              THE COURT:  Mr. Sobelman.

7              MR. SOBELMAN:  Defense counsel is just wrong on the

8    law here.  The jury absolutely is entitled to find the

9    defendant guilty of Counts One and Two and not Count Four, or

10   Count Four and not Counts One and Two.  It's not a predicate,

11   for example, like with 1028(a) where there might be a

12   situation, for example, like we had in Avenatti, where if the

13   jury did not convict him of wire fraud, because that was the

14   only predicate for the 1028(a), they would not proceed to the

15   1028(a).  Here, the elements are separate.  The conduct, while

16   arguably overlapping, is arguably separate, and the jury could

17   reach that verdict and it would not be illegally inconsistent.

18             THE COURT:  I agree, so I'll leave it and therefore

19   leave the language on page 17.

20             Any other objections or requests, Mr. Schneider?

21             MR. SCHNEIDER:  No, sir.

22             THE COURT:  I'll ask my law clerk to retrieve from the

23   printer the proposed aiding and abetting charge for you to

24   consider.  I think it's based on fairly standard language

25   and/or Sand, so you can take a look at that.

M9FQraj6

1           MR. SOBELMAN:  The government has no objection to this

2     charge.

3           MR. SCHNEIDER:  No objection.

4           THE COURT:  All right.  Then, as discussed, I'll put

5     it before the venue instruction that's currently on page 45.

6     All right.

7           Anything else to discuss?  Who's closing for the

8     government.

9           MR. SOBELMAN:  Ms. Ghosh.

10          THE COURT:  And do you know how long her closing is

11    likely to be?

12          MR. SOBELMAN:  This is a very rough estimate, but an

13    hour and a half to two hours.

14          THE COURT:  And who is doing the rebuttal?

15          MR. SOBELMAN:  Ms. Kamal.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

M9F6RAJ7

| | |
|---|---|
| 1 | THE COURT:  All right.  And, Mr. Schneider, any idea |
| 2 | the length of your closing? |
| 3 | MR. SCHNEIDER:  You see me laughing.  I hope -- I |
| 4 | don't want it to be two hours.  I do not want it to be that |
| 5 | long.  I don't know if that answers your question. |
| 6 | THE COURT:  It doesn't, but why don't both sides aim |
| 7 | for an hour and a half or lower, and Ms. Kamal, I'll assume |
| 8 | rebuttal will be under half an hour. |
| 9 | And as discussed, please make sure you guys agree upon |
| 10 | an exhibit list that can go to the jury, compile any exhibits |
| 11 | so they can go promptly to the jury. |
| 12 | Any objection to the indictment going to the jury? |
| 13 | MR. SCHNEIDER:  Yes, I do.  No matter how many times I |
| 14 | tell the jurors that the indictment is not evidence, when you |
| 15 | give it to them with the exhibits, it has a different meaning. |
| 16 | I don't think it's necessary.  You explain it in the charge, |
| 17 | they will have a copy of the charge with them, in addition to |
| 18 | you reading it to them.  I don't think they need to see the |
| 19 | indictment. |
| 20 | THE COURT:  So that's a general objection, and I will |
| 21 | overrule.  I think, here, we don't always submit it.  Here, I |
| 22 | think it will be evidence given the 404 evidence.  I think it |
| 23 | will be helpful for the jury to understand accurately what the |
| 24 | charges are in the indictment.  I think there's a reason to |
| 25 | give it to them. |

M9F6RAJ7

1        MR. SCHNEIDER:  I apologize.  It's late in the

2   afternoon.  In the final charge, was there something about the

3   limiting instruction in here as well?

4        THE COURT:  Yes.

5        MR. SCHNEIDER:  Okay.  Okay.

6        THE COURT:  All right.  Anything else from the

7   government?

8        MR. SOBELMAN:  No, your Honor.

9        THE COURT:  Mr. Schneider.

10        MR. SCHNEIDER:  No.

11        THE COURT:  All right.  I'll let you go for the day,

12   then.

13        Be ready to start promptly Monday morning, 9:00 a.m.,

14   and we'll get the jury in and go from there.

15        Mr. Schneider, obviously, I will hope and assume that

16   the defendant has no health issues and is in better shape, but,

17   that's to say, obviously, keep us apprised if there are any

18   material developments on that score.  But, otherwise, I intend

19   to see everyone bright and early on Monday.  Have a restful and

20   long weekend, and I'll see you on Monday morning.

21        MR. SCHNEIDER:  Thank you.

22        (Adjourned to September 19, 2022, at 9:00 a.m.)

23                              * * *

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MICHAEL GASSERT

Direct By Ms. Ghosh  . . . . . . . . . . . . . 435

Cross By Mr. Schneider . . . . . . . . . . . 476

Redirect By Ms. Ghosh  . . . . . . . . . . . 488

 DUSTIN KARL PALMER

Direct By Ms. Ghosh  . . . . . . . . . . . . 489

Cross By Mr. Schneider . . . . . . . . . . . 514

 VICTORIA HERNANDEZ

Direct By Mr. Sobelman . . . . . . . . . . . 532

GOVERNMENT EXHIBITS

Exhibit No.                                   Received

 501-506  . . . . . . . . . . . . . . . . . 445

S9; 101A-101E; 102A-102C; 103A-103G;  . . . . 445

          104A-104D; 105A-105D;

          107A-107C; 110A-110C;

          111A-111D; 112A

 101F  . . . . . . . . . . . . . . . . . . . 447

 403 and 405  . . . . . . . . . . . . . . . 448

 315  . . . . . . . . . . . . . . . . . . . 461

 402  . . . . . . . . . . . . . . . . . . . 471

 512  . . . . . . . . . . . . . . . . . . . 498

 513  . . . . . . . . . . . . . . . . . . . 535

 514  . . . . . . . . . . . . . . . . . . . 540

1    515    . . . . . . . . . . . . . . . . . 543

2                          DEFENDANT EXHIBITS

3    Exhibit No.                                    Received

4    A    . . . . . . . . . . . . . . . . . . 570

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25