M9J6RAJ1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                        19 CR 870(JMF)
                                            Trial
5    MUSTAPHA RAJI,

6                 Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           September 19, 2022
9                                          9:00 a.m.
     Before:
10
                        HON. JESSE M. FURMAN,
11
                                           District Judge
12                                         –and a Jury–

13
                             APPEARANCES
14

15   DAMIAN WILLIAMS,
          United States Attorney for the
16        Southern District of New York
     BY:  JILAN KAMAL
17        ROBERT SOBELMAN
          CATHERINE GHOSH
18        Assistant United States Attorneys

19   JEREMY SCHNEIDER
          Attorney for Defendant
20
     Also Present:
21   Matthew Bailey, AUSA Paralegal
     Mayerlin Ulerio, Defense Paralegal
22

23

24

25

M9J6RAJ1

1            (Trial resumed; jury not present)

2            THE COURT:  Good morning.  Welcome back.  I hope you

3    all had nice weekends.  Now, is the government ready to proceed

4    to closings?

5            MS. GHOSH:  Yes, your Honor.

6            THE COURT:  Mr. Schneider, are you ready to proceed to

7    closings?

8            MR. SCHNEIDER:  Yes, your Honor.

9            THE COURT:  Great.  We'll get the jury in and go from

10   there.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9J6RAJ1

1           (Jury present)

2           THE COURT:  Good morning.  Welcome back.  I hope you

3   all had good long weekends, at least as far as the trial is

4   concerned.  Good to see you.  Thanks for being on time.  I

5   gather Ms. Smallman gave you your lunch order forms, and

6   hopefully they'll be there or shortly after we break for lunch.

7           With that, we'll proceed with the next phase of the

8   case, which I mentioned is the closing arguments of the

9   lawyers.  Let me remind you that what the lawyers say is not

10  evidence, so if there's any conflict between what they say and

11  your recollections of the evidence, it's the evidence that

12  controls, so they don't get to instruct you about what the law

13  is.  That's my job.  I'll do that after their closing

14  arguments.

15          They may make arguments to you about the law and tell

16  you what they anticipate I will tell you.  That's because, as I

17  told you last week, I discussed with them what I'm going to

18  share with you about the law.  But if there's any conflict

19  between what they tell you what the law is and what I tell you

20  the law is, what I tell you the law is controls as well.

21          Having said that, it's an important part of the case.

22  It's their opportunity to make arguments to you about the

23  conclusions that you should draw from the evidence, and it's

24  very helpful usually in helping you understand the evidence,

25  which comes in just bit by bit, witness by witness, and sort of

M9J6RAJ1                    Summation - Ms. Ghosh

1    all together.

2           I ask you to listen with care to both sides.  We do

3    start with the government and then the defense gets to close,

4    and then the government, because it bears the burden at all

5    times, so it gets the final word with the rebuttal.  So at this

6    time, I ask you to give your undivided attention to the

7    government, Ms. Ghosh.

8           MS. GHOSH:  Mr. Raji was the money mover.  The bank

9    account guy.  The launderer.  He played a key role in an

10   international fraud and money laundering scheme.  He provided a

11   place to receive large amounts of stolen money and then helped

12   to move that money around quickly so that it would be hard to

13   trace, hard to get back when the victim and the banks caught

14   on, and that's exactly what he did here.

15          This is the government's summation.  It's our

16   opportunity, now that all the evidence is in, to put it all

17   together for you, and explain how the evidence proves beyond a

18   reasonable doubt that the defendant, Mr. Raji, committed the

19   crimes charged.

20          This trial only lasted a few days.  But during that

21   time, you saw and heard more than enough evidence to know that

22   the defendant is guilty as charged.  Let's start by talking

23   about what isn't in dispute in this case.

24          First, there was a fraud.  In July 2018, there was an

25   e-mail compromise scheme.  Marble Arch was conned into sending

M9J6RAJ1                    Summation - Ms. Ghosh

1    money to Unique Bamboo Investment.  You heard from the victims

2    at Marble Arch how the business was closing and they were

3    returning all the remaining money to the investors, about how

4    the e-mail account of the founders, Scott McLellan, was hacked,

5    about how Adam Angelowicz was tricked into telling their bank

6    to wire the money meant for Scott to Unique Bamboo instead.

7    You saw the fake e-mail and the fake wire instructions that the

8    forensic IT firm was able to recover.  That's Exhibit 803 and

9    803A.

10             Second, you learned that from this scheme,

11   $1.7 million was stolen.  You can see this in bank records like

12   Exhibit 101C, the wire record, as well as summary charts based

13   on those records, like Exhibit 501.

14             Third, you saw that the stolen money went from Marble

15   Arch's bank in California to a New York bank account for

16   Unique Bamboo Investment.  This interstate wire transfer into

17   this district satisfies the venue and interstate wire

18   requirements that Judge Furman will explain to you, and those

19   are not in dispute here.

20             And, fourth, once the money was in Unique Bamboo's

21   account, it didn't sit there.  It moved to account after

22   account after account after account, which you saw in Summary

23   Chart 506.  And $50,000 of it moved directly to the defendant's

24   bank account, $50,000 of fraud money straight from

25   Unique Bamboo to Mustapha Raji's personal TD Bank account.

1          You've seen those bank statements.  That's Exhibit

2    103B, as well as all the summary charts, 501 to 506, that show

3    you how quickly and widely that money was spread.  None of

4    those money transfers are in dispute here.

5          Before I talk more about the evidence, I'd like to

6    step back and explain what exactly the defendant is charged

7    with here.  Judge Furman will instruct you on the specific

8    elements of each of these crimes, and you should listen

9    carefully when he does.  But the indictment charges the

10   defendant with four counts.

11         The first two, wire fraud and wire fraud conspiracy,

12   are for the defendant's participation in the scheme to steal

13   money from Marble Arch and from working with others in that

14   scheme.

15         Conspiracy to commit money laundering is for the

16   defendant working with others, like Nancy, in moving the stolen

17   money around and concealing it.  And receipt of stolen funds is

18   for the defendant putting some of the stolen money into his own

19   bank account.

20         So what is in dispute here?  It boils down to these

21   three questions:  Did the defendant know the purpose of the

22   wire fraud conspiracy and scheme?  Did the defendant know the

23   money laundering conspiracy's purpose of concealment, and to

24   transfer more than $10,000 of crime proceeds, and did the

25   defendant know the money was stolen?  The answer to all of

1    these is, of course, he did.

2              With my time before you this morning, I'm going to

3    explain ten ways you know beyond a reasonable doubt that the

4    defendant knowingly agreed with others to defraud victims,

5    steal money, and help hide that stolen money.

6              Ten reasons you know the defendant is guilty:

7              The first reason that you know the defendant is guilty

8    is that he had no legitimate business with Nancy Martino-Jean,

9    no legitimate business with Nancy, but they were partners in

10   using Unique Bamboo and Nancy's other Unique companies to

11   receive large amounts of money.  Their business was money

12   laundering.  And what does the money laundering business need?

13   Bank accounts — as many as you can get.

14             You saw multiple messages in Exhibit 302, that long

15   WhatsApp chain with the defendant asking for and receiving

16   information about Nancy's various bank accounts.  "Do you have

17   another Wells or BOA that you have not given me yet?"  "Yes, I

18   do.  BOA.  I also have a saving Wells for Martinos group."

19   "Send me the BOA."

20             On another occasion, "what account and how much?

21   Where is coming from?"  "It's the same 1 million to TD."  On

22   yet another occasion, "Unique Bamboo is BOA?"  "Yes."  "And

23   Unique Loan is TD?"  "Yes."  "We have TD as well for

24   Unique Bamboo.  Do you want to use it?"

25             Why did the defendant need to use so many of Nancy's

M9J6RAJ1                    Summation - Ms. Ghosh

1    business bank accounts?  "If you want to use it."  For what?

2    Money laundering.

3            Remember what the expert said about business accounts,

4    "They can process more money than a personal bank account

5    without setting off red flags."  In case it isn't clear enough

6    from the messages we just saw that Unique Bamboo, like Nancy's

7    other accounts, was essentially a bank account for hire, let's

8    make it crystal clear:  June 26, 2018, exactly one month before

9    the money was stolen from Marble Arch, remember how the

10   defendant sent Nancy a bunch of messages all at once, and then

11   he wrote "from Agnes"?  We'll come back to these messages in a

12   moment, but he was forwarding Nancy a request from someone

13   named Agnes who was involved in the scheme.

14           By the way, you saw it in the other WhatsApp chain,

15   301, that Agnes is the one working with two guys in Ghana.

16           But back in the other chain, Exhibit 302, the messages

17   the defendant forwarded from Agnes, asked for a trusted

18   receiver with a U.S.A. passport and Bank of America corporate

19   account that can receive wire transfers.  We need only Bank of

20   America account in U.S.A.  Remember that Mr. Palmer told you

21   that using a U.S. bank would get a lot less scrutiny than using

22   an overseas account.

23           The messages the defendant forwarded also specified

24   that the account holder must be able to receive large funds and

25   also be able to transfer out easily.  And the messages urge,

M9J6RAJ1                    Summation - Ms. Ghosh

1    "let's move fast.  This is a hot deal."  The defendant passed

2    all of these on to Nancy.  What was the bank account they were

3    hoping to use for this hot deal?  Unique Bamboo Investment —

4    the same Bank of America account that received the $1.7 million

5    stolen from Marble Arch one month later.

6           Those messages were explicit requests for nothing more

7    than a reliable bank account -- not a business partner, a bank

8    account.  The defendant knew full well that the people sending

9    these messages weren't trying to do legitimate business with

10   Unique Bamboo.  They just needed a bank account that could

11   receive large amounts of money without attracting too much

12   attention.  And he was able to provide one.

13          By the way, you also know it wasn't a legitimate

14   business because the defendant and Nancy didn't even know what

15   their cover story was supposed to be.  Remember those messages

16   in Exhibit 302 where they talked about getting $650,000 from

17   China and $25 million from Brazil?  That's a lot of money.  And

18   the defendant told Nancy that they needed an escrow account

19   with the lawyer's name on it.  But he told her to use your

20   e-mail and phone, just get the lawyer account.  Okay?  Let's

21   control this deal.  So what was the deal they were controlling?

22   Nancy asked, "what do I tell him the funds is for?"  "Who is

23   our clients and what service it's for?"

24          No, if these were legitimate deals, Nancy would know,

25   and more importantly, if these were legitimate deals, the

1   defendant would know, but he had to ask someone, "I'm waiting

2   for the answer."  12 hours later, he finally told her it is for

3   commodities and investment.  The defendant didn't know what the

4   service was because there was no service.  There was no real

5   business — only their money laundering business.

6           That's the first reason you know the defendant is

7   guilty.  The second reason is that he tried to give enough

8   information to the bank so it wouldn't ask questions.  But if

9   it did start asking questions, he knew it was time to walk

10  away.  You saw this repeatedly in the WhatsApp messages sent by

11  the defendant.  "If they ask too many questions, we'll find

12  another way."  That was in the other WhatsApp chain with Nancy,

13  Exhibit 301.  "They need her date of birth and the name of her

14  mother and father and my relationship with her."  "We'll find

15  another way."  That's Exhibit 302.

16          You also heard these same things from the defendant.

17          (Audio played)

18          MS. GHOSH:  That was Exhibit 302D.

19          (Audio played)

20          MS. GHOSH:  That was Exhibit 302Q.  That is the

21  defendant's own voice, not Nancy's, not Mr. Adeusi's.  The

22  defendant's speaking to his coconspirator, telling her how he

23  didn't want the bank asking too many questions because he knew

24  none of this was legitimate.

25          Another way the defendant tried to avoid bank scrutiny

is with those CIS documents, the client information sheet.  He

filled these out for companies involved in laundering the fraud

money, including Unique Bamboo in Exhibit 212A.  Why?  So they

wouldn't have incomplete transaction information or incomplete

customer information.

        The money laundering expert explained that those would

have been red flags for the bank.  He also told you that money

launderers are well aware of these red flags and take steps to

alter their behavior to try to avoid triggering a red flag.

The bank could freeze the money if the transaction didn't seem

legitimate.  So the defendant had to make sure the accounts he

provided to the scheme worked.  He had to avoid scrutiny.  He

had to appear legitimate.  And that meant avoiding too many

questions from the bank.

        That's reason number two you know the defendant is

guilty.  And that brings us to the third reason:  The money

movement.  Because in order to launder money successfully, the

defendant needed to move it fast to keep it from being frozen

from the bank.

        Now, you've seen a lot of charts showing a lot of

transactions.  exhibit 506 is the summary chart that showed the

immediate aftermath of the fraud.  The money was stolen on

July 26.  It just sat in the account for four days.  The

defendant let it rest.  But then in a four-day span between,

July 30 and August 2, over $1.4 million was transferred out.

M9J6RAJ1                    Summation - Ms. Ghosh

1    $1.4 million in four days.  It's obvious why they had to move

2    it out fast.  If it just stayed in the first Unique Bamboo

3    account, as soon as the victim realized the fraud, the money

4    would be taken back by the bank.  But if the money was sent to

5    lots of other places, it would be much harder to get back.

6            Some of the other summary charts showed you more

7    details about those movements.  Exhibit 503 showed you what the

8    defendant did with the money; cash withdrawals, checks, a

9    transfer to ML Morris Inc., which also received fraud money

10   directly from Unique Bamboo, and a transfer to someone named

11   Misan Megbuluba, who also received a transfer from M.L. Morris

12   Inc., and then to cash in several transactions himself.  The

13   money was moving.

14           And, by the way, the money moved where the defendant

15   wanted it to.  As one example, you saw this e-mail, Exhibit 217

16   from Timothy Oyewole on July 29, giving defendant — not Nancy,

17   but the defendant — his bank details.  And on August 2, four

18   days later, that's where $25,000 went.  You saw that in Summary

19   Chart 504, which also showed you how Oyewole then transferred

20   $10,000 to a business in Canada that the defendant's brother

21   owned.

22           This wasn't the only time the defendant directed Nancy

23   where to move the stolen money.  There was a whole series of

24   texts in Exhibit 302 from him to Nancy on August 8th to various

25   companies, like Timothy Oyewole's company, Comcristal, again,

1   or his brother's company, Timmins, again.

2           Now, not only did the defendant direct that the money

3   be moved around, but he directed that it be moved fast.  I'm

4   sure you remember this message in Exhibit 302 when Nancy

5   finally sends the defendant the confirmation he's been waiting

6   for.  "the $1.7 million is in the Unique Bamboo account."

7   Ladies and gentlemen, make no mistake about it, the defendant's

8   response 22 seconds later is one of the most damning piece of

9   evidence in this case.  "Thank God."  "Let's start moving it."

10  "We keep 30 percent."  "Move it out ASAP."  That language is a

11  smoking gun.  "Move it."  Nothing about paying off creditors or

12  buying supplies or paying employees.  None of the legitimate

13  things a business might do when it gets money.  All he wanted

14  to do was move it somewhere as soon as possible, because once

15  you have $1.7 million in stolen money, you need to start

16  concealing it.

17          Ladies and gentlemen, this is money laundering.  And

18  this is the third reason you know the defendant is guilty.

19          The third reason you know he was fully aware of what

20  this scheme was.  Why did the defendant need to move the money

21  out so quickly?  Because once the victim caught on, or the bank

22  noticed some red flags, it was only a matter of time before the

23  money would be frozen, the account would be closed, the funds

24  would be returned.

25          What's the fourth reason you know the defendant is

1    guilty?  You saw example after example of these exact things

2    happening to the defendant for two accounts he was trying to

3    use.  In Exhibit 208, his Wells Fargo account closed a month

4    before the Marble Arch fraud; Exhibit 302S, his Citibank

5    account blocked five days later.  Those were his own accounts.

6    Nancy also had funds frozen.  Eight days after the defendant's

7    Citibank account was blocked, Nancy told him the bank was

8    taking back $52,000 that had just been deposited into her

9    account.  That's Exhibit 302U.  Why does this matter?  It shows

10   you that the defendant was well aware that the transactions he

11   was involved in were not legitimate and that the transactions

12   Nancy was involved in were not legitimate, even before he

13   became involved in the Marble Arch fraud.  And the same thing

14   happened again and again with accounts that received the

15   Marble Arch money:  Exhibit 302AH, account blocked.  302AI,

16   wire return.  302AK, fraudulent wire.  302, trouble.  Same

17   thing, requesting return.

18           Now, what does the defendant do after learning about

19   these serious problems with the transfers he was involved in?

20   Better question is, what didn't he do?  He didn't stop working

21   with Nancy.  He didn't ask why the banks were holding the

22   money.  He didn't suggest that Unique Bamboo return the money

23   to Marble Arch.  He didn't express confusion or surprise about

24   why a bank would close his account.  He didn't do any of those

25   things because he wasn't surprised.  Because he knew the money

1    was from fraud, and he knew sometimes the banks caught up with

2    you.  That's the fourth reason you know the defendant is

3    guilty.

4            But there was one thing the defendant did after the

5    bank started asking questions, and that's the fifth reason you

6    know he's guilty.  The defendant created a fake paper trail, a

7    coverup.  I am talking about that fake loan document the

8    defendant e-mailed around as the scheme was falling apart.

9    That was Exhibit 233A.

10           First, you know it isn't real.  The Marble Arch

11   witnesses told you that.  Not only had they never seen it

12   before, but it didn't even make sense.  The real Marble Arch

13   Investments didn't lend money, it wasn't based in Hong Kong,

14   and, by the way, the signature page doesn't even match the rest

15   of the document.  It's a different font, and it talks about an

16   affidavit rather than a promissory note or security agreement.

17   So you know the document is fake.  And common sense tells you

18   it was created after the fact to try to explain the

19   $1.7 million from Marble Arch to Unique Bamboo, because the

20   banks were asking questions.

21           You saw that in Exhibit 302AJ, the blurry document

22   that Nancy sent the defendant, the same day as the fake loan

23   agreement.  The clearer version is Exhibit 232A, and it shows

24   that the bank that had received $700,080, of the stolen money

25   had been told by Marble Arch's bank that the transfer was

1    fraudulent.  "Please return our fed payment."  "Urgent

2    fraudulent payment.  Return funds."  And Nancy passed that info

3    on to the defendant.  That's why this fake loan document

4    exists.  It was supposed to convince the banks that the money

5    is legitimate so they wouldn't freeze it before the defendant

6    and his partners could move it out.

7            You heard about this from the money laundering expert,

8    papering the transaction on Page 511 of the transcript.  He

9    explained, "papering refers to creating documents, usually

10   after the fact, after a transaction has happened, to describe

11   what happened in the transaction or what they want people to

12   believe happened in the transaction."

13           On Page 512, he told you that "a promissory note or

14   loan document can be used to paper a transaction.  And that

15   these types of documents are often backdated."  And he said on

16   Page 513 that "these fake documents might have a notary stamp

17   so they look legitimate."

18           So you know why there was a fake loan document.  Now,

19   what was the defendant's role in creating that fake document?

20           You saw in Exhibit 233 that he received on August 14

21   from Pierre Thimot.  Who's that?  Well, that same day, Nancy

22   told the defendant "call Pierre, please."  So he's someone

23   involved with Nancy.  So the defendant received the agreement

24   with a completely blank signature page on August 14.  On

25   August 15, next day, he sent just the signature page back to

1    Pierre.  That's Exhibit 235 and 235A.

2            Here, you can see the two side by side, exhibits 233A

3    and 235A.  What's different now?  In the one the defendant sent

4    on August 15, a date is filled in, but not August 14 or 15,

5    even though the version the defendant received on the 14th was

6    blank.  Those dates wouldn't help cover up the crime because

7    the agreement is supposed to look like it's from before the

8    money was stolen.  So the date filled in is July 2nd.  The

9    defendant backdated it.

10           There's also a notary stamp and signature which makes

11   it look official, but there's no signature of the people who

12   are supposedly signing this document.  Just look at what it

13   says before the notary signature, "sworn to or affirmed and

14   signed before me on this 2nd day of July."

15           The money laundering expert explained how notaries

16   work at Pages 513 and 514 of the transcript.  Basically, the

17   person presents identification and signs the document before

18   the notary stamps and signs it.  But, here, no one signed in

19   front of the notary.  So the defendant sent back to Pierre a

20   fake backdated contract that a notary, but no one else, had

21   signed.  The defendant knew this wasn't a real contract.  He

22   knew it was a coverup, and he knew what he had to cover up:

23   the stolen $1.7 million.

24           That's the fifth reason you know the defendant is

25   guilty.  The sixth reason you know the defendant is guilty is

M9J6RAJ1                        Summation - Ms. Ghosh

1   that he used the same fraud money laundering plan for the

2   Marble Arch fraud that he had used at least twice before.

3           In 2017, the defendant received money that had been

4   stolen from Southern Oregon University.  In 2018, just a month

5   or so before the defendant committed the crimes committed in

6   this case, he received and laundered stolen money from

7   Saint Francis Medical Center.

8           As Judge Furman instructed you during the trial, this

9   evidence was admitted for a limited purpose, to help you decide

10  if the defendant had knowledge or intent about the charged

11  Marble Arch scheme, to help you decide if his involvement in

12  the Marble Arch scheme was just a mistake or an accident.

13  Well, his prior conduct confirms that he knew exactly what he

14  was doing with the Marble Arch scheme.

15          You learned that Southern Oregon University was

16  tricked with fake e-mails into sending a $1.9 million payment

17  to Best Janitor Cleaning Services.  These are Exhibits 50 and

18  50B, the fake e-mail and wire instructions.  This was carried

19  out just like the Marble Arch fraud, redirecting a legitimate

20  payment to an account controlled by members of the fraud

21  scheme.

22          As soon as the university was tricked into sending out

23  the money, more than $100,000 of it was immediately sent on to

24  two of the defendants' bank accounts for Emergent Development,

25  his company, as shown in Summary Chart 509.  There's no doubt

1   the defendant knew exactly what happened here.  Its his

2   company.  He's the signer on the accounts, and the university

3   witness explained that no one tried to return to the stolen

4   money.

5         You also heard from the St. Francis witness, that May

6   and June 2018, the hospital lost more than $250,000 by paying

7   fake invoices from Emergent Development, the defendant's

8   company.  Exhibit 22 is one of those fake e-mails, and 22A is

9   one of those invoices.  David Prather's e-mail had been hacked

10  just like Scott McLellan's.

11        There was no doubt the defendant didn't know this

12  money was stolen, because he knew Emergent Development had

13  never done any work, any business at all with St. Francis.  But

14  what did he do when the money came into his account?  Did he

15  return it?  Ask why they were paying his company?  Was he

16  surprised?  Of course, not.  He was in the scheme to steal the

17  money, money that the defendant then immediately split up into

18  other accounts, checks to himself and others, and thousands in

19  cash.  You can see that in the excerpts from charts in Exhibits

20  507 and 508.

21        The defendant's participation in those schemes shows

22  that when the Marble Arch scheme came around, he knew exactly

23  what was going on.  He wasn't confused.  He wasn't mistaken.

24  He didn't think he was part of a real business deal.  It wasn't

25  an accident that he received money obtained from an e-mail

M9J6RAJ1                          Summation - Ms. Ghosh

1      compromise scheme and then transferred it out again quickly or

2      withdrew it in cash.  Those weren't coincidences.  That was the

3      plan.

4            And that's the sixth reason you know the defendant

5      knew he was involved in a scheme to steal and then launder

6      Marble Arch's money.  The sixth reason he's guilty.

7            The seventh reason you know the defendant was fully

8      aware of the Marble Arch fraud is based on what he did after.

9      As you saw in May and June of 2019, the defendant was eager to

10     follow the same plan again when Afolabi Adeusi reached out to

11     him for another account to receive fraud money.  This was all

12     captured in text messages.

13            Now, just as with the university and hospital schemes,

14     Judge Furman instructed you that this evidence was received for

15     a limited purpose, including to help you to decide what the

16     defendant's knowledge and intent were in the charged

17     Marble Arch scheme.  And this evidence erases any doubt that

18     the defendant knew exactly what he was doing the year before,

19     because he was willing and eager to follow the same plan, the

20     same way, with the same coconspirator again.

21            The text messages between the defendant and Mr. Adeusi

22     from May and June 2018 are Exhibit 313.  Those messages show

23     that this new scheme would work the same way as the one charged

24     in this case.  First, the defendant confirmed that he would get

25     a deposit slip from Mr. Adeusi just like the he got for the

1   $1.7 million from Marble Arch to Unique Bamboo in July 2018.

2   After Mr. Adeusi sent the defendant more details, the defendant

3   confirmed what the job was.  Still in exhibit 313:  "we only

4   going after facilitator fees?"

5         You know that when the defendant wrote "going after,"

6   he meant steal and launder.  The same thing that the defendant

7   and Mr. Adeusi tried to do the year before in the Marble Arch

8   fraud.  Also in Exhibit 313, Mr. Adeusi told the defendant it

9   was an insider job, meaning that the person helping them steal

10  the money actually worked at the victim company.  How did the

11  defendant respond?  Did he express concerns?  No.  He said

12  okay.  That was fine with him.  Just another variation on the

13  same fraud they had committed before.

14        And what did the defendant do next?  Send wire

15  instructions for an account to receive the stolen $2.3 million,

16  just as he had sent wire instructions to Mr. Adeusi for the

17  Unique Bamboo Bank of America account back in July 2018.

18        Mr. Adeusi also told the defendant that he should let

19  the stolen money rest for four days.  How did the defendant

20  respond?  Did he say, what are you talking about?  Why would

21  the money need to rest?  Of course not.  He responded, "I'll

22  finish my end with our bank by morning."  The defendant was not

23  just willing, but eager, to help Mr. Adeusi with the same type

24  of scheme they had done the year before with Marble Arch, where

25  he had also let the money rest for four days.  That is how you

M9J6RAJ1                    Summation - Ms. Ghosh

1   know that the defendant knew what he was doing in 2018; he

2   jumped at the opportunity to do it again in 2019.

3          And, remember, that these messages aren't just after

4   the Marble Arch scheme.  They are after the defendant was aware

5   of the Marble Arch money being frozen, taken back, called

6   fraudulent, after the defendant knew that the Unique Bamboo

7   bank account had been blocked, after the defendant knew Nancy

8   had been arrested.  Yet, in 2019, when Mr. Adeusi came calling

9   about another job, did the defendant say, "no way.  I'm not

10  working with you again.  That last job turned out to be a

11  fraud"?  Of course not.  He said, "okay.  Cool."  That's

12  Exhibit 313.

13         And he wasn't concerned about whether this was a

14  legitimate business deal or not.  He was concerned about

15  whether they would get at least two weeks to clean house.  Also

16  Exhibit 313.  The defendant knew the truth in 2019 just like he

17  knew the truth in 2018.  It was a fraud and money laundering

18  scheme, and he was a key part of it.  That's the seventh reason

19  you know the defendant is guilty.

20         The eighth reason you know that the defendant knew

21  precisely what he was doing is that he and his companies didn't

22  report the stolen money as income to the IRS.  Let's start with

23  Unique Bamboo, the company that received the $1.7 million from

24  Marble Arch in July 2018.

25         The defendant was vice president of Unique Bamboo at

M9J6RAJ1                    Summation - Ms. Ghosh

1    the time of the fraud, you saw that Exhibit 403, the business

2    records from June 12, 2018, just about six weeks after the

3    money was stolen.

4           How many dollars in income did Unique Bamboo report to

5    the IRS for 2018?  Exhibit 514 says it all.  Zero.  How many

6    employees did it report paying?  None.  No tax filings at all

7    that year.  Because the defendant's company had everything to

8    hide.  If the defendant had thought the money from Marble Arch

9    was some legitimate transaction, he would have filed a tax

10   return for his company.

11          Instead, he tried to hide it by not filing at all.

12   The defendant's other company, Emergent Development, also got a

13   lot of stolen money.  You saw the business records showing he

14   was president in Exhibit 408.  As shown in Exhibit 509, more

15   than $100,000 in 2017 was paid to Emergent by Best Janitor

16   Cleaning Services from the Southern Oregon University fraud.

17   And as shown in Exhibits 507 and 508, more than $250,000 in

18   2018 from the St. Francis fraud; yet the defendant didn't file

19   a tax return for Emergent Development in 2017 or 2018, even

20   though he had hundreds of thousands of dollars coming in.  Why?

21   He knew the money was from fraud.  He didn't want to report

22   that, so he tried to hide it by not filing at all because he

23   knew exactly what he was doing the whole time.

24          The defendant didn't just hide the income from his

25   companies.  He also hid his own personal income from the IRS.

He used money stolen from St. Francis to pay himself more than

$20,000 from Emergent Development in May and June of 2018, as

shown in Exhibit 507 and 508 those summary charts.  He used

stolen money from Marble Arch to pay himself $50,000 in

July 2018, as shown in Exhibit 501.

How much income did the defendant report to the IRS?

Absolutely none.  As shown in Exhibit 513, he didn't even file

a return in 2017 or 2018.  The defendant knew that the money

was from fraud, so he tried to hide it from the authorities,

including the IRS.

By the way, the evidence makes clear that the

defendant knew he was supposed to file taxes for his companies

and himself every year.  In fact, before 2017, he had filed a

tax return.  The IRS witness told you that.  In 2017 and 2018,

it was no mistake, it was no accident, he didn't forget to file

his tax return.  Same for the companies.  A letter goes out to

every business that is registered with the IRS that indicates

what forms you have to file and when.  That testimony is at

Pages 538 and 541 of the transcript.

The meaning of this evidence is clear.  The defendant

did not file taxes for himself or his companies because he knew

he had something to hide:  his participation in the wire fraud

and money laundering schemes.  The defendant's failure to file

taxes for himself or his companies is the eighth reason you

know he's guilty.

1          The ninth reason you know the defendant is guilty is

2     that he used multiple methods to try to conceal the source and

3     destination of the stolen money.

4          Let's go back to the testimony of the expert,

5     Dustin Palmer, what he told you were red flags for money

6     laundering.  Remember, he said you typically see two to five

7     red flags when there's money laundering.  There can be as few

8     as one.  Here, there are at least five.

9          First, layering.  Mr. Palmer explained that this means

10    adding extra hops, as he called it, extra transfers of money

11    when fewer would do.  Let's look at Exhibit 505 and try to

12    trace some of these transactions.

13         Unique Bamboo to Unique Multi Services to Unique Loan

14    to a different Unique Bamboo account.  Or Unique Bamboo to

15    Nancy Martino-Jean, back to the same Unique Bamboo.  Or

16    Unique Bamboo to Unique Multi Services to Unique Loan and back

17    to Unique Bamboo.  Layers.  These were all Nancy's accounts, so

18    they could have gone directly from A to B if they weren't

19    trying to conceal something.

20         By the way, Exhibit 505 also gives you a good example

21    of structuring.  That's breaking a larger transaction into

22    smaller ones or sending money to two different accounts for the

23    same person or entity instead of to one account.  That method

24    is certainly present here as well, like when Unique Loan made

25    two transfers to Unique Multi Services on the same day.

M9J6RAJ1                      Summation - Ms. Ghosh

1          I expect defense counsel is going to stand up here and

2     point out Nancy Martino-Jean's name on that.  She was the

3     signatory to all those accounts.  Sure, she was.  But you know

4     that Nancy shared these exact bank accounts with the defendant,

5     her partner in crime.  We saw that earlier with these texts,

6     among others, from Exhibit 302.

7          Unique Bamboo at Bank of America.  That's the account

8     that received the $1.7 million, shared with the defendant.

9     Unique loan at TD Bank, shared with the defendant.

10    Unique Bamboo at a TD Bank, shared with the defendant.  All

11    offered up to the defendant on June 20, 2018.  So when you see

12    those accounts moving money in July and August 2018, you know

13    exactly what the defendant's response was when Nancy asked him

14    you want to use it.  He used those accounts.

15         Another red flag Mr. Palmer mentioned is same person,

16    multiple accounts.  Here are two quick examples.  Unique

17    companies had at least four different bank accounts.  Those

18    records are in the subparts of Exhibits 101, 110, 111, and 112.

19    And there were at least three different bank accounts for

20    Emergent Development.  That's 106, 108, and 109.  The more bank

21    accounts they had, the more they could move the money, just as

22    you saw they did here.

23         Another red flag Mr. Palmer mentioned is high volume

24    elaborate movements.  High volume.  How about moving over

25    $1.4 million in four days, Monday through Thursday, in more

M9J6RAJ1                    Summation - Ms. Ghosh

1    than a dozen different transfers.  That's what you see in

2    Exhibit 506.  Elaborate movements.  That's what you see in

3    Exhibit 503 as money goes among the defendant, ML Morris Inc,

4    and Megbuluba.  Not to mention Exhibit 505 where the money just

5    goes in circles.

6           And, by the way, if you think these charts are

7    confusing, that's because the money movement is meant to be

8    confusing.  That is exactly what the defendant and his partners

9    wanted, to conceal where the money was really coming from.

10          The last red flag I'll mention is round dollar

11   transactions.  This is an easy one.  Let's look again at

12   Exhibit 506, the summary of all the transfers from

13   Unique Bamboo.

14          Except for one transaction of $11,910 on August 2,

15   every single transaction is a round dollar transaction ending

16   in two, three, four, or five zeros.  No dollars and cents.

17   Just even numbers.  Why?  They're just picking whatever figures

18   they want.  There isn't a real invoice that needs to be paid or

19   a real loan.

20          You know from experience that when you actually buy

21   something, tax is added.  When you repay a loan, interest is

22   added.  Those things don't usually result in round, even dollar

23   amounts.  And, by the way, that transaction for $11,910, that

24   was actually an international wire.  So you can see in

25   Exhibit 101C that that uneven U.S. dollar amount is after the

M9J6RAJ1                    Summation - Ms. Ghosh

1    exchange rate.  How much was that one?  10,000 euros.  Nice and

2    even.

3            So those are five of the methods Mr. Palmer told you

4    about being used by the defendant here.  And those are in

5    addition to the papering we talked about earlier on, or other

6    red flags like shell companies or the use of checks, which you

7    also saw evidence of.

8            Bottom line is, there are red flags all over this

9    scheme.  And, here, that's because this was a money laundering

10   scheme.  The defendant and his partners were trying to hide

11   where the money had come from because it had been stolen from

12   Marble Arch.  That's the ninth reason you know the defendant

13   knew exactly what he was doing.

14           That brings us to the tenth reason you know the

15   defendant is guilty.  Because after Afolabi Adeusi, an insider

16   in the scheme, and the defendant's coconspirators, told you in

17   no uncertain terms that the defendant was well aware this was

18   fraud and money laundering.

19           Now, the first nine reasons are entirely separate from

20   this last reason.  You can find the defendant guilty without

21   even considering Mr. Adeusi's testimony.  And let's be clear,

22   defendant counsel started off this trial by calling Mr. Adeusi

23   the government's star witness.  He is not.  The defendant's own

24   words in text message after text message are the most important

25   evidence in this case.  But you should consider Mr. Adeusi's

1    testimony and the details it provided about the defendant's

2    participation in the fraud and money laundering scheme.

3           As you've seen, his testimony fits with all the other

4    evidence in this case; the testimony of the victims, the bank

5    records, the money laundering expert, and most importantly, the

6    text messages.  You got to see and hear him.  You know he gets

7    no benefit from cooperating unless he tells the truth.

8           And as you learned, the truth about Mr. Adeusi's

9    interactions with the defendant is devastating evidence of the

10   defendant's guilt.  If you believe Mr. Adeusi, the defendant is

11   guilty.  That's all there is to it.

12          Mr. Adeusi told you what the defendant's role was.

13   The defendant was the one who supplied the bank accounts that

14   the stolen money would go into.  So when Mr. Adeusi needed a

15   business account that could receive $1.7 million, he reached

16   out to the defendant because he had said that he likes big

17   money.  And that's the only thing he likes to do.  He doesn't

18   do small money.  That's Page 172 of the transcript.  Mr. Adeusi

19   knew the defendant would be interested in the $1.7 million job,

20   and he was right.  Mr. Adeusi told you the defendant was the

21   one who supplied the scheme with the Unique Bamboo Bank of

22   America account.  That's on Page 178.

23          Mr. Adeusi also told you that the defendant was never

24   confused about the fact that this was a fraud and even used the

25   code word "alibaba" to ask if the Marble Arch fraud was an

1   e-mail compromise scheme.  That's in the transcript on

2   Page 173.  Mr. Adeusi testified about a lot of other details,

3   and you can go back and look at the transcript if you want to

4   see more of his testimony.  But if you believe him, then the

5   things I just mentioned are all you really need to know to find

6   the defendant guilty.

7        Now, look.  Mr. Adeusi was also part of the fraud

8   scheme.  He is a criminal.  Why should you rely on his

9   testimony?  First, he gets no benefit by lying.  You know that

10  from his cooperation agreement, Exhibit 31; second, more

11  importantly, his testimony is consistent with all the other

12  evidence you've seen in this case; text messages, bank records,

13  e-mails.  I'll give a few examples.

14       To start with, you saw that two of the defendant's

15  phone numbers are saved in Mr. Adeusi's phone.  That's Exhibit

16  312 and 318.  And you also saw text messages between them in

17  Exhibits 313 and 314.  So they did know each other.  They did

18  talk on WhatsApp.  You know all that is true.  The only

19  question is whether you believe Mr. Adeusi's testimony that the

20  defendant knew the jobs they did together were fraudulent.

21       Another piece of his testimony that matches up to the

22  rest of the evidence is that Mr. Adeusi and the defendant

23  talked about Unique Bamboo.  You saw texts in Exhibits 314 from

24  September 10, 2018, where Mr. Adeusi referenced Unique Bamboo

25  as he's trying to find out what happened to the stolen money.

1          Another thing that's consistent with the other

2     evidence, Mr. Adeusi told you that he sent the defendant the

3     wire confirmation slip after the fraud money went to

4     Unique Bamboo.  He was asked, what, if anything, did you do

5     with that receipt, referring to the confirmation slip showing

6     that the money went from the victim's account to the

7     Unique Bamboo Bank of America account.  He told you I sent it

8     to Mustapha.  That's in the transcript at Page 182.

9          Well, you have seen that confirmation slip.  The

10    defendant sent it to Nancy in Exhibit 302AC, about an hour and

11    a half after telling her in Exhibit 302AB that he should have

12    the confirmation soon.

13          (Audio played)

14          MS. GHOSH:  Another detail that matches up, using the

15    code word "house" for an account.  When Mr. Adeusi was telling

16    you about a conversation he had with another coconspirator, he

17    said that Femi had said he needed a house for the $1.7 million

18    meaning an account it could go into.  That's on Page 170 and

19    171 in the transcript.  Who else has used that word?  The

20    defendant.  When he asked for at least two weeks to "clean

21    house" in 2019.  That was Exhibit 313.

22          I'll give one last example of how Mr. Adeusi's

23    testimony matches up with the other evidence in this case and

24    why you should believe him when he tells you that the defendant

25    knew this was all a fraud.  The text messages between the

1    defendant's brother, Dauda, and Mr. Adeusi.  These also

2    corroborate in realtime that they were all in on the fraud

3    together.  Those are Exhibit 309.

4            On September 18, 2018, Dauda forwarded along the

5    defendant's messages showing that Nancy, the business account

6    holder, had been arrested.  Neither Mr. Adeusi or Dauda

7    expressed any confusion over why she would have been arrested.

8    Then Mr. Adeusi told Dauda to tell Mustapha to call us.  Dauda

9    said the defendant would call but not immediately because

10   things are "too hot right now."  You know exactly what "too hot

11   right now" meant.  Law enforcement was getting close, and they

12   were all afraid of getting caught.

13           Mr. Adeusi responded, "please tell him to be careful.

14   Make him go far bro."  Go far.  Run away.  So Mr. Adeusi's

15   testimony to you last week that this was obviously a fraud to

16   everyone involved matches up perfectly with the text messages

17   with Dauda, the defendant's brother.

18           I've given a lot of examples, some big and some small,

19   of the ways that Mr. Adeusi's testimony is corroborated by

20   other evidence you've seen, irrefutable evidence like text

21   messages and documents.  And those are far from the only

22   examples.  So as I said earlier, if you believe Mr. Adeusi, an

23   insider in the scheme, than the defendant is guilty, and you

24   have every reason to believe him when he said the defendant

25   knew what was going on.  That is the tenth reason you know that

M9J6RAJ1                        Summation - Ms. Ghosh

1   the defendant is guilty.

2          As you've heard over the past week, Mustapha Raji was

3   a key part of a group that defrauded victims and funneled

4   stolen money to bank account after bank account, because when

5   you steal money, you need somewhere to put it, a way to spend

6   it, away to hide that it's stolen.  That was the defendant's

7   specialty:  Business bank accounts in the United States that he

8   controlled and provided to a much larger scheme.  As a member

9   of this scheme, the defendant took his cut.  In the Marble

10  Arch, $50,000.  And you saw that if one scheme didn't work out,

11  he moved onto the next.  If one account was frozen, he moved

12  onto the next.  Because he what was doing, and he thought he

13  could get away with it.  But he didn't.  He got caught.  And

14  that's why we are here today.

15         It is finally time for you, the jury, to hold the

16  defendant accountable for his crimes.  As you begin to

17  deliberate, I ask that you use your common sense to consider

18  the mountain of evidence of the defendant's guilt.  Use it when

19  you consider the WhatsApp messages, the e-mails, the bank

20  records, and the testimony of the victims, the expert, and the

21  cooperating witness.  And after considering that evidence, you

22  will return the only verdict consistent with the evidence and

23  the law:  The defendant is guilty.

24         (Continued on next page)

25

M9Jraj2

1          THE COURT:  All right.  Thank you, Ms. Ghosh.

2          Ladies and gentlemen, I think just to ensure that you

3    are paying good close attention to the defense closing as well,

4    I'd suggest -- well, let me ask you and see from the look on

5    your faces, if you'd like a five, seven minute break just to

6    stretch and use the facilities or if you want to just go ahead.

7    All right.  Let's take a break.  Let's keep it to five to seven

8    minutes.  I'll have Ms. Smallman come check on you in several

9    minutes.

10         Before you go anywhere though, let me give you my

11   usual reminder.  I'm sure you can recite them by heart with me.

12   Don't discuss the case.  Keep an open mind.  And don't do any

13   research about the case.  With that, enjoy your brief break,

14   and we will commence with the defense closing in a few minutes.

15   Thank you.

16         THE COURT:  You may be seated.

17          I assume nothing to discuss?  Very good.  I'll give

18   you a couple minutes.  I'll be back out in about five, and

19   hopefully we can get started.  Thanks.

20          (Recess)

21         THE COURT:  We will get the jury and continue.  I will

22   give the government fair warning.  That was shorter than I

23   expected so it sort of throws off my expectation of the

24   schedule, which means that depending on how long Mr. Schneider

25   is, I may just go straight into rebuttal rather than breaking,

M9JQraj2                    Summation - Mr. Schneider

1    but I will see where we stand at that point.

2              (Jury present)

3              THE COURT:  Welcome back.  We will continue with

4    defense closing.  I ask that you give Mr. Schneider the same

5    close attention that you gave Ms. Ghosh.

6              Mr. Schneider.

7              MR. SCHNEIDER:  Thank you, your Honor.

8              Good morning.

9              MR. SCHNEIDER:  Ms. Ghosh was right.  There's a

10   mountain of evidence.  It was overwhelming.  Everything she

11   said is true, except the problem is that the evidence was about

12   Nancy Martino-Jean, the woman who was arrested in September of

13   2018.  The evidence was not pointing, as overwhelming, and as

14   mountainous as you may think to Mustapha Raji.  It does not

15   point to his guilt.  Just as I told you a week ago in my

16   opening:  Witnesses, charts, bank records, phone records, text

17   records, WhatsApp messages, it all shows very clearly and in a

18   way that is really convincing that $1.7 million from Marble

19   Arch went into Unique Bamboo.  They have charts.  They have

20   testimony.  They have it all.  And Unique Bamboo is Nancy

21   Martino-Jean's company, plain and simple.  No matter how many

22   times the government tries to say that Mustapha Raji shared or

23   was part of it.  No.  He was the vice-president in name that

24   had absolutely no signatory powers whatsoever.  So let's be

25   clear.  $1.7 went into Unique Bamboo, and a percentage of that,

1    $50,000 went to Mustapha Raji.  That is undisputed.  It doesn't

2    mean he knew where that money came from.  It doesn't mean he

3    knew how Nancy Martino-Jean got that money.  It doesn't mean he

4    knew that that money, when she got it.  None of that.

5           Now, the government called a number of civilian

6    witnesses, you know, the victims from Marble Arch,

7    Mr. McLellan, Mr. Angelowicz.  They didn't really help the case

8    in terms of proving whether or not he was involved.  There's no

9    dispute that those people were scammed.  There's no dispute.

10   It wasn't about them being negligent.  It wasn't about them

11   making a mistake.  It wasn't about any of that.  They were

12   scammed.  They were innocent victims, but that does not help

13   you decide whether or not he was a knowing participant in that

14   scam.  So it's not about whether Mr. McLellan or Mr. Angelowicz

15   were defrauded or whether their email was hacked.  That is

16   beyond dispute.

17          You're going to hear from the Judge -- and I'm not

18   going to tell you what the law is -- about conspiracy.  What

19   you need to know, and the Judge will tell you very clearly,

20   that the defendant has to have actual knowledge of the illegal

21   activity.  You're going to hear about that.  I'm not going to

22   read it.  The Judge will tell you very clearly.  There's also a

23   portion of the judge's charge, maybe a little paragraph, you're

24   going to get a copy of it, that talks about the mere presence

25   or even knowledge of the crime is insufficient without actual

1   knowledge.  So you're going to hear about that, and you're

2   going to see about that.

3          Now, I'm asking you to look at the evidence in this

4   case as a legitimate business relationship and to keep an open

5   mind.  However, the government is coming at it from a

6   180-degree difference, right?  Their position is that you

7   should examine every single transaction, every email, every

8   text through a looking glass with kind of like a prism of

9   criminality.  They put everything single thing they say as an

10  indication of guilt.  Whether it's an even amount of money or

11  not an even amount of money; whether they take money out quick

12  or whether they take money out slow.  Each way it's considered

13  criminality in their perspective.

14         Let's give you a little scenario.  Let's say you steal

15  a million dollars, okay?  You decide to steal a million

16  dollars.  You want to do it and think you can get away with it.

17  So you pay the rent to your landlord.  Your rent is, whatever

18  it is, depends where you live, I guess, but you pay the rent to

19  your landlord, and the landlord takes that check that you give

20  him, and he deposits that check into his account.

21         A few days later what does he do?  He decides to take

22  some money out of that same account in cash because he had to

23  go pay his super, who he pays in cash to take care of the

24  building.  What does he also do?  He takes out checks and

25  writes a few checks on that same account with the money that

1    you gave him, that you stole, he writes a few checks to his

2    vendors.  He writes another check to his ex-wife.  He also

3    gives his ex-wife a little cash on the side so that they could

4    take care of whatever business they have together.  And he also

5    decides to write a check to his brother who he owes some money

6    to because his brother had given him a loan a week or two

7    before.  And because it was his brother, there's no paperwork

8    between them.  There was no need to have a written loan

9    agreement, so he decides to write the check to his brother,

10   right?  You stole the money.  You give that money right to the

11   landlord.  The landlord does a check, check, check, check,

12   check, a couple cash here, right?  Has the landlord knowingly

13   participated in a fraud?  Has the landlord knowingly

14   participated in money laundering?  By the way, he doesn't pay

15   you back.  He doesn't like take the money you give him and then

16   he give it right back to you, which would be an indication of

17   money laundering, right?  So that's the way you kind of like

18   hide of the extra hops acts of transactions.

19        The landlord didn't know it was stolen.  He didn't

20   know where the money came from.  He didn't know how you got it.

21   He didn't ask you when you paid him the rent check, where did

22   this money come from?  Did you steal it?  I want to make sure

23   it's all okay.  He didn't do any of that.  He has no obligation

24   to do any of that.  Now, if someone pays you money that they

25   owe you, you don't ask, "Hey, thank you for paying me back.

1     Where did the money come from?"

2              There's a little bit of a difference here, a little

3     hitch.  Granted, if you had a friend who you gave a loan to at

4     some point because this friend, because of Covid, he lost his

5     job.  He was having trouble.  He had no savings.  He spent all

6     of his savings because of Covid.  He's having trouble with his

7     children.  So he needed money.  You give him some money.  You

8     give him a loan.  Okay?

9              The next week he drives up, and he pays you back, but

10    all of a sudden he drives up in a Bentley, a brand spanking-new

11    Bentley that he didn't have the week before.  Then maybe you

12    should say to yourself, you know what?  Maybe you should ask

13    where did you get that money?  Where did you get the money for

14    the Bentley because it is now something that's unusual.

15    According to Mr. Palmer, the expert, this is now an unusual

16    occurrence.  A guy comes from having no money to pay you back

17    in a Bentley.  So that should kind of alert you to the fact

18    that maybe something is not right.

19             This case is only a crime, this case is only brought

20    here because of the testimony of Mr. Adeusi.  Period.  Stop.

21    End of conversation.  The cooperator.  No matter how many times

22    the government -- see, they put him up at 10.  Now they gave

23    you a list of one through ten, they stuck in number 10 because

24    they didn't really want you to focus on him.  But you have to

25    focus on him because without him, there is no crime.  Without

1    him, you don't know what's in Mr. Raji's mind.  Without him,

2    you don't know what Mr. Raji really meant by some of his texts

3    or emails or et cetera.

4           Now they called him a cooperator pursuant to a

5    cooperation agreement.  Now, cooperation has a very nice ring

6    to it.  The kind of thing you'd like to teach your children.

7    Let's cooperate.  It shows a sense of community, a sense of

8    working together, a sense of being nice.  No.  Not here.  Not

9    in this case.  Okay.  This cooperator, the man who testified

10   here before you, is not a nice person who wants to cooperate.

11   He is a criminal.  He was a turncoat, also known as a rat.

12   That's who he is.  That's who he was.  He's only out for

13   himself.  He only wants do whatever he could possibly do to

14   stay out of jail, stay in this country.  And I suggest you saw

15   when -- if he ever gets that chance, he will continue to commit

16   crimes.  His whole life, his whole adult life was about living

17   a lie, cheating people, stealing and somehow getting involved

18   in the criminal world of fraud.

19          These were not spontaneous crimes.  These were not the

20   kinds of crimes that people do because they're desperate.

21   These were well thought-out crimes that this guy Adeusi was

22   involved in.  He made a conscious decision.  It was considered.

23   He weighed the pros and cons.  Should I do it?  Should I not

24   do?  How could I do it?  How could I make the most money?  How

25   could I best succeed?  What's the best idea?  Then he had the

1    nerve during direct examination to start crying in front of

2    you.  Okay?  And what did he say?  He said, "I made a mistake.

3    I feel bad."  That was at page 263 of the transcript, by the

4    way, in case you want to know when he started crying and what

5    that back-and-forth was.  That was not when I was questioning

6    him.  It was when the government was questioning him, and he

7    started to cry.  He said, "I felt bad.  I feel sorry for

8    stealing or helping to steal from the victims.  I'm a changed

9    person."

10           You know, you commit a crime by mistake when you're a

11    drug user who steals money for drugs.  That's a mistake in your

12    life.  That's a bad choice, okay?  You commit a mistake.  You

13    commit a crime.  You make a bad choice when you're a poor

14    mother who steals milk out of the supermarket because your

15    child can't have enough to eat or drink.  That's a mistake.

16    This guy is, was, and will always be, a fraudster:  Someone who

17    his whole life was stealing from other people.  Whether he

18    initiated, whether he hacked, whether he was a middle man.

19    Didn't matter.  He made a conscious life choice, to character

20    trait.  Let's see, how does his mind work?  How did it work

21    when he was involved and he began?

22           He finally, learned he found out about a guy named

23    Bones, that Bones was arrested.  And he learns that federal

24    agents are looking for him.  they called his wife.  They were

25    looking for him.  What did he do?  Did he go at that time and

M9JQraj2                    Summation - Mr. Schneider

1    become a changed person?  Did he call a spiritual advisor?  No.

2    Did he go confess?  No.  did he go search out the police and

3    look for them?  No.  Did he go and live on the straight and

4    narrow?  No.  What did he do?  The first thing he thought of

5    before he got connected to the police, before they actually

6    came to him, was that he destroyed evidence.  Is that the mind

7    of someone who is sorry for what they did?  Is that the mind of

8    someone who feels bad for stealing from people?  No.  That's

9    the mind of someone who realizes, well, wait a second.  I'm

10   about to get in trouble.  I'm about to get nabbed.  I'm about

11   to see what's going to happen when they come put the handcuffs

12   on me.  I have incriminating evidence on my phone.  Let me get

13   rid of it.  Let me make sure that anything that's there is

14   gone, so that I can pretty much say whatever I want, and

15   there's nothing to correct me or contradict me on my own

16   device.

17        He's now to free to make stuff up, which is what he

18   did, and it's a calculated decision.  And the decision from a

19   fraudster is always how can I help myself?  How can I make

20   money?  I guess the question you need to ask is, do you

21   genuinely believe that this is a man who has changed?  Do you

22   believe that he's sorry for what he did?  Or do you believe

23   that when he gets out of this situation, he will go do it again

24   if he thinks he can get away with it.

25        Now, he also -- he's tried to avoid responsibility

1   even today.  How many times he try to wiggle out -- even though

2   he kind of pled guilty because he knew he had to in order to

3   get the deal.  He still tried to minimize his own conduct.  He

4   said at page 265, "I have zero contacts with all the victims.

5   I helped provide an account.  I did not instigate this.  I'm

6   just the middleman.  I did not go to the victim."  That's page

7   305.  "I never had contact with a victim.  I never opened bank

8   accounts.  I never used my ID or fake ID to go to the bank and

9   steal."  Therefore, he thinks he's not guilty.

10          Well, whether he thinks he's guilty or not, he decided

11  what was best for him, the only way he thought he could (A)

12  possibly stay out of jail and (B) possibly stay in the country

13  is get a cooperation agreement, which is Government Exhibit 31.

14  That is something that you should please read because it's

15  really interesting.  Everybody talks -- when I say everybody

16  talks, the witness and the government talk about his only job

17  is to tell the truth.  Nothing is going to help me if I lie.  I

18  have no benefit by lying.  I'm only going to do well if I tell

19  the truth.

20          Well, the fact is, who decides if he tells the truth?

21  Not me.  Not you.  Because the government simply said to him,

22  does your getting a 5K -- is it affected by a jury verdict?  He

23  said no.  So I don't decide who tells the truth.  You don't

24  decide who tells the truth, and Judge Furman doesn't decide who

25  tells the truth.  The only one who decides if he tells the

1    truth is the government.  They decide if they agree to give him

2    a 5K letter.  They decide to give him the benefit.  And this

3    isn't just me staying.  This is Government Exhibit 31, which is

4    the cooperation agreement.  Okay.

5         If you look at page 4 of it, you'll see toward the

6    end, it says, "In addition, if this office determines" -- this

7    office is the government.  "if this office determines that the

8    defendant has provided substantial assistance, and

9    investigation and has fully complied, a motion will be made

10   pursuant to 5K1."  Next page, "It is understood that should

11   this office determine."  Next paragraph.  "it is understood

12   should this office determine."  Okay?  That's not me.  That's

13   not making it up.  That's if the government decides, if they

14   think that what he said was substantial assistance, they'll

15   give him a 5K letter.

16        Now, I want to be clear, there's nothing wrong with

17   that, by the way.  The government is not doing anything wrong

18   by giving somebody a 5K letter.  It's not about them.  It's

19   about the witness.  It's what the witness believes.  He

20   believes he has to satisfy the government.  He believes he has

21   to make them feel like he is a necessary part of their case.

22   So it's not about what the government feels.  It's what he

23   hopes.  It's what he believes.  It's what he wants.  Because

24   that's what's really important here.

25        So pursuant to the cooperation agreement, which is in

M9JQraj2                    Summation - Mr. Schneider

1    evidence, he pled guilty.  Now, pleading guilty is not just a

2    small thing where someone just says, "Did you do it?"

3            "Yes, I did it.  I'm guilty."

4            He was put under oath by a federal magistrate judge,

5    okay?  He was sworn to tell the truth.  He admitted to bank

6    fraud, to wire fraud, to marriage fraud, to immigration fraud,

7    to destroy evidence.  He admitted all of those crimes under

8    oath.  "I swear to tell the truth."  And he was told, and he

9    was, in the actual agreement Government Exhibit 31, he was

10   facing a possible sentence of 145 years in jail.  And

11   deportation.  And restitution to the victims.  And forfeiture

12   of the money he got.  But all he has to do is tell the truth,

13   according to him and according to the government, right?

14           Now the government always says, and they'll continue

15   saying, and they'll probably say it again when I sit down, that

16   he only will have the benefit if he tells the truth; that he

17   doesn't have any benefit by lying.  And again I say to you, it

18   is whatever he, the witness, believes.

19           Now, this marriage fraud that he admitted to under

20   oath, let's be very clear.  He paid a United States citizen, a

21   woman to marry him so he could stay in this country, he

22   believed, legally, which is really illegal, but if you marry --

23   if you legitimately marry someone as a citizen, you can stay

24   here.  So he admitted that.  He said under oath to a judge, "I

25   stayed here illegally after I paid a woman, a U.S. citizen,"

M9JQraj2                    Summation - Mr. Schneider

1    right?  Same thing with the immigration fraud clause because

2    once you try to get your immigration papers, he lied in those

3    documents which are under oath, sworn to under penalty of

4    perjury that I'm a citizen, I married a U.S. citizen.  The

5    marriage is good.  The marriage is valid.  The marriage is

6    legal.

7           Well, except -- so this happened when he pled guilty.

8    This is in 2019.  Cooperation agreement.  Then all of a sudden

9    as time goes on, he begins to convince himself, you know, maybe

10   I don't know that I want to be guilty of marriage fraud.  Maybe

11   I didn't really commit marriage fraud.  Maybe immigration fraud

12   is not really so.  So he begins to convince himself that he did

13   not commit marriage fraud.  And he begins to have a series of

14   conversations with the prosecutors, these and other

15   prosecutors, and his lawyer -- I want to be clear, he always

16   had a lawyer representing him in these conversations -- that he

17   began to rethink, I want to maybe withdraw my guilty plea.  I

18   want to decide and maybe go to trial.  But in some of these

19   meetings, he was told by the prosecutors that you're doing a

20   great job as a cooperator.  You should stay as a cooperator

21   because if you don't, you're going to go to trial.  You're

22   going to lose.  You're going to go to jail.  You're going to be

23   deported.  Those are all problems, okay?  And he was a little

24   iffy because at some point during my cross he said he didn't

25   even know what a 5K letter was.  He didn't know what was

M9JQraj2                    Summation - Mr. Schneider

1   actually in the agreement, but it doesn't really matter much

2   about that.

3         Now, the government said on their direct examination

4   of him that there are no promises made to you, Mr. Adeusi,

5   about what your sentence will be.  There's no promise.

6   However, let's remember, you have heard testimony page 298,

7   304, 307, 309, 314, all over the place, where the government

8   was trying to convince Adeusi to maintain his cooperation.

9   Even though he pled guilty, they were trying to convince him,

10  you know what?  You're making a mistake.  You can do it if you

11  want.  It's your choice to withdraw your plea.  You have a

12  right to go to trial, but if you do, you're going to go to

13  jail.  So I think -- I being the government -- or we think you

14  should do everything you can to try to maintain your

15  cooperation.

16        Except on November 19 of 2020 in a meeting government

17  he specifically said, "I have never committed fraud."  He

18  didn't say, "Well, maybe.  I'm not so sure.  Maybe I did this,

19  but I didn't do that."  Now, the government -- actually Defense

20  Exhibit right -- the government has exhibits up the wazoo.  I

21  got one, one piece of paper or two pieces of paper, one

22  exhibit, a stipulation, where you'll read it, you'll see it.

23  It's admitted.  You'll be able to see it.  He specifically says

24  that on November 19, 2020, he said in a meeting, "I have never

25  committed fraud," in addition to other things.  So the

1    government's position is that, well, at that time, he wasn't

2    feeling great.  He wasn't sleeping.  He was a little confused.

3    But even so, he still maintained the next month, on December of

4    2020, he still told the prosecutors, "I'll go along with the

5    plea, but only if the marriage fraud and the immigration fraud

6    are not included because I still think I didn't do those

7    things."  He thought -- not he thought -- he said to the

8    prosecutors in December of two years ago he did not commit a

9    fraud.  What does all of this mean, the fact that he said all

10   is this?  It means the truth doesn't matter to him.  It means

11   when he swears he did something, it doesn't matter because he

12   was under oath in front of a magistrate judge when he said he

13   did it.  When he said no promises were made to me to get this

14   to continue to cooperate, not really true.  There were promises

15   that the government would try -- not promise -- but they would

16   try to look into maybe getting him an S-1 visa to maybe stay

17   here.  They would try to delay any sentencing.  They would try

18   to do that for him.  It all matters because it all shows that

19   he was interested in what he can do for himself at that moment.

20          What do I have to say is what he's thinking.  How do I

21   have to say it?  Let's remember, hope is the word that really

22   dictates the cooperation agreement.  Hope the judge gives him a

23   good sentence.

24          Now, didn't you think it's a little odd that Bones had

25   approached Adeusi for a scam out of nowhere?  According to

1    Adeusi, he had never done this before, and Bones had no reason

2    to think he was a scam artist.  So why all of a sudden would he

3    come to this guy and say, "Hi, how you doing?  You want to get

4    involved in a scam?  I don't know you from a hole in a wall.  I

5    don't know you," but I'm asking you get involved in a scam?  I

6    doesn't make any sense, unless, of course, he, Adeusi has been

7    lying to you and had been involved in scamming well before

8    Bones got involved.

9         Now, he told you about a whole lot of other of

10   scammers, Adeusi did.  A guy named Naandi, the guy who drove

11   the Bentley, was very successful, who was interviewed by the

12   FBI.  A guy named James Dwight, who is the biggest fraud of

13   all.  A guy named Ayo, A-Y-O, very, very big frauds.

14        So one of the things he said, I think it's one of the

15   exhibits the government played for you during summation was he

16   went -- he meaning Adeusi -- reached out to Mustapha because

17   Mustapha liked big frauds, right?  Mustapha like the big deals,

18   the big situations, right?  Except for the people I just

19   mentioned, Naandi, Dwight and Ayo, all three of them had done

20   scams with this guy before, had done big scams, the biggest;

21   not just big, but the biggest scams he knew about.  So there

22   was absolutely no reason in the world for you to believe that

23   Adeusi ever approached Mustapha Raji in 2017 or '18 to use this

24   him to get accounts.  He didn't know him.  And once he knew

25   him, you'll find out in a few minutes, he was not successful.

M9JQraj2                    Summation - Mr. Schneider

1    So there's no reason to think that at all.

2              So let's look at his relationship -- meaning Adeusi's

3    relationship -- with Mustapha.  He says he met him in 2017

4    because Ugo wanted him -- him meaning Adeusi -- to go call,

5    right?  So Adeusi is there one day.  Ugo calls him and says,

6    "Listen, I need you to call a guy Mustapha Raji because he's

7    not calling me."

8              So I said to Adeusi, "Well, did you know Mustapha Raji

9    before?

10             "No.

11             "Had you ever spoken to him before?

12             "No.

13             "Had you ever met him?  Had you ever heard of him?

14             "No.  No.  No.  No.  No."

15             So think about it.  Why in God's name should you

16   believe that this guy named Ugo ever asked Adeusi to reach out

17   to Mustapha Raji?  Why would Raji even talk to this guy?  It

18   makes no sense, and there's no evidence to connect them at that

19   time in 2017.

20             But he says, "All right, he spoke to me.  I reached

21   out to him."

22             "And what was his response?

23             "Don't worry about it, I'll call him," according to

24   Adeusi, right?

25             But let me ask you something.  Now, on direct

M9JQraj2                    Summation - Mr. Schneider

1    examination, he was pretty clear.  This happened in 2017,

2    right?  He didn't say, "I'm not sure.  I'm not sure.  I don't

3    remember."  He said 2017.

4              Well, when I confronted him on cross-examination about

5    the dates when he says he first met him, and I said, "Was it in

6    2018?  Didn't you tell the prosecutor that you told -- didn't

7    you tell the prosecutors that you met Mustapha Raji in 2018?"

8              Here's his answer:  "Well, that might be a mess up.

9    Maybe I don't remember."

10             Then at page 334, lines 14 to 17, this is what he

11   says, "What I'm saying as regards to the date and the year,

12   umm" -- hesitation -- "I was probably just don't know when,

13   maybe" -- hesitation -- "it might be a little bit" --

14   hesitation -- "a little"-- hesitation -- "let me say that"--

15   hesitation -- "a little confusion with that year."

16             Now, that's something that you just can't ignore.  And

17   it wasn't like I said to him, "well Was it three and a half

18   inches or three and a quarter inches?  Was it green or

19   greenish-blue?"

20             No, these were years.  And I didn't even ask the month

21   or day.  It's not like I said, "Was it a Tuesday afternoon?"  It

22   was the year, and he says he didn't know.  Then he says the

23   next time he dealt with him -- meaning Mr. Raji -- was in the

24   summer of 2017.

25             By the way, we know that nothing happened in that

1    first conversation between Ugo and Mustapha and Adeusi.  So in

2    the summer of 2017, there's $150,000 scam where Ugo said,

3    "Wells Fargo."  You'll remember, it was during direct.  And

4    that was another scam that was not successful.  It didn't

5    happen.  Adeusi did not get any money.  He did not get paid.

6         When I asked him, "What's the name of the Nigerian guy

7    who started this?  The main guy."  He didn't know.  He didn't

8    remember the main Nigerian name.

9         And here it is.  So, once again, Mr. Raji did not come

10   up with any money at all.  He didn't have any money for the

11   Nigerian, no money for Adeusi, no money for Ugo, no money for

12   anyone.  Nobody got paid in this supposed scam.  So again, it's

13   the same old story.  Adeusi said very clearly that he even

14   reminded Ugo, he said remember, "This guy Raji, he didn't come

15   through the first time when we tried to do it last time?"

16        And Ugo said, "Don't worry about it.  He's okay."

17        So, by the way, there's a photograph of an IHOP, okay,

18   and there's some evidence of a search on Mustapha's computer

19   that had to give an address, the address is the IHOP.  There's

20   no dispute that they know each other.  Mustapha is in his

21   phone.  They have contact.  There's email.  There were text

22   messages.  Okay, there's contact.  It doesn't mean there was

23   contact for this crime that was involved for the $1.7 million.

24        Ask yourself why would Adeusi ever use Mustapha at

25   all?  Why would you trust him?  He had so many other contacts.

M9JQraj2                      Summation - Mr. Schneider

He had so many other contacts who were much bigger, who were
more reliable, who paid him, who would, in fact, had successful
deals so Adeusi could make the money that he wanted to make as
a fraudster.

          So after he's approached, after Adeusi is approached
by agents in August of 2018, he reaches out to Mustapha asking
for money.  He asking for a lawyer.  Mustapha said, "Of course.
No problem.  Don't worry about it."  And once again, Mustapha
doesn't give him money.  Doesn't give him a lawyer.  Just like
in the past.  Again, I suggest to you that there is no reason
in the world for Adeusi to ever think that Raji would ever do
anything with him.

          Now, the $1.7 million scheme.  In the summer of 2018,
Femi reaches out to Adeusi.  Who does Adeusi call?  Does Adeusi
call Naandi?  No.  Does he call Bones, Ayo, James Dwight?  No.
No.  No.  Those are the biggest guys who have done successful
schemes in the past.  They are the ones who you think he would
call.  They're the ones who have paid Adeusi in the past when
he made his money.  Not Raji.  Here we have Raji who has never
given this guy a penny.  You have all these other guys who have
paid him every time they've been involved in scams.  According
to him, he got paid.

          It was interesting, on redirect the government got up
and said, "Well, you didn't call Naandi, right?"

          "Right.

1    "Well, isn't Naandi -- wasn't Naandi -- isn't Naandi

2   in jail?"

3          So he said yes.  So that leaves you with the

4   impression on redirect, the impression that the government

5   tries to leave with you is that the reason Adeusi didn't call

6   Naandi in 2018 for the 1.7 million scheme was because Naandi

7   couldn't help him because Naandi was in jail.

8          So on recross, I asked him, "Isn't it a fact that

9   Naandi was not in jail in 2017, and he was not in jail in

10   2018?"  So the government on redirect left you with a

11   misimpression that, in fact, Naandi couldn't have done it, when

12   in fact this witness told you that Naandi could have.

13          So he doesn't call Naandi or Bones or Ayo or James

14   Dwight.  He calls the one guy, the one guy he met one time, the

15   one guy who didn't return his calls, the one guy who never gave

16   him any money, the one guy who has clearly not been a

17   successful scam artist with him.  What does Adeusi say?  He

18   says, "I'm hoping to make $20,000."  Sounds like it's not much

19   work for 20,000.

20          But then all of a sudden out of nowhere, he comes up

21   with this whole four, four, two scheme, right?  This 40 percent

22   of the money goes to the sender.  40 percent of the money goes

23   to the account holder.  And 20 percent he said will go to me,

24   Mustapha Raji, Femi and a guy name Ade, A-D-E, also known as

25   Prince.

M9JQraj2                    Summation - Mr. Schneider

1          So I did a little bit of math.  40, 40 and 20 of 1.7.

2     That means, if you do the percentages, do the math, the sender

3     of the email is supposed to get $680,000.  The account holder

4     supposed to get $680,000.  And the other four people are

5     supposed to get 20 percent, which is $340,000 divided by four,

6     equals $85,000 each.  So where did this 20,000 come from that

7     he just said?  If you believe his four, four, two theory that

8     he was due $85,000, he just makes stuff up.  He makes up

9     conversations.  He makes up deals.  He makes up dates.

10         And just a few moments ago, Ms. Ghosh got up and said

11    that the most damning evidence is the WhatsApp where they say

12    "We keep 30 percent.  Thank God."  That's between Adeusi and

13    Mustapha Raji.  Mustapha said, "Thank God.  We keep

14    30 percent."  Again, do a little bit of math.  30 percent of

15    1.7 is $510,000.  That makes no sense in anybody's calculation

16    of any testimony you've heard whatsoever.

17         Now, once again, after this scheme supposedly happens,

18    this 1.7 supposedly gets into Unique Bamboo's account, they

19    can't reach -- he, Adeusi, is trying to reach Mustapha, he

20    says, ten times, over ten times.  "I leave a message.  He

21    doesn't return my calls.  I leave a message."  Same thing

22    happened again.  They have this conference call.  "don't worry

23    about it."  They meet at the IHOP.  "don't worry about it."

24         Now, Adeusi said he remembers a number of different

25    conversations he had with Mustapha, with Femi, with Ade, with

M9JQraj2                    Summation - Mr. Schneider

1    Ugo, all of them.  He says he remembers these conversations
2    from five years ago, 2017 and 2018, four years ago.  Now, let's
3    remember, at the time he's having these conversations, he was
4    not a cooperator.  He was not involved in government law
5    enforcement.  He was committing scams every day of his life
6    with different people.  He's having conversations with you,
7    you, you and you about each scam to make sure it's going to
8    happen, see if it's going to figure out.  So these were
9    run-of-the-mill conversations.  Talking about the Alibaba,
10   talking about four, four, two.  These are all conversations,
11   over 20 people he's dealing with having conversations all the
12   time.  So he didn't know he was going to get caught.  He didn't
13   know he was going to become a cooperator.  He didn't know he
14   was going to have to testify.  He didn't know he was going to
15   testify years later.  At the time he's having these
16   conversations that he says he remembers speaking to Mustapha
17   Raji about specifically in 2017 and 2018, there's no
18   recordings, no notes, no diaries, nothing to help him refresh
19   his recollection.  And there should be no reason to.  It's not
20   like he's expecting to testify and saying, "Wait a second.
21   This is an important conversation I must remember because when
22   I'm called by the government to testify in front of Judge
23   Furman in 2022, I'm going to have to recount these
24   conversations."  He didn't make notes, and he doesn't remember
25   the conversations because he has no reason to remember.

1          On redirect examination when he was asked specifically

2      and confronted about the conversations I said that he had,

3      which is Defense Exhibit A, Mr. Sobelman got up and said,

4      "Well, these conversations you had with the prosecutor, they

5      were two years ago.  You don't remember the specific words.

6      Nobody was taking notes."  Well, if he can't remember those

7      conversations, which are very important to his life at the time

8      because it's about his freedom, how could he be expected to

9      remember conversations he had years before which were

10     insignificant, which didn't matter to him at that point?

11         Let's remember, the government's exhibit about the

12     text messages between and emails whatever between Mustapha and

13     Adeusi all happened after he was a cooperator, 2019.  There's

14     no code words.  There's no use of any words indicating any

15     involvement at all that he was involved in the 1.7.  There's

16     actually no discussion.  Don't you think that Adeusi would say

17     to him, "Wait a second.  You still owe me money from before.

18     Where's my money from before?"  There's nothing about that.

19         Now some of the charts -- I'm a little inadequate here

20     because I don't have PowerPoint.  I don't have that technology

21     in my DNA.  But I can show you a couple of charts that are in

22     evidence, I guess I'll just show you my age here now.  I still

23     use hard copies and write things down.  So it's really

24     important, ladies and gentlemen, not to confuse and not to

25     confabulate Mustapha Raji, the guy sitting there, with Unique

M9JQraj2                    Summation - Mr. Schneider

1   Bamboo, okay?  Yes, he, Mustapha, was the vice-president, okay?

2   But he did not have access to the funds.  He did not have

3   signatory power.  He did not have -- he was not authorized to

4   write or send wires in any manner, shape or form.  Do not

5   confuse him with, not just Unique Bamboo, but with Nancy

6   Martino-Jean.  She was the one who was the authorized user of

7   Unique Bamboo.

8          Now, the prosecutor was right.  At the end of

9   cross-examination, she said, well, Mr. Schneider is going to

10  get up here and say that she knew I would say that it's all

11  Nancy -- all Martino-Jean.  It's not Mustapha.  Well, the

12  reason she knew I would say it is because it's true because the

13  government hasn't shown the difference between Nancy and

14  Mustapha, and they want you to just talk about them as one

15  entity.  They are not.  Please, do not speculate because I

16  think at one point she used the phrase that Mr. Mustapha --

17  Mr. Raji and Nancy, they shared the account.  Okay.  No.  No.

18  There's no evidence that he shared the account; that he had the

19  power to deposit, distribute or in any way write checks or wire

20  or anything like that.

21         So Government Exhibit 501, which you will see, you

22  looked at the same thing here, boom, boom, boom.  It talks

23  about 50,000 going to Unique -- 50,000 going to Mustapha from

24  Unique.  There's no attempt to hide that at all.  780 went to

25  Down Home Title in Oculina Bank.  It's all here on Government

1   Exhibit 501.  But then if you look at Government Exhibit 212,

2   212a, which is the attachment and client information sheet, it

3   has Mustapha Raji's name, his phone number, his email address.

4   There is no effort by him to try to hide anything.  212a, page

5   2 has Unique Bamboo with the same phone number as Mustapha, and

6   the same name as Mustapha, but the bank is Oculina Bank, okay?

7   He uses a passport.  He shows a passport with a photograph on

8   page 4, okay?  The government wants you to believe that it's

9   his account.  Well, it's not, because this does not show

10  anything like that.  The documents you have seen in 212 and

11  212a do not show that he has the ability to buy and sell, to

12  deliver, to withdraw, to send anything out that of account.

13  The paperwork only shows him acting as vice-president.  He has

14  no signatory powers at all.  And if you remember the

15  stipulation S-9, the bank records, there are no bank records at

16  all for Down Home Title Services.  There's no money that goes

17  from him out to any other account and then directly back to

18  him.

19          It's also kind of a little annoying.  They have here

20  2,400 to three recipients.  It makes it looks like it's one of

21  those even numbers, makes it look like it's something illegal,

22  improper.  Then when I cross-examined the agent about this, he

23  said, "Oh, yes, we were able to check and we were able to see

24  who those recipients were."  Well, there's no improper about

25  those people.  There's nothing improper about those names and

M9JQraj2                     Summation - Mr. Schneider

1   the people who received that money.  So it also shows the same

2   thing $47,000 to three other recipients.  Again, not

3   identified.  When you look at it like this, it looks

4   incriminating:  47,000 to three unknown people.  But they were

5   known people and the records reflect that completely.

6          502 is Unique Bamboo.  Here it is.  There's no money

7   that goes here -- that goes out to Mustapha and comes back to

8   him at all.  Timothy Oyewole, Suntrust Bank, $7,500 withdrawal,

9   $1,200, all of these, Government Exhibit 105A, B, C, D, they

10  are all not incriminating pieces of evidence.  It's very clear.

11  There are no corporate records for Comcristal Company.  There

12  are no bank records for other years other than what they have

13  here.  There's no evidence anywhere that any money ever went

14  from him back to him again.

15         M.L. Morris, this is 503.  M.L. Morris or Marvin

16  Morris is a person.  If anything, it just shows it's a

17  legitimate business deal.  It's the account opened in 2016 with

18  deposits, withdrawals, with wire transfers.  By the way, they

19  only showed you one month, August of '18.  Misan Megbuluba,

20  again, no corporate documents.  They're trying to make it look

21  like there's something wrong, but there's nothing wrong.  The

22  documents do not support any illegal activity by him for his

23  individual participation in any of those in anything other than

24  legitimate businesses.  The key is also there is not one piece

25  of chart evidence, documents, records that show he put money in

M9JQraj2                   Summation - Mr. Schneider

1     an account, and then somehow that money went right back to him,

2     which is what you saw in Nancy Martino-Jean.

3          The government made a big deal of Exhibit 504 that the

4     Comcristal sent money to Timmins Property Limited.  And they

5     said, "Aha, that's Mustapha's brother, Dauda Raji."  I'm sorry,

6     I didn't know it was a crime to send money to a company in a

7     country where you live in Canada to your brother who has a

8     company.  There's no evidence that that money was ever sent

9     back to Mustapha as a way to try to hide it as an extra hop,

10    try to hide the transaction.  There's no evidence anywhere that

11    Dauda or Timmins ever gave that money back to Mustapha at all.

12         Government Exhibit 505 shows a lot of arrows, a lot of

13    money going from Unique to Nancy and back to Unique.  Again,

14    the government is right, there's overwhelming mountains of

15    evidence.  They're convincing, these charts.  They're

16    compelling, these charts.  Evidence of Nancy Martino-Jean's

17    guilt; not Mustapha.

18         Now, there was some discussion about red flag typology

19    regarding money laundering.  Well, these red flags are ways for

20    banks and law enforcement to try to investigate, to draw their

21    attention to possible suspicious activity.  The whole idea of

22    money laundering is what?  It's the use of financial

23    transactions to conceal the origin or the destination of

24    illegally obtained funds.  These kinds of red flags or

25    typology, are kind of consciousness of guilty, I would say.  If

M9JQraj2                    Summation - Mr. Schneider

1    you do some of these things, two or five of them, these are all
2    indications, indicia of your guilty knowledge of the money
3    laundering scheme.  Well, let's not forget some of these --
4    let's call these white flags.  How about consciousness of
5    innocence.  He has never once used an alias.  He has never once
6    used anything but legitimate ID when he opened or closed any
7    accounts or had anything to do with any money.  He used a
8    driver's license.  He used a passport with a photo.  Not
9    expired, not somebody else, take a photograph and stick it on
10   it and forge it, and he use it himself.
11          Now, the whole idea of money laundering is because you
12   want to have a lot of money and hide it, right?  Also, by the
13   way, he used his date of birth and his address so they could
14   find him so they could investigate if anybody wants to.  Date
15   of birth is a very serious way to investigate somebody's
16   background.  So, if you're a money launderer, you would think
17   that somebody's lifestyle would be relevant to how -- if they
18   have money and if they made the kind of money that, according
19   to Adeusi, Mr. Raji supposedly made.  Well, where is his real
20   estate?  Where are his houses?  Where is his property?  Where
21   is his fancy jewelry?  Where is his cash?  Where is his safe
22   deposit boxes that he supposedly keeps all this illegal stuff
23   in?  Where are his cars?  Where's his Bentleys?  Where's his
24   artwork on the wall to hide his money?  Where is his lavish
25   travel?  There's not one of those things present here to show

M9JQraj2                           Summation – Mr. Schneider

1    you that he has any connection to this kind of money laundering

2    involvement.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SCHNEIDER:  His lifestyle, or lack thereof, has to

2     be some typology of a red flag, right?

3          Government Exhibit 103D, TD Bank, on the same day,

4     August 2, the same bank he withdrew 10,608.  Is that an even

5     number?  It's not one of those zero, zero, zero numbers,

6     10,000.  It's also over $10,000.  It's CTR, one of those forms

7     that alerts the bank, according to the agent, right?  According

8     to the agent.

9          So he took out 10,608 and 5,000 from the same day and

10    the same bank.  Both of those things, according to the expert,

11    are indications of not money laundering.  Okay?  Where are the

12    other ones like cashier's checks in money laundering,

13    traveler's checks and opening prepaid cards?  Those are all

14    indications of money laundering that are not present with

15    Mr. Raji.

16         Now, this security document, security agreement, now,

17    first of all, just a few moments ago, there was an indication

18    that, according to WhatsApp, the government said that Nancy and

19    Mustapha were coming up with a plan, a cover, and what's it

20    going to be.  And if you look at the text it says, commodities

21    and investments.  Commodity.  There was no discussions in those

22    texts about a security agreement, was there?  There's nothing

23    about the agreement at all.

24         Now, I have to say, they put up on the screen, the

25    securities agreement on one side, and the agreement -- the last

1   page with the notary stamp.  I don't believe the stamp.  What

2   good are those documents?  How are those backdating forged

3   documents meaningful?  Nobody signed them.  They're blank.  So

4   even if you believe that somebody put a fake notary there, big

5   deal.  They could not be used because you need signatures above

6   the notary.

7          So, number one, where is the notary?  Okay.  Where is

8   that person?  Why didn't he come in here and tell you anything

9   that he didn't notarize that.  Number two, how do we know that

10  it was backdated?  I mean, we know that it came after July 2nd,

11  but you don't know when it was written.  It could have been

12  written on July 2nd, even though it was sent sometime later.

13  And what good is a document without the signatures?  And we

14  know for a fact it was never presented to anybody, so what's

15  the fact -- what does it mean?  It means nothing at that point.

16         Now, if you take money out of a bank account and put

17  it back in the same bank account, that person's interest is

18  involved in layering.  Okay.  Not Mustapha Raji.  There's no

19  evidence that he ever did any of that.  Did he ever go into

20  multiple branches of the same bank and make unusual deposits?

21  No.  Was he ever part of a group of people who entered a bank

22  together and deal with them at the same time?  No.  Did he ever

23  use a bank that was not geographical reasonable?  No.  Did he

24  ever have multiple safe deposit boxes?  No.  No money ever went

25  out of his account and then went back into the same account.

1          There's no evidence that any company or account is a

2     shell company that he controls.  He used legitimate

3     identification and returned.  He used legitimate information

4     when requested.  He did not deny banks information.  They asked

5     for information, he gave it.  He was not trying to conceal.  He

6     was not trying to hide the origin or the destination of any

7     money.  This whole thing about the taxes.

8          Now, you know, if I want to hide money, I don't want

9     to draw attention to myself by not filing taxes because then

10    the IRS will know.  Wait a second.  Why aren't you filing

11    taxes?  Now, I can understand, if he files taxes in 2017 and

12    did not include the fraud money on those taxes, that's an

13    indication that he knows, uh-oh, I better not do that.  But him

14    not filing taxes doesn't mean anything.  If he had filed and

15    didn't declare it, that's something you should be concerned

16    about.  That's something you should worry about.

17         I'm going to try to talk to you person to person, not

18    lawyer to jury.  Because I'm going to ask you to do something

19    that's really challenging now.  Because I have to say, no

20    matter what I say, there's no doubt that some of you may feel

21    in your gut, you may think that he's guilty.  You may.  So I'm

22    going to ask you to step outside that comfort zone, follow the

23    law, not your gut.  Follow the evidence, not your feeling.

24         The government spent so much time and effort and

25    witnesses and charts and his involvement in crimes that he's

M9J6RAJ3                      Summation - Mr. Schneider

1    not charged with.  Please remember that.  He is not charged

2    with the St. Francis crime; he is not charged with the Southern

3    Oregon University crime.  Mr. Larvick, Mr. Floyd, who

4    testified, okay, that was just raving on the government's case,

5    not related to the 1.7 million.

6            And, again, person to person, not lawyer to jury, in

7    the real world, if you step outside this courtroom, there's no

8    doubt that if you have a gut feeling you would say, you know,

9    he did it before, he must have done it again.  He did it in

10   2018 -- earlier, he must have done it.  That's outside, there.

11   I know people say where there's smoke, there's fire.  I know

12   people say and think if you're a criminal once, you're a

13   criminal twice.  But this is the hard part, the challenging

14   part, right now, because the judge during that testimony gave

15   you very specific instructions that the purpose was very

16   limited.

17           And the judge will tell you again at the end of the

18   case that the purpose that they introduce St. Francis and

19   Southern Oregon University was for a very specific limited

20   purpose.  But I'm afraid that you're going to go past that, I'm

21   afraid you're going to say criminal propensity.  I'm afraid

22   you're going to say he's a criminal, therefore, he committed

23   this crime.  It's reality.  And you have a right to think that

24   out there.

25           The judge is going to tell you that that evidence is

1    not a substitute for evidence of the crimes charged here.  The

2    judge told you, and will tell you again, you are not to show or

3    think that because of that, he is a criminal, and therefore he

4    must have committed this crime here.  Do not get overwhelmed by

5    the documents.  Just peal them back.  Okay?  Just remember this

6    is about him, not about Nancy Martino-Jean.

7            Can you, in this courtroom, in good conscience, say

8    right now -- because you're not outside, you're in here -- I

9    believe he is innocent now.  I believe after Schneider sits

10   down and after Judge Furman gives the charge, he's innocent.

11   As you get up and walk into the jury room and decide -- begin

12   to decide your deliberations, can you say to yourself he is

13   innocent?  Because the judge will tell you -- the judge will

14   tell you that he is presumed innocent throughout all of that.

15   You begin your deliberations by saying he's presumed innocent.

16           Can you honestly say to yourselves, it's not whose

17   evidence binder is bigger.  They have a lot of evidence, a lot

18   of exhibits, but you don't have to.  The judge will tell you

19   that.  The burden of proof means not who has more, whose is

20   heavier, it's the quality of the evidence, of the testimony.

21           Can you honestly say to yourself, I would have liked

22   to have heard what he would have to say for himself, I would

23   have liked for him to testify, I'd like to hear his side of the

24   story, because that's his right, Fifth Amendment right not to

25   testify, not to present a defense.  You're going to hear about

1    conspiracy and what the requirements of conspiracy are.  The

2    judge will tell you that.

3            If some of you had loved ones sitting in that chair,

4    if someone you loved were charged, would you be satisfied by

5    the proof in this case?  The government would.

6            The government will get up after I'm done.  I ask you

7    to do what I asked you to do at the beginning of the case,

8    focus on the evidence, your common sense, follow the

9    instructions.  I'm confident if you do all of those things, if

10   you focus on him, not necessarily just Nancy Martino-Jean, and

11   if you focus on the burden of proof and the presumption of

12   innocence, and beyond a reasonable doubt, you'll find

13   Mustapha Raji not guilty.

14           Thank you very much.

15           THE COURT:  Thank you, Mr. Schneider.  All right.

16   We're going to go directly into the government's rebuttal.  As

17   I said, the government gets the last word, or among the

18   lawyers, the last word.  My last word is my instructions.

19   We'll proceed with the government's rebuttal and then a short

20   break before I give you instructions.

21           MS. KAMAL:  "Thank God."  "Let's start moving it".  We

22   keep 30 percent."  And notice at the very end, this is just

23   below the page break on Government Exhibit 302, "I can't talk

24   about it on the phone."  That's what the defendant said to

25   Nancy Martino-Jean as soon as the money stolen from Marble Arch

1    hit the bank account.

2            "Let's start moving it."  "I can't talk about it on

3    the phone."  Who says that?  The person who says that, ladies

4    and gentlemen, knows they are committing a crime.

5            Now, Mr. Schneider just spoke to you, and he's a

6    great, effective advocate, but he's not a magician.  So he

7    can't make all the evidence you see in this case just

8    disappear.  Ms. Ghosh walked through with you all the evidence

9    in this case.  She tied together the text messages, the

10   e-mails, the bank records, she gave you the ten reasons you

11   know the defendant is guilty.  But let me be clear of one

12   thing:  Defense counsel could have said nothing at all in

13   response to Ms. Ghosh.  I mean, the defendant has no burden at

14   this trial, none whatsoever, not even now.  We, we, bear the

15   burden of proving the defendant's guilt in this case and in all

16   cases.  It's our burden and we embrace it.

17           But when defense counsel makes arguments or tries to

18   distract you from the evidence, we are entitled to respond, and

19   this is our opportunity.  So in my brief time with you -- I'm

20   not going to address every argument that you heard from

21   Mr. Schneider because I don't really need to -- but I would

22   like to address just a few key points.

23           So, now, Mr. Schneider tried to paint the Marble Arch

24   transaction as though it were some common transaction with your

25   landlord.  He got money from the Unique Bamboo bank account,

M9J6RAJ3                    Summation - Ms. Kamal

1   $50,000, and that was just like someone paid rent to their

2   landlord.  They got a payment.  They don't know where their

3   landlord got the money from.

4           Ladies and gentlemen of the jury, we're all

5   New Yorkers.  We all had landlords.  Does your landlord send

6   all their bank account and banking information from multiple

7   accounts?  Do you tell your landlord when they're going to get

8   a $1.7 million wire into their bank account?  Of course, not.

9   It doesn't make sense, and it certainly doesn't fit the facts

10  that you've heard and learned in this case.

11          That's all part of Mr. Schneider's attempt to make you

12  believe the defendant didn't know that he was participating in

13  a fraud, that he believed everything he was participating in

14  was legitimate, that that $50,000 was a just loan payment.

15  This was real business.  He wants you to believe the only

16  evidence the defendant knew this was fraud and knew this was

17  money laundering comes from the cooperating witness,

18  Mr. Adeusi.  And according to Mr. Schneider, Mr. Adeusi can't

19  be trusted to tell you the truth, even when he is corroborated

20  by text messages and Google searches.

21          Ladies and gentlemen, I'd like you to indulge me for

22  just a minute, for a minute or two.  Let's pretend Mr. Adeusi

23  never testified at this trial at all, because here's the thing,

24  you don't need Mr. Adeusi's testimony to find the defendant

25  guilty.  Focus on the defendant's own words instead.  Focus on

1      the documents he sent and the text messages he sent and

2      received.  Let's go back once again to Government Exhibit 302

3      at Pages 26 to 27.  This is that text I just read to you.

4      "Let's start moving it."

5             Why, if this money is legitimate, why does it have to

6      be moved out?  Why can't it just stay in the business bank

7      account of Unique Bamboo?  Because it's stolen money.  It's

8      fraud money.  The defendant knew that, and now you do too.

9      Because you have seen the bank records, the bank records and

10     the flow charts that show Nancy doing exactly what the

11     defendant told her to do in Government Exhibit 302.  She's

12     moving that 1.7 million.  She's trying to hide it.

13            You see the defendant getting his $50,000 of that

14     Marble Arch money.  And his cut, notice his is one of the first

15     to go out.  It's in that big tranche that goes to the other

16     Unique companies.  You see the e-mail, the e-mail where the

17     defendant is sent a fake contract between Marble Arch and

18     Unique Bamboo from someone named Pierre.  He was told to get in

19     touch with Pierre by Nancy, and he sends back the fake notary

20     page the defendant attached to that fake loan and security

21     agreement.

22            Why?  What is the point of that cut-and-paste job with

23     that security agreement between Marble Arch and Unique Bamboo?

24     It's there to try to convince the bank that is now trying to

25     pull back that 1.7 million, it's trying to convince the bank

1   that this wire in the Unique Bamboo account was legitimate.

2   But it wasn't.  The defendant knew it, and now you know it.

3          You have also seen the WhatsApp.  You have seen the

4   messages between the defendant and Nancy in 2019.  You've seen

5   the messages between the cooperator, Mr. Adeusi, and the

6   defendant's brother, right after the Marble Arch wire was sent.

7   That's also in 2018.  And you've seen the text messages between

8   the defendant and the cooperator a year later in 2019 where the

9   defendant jumps at the chance to work on another e-mail scam

10  with Mr. Adeusi.  You have seen text messages before the Marble

11  Arch fraud and after the Marble Arch fraud that showed the

12  defendant's real business is laundering stolen money, money

13  that has been stolen from e-mail accounts.

14         These text messages, e-mails, and bank records tell

15  you everything you need to know, and it is this:  The defendant

16  knew exactly what he was doing, and he knew he had to hide it

17  because he was breaking the law.  And, really, ladies and

18  gentlemen, none of that evidence relies on Mr. Adeusi's

19  testimony.  It doesn't.  The text messages, the bank records

20  between the defendant and Nancy, between Mr. Adeusi and his

21  brother, this is overwhelming evidence, and not one word of it

22  came out of Mr. Adeusi's mouth at this trial.

23         So if you want to hold onto our little thought

24  experiment here and forget Mr. Adeusi ever testified at trial,

25  you still have nine different reasons, which separately or a

M9J6RAJ3                    Summation - Ms. Kamal

1    part, separately or together, lead you, must lead you, to the

2    conclusion that the defendant is guilty.

3           Now, Mr. Schneider spent a lot of time talking about

4    Mr. Adeusi.  So I'm going to address a little bit of that.  He

5    spent more time talking about Mr. Adeusi than he spent talking

6    about the defendant's own words and actions in this case.

7           Now, it shouldn't surprise anyone here that Mr. Adeusi

8    was involved in scams and money laundering before he met the

9    defendant.  He's committed a host of other crimes too, and

10   those are the immigration fraud and the marriage fraud.

11          Look, the government didn't pick Mr. Adeusi.  The

12   defendant did when he chose to work with him -- not once, but

13   twice.  The defendant chose to work with Mr. Adeusi in 2018 to

14   scam Marble Arch, and he wanted to work with him again a year

15   later in May 2019.  Sometimes, ladies and gentlemen, it helps

16   to have an insider to explain to those of us on the outside how

17   those schemes work, and that's exactly what Mr. Adeusi did

18   here.

19          Now, Mr. Schneider brought up a whole host of names

20   you didn't hear much about, right?  Naamdi and Bones.  These

21   sort of came up in passing during Mr. Adeusi's testimony, and

22   he wants you to think that Mr. Adeusi and Mr. Raji, they knew

23   each other, but they never worked together in 2018.  Those

24   conversations between Mr. Adeusi and Mr. Raji never happened.

25   Right?  In Mr. Schneider's world, Mr. Adeusi knew nothing about

M9J6RAJ3                     Summation - Ms. Kamal

1   this Marble Arch scam before it happened.  So, ladies and
2   gentlemen, if that's true, how did Mr. Raji get the wire
3   confirmation of the Marble Arch 1.7 million before Nancy --
4   before anyone else, as far as the evidence we've seen in this
5   case?
6           He's the one who gets a copy of that wire transfer
7   from First Republic.  He leaves a voice text for Nancy saying,
8   hey, don't worry, we got the confirmation, we'll have it soon,
9   and then he forwards a picture, a photograph of that wire
10  confirmation to Nancy.  Where did he get that?
11          Now, we know that Mr. Adeusi made the wrong decision
12  and he erased a lot of the information that was in his phone
13  from that time.  But we do have those text messages from
14  Nancy's phone and they show that Mr. Raji is the one providing
15  that information to Nancy, not the other way around.  So where?
16  Where did he get it?
17          Well, Mr. Adeusi told you.  He said I sent the wire
18  confirmation to Mr. Adeusi.  We don't see that.  Because we
19  don't have Mr. Adeusi's phone, we don't -- and you haven't seen
20  any evidence from Mr. Raji's phone.  But he's told you that.
21  And that's corroborated by that wire, that wire confirmation
22  that Mr. Raji sends to Nancy.
23          So ask yourself, ladies and gentlemen, you should ask
24  yourselves whether or not, or how much, to rely on Mr. Adeusi's
25  testimony.  Just like all the evidence in the case, pay

1   attention to how it fits together with the other evidence, the

2   bank records and the e-mails and the text messages.

3           Now, I want to go back for just a minute to that

4   landlord/tenant example that Mr. Schneider gave you.

5           Another way of sort of expressing that is kind of like

6   saying that Mr. Raji is here, is in this room in front of all

7   of you, a mistake, as if it's some kind of an accident.  You

8   know?  He didn't know the $50,000 he got from Unique Bamboo was

9   fraud money from the Marble Arch scam.  He's not a signatory on

10  the Unique Bamboo bank account.  So how is he supposed to know

11  this money is from a fraud?  He's just unlucky.  That defies

12  the evidence in this case and your common sense for at least

13  four different reasons.

14          First, as I just told you, and I'm not going to

15  belabor it, he knew all about the Marble Arch wire, he was the

16  one who got the wire confirmation from Mr. Adeusi and sent it

17  to Nancy.  He may have not been the signatory on the account,

18  but he was the first person to get a cut, that $50,000 cut from

19  those stolen funds.  So does defense counsel expect you to

20  believe that's just like a coincidence?

21          Second, the money from the St. Francis Hospital scam

22  was wired directly to the defendant's business account.  He's

23  the only signatory on that account.  And Judge Furman told you

24  and Mr. Schneider told you and I'm going to tell you and

25  Judge Furman is going to remind you again, right, Mr. Raji is

1    not on trial for that.  That's here to help you assess -- that

2    evidence is in front of you to help you assess this very

3    question.  Was this an accident?  Was it an accident that the

4    $250,000 stolen from St. Francis somehow made its way directly

5    to the defendant's business bank account?

6          Remember, Wayne Floyd from St. Francis told you, it's

7    not like anyone came forward and returned that money.  So ask

8    yourself, is it really an accident?

9          The third reason that you know the defendant knew all

10   about the true purpose and objects of the scheme was also the

11   Southern Oregon University scam.  The same caveats apply.  The

12   defendant is not on trial for that.  It's here to help you

13   assess what he knew and whether it is reasonable to infer that

14   he didn't know anything about this Marble Arch money being a

15   scam.

16         Was it a mistake, ladies and gentlemen, that the bank

17   account for Best Janitor services, right, that outfit that

18   never did any work for Southern Oregon University, that was

19   somehow paid $1.9 million, right?  Is it just a mistake that

20   there was suddenly over $100,000 sent out in two different

21   checks to two different bank accounts, both of which were

22   controlled by Mr. Raji?

23         Fourth, ladies and gentlemen, you've seen in this

24   case, Ms. Ghosh showed you, by the time the Marble Arch scam

25   came around in July 2018, the defendant's bank accounts were a

1    mess, right?  One month before the Marble Arch scam, Citibank

2    froze his business account and Wells Fargo had already closed

3    another one of his accounts.  And you see this because he had

4    sent this information to Nancy.  Okay?

5           So when you take all of that together, it's really

6    absurd to suggest that the defendant's participation in this

7    scheme, the Marble Arch scheme, was somehow unlucky, that it's

8    an accident or a mistake.  The defendant would have to be the

9    unluckiest man in the world for that to be true.  But the

10   defendant is not unlucky; he is guilty.  And that is why he is

11   sitting in front of you all today.

12          Now, Mr. Schneider also asked you to make sure to bear

13   in mind that the defendant is not Nancy and Nancy is not the

14   defendant.  He's absolutely right about that, right?  But the

15   defendant is charged with two counts of conspiracy.  Conspiracy

16   is agreeing with others to commit the crimes that are charged

17   in the indictment.  But setting that aside, Mr. Schneider

18   expects you to believe that just because Nancy controlled the

19   Unique Bamboo bank account that she was the one in control,

20   that she was somehow the one deceiving him about the funds,

21   about whether or not the businesses were legitimate.

22          But all the evidence you have seen in this case, I'm

23   talking about the uncontested evidence, the text messages,

24   there's no argument about whether or not the text messages are

25   lying.  All of that proves the complete opposite, right?  So,

1    first, again, it's the defendant, not Nancy, who gets the wire

2    confirmation, right?  So he's the one that the hackers

3    overseas, he's the one who's those contacts, he's the one

4    that's the bridge to Nancy to tell her when the money is going

5    to be hitting her account.

6           Second, Raji is the one who gets the name and the

7    account information for some of those downstream recipients to

8    the stolen money, right?  One of them is that

9    Comcristal Company which is owned by someone named

10   Timothy Oyewole.  You see it in the e-mails an address, signed

11   up to someone Timothy Oyewole, sends the bank account

12   information for Comcristal to the defendant's e-mail address,

13   right, and then you see four days later nancy moving the money

14   to Comcristal, right?  That is the flow of influence here.  The

15   defendant is positioned between the fraudsters, the hackers

16   overseas, and he is the one who is connecting them to the safe

17   parking lot for that stolen money:  Nancy's accounts.

18          So you also see other examples of Mr. Raji serving as

19   that middleman, right, the bridge between the hackers and Nancy

20   in so many of those text messages before the Marble Arch

21   scheme, right?  I won't bring them up again for you, but there

22   are so many in Government Exhibits 301 and 302, right?  We

23   don't actually need to bring these up, Mr. Bailey.

24          There's the "do you have the other wells or BOA?  You

25   have not given me," right?  That's Government Exhibit 302.

1    Mr. Raji to Nancy, the defendant using Nancy for his bank

2    accounts.  Nancy writes to him, "I did not receive any

3    warning".  What account and how much and where it's coming

4    from.  Like that, I can contact the bank."

5            So let's be clear, this is Nancy's bank account.

6    She's talking here about some other scam, not Marble Arch.  She

7    has to ask the defendant what's going on, right.  Where the

8    money is, what's going on.  That tells you all you need to

9    know.

10           And the last example I'm going to bring up, which you

11   may remember, this is Government Exhibit 302 still.  This is

12   the supposed $650,000 from China and the 25 million from Brazil

13   that Raji tells Nancy they need the lawyer account for, the

14   escrow account.  And Nancy tells Mr. Raji, what do I tell

15   him -- meaning the lawyer's account she's going to be using.

16   What do I tell him that the funds is for?  Who is our client?

17   She doesn't know.

18           She knows her role, right?  Her role is, I'm the bank

19   account, and Mr. Raji, he's the broker for the bank account.

20   Now, ask yourself, why is he even involved at all?  Because

21   Nancy doesn't have any contact with the hackers.  You haven't

22   seen any information or evidence about that.  It's Mr. Raji.

23   He controls the flow of funds to Nancy, and he is the one who

24   is directing her on where to have the money.

25           There is nothing about Nancy's involvement in these

M9J6RAJ3                    Summation – Ms. Kamal

1    schemes that casts any doubt on whether the defendant is

2    guilty.  She is guilty, I agree with Mr. Schneider on that, but

3    he is guilty too.

4            Mr. Schneider also tried to make you think that just

5    because the defendant used his own name -- you saw the CIS

6    forms, the passport, that somehow shows that the defendant

7    wasn't trying to hide, right?  So he couldn't have known he was

8    doing anything wrong if he's putting his own name, his own

9    identification up there.

10           If you think about that argument another way, ladies

11   and gentlemen, it's almost as though Mr. Schneider wants you to

12   believe that getting caught is a defense to the crime, right?

13   Mr. Raji could have done this better.  He could have hidden his

14   involvement more.

15           But think about it.  You've seen evidence that his own

16   bank accounts were getting closed, right, his business bank

17   accounts, the Wells Fargo, the Citibank, you saw examples of

18   that in the evidence.  And, second, the defendant wanted his

19   cut, right?  He's not doing this out of the goodness of his

20   heart.  We haven't seen any evidence of that.  So he had to get

21   his money somehow.  So that, ladies and gentlemen, I submit, is

22   inference to draw from the fact that the defendant had to use

23   his own identification and his personal bank account, because

24   how else was he going to get the money?

25           If you ever heard the expression "there's no honor

M9J6RAJ3                         Summation - Ms. Kamal

1  among thieves," you should think about that phrase now and what

2  it means in this case.  Getting caught is just not a defense.

3            Just one moment.

4            (Pause)

5            MS. KAMAL:  So, ladies and gentlemen, I'm almost done.

6  When we started this trial and Mr. Sobelman was in front of you

7  and he asked you to do three things:  First, pay close

8  attention to the evidence -- I think we all know that you've

9  done that and we thank you; second, follow Judge Furman's

10 instructions on the law.  He's going to give you those

11 instructions after I sit down.  Hopefully, we'll get a break;

12 and third, use your common sense, the same common sense that

13 you use every day.

14           Don't let defense counsel distract you --

15           MR. SCHNEIDER:  Objection.

16           THE COURT:  Overruled.

17           MS. KAMAL:  -- with appeals to emotion.  Look at the

18 evidence and the law and use your common sense.  If you do

19 those things, you will quickly see that the evidence here is

20 overwhelming.  No one disputes that Marble Arch was the victim

21 of the business e-mail compromise.  No one disputes that

22 Adam Angelowicz was manipulated into wiring $1.7 million into a

23 bank account in the name of Unique Bamboo.  The defendant knew

24 that.  The defendant provided that bank account to the

25 fraudsters, to Mr. Adeusi, who passed it onto the hackers.

M9J6RAJ3                    Summation - Ms. Kamal

1          The defendant got almost -- got $50,000 of
2     Marble Arch's money almost immediately.  And as for the account
3     holder, Nancy Martino-Jean, well, she did exactly what the
4     defendant told her to do:  Move it out ASAP.  Government
5     Exhibit 302.
6          Ladies and gentlemen, that's as close you get to a
7     smoking gun in a case about fraud and money laundering.  The
8     defendant is guilty.
9          THE COURT:  Thank you, Ms. Kamal.
10         All right.  Ladies and gentlemen, I'm sure that you
11    listened with care to my instructions, which is what we're
12    going to do next.  For that reason we're going to take another
13    short break, stretch your legs, use the restroom, and we'll
14    pick up from there before I excuse you for lunch and your
15    deliberations.
16         My usual instructions continue to apply, because you
17    have not yet heard my instructions and those are pretty
18    important as well.  So don't discuss the case and keep an open
19    mind.  Don't do any research about the case.  I will have
20    Ms. Smallman check on you in just a few minutes.  So hopefully
21    we can get going in five to seven minutes.  And with, that you
22    are excused.
23
24
25

M9J6RAJ3

1          (Jury not present)

2          THE COURT:  Anything anyone needs to discuss,

3   government?  Mr. Schneider?

4          MR. SCHNEIDER:  No.

5          THE COURT:  All right.  I take it you have collected

6   the evidence that's ready to go to the jury once they begin

7   their deliberations?

8          MR. SCHNEIDER:  Yes.

9          THE COURT:  All right.  Government has confirmed that

10  it included all exhibits that were admitted and nothing that

11  wasn't admitted?

12         MS. GHOSH:  Yes, your Honor.

13         THE COURT:  Mr. Schneider, you've done the same?

14         MR. SCHNEIDER:  Yes, your Honor.

15         THE COURT:  Do we have a copy of the indictment with

16  the index or exhibit list.

17         MS. GHOSH:  Yes, we do.

18         THE COURT:  Mr. Schneider, you have reviewed those?

19         MR. SCHNEIDER:  Yes.

20         THE COURT:  All right.  Give me one second.

21         MR. SCHNEIDER:  Actually, your Honor, I haven't seen

22  the indictment that's going in, but I've seen the exhibit list.

23  Okay.  Give me a second.

24         THE COURT:  My understanding is that the audio is

25  being provided to the jury with a laptop that enables them to

M9J6RAJ3

1  play it; is that correct?

2          MS. GHOSH:  Yes.  There's a clean laptop that just has

3  the audio on the desktop to listen if they want to.

4          THE COURT:  And I presume that's the only thing on the

5  laptop.

6          MS. GHOSH:  Correct?

7          THE COURT:  And defense counsel, Mr. Schneider, you've

8  reviewed that as well.

9          MR. SCHNEIDER:  Yes?

10          THE COURT:  Great.  And the indictment, you just

11  looked at it?

12          MR. SCHNEIDER:  I have looked at it.  It's fine.

13          THE COURT:  Very good.  We don't need to get off the

14  bench myself, but if you want to get up for a moment or two,

15  we'll get going in a couple minutes.  Thanks.

16          (Recess)

17

18

19

20

21

22

23

24

25

M9J6RAJ3                              Charge

1          (Jury present)

2          THE COURT:  Welcome back, ladies and gentlemen.  I

3    hope you enjoyed your break, however short it was.  You

4    probably found on your seats a copy of my instructions.  I will

5    begin at Page 1, and as I will note in a moment, you are

6    welcome to follow along.  You're also welcome to just listen.

7    You can do either.  Some people do better if they just listen,

8    some people do better if they listen while I read.  In either

9    case, if you wish to follow along, you may turn to Page 1,

10   where I will begin.

11         Members of the jury, you have now heard all of the

12   evidence in the case and the lawyers' closing arguments.  It is

13   my duty at this point to instruct you as to the law.  My

14   instructions to you will be in three parts:

15         First, I will give you general instructions -- for

16   example, about your role as the jury, what you can and cannot

17   consider in your deliberations and the burden of proof.

18         Second, I will describe the law that you must apply to

19   the facts as you find them to be established by the evidence.

20         Finally, I will give you some instructions for your

21   deliberations.

22         I am going to read my instructions to you.  It is not

23   my favorite way to communicate, and not the most scintillating

24   thing to listen to, but there is a need for precision, and it

25   is important that I get the words just right, and so that is

1   why I will be reading.

2           I've given you, as I mentioned a moment ago, a copy of

3   my instructions to follow along because they cover many points.

4   Please limit yourself to following along; that is, as tempting

5   as it may be, do not read ahead in the instructions.  If you

6   find it easier to listen and understand while you are following

7   along, please do so.  If you would prefer, you can just listen

8   and not follow along.

9           In the unlikely event that I deviate from the written

10  instructions, it is my oral instructions that govern and that

11  you must follow.  But you may take your copy of the

12  instructions with you into the jury room so you can consult it

13  if you want to reread any portion of the charge to facilitate

14  your deliberations.

15          For now, listen carefully and try to concentrate on

16  the substance of what I'm saying.  You should not single out

17  any instruction as alone stating the law.  Instead, you should

18  consider my instructions as a whole when you retire to

19  deliberate in the jury room.

20          You, the members of the jury, are the sole and

21  exclusive judges of the facts.  You must weigh and consider the

22  evidence without regard for sympathy, prejudice, or passion for

23  or against either party.  It's your duty to accept my

24  instructions as to the law and apply them to the facts as you

25  determine them.

1          If either party has stated a legal principle

2     differently from any that I state to you in my instructions, it

3     is my instructions that you must follow.

4          In reaching your verdict, you must remember that all

5     parties stand equal before a jury in the courts of the

6     United States.  The fact that the government is a party and the

7     prosecution is brought in the name of the United States does

8     not entitle the government or its witnesses to any greater

9     consideration than that accorded to any other party.  By the

10    same token, you must give it no less deference.  The government

11    and the defendant stand on equal footing before you.

12         Some of the people who may have been involved in the

13    events leading to this trial are not on trial.  This does not

14    matter.  There is no requirement that all members of a

15    conspiracy be charged and prosecuted or tried together in the

16    same proceeding.  You may not draw any inference, favorable or

17    unfavorable, toward the government or the defendant from the

18    fact that any person was not named as a defendant in this case,

19    and you may not speculate as to the reasons why other people

20    are not on trial before you now.  Those matters are wholly

21    outside your concern and have no bearing on your function as

22    jurors in deciding the case before you.

23         The personalities and the conduct of counsel are not

24    in any way at issue.  If you formed opinions of any kind about

25    any of the layers in the case, favorable or unfavorable,

M9J6RAJ3                          Charge

1   whether you approve or disapprove of their behavior, those

2   opinions should not enter into your deliberations.  In

3   addition, remember that it is the duty of a lawyer to object

4   when the other side offers testimony or other evidence that the

5   lawyer believes is not properly admissible; therefore, you

6   should draw no inference from the fact that there was an

7   objection to any testimony or evidence, nor should you draw any

8   inference related to weight or importance of any testimony or

9   evidence from the fact that I sustained or overruled an

10  objection.  Simply because I have permitted certain testimony

11  or evidence to be introduced does not mean that I have decided

12  on its importance or significance.  That is for you to decide.

13        The defendant has pleaded not guilty to the charges

14  against him.  As a result of that plea of not guilty, the

15  burden is on the government to prove guilt beyond a reasonable

16  doubt.  This burden never shifts to a defendant for the simple

17  reason that the law never imposes upon a defendant in a

18  criminal case the burden or duty of testifying or calling any

19  witness or locating or producing any evidence.  The fact that

20  the defendant presented evidence does not shift the burden to

21  him.

22        Furthermore, the law presumes the defendant to be

23  innocent of the charges against him.  The presumption of

24  innocence was in his favor when the trial began, continued in

25  his favor throughout the entire trial, remains with him even as

1    I speak to you now, and persists in his favor in the course of

2    your deliberations in the jury room unless and until you

3    determine that the government proved beyond a reasonable doubt

4    that he committed one of the charged crimes.

5          The question that naturally arises is what is

6    reasonable doubt.  A reasonable doubt is a doubt based on your

7    reason, your judgment, your experience, and your common sense,

8    it is a doubt that a reasonable person has after carefully

9    weighing all the evidence.  It is a doubt founded in reason and

10   arising out of the evidence in the case, or the lack of

11   evidence.  A reasonable doubt is not caprice or whim; it is not

12   speculation or suspicion.

13         Proof beyond a reasonable doubt des not mean proof

14   beyond all possible doubt.  It is practically impossible for a

15   person to be absolutely and completely convinced of any

16   disputed fact that, by its very nature, cannot be proved with

17   mathematical certainty.  The government's burden is to

18   establish guilt beyond a reasonable doubt, not all possible

19   doubt.

20         If, after a fair and impartial consideration of all

21   the evidence, you can candidly and honestly say that you are

22   not satisfied with the guilt of the defendant, that you do not

23   have an abiding belief of the defendant's guilt — in other

24   words, if you have such a doubt as would reasonably cause a

25   prudent person to hesitate in acting in matters of importance

M9J6RAJ3                    Charge

1    in his or her own affairs — then you have a reasonable doubt,

2    and in that circumstance, it is your duty to acquit.

3           On the other hand, if after a fair and impartial

4    consideration of all the evidence you can candidly and honestly

5    say that you do have an abiding belief of the defendant's

6    guilt, such a belief as a prudent person would be willing to

7    act upon in important matters in the personal affairs of his or

8    her own life, then you have no reasonable doubt, and in that

9    circumstance, it is your duty to convict.

10          There are two types of evidence that you may properly

11   use in deciding whether the defendant is guilty or not guilty

12   of the crimes with which he is charged.  One type of evidence

13   is called direct evidence.  Direct evidence of a fact in issue

14   is present when a witness testifies to that fact based on what

15   he or she personally saw, heard, or otherwise observed through

16   the five senses.  The second evidence is circumstantial

17   evidence.  Circumstantial evidence is evidence that tends to

18   prove a disputed fact indirectly by proof of other facts.

19          There is a simple example of circumstantial evidence

20   that is often used in this courthouse.  Assume that when you

21   came into the courthouse this morning the sun was shining and

22   it was a nice day outside.  Also assume that the courtroom

23   shades were drawn and you could not look outside.  Assume

24   further that as you were sitting here, someone walked in with

25   an umbrella that was dripping wet and then a few moments later,

M9J6RAJ3                         Charge

1    somebody else walked in with a raincoat that was also dripping
2    wet.  Now, because you could not look outside the courtroom and
3    you could not see whether it was raining, you would have no
4    direct evidence of that fact.  But on a combination of facts I
5    have asked you to assume, it would be reasonable and logical
6    for to you conclude that it was raining.
7               That is all there is to circumstantial evidence.  You
8    infer on the basis of your reason, experience, and common sense
9    from one established fact the existence or the nonexistence of
10   some other fact.
11              The matter of drawing inferences from facts in
12   evidence is not a matter of guesswork or speculation.  An
13   inference is a logical, factual conclusion that you might
14   reasonably draw from other facts that have been proved.  It is
15   for you, and you alone, to decide what inferences you will
16   draw.
17              Many material facts, such as a person's state of mind,
18   are not easily proved by direct evidence.  Usually, such facts
19   are established by circumstantial evidence and the reasonable
20   inferences you draw.  Circumstantial evidence may be given as
21   much weight as direct evidence.  The law makes no distinction
22   between direct and circumstantial evidence.  The law simply
23   requires that before convicting a defendant, you must be
24   satisfied of the defendant's guilt beyond a reasonable doubt
25   based on all of the evidence in the case.

What, then, is the evidence in the case?

The evidence in this case is; one, the sworn testimony of the witnesses; two, the exhibits received into evidence; and, three, any stipulations made by the parties.  Anything else is not evidence.

For example, questions posed to a witness is not evidence.  It's the witness' answers that are evidence, not the questions.  In addition, exhibits marked for identification but not admitted by me are not evidence, nor are materials brought forth only to refresh a witness' recollection.

Moreover, testimony that has been stricken or excluded by me is not evidence and may not be considered by you in rendering your verdict.

Along those lines, we may have, among the exhibits, received in evidence some documents that are redacted. Redacted means that part of the document was taken or blacked out.  You are to concern yourself only with the part of the document that has been admitted into evidence.  You should not consider any possible reason why the other part of it has been deleted or blocked out.

Arguments by the advocates are also not evidence. What you heard during the opening statements and summations is merely intended to help you understand the evidence and reach your verdict.  If your recollection of the facts differs from the lawyer's statements, you should rely on your recollection.

M9J6RAJ3                          Charge

1    If a lawyer made a statement during his or her opening or

2    summation and you find there's no evidence to support the

3    statement, you should disregard the statement.

4          Finally, any statements that I have made during the

5    trial or during the instructions do not constitute evidence.

6    At times, I may have admonished a witness or directed a witness

7    to be responsive to questions or to keep his or her voice up.

8    At times, I may have asked a question myself.  Any questions

9    that I asked or instructions that I made were intended only to

10   clarify the presentation of evidence and to bring out something

11   that I thought might be unclear.

12         You should draw no inference or conclusion of any

13   kind, favorable or unfavorable, with respect to any witness or

14   party in the case by reason of any comment, question, or

15   instructions of mine.  The rulings I have made during the trial

16   and these instructions are no indication of my views of what

17   your decision should be, nor should you infer that I have any

18   views as to the credibility of any witness, as to the weight of

19   the evidence, or as to how you should decide any issue that is

20   before you.  That is entirely your role.

21         If certain testimony or evidence was received for a

22   limited purpose, you must follow the limiting instructions that

23   I gave you.

24         In particular, the government has offered evidence

25   that, on different occasions, the defendant allegedly engaged

1    in criminal conduct that is not charged in this case.  Let me

2    remind you that the defendant is not on trial for committing

3    acts that are not charged in the indictment.  Accordingly, you

4    may not consider evidence of other facts as a substitute for

5    proof that the defendant committed the crimes charged in the

6    indictment, nor may you consider such evidence as proof that

7    the defendant has a propensity to commit crimes or has a bad

8    moral character, and therefore committed the charged crimes.

9         The evidence of other acts was admitted for much more

10   limited purposes.  It was admitted to help you decide the

11   defendant's knowledge, intent, absence of mistake, or lack of

12   accident, with respect to the charged crimes.

13        In addition, to the extent that the government offered

14   evidence of the defendant's alleged conduct in 2019 after the

15   charged crimes were allegedly committed, you may consider such

16   evidence in evaluating the credibility of the testimony of

17   Afolabi Adeusi, the cooperating witness.  The evidence of

18   uncharged acts may be considered by you only for these

19   purposes.  Such evidence may not be considered by you for any

20   other purpose.  Specifically, you may not use any of this

21   evidence to conclude that because the defendant may have

22   committed other acts, he must have also committed the acts

23   charged in the indictment.

24        How do you evaluate the credibility or believability

25   of the witnesses?  The answer is that you use your common

1   sense.  There is no magic formula by which you can evaluate

2   testimony.  You may use the same test here that you use in your

3   everyday life when evaluating statements made by others to you.

4   You may ask yourself, does the witness impress you as open,

5   honest, and candid?  How responsive was the witness to the

6   questions asked on direct examination and on cross-examination?

7          If you find that a witness intentionally told a

8   falsehood, that is always a matter of important you should

9   weigh carefully.  On the other hand, a witness may be

10  inaccurate, contradictory, or even untruthful in some respects

11  and entirely believable and truthful in other respects.  It is

12  for you to determine whether such inconsistencies are

13  significant or inconsequential and whether to accept or reject

14  all of the testimony of any witness or to accept or reject only

15  portions.

16         You are not required to accept testimony even though

17  the testimony is uncontradicted and the witness' testimony is

18  not challenged.  You may reject it because of the witness'

19  bearing or demeanor or because of the inherent improbability of

20  the testimony, or for other reasons sufficient for you to

21  conclude that the testimony is not worth of belief.

22         (Continued on next page)

23

24

25

M9JQraj4                        Charge

1          THE COURT:  (Continued) In evaluating the credibility

2     of the witnesses, you should take into account any evidence

3     that a witness may benefit in some way from the outcome of the

4     case.  Such an interest in the outcome creates a motive to

5     testify falsely and may sway a witness to testify in a way that

6     advances his or her own interest.  Therefore, if you find that

7     any witness whose testimony you are considering may have an

8     interest in the outcome of this trial, you should bear that

9     factor in mind when evaluating the credibility of his or her

10     testimony and decide to accept it with great care.

11          Keep in mind, though, that it does not automatically

12     follow that testimony given by an interested witness is to be

13     disbelieved.  There are many people who, no matter what their

14     interest in the outcome of the case may be, would not testify

15     falsely.  It is for you to decide based on your own perceptions

16     and common sense to what extent, if at all, the witness's

17     interest has affected his or her testimony.

18          You have heard from a witness -- Afolabi Adeusi -- who

19     testified that he was involved in committing certain crimes and

20     is now cooperating with the government.

21          Experience will tell you that the government sometimes

22     must rely on the testimony of so-called cooperating witnesses

23     because otherwise it would be difficult or impossible to detect

24     and prosecute wrongdoers.  For these very reasons, the law

25     allows the use of testimony from cooperating witnesses.

M9JQraj4                    Charge

1    Indeed, under federal law, testimony of a cooperating witness

2    may be enough in itself for conviction if the jury believes

3    that the testimony establishes guilt beyond a reasonable doubt.

4            You may not draw any conclusions or inferences of any

5    kind about the guilt of the defendant on trial from the fact

6    that Mr. Adeusi pleaded guilty to other charges.  The decision

7    of that witness to plead guilty was a personal decision that

8    witness made about his own guilt.  It may not be used by you in

9    any way as evidence against or unfavorable to the defendant.

10           Additionally, because of the interest a cooperator may

11   have in testifying, you should scrutinize his testimony with

12   special care and caution.  You may consider the fact that a

13   witness is a cooperator as bearing upon his credibility.  Like

14   the testimony of any other witness, cooperating witness

15   testimony should be given such weight as it deserves in light

16   of the facts and circumstances before you, taking into account

17   the witness's demeanor and candor, the strength and accuracy of

18   the witness's recollection, his background, and the extent to

19   which is testimony is or is not corroborated by other evidence

20   in the case.  You may consider whether a cooperating witness

21   has an interest in the outcome of the case, and if so, whether

22   that interest has affected his testimony.

23           You heard testimony about an agreement between the

24   government and the cooperating witness.  I must caution you

25   that it is no concern of yours why the government made an

agreement with a particular witness.  You may, however,

consider the effect, if any, that the existence or terms of the

agreement have on the witness's credibility.  A witness who

hopes to obtain leniency may have a motive to testify as he

believes the government wishes, or he may feel that it is in

his interest to incriminate others.  As with any witness, your

responsibility is to determine whether any such motive or

intent has influenced the witness's testimony and whether the

witness has told the truth in whole or in part.

            In sum, in evaluating the testimony of a cooperating

witness, you should ask yourselves the following questions:

Would the cooperating witness benefit more by lying or by

telling the truth?  Was any part of his testimony potentially

made up because he believed or hoped that he would receive

favorable treatment from the government by testifying falsely

or as he believed the government wanted?  Or did he believe

that his interests would be best served by testifying

truthfully?  If you believe that the witness was motivated by

hopes of personal gain, was the motivation one that would cause

him to lie, or was it one that would cause him to tell the

truth?  Did this motivation color his testimony?  It does not

follow, however, that simply because a person has admitted to

participating in one or more crimes, he is incapable of giving

a truthful version of what happened.

            If you think that the testimony was false, you should

M9JQraj4                         Charge

reject it.  However, if, after a cautious and careful

examination of an accomplice or cooperating witness's testimony

you are satisfied that the witness told the truth, you may

accept his testimony as credible and act upon it accordingly.

        As with any witness, let me remind you that the issue

of credibility need not be decided in an all-or-nothing

fashion.  If you find that a witness has been untruthful in

some respect, you may, but are not required to, reject the

witness's testimony in its entirety.  Even if you find that a

witness testified falsely in one part, you still may accept his

testimony in other parts.  How much of a witness's testimony to

accept, if any, is a determination entirely for you, the jury.

        You have heard testimony from law enforcement or other

government witnesses.  The fact that a witness may be employed

as a law enforcement official or government employee does not

mean that his or her testimony is necessarily deserving of more

or less consideration or greater or lesser weight than that of

an ordinary witness.  It is your decision, after reviewing all

the evidence, whether to accept the testimony of any law

enforcement witness or government witnesses, as it is with

every other type of witness, and to give that testimony the

weight you find it deserves.

        You have heard testimony from an expert witness.  As I

previously explained, an expert witness is someone who, by

education or experience, has acquired learning or experience in

1    a specialized area of knowledge.  Such a witness is permitted

2    to express his opinions on matters about which he or she has

3    specialized knowledge and training.  The parties may present

4    expert testimony to you on the theory that someone who is

5    experienced in the field can assist you in understanding the

6    evidence or in reaching an independent decision on the facts.

7           Your role in judging credibility applies to the expert

8    as well as other witnesses.  In weighing the expert's opinion,

9    you may consider the expert's qualifications, education and

10   reasons for testifying, as well as all of the other

11   considerations that ordinarily apply, including all the other

12   evidence in the case.  If you find the opinion of the expert is

13   based on sufficient data, education, and experience, and the

14   other evidence does not give you reason to doubt his

15   conclusions, you would be justified in placing reliance on his

16   testimony.  However, you should not accept witness testimony

17   simply because the witness is an expert.  The determination of

18   the facts in this case rests solely with you.

19          You have heard some evidence during the trial that

20   witnesses discussed the facts of the case and their testimony

21   with the lawyers before the witnesses appeared in court.

22   Although you may consider such evidence when you are evaluating

23   a witness's credibility, it is common for a witness to meet

24   with lawyers before testifying so that the witness can be aware

25   of the subjects he or she will be questioned about, focus on

1   the subjects, and have the opportunity to review relevant

2   exhibits before being questioned about them.  In fact, it would

3   be unusual for a lawyer to call a witness without such

4   consultation.  As always, the weight you give to the fact or

5   the nature of these issues and what inferences you draw from

6   them are matters completely within your discretion.

7          There are people whose names you have heard during the

8   course of the trial but who did not appear here to testify.  I

9   instruct you that each party had an equal opportunity, or lack

10  of opportunity, to call any of these witnesses.  Therefore, you

11  should not draw any inferences or reach any conclusions as to

12  what they would have testified to had they been called.  Their

13  absence should not affect your judgment in any way.

14         You should, however, remember my instruction that the

15  law does not impose on a defendant in a criminal case the

16  burden or duty of calling any witness or producing any

17  evidence.  The burden of proof remains at all times with the

18  government.

19         The fact that one party called more witnesses or

20  introduced more evidence does not mean you should necessarily

21  find the facts in favor of the side offering the most witnesses

22  and the most evidence.  By the same token, you do not have to

23  accept the testimony of any witness who has not been

24  contradicted or impeached if you find the witness to be not

25  credible.  After examining all the evidence, you may decide the

M9JQraj4                    Charge

1     party calling the most witnesses has not persuaded you because

2     you do not believe its witnesses or because you do believe the

3     fewer witnesses called by the other side.

4              Again, you should also keep in mind that the burden of

5     proof is always on the government.  The defendant is not

6     required to call any witnesses or offer any evidence since he

7     is presumed to be innocent.  On the other hand, the government

8     is not required to prove each element of the offense by any

9     particular number of witnesses.  The testimony of a single

10    witness may be enough to convince you beyond a reasonable doubt

11    of the existence of the elements of the charged offenses -- if

12    you believe that the witness has truthfully and accurately

13    related what he or she has told you.  The testimony of a single

14    witness may also be enough to convince you that reasonable

15    doubt exists, in which case you must find the defendant not

16    guilty.

17             Stipulations were entered into relating to various

18    facts in this case.  A stipulation, as I told you, is an

19    agreement between parties as to what certain facts were or what

20    the testimony would be if certain people testified before you.

21    The stipulations are the same for your purposes as the

22    presentation of live testimony.  You should consider the weight

23    to be given such evidence just as you would any other evidence.

24             The government has presented exhibits in the form of

25    charts and summaries.  As I mentioned to you earlier, I

M9JQraj4                        Charge

1    admitted these charts and summaries in place of, or in addition

2    to, the underlying testimony or documents that they represent

3    in order to save time and avoid unnecessary inconvenience.

4    They are no better than the testimony or the documents upon

5    which they are based.  Therefore, you are to give no greater

6    consideration to these charts or summaries than you would give

7    to the evidence upon which they are based.  It is for you to

8    decide whether they correctly present the information contained

9    in the testimony and in the exhibits on which they were based.

10         You've heard testimony about evidence that was seized

11   and about various searches, including searches of electronic

12   devices and email accounts.  Evidence obtained from these

13   searches was properly admitted in this case and may be properly

14   considered by you.  Indeed, such searches are entirely

15   appropriate law enforcement actions.  Whether you approve or

16   disapprove of how the evidence was obtained should not enter

17   into your deliberations because I instruct you that the

18   government's use of the evidence is lawful.

19         You must, therefore, regardless of your personal

20   opinions, give this evidence full consideration along with all

21   the other evidence in the case in determining whether the

22   government has proved the defendant's guilt beyond a reasonable

23   doubt.  Once again, however, it is for you to decide what

24   weight, if any, to give to this evidence.

25         You have heard reference to certain investigative

1    techniques that were used or not used by the government in this

2    case.  There is no legal requirement that the government prove

3    its case through any particular means.  While you are to

4    carefully consider the evidence, and/or lack of evidence,

5    adduced by the government, you are not to speculate as to why

6    the government used the techniques it did or why it did not use

7    other techniques.  Your concern is to determine whether or not

8    on the evidence, or lack of evidence, the government has met

9    its burden of proving each element of each charge beyond a

10   reasonable doubt.

11        The law does not require any party to call as

12   witnesses all persons who may have been present at any time or

13   place involved in the case or who may appear peer to have some

14   knowledge of the matter in issue at this trial.  Nor does the

15   law require any party to produce as exhibits all relevant

16   papers and things available to either party during the course

17   of the trial.

18        The government was permitted to give you transcripts

19   containing the parties' interpretation of what can be heard on

20   some of the audio recordings that were received as evidence.

21   As I told you, those were given to you as an aid or guide to

22   assist you in listening to the recordings.  The transcripts are

23   not in and of themselves evidence.  You alone should make your

24   own interpretation of what appears on the recordings based on

25   what you heard.  If you think you heard something differently

M9JQraj4                    Charge

1   than appeared on the transcript, then what you heard is

2   controlling.

3          The defendant did not testify.  Under our

4   Constitution, a defendant is presumed innocent and has no

5   obligation to testify or to present any other evidence because,

6   as I have told you many times, it is the government's burden to

7   prove the defendant's guilt beyond a reasonable doubt.  The

8   burden remains on the government throughout the entire trial

9   and never shifts to the defendant.  A defendant is never

10  required to prove that he is innocent.

11         You may not attach any significance to the fact that

12  the defendant did not testify.  No adverse inference against

13  the defendant may be drawn by you because the defendant did not

14  take the witness stand.  You may not speculate as to why he did

15  not testify.  You may not consider this in any way in your

16  deliberations in the jury room.

17         That concludes my introductory instructions.  Let me

18  now turn to the charges.

19         Mr. Raji is formally charged in an indictment.  As

20  instructed you at the outset of this case, the indictment is a

21  charge or accusation.  It is not evidence, and it does not

22  prove or even indicate guilt.  It does not create any

23  presumption or permit any inference that the defendant is

24  guilty.  As I have told you many times, the defendant is

25  presumed innocent and has entered a plea of not guilty.  It is

1   the government's burden to prove the defendant's guilt beyond a

2   reasonable doubt.

3           The indictment (a copy of which you will have in the

4   jury room during your deliberations) contains four charges, or

5   "counts," against the defendant.  Each count accuses the

6   defendant of committing a different crime between around

7   July 2018 and September 2018.  You must, as a matter of law,

8   consider each count, and you must return a separate verdict for

9   each count in which the defendant is charged.  Your verdict on

10  one count should not control your decision as to any other

11  count.

12          Counts One and Two charge that Mr. Raji committed wire

13  fraud or participated in a conspiracy to commit wire fraud

14  against an investment firm named Marble Arch Investments.

15  Specifically, the indictment alleges that Mr. Raji and others

16  fraudulently induced the investment firm to send $1.7 million

17  to a bank account held by a company called Unique Bamboo

18  Investments.  Count Three charges that Mr. Raji received stolen

19  funds from this fraudulent wire transfer.  And Count Four

20  charges that Mr. Raji participated in a conspiracy to commit

21  money laundering using the proceeds from the fraudulent wire

22  transfer.

23          I will explain each count in turn.  I remind you that

24  you must consider each count separately and return a separate

25  verdict on each count.

M9JQraj4                    Charge

1          Before I instruct you on each of the counts, however,

2   I want to define some terms and concepts that will come up

3   repeatedly throughout these instructions.

4          One set of terms relates to the defendant's state of

5   mind.  Specifically, the defendant cannot be convicted of any

6   crime unless, among other things, he acted "unlawfully,"

7   "knowingly," and "intentionally" (or, as it is sometimes put,

8   "willfully.")

9          "Unlawfully" obviously means contrary to law.  In

10  terms of its application to the defendant's state of mind,

11  however, the government is not required to show that the

12  defendant knew that he was violating or breaking any particular

13  law.  Instead, the government must prove that the defendant was

14  aware of the generally unlawful nature of his acts.

15         "Knowingly" means to act deliberately and voluntarily,

16  rather than by mistake or accident or mere inadvertence.

17         "Intentionally" and "willfully" mean to act

18  deliberately and with a bad purpose, rather than innocently.

19         The question of whether a person acted with a

20  particular state of mind -- such as knowingly or

21  intentionally -- is a question of fact for you to determine

22  like any other fact question.  Direct proof of a person's state

23  of mind is often not available.  It would be a rare case where

24  it could be shown that a person wrote or stated that as of a

25  given time in the past he committed an act with a particular

1    state of mind.  Such direct proof is not required.  The

2    ultimate facts of knowledge and criminal intent, though

3    subjective, may be established by circumstantial evidence,

4    based upon a person's outward manifestations, his words, his

5    conduct, his acts and all the surrounding circumstances

6    disclosed by the evidence and the rational or logical

7    inferences that may be drawn from them.

8            Circumstantial evidence, if believed, is of no less

9    value than direct evidence.  In either case, however, the

10   essential elements of the crime, as I will explain them to you,

11   must be established beyond a reasonable doubt.

12           The defendant is charged in two counts --

13   specifically, Counts One and Four -- with participating in

14   conspiracies.  The defendant is charged in Counts Two and Three

15   with what are called "substantive" crimes.  I will instruct you

16   as to each count separately in just a moment.

17           A conspiracy count is different from a substantive

18   count.  Generally speaking, a conspiracy charge alleges that

19   two or more persons agreed together to accomplish an unlawful

20   objective.  The focus of a conspiracy count, therefore, is on

21   whether there was an unlawful agreement.  There can be no

22   conspiracy unless at least two people reached such an unlawful

23   agreement, whether express or implied.

24           A substantive count, on the other hand, charges a

25   defendant with the actual commission of an offense.  a

M9JQraj4                    Charge

1    Substantive offense, therefore, may be committed by a single

2    person, and it need not involve any agreement with anyone.

3              A conspiracy to commit a crime is an entirely separate

4    and different offense from a substantive crime, the commission

5    of which may be an object or goal of the conspiracy.  And

6    because the essence of the crime of conspiracy is an agreement

7    or understanding to commit a crime, it does not matter if the

8    crime, the commission of which was an objective of the

9    conspiracy, was ever committed.  In other words, if a

10   conspiracy exists and certain other requirements are met, it is

11   punishable as a crime even if its purpose was not accomplished.

12   Consequently, a conspiracy charge does not require proof that

13   the crime or crimes that were the objective or objectives of

14   the conspiracy actually were committed.

15             By contrast, conviction on a substantive count

16   requires proof that the crime charged actually was committed or

17   attempted but does not require proof of an agreement.  If a

18   defendant both participates in a conspiracy and commits the

19   crime or crimes that were the object or objects of the

20   conspiracy, that defendant may be guilty of both the conspiracy

21   and the substantive crime or crimes.

22             I will now turn to the elements of each count.  As I

23   noted previously, Count One charges the defendant with

24   conspiracy to commit wire fraud, but I'm going to begin with

25   Count Two, which charges the defendant with the substantive

crime of wire fraud, as doing so will simplify my instructions
with regard to the conspiracy count.

In order to find the defendant guilty of Count Two the
government must prove the following three elements beyond a
reasonable doubt:

First, that between around July 2018 and
September 2018, there was a scheme or artifice to defraud or to
obtain money or property by materially false and fraudulent
pretenses, representations, or promises;

Second, that the defendant knowingly, willfully, and
with the intent to defraud, devised or participated in the
scheme or artifice; and

Third, that an interstate or international wire
communication was used in furtherance of the scheme or
artifice.

The first element the government must prove beyond a
reasonable doubt with respect to Count Two is the existence of
a scheme or artifice to defraud or to obtain money or property
by means of false or fraudulent pretenses, representations or
promises.

A "scheme or artifice" is merely a plan for the
accomplishment of an object.  A "scheme to defraud" is any
plan, device or course of action to obtain money or property by
means of false or fraudulent pretenses, representations or
promises.

1          Now, "fraud" is a general term that includes all of

2     the various means by which human ingenuity can devise and that

3     are resorted to by an individual to gain some unfair advantage

4     over an another person by false representations, false

5     suggestions or suppression of the truth, or deliberate

6     disregard for the truth.  Thus, a "scheme to defraud" is merely

7     a plan to deprive another of money or property by trick,

8     deceit, deception or swindle.

9          The scheme to defraud charged here is alleged to have

10    been carried out by making false pretenses, representations,

11    promises, and statements.  A pretense, representation, promise

12    or statement is false if it is untrue when made and was then

13    known to be untrue by the person making it or causing it to be

14    made.  A pretense, representation, promise or statement is

15    fraudulent if it was falsely made with the intention to

16    deceive.  Deceitful statements or representations of

17    half-truths or the concealment of material facts may also

18    constitute false or fraudulent statements or representations

19    under the wire fraud statute.

20         The deception need not be premised upon spoken or

21    written words alone.  The arrangement of the words or the

22    circumstances in which they are used may convey the false and

23    deceptive appearance.  If it is deception, the manner in which

24    it is accomplished is of no consequence.

25         The false or fraudulent pretense, representation,

1  promise or statement must relate to a "material" fact or

2  matter.  A material fact is one that reasonably would be

3  expected to be of concern to a reasonable person in relying

4  upon the pretense, representation, promise or statement in

5  making a decision.  This means if you find a particular

6  statement of fact or representation to have been false, you

7  must also determine whether that statement or representation

8  was one that a reasonable person would have considered

9  important in making his or her decision.  The same principle

10 applies to fraudulent half-truths or omissions of material

11 facts necessary to make the statements that were made not

12 materially misleading.  The government does not need to prove

13 that anyone actually relied on the false statement or

14 representation.  Instead, it is sufficient if the

15 misrepresentation is one that is capable of influencing a

16 reasonable person's decision and is intended to do so.

17        In addition to proving that a pretense,

18 representation, promise or statement was false or fraudulent

19 and related to a material fact, in order to establish a scheme

20 to defraud, the government must prove that the alleged scheme

21 contemplated wrongly depriving another of money or property.

22 The government is not, however, required to prove that the

23 defendant personally originated the scheme to defraud.  Nor is

24 the government required to prove that the scheme or artifice to

25 defraud actually succeeded; that is, the government is not

required to prove the intended victim suffered any loss or

harm.  Although whether or not the scheme actually succeeded is

not the question, you may consider whether it succeeded in

determining whether the scheme existed.  The question for you

to decide is whether the government has proved that the

defendant knowingly devised or participated in a scheme to

defraud.

          A scheme or artifice to defraud need not be shown by

direct evidence but may be established by all the circumstances

and facts in the case.

          The second element that the government must prove

beyond a reasonable doubt with respect to Count Two is that the

defendant devised or participated in the fraudulent scheme

knowingly, willfully, with the specific intent to defraud.

          I have already explained the meaning of the terms

knowingly and willfully

              and you should apply those instructions here.

          To "devise" a scheme to defraud is to concoct or plan

it.  To "participate" in a scheme to defraud means to associate

oneself with it with a view and intent toward making it

succeed.  Although a mere onlooker is not a participant in a

scheme to defraud, it is not necessary that a participant be

someone who personally and visibly executes a scheme to

defraud.

          "Intent to defraud" means to act knowingly and with

the specific intent to deceive for the purpose of causing some

financial or property loss to another.  Thus, the defendant

acted with intent to defraud in the context of wire fraud if he

engaged or participated in the fraudulent scheme with awareness

of its fraudulent or deceptive character, with an intention to

be involved in the scheme to defraud and to help it succeed,

and with a purpose of obtaining money or property from the

victim.  That is, the government must prove beyond a reasonable

doubt that the defendant contemplated some actual harm or

injury to a victim with respect to the victim's money or

property.  But the government does not need to prove that the

intended victim was actually harmed; only that the defendant

intended to harm the victim by obtaining money or property.

The government is also not required to prove that the defendant

realized any gain from the scheme, although you may consider

any gain the defendant realized in determining whether the

defendant participated in the scheme.

        Since an essential element of wire fraud is intent to

defraud, it follows that good faith on the part of the

defendant is a complete defense to a charge of wire fraud.  A

defendant, however, has no burden to establish a defense of

good faith.  The burden is on the government to prove

fraudulent intent and the consequent lack of good faith beyond

a reasonable doubt.  If the defendant participated in the

scheme to defraud, then a belief by the defendant, if such

1   belief existed, that ultimately everything would work out so

2   that no one would lose any money does not mean that the

3   defendant acted in good faith.

4          To conclude on this element, if you find that the

5   defendant was not a knowing participant in the scheme or that

6   he lacked the specific intent to defraud, you should find the

7   defendant not guilty.  On the other hand, if you find that the

8   government has established beyond a reasonable doubt the first

9   element; namely, the existence of a scheme to defraud, and this

10  second element, that the defendant was a knowing participant

11  and acted with specific intent to defraud, then you must

12  consider a third element.

13         The third and final element the government must

14  establish beyond a reasonable doubt with respect to Count Two

15  is that an interstate or foreign wire (for example, a telephone

16  call, email communication, WhatsApp message, text message or

17  bank wire transfer) was used in furtherance of the scheme to

18  defraud within the period of the scheme listed in Count One.

19         The "interstate" or "foreign" requirement means that

20  the wire communication must pass between two or more states or

21  between the United States and a foreign country.  This could

22  include, for example, a telephone call between two different

23  states, an email between two different states or between a

24  foreign country and the United States, a wire transfer between

25  banks located in two different states, or a wire transfer

M9JQraj4                    Charge

1    between a bank in the United States and a bank in a foreign

2    country.

3           To be in furtherance of the scheme, the wire

4    communication must be incident to an essential part of the

5    scheme to defraud and must have been caused directly or

6    indirectly by the defendant.  It is not necessary for the

7    defendant to be directly or personally involved in any wire

8    communication, as long as the communication is reasonably

9    foreseeable in the execution of the alleged scheme to defraud

10   in which the defendant participated.  In this regard, it would

11   be sufficient to establish this element of the crime if the

12   government proved that the defendant caused the wires to be

13   used by others.  This does not mean that the defendant himself

14   must have specifically authorized or directed others to execute

15   a wire communication.  When a person acts with knowledge that

16   the use of wire facilities will follow in the ordinary course

17   of business, or where the use of wire facilities can reasonably

18   be foreseen, even though not actually intended, then he causes

19   the wires to be used.  Furthermore, the requirement that an

20   interstate or foreign wire facility was used is satisfied even

21   if a wire facility was used by a person with no knowledge  of

22   the fraudulent scheme, including a victim of the alleged fraud,

23   so long as the wire was in furtherance of the alleged scheme.

24          The use of a wire facility need not itself be

25   fraudulent.  Stated another way, the material sent by wire need

M9JQraj4                    Charge

1    not contain any fraudulent representation or even any request

2    for money.  It is sufficient if a wire facility was used to

3    further or assist in carrying out the scheme to defraud.

4           Only the use of a wire facility must be reasonably

5    foreseeable, not its interstate or foreign component.  Thus, if

6    you find that the use of a wire facility was reasonably

7    foreseeable, and an interstate or foreign wire facility was

8    actually used, then this element is satisfied even if it was

9    not foreseeable that the wire communication would cross state

10   or national boundaries.

11          Having explained the substantive count of wire fraud,

12   I will return to Count One, which charges the defendant with

13   conspiring to commit wire fraud.  In order to find the

14   defendant guilty of Count One, the government must prove the

15   following two elements beyond a reasonable doubt:

16          First, that the conspiracy charged existed; that is,

17   that between around July 2018 and September 2018, an agreement

18   or understanding between two or more persons existed to commit

19   wire fraud; and

20          Second, that the defendant intentionally and knowingly

21   became a member of this conspiracy; that is, that at some point

22   during the conspiracy, he knowingly joined and participated in

23   the conspiracy to commit wire fraud with knowledge of its

24   illegal object and intent to further that object.

25          Starting with the first element, what is a conspiracy?

M9JQraj4                    Charge

1    A conspiracy is an agreement or an understanding between two or

2    more persons to accomplish by joint action a criminal or

3    unlawful purpose.  If you find beyond a reasonable doubt that

4    two or more persons came to an understanding explicitly or

5    implicitly (that is, spoken or unspoken) to violate the law and

6    to accomplish an unlawful plan, then the government will have

7    sustained its burden of proof as to this element.

8            To satisfy its burden of proof on this element, the

9    government is not required to show that two or more people sat

10   around a table and entered into a solemn pact, orally or in

11   writing, stating that they had formed a conspiracy to commit

12   wire fraud and spelling out who would do what in order to carry

13   out the unlawful project.  Common sense tells you that when

14   people, in fact, agree to enter into a criminal conspiracy,

15   much is left to unexpressed understanding.  In determining

16   whether a conspiracy existed, you may consider direct as well

17   as circumstantial evidence.

18           When people enter into a conspiracy to accomplish an

19   unlawful end, they become agents and partners of one another in

20   carrying out the conspiracy.  In determining whether there has

21   been an unlawful agreement as alleged, you may consider the

22   acts and conduct of the alleged co-conspirators that were done

23   to carry out the apparent criminal purpose.  The old adage

24   "Actions speak louder than words" applies here.  Often, the

25   only evidence that is available with respect to the existence

1    of a conspiracy is that of disconnected acts and conduct on the

2    part of alleged individual co-conspirators.  When taken

3    together and considered as a whole, however, these acts and

4    conduct may warrant the inference that a conspiracy existed as

5    conclusively as would direct proof.

6            The object of a conspiracy is the illegal purpose the

7    co-conspirators agree or hope to achieve.  The object of the

8    conspiracy charged in Count One is wire fraud, the substantive

9    offense charged in Count Two, which I have already explained to

10   you.

11           If you conclude the government has proved beyond a

12   reasonable doubt that the conspiracy charged in Count One

13   existed, then you must next determine the second question,

14   which is whether the defendant knowingly and willfully became a

15   member of that conspiracy; that is, whether the defendant

16   participated in a conspiracy with knowledge of its unlawful

17   purpose or purposes and in furtherance of its unlawful

18   objective or objectives.

19           The government must prove beyond a reasonable doubt

20   that the defendant knowingly and willfully entered into the

21   conspiracy with a criminal intent; that is, with an unlawful

22   purpose; and that he agreed to take part in the conspiracy with

23   knowledge of its unlawful purpose or purposes, and with the

24   specific intention of furthering its objective or objectives.

25   I have already explained the meaning of the terms "willfully"

1    and "knowingly," and you should apply those instructions here.

2          It is not necessary for the government to show that

3    the defendant was fully informed as to all the details of the

4    conspiracy in order for you to infer knowledge on his part.  To

5    have guilty knowledge, a defendant need not have known the full

6    extent of a conspiracy or all of the activities of all of its

7    participants.  It is not even necessary that a defendant knew

8    every other member of the conspiracy.

9          When people enter into a conspiracy to accomplish an

10   unlawful end, they become agents and partners of one another in

11   carrying out the conspiracy.  In determining the factual issues

12   before you, you may, but are not required to, take into account

13   any acts or statements made by the defendant's co-conspirators,

14   if any, which were made during, in the course of, and in

15   furtherance of the conspiracy, even though such acts or

16   statements were not made in the presence of the defendant or

17   were made without his knowledge.  Acts or statements made in

18   furtherance of the common purpose of the conspiracy are deemed

19   under the law to be the acts or statements of all of the

20   members, and all of the members are responsible for such acts

21   and statements.

22         Indeed, each member of the conspiracy may perform

23   separate and distinct acts and may perform them at different

24   times.  Some conspirators may play major roles, while others

25   play minor roles.  An equal role is not what the law requires.

1    In fact, even a single act may be sufficient to draw a

2    defendant within the scope of the conspiracy.  Nor is it

3    necessary that a defendant received any monetary benefit from

4    his participation in the conspiracy or had a financial stake in

5    the outcome, so long as he in fact joined in the conspiracy in

6    the manner I've explained.

7            Keep in mind, however, that a person may know,

8    assemble with, associate with, or be friendly with, one or more

9    members of a conspiracy without being a co-conspirator himself.

10   Mere similarity of conduct or the fact that the defendant may

11   have discussed aims and interests does not necessarily

12   establish proof of the existence of a conspiracy or the

13   defendant's membership in the conspiracy.  I also want to

14   caution you that mere knowledge or acquiescence, without

15   participation in the unlawful plan, is not sufficient.

16           Moreover, the fact that the acts of the defendant

17   without knowledge merely happened to further the purposes or

18   objectives of the conspiracy, does not make the defendant a

19   member of the conspiracy.  More is required under the law.

20   What is necessary is that the defendant must have participated

21   with knowledge of at least some of the illegal purposes or

22   objects of the conspiracy and with the intention of aiding in

23   the accomplishment of those unlawful ends.

24           The duration and extent of a defendant's participation

25   has no bearing on the issue of the defendant's guilt.  He need

not have joined the conspiracy at the outset.  He may have

joined it at any time in its progress, and he will still be

held responsible for a full membership in the conspiracy.

        Once a conspiracy is formed, it is presumed to

continue until either its objective is accomplished or there is

some affirmative act of termination by the members.  So too,

once a person is found to be a member of a conspiracy, he is

presumed to continue as a member of the conspiracy until the

conspiracy is terminated, unless it is shown by some

affirmative proof that the person withdrew and disassociated

himself from the conspiracy.

        In sum, you must find beyond a reasonable doubt that

the defendant, with an understanding of the unlawful character

of the conspiracy, intentionally engaged, advised, or assisted

in the conspiracy for the purpose of furthering the illegal

undertaking.  He thereby becomes a knowing and willing

participant in the unlawful agreement; that is to say, a

conspirator.

        With regard to both Counts One and Two, which charge

conspiracy to commit wire fraud and wire fraud, it is

unimportant whether a victim might have discovered the fraud

had he or she probed further.  If you find that a scheme or

artifice to defraud existed, it is relevant whether you believe

that a victim is careless, gullible, or even negligent.

Negligence, carelessness or gullibility on the part of the

M9JQraj4                    Charge

victims is no defense to a charge of such fraud.

Count Three charges the defendant with receiving stolen money.  In order to find the defendant guilty of Count Three, the government must prove the following five elements beyond a reasonable doubt:

First, that the money was stolen, converted, or taken;

Second, that after the money was stolen, converted, or taken, it crossed a state boundary or boundary of the United States;

Third, that the defendant received, possessed, concealed, stored, bartered, sold, or disposed of the stolen, converted, or taken money;

Fourth, that the defendant knew that money had been stolen, converted, or unlawfully taken; and

Fifth, that the value of the money was at least $5,000.

The first element that the government must prove beyond a reasonable doubt with respect to Count Three is that the money described in the indictment was stolen, converted, or unlawfully taken.

"Stolen" money means money taken with the intent to deprive the owner of the use or benefits of ownership.

"Converted" money means money taken for one's own use by any dishonest or illegal means.  For example, if a person has received money in exchange for specific services, and he

M9JQraj4                    Charge

1    does not perform those services and instead retains the money

2    for his own use, he has converted money.

3           Although you must decide beyond a reasonable doubt if

4    the money at issue was stolen, converted, or unlawfully taken,

5    you do not have to determine who stole, or unlawfully took it,

6    or that the defendant knew who did so.  The government need not

7    prove that the defendant personally stole the money from the

8    owner.  However, you must determine that the owner of the money

9    at issue was deprived of the rights and benefits of ownership

10   without the owner's consent.

11          The second element that the government must establish

12   beyond a reasonable doubt with respect to Count Three is that,

13   after the money was stolen, converted, or taken, it crossed a

14   state boundary of the United States.

15          The defendant need not have intended or known of the

16   money's interstate or foreign movement, nor is it necessary

17   that the defendant actually physically moved the money across

18   state lines.  The government satisfies its burden on this

19   element if it proves beyond a reasonable doubt that the

20   defendant received the money after it had moved across a state

21   line or a border of the United States.

22          The third element the government must prove beyond a

23   reasonable doubt with respect to Count Three is that the

24   defendant received, possessed, concealed, bartered, sold, or

25   disposed of the stolen, converted, or unlawfully taken money.

1          In considering whether the defendant received,

2     concealed, stored, bartered, sold, or disposed of the money at

3     issue, you should give those words their common and ordinary

4     meaning and understand them as they are used in their everyday

5     sense.  For example, a defendant may have received property

6     simply by physically taking possession of the property or

7     exerting control over it.  The defendant need not have

8     benefited in any way from having received, concealed, stored,

9     bartered, sold, or disposed of the money in order for this

10    element to be satisfied.  Whether a defendant received,

11    possessed, stored, bartered, sold, or disposed of the money is

12    a question for you to determine from the surrounding facts and

13    circumstances.  It is not necessary that the government prove

14    that the defendant performed all of those actions with respect

15    to the money.  The government satisfies its burden of proving

16    unlawful receipt of money if it proves beyond a reasonable

17    doubt that the defendant engaged in any one of these actions

18    with respect to the money.

19          However, you may not find the defendant guilty unless

20    you agree unanimously that one particular action, or type of

21    action, was taken.  That is, you must all agree that the

22    defendant received, or possessed, or concealed, or stored, or

23    bartered, or sold, or disposed of the money.  It is not enough

24    that some of you find only that the defendant concealed or

25    stored the money, and the rest of you find only that the

1    defendant sold the money.  You must all agree that the

2    defendant performed at least one specific action, or type of

3    action, with respect to the money in order to find the

4    defendant guilty of Count Three.

5          The fourth element that the government must prove

6    beyond a reasonable doubt with respect to Count Three is that

7    the defendant knew at the time of receipt, possession, storage,

8    bartering, sale or disposition that the money was stolen,

9    converted, or unlawfully taken.

10         In deciding whether the defendant knew the money was

11   stolen, converted, or unlawfully taken at the relevant time,

12   you must focus on his actual knowledge at that time.  Even if

13   you find that a prudent person would have known that the money

14   was stolen at the relevant time, if you find that the defendant

15   did not know, then you cannot find the defendant guilty.

16         The government has offered evidence that the defendant

17   was in possession of recently stolen money.  I instructed you

18   that you may, but not need, find from the defendant's

19   possession of the money that he knew it was stolen at the time

20   he received it.

21         When I refer to the money as "recently" stolen, you

22   should give the word "recently" its ordinary, everyday meaning.

23   The longer the period since the theft, the weaker the

24   connection between the defendant's possession of the money and

25   the defendant's knowledge that the money was stolen.  The fact

1    that the money was recently stolen is a factor for you to

2    consider in examining the circumstances surrounding the

3    defendant's possession of the money and deciding what

4    conclusions, if any, you wish to draw from that possession.

5            Let me emphasize again that you are not required to

6    make a connection between the defendant's possession of

7    recently stolen money and his knowledge that the money was

8    stolen.  The mere fact that I am telling you that you may draw

9    such a connection does not mean that I am encouraging you to

10   make it.  You need not draw a connection even if you find the

11   defendant was in possession of the money in question.  Remember

12   that at all times the government has the burden of proving

13   beyond a reasonable doubt that the defendant knew the money was

14   stolen, converted, or unlawfully taken.

15           This element involves a decision about the defendant's

16   state of mind.  Earlier, I gave you instructions about what

17   evidence you may consider when making findings about the

18   defendant's state of mind, and you should follow those

19   instructions here.

20           The fifth element that the government must prove

21   beyond a reasonable doubt with respect to Count Five is that

22   the money at issue had a value of $5,000 or more.

23           Count Four, the final count, charges the defendant

24   with conspiracy to commit money laundering.  In order to find

25   the defendant guilty of Count Four, the government must prove

the following two elements beyond a reasonable doubt:

First, the conspiracy charged existed; that is, an agreement or understanding between two or more persons existed between around July 2018 and September 2018 to intentionally and knowingly commit money laundering; and

Second, that the defendant knowingly and willfully became a member of the charged conspiracy.

I instructed you as to the definition of conspiracy and the elements of membership in connection with Count One, and those same instructions apply here.

The difference between Count One and Count Four is the object or objects of the charged conspiracy.  The conspiracy charged in Count Four has two objects or goals; namely, two different types of money laundering.

The first object is participation in a financial transaction that involves the proceeds of a specified unlawful activity (here, the wire fraud scheme charged in Counts One and Two) knowing that the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.  This type of money laundering is known as "concealment" money laundering.

The second object is engagement in a monetary transaction in criminally derived property of a value of greater than $10,000.  The second object of the conspiracy charged in Count Four is known as "monetary" transactions in

1    criminally derived property.

2              I will explain each of these objects in turn.  It is

3    important to note, however, that the government does not need

4    to prove that the defendant agreed to accomplish both of the

5    two objects in order for you to find the defendant guilty of

6    Count Four, conspiracy to commit money laundering.  Moreover,

7    as I explained earlier, you need not find that either of the

8    two objects was actually accomplished.  An agreement to

9    accomplish either of the two objects or both is sufficient to

10   find the defendant guilty on Count Four.  However, you must be

11   unanimous as to which of the two objects the defendant agreed

12   to commit or unanimously agree that he agreed to commit both

13   objects.

14             To prove the substantive crime of concealment money

15   laundering -- that is the first object of conspiracy charged in

16   Count Four -- the government would have to prove the following

17   three elements beyond a reasonable doubt:

18             First, that the defendant conducted or attempted to

19   conduct a financial transaction involving property constituting

20   the proceeds of a specified unlawful activity, specifically the

21   wire fraud scheme charged in Counts One and Two;

22             Second, that the defendant knew that the property

23   involved in the financial transaction was the proceeds of some

24   form of unlawful activity; and

25             Third, the defendant knew that the transaction was

M9JQraj4                          Charge

designed in whole or in part either to conceal or disguise the
nature, location, source, ownership or control of the proceeds
of specified unlawful activity.

          The term "conducts" includes initiating, concluding,
or participating in initiating or concluding a transaction.

          The term "financial transaction" means a transaction
involving a financial institution that is engaged in, or the
activities of which affect, interstate or foreign commerce in
any way or degree, or a transaction that in any way or degree
affects interstate or foreign commerce and involves the
movement of funds by wire or other means, or involves one or
more monetary instruments.

          A "transaction involving a financial institution"
includes a deposit, withdrawal, transfer between accounts,
exchange of currency, loan, extension of credit, purchase or
sale of any stock, bond, certificate of deposit or other
monetary instrument.  Use of a safe deposit box or any other
payment, transfer, or delivery by, through or to a financial
institution by whatever means.

          The term "interstate or foreign commerce" means
commerce between any combination of states, territories or
possessions of the United States, or between the United States
and a foreign country.

          The term "monetary instrument" includes, among other
things, coin or currency of the United States or any other

M9JQraj4                    Charge

country, personal checks, travelers checks, cashiers checks,

bank checks, money orders and investment securities or

negotiable instruments in bearer form or otherwise in such form

that title thereto passes upon delivery.

    The term "specified unlawful activity" includes wire

fraud and conspiracy to commit wire fraud.  However, it is for

you to determine whether the funds at issue were in fact the

proceeds of the wire fraud scheme charged Counts One and Two.

    The defendant must have known that the property

involved in the financial transaction represented proceeds from

some form, though not necessarily which form, of activity that

constitutes a felony under state, federal, or foreign law.

Thus, to satisfy this element, the government does not have to

prove that the defendant specifically knew that the property

involved in the transaction represented the proceeds of wire

fraud, a conspiracy to commit wire fraud, or any other specific

offense; the government has to prove only that the defendant

knew the money represented the proceeds of some illegal

activity that was a felony.  I instruct you that as a matter of

law that wire fraud and wire fraud conspiracy are felonies

under federal law.

    Finally, the defendant must have known that the

transaction was designed to conceal or disguise the nature,

location, source, ownership or control of the proceeds of

specified unlawful activity; namely, wire fraud.  Thus, if the

1    defendant knew of the purpose of the particular transaction at

2    issue, and he knew that the transcription was either designed

3    to conceal or disguise the true origin of the property in

4    question, this element is satisfied.  However, if the defendant

5    knew of the transaction but did not know that it was either

6    designed to conceal or disguise the true origin of the property

7    in question, this element has not been satisfied.

8             To prove the substantive crime of engaging in a

9    monetary transaction in criminally derived property -- that is

10   the second object of the conspiracy charged in Count Four --

11   the government would have to prove the following five elements

12   beyond a reasonable doubt:

13            First, that the defendant engaged in a monetary

14   transaction in or affecting interstate or foreign commerce;

15            Second, that the defendant did so knowing that the

16   transaction involved criminally derived property;

17            Third, that the criminally derived property was of a

18   value greater than $10,000;

19            Fourth, that the criminally derived property was in

20   fact derived from a specified unlawful activity; here, from the

21   wire fraud scheme charged in Counts One and Two;

22            Fifth, that the monetary transaction took place either

23   (1) in the United States or (2) outside of the United States,

24   and the defendant is a United States person.

25            The term "monetary transaction" means the deposit,

withdrawal, transfer, or exchange in or affecting interstate or

foreign commerce, of funds or a monetary instrument by,

through, or to a financial institution.

I have already explained the concepts of transactions

in or affecting interstate or foreign commerce, and you should

apply those instructions here too.  The effect on interstate

commerce can be established in several ways.

First, any monetary transaction with a financial

institution insured by the Federal Deposit Insurance

Corporation (or FDIC) affects interstate commerce, so if you

find that a bank involved in a relevant monetary transaction

was insured by the FDIC, that is enough to establish that the

transaction affected interstate commerce.

Second, if you find that the source of the funds used

in the transaction affected interstate or foreign commerce,

that is sufficient as well.

Third, if you find that the transaction itself

involved an interstate or foreign transfer of funds, that would

also be sufficient.

The term "criminally derived property" means any

property constituting or derived from proceeds obtained from

any criminal offense.  The government is not required to prove

that the defendant knew the particular offense from which the

criminally derived property was derived, but the government

must prove beyond a reasonable doubt that the defendant knew

that the transaction involved property derived from some
criminal offense.

The third and fourth elements of the crime
constituting the second object of the conspiracy charged in
Count Four are, respectively, that the criminally derived
property must of a value greater than $10,000, and that the
criminally derived property must also in fact have been derived
from a specified unlawful activity; here, from the wire fraud
scheme charged in Counts One and Two.

I previously defined the term "specified unlawful
activity," and that definition applies here too.

The government is not required to prove that all of
the property involved in the transaction was criminally derived
property.  However, the government must prove that more than
$10,000 of the property involved was criminally derived
property.

The fifth element of the crime constituting the second
object of the conspiracy charged in Count Four is that the
monetary transaction took place either (1) in the United
States, or (2) outside of the United States and the defendant
is a United States person.  A United States person includes
both nationals of the United States and any person located
within the territory of the United States.

As I explained, with respect to both Counts One and
Four -- those are the conspiracy charges -- the government is

M9JQraj4                    Charge

1    required to prove beyond a reasonable doubt that the defendant

2    knew of the illegal object or objects of the charged

3    conspiracy.  In determining whether the defendant did, so you

4    may consider whether the defendant deliberately closed his eyes

5    to what otherwise would have been obvious.

6          For example, with respect to Count One, if you find

7    that the defendant was aware of a high probability that the

8    object of the conspiracy was to commit wire fraud, but that the

9    defendant acted with deliberate disregard of that fact, you may

10   find that the defendant acted knowingly.  The law calls this

11   "conscious avoidance."  Nevertheless, if you find that the

12   defendant actually believed that he and his co-conspirators

13   were acting in a lawful manner, he may not be convicted of the

14   charge in Count One.  This principle applies to the charge in

15   Count Four as well.

16         I want to be very clear about what this means and does

17   not mean.  First, there is a difference between knowingly

18   participating in the conspiracy and knowing the objects of the

19   conspiracy.  Conscious avoidance, as I have described it,

20   cannot be used as basis for finding that the defendant

21   knowingly joined the conspiracy.  It is logically impossible

22   for a defendant to join the conspiracy unless he or she knows

23   the fact that the conspiracy exists.  But if you find beyond a

24   reasonable doubt that the defendant knowingly chose to

25   participate in a joint undertaking, you may consider whether

1    the defendant deliberately avoided performing an otherwise

2    obvious fact, such as, that the purpose of the partnership he

3    joined was to commit wire fraud or money laundering.

4            If you find beyond a reasonable doubt that the

5    defendant was aware that there was a high probability that his

6    alleged co-conspirator's or co-conspirators' objective was to

7    commit wire fraud or money laundering, but that he deliberately

8    avoided confirming this fact, you may treat this deliberate

9    avoidance of positive knowledge as the question equivalent

10   knowledge of the object of charged conspiracy, unless you find

11   that the defendant actually believed that he and his

12   co-conspirator or co-conspirators were acting in a lawful

13   manner.

14           The knowledge on the part of the defendant regarding

15   the object of the conspiracy cannot be established by showing

16   that the defendant was merely careless, negligent, stupid or

17   foolish, or that he or she should have known what was going on.

18           Thus, if the defendant actually believed that the

19   charged conspiracy was about something else entirely, or if he

20   was merely foolish, careless or even reckless about the risk

21   that he was wrong, then you cannot find him guilty of the count

22   you are considering.

23           Conscious avoidance can be established only where the

24   defendant deliberately decided not to confirm a key fact when

25   it was obvious or highly probable that the fact was true.  One

M9J6RAJ3                       Charge

may not willfully and intentionally remain ignorant of important facts in order to escape criminal laws.

As I explained earlier, to find the defendant guilty of Count Two, which charges him with wire fraud, the government must prove beyond a reasonable doubt that the defendant participated in a scheme to defraud knowingly, willfully and with the specific intent to defraud.

Before you find the defendant guilty of Count Three, which charges him with receipt of stolen money, the government must prove beyond a reasonable doubt that the defendant knew at the relevant time that the money was stolen, converted or unlawfully taken.  Here too, you may consider whether the defendant deliberately closed his eyes to what otherwise would have been obvious.

Thus, for example, if you find beyond a reasonable doubt the defendant was aware that there was a high probability that the money sent to him were the proceeds of a fraudulent scheme or that the money he received was stolen, but he deliberately and consciously avoided confirming those facts, you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge unless you find that the defendant actually believed that he and his associates were acting in a lawful manner.

(Continued on next page)

M9J6RAJ3                         Charge

1          THE COURT:  Again, however, I emphasize that the

2    necessary knowledge cannot be established by the showing of

3    careless, negligent, or even foolish.

4          The defendant is also charged with aiding and abetting

5    the commission of the substantive crimes charged in Counts Two

6    and Three, and the defendant can be convicted therefore either

7    if he committed the crime himself or if another person

8    committed the crime and the defendant aided and abetted that

9    person to commit the crimes.  In other words, it is not

10   necessary for the government to show that the defendant himself

11   physically committed the crime charged in order for you to find

12   him guilty.  This is because a person who aids, abets,

13   counsels, commands, induces, or procures the commission of a

14   crime is just as guilty of that offense as if he committed it

15   himself.

16         Accordingly, you may find the defendant guilty of the

17   offenses charged in Counts Two and Three if you find beyond a

18   reasonable doubt the government has proved that another person

19   actually committed the offense with which the defendant is

20   charged, and the defendant aided, abetted, counseled,

21   commanded, induced, or procured that person to commit the

22   crime.

23         To aid or abet another to commit a crime, it is

24   necessary the government prove beyond a reasonable doubt that a

25   defendant willfully and knowingly associated himself in some

way with the crime committed by the other person and willfully

and knowingly sought by some act to help the crime succeed.  In

other words, an aider and abettor must know that the crime is

being committed and act in a way that is intended to bring

about the success of the criminal venture.

        Let me caution you that the mere presence of the

defendant where a crime is being committed, even when coupled

with knowledge by the defendant that the crime is being

committed, or merely associating with others who are committing

a crime, is not sufficient to make the defendant guilty under

this approach of aiding and abetting.  Such a defendant would

be guilty of aiding and abetting only if, in addition to

knowing of the criminal activity, he actually took actions

intended to help it succeed.

        To determine whether the defendant aided or abetted

the commission of the crime with which he is charged, ask

yourself these questions:

        One, did he participate in the crime charged as

something he wished to bring about?

        Two, did he knowingly associate himself with the

criminal venture?

        Three, did he seek by his actions to make the criminal

venture succeed?

        If he did, then the defendant is and aider and

abettor, and therefore guilty of the offense.  If on the other

hand, your answer to any of these questions is no, then the

defendant is not an aider and abettor, and you must find him

not guilty under that theory.

In addition to all of the elements I have described

for you, in order to convict the defendant of each count in the

indictment, you must also decide whether any act in furtherance

of the count occurred within the Southern District of the

United States -- the Southern District of New York.  Sorry.

The Southern District of New York, not the United States.  The

southern District of New York includes Manhattan.  The

government does not have to prove the complete crime was

committed in the Southern District of New York or the defendant

was ever in the Southern District of New York.  It is

sufficient to satisfy this element if any act in furtherance of

the crime occurred within this district.

Venue must be examined separately for each count in

the indictment.  Venue on one count does not establish venue on

another count, although, if applicable, you may rely on the

same evidence to establish venue on multiple counts.  With

respect to the conspiracy offenses charged in Counts One and

Four, it is sufficient to establish venue if the government

proves that any fact in furtherance of the conspiracy charged

occurred in the Southern District of New York.

The acts itself need not be a criminal act.  It could

include, for example, a wire transfer into, out of, or through

M9J6RAJ3                          Charge

this district.  That act need not be taken by the defendant or

a conspirator, as long as the act was caused by the conduct of

the defendant or coconspirator or was reasonably foreseeable.

With respect to the substantive offenses charged in Counts Two

and Three, it is sufficient to establish venue if the

government proves any contact in the furtherance of the crime

occurred within this district.

          I should note that on this issue, and this issue

alone, the government need not prove venue beyond a reasonable

doubt, but only by a mere preponderance of the evidence.  Thus,

the government has satisfied its venue obligations as to a

count if you conclude it's more likely than not that any act in

furtherance of the crime charged in that count occurred in the

Southern District of New York and that it was reasonably

foreseeable to the defendant that the act would take place in

the Southern District of New York.  By contrast, if you find

that the government failed to prove venue by a preponderance of

the evidence with regard to any count, then you must acquit the

defendant of that count.

          It does not matter if the evidence you heard at trial

indicates that a particular act occurred on a different date.

The law requires only a substantial similarity between the

dates alleged in the indictment and the dates established by

the evidence.  In.

          A few minutes, you are going to go into the jury room

1    and begin your deliberations, although, you may certainly start

2    with lunch, less you worry.  Your first task, lunch perhaps,

3    will be to select a foreperson.  A foreperson has no greater

4    voice or authority than any other juror but is the person who

5    will communicate with me when questions arise and when you have

6    reached a verdict.  You will be asked in open court to pass

7    your completed verdict form to me.  Notes should be signed by

8    the foreperson and should include the date and time they were

9    sent.  They should also be as clear and precise as possible.

10   Any notes from the jury will become part of the record in this

11   case, so please be as clear and specific as you can be in any

12   notes that you send.  Do not tell me or anyone else how the

13   jury stands on any issue until after a unanimous verdict is

14   reached.

15           All of the exhibits will be given to you near the

16   start of your deliberations.  In addition, you will also be

17   provided with a list of all the exhibits that were received

18   into evidence.

19           Now, one note on this that is not in the written

20   instructions.  The evidence, the exhibits that are in evidence

21   that are audio recordings, those have been loaded onto a laptop

22   that has the files on the desktop or the laptop.  So if you

23   wish to listen to the recordings in the jury room, you should

24   be able to do so on your own with the laptop.

25           If you prefer to view any evidence here in the

courtroom, or listen, for that matter, or if you want any of
the testimony submitted to you or read back to you, you may
also request that.

        Keep in mind, that if you ask for testimony, however,
the court reporter must search through her notes, the parties
must agree on what portions of testimony may be called for, and
if they disagree, I must resolve those disagreements.  That can
be a time-consuming process.  Please try to be as specific as
possible in requesting portions of the testimony, if you do.

        Again, the request for testimony -- in fact, any
communication with the Court -- should be made to me in writing
signed by your foreperson with the date and time and given to
one of the court security officers.

        If any one of you took notes during the course of the
trial, you should not show your notes or discuss your notes
with any other jurors during your deliberations.  Any notes you
have taken are to be used solely to assist you.  The fact that
a particular juror has taken notes entitles that juror's views
to no greater weight than any other juror.  Finally, your notes
are not to substitute for your recollection of the evidence in
this case.  If, during your deliberations, you have any doubt
as to any of the testimony, you may, as I just told you,
request that the official trial transcript that has been made
of these proceedings be submitted or read back to you.

        All of us, no matter how hard we try, tend to look at

others and weigh what they have to say through the lens of our

own experience and background.  We each have a tendency to

stereotype others and make assumptions.  Often, we see life and

evaluate evidence through a clouded filter that tends to favor

those like ourselves.  You must do the best you can to put

aside such stereotypes, for all litigants and witnesses are

entitled to a level playing field.

        In particular, it would be improper for you to

consider, in reaching your decision as to whether the

government sustained its burden of proof, any personal feelings

you may have about the defendant's race, religion, national

origin, gender, sexual orientation, or age.  Similarly, it

would be improper of you to consider any personal feeling you

may have about the race, religion, national origin, gender,

sexual orientation, or age of any witness or anyone else

involved in this case.

        Indeed, under your oath as jurors, you are not to be

swayed by bias, prejudice, or sympathy.  You are to be guided

solely by the evidence in this case.  And as you sift through

the evidence, the crucial question you must ask yourself for

each count is:  Has the government proved each element of each

count beyond a reasonable doubt.

        It is for you, and you alone, to decide whether the

government has sustained its burden of proving beyond a

reasonable doubt solely on the basis of the evidence or lack of

1    evidence and subject to the law as I've instructed you.

2              It must be clear to you that once you let prejudice or

3    bias or sympathy interfere with your thinking, there is a risk

4    that you will not arrive at a true and just verdict.  If you

5    have a reasonable doubt as to the defendant's guilt with

6    respect to a particular count, then you must render a verdict

7    of not guilty on that particular count.

8              On the other hand, if you should find that the

9    government has met its burden of proving the guilt of the

10   defendant beyond a reasonable doubt with respect to a

11   particular count, then you should not hesitate because of

12   sympathy or any other reason to render a verdict of guilty on

13   that count.

14             I caution you that, under your oath as jurors, you

15   cannot allow to enter into your deliberations any consideration

16   of punishment that may be imposed upon the defendant if he is

17   convicted.  The duty of imposing a sentence in the event of

18   conviction rests exclusively with the Court, and the issue of

19   punishment cannot affect your deliberations as to whether the

20   government has proved the defendant's guilt beyond a reasonable

21   doubt.

22             The most important part of this case, members of the

23   jury, is the part that you as jurors are now about to play as

24   you deliberate on the issues of fact.  I know you will try the

25   issues that have been presented to you according to the oath

M9J6RAJ3                        Charge

you have taken as jurors.  In that oath, you have promised that
you would well and truly try the issues joined in this case and
a true verdict rendered.

        As you deliberate, please listen to the opinions of
your fellow jurors and ask for an opportunity to express your
own views.  Every juror should be heard.  No one juror should
hold center stage in the jury room, and no one should control
or monopolize the deliberations.  If, after listening to your
fellow jurors, and if after stating your own view, you become
convinced that your view is wrong, do not hesitate because of
stubbornness or pride to change your view.  On the other hand,
do not surrender your honest beliefs solely because of the
opinions of your fellow jurors or because you are outnumbered.

        Your verdict must be unanimous.  If at any time you
are not in agreement, you are instructed that you are not to
reveal the standing of the jurors — that is the split of the
vote — to anyone, including me, any time during your
deliberations.

        We have prepared a verdict form for you to use in
recording your decisions, a copy of which is attached to these
instructions.  Now, one thing I'll note on that score is you'll
see that you are asked to return a verdict of guilty or not
guilty wither respect to each count, and Count Four, has to
return a separate verdict as to each object of the conspiracy
charged in Count Four, but that should be clear from the

1    verdict form.

2              Do not write on your individual copies of the verdict

3    form.  My staff, Ms. Smallman, will give the official verdict

4    form to Juror Number 1, who shall give it to the foreperson

5    after the foreperson has been selected.

6              You should draw no inference from the questions on the

7    verdict form as to what your verdict should be.  The questions

8    are not to be taken as any indication that I have any opinion

9    as to how they should be answered.  After you have reached a

10   verdict, the foreperson should fill in the verdict form and

11   note the date and time, and you should all sign the verdict

12   form.

13             The foreperson should then give a note, not the a

14   verdict form itself, for the court security officer outside

15   your door, stating that you have reached a verdict.  Do not

16   specify what the verdict is in your note.  Instead, the

17   foreperson should retain the verdict form and hand it to me in

18   open court when I ask for it.

19             I will stress again that each of you must be in

20   agreement with the verdict that's announced in court.  Once

21   your verdict is announced in open court and officially

22   recorded, it cannot ordinarily be revoked.

23             Finally, I say this not because I think it is

24   necessary, but because it is the custom in this courthouse to

25   say it:  You should treat each other with courtesy and respect

M9J6RAJ3                         Charge

1    during your deliberations.  All litigants stand equal in this

2    room.  All litigants stand equal before the bar of justice.

3    All litigants stand equal before you.  Your duty is to decide

4    between these parties fairly and impartially, and to see that

5    justice is done.

6              Under your oath as jurors, you are not to be swayed by

7    sympathy or prejudice.  You should be guided solely by the

8    evidence presented during the trial and the law as I gave it to

9    you, without regard to the consequences of your decision.  You

10   have been chosen to try the issues of fact and reach a verdict

11   on the basis of the evidence or lack of evidence.  If you let

12   sympathy or prejudice interfere with your clear thinking,

13   there's a risk you will not arrive at a just verdict.  You must

14   make a fair and impartial decision so that you will arrive at

15   the just verdict.

16             Members of the jury, I ask for your patience for a few

17   moments longer.  It's necessary for me to spend a few moments

18   at the sidebar with the parties and the court reporter at the

19   side bar.  I will ask you to remain patient in the jury box

20   without speaking to each other, and we will return in just a

21   moment to submit the case in chief.

22             Thank you.

23             (Continued on next page)

24

25

M9J6RAJ3                          Charge

1              (At the sidebar)

2              THE COURT:  All right.  Any objections that were

3    previously made or preserved?  No need to make them again, any

4    objections to the charges given by the government?

5              MS. KAMAL:  No, your Honor.

6              THE COURT:  Mr. Schneider?

7              MR. SCHNEIDER:  Just two things.  I want to renew my

8    application that was made earlier, at specifically Page 4,

9    Line 8 and Page 4, Line 11.  You highlighted reasonable and

10   possible on both lines.  So I had asked in my initial jury

11   charge conference that you include the mere preponderance

12   charge that would balance it out --

13             THE COURT:  You don't have to reiterate.

14             MR. SCHNEIDER:  No.  But at this time you actually

15   highlighted in the written charge, which the jurors have, the

16   word "reasonable" and "possible" twice.

17             So other than that and what I said before, nothing

18   else.

19             THE COURT:  I'm pretty sure that was in the draft, but

20   in any event, so noted.  All right.  Thank you very much.

21             (Continued on next page)

22

23

24

25

M9J6RAJ3                    Charge

1          (In open court)

2          THE COURT:  All right.  Thank you very much for your

3    patience and thank you for listening.  It took a while.  It's

4    not the preferred way to speak with you, so I appreciate your

5    understanding for the need of that.  This is the moment before

6    I excuse you to deliberate where I have either the pleasure or

7    mispleasure -- that's not a word.  You get the point -- of

8    telling Jurors Number 13 and 14, you are alternates, so I'm

9    going to let you go at this moment.

10          However, before you go anywhere, let me stress a

11   couple of things.  You are not formally excused at this time

12   because it is possible, but during the course of the jury's

13   deliberation, that something will happen and you will be called

14   upon to substitute and join in the deliberations.  So for that

15   reason, until you are formally excused, which would happen when

16   the jury is excused, you should continue to abide by the

17   instructions that I have given you throughout the trial; that

18   is, do not discuss the case with each other, with anyone else.

19   You should continue to keep an open mind, and don't do any

20   research about the case.  That is critically important.  All

21   right?  If you violate any of those rules because you think you

22   might not be called upon to deliberate and it turns out you are

23   called upon to deliberate, it's going to be a problem.

24          So I promise that we will let you know when you are

25   formally excused.  If you are not called upon to deliberate, at

M9J6RAJ3                    Charge

1    which time those restrictions will no longer apply, but until

2    you are contacted by someone on my staff or by me, please

3    continue to abide by those instructions.  It's very important.

4              I don't know if it is a relief or disappointment that

5    you will not be called upon to deliberate, at least in the

6    first instance, but I want to assure you that you have played a

7    critical role simply by being here.  It may not feel that way

8    if you're not called upon to deliberate, but even in the before

9    times, before the pandemic, it was always important to have

10   extra jurors to ensure that we have the requisite number when

11   the time comes.  And it is especially important in the now

12   times because one never knows.

13             So in that regard, again, simply by being here,

14   ensuring that we could get to this point, and, again, you may

15   be called to substitute, so for that reason, your role is not

16   yet done.  So I want to thank you, and thank you on behalf of

17   the parties for the time and attention that you have paid.

18             And with that, I'll ask just the two of you, Jurors

19   Number 13 and 14, to follow Ms. Smallman into the jury room.

20   Your lunches are there.  You're welcome to take your lunch with

21   you, but please don't remain in the jury room because the jury

22   will be excused in a moment.  But take your personal

23   belongings, take your lunch, you can take your lunch, and then

24   you are free to go.  But you are not yet formally excused, so

25   thank you very much.

1            And the rest of you should just remain where you are

2    for the moment.

3            (Pause)

4            THE COURT:  And at this time, I'll ask the court

5    security officer who will secure the jury's deliberations to

6    step forward so I can administer the oath.

7            Sir, will you raise your right hand?

8            (Marshal sworn)

9            THE COURT:  All right.  Thank you very much.

10           Now, ladies and gentlemen, just wait another moment

11   until Ms. Smallman comes back after your colleagues have

12   retrieved their belongings and made their way out of the jury

13   room.

14           Let me say a couple further things.  First,

15   Ms. Smallman should have the official verdict form, which

16   she'll provide to Juror Number 1.  As I said earlier, Juror

17   Number 1 should provide it to the foreperson when that person

18   is selected.  I said that your first task should be the

19   selection of the foreperson.  I assume you're rather hungry, so

20   you can eat your lunch first.  I leave it to you if you wish to

21   deliberate or wait until you're done.  It is entirely up to

22   you.

23           I did say at the beginning of the trial that you guys

24   can spread out and use the second room if you wish.  I just

25   want to stress you may not deliberate in any way, shape, or

M9J6RAJ3                        Charge

1   form unless all 12 of you are there.  So if you spread out, for

2   instance, for lunch, make sure you don't begin to discuss the

3   case or conduct any deliberations until all 12 of you are

4   actually in the jury room.  And that applies at all times

5   during your deliberations.

6          And the last thing I will say, if we have not heard

7   from you before then, in one way or another, I will retrieve

8   you at 5:00 o'clock today, at which time I will excuse you for

9   the evening and give you further instructions at that time.

10  Obviously, if we see you before then, for one reason or

11  another, we see you before then.  But if we have not heard from

12  you, I will bring you out at that time to let you go for the

13  day.

14         Let me check with Ms. Smallman, and we'll get you on

15  your way.

16         And the last thing I will say, we do have all the

17  exhibits that were admitted into evidence.  I mentioned that

18  earlier.  I would say a minute or so after you leave, maybe

19  even with you, we'll provide those with you so you should have

20  them in the jury room.

21         With that, you are now excused to begin your

22  deliberations.  Enjoy your lunch, and good luck with your

23  deliberations.

24         (At 1:24 p.m., the jury retired to deliberate)

25

M9J6RAJ3                         Charge

1              (Jury not present)

2              THE COURT:  You may be seated.

3              All right.  First of all, it is my practice to say it

4    is true, at this time, before we have heard from the jury, that

5    the case is well tried.  The case was well tried, so I am going

6    to say it to both sides:  I appreciate it.  You made my task

7    easier by presenting issues in an appropriate and helpful way

8    and by handling yourselves well.  So thank you.

9              In my experience, first of all, no one should go very

10   far.  And if you do leave the courtroom -- I'll talk about that

11   in a moment -- you should make sure we have your cell phone

12   numbers and you're reachable.  I want to underscore,

13   Mr. Schneider, since we had some issues with Mr. Raji's timely

14   appearance earlier in the case, he should definitely not go

15   anywhere or very far at all, and you should make sure you know

16   where he is at all times.

17             Now, in my experience, it's not uncommon that we get a

18   note relatively quickly, even if it's about something

19   ministerial or the like.  So for that reason, it's 1:30, and

20   I'm sure you're starving as well, so feel free to run and get

21   some food.  But make sure, I would say for the next hour or so,

22   other than when you're getting food or eating the food, that

23   you're ideally in the courtroom and certainly nearby.

24             And, again, if you're not in the courtroom, please

25   make sure we have your cell phone numbers, and that you are

1   easily reachable and that you get back here as quickly as you

2   can if we get any sort of communication.  I don't want to waste

3   the jury's time.

4          Now, I have begun to ask, just to save time, that the

5   parties prepare redacted versions of the transcript ahead of

6   time so we don't have to do that upon receiving a note.  So I

7   would ask the government to go through the transcript and

8   redact what would need to be redacted if the jury were to ask

9   for any portions of it.  And show those to Mr. Schneider.  I

10  would recommend that you use your judgment and maybe begin with

11  the witnesses that you think would be most likely for the jury

12  to ask; that is to say triage.  I'm guessing that you can use

13  your judgment on that score.  But in any event, it would be

14  ideal to have that done before the jury were to send any sort

15  of note so that they don't need to wait.  Any questions, any

16  concerns, any problems from the government?

17         MS. GHOSH:  No, your Honor.

18         THE COURT:  Mr. Schneider?

19         MR. SCHNEIDER:  No.

20         THE COURT:  All right.  As you heard, I will bring

21  them back into the courtroom at or a couple minutes before

22  5:00 p.m. to excuse them, if we do not hear from them or see

23  them before that.  So in the event we don't get a note in one

24  form or another by 4:50, you should certainly make sure you're

25  present at 4:45 and ready to go at that time.

M9J6RAJ3                          Charge

1              With that, enjoy your lunches, and I'll see you when I

2      see you.   Thank you.

3              (Recess)

M9J6RAJ5

1        (At 2:05 p.m. a note was received from the jury)

2        THE COURT:  All right.  As I think you may know, we

3   received a note.  It is dated today, September 19, 2:05 p.m.

4   It states:  We have arrived at a verdict signed by the jury

5   foreperson.

6        I will mark this as Court Exhibit 1.  And my intention

7   is to docket it along with the verdict form with the jury's

8   signatures after the case.  With that, we'll get the jury and

9   proceed.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9J6RAJ5

1          (Jury present)

2          THE COURT:  All right.  Welcome back, ladies and

3     gentlemen.  We have received your note dated today, 2:05 p.m.,

4     stating, "we have arrived at a verdict," and the foreperson, I

5     gather, that's Jury Number one; is that correct?

6          THE JUROR:  Yes.

7          THE COURT:  Can you please hand your verdict form to

8     Ms. Smallman who will hand it to me?

9          All right.  Ladies and gentlemen, I'm about to read

10    your verdict aloud.  After I do that, I'm going to ask each of

11    you individually if the verdict that I read is, in fact, your

12    verdict.

13          Now, with that, as to Count One, charging the

14    defendant with conspiracy to commit wire fraud, the jury finds

15    the defendant, Mustapha Raji, guilty.

16          As to Count Two charging the defendant with wire

17    fraud, the jury finds the defendant guilty.

18          As to Count Three, charging the defendant with receipt

19    of stolen funds, the jury finds the defendant guilty.

20          As to Count Four, charging the defendant with

21    conspiracy to commit money laundering, with respect to Object

22    One of that conspiracy, the jury finds the defendant guilty.

23          And as to Count Four, Object Two, the jury finds the

24    defendant guilty.

25          The verdict form is signed by what appears to be all

M9J6RAJ5

1   12 jurors dated today, September 19, 2022, at 2:05 p.m.

2              Juror Number 1, is that your verdict?

3              JUROR:  Yes, it is, sir.

4              THE COURT:  Juror Number 2, is that your verdict?

5              THE JUROR:  Yes.

6              THE COURT:  Juror Number 3, is that your verdict?

7              THE JUROR:  Yes.

8              THE COURT:  Juror Number 4, is that your verdict?

9              THE JUROR:  Yes.

10             THE COURT:  Juror Number 5, is that your verdict?

11             THE JUROR:  Yes.

12             THE COURT:  Juror Number 6 is that your verdict?

13             THE JUROR:  Yes.

14             THE COURT:  Juror Number 7, is that your verdict?

15             THE JUROR:  Yes?

16             THE COURT:  Juror Number 8, is that your verdict?

17             THE JUROR:  Yes, your Honor.

18             THE COURT:  Juror Number 9, is that your verdict?

19             THE JUROR:  Yes.

20             THE COURT:  Juror Number 10, is that your verdict?

21             THE JUROR:  Yes.

22             THE COURT:  Juror Number 11, is that your verdict?

23             THE JUROR:  Yes.

24             THE COURT:  Juror Number 12, is that your verdict?

25             THE JUROR:  Yes, your Honor.

M9J6RAJ5

1          THE COURT:  Jury is unanimous.  Counsel, is there any

2     reason that at this time I cannot excuse the jury?

3          MR. SOBELMAN:  No, your Honor.

4          MR. SCHNEIDER:  No, your Honor.

5          THE COURT:  All right.  So, ladies and gentlemen, in a

6     moment, I'm going to excuse you.  But first I'll have you

7     listen to me a minute or so longer.

8          Number one, when I excuse you, the restrictions that

9     you've been under to date, namely not discussing the case and

10    not doing any research about the case, that sort of thing, that

11    no longer applies, which it to say you may talk to whomever you

12    want to talk to about it and you can do whatever you want with

13    respect to the looking into the case.

14         My own suggestion to you is that if anyone does talk

15    to you about the case, I don't anticipate members of the press

16    would be asking you about this case, but be that as it may, if

17    anyone asks you about the case, my only personal request or

18    suggestion is that you discuss your own views of the case, if

19    you discuss them at all.  It's up to, if you wish to discuss

20    it, obviously.  But I think it's appropriate for you to respect

21    the privacy of the jury room and therefore not to talk about

22    your fellow jurors' views of the case or about your

23    deliberations.  Our system has relied on juries and secrecy of

24    jury deliberations for over two centuries, and it's a pretty

25    good affect, and I think there are good reasons to respect the

M9J6RAJ5

1      privacy and secrecy of the jury's deliberations.

2              And, again, for that reason, I think if you do choose

3      to speak with anyone about the case, it is one thing to share

4      your own views, it's one thing to talk about what your fellow

5      jurors were thinking, but ultimately the question is up to you.

6              If you are willing to stick around for a little bit, I

7      would love an opportunity with my staff to just come and speak

8      to you in the jury room, to talk to you more intimately and

9      thank you for your jury service.  I'll get to that in a second

10     as well.  Also, to answer any questions about the process or

11     find out ways we could improve the jury service experience.

12     But it's entirely up to you.  You don't have to stick around.

13     If you wish to get back to your lives and get to your offices

14     or wherever you may be going, you are certainly welcome to do

15     that, and I won't be offended.  I promise.

16             As for thanks, my staff has heard me say this before,

17     but there's a very famous judge in this district known by the

18     name of Edward Weinfeld, who many of us on the bench here in

19     the Southern District seek to emulate because he's one of the

20     greatest judges in the history of our country and certainly in

21     the history of this district.

22             There are many ways in which I do seek to emulate him,

23     and there is one in which I disagree vehemently with, which is

24     it was his practice when he was a judge not to thank jurors

25     because he felt that it was one of the few obligations of

M9J6RAJ5

1    citizenship in our country, that you're called upon to serve on

2    a jury, and it's an obligation.  If you're fulfilling an

3    obligation, you don't deserve thanks.  I disagree.  And I

4    disagree because I recognize that jury service is an imposition

5    on all of you, that it takes you out of your lives, that you

6    come here each and every day, and you guys have been great

7    about getting here on time and enabling us to start on time and

8    make the most of your time.

9            And it's one thing to fill an obligation.  It's

10   another thing to recognize in doing that it imposes on you and

11   your lives.  And, also, it's another thing to do it in the

12   conscientious way you do it.

13           I want to be clear, I'm not commenting on your

14   verdict.  The verdict is your prerogative.  I have no role on

15   that.  You've been here on time, you've obviously been

16   listening and watching with intensiveness, and for that I think

17   you deserve the parties' thanks, my thanks, and the Court's

18   thanks.  It is because of people like you who take time out of

19   their busy lives and come here each and every day that we are

20   able to keep the system going.  And I mentioned how important

21   that is, and especially in the moment that we're living in.

22           And so it is for that reason that I give my sincere

23   thanks.  I'm sure the parties would join me if they were able

24   to.  But I'll thank them on your behalf, a genuine and sincere

25   thank you.

M9J6RAJ5

1          Again, if you're willing to wait a couple minutes, I

2    do need to discuss various matters with the parties before I

3    conclude.  But if you're willing to wait for me, I'm happy to

4    come in and speak to you in the jury room and get a sense of

5    your experience.

6          And with that, and with my thanks, you are excused

7    thank you very much.

8          (Jury excused)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M9J6RAJ5

```
1              THE COURT:  All right.  You may be seated.
2              In a moment, I'll give you a date and time for
3    sentencing.  I will direct the government to provide the
4    probation department with its factual description of the
5    offenses within seven days.  Mr. Schneider, you should arrange
6    for Mr. Raji to be interviewed by the probation department
7    within the next two weeks.
8              Do you wish to be present for any interview,
9    Mr. Schneider?
10             MR. SCHNEIDER:  Yes.  Either my associate or myself.
11   Yes, your Honor.
12             THE COURT:  I'll order no interview take place unless
13   counsel is present.  I will set sentencing down for
14   December 20.
15             MR. SCHNEIDER:  Your Honor, can we just discuss that
16   sentencing date?
17             THE COURT:  Sure.
18             MR. SCHNEIDER:  Thank you.  I'm expecting to be away
19   with my family at the end of December, so if we could go the
20   first -- the second week of January, please?  I'd appreciate
21   that.
22             THE COURT:  All right.  the Second week of January.
23             MR. SCHNEIDER:  May I suggest like January 11, if
24   that's convenient for the Court?
25             THE COURT:  I'll give you a date and time in one
```

M9J6RAJ5

1    moment.

2              January 11 it is.  3:15 in the afternoon.

3              MR. SCHNEIDER:  3:15.

4              THE COURT:  3:15.  In accordance with my individual

5    rules and practices, defense submissions in connection with

6    sentencing are due two weeks prior to sentencing.  The

7    government's submission is due one week prior to sentencing.

8    In the unlikely event that there's no substantive sentencing

9    submission from either side, please file a letter to that

10   effect, but that would obviously surprise me.

11             Does the government wish to be heard on the

12   defendant's bail status?

13             MR. SOBELMAN:  Yes, your Honor.

14             In light of the jury's verdict, we respectfully move

15   to have the defendant remanded pending sentencing under

16   18 U.S.C. 3143(a).

17             THE COURT:  Mr. Schneider.

18             MR. SCHNEIDER:  Yes.  I oppose that application.  I

19   don't believe this is -- this is not a presumption case.

20   There's no reason in the world to think that Mr. Raji would not

21   appear.  The fact that he was here during the -- not just

22   during the trial, but during -- waiting for the verdict in the

23   courthouse.

24             As you know, he has a very serious, serious medical

25   condition.  In fact, your Honor was the one who released him

M9J6RAJ5

1    after he had been on bail because of the medical condition and

2    the COVID, et cetera, and as a result, in the last -- how long

3    have you been out?  Well over a year that he's been out, he's

4    never had one incident, not one question, regarding his

5    compliance with his bail conditions.

6            He's been living in Florida where he wanted to move to

7    deal with his medical conditions within Florida.  He didn't do

8    anything until the Court gave him permission.  He's always

9    contacted his pretrial services officer when he's had any

10   issues.  He's been in New York.  He's been staying in a hotel.

11           The very first day of the pretrial conference, he was

12   late because he didn't know the trains.  After your Honor

13   admonished him, he's been in my office well before 8:00 o'clock

14   every single day of this trial.

15           He is not a flight risk.  He's clearly not a danger to

16   anybody.  The government has his passport.  He has been a

17   perfect candidate on bail.  And nothing has really changed

18   because when bail was set, initially, there was a discussion

19   about the strength of the case, that's always been one of the

20   factors.  The case didn't get any stronger.  There was always a

21   presumption -- almost that he would be convicted.  That's how

22   bail was set initially.  So nothing has changed except he's

23   been convicted.  If he -- or a couple things happen.  If he

24   gets remanded, that affects his status in terms of the BOP

25   designation.  If he stays out, that could affect your Honor's

M9J6RAJ5

1    sentencing ultimately in terms of how well he does and whether

2    or not he does a good job, and therefore, receives a better

3    sentence from that.

4           So I think to punish him at this point, when he's

5    going to get punished, he knows -- by the way, when I spoke to

6    him before today's proceeding, I said it was possible that the

7    government may ask that he be remanded and that your Honor did

8    have the discretion to put him in.  He said he knew, and he's

9    here.  He was here in the morning, and he said after the

10   summation and after the charge, knowing that he could go in.

11   If he was going to run, that would have been the time.  Or if

12   he was going to run, he would have ran last Thursday when your

13   Honor gave us the weekend off.

14          So it just seems to me that it's just unnecessarily

15   punitive because he is not -- he has not shown any evidence of

16   being a flight risk, and we know he is not a danger.

17          THE COURT:  Thank you, Mr. Schneider.  Certainly,

18   suffice it to say, I'm pleased that he did not run and that he

19   remained, but I am going to grant the government's application.

20   What has changed is that there's a verdict, and that has a

21   significant legal effect in addition to having a significant

22   factual difference.  The legal effect is that it is the subject

23   of Section 3143(a), the provision cited by Mr. Sobelman.

24          When I granted bail to Mr. Raji back in May of 2021

25   and I reread the transcript this morning, I said it was a close

M9J6RAJ5

1    case at that time, I did grant bail in no small part because of

2    the COVID-19 pandemic.  And the fact that made flight out of

3    the United States significantly more difficult.

4           Those circumstances are not present to the same extent

5    today, and the standard is very different.  I am not prepared

6    to find as I would have to, to leave him out, by a clear and

7    convincing standard that he is not likely to flee.  He doesn't

8    have legal status in this country.  He now stands convicted of

9    four serious offenses.  He faces certain deportation.  I think

10   under the circumstances and given the potential means that he

11   has to flee, I cannot make that finding.  So the application is

12   granted.

13          You will be detained pending sentencing, and I'll sign

14   an order to that effect.  The Marshals are here and will take

15   him into custody at the conclusion of this proceeding.

16          Anything else to discuss before we adjourn from the

17   government?

18          MR. SOBELMAN:  No, your Honor.

19          THE COURT:  Mr. Schneider.

20          MR. SCHNEIDER:  No.

21          THE COURT:  All right.  In that case, we are

22   adjourned.  Thank you very much and have a good day.

23          (Adjourned)

24

25