UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA      :

            - against -            :

MUSTAPHA RAJI,            :

              Defendant.      :

---------------------------------------------------------------X

DEFENDANT'S SENTENCING
SUBMISSION

19 Cr. 870 (JMF)

**Sentencing Submission for Mustapha Raji**

By:    Jeremy Schneider
Rothman, Schneider,
       Soloway & Stern, LLP
100 Lafayette Street, Ste 501
New York, New York 10013
(212) 571-5500

*Attorney for Mustapha Raji*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

UNITED STATES OF AMERICA          :          DEFENDANT'S SENTENCING
                                                      SUBMISSION
          - against -                         :

MUSTAPHA RAJI,                         :          19 Cr. 870 (JMF)

                              Defendant.     :
--------------------------------------------------------------X


## Introduction

Mustapha Raji is scheduled for sentencing before your Honor on May 16, 2023 at 3:15 P.M. following his conviction at trial of one count of Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §§ 1349 and 1343; Wire Fraud, in violation of 18 U.S.C. § 1343 and 2; one count of Receipt of Stolen Funds, in violation of 18 U.S.C. § 2315 and 2; and one count of Money Laundering, in violation of 18 U.S.C. § 1956(h).

At the outset, it must be noted that neither Mr. Raji nor counsel are attempting to minimize the seriousness of his conviction. Nevertheless, this memorandum is submitted to paint a picture of the man that this Court will be sentencing.  Mr. Raji is 52 years old and has no criminal record.  Born and raised in Ghana, he spent much of his adult life living and working in Toronto, Canada, and since 2013 has been living and working in the United States.  Mr. Raji suffers from several serious medical conditions, including stage 4 kidney disease, heart failure, high blood pressure, and obesity, which has led to several hospitalizations in the last few years. By the time of sentencing, Mr. Raji will have served seven months of pre-trial home incarceration, as well as thirteen months of imprisonment under extremely harsh and borderline inhumane conditions. He was in custody at the Metropolitan Correctional Center for the "gun

lockdown" in early 2020, throughout the first six months of the Covid-19 pandemic, and since being remanded after his conviction at trial in September 2022, he has been detained at the Metropolitan Detention Center, living under lockdown approximately 60% of the time through no fault of his own. Prior to his post-trial remand, Mr. Raji was residing in Florida on pretrial release for two years without a single infraction of his bail conditions. He has had no disciplinary issues while incarcerated. As a consequence of his conviction he will likely be deported.

Accordingly, for the reasons discussed herein, and for those to be discussed at the time of sentencing, it is respectfully submitted that a sentence of time served with a reasonable period of home confinement is sufficient but not greater than necessary to achieve the goals of sentencing while serving Mr. Raji's significant need for medical care.

## Presentence Report and Advisory Sentencing Guidelines

Mr. Raji has reviewed the Presentence Report ("PSR") prepared by U.S.P.O. Alyssa Lopez, filed on April 24, 2023, and he has objections to the Guidelines calculation therein.

As reflected in the PSR, Mr. Raji's base offense level is 7. Probation calls for an 18-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J), based on an alleged loss amount of $3,931,650.68 (which Mr. Raji disputes, as discussed in further detail below), an increase of 2 levels because the offense involved a scam website, pursuant to § 2B1.1(b)(11)(A)(ii); an increase of two levels because Mr. Raji was convicted under 18 U.S.C. § 1956 (money laundering), pursuant to U.S.S.G. § 2S1.1(b)(2)(B); an increase in 2 levels because the offense involved sophisticated laundering, pursuant to U.S.S.G. § 2S1.1(b)(3); and an increase in two levels for being an "organizer, leader, manager, or supervisor" pursuant to § 3B1.1(c) (which Mr. Raji disputes as discussed in further detail below), resulting in a total offense level of 33. Mr. Raji has no criminal history and is therefore in Criminal History Category 1. A total offense

level of 33 and a Criminal History Category of I results in an advisory Guidelines range of 135 to 168 months' imprisonment. Probation recommends a downward variance to 120 months' imprisonment.

***Mr. Raji Objects to a Loss Amount that Includes Relevant Conduct***

It is respectfully submitted that the loss amount should only reflect financial losses from the offense of conviction, *to wit*, the fraud scheme related to Marble Arch Investments. As set forth in the PSR, the government submits that the total loss amount should include the $1.7 million intended loss from Marble Arch (the charged conduct), as well as $1.9 million in alleged stolen funds from Saint Francis Medical Center and Southern Oregon University, for which Mr. Raji has never been criminally charged[1], resulting in a total loss amount of $3,931,650.68, which is more than double the intended loss of the instant offense, and which significantly increases Mr. Raji's Guidelines.

As noted in our objections to Probation, while we are aware that the present state of the law is that loss amount is calculated based on all relevant conduct, including uncharged conduct (*see* U.S.S.G. §1B1.3, *see also United States v. Feldman*, 647 F.3d 450, 462 (2d Cir. 2011)), it is respectfully submitted that Mr. Raji's Guidelines calculation should not include alleged losses related to uncharged conduct. A total loss amount of $3,931,650.68 increases Mr. Raji's offense level by 18, pursuant to U.S.S.G. § 2B1.1(b)(1)(J), resulting in a total offense level of 33, and a Guidelines range of 135 – 168 months' imprisonment (or 11.25 – 14 years).  If the loss amount were based solely on the $1.7 million stolen funds related to Marble Arch, Mr. Raji's offense level would increase by 16 levels, resulting in a total offense Level of 31, and a Guidelines range of 108 – 135 months' imprisonment (9 – 11 years).  Thus, including the *uncharged* conduct more

---

[1] This evidence was introduced at trial for limited evidentiary purposes.

than doubles the loss amount and substantially increases the advisory length of imprisonment, which seems an unjust result that overstates the criminal conduct for which Mr. Raji was charged and convicted. It is therefore respectfully submitted that, in the interest of fairness, the relevant conduct should not be included in the loss amount calculation.

**_Mr. Raji Objects to a Loss Amount that Reflects "Intended Loss"_**

It is further respectfully submitted that the loss amount should represent only the _actual_ financial losses incurred by Marble Arch.  Evidence at trial showed that Marble Arch recovered a total of $988,442 of the $1.7 million stolen funds, resulting in an _actual loss_ of $711,558. Indeed, the Sentencing Guidelines provide that the base offense level for certain crimes must be increased based on the amount of financial "loss." _See_ U.S.S.G. § 2B1.1(b)(1). The commentary to the Guidelines says that "loss" means the actual or intended loss, whichever is greater. _Id._ cmt. n.3(A).  However, the Third Circuit recently held in _United States v. Banks_, 55 F.4th 246, 257 (3d Cir. 2022), that the Guidelines commentary is invalid because, under _Kisor v. Wilkie_, 139 S. Ct. 2400 (2019)[2], it improperly expands the plain meaning of "loss," which refers to the actual loss only. In _Banks_, the Third Circuit held:

> Our review of common dictionary definitions of "loss" point to an ordinary meaning of "actual loss." None of these definitions suggest an ordinary understanding that "loss" means "intended loss." […] Because the commentary expands the definition of "loss" by explaining that generally "loss is the greater of actual loss or intended loss," we accord the commentary no weight.

---

[2] Under _Kisor_, the Supreme Court held that before deferring to the Sentencing Commission's commentary for a Guideline interpretation, "a court must exhaust all the traditional tools of construction", such as looking to the "text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on," and further, a court must make an "independent inquiry" into the "character and context" of the reasonable interpretations of the regulation. _United States v. Banks_, 55 F.4th at 255-56 (quoting _Kisor v. Wilkie_, 139 S. Ct., at 2414 – 16).

*Id*. at 258. The Third Circuit thus vacated the defendant's sentence, which included a 12-level enhancement for intended loss, and remanded for resentencing without the enhancement.

Counsel is aware that while the Second Circuit presently follows the Guidelines commentary that defines "loss" as the greater of intended or actual loss (*see United States v. Lacey*, 699 F.3d 710, 718 (2d Cir. 2012)), it has not yet addressed the validity of the intended loss commentary since the ruling in *Kisor*. Accordingly, in the hope that the Second Circuit sees the error of its ways and adopts the well-reasoned logical analysis of the Third Circuit, Mr. Raji objects to a loss amount that is based on the intended loss of $1.7 million, and respectfully submits that the loss amount should reflect the ordinary meaning of "loss", i.e., the *actual* financial loss of $711,558 incurred by Marble Arch. A loss amount reflecting the actual loss of $711,558 would result in an offense level increase of 14, pursuant U.S.S.G. § 2B1.1(b)(1)(H), which applies to financial losses of more than $550,000 but less than $1.5 million.

### Mr. Raji Objects to a Leadership Role Enhancement

As noted in our objections to Probation, Mr. Raji objects to a two-level role enhancement for being an organizer, leader, manager, or supervisor of the criminal activity pursuant to U.S.S.G. § 3B1.1(c). The PSR states that a 2-level increase is warranted because "[t]he defendant was the registered Vice President of Unique Bamboo Investments" and "directed others in the scheme. As such he is considered an organizer, leader, manager, or supervisor in the criminal activity[.]" PSR ¶ 42.

U.S.S.G. § 3B1.1 provides:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1.

The PSR states subsection (c) applies to Mr. Raji.  Notably, Probation makes no distinction as to whether Mr. Raji was an organizer, leader, manager, or supervisor in the offense.  In distinguishing organizers and leaders from mere managers or supervisors, Application Note 4 to § 3B1.1 provides that the following factors should be considered

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, Application Note 4.

Furthermore, "[a] defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense ... or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) (quoting *United States v. Blount*, 291 F.3d 201, 217 (2d Cir.2002)).

It is respectfully submitted that, even accepting the jury's verdict as true, the facts at trial did not establish that Mr. Raji was an organizer, leader, manager, or supervisor in the offense. First, although Mr. Raji had the title of Vice President of Unique Bamboo, he lacked decision-making authority for the company. He was not the authorized user for the Unique Bamboo bank accounts and did not have signatory powers. (Tr. at 479:2-21). Mr. Raji did not possess any debit cards in the name of the company, and there was no evidence that he authorized any wire

transfers on behalf of Unique Bamboo. (Tr. at 480:8 – 482:10).  However, Nancy Martino-Jean[3], Mr. Raji's alleged co-conspirator, who pleaded guilty in a related criminal matter before Judge Buchwald, was the President of the company, had signatory powers, and was the sole person with authority to conduct financial transactions on behalf of the company, as confirmed by the government, yet she did not receive any role enhancement. *See* Martino-Jean Sentencing Transcript, ECF Dkt. 30 at 12 ("[Martino-Jean] was the only signatory on that bank account, so she would have been the only one who could have authorized the transfers out of that account"). Therefore, Mr. Raji's role as Vice President should not qualify him as having any more authority or decision-making power than Martino-Jean, the President of the company with sole signatory powers. If anything, Mr. Raji was a pawn being used by Martino-Jean in her own criminal conduct on behalf of the company.

Moreover, even if one were to accept the evidence presented at the trial as true, Mr. Raji did not play a "vital" role in the scheme. (PSR at 18).  He was neither indispensable nor vital, as the scheme could have and would have occurred whether he participated or not. Furthermore, he had no special skill or knowledge, and his degree of participation and planning, or direction, if any, was minimal, as he merely conveyed information to others.

The government attempts to paint Mr. Raji as having control and direction over Martino-Jean. But she was more than a just tool being used for her bank account. Based on the government's analysis, Martino-Jean exercised decision-making power and control. As described in the government's sentencing submission, "[t]his is not a situation where the defendant [Martino-Jean] made a single, misguided decision. Over a week-long period in August, the

---

[3]  Martino-Jean pled guilty to one count of conspiracy to commit wire fraud on Indictment 18 Cr. 853 (NRB). She accepted responsibility for a loss amount of $1.7 million, and her Sentencing Guidelines range was 33 – 41 months imprisonment. *See* 18 Cr. 853 (NRB), Dkt. 25.  Martino-Jean was sentenced to time served (approximately six months' imprisonment) on October 17, 2019 and two years of supervised release. *Id.*, Dkt. 27.

defendant engaged in over a dozen transfers of funds out of the Unique Bamboo Investments account. The defendant's conduct shows that she was not simply a passive recipient of fraudulently-obtained funds, but an active participant in disbursing and hiding money[,]" and further, "simply put, the defendant made many calculated decisions in the course of committing this crime. She decided again and again to make the choice to steal and lie. Her choices hurt people." *See* Government Sentencing Memorandum, Dkt. 25 at 3. Additionally, as discussed in greater detail below, Martino-Jean distributed a large portion of the proceeds to persons and entities with whom only she was associated, including using $700,000 of the fraud proceeds to try to pay off a personal debt, whereas Mr. Raji only received $50,000 of the proceeds, further emphasizing that Mr. Raji did not claim greater "fruits of the crime." *See* Martino-Jean Sentencing Transcript, ECF Dkt. 30 at 13. Accordingly, Mr. Raji possessed significantly less power than Martino-Jean, who did not receive any role-enhancement. For these reasons, Mr. Raji objects to an upward two-level role adjustment under U.S.S.G. § 3B1.1(c).

Notably, if the Court grants the above objections to the Guidelines calculation, the total offense level would be reduced by six levels, resulting in a total offense level of 27, which, when combined with a Criminal History Category of I, yields an advisory Guidelines range of 70 – 87 months (5.8 – 7.25 years).

### *Offense Level Reduction Pursuant to Proposed Amendment to the Sentencing Guidelines § 4C1.1, "Adjustment for Certain Zero Point Offenders"*

It is respectfully submitted that Mr. Raji would qualify for an additional two-level reduction based on proposed sentencing guideline U.S.S.G. § 4C1.1, which provides for a two level reduction for certain first time offenders with zero criminal history points.[4] According to

---

[4] *See* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf at page 2, 11.

the Sentencing Commission's website, "the Commission will send final amendments to Congress by May 1, 2023. If Congress does not act to disapprove the amendments, they will take effect on November 1, 2023."[5]

If § 4C1.1 goes into effect, a defendant may be subject to a two level reduction if they meet the following criteria: (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses involving Individual Rights); the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights offenses); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in continuing criminal enterprise, as defined in 21 U.S.C. § 8848.

As noted, Mr. Raji has zero criminal history points. If the Court finds that Mr. Raji did not have an aggravating role in the offense, then he would meet all of the above criteria to qualify for a two-level reduction under 4C1.1 if he were sentenced after November 1, 2023. It is therefore respectfully proposed that in calculating a reasonable sentence, this Court should consider Mr. Raji's eligibility for an additional two-level reduction based on his criminal history score of zero.

---

[5] *See* https://www.ussc.gov/about/news/press-releases/april-5-2023

## **Personal History & Family Background**

Mr. Raji is a 52-year-old man with no criminal history. He was born and raised in Accra, Ghana, and briefly moved to Nigeria with his family in the 1980's before settling in Toronto, Canada, where he lived and worked before coming to the United States in 2013.  As shown in the attached letters to the Court, annexed hereto as Exhibit A, Mr. Raji comes from a close-knit family and has maintained positive relationships with his parents, relatives, and those in the community. He was raised by his father, Suleiman Raji, and mother, Fatimah Aribidesi. He has six sibling: Yusuf Raji, age 60; Ramata Raji, age 54; Hakeem Raji; age 49; Dauda Raji, age 45; Sadiq Raji, age 43; and Abdul Raji, age 38. Mr. Raji's siblings reside in Canada, except for his sister, Ramata, who lives in Australia. Their mother is 82 years old, lives in Canada and suffers from a heart condition and high blood pressure. Mr. Raji's father died in 1999 at the age of 63 as a result of heart failure, which was a devastating loss for him.

Mr. Raji has never been married and has no biological children; however, four years ago he adopted the daughter of his closest cousin in Ghana, Sulleyman Thompson (named after Mustapha's father), who suddenly died from a heart attack in approximately 2016. At first the girl lived with Mustapha's uncle, until he also passed away. Thereafter, Mustapha obtained legal guardianship. She is now seven years old and lives with her grandmother in Ghana, but Mr. Raji remains her legal guardian and she depended on him for financial support. Prior to his arrest in this case he sent her $700 on a monthly basis[6].

---

[6] The adoption of Mr. Raji's cousin differs from a formal adoption, in the common sense of the word. Mr. Raji informs that this was an "Islamic adoption", which is akin to legal guardianship in the United States, where the child retains their original last name. Attached as Exhibit B is the girl's birth certificate, which is respectfully requested to be filed under seal because it contains sensitive personal identifying information of a minor child. *See also*, Exhibit A, letter from Akande Aribidesi discussing the adoption. We were unable to obtain a copy of the adoption papers since Mr. Raji is in custody and they are not in his possession.

Born in 1970, Mr. Raji was raised during a period of political unrest stemming from the revolution in Ghana.  His father was a journalist, which placed their family in danger amidst the hostile political climate. Mr. Raji described his childhood as "tense" and stated "the risks were constant." Consequently, like millions of other Ghanaians at the time, the family fled to Nigeria in the 1980's to escape the danger in their home country. They remained in Nigeria for a short period of time, which allowed Mr. Raji to graduate from high school. After high school he immigrated to Canada for college, and settled in Toronto where his brother was going to school. His parents and other siblings remained between Nigeria and Ghana. After the death of their father, the family immigrated to Canada.

Mr. Raji began his professional life by pursuing a career in journalism, following in his father's footsteps. He earned an associate's degree in journalism in 1993 from Granton Institute of Technology in Canada, and worked as a staffwriter for Toronto newspapers from 1993 to 1995. He also earned an associate's degree in business administration in 1994, and in 1996 earned his bachelor's degree from the University of Toronto.

Ultimately, Mr. Raji became more interested in community outreach and development. Throughout the 1990's to mid-2000's, he remained in Canada and worked in different capacities for a variety of public service organizations – as the director of Economic Development for the Peel Multicultural Council in Mississauga, Canada; a manager and coordinator for the Rexdale Youth Resource Center in Toronto; and the planner for the Community Social Planning Council of Toronto.  From 2006 to 2008 Mr. Raji worked fulltime as a planner for the Community Housing Company in Toronto.

In 2008, Mr. Raji started a consulting business that focused on property and agricultural development. He closed the business in 2013 and moved to Atlanta, Georgia where he opened a

consulting and planning agency, Emergent Equity Group. Three years later, he moved to Hollywood, Florida, where he registered a new consulting business, Emergent Development Corporation, which focused primarily on property development for governments and private parties. He maintained the business until his arrest in 2019.

Mr. Raji has an impressive history of volunteer work, having volunteered for numerous organizations by providing consulting services and conducting fundraising.  As shown in Exhibit A, he has fundraised for an orphanage in Kenya to assist with the renovation of a dormitory, and was working with Smile of Hope Children's Outreach program in Florida, and Taking Future Foundation in Los Angeles, which serves homeless women and veterans, prior to his arrest.

### Mr. Raji Suffers from Several Serious Medical Conditions that Place him at Risk of Serious Illness or Death While Incarcerated

As the Court is aware, Mr. Raji suffers from several serious medical conditions that require continuous monitoring, attention and treatment from specialized doctors. He is currently diagnosed with the following: stage 4 chronic kidney disease; essential primary hypertension; heart failure; nonrheumatic mitral valve disorder; sleep apnea; and obesity.  He suffered a brain aneurism in 2014 and underwent a parathyroidectomy in 2011, which removed one of his thyroid glands. As previously noted, Mr. Raji's father had a history of heart disease and died from heart failure at age 63.

Unfortunately and unsurprisingly, Mr. Raji's health has worsened over the years, and even more so since his arrest in this case. As the Court may remember, Mr. Raji was undergoing treatment for congestive heart failure and a then-recent diagnosis of stage 3 kidney disease at the time of his arrest on December 20, 2019. *See* Bail Application, ECF # 20, May 18, 2020.  Mr. Raji's serious health problems began in 2017 when while hospitalized in Atlanta, Georgia he was diagnosed with non-ischemic cardiomyopathy, an enlarging or toughening of the heart muscle

that makes it difficult for the heart to pump blood correctly; a common cause of heart failure. *See* https://my.clevelandclinic.org/health/diseases/16841-cardiomyopathy. He was again hospitalized in August 2019 for heart failure.  Thereafter, he underwent continued treatment at Orlando Heart Health Institute in Orlando, Florida for issues related to his heart failure and stage 3 kidney disease. *See* Exhibit C[7], records from Orlando Heart Health Institute. He traveled to Orlando every two weeks for treatment and sometimes stayed overnight for testing. During these visits Mr. Raji's medication dosages were assessed and recalibrated in accordance with his needs at that time.

Mr. Raji was arrested at his home in Hollywood, Florida on December 20, 2019 and was immediately admitted to the ICU at Broward County Hospital as a result of high blood pressure, where he remained for four days. Thereafter, he spent one month housed in the infirmary at Broward County Correctional Center while he remained in custody in Florida, and was then transferred to Oklahoma until being transferred to the New York Metropolitan Correctional Center ("MCC") on February 5, 2020. Despite his serious health conditions and the danger he faced from Covid-19, it took several months for Mr. Raji to be examined by a doctor at the MCC.[8]

On August 19, 2020, Mr. Raji was released on bail with the condition of home incarceration and electronic monitoring.  Throughout his time on pretrial release, he was hospitalized on approximately three occasions as a result of dangerously high blood pressure. Most recently, before his remand in September 2022, Mr. Raji was hospitalized at Broward County Health Center in June and July of 2022 after experiencing symptoms of fatigue and

---

[7] It is respectfully requested that Exhibits C and D be filed under seal because they contain Mr. Raji's personal medical records.
[8] At the time our written bail application was made on May 18, 2020 – more than three months after Mr. Raji's arrival at MCC – he had not yet been examined by a doctor despite his repeated requests for medical attention.

extreme shortness of breath. During his July hospitalization, Mr. Raji was diagnosed with stage 4 kidney disease, an increase from his prior stage 3 diagnosis.

Persons with chronic kidney disease (CKD) have damaged kidneys that cannot function properly. *See* https://www.kidney.org/patients/peers/stage4.  There are five stages of kidney disease – stage 5 being the most severe. *Id*. According to the National Kidney Foundation, patients with stage 4 kidney disease have "severe kidney damage" and have lost 85-90% of kidney function. *Id*. At stage 4, "it is very important to slow the loss of kidney function by following [a] treatment plan, and managing other problems like high blood pressure or heart disease." *Id*. Stage 5 CKD is total kidney failure, which would likely require a kidney transplant or dialysis in order to live. *Id*.  Prior to Mr. Raji's remand, he was being treated by a nephrologist, Dr. Parham Eftekhari of Florida Kidney Physicians, LLC in Fort Lauderdale, Florida. He had three visits with Dr. Eftekhari in the month prior to trial. According to Mr. Raji's most recent BOP medical records, he remains diagnosed with severe stage 4 kidney disease.

Furthermore, as confirmed by recent BOP records, relevant portions of which are attached here to as Exhibit D, Mr. Raji is currently diagnosed with several heart conditions. His diagnosis of heart failure means that his heart cannot supply enough blood to meet his body's needs. *See* https://www.mayoclinic.org/diseases-conditions/heart-failure/symptoms-causes/syc-20373142. Symptoms include shortness of breath, swelling of the legs, ankles and feet, and fatigue and weakness, all of which Mr. Raji experiences. *Id*.

 Additionally, Mr. Raji is diagnosed with nonrheumatic mitral valve disorder, a condition that prevents blood flow between the heart chambers. *See* https://www.mayoclinic.org/diseases-conditions/mitral-valve-disease/symptoms-causes/syc-20355107.  He underwent an echocardiogram performed at Brooklyn Hospital on January 6, 2023.  Results of the exam note

"severe concentric LVH", or left ventricle hypertrophy, a thickening of the heart wall which increases blood pressure, *see* https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/diagnosis-treatment/drc-20374319, and "MR" or "mitral valve regulation," the severity of which "may be underestimated", according to the doctor's notes on January 10, 2023. Notably, this is a new diagnosis.

According to the National Library of Medicine, LVH "forecasts an increased risk of cardiovascular morbidity and mortality … [and is] an independent risk factor for cardiovascular disease. Once LVH is developed, it puts the patient at significant risk of developing myocardial ischemia and infarction, heart failure, dysrhythmias, or even sudden death." *See* https://www.ncbi.nlm.nih.gov/books/NBK557534/#:~:text=Once%20LVH%20is%20developed%2C%20it,with%20the%20regression%20of%20LVH.

Mitral valve regurgitation is a disease of the heart valve that causes blood to leak backward across the valve. *See* https://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/symptoms-causes/syc-20350178. According to the Mayo Clinic, "[i]f the leakage is severe, not enough blood will move through the heart or to the rest of the body", causing a person to feel fatigued and short of breath, symptoms that Mr. Raji commonly experiences. *Id*. Accordingly, a "TEE", or a transesophageal echocardiogram, was suggested. Additional medical notes from January 10, 2023 express concern that Mr. Raji's heart and blood medication may be worsening his CKD, but that such medications are necessary to treat his heart failure, the classic "rock and a hard place" dilemma. *Id*.

Mr. Raji is also diagnosed with high blood pressure, obesity, and sleep apnea, which requires a CPAP machine; which he has not yet received since arriving at the MDC. He has been informed that it could take up to one additional year to arrive. He is currently prescribed the

following medications: Amlodipine, 10mg daily (for blood pressure); Aspirin, 81 mg daily (for

blood pressure); Atorvastatin, 40 mg daily (high cholesterol, hyperlipidemia); Furosemide, 40

mg daily (heart failure); Losartan potassium, 100 mg daily (for high blood pressure); and

Carvedilol, 50 mg 2x daily (heart failure), which increased by 25 mg on January 10, 2023. *See*

Exhibit D.

      A medical entry dated March 16, 2023 notes various care instructions for Mr. Raji to

follow, including: avoiding strenuous exercise; reducing sodium intake; avoiding concentrated

sweets; increase water intake; increase fiber, fruit and vegetable intake; follow a low fat, low

calorie and low sodium diet; manage stress; and 30 minutes of daily exercise. *Id*. However, the

inherent nature of the prison environment makes it difficult, if not impossible, to regularly follow

these required protocols. For example, the jail does not regularly serve fruits, vegetables, low fat,

low sodium, or high fiber foods – much of the food is highly processed, fattening and contain

added sugar. Consequently, Mr. Raji has been subsiding on packaged food purchased from

commissary, which is equally unhealthy. Prior to his remand, Mr. Raji was taking daily 30

minute walks as a form of low-intensity exercise, but due to the constant lockdowns at MDC he

has been confined to his cell and unable to move about freely. The concept of stress reduction in

prison is an oxymoron and all but impossible to achieve given the constant threats of violence,

unexpected raids, and repeated lockdowns.

      It is clear that Mr. Raji suffers from several serious and complex medical conditions that

require constant assessment, monitoring and treatment from specialized doctors. His conditions

are worsening, as his stage 3 kidney disease elevated to stage 4 almost a year ago, and since

arriving at MDC he has been diagnosed with additional heart conditions. If he were sentenced to

a term of imprisonment, it clearly would exacerbate his already serious health problems and

ensure his risk of future problems. His heart conditions, high blood pressure and CKD require a strict medication regimen and a lifestyle that includes proper diet, regular exercise, and low stress, and it is important that he have prompt access to specialized medical care when he inevitably develops worsening symptoms. Indeed, there is no doubt that Mr. Raji's medical needs would best be served while on home confinement, where he would have the ability to be treated by doctors and specialists of his own choosing on his own time, and would have prompt access to emergency care if necessary. A sentence to time served with home confinement would serve to justly punish Mr. Raji – a seriously ill, non-violent, first-time offender – while also safeguarding his health, and the community.

**Circumstances of the Offense**

While the Court is already familiar with the facts of this case from having presided over Mr. Raji's trial, there are circumstances unique to his crime that should be evaluated in fashioning an appropriate punishment.  These circumstances are not presented to minimize the seriousness of Mr. Raji's conviction, but they are mentioned as mitigating factors, relevant to his conduct and his overall character, which should be considered in formulating a reasonable sentence.

This case represents Mr. Raji's first criminal conviction. He has no history of violence, threats of violence, or criminal history whatsoever. Mr. Raji exercised his constitutional right to trial, and exercised his right not to testify at trial.  Therefore, Mr. Raji neither obstructed nor attempted to obstruct justice in any way.

The fraud scheme in this case occurred in July of 2018 and involved $1.7 million in stolen funds from Marble Arch Investments, a financial firm located in Manhattan.  Mr. Raji was convicted of providing bank account information to his alleged co-conspirator, Nancy Martino-

17

Jean, for the receipt and disbursement of the stolen funds. The funds were stolen through an email "phishing" scam that deceived a Marble Arch employee to deposit money into a bank account controlled by Unique Bamboo Investments, a company owned by Martino-Jean, who was listed as the President and the sole signatory on the account, as confirmed by the government. *See* Martino-Jean Sentencing Transcript, ECF Dkt. 30 at 12.  Martino-Jean accepted the $1.7 transfer into the bank account that only she controlled, which previously had a negative balance. Then, according to the government, she transferred "a lot" of the fraud proceeds to entities and individuals that were associated only with her. *Id*. at 13. For example, in addition to the $50,000 she sent to Mr. Raji, she sent $1,000 to her son, as well as a portion to somebody she knew in France, and she admittedly paid $700,000 of the fraud proceeds to a title company to pay her personal debts. *Id*. at 13-14. Finally, Marble Arch was able to recover $988,442 of the $1.7 million, making their actual loss $711,558.

    Although Mr. Raji disagrees with the jury's verdict, even accepting the evidence as true, his role was that of a middleman with little authority or decision-making power.  As previously discussed, the government claims that Mr. Raji "directed" Martino-Jean regarding the receipt and distribution of the fraud proceeds; however, Martino-Jean was the only person who had authority to manage the Unique Bamboo bank account that received the fraud proceeds. Therefore, Martino-Jean exercised exclusive control over the stolen funds. At most, Mr. Raji was a middleman who was relaying information from his superiors involved in the scheme. Furthermore, Mr. Raji had no involvement in the creation or facilitation of the email "phishing" scam, he had no direct contact with any victim, and he did not receive or claim receipt of a larger share of the fraud proceeds than his co-conspirators, as he received significantly less than Martino-Jean.

## Post-Arrest Conduct & Amenability to Supervision

Mr. Raji has exhibited exceptional post-arrest conduct which proves that he is amendable to supervision if sentenced to home confinement. He was on pretrial release for over two years – from August 2020 to September 2022 and did not have one single issue with supervision. His initial bond conditions included home incarceration, and he remained confined in his home in Hollywood, Florida for approximately seven months.  On April 15, 2021, the Court granted counsel's request for a bond modification to remove the condition of home incarceration and impose a curfew.  Thereafter Mr. Raji was free to leave his home and travel around the state of Florida. Again, Mr. Raji had no issues with supervision once the restriction of home incarceration was removed. He consistently stayed in contact with his pretrial officer, appeared virtually for court appearances when required, and complied with his curfew, as well as with all remaining conditions of release. Despite his potential trial and the significant punishment he faced if convicted, at no time did Mr. Raji ever attempt to flee or try to obstruct or evade the charges in this case. He also never attempted to flee after Martino-Jean's arrest in September 2018, remaining at his residence in Hollywood, Florida until his arrest in December 2019.

Remarkably, Mr. Raji did not have a single disciplinary infraction throughout his thirteen months in custody. This is especially commendable given the prevalent violence within the MCC and MDC, as well as the harsh conditions of incarceration posed by the pandemic and ongoing institutional lockdowns. While educational programs were not available during his incarceration at the MCC in 2020, Mr. Raji has availed himself of the (albeit minimal) educational opportunities available to him at MDC.  He has received certificates in the following courses, which are attached hereto as Exhibit E: Budgets and Financial Reports (January 27, 2023);

Commercial Driver's License Course (February 14, 2023); and Business Acumen (February 24, 2023).

While Mr. Raji exercised his constitutional right to go to trial, his impeccable post-arrest conduct clearly demonstrates his respect for the Court, the criminal justice system and the process.  There is no reason to think that his conduct would be any different if a sentence of home confinement were imposed.

**<u>Mr. Raji Should Receive Credit for Time Served Under Harsh and Inhumane Conditions of Incarceration at the New York Metropolitan Correctional Center and the Brooklyn Metropolitan Detention Center</u>**

By the time of sentencing, Mr. Raji will have served approximately 13 months in custody between the Manhattan Metropolitan Correctional Center ("MCC") and the Brooklyn Metropolitan Detention Center ("MDC"), two New York City federal correctional facilities that have been excoriated by the courts and in the media for their abysmal responses to the Covid-19 pandemic and the harsh and inhumane conditions of incarceration imposed upon inmates.

Numerous judges in the Southern and Eastern Districts, including this Court, have varied downward at sentencing in light of the unduly harsh conditions posed by the Covid-19 pandemic. In September 2020, in the matter of *United States v. Amado-Ortiz,* 19 Cr. 926 (JMF), Your Honor varied downward from guidelines of 70 – 87 months to 36 months' imprisonment for a defendant who pled guilty to conspiring to possess and distribute with intent to distribute fentanyl, methamphetamine and heroin in violation of 21 U.S.C. §§ 841(b)(1)(A) and (C). Acknowledging the seriousness of the defendant's narcotics offenses and the significant quantity of drugs involved, Your Honor imposed a sentence of 36 months' imprisonment, in part because the defendant was incarcerated during the first six months of the Covid-19 pandemic. The Court stated that the conditions of detention during that time constituted "mitigating circumstances"

and that "the precautions that have been taken in order to prevent the spread of coronavirus in the jail, have required a degree of conditions that are unusual and unusually harsh." *United States v. Amado-Ortiz*, 19 Cr. 926 (JMF), September 20, 2022 Sentence Minutes (ECF # 36) at 52:24 – 51:22).

In *United States v. Gonzalez*, 18 Cr. 669 (JPO), Judge Oetken varied downward dramatically with respect to a defendant facing his fourth narcotics conviction and a sentencing guidelines range of 78 - 97 months, to 24 months' imprisonment based primarily upon unduly harsh conditions of incarceration during the pandemic, stating:

> Now, the defendant has already served 24 months of detention and that really has been under conditions that have been extraordinarily harsh. Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years ... [T]hat is significantly below the guidelines ... but I think that's a long period of time.

*United States v. Gonzalez*, 18 Cr. 669, April 22, 2021, Sentence Minutes, Doc 250, pp. 17-18.

Furthermore, in *United States v. Mcrae*, Judge Engelmayer stated that "a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." 2021 WL 142277 at *1, *5 (S.D.N.Y. Jan. 15, 2021) (internal citations omitted).

Other district courts have followed suit. *See e.g.*, *United States v. Rodriguez*, 19-Cr-460 (E.D.N.Y. July 29, 2022 (Irizarry, J.) (in 922(g) case with guidelines range of 84 – 105 months, downward variance of 12 months attributed to the period the defendant spent in MDC under

conditions caused by the pandemic); *United States v. Quinones*, 18 Cr. 472 (S.D.N.Y. Dec. 16, 2021) (Failla, J.) (Sentencing Tr. 44:24-45:6) ("[O]ver the past few years, because I too have seen what you have experienced living at MDC over that period of time. . . in most if not all of the sentencings that I have done in the pandemic of detained defendants, I have varied downwardly to account for the conditions of confinement, and I will do that here."); *United States v. Oliver*, 19 Cr. 229 (E.D.N.Y. May 24, 2021) (Chen, J.) (Stating, with respect to MDC, "in terms of punishment and deterrence, the severity of the COVID condition[s] really results in a sentence that has much greater impact and is equivalent to a much longer sentence than under normal prison conditions.")

Like defendant Amado-Ortiz, Mr. Raji was also incarcerated for the first six months of the Covid-19 pandemic. During this time, he endured the same "unusually harsh" and inhumane conditions of incarceration. He was detained at the Manhattan MCC from February 8, 2020[9] to August 19, 2020. There, he lived under continuous lockdown, confined to his cell for almost 24 hours a day, permitted to leave every few days for approximately 30 minutes, when he could either choose to bathe or make a phone call to family or his attorney, a decision no one should be forced to make. The jail lacked access to basic hygiene supplies and inmates were often served frozen or inedible food. These highly restrictive and inhumane conditions lasted for several months. Mr. Raji had no access to social or legal visitation, and educational and recreational programs were suspended. Moreover, he suffered additional stress as he lived in constant fear of becoming more seriously ill or dying given his numerous medical conditions that placed him at an increased risk of severe illness or death if he were infected with the Covid-19 virus.  Mr. Raji

---

[9] Mr. Raji was arrested in the Southern District of Florida on December 20, 2019 and was initially detained at Broward County Correctional Center. He was then transferred to a federal detention facility in Oklahoma before arriving to MCC on February 5, 2020.

observed inmates around him becoming ill from Covid-19 infection as the jail struggled (and failed) to effectively prevent the spread, causing him to continuously fear for his life. As discussed in our written bail application dated May 18, 2020, Mr. Raji's requests for basic medical attention also went ignored, and he went months without seeing a doctor to evaluate the state of his many medical conditions. Notably, the conditions at the MCC were so poor that the facility ultimately shut down in September 2021.[10]

Just a few weeks before the pandemic, Mr. Raji was in custody at the MCC during the "gun lockdown" in February 2020, when all movement in the facility shut down for over a week as law enforcement raided the units in search of a gun that had allegedly been smuggled in by a corrections officer. Again, through no fault of his own, Mr. Raji was locked in his cell for over ten days straight, unable to bathe or make phone calls.

Immediately following his conviction at trial on September 19, 2022, Mr. Raji was remanded to the Brooklyn MDC.  Although the threat of Covid-19 has decreased since he was last incarcerated, the deplorable conditions at the MDC continue. On August 16, 2022 local officials in Brooklyn submitted a letter to Attorney General Merrick Garland and BOP Director Colette Peters detailing the MDC's longstanding "systemic dysfunction" that "has resulted in years of unacceptable conditions of confinement for detainees, denial of basic necessities, and inadequate access to counsel and legal materials," calling the situation a "humanitarian crisis [that] must be addressed now."[11]

Despite the decrease in Covid risks, MDC continues to place inmates on lockdown multiple times a month, if not weekly, for days or weeks at a time (at the time of this writing, the

---

[10] *See* https://apnews.com/article/health-prisons-new-york-manhattan-coronavirus-pandemic-5113a1e33a0c3967787e04c0523e406b

[11] *See* https://www.brooklynpaper.com/wp-content/uploads/2022/08/FINAL-letter-re-MDC-Brooklyn-8.16.pdf

MDC was once again on lockdown). The lockdowns appear to be the result of many factors, including staffing shortages, violence, and criminal activity within the jail, although most of the time inmates are not informed of the reason. Additionally, as the result of frequent raids by corrections officers searching for smuggled weapons and drugs, Mr. Raji has had commissary and legal documents taken away from him and not returned, despite not having done anything wrong.  In sum, since he arrived at MDC seven months ago, he remains locked in his cell for days or weeks at a time, through no fault of his own, making his time in custody more punishing than under "ordinary" circumstances.

Accordingly, it is respectfully submitted that Mr. Raji should receive consideration for additional credit for the unduly harsh conditions of incarceration.

### The Need to Avoid Unwarranted Sentencing Disparities

In consideration of the need to avoid unwarranted sentencing disparities, Mr. Raji should receive a sentence that is comparable to his similarly situated co-conspirator, Nancy Martino-Jean. As discussed above, Martino-Jean was sentenced to time served after serving six months in pretrial custody. According to the government, Martino-Jean was an active participant in the scheme who made several calculated decisions throughout her offense conduct. She exercised a degree of decision-making power and control that was at the very least equal to, if not greater than, Mr. Raji's. She was the President of Unique Bamboo Investments and had sole control over the company's bank account and the transferring of the stolen funds. She distributed more than $700,000 of the fraud proceeds to persons or entities with whom only she had a relationship (whereas Mr. Raji personally received $50,000).

According to the government, Martino-Jean was arrested at the airport on September 16, 2018 as she attempted to board a flight to Haiti, after purchasing a plane ticket two days prior.

24

She was then interviewed by the FBI and told an "elaborate lie." *See* Government Sentencing
Memorandum, Dkt. 25 at 4. Her computer history in the days following the offense revealed her
efforts to try to cover up the crime (she had google searched "how to wipe out a hard drive",
"how to know if you are under investigation by the F.B.I.", among other things). At sentencing,
after having pled guilty to her crime, Martino-Jean tried to minimize her involvement, blaming
the entire scheme on Mr. Raji, and disclaimed having knowledge of the fraud scheme until after
she received the proceeds, which the government knew to be a lie.

Understanding the significance of Mr. Raji's conviction at trial, the discussion of
Martino-Jean's offense conduct is not intended to minimize the seriousness of his own
conviction or to argue that his conviction is not deserving of significant punishment. Rather, it is
presented to show that Mr. Raji and Martino-Jean are similarly situated and therefore should
receive comparable sentences.  A sentence within the Guidelines range of 135 – 168 months'
imprisonment (or 11.25 – 14 years) is substantially disproportionate to Martino-Jean's sentence
of six months (time served), and even the 120 month sentence recommended by probation is
equally disparate. Accordingly, in consideration of Martino-Jean's sentence, along with Mr.
Raji's medical condition, and the harsh conditions of incarceration from the pandemic (which
Martino-Jean did not experience), a sentence of time served with home confinement is more than
sufficient punishment for Mr. Raji.

## Conclusion

For all of the foregoing reasons, it is respectfully submitted that the Court impose a
sentence of time served and a reasonable period of home confinement as a sufficient and
reasonable sentence under Mr. Raji's individual circumstances.

Dated:   New York, New York
            May 2, 2023

                                                    _____/s/_____
                                                    Jeremy Schneider
                                                     Rothman, Schneider,
                                                        Soloway & Stern, LLP
                                                    100 Lafayette Street, Ste 501
                                                     New York, New York 10013
                                                     (212) 571-5500
                                                    (212) 235-5494

                                                    *Attorney for Mustapha Raji*

To:      CLERK OF THE COURT
          United States District Court
          Southern District of New York
          500 Pearl Street
          New York, New York 10007

          HON. JESSE M. FURMAN
          United States District Judge
          Southern District of New York
          40 Foley Square
          New York, New York 10007

          JILAN KAMAL
          ROBERT SOBELMAN
          CATHERINE GHOSH
          Assistant United States Attorneys
          Southern District of New York
          1 St. Andrew's Plaza
          New York, New York 10007