

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 9, 2023

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Mustapha Raji*, 19 Cr. 870 (JMF)

Dear Judge Furman:

    The Government respectfully writes in advance of the sentencing of defendant Mustapha Raji, and in response to the defendant's sentencing letter dated May 2, 2023 (Dkt. No. 134) ("Def. Mem.").

    Raji was convicted, following a jury trial, of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count Two); receipt of stolen funds, in violation of 18 U.S.C. §§ 2315 and 2 (Count Three); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Four). These charges arose from the defendant's involvement in a "business email compromise" scheme in which a victim wired $1.9 million to a bank account controlled by the defendant's co-conspirator, Nancy Martino-Jean, who then, at the direction of the defendant, attempted to distribute the money to a variety of individuals and entities, including $50,000 to Raji himself. Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), the sentencing range applicable to the defendant's conduct is 135 to 168 months' imprisonment, as set forth in the Presentence Investigation Report ("PSR") of the United States Probation Office ("Probation Office").

    The Probation Office recommends a sentence of 120 months' imprisonment. (PSR at 20.) Raji has requested that the Court impose a sentence of time-served (approximately 13 months) with "a reasonable period of home confinement." (Def. Mem. at 2.) For the reasons set forth below, the Government submits that a substantial but below-Guidelines sentence of at least 78 months' imprisonment would be sufficient but not greater than necessary to satisfy the purposes of sentencing.

Honorable Jesse M. Furman
United States District Judge
May 9, 2023
Page 2

### I. Background

#### A. Offense Conduct

As described in the PSR and proven at trial, Raji was a member of an international fraud ring that used business email compromise schemes to prey on victims by causing them to send large amounts of money—hundreds of thousands or millions of dollars—to accounts controlled by members of the conspiracy, and then transferring the money as quickly as possible to make it hard to trace and return to the victims once they became aware of the fraud. Raji's role in the scheme was to find bank accounts the fraud ring could use to receive these large amounts of stolen money, and he fulfilled this role for years, including in schemes that successfully stole nearly $4,000,000 from just three victims.[1]

In July 2018, Marble Arch Investments was the victim of a business email compromise scheme. After clicking on a link in a phishing email which purported to be from the Microsoft Support Team, managing partner Scott McLellan entered his work email credentials on a scam website—thus enabling the defendant's co-conspirators to hack McLellan's email and direct an upcoming partnership distribution of $1.7 million to be sent to a Florida bank account in the name of "Unique Bamboo Investments" ("Unique Bamboo") rather than McLellan's actual bank. (PSR ¶¶ 14-17.)

The Unique Bamboo bank account had been provided to the fraud ring by Raji. It was controlled by Raji's co-conspirator Nancy Martino-Jean, although Raji was listed as Vice President of the company in a public business filing on or about June 12, 2018—approximately six weeks before the money was stolen. (PSR ¶ 19.) After Unique Bamboo received the stolen $1.7 million from Marble Arch, the defendant texted Martino-Jean, "Thank God[.] Let's start moving it[.] We keep 30%[.] Move it out ASAP[.]" Consistent with his directive to "start moving it," text messages introduced at trial showed that the defendant directed Martino-Jean to transfer some of the money to specific people and entities, including ones associated with the defendant. For example, he provided Martino-Jean with bank account information for a company controlled by his brother, and also directly received $50,000 from the stolen funds. (PSR ¶ 20.)

When banks started to freeze the money, Raji also helped create a fake, back-dated contract in an attempt to make the transfer from Marble Arch to Unique Bamboo appear legitimate. Specifically, on August 14, 2018, he received a document from an associate of Martino-Jean that purported to be a $1.7 million loan agreement between Unique Bamboo and Marble Arch, with a blank signature page. The next day, the defendant sent back to the associate the signature page with a notary stamp and signature—dated July 2, 2018, shortly before the money was stolen. (PSR ¶ 27.)

---

[1] Because the Court presided over the trial, this letter does not describe all aspects of the scheme or cite all relevant evidence.

Honorable Jesse M. Furman
United States District Judge
May 9, 2023
Page 3

Evidence introduced at trial also showed that the defendant had been involved in similar schemes—without Martino-Jean—before the July 2018 Marble Arch scheme. (PSR ¶ 28.) In April 2017, Raji's company Emergent Development Corporation ("Emergent Development") received over $100,000 in two transfers from an entity called Best Janitor Cleaning Services LLC, which had itself just received nearly $2 million in stolen money from a public university in Oregon. Like Marble Arch, the university had been conned into sending the payment to Best Janitor instead of the bank account of the legitimate vendor it intended to pay.

Similarly, in May 2018, a hospital system in Missouri fell victim to a business email compromise scheme. As part of that scheme, unauthorized emails were sent from the email account for the hospital's Chief Financial Officer that purported to direct that payments be issued for false invoices issued by the defendant's company, causing over $250,000 to be sent directly by the victim to Emergent Development.

In September 2018, Raji learned from his brother, Dauda (who also received some of the stolen money), that Martino-Jean had been arrested. Nonetheless, when Afolabi Adeusi approached Raji in 2019 about a new fraud—a supposed insider job to steal $2.3 million—the defendant agreed to participate and sent Adeusi wire instructions for an account to receive the stolen money. (In fact, there was no such job, and Adeusi was cooperating with law enforcement at this time.)

B.  **The Advisory Guidelines Range**

The Probation Office calculates the defendant's advisory Guidelines range as follows:

- **Grouping Analysis**

    o Counts One through Four (the "Group") group together pursuant to U.S.S.G. § 3D1.2(d) because the offense levels for these offenses are determined largely on the basis of the total amount of harm or loss. Pursuant to U.S.S.G. § 3D1.3(b), the offense level applicable to the Group is the applicable offense level corresponding to the aggregated quantity of harm or loss that produces the highest offense level. (PSR ¶ 37.)

    o The Guidelines applicable to the Group are U.S.S.G. §§ 2B1.1 and § 2S1.1, and § 2S1.1 produces the highest offense level. (PSR ¶ 37.)

- **Base Offense Level**

    o Pursuant to § 2S1.1(a)(1), the base offense level is the offense level for the underlying offense (including base offense level, specific offense characteristic, cross references, and special instructions) from which the laundered funds were derived—here, U.S.S.G. § 2B1.1. (PSR ¶ 38.)

Honorable Jesse M. Furman
United States District Judge
May 9, 2023
Page 4

- o   Pursuant to U.S.S.G. § 2B1.1, the base offense level is 7 (because Counts One, Two, and Four have a statutory maximum term of imprisonment of 20 years or more); 18 levels are added because the loss amount of $3,931,650.68 (including relevant conduct) is between $3.5 million and $9.5 million; and 2 levels are added because the offense involved possession or use of an authentication feature, for a total base offense level of 27.  (PSR ¶ 38.)

- **Specific Offense Characteristics and Role Adjustments**

    - o   Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because the defendant was convicted under 18 U.S.C. § 1956, the base offense level is increased by two levels.  (PSR ¶ 39.)

    - o   Pursuant to U.S.S.G. § 2S1.1(b)(3), because the offense involved sophisticated laundering (multiple layers of transactions which were directed to multiple entities and foreign bank accounts), the base offense level is increased by two levels.  (PSR ¶ 40.)

    - o   Pursuant to U.S.S.G. §3B1.1(c), because the defendant was an organizer, leader, manager, or supervisor in the criminal activity, the offense level is increased by two levels.  (PSR ¶ 42.)

    - o   The defendant has not accepted responsibility for the offense, and therefore no such reduction is warranted.  (PSR ¶ 46.)

    - o   Accordingly, the applicable Guidelines offense level for the Group is 33. (PSR ¶ 47.)

- **Criminal History Category**

    - o   The defendant has no prior criminal convictions, which results in a criminal history score of zero.  Accordingly, the defendant's Criminal History Category is I.  (PSR ¶ 50.)

Based upon the above calculations, the defendant's Guidelines sentencing range is 135 to 168 months' imprisonment.  (PSR ¶ 77.)  The Probation Office does not recommend supervised release because the defendant, a Canadian citizen, has no status in the United States and is expected to be deported upon completion of his sentence.  (PSR at 2, 21.)

The defendant has been detained since his conviction on September 19, 2022.

II.   **Discussion**

  A.   **The Probation Office's Guidelines Calculation Is Correct**

The defendant contends that the Probation Office's calculation of the advisory Guidelines range is incorrect in three ways.  First, the defendant argues that the loss amount under U.S.S.G.

§ 2B1.1(b)(1) should not include the loss from two related schemes introduced at trial pursuant to Federal Rule of Evidence 404(b) involving Saint Francis Medical Center and Southern Oregon University, but should instead be limited to the loss to the victim of the charged conduct, Marble Arch Investments. (Def. Mem. at 3-4.) Second, he argues that the loss amount should further be limited to the actual loss to Marble Arch, not the intended loss, which he argues is the $711,558 that was never recovered from Raji and his co-conspirators. (Def. Mem. at 4-5.) Third, the defendant argues that there should not be a two-level adjustment for his role in the offense because he was not an organizer, leader, manager, or supervisor. (Def. Mem. at 5-8.) None of these arguments have merit.

### 1. The Correct Loss Amount Is $3,931,650.68

First, as to the correct amount considered for the Marble Arch scheme, the defendant acknowledges that "the Second Circuit presently follows the Guidelines commentary that defines 'loss' as the greater of intended or actual loss" (Def. Mem. at 5), and this Court must follow the law of this Circuit and apply the intended loss of $1.7 million. However, even if the Court were to ignore the commentary to the Guidelines—and it should not—the "loss" to be used under U.S.S.G. Section 2B1.1(b)(1) is $1.7 million, the amount that was successfully stolen from Marble Arch and transferred to Unique Bamboo and which Raji and his co-conspirators then began to "move [] out ASAP." In the Third Circuit case relied upon by Raji, the victim company "did not transfer a single dollar to [the defendant]," although the defendant had unsuccessfully tried to make fraudulent withdrawals from the victim. *United States v. Banks*, 55 F.4th 246, 251 (3d Cir. 2022). That is, *Banks* would be similar to this case only if Raji and his co-conspirators had attempted to divert the $1.7 million from Marble Arch but were unsuccessful. They were not—they successfully stole the full $1.7 million, and the fact that stolen property was later returned (in part) months later does not mean the victim did not lose it in the first place. Were it otherwise, a defendant's Guidelines range would be based on the fortuity of actions taken by banks and law enforcement after the fraud was committed, and not the severity of the defendant's own conduct.

Second, as the defendant similarly recognizes, "the present state of the law is that loss amount is calculated based on all relevant conduct, including uncharged conduct." (Def. Mem. at 3.) Not only is this required, but there is nothing "unfair" about including the loss amount for uncharged conduct in the defendant's Guidelines calculations (which only increases the offense level by two points). Evidence and testimony at trial showed that $256,436.75 was sent by Saint Francis Medical Center *directly to the defendant's own company* (Emergent Development Corporation) as the result of an email scam. Southern Oregon University was the victim of a similar scam and sent $1,975,213.93 to an individual who disbursed nearly all of the money over a 6-day period, including over $100,000 to the defendant's company, Emergent Development. Both scams were similar to the Marble Arch fraud for which the defendant was convicted, and the Government has met its burden of proving by a preponderance that the defendant is responsible for the losses from those frauds as well as the Marble Arch fraud. The Guidelines fairly take account of all of the defendant's conduct, including his role in similar schemes that caused huge losses to their victims. The defendant has benefited by not being charged with the other two schemes, as he cannot be required to pay restitution to those victims or forfeit the proceeds of those

Honorable Jesse M. Furman
United States District Judge
May 9, 2023
Page 6

crimes, but he should not receive the windfall of a Guidelines range that ignores the very real and substantial harm he caused to other victims as part of the same overall course of conduct.

### 2.     A Two-Level Leadership Enhancement Is Warranted

As the Sentencing Guidelines explain, a defendant qualifies for this adjustment either if he was the "organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, Application Note 2. "A defendant may properly be considered a manager or supervisor if he exercise[d] some degree of control over others involved in the commission of the offense . . . or play[ed] a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) (quoting *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002)). "It is enough to manage or supervise a single other participant." *Id*. (citing *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995)). "Once this management or supervision is found, the adjustment is mandatory." *Id*. (citing *United States v. Jiminez*, 68 F.3d 49, 51-52 (2d Cir. 1995)).

A two-level leadership enhancement is warranted here because the defendant "was an organizer, leader, manager, or supervisor," U.S.S.G. § 3B1.1, which also disqualifies him for the potential Guidelines reduction referenced by the defendant which may take effect in November 2023. (Def. Mem. 8-9.) Specifically, and at the very least, he led, managed, or supervised Martino-Jean, the person he recruited into the Marble Arch scheme to provide a business bank account.

The defendant's focus on his level of decision-making authority at Unique Bamboo ignores the decision-making authority he had in the fraud itself. Evidence and testimony at trial showed that the defendant, among other things, (1) directed Martino-Jean to provide him with bank accounts that he could use to receive large amounts of money; (2) taught Martino-Jean how the fraud schemes worked;[2] (3) directed Martino-Jean where to transfer stolen money; and (4) sent

---

[2]   For example, text messages introduced at trial showed the following exchange on May 29, 2018 (GX 301):

> **Martino-Jean**:  How we doing the funds now. So I know what to use out of it
> **Raji**:  Because its a cash deposit. Its generally less percentage[.] But, I gave negotiated 30%
> **Martino-Jean**:  Meaning?
> **Raji**:  Keep 30%[.] And send her 70%
> **Martino-Jean**:  Send where?
> **Raji**:  I'll give u the nane to do money gram or wu to
> **Martino-Jean**:  Why they take so much?
> **Raji**:  Agnes W. Cannon[.] Either Western Union or Money Gram[.] Accra, Ghana[.] Its a cash deposit

As another example, text messages showed the following exchange on June 10, 2018 (GX 302):

Martino-Jean's associate a notarized signature page for a fake, back-dated contract that purported to justify the money stolen from Marble Arch. The defendant also engaged in similar fraud schemes both before and after the Marble Arch scheme which did not involve Martino-Jean. Far from being a "pawn" of Martino-Jean (Def. Mem. at 7), the defendant's role was to provide his other co-conspirators with bank accounts that could receive large amounts of stolen money—a vital role in the conspiracy—and in the Marble Arch scheme he used Martino-Jean and her company to do so.[3]

### B. A Substantial Sentence of Imprisonment Should Be Imposed

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, the nature and circumstances of his offenses, the need to avoid unwarranted sentencing disparities, and the importance of general deterrence, a substantial but below-Guidelines sentence of at least 78 months' imprisonment would be sufficient but not greater than necessary to satisfy the purposes of sentencing.

*First*, the nature and seriousness of the offenses and the need to provide just punishment warrant such a sentence. *See* 18 U.S.C. § 3553(a)(1), (2)(A). As demonstrated by the millions of dollars the defendant was involved in stealing from just three victims, the defendant repeatedly took part in sophisticated schemes that involved large amounts of money and caused real harm to their victims. Marble Arch was able to recover slightly more than half of its stolen money, and Southern Oregon University recovered approximately $610,000 out of $1.9 million (Tr. 115), but Saint Francis was not able to recover any of its stolen funds—over $250,000 sent directly to Raji's company, Emergent Development Corporation. (Tr. 368, 370). The testimony of Adeusi and text messages from Raji show that these three schemes were not the only ones the defendant participated in.

Raji's role in these schemes was not minor; the schemes could not succeed without reliable bank accounts that could receive such large amounts of money without causing the banks to become suspicious or freeze the funds. As shown in text messages Raji sent to co-conspirator Nancy Martino-Jean (whom he recruited to serve just such a purpose), the fraud ring needed

---

> **Raji**: Do u have escrow acct, the client is paying tomorrow[.] . . . Send me the lawyer email address, names and telephone number[.] $650,000 from China and $25m from Brazil[.] A lawyer must be in controll of the acct[.] Use your email and phone just get the lawyer account ok lets control this deal
> **Martino-Jean**: Ok but he is going to ask question. What do I tell him the funds is for? Who is our clients? And what service it's for
> **Raji**: I'm waiting for the answer . . . It is for commodities and investment[.]

[3] It is therefore entirely appropriate that she received no role enhancement at her sentencing, yet Raji should; although she was a fully willing participant, she was not an "organizer, leader, manager, or supervisor." Even if she diverted some of the stolen money for her own purposes, that does not make her a leader (and does not make Raji any less of a leader); at most it means that he brought in an untrustworthy person to the scheme.

Honorable Jesse M. Furman
United States District Judge
May 9, 2023
Page 8

established, U.S.-based business accounts that could "receive large funds and also be able to transfer out easily." (GX 302.) If the stolen money was not transferred quickly enough, it would be frozen by the bank once the victim caught on to the fraud, as happened again and again to bank accounts Raji and his co-conspirators controlled. This is precisely why, when the stolen Marble Arch money arrived in Martino-Jean's bank account, Raji directed her to "[m]ove it out ASAP." (GX 302.)

Despite the overwhelming evidence of his guilt shown at trial, the defendant has yet to accept responsibility and instead continues to minimize his culpability and deflect blame. For example, he describes his crime as merely "providing bank account information to his alleged co-conspirator, Nancy Martino-Jean, for the receipt and disbursement of the stolen funds" (Def. Mem. at 17-18), yet he fulfilled an integral role in the conspiracy by providing bank accounts to which hackers could direct stolen funds.[4] He also claims to be similarly situated to Martino-Jean (Def. Mem. at 25), yet he recruited her into the scheme, taught her how to commit the fraud, and participated or attempted to participate in similar frauds involving millions of dollars both before and after her involvement; he is far more culpable.

*Second*, the needs for the sentence imposed to promote respect for the law and to afford adequate deterrence to criminal conduct warrant a substantial sentence. *See* 18 U.S.C. § 3553(a)(2)(A), (2)(B). With schemes such as this, it is often easy to determine that a fraud has been committed but hard to identify the individuals responsible, and harder still to bring them to justice. *See United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of . . . deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime."). The fraud ring was international: it involved co-conspirators in at least Ghana and Canada, and Raji discussed stolen money from China and Brazil, among other countries. (GX 302). Millions of dollars could be stolen with a few clicks, and once it was in the hands of Raji and his co-conspirators it was very difficult for the victim to get back. The sentence imposed must impress upon others that participating in fraud schemes like this in an attempt to make easy money will come at a high cost. *See United States v. Watts*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023) (summary order) ("consideration of general deterrence is especially important in the crimes of the sort that this case involves," *i.e.*, wire fraud and money laundering).

A substantial sentence is similarly necessary for specific deterrence. As noted, the Marble Arch scheme was not the only one in which Raji participated, and to this day he refuses to accept responsibility or acknowledge his crime. He took steps to avoid being caught, such as helping to create a fake loan document that purportedly justified the Marble Arch money he helped steal;

---

[4] Raji also implausibly claimed to the Probation Office that he worked as a self-employed "consultant" and that his business Emergent Development Corporation earned $1 million per year in revenue and had seven employees (PSR ¶ 67), yet neither Raji nor Emergent Development ever filed any taxes for at least 2017 and 2018 (the years obtained by the Government), and, as noted above, Emergent Development received hundreds of thousands of dollars in stolen money from at least two victims of similar fraud schemes.

Honorable Jesse M. Furman
United States District Judge
May 9, 2023
Page 9

directing Martino-Jean to transfer the money to a variety of bank accounts (including international accounts) and withdrawing much of his own proceeds in cash; and filling out a "client information sheet" for Unique Bamboo after he was added as Vice President to try to avoid bank scrutiny. (GX 212A.)

To the extent the defendant cannot be deterred from this type of criminal conduct, a substantial sentence is also necessary for incapacitation to protect the community. He was not deterred by banks shutting down his or his co-conspirators' bank accounts because of likely fraud. He was not deterred by Martino-Jean's arrest in 2018, as he planned to take part in a new "insider job" with Adeusi in 2019. And sitting through the testimony of victims from Marble Arch, Southern Oregon University, and Saint Francis has not caused him to admit his fault and apologize. There is a high likelihood that Raji will continue to commit this type of crime when he is released, and therefore his sentence must protect the public for as long as possible.

Finally, a substantial sentence of at least 78 months' imprisonment is in line with sentences imposed in similar types of cases and considering the defendant's mitigating health issues. *See, e.g.*, *United States v. Adelekan*, 19 Cr. 291 (LAP) (defendants Oluwaseun Adelekan and Temitope Omotayo sentenced after trial to 108 months and 72 months, respectively, for their roles in business email compromise and romance scams);[5] *United States v. Freeman*, 21 Cr. 88 (JSR) (defendant sentenced after trial to 78 months for money laundering role in romance scam).[6] A time-served sentence (even one which includes home incarceration) as requested by the defendant would be vastly out of line with the harm he caused by willing participating in multiple fraudulent schemes.

---

[5] As described in the Government's sentencing submissions in that case, "Adelekan was an organizer and leader of the conspiracy. In particular, Adelekan organized and led a crew of co-conspirators to open and/or use bank accounts in the United States under false pretenses so that those bank accounts could receive fraud proceeds, and so that Adelekan could funnel those fraud proceeds to other of his associates and to himself." (19 Cr. 291, Dkt. No. 514.) "Omotayo was a manager and supervisor of the scheme and reaped benefits from his role in the scheme. As part of the scheme, he received money directly into a bank account opened in his own name and into several bank accounts opened in the name of his shell company." (19 Cr. 291, Dkt. No. 477.)

[6] As described in the Government's sentencing submission in that case, "the defendant laundered fraud proceeds on behalf of a criminal enterprise (the "Enterprise") based in Ghana through his personal bank accounts and through business bank accounts in the name of his company . . . . After Freeman's accounts were each closed for fraud, he remained unrepentant and continued to receive fraud proceeds from other members of the Enterprise in cash, which he laundered back to Ghana. Further, following his arrest, Freeman attempted to flee from law enforcement, lied to law enforcement about the nature of his purported business after he was apprehended, and lied in his testimony at trial claiming, among other things, he had no knowledge of or involvement in the fraud proceeds being laundered through accounts under his sole control and in fact did not authorize transactions laundering fraud proceeds." (21 Cr. 88, Dkt. No. 126.)

### C. The Court Should Order Restitution and Forfeiture

The Mandatory Victims Restitution Act ("MVRA") provides for mandatory restitution to victims of certain crimes, including fraud. *See* 18 U.S.C. § 3663A(c). "The primary and overarching goal of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Qurashi*, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks and citation omitted). Accordingly, restitution to the victim should be ordered in the amount of $711,557.54, to reflect the direct harm to him of the defendant's crimes.

Forfeiture should be ordered in the amount of $711,557.54, which reflects the property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense. 18 U.S.C. § 981(a)(1)(C); *see also id.* § 981(a)(2)(A) (in cases involving "illegal activities," forfeiture "not limited to the net gain or profit"); 21 U.S.C. § 853(c) ("All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section.").[7]

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a substantial but below-Guidelines sentence of at least 78 months' imprisonment, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing, and also order restitution and forfeiture.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   s/ _____
Catherine E. Ghosh
Jilan J. Kamal
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-1114/2192/2616

cc: Counsel of Record (by ECF)

---

[7] The parties are conferring as to whether forfeiture and restitution will be on consent, and the Government will submit proposed orders by the time of sentencing.