ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP

Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

| | |
|---|---:|
| Franklin A. Rothman | Tel: (212) 571-5500 |
| Jeremy Schneider | Fax: (212) 571-5507 |
| Robert A. Soloway | |
| David Stern | |
| ———— | |
| Rachel Perillo | |

September 13, 2023

**By ECF & Email**
Hon. Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re: United States v. Mustapha Raji
       19 Cr. 870 (JMF)

Dear Judge Furman:

  I am the attorney for Mustapha Raji, the defendant in the above-named matter. Mr. Raji is scheduled to be sentenced on September 19, 2023. This letter is respectfully submitted in advance of sentencing to supplement the previous submission filed on May 2, 2023 and in further support of the requested sentence of time served. Notably, in the passage of time since we filed our initial submission, Mr. Raji has served an additional four months in custody and has no disciplinary infractions.

  **Mr. Raji Continues to Suffer from Serious Medical Conditions**

  First, Mr. Raji remains diagnosed with several serious medical conditions with no improvement. As noted in a letter to the Court dated June 7, 2023, Mr. Raji underwent testing and evaluation at the Brooklyn Hospital Center on May 22 and May 25, 2023 and was diagnosed with severe mitral regurgitation, a new heart condition that he did not have before he was remanded. He was recommended for cardiothoracic surgery at Mount Sinai Hospital where he met with doctors in June 2023 to discuss his surgery. Medical records from Brooklyn Hospital Center are attached hereto as Exhibit A, and medical records from Mount Sinai are attached hereto as Exhibit B.[1]

  Mr. Raji's medical records from Brooklyn Hospital reflect the following current diagnoses:

---

[1] It is respectfully requested that Mr. Raji's medical records be filed under seal.

1

- Valvular Heart Disease[2] (primary diagnoses)
- Stage C-D valve disease[3]
- Moderate to Severe MR[4]
- Severe LVH[5]
- Moderate LAE[6]
- Hypertension
- Hyperlipidemia
- Chronic Kidney Disease Stage 4 (reported history)

Medical notes entered by Dr. Cesar Ayala-Rodriguez dated June 1, 2023 state Mr. Raji "remains symptomatic likely due to moderate to severe MR-flail MV leaflet" and will need to be evaluated for cardiothoracic surgery ("CTSX") as well as an angiogram preceding surgery. *See* Exhibit A.

Attached as Exhibit B are records from Mount Sinai where Mr. Raji was evaluated for heart surgery on June 20, 2023 following a referral from Brooklyn Hospital. The records confirm Mr. Raji's mitral valve disease and categorizes him as having Class II heart failure under New York Heart Association's (NYHA) Functional Classification. According to the American Heart Association, classes are assigned to individuals with Stage C or Stage D heart failure (Stage C includes people with current or previous symptoms of heart failure and Stage D includes people with heart failure symptoms that interfere with daily life functions or lead to repeated hospitalizations).[7] According to the NYHA classification, Class II heart failure indicates a person with Stage C or D heart failure who experiences slight limitation of physical activity as a result of their heart failure, and may experience fatigue, heart palpitations, shortness of breath or chest pain resulting from ordinary physical activity.[8] The records reflect that Mr. Raji suffers from shortness of breath, chest pain and palpitations which is exacerbated by physical activity, and he has trouble breathing when lying flat. *See* Exhibit B. He stated that while incarcerated he has had

---

[2] Valvular heart disease is when there is damage or disease to any of the heart valves. *See* https://www.cdc.gov/heartdisease/valvular_disease.htm#:~:text=If%20the%20heart%20valves%20are,stops%20beating)%2C%20and%20death

[3] According to the Mayo Clinic, there are four stages of heart valve disease. Relevant to Mr. Raji, stages C and D are both considered "severe" heart valve disease, stage C being severe without symptoms, and stage D being severe with symptoms. *See* https://www.mayoclinic.org/diseases-conditions/mitral-valve-disease/diagnosis-treatment/drc-20355112

[4] Mitral valve regurgitation ("MR") is a type of heart valve disease in which the valve between the left heart chambers does not close completely causing blood to leak backward across the valve. *See* https://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/symptoms-causes/syc-20350178 Severe MR, which Mr. Raji has, "often requires a catheter procedure or heart surgery to repair or replace the mitral valve" and without proper treatment "can cause heart rhythm problems (arrhythmias) or heart failure." *Id*.

[5] Left ventricular hypertrophy ("LVH") is the thickening of the walls of the lower left heart chamber, the heart's main pumping chamber. *See* https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/symptoms-causes/syc-20374314. LVH makes it difficult for the heart to effectively pump blood, and may lead to arrhythmia and heart failure. *Id*. High blood pressure increases the risks of LVH and those with high blood pressure, such as Mr. Raji, will require regular medical checkups. *Id*.

[6] Left atrial enlargement ("LAE") is when one of the heart chambers becomes larger than normal usually as a consequence of high blood pressure, mitral valve disease or other heart diseases. https://my.clevelandclinic.org/health/diseases/23967-left-atrial-enlargement

[7] https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure

[8] *Id*.

2

to prop himself up with "7 to 8 books" at night so that he can breathe effectively while sleeping. *Id*.

In addition to requiring heart surgery, Mr. Raji requires continued treatment, constant monitoring and regimented medication. Given that his medical conditions have not improved, and have actually worsened since he became incarcerated, it is respectfully submitted that a sentence of time served would best serve Mr. Raji's need for adequate continued medical treatment, while at the same time satisfy the public's need for a just sentence.

## Mr. Raji's "Loss Amount" Under 2B1.1 Should be Limited to Actual Loss and not Intended Loss

Second, Mr. Raji respectfully reasserts that the loss amount in his Guidelines calculation should be based on the *actual loss*, not intended loss, in light of similar decisions in other Circuit courts as well as the Eastern District of New York. In our initial submission we relied primarily on the Third Circuit's ruling in *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022), which held that the Guidelines commentary to 2B1.1 directing application of the greater of "actual" or "intended" loss, is invalid because, under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)), the commentary improperly expands the plain meaning of "loss" to include intended loss.

Other Circuits have also refused to expand the Guideline text under *Kisor*. In *United States v. Ricciardi*, 989 F.3d 476, 479-80 (6th Cir. 2021), the Sixth Circuit applied *Kisor* in rejecting § 2B1.1's commentary to calculate loss. There, the defendant stole gift cards valued at $47,000 from the mail. The district court applied § 2B1.1 cmt. n.3(F)(i) which sets a minimum loss amount of $500 for each "unauthorized access device," regardless of actual value. This resulted in a much higher loss amount of $725,500, which required a 14-level enhancement. The Sixth Circuit rejected the enhancement and vacated the sentence, stating that "the commentary's $500 minimum loss amount for gift cards does not fall 'within the zone of [any] ambiguity' in this [G]uideline," as "no reasonable person would define the 'loss' from a stolen gift card as an automatic $500. Rather, the 'amount' of the loss or 'damage' to the victim from a gift-card theft in any case will turn on such fact- dependent things as the value of the gift card or the costs of replacing it." *Ricciardi*, 989 F.3d at 486.

As noted in our initial submission, the Second Circuit has not ruled on the validity of the Guideline commentary regarding the application of intended loss since the Supreme Court's decision in *Kisor*. However, district courts in the Eastern District of New York have recently applied *Kisor* to hold that intended loss cannot be used in calculating a defendant's Guidelines. In *United States v. Beebe*, 21 Cr. 197 (CBA), Judge Amon followed the Sixth Circuit's reasoning in *Ricciardi* in ruling that the court should not "defer to the guidelines commentary" and that "the text of 2B1.1 requires that the guidelines be applied based on actual loss."[9] The court stated that "under Kisor":

---

[9] The sentencing hearing transcript in this matter is not available but the relevant language has been provided by the New York Federal Defenders Office.

> I should only refer to a regulator's interpretation of its own rule where the regulation is genuinely ambiguous and then only where the regulator's interpretation comes within the zone of ambiguity.
>
> Accordingly, rather than reflexively deferring to the commentaries' interpretation of the word loss, I must analyze the word and determine whether intended loss is the reasonable interpretation.
>
> Applying Kisor's instructions to the term loss in 2B1.1, I again agree with the Riccardi court that the word may be ambiguous. As the Sixth Circuit explained, the word might include emotional harms or might include just economic harms or it might cover only the precise value of what is stolen or it might include the costs associating with the replacement. However, the idea that loss means intended loss rather than actual loss, in my view, does not fall within the zone of ambiguity.

*Id.*

Additionally, at an August 24, 2023 sentencing hearing in *United States v. Gary*, 20 Cr. 440 (AMD), Judge Donnelly followed Judge Amon's decision and orally ruled that intended loss cannot be used to calculate the defendant's loss amount.[10] In that case, the PSR calculated the defendant's Guidelines as 51 to 63 months' imprisonment based on the inclusion of an 18-level increase in offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J). The offense involved counterfeit money orders with an alleged value of $4,800,380, which represented an intended loss exceeding $3,500,000 but not greater than $9,500,000. Yet no actual loss had been alleged by the government or Probation. Without the intended loss enhancement, and after further reduction for acceptance of responsibility, the defendant's offense level would have been 7, and his Guidelines would have been 0 – 6 months imprisonment. Judge Donnelly granted the defendant's request (argued pursuant to *Kisor* and related cases), declining to apply the 18-level enhancement for intended loss, and imposed a sentence of time served. *See* 20 Cr. 440 (AMD) (EDNY), Minute Entry for August 24, 2023.

Accordingly, for these reasons and those discussed in our prior submission, as well as the comments to be made at the time of sentencing, it is respectfully submitted that the Court should apply only the *actual loss* of $711,558 in calculating Mr. Raji's Guidelines. Applying the intended loss amount gives improper deference to the Guidelines commentary in violation of the Supreme Court's decision in *United States v. Kisor*.

The Court's time and attention to this matter is greatly appreciated.

Respectfully submitted,<br>
/s/<br>
Jeremy Schneider

---

[10] The sentencing hearing transcript in this matter is not available but the relevant factual information has been provided by the New York Federal Defenders Office.

cc: Robert Sobelman, Catherine Ghosh,
    Jilan Kamal, *Assistant United States Attorneys*
    (by ECF)

Case 1:19-cr-00870-JMF   Document 145   Filed 09/13/23   Page 5 of 5